66

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 4 2001

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. CV-B-00-192 |
| | § | JURY DEMANDED |
| | § | |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## DEFENDANTS COLUMBIA VALLEY HEALTHCARE SYSTEMS, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER AND HCA-THE HEALTHCARE COMPANY'S MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Columbia Valley Healthcare Systems, L.P. d/b/a Valley Regional Medical Center and HCA-The Healthcare Company Valley Regional Medical Center, Defendants in the above entitled and numbered cause, and makes and files this, its Motion to Dismiss and would respectfully show the Court as follows:

I.

Plaintiff filed this case against these Defendants on February 1, 2001. More than 180 days have elapsed and the Plaintiff has not furnished an expert report and a curriculum vitae with opinions about Defendant's conduct nor has the Plaintiff voluntarily non-suited Defendants. These Defendants move the Court to enter an Order under Section 13.01 of Article 4590(i) of the Texas Revised Civil Statutes to dismiss this case with prejudice against these Defendants.

II.

### EVIDENCE

1.     Reports submitted by James C. Garriott, PH.D, Nick Peters, M.D., Dr. Ross, and Jeremy M.Slater, M.D.

2.     Scheduling Order in this case.

DELEON: DISMISS
PAGE 1

CNIPDF - www.fadai.com

III.

## **ARGUMENT**

In the past twenty years, there has been a flood of medical malpractice claims in Texas. The filing of legitimate health care claims is a contributing factor affecting medical professional liability rates. The amounts being paid out by insurers in judgements and settlements have likewise increased inordinately in the same short period of time. This has caused a serious public problem in availability of and affordability of adequate medical professional liability insurance. The situation has created a medical malpractice insurance crises in the state of Texas, which has a material adverse effect on the delivery of medical and health care in Texas, including significant reductions in the availability of medical and health care services to the people of Texas, and a likelihood of further reductions in the future. This crisis has had a substantial impact on the physicians and hospitals of Texas, and the cost to physicians and hospital for adequate medical malpractice insurance has dramatically risen in price, with cost impacts on patients and the public. The crises has increased the cost of medical care both directly through fees and indirectly through additional services provided for protection against future suits or claims; defensive medicine has resulted in increasing cost to patients, private insurers, and the state and has contributed to the general inflation that has marked healthcare in recent years. Because of this, satisfactory insurance coverage for adequate amounts of insurance in this area is often not available at any price. This has caused a serious public problem both with respect to the availability of coverage and to the high rates being charged by insurers for medical professional liability insurance to some physicians, health care providers and hospitals. V.A.T.C. S. art. 4590i; § 1.02 et. seq. Because of these above conditions, the legislature enacted art. 4590i. Id. The purpose of the act is to improve and modify the system by which health care liability claims are determined in order to reduce excessive frequency and severity of health care liability claims, decrease the cost of those claims, and assure awards are

DELEON: DISMISS
PAGE 2

rationally related to actual damages, and do so in a manner that will not unduly restrict a claimant's rights any more than necessary.  Another purpose is to give protection to physicians, hospital and other health care providers protection against potential liability through the insurance mechanism at reasonably affordable rates, and to make medical and health care more accessible and available to the citizens of Texas.  V.A.T.C.S. art. 4590i § 1.02 (b) et.seq.

One of the new conditions imposed by art. 4590i is the requirement that the Plaintiff file an expert report setting out certain information, or file a cash bond.  V.A.T.C.S. art. 4590i § 13.01 et.seq.  Failure to timely submit an expert report with curriculum vitae of the expert that complies with the statute results in sanctions against the Plaintiff, that he voluntarily non-suit the case or a mandatory dismissal by the trial court.  V.A.T.C.S. art. 4590i § 13.01 (d);(e).  This report must be tendered no later than the 180th day after the date on which a health care liability claim is filed.  Id.

The statutory time period has elapsed in this case.  Plaintiff's have not tendered an expert report that complies with the statute, nor have they tendered a cash bond in lieu of the report.  Therefore the mandate of the Texas Legislature requires that this case be dismissed with prejudice.  V.A.T.C.S. art. 4590i § 13.01 (e)

There have been four expert reports filed in this case.  see exhibit 1.  None contain notice identifying the reports submitted as a 4590i expert report.

What is the definition of a 4590i expert report?  An expert report is defined by statute and case authority.  Art. 4590i defines an expert report as...

" a written report by an expert that provides a fair summary of the experts opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the casual relationship between the failure and the injury, harm or damages claimed.  "V.A.T.C.S. art 4590i § 1301 (r)(6).

In order to qualify as a 4590i expert report, the report must include all of the elements listed

in the statute.  American Transitional Care Centers of Texas, Inc. v. Palacios, 46 S.W. 3d 873 (Tex. 2001); Wright v. Bowie Memorial Hospital, 48 S.W. 3d 443 (Tex. App-Forth Worth. 2001) no pet. A report need not Marshall all the Plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute.  In setting out the expert's opinion on each of those elements "the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort.  First, the report must inform the Defendant of the specific conduct the Plaintiff has question. Second and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. [citations omitted] A report that merely states the expert's conclusions about the standard of care, breach and causation does not fulfill these two purposes.  Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. Palacios @ 879

None of the expert reports submitted by the Plaintiff's meet the definition of an expert report as defined under the statute or the Palacios case.  Exhibit 1.   None of the reports set out the appropriate standard of care.  Every report concludes that the standard of care was breached without saying what that standard is.  Each report fails to state how the care failed to meet the standard of care, and the casual relationship between that failure and the injury, harm or damages claimed. V.A.T.C.S. art. 4590i § 13.01 (r)(6).  Not only do the reports not meet the statutory requirements for a 4590i expert report, they fail to meet the Palacios standard.  These reports merely state the experts conclusions about the standard of care, breach and causation.  Palacios clearly states that this is not sufficient to meet the two prong test: 1) The report must inform the Defendant of the specific conduct the Plaintiff has called into questions, and 2) provide a basis for the trial court to conclude that the claims merit.  Palacios @ 879.

Thus, the Plaintiffs have filed to timely submit a 4590i expert report.  Of the reports they have submitted, they have failed to identify or give notice as to which one they claim is their 4590i

DELEON: DISMISS
PAGE 4

expert report.  The deadline under the scheduling order to add experts has passed.  Exhibit 2

Plaintiff's have failed to voluntarily non-suit their case against defendants.  Therefore their case

should be dismissed with prejudice to refile the same.

Although Defendants are entitled to the award of attorneys' fees under 4590i, these

Defendants are not seeking attorney's fees.  All that these Defendants pray is the dismissal of

Plaintiff's case with prejudice to refile the same.

WHEREFORE, PREMISES CONSIDERED, Defendants move the Court to set this motion

for hearing and upon hearing hereof and to dismiss this case with prejudice and for such other and

further relief, at law or in equity, to which these Defendants may show themselves justly entitled to

receive.

Respectfully submitted,

Brin & Brin, P.C.
1325 Palm Boulevard, Suite A
Brownsville, Texas 78520
(956) 544-7110
(956) 544-0607 Telecopier

By: _William Gault_ w/permission
      William Gault   by Jesse Buttery
      Federal I.D. No. 14685
      State Bar No. 07765050

      Jesse R. Buttery
      Federal I.D. No. 27995
      State Bar No. 24025275
ATTORNEYS FOR DEFENDANTS
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER AND
HCA-THE HEALTHCARE COMPANY

DELEON: DISMISS
PAGE 5

# CERTIFICATE OF SERVICE

This is to certify that the above and foregoing instrument has been forwarded to counsel as indicated below on this the ___21___ day of September, 2001.

Ms. Carol Lomax                                    **VIA CM# 7000 1670 0001 2715 9079**
Branton & Hall, P.C.
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, Texas 78205

Mr. Ryan Henry                                     **VIA REGULAR MAIL**
Willette & Guerra, L.L.P.
3505 Boca Chica Boulevard
Brownsville, Texas 78521

Mr. Tyler Scheuerman                               **VIA REGULAR MAIL**
Uzick & Oncken, P.C.
Fountainhead One Building
8200 IH-10 West, Suite 208
San Antonio, Texas 78230

William Gault w/permission
William Gault     by JAB

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| **CANDELARIO DE LEON** | § |
| | § |
| **VS.** | § |
| | § **CIVIL ACTION NO. CV-B-00-192** |
| | § **JURY DEMANDED** |
| | § |
| **CITY OF BROWNSVILLE,** | § |
| **TEXAS, ET AL** | § |
| | § |

## ORDER SETTING HEARING

It is hereby ORDERED by the Court that a hearing on Defendants' Columbia Valley Healthcare

Systems, L.P. d/b/a Valley Regional Medical Center and HCA-The Healthcare Company Valley

Regional Medical Center Motion to Dismiss on file herein, is hereby SCHEDULED for hearing on the

_____ day of _____, 2001, beginning at _____ o'clock ___.m.

SIGNED AND ENTERED, this the _____ day of _____, 2001.


_____
JUDGE PRESIDING


COPIES TO:

Ms. Carol Lomax, Branton & Hall, P.C.,700 N. St. Mary's Street, Suite 1700, San Antonio, Texas 78205
Mr. Ryan Henry, Willette & Guerra, L.L.P., 3505 Boca Chica Boulevard, Brownsville, Texas 78521
Mr. Tyler Scheuerman, Uzick & Oncken, P.C., 8200 IH-10 West, Suite 208, San Antonio, Texas 78230

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| **CANDELARIO DE LEON** | § |
| | § |
| **VS.** | § |
| | § **CIVIL ACTION NO. CV-B-00-192** |
| | § **JURY DEMANDED** |
| | § |
| **CITY OF BROWNSVILLE,** | § |
| **TEXAS, ET AL** | § |
| | § |

## ORDER OF DISMISSAL OF COLUMBIA VALLEY HEALTHCARE SYSTEMS, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER AND HCA-THE HEALTHCARE COMPANY

On this the _____ day of September, 2001 came on to be considered Defendants Columbia Valley Healthcare Systems, L.P. d/b/a Valley Regional Medical Center and HCA - The Healthcare Company's Motion to Dismiss in the above entitled and numbered cause. The Court, having considered the documents on file and argument of counsel, is of the opinion that such Motion should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiff's claims against Defendants Columbia Valley Healthcare Systems, L.P. d/b/a Valley Regional Medical Center and HCA - The Healthcare Company are hereby dismissed with prejudice with Plaintiff to pay court costs for which let execution issue if not paid.

SIGNED AND ENTERED, this the _____ day of September, 2001.


_____
JUDGE PRESIDING


COPIES TO:

Ms. Carol Lomax, Branton & Hall, P.C.,700 N. St. Mary's Street, Suite 1700, San Antonio, Texas 78205
Mr. Ryan Henry, Willette & Guerra, L.L.P., 3505 Boca Chica Boulevard, Brownsville, Texas 78521
Mr. Tyler Scheuerman, Uzick & Oncken, P.C., 8200 IH-10 West, Suite 208, San Antonio, Texas 78230

DELEON: DISMISS
PAGE 8

# JAMES C. GARRIOTT, PH.D., D-ABFT
## TOXICOLOGIST
*16031 Oak Grove*
*San Antonio, Texas 78255*
*(210) 695 9520; FAX (210) 695 9520*

## PRELIMINARY REPORT

June 27, 2001

Carol P. Lomax
Branton & Hall
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, Texas 78205

RE:  Candelario De Leon
     D.O.A.:   December 24, 1998
     File No. 9827

Dear Ms. Lomax:

You have sent to me certain records concerning an accident in which Candelario de Leon was the driver of one of the vehicles involved. You nave asked me to review these records and to provide a toxicology interpretation and opinion regarding alcohol consumption.  I have seen and reviewed the following records:

1-Texas Peace Officer's report of accident of December 24, 1998;
2-Medical records of Columbia valley Regional Medical Center;
3-Medical records of Brownsville Medical Center;
4-City of Brownsville Medical Center;
5-Report of Nick Peters, M.D.;
6-Report of Jeremy Slater, M.D.

According to these records, I understand that Mr. Candelario DeLeon was involved in a motor vehicle collision at approximately 7:35 pm on December 24, 1998.  He was found by paramedics unable to get out of his vehicle and complaining of numbness from the neck down.  He was transported to Columbia Valley Regional Medical Center, where he was treated in the emergency department and then released to police custody at approximately 8:30 pm.  Dr. Dovale Joao noted the patient was "obviously drunk".  After spending the night in jail, he was taken to Brownsville Medical Center emergency department the next day with complaints of back pain, numbness and inability to move his legs.  It has been represented to me that Mr. DeLeon's blood alcohol was 0.08 g/dL.

A blood alcohol level of 0.08 g/dL is consistent with Stage 2 of alcoholic influence/intoxication, which is termed "Euphoria".  At this stage, effects such as mild euphoria, talkativeness, some decreased inhibitions, and some diminution of attention, judgment and control would be expected to be present.  Most individuals do not appear obviously intoxicated at this stage.  To an observer,



EXHIBIT

CAROL LOMAX; RE: CANDELARIO DELEON
June 27, 2001
P. 2

alcohol may be detectable on the breath, and some behavioral signs of alcohol use may occur as stated above. However, many individuals do not exhibit any obvious signs of intoxication until levels reach 0.10 g/dL and greater. The symptoms of intoxication are largely dependent on the individual's tolerance to alcohol as determined by the frequency of drinking.

It is my opinion that, if Mr. DeLeon had only a blood alcohol level of 0.08 g/dL on the evening of December 24, 1998, then this would not have induced symptoms of numbness, instability and immobility, nor any of the symptoms of severe alcohol intoxication. Symptoms of paralysis or loss of sensation in the limbs do not occur with alcohol except at extremely high levels, which may be life-threatening.

Thank you for asking me to review this case. Should additional information become available, I would reserve the right to review this information and to reconsider or modify the above opinions if necessary.

Sincerely yours,

James C. Garriott, Ph.D.

# CURRICULUM VITAE

## JAMES C. GARRIOTT, Ph.D., D-ABFT

**Present Address:**   16031 Oak Grove
San Antonio, TX 78255-1128

**Phone/FAX:**   (210) 695-9520
**E-Mail:**   JCGARRIOTT@satx.rr.com

**Education:**   Louisville Male High School
Louisville, Kentucky
1956 (Graduated)

Hanover College
Hanover, Indiana
1956 - 1958

University of Louisville
Louisville, Kentucky
1958 - 1960 (BA)

Indiana University Medical Center
Indianapolis, Indiana
1963 - 1967 (Ph.D)

**Positions:**   Toxicology Chemist
Indiana University Medical Center
Indianapolis, Indiana
1961 - 1963

Predoctoral Fellow
Indiana University Medical Center
Indianapolis, Indiana
1963 - 1967

Research Associate
Institute für Gerichtliche Medizin
Tübingen, Germany
1967

Postdoctoral Fellow
University of Miami
Institute of Marine Science
Miami, Florida
1967 - 1968

Toxicologist
State of Connecticut
Hartford, Connecticut
1968 - 1970

Chief Toxicologist
Southwestern Institute of Forensic Sciences
Dallas, Texas

1970 - 1982

Instructor in Forensic Sciences
Departments of Pathology and Pharmacology
University of Texas Southwestern Medical
School, Dallas, Texas
1970 - 1976

Consulting Staff
Parkland Memorial Hospital
Dallas, Texas
1972 - February 1982

Consultant
Veterans Administration Hospital
Dallas, Texas
1973 - 1980

Assistant Professor
Forensic Sciences
Departments of Pathology and Pharmacology
University of Texas Southwestern Medical       School,
Dallas, Texas
1976 - 1981

Associate Professor
Forensic Sciences
Departments of Pathology and Pharmacology
University of Texas Southwestern Medical
School, Dallas, Texas
1981 - 1982

Adjunct Faculty (Chemistry)
East Texas State University
Commerce, Texas
1976 - 1980

Chief Toxicologist
Bexar County Forensic Science Center
7337 Louis Pasteur Dr.
San Antonio, Texas 78229
February 1982 - July 1997 (Retired)

Affiliate Member
Medical - Dental Staff
Bexar County Hospital District
San Antonio, Texas
July 1982 - 1998

(Positions continued)

Associate Professor

Departments of Pathology and Pharmacology
University of Texas Health Science Center
San Antonio, Texas
August 1982 - 1996

Professor
Departments of Pathology and Pharmacology
University of Texas Health Science Center
San Antonio, Texas
September, 1996 - 1998

Professor (Adjunct)
Department of Allied Health Sciences
University of Texas Health Science Center
San Antonio, Texas
September 1998 - present

**Society Memberships:**

International Association of Forensic
Toxicologists
American Academy of Forensic Sciences
  1969 Fellow
  1974 Toxicology Section Membership Chairman
  1975 Toxicology Section Program Chairman
  1976 Section Secretary
  1980 - 1981 Toxicology Section Chairman
American Assoc. for the Advancement of
Science
California Association of Toxicologists
American Chemical Society
American Academy of Clinical Toxicology        (Fellow)
Southwestern Association of Toxicologists
  1990 - 91 --President
Society of Toxicology
Society of Forensic Toxicologists
Texas Academy of Sciences

**Certification:**    Diplomate, American Board of Forensic
Toxicology,Inc., 1976
Requalification:
1981, 1985, 1990, 1995, 2000.

**Consulting:**    U.S. Environmental Protection Agency.
Consultant on Toxic Waste, 1980 - 1982

U.S. Dept. of Health and Human Services;
PHS, National Institutes on Drug Abuse,
Contract Review Consultant, 1979, 1982

Center for Human Toxicology - FDA Projects,
Assessment of Propoxyphene, 1978, 1979, 1981,        1985,
1989

College of American Pathologists

Consultant, Toxicology Resource Committee
1982 - 1988
Survey Referee, 1982-1995

North Texas Poison Center
Parkland Memorial Hospital
Dallas, Texas
Board of Consultants
1987 - present

U.S. Department of Transportation, Drug and Alcohol
Compliance Office, consultant in National Laboratory
Certification Program/Direccion General de Proteccion y
Medicina Preventiva en el Transporte, July, 1998

**Editorial Boards:**      Journal of Toxicology, Clinical Toxicology
Marcel Dekker, Inc., Publisher
1982 - 1998

Journal of Analytical Toxicology
Preston Publications
 1977 - 1998

American Journal of Forensic Medicine and Pathology,
Publication of the National Association of Medical
Examiners, Raven    Press, Publisher, 1991 - present

Toxic Substances Journal
John A. Thomas, Editor
Taylor & Francis, Publisher
1993 - 1999

**Committee Member:**      Alamo Area Council of Governments,
Regional Alcoholism and Drug Abuse,
San Antonio, Texas
Advisory Committee,
November 1986 - December 1988

Injury Control Advisory Board
Poison Subcommittee
San Antonio Metropolitan Health Department
San Antonio, Texas
1990 - 1997

Director, American Board of Forensic
Toxicology, Inc., 1980 - 1986

Member, Institutional Safety Committee, subcommittee
for Chemical Safety.
The University of Texas Health Science Center at San
Antonio, San Antonio, TX
Aug. 1994 - 1998

**Awards:**      Alexander O. Gettler Award for Outstanding    Analytical
Achievements in Forensic                        Toxicology.

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 15 of 80

American Academy of Forensic Sciences,  February, 1992.

# BIBLIOGRAPHY

**James C. Garriott**

(Books, chapters in books, invited articles, other miscellaneous material)

1967      James Clark Garriott. "Synthesis and Pharmacologic
          Investigation of Some Cannabinol and
          Tetrahydrocannabinol Analogs", PhD. Thesis, Indiana
          University, Indianapolis, Indiana, June, 1967.

1971      J.C. Garriott and W.Q. Sturner.  Fatal Ethchlorvynol
          Intoxication, Bull. Int. Assoc. Forensic Tox.,
          8(1):4, 1971.

          J.C. Garriott and W.Q. Sturner.  Chlordiazepoxide
          (Librium) Intoxication, Bull. Int. Assoc. Forensic
          Tox., 8(2):8, 1971.

          Amphetamine (or methamphetamine, phenylpropanolamine        and
related drugs) Type B Procedure in CRC Manual of
          Analytical Toxicology, Ed. Irving Sunshine, The
          Chemical Rubber Co., Cleveland, OH, pp. 20-23, 1971.

          Cannabis, Nicotine and Alcohol Compared.  (Letter to
          Editor) NEJM, 285(14):806-807, 1971.

          Toxicology - Choice of Specimens, Drug Distribution and
          Metabolism, Forensic Science Gazette, 2(3):1-3, (1971).

1972      Drug and Chemical Deaths - Dallas County, Forensic Sci.
          Gazette, 3(1):3-4, 1972.

1973      Drug and Chemical Deaths - Dallas County, Forensic Sci.
          Gazette, 5(5):9-10, 1973.

1974      Caffeine Concentrations in Blood of Subjects after
          Consumption of Coffee, Coca Cola or Caffeine, Forensic
          Science Gazette, 5(3):2, 1974.

          Therapeutic and Toxic Concentrations of Common Drugs
          and Poisons, Forensic Science Gazette, 5(3):3-4, 1974.

          The Expert Witness from the Laboratory - Scientist or
          Accuser, (Editorial) Forensic Science Gazette,
          5(4):2-3, 1974.

1975 Diazepam - Type B Procedure, CRC Methodology for
          Analytical Toxicology, Ed. Irving Sunshine, The
          Chemical Rubber Co. Press, Cleveland, OH, 1975, pp.
          119-123.

Choice of Specimens for Toxicology Testing, Forensic  Sci.
Gazette, 6(2):4-7, 1975.

Caffeine - Type C Procedure, CRC Methodology for
Analytical Toxicology, Ed. Irving Sunshine, The
Chemical Rubber Co. Press, pp. 58-60, Cleveland,
OH.1975.

Diazepam in Blood after Therapeutic Administration,
Forensic Sci. Gazette, 6(1):2-3, 1975.

1977 Garriott, J.C.  Drugs Plus Alcohol - A Lethal
Combination, The Dallas Medical Journal, 63(1):17-20,
1977.

1979 Lowry, W.T. and Garriott, J.C.  Forensic Toxicology:
Controlled Substances and Dangerous Drugs.  Plenum
Press: NY, 1979.

Garriott J.C. and Ruff, R.M.  Phencyclidine Detection  in Medical
Examiner Autopsies, Forensic Science  Gazette, 10(4):1, 1979.

Daniel, D. and Garriott, J.C.  Phencyclidine Detection
in Two Clinical Intoxication Cases, For. Sci. Gazette,
10(4):1-2, 1979.

Garriott, J.C., Juarez, L., Foerster, E. and Curoe, J.
Toluene Detection in Cases of Inhalant Abuse, Forensic
Science Gazette, 10(4):2-3, 1979.

1980 Curran, McGarry and Petty, eds., "Forensic Toxicology:
General Considerations", Chapter in Modern Legal
Medicine, Psychiatry and Forensic Medicine.  F.A. Davis
Co., Philadelphia, 1980, pp. 1051-1056.

McAnalley, B.H., Gardiner, T.J. and Garriott, J.C.
Cyanide Concentrations in Blood after Amygdalin
(Laetrile) Administration in Rats, Vet. and Hum.
Toxicol., 22(6):400-402, 1980.

DiMaio, V.J.M. and Garriott, J.C.  A Fatal Case of Lead
Poisoning Due to a Retained Bullet, Vet. and Human
Toxicol., 22(6):390-391, 1980.

1982    Garriott, J.C.  "Forensic Toxicology", Chapter in  Survey of
Contemporary Toxicology, Volume 2, John Wiley & Sons, New York,
1982, pp. 82-122.

1983    Garriott, J.C.  Interpretive Toxicology, in Clinics in
Laboratory Medicine, 3(2):367-384, W.B. Saunders,
Phil., PA, June 1983.

Garriott, J.C.  Forensic Aspects of Ethyl Alcohol,
Clinics in Laboratory Medicine, 3(2):385-396, W.B. Saunders,
Phil, PA, June 1983.

1985        DiMaio, V.J.M. and Garriott, J.C.  How Valid is the            0.10
Percent Alcohol Level as an Indicator of      Intoxication?  Pathologist, 39
(3):31-33, March 1985.

1986        Garriott, J.C.  Drug Analysis in Postmortem Toxicology,
            Chapter in Ultratrace Analysis of Pharmaceuticals and
            Other Compounds of Interest.  S. Ahuja, ed., John Wiley
            & Sons, Inc., New York, pp. 353-376, July 1986.

            Sedgwick, P. and Garriott, J.C.  Medical Staff Drug
            Abuse, A Case History, News and Views, A Forum for
            Forensic Toxicologists, 11:1, July 1986.

1987        Rodriguez, R., Garriott, J.C. and Bousser, J.E.  A            Urine
Screening Procedure for the Detection of 11-nor-       9-carboxy-delta-9-
THC by HPTLC and GC/MS, Southwestern
            Association of Forensic Scientists, 9(1):21-27.

1988        Garriott, J.C., editor and chapters author, Medicolegal Aspects
            of Alcohol Determination in Biological Specimens.  PSG Publishing
            Co., Inc., Littleton, Mass, 1988.

            Garriott, J.C., Rodriguez, R. and Castorena, J.L.
            Cocaine Metabolites after Ingestion of "Health Inca
            Tea", J. Southwestern Association of Forensic
            Scientists, 10(2):19-20, 1988.

1992        Garriott, J.C. Death Among Inhalant Abusers, In
            Inhalant Abuse: A Volatile Research Agenda, Charles
            Sharp, Fred Beauvais, and Richard Spence, eds., NIDA
            Research Monograph 129, U.S. Dept. of Health and Human
            Services, Public Health Service, National Institutes of
            Drug Abuse, Rockville, MD, 1992.

1993        Garriott, J.C., editor, Medicolegal Aspects of Alcohol
            Determination in Biological Specimens, 2nd ed. Lawyers and Judges
            Publishing Co., Tucson, AZ, 1993.

1994        Garriott, J.C.  Forensic Toxicology for the General
            Pathologist, in Advances in Pathology and Laboratory
            Medicine, vol. 7, 1994, Mosby-Year Book, Inc., pp. 313-      358.

1996        Garriott, J.C., editor, Medicolegal Aspects of Alcohol, 3rd ed.
            Lawyers and Judges Publishing Co., Tucson, AZ, July, 1996.

1997        Kurt, T., Foerster, E., and Garriott, J.C. Interpretation and
            Extrapolation of Blood Alcohol Results, MRO Update, October 1997
            issue, pp 1-4.

1999        Garriott, J.C. Alcohol Testing, Chapter 39. In Modern Scientific
            Evidence,  Suppl. Vol. 3, by D. Faigman, D. Kaye, M. Saks, and J.
            Sanders, West Group; St. Paul MN, 1999.

CSMPDF - www.fastio.com

**Investigative Reports Published in Journals with Editorial Review**
**James C. Garriott**

1967        Garriott, J.C., Richards, A.B., Hughes, F.W. and
            Forney, R.B.  Acute Ethanol Toxicity in the Dog,
            J. Forensic Sciences, 12(1):8-18, 1967.

            Garriott, J.C., King, L.J., Forney, R.B. and Hughes,        F.W.
Effects of Some Tetrahydrocannabinols on
            Hexobarbital Sleeping Time and Amphetamine Induced
            Hyperactivity, Life Sciences, 6:2119-2128, 1967.

1968        Garriott, J.C., Forney, R.B. and Hughes, F.W.
            Pharmacologic Properties of Some Tetrahydrocannabinol        and
Cannabinol Derivatives, Arch. Int. Pharmacodyn.
            Therap., 171(2):425-434, 1968.

1969        Garriott, J.C. and Lane, C.E.  Some Autonomic Effects
            of Physalia Toxin, TOXICON, 6:281-286, 1969.

1971        Garriott, J.C. and Stolman, A.  Detection of Some
            Psychotherapeutic Drugs and Their Metabolites in Urine.
            Clinical Toxicology, 4(2):225-243, 1971.

1972        Sturner, W.Q. and Garriott, J.C.  L-Dopa Poisoning,
            J. Forensic Sci., 17(3):440-443, 1972.

1973        Sturner, W.Q. and Garriott, J.C.  Deaths Involving
            Propoxyphene:  A Study of 41 Cases over a Two-Year
            Period.  JAMA, 223(10):1125-1130, 1973.

            Garriott, J.C., Sturner, W.Q. and Mason, M.F.
            Toxicologic Findings in Six Fatalities Involving
            Methadone, Clin. Tox., 6(2):163-173, 1973.

            Garriott, J.C. and Spruill, F.G.  Detection of
            Methamphetamine in a Newborn Infant, J. Forensic Sci.,
            18(4):434-436, 1973.

            Garriott, J.C. and Sturner, W.Q.  Morphine
            Concentrations and Survival Periods in Acute Heroin
            Fatalities, NEJM, 289:1276-1278, December, 1973.

1974        DiMaio, V.J.M. and Garriott, J.C.  Lethal Caffeine
            Poisoning in a Child, Forensic Science, 3:275-278,
            1974.

DiMaio, V.J.M. and Garriott, J.C.  A Fatal Overdose of Paraldehyde During Treatment of a Case of Delirium Tremens, Journal of Forensic Science, 19(4):755-758, 1974.

Sturner, W.Q., Spruill, F.G. and Garriott, J.C.  Two Propylhexedrine Associated Fatalities:  Benzedrine[R] Revisited, Journal of Forensic Science, 19:572-574,    1974.

1975   DiMaio, V.J.M., Garriott, J.C. and Putman, R.  Digoxin Concentrations in Postmortem Specimens after Overdose and Therapeutic Use.  Journal of Forensic Science, 20(2):340-347, 1975.

Garriott, J.C.  Propylhexedrine - A Dangerous Drug, Clin. Toxicol. 8:665, 1975.

Sturner, W.Q. and Garriott, J.C.  Comparative Toxicology in Vitreous Humor and Blood, Forensic Science, 6:31-39, 1975.

Sturner, W.Q. and Garriott, J.C.  Comparative Toxicology in Vitreous Humor and Blood, Can. Soc. Forens. Sci. J., 8:(4):126-131, 1975.

Lowry, W.T. and Garriott, J.C.  On the Legality of Cannabis:  The Responsibility of the Expert Witness. Journal of Forensic Science, 20(4):624-628, 1975.

1976   Garriott, J.C. and Latman, N.  Drug Detection in Cases of "Driving Under the Influence", Journal of Forensic Sci., 21(2):398-415, 1976.

1977   Garriott, J.C., DiMaio, V.J.M., Zumwalt, R.E. and Petty, C.S.  Incidence of Drugs and Alcohol in Fatally Injured Motor Vehicle Drivers, Journal of Forensic Sci., 22(2):383-389, 1977.

DiMaio, V.J.M. and Garriott, J.C.  Intravenous Abuse of Propylhexedrine, J. of Forensic Sci., 22(1):252, 1977.

Lundberg, G.D., Garriott, J.C., Reynolds, P.C., Cravey, R.H. and Shaw, R.F.  Cocaine Related Death, J. of For. Sci., 22(2):402-408, 1977.

1978   DiMaio, V.J.M. and Garriott, J.C.  Four Deaths Resulting from Abuse of Nitrous Oxide, Journal of For. Sci., 23(1):169-172, 1978.

Foerster, E., Hatchett, D. and Garriott, J.C.  A Rapid, Comprehensive Screening Procedure for Basic Drugs in Blood or Tissues by Gas Chromatography, J. Anal. Tox., 2(2):50-55, 1978.

McCloskey, K.L., Garriott, J.C. and Roberts, S.M.
Quinine Concentrations in Blood Following the
Consumption of Gin Tonic Preparations in a Social
Setting, J. Anal. Toxicol., 2:110-112, 1978.

1979    DiMaio, V.J.M. and Garriott, J.C.  Four Deaths due to
Intravenous Injection of Cocaine, Forensic Science,
12(2):119-125, 1979.

Blaw, M.E., Adkisson, M.A., Levin, D., Garriott, J.C.
and Tindall, R.S.A.  Poisoning with Caroline Jessamine,
J. of Pediatrics, 94(6):998-1001, 1979.

Levin, D.L., Mills, L.J., Parkey, J., Garriott, J.C.
and Campell, W.  Constriction of the Fetal Ductus
Arteriosus after Administration of Indomethacin to the
Pregnant Ewe, J. of Pediatrics, 94(4):647-650, 1979.

Foerster, E.H., Dempsey, J. and Garriott, J.C.  A Gas
Chromatographic Screening Procedure for Acid and Neutral Drugs in
Blood, J. Anal. Tox., 3(3):87-91, 1979.

Oliver, R.D. and Garriott, J.C..  The Effects of Acetone and
Toluene on Breathanalyzer Results, J. Anal. Tox., 3(3):99-101,
1979.

McAnalley, B.H., Lowry, W.T., Oliver, R.D. and
Garriott, J.C.  Determination of Inorganic Sulfide and
Cyanide in Blood Using Specific Ion Electrodes:
Application to the Investigation of Hydrogen Cyanide
and Sulfide Poisoning, J. Anal. Tox., 3(3):111-114,
1979.

Horne, M.K., Waterman, M.R., Simon, L.M., Garriott,
J.C. and Foerster, E.H.  Methemoglobinemia from
Sniffing Butyl Nitrite, Ann. Int. Med., 9(3):417-8,
1979.

Lowry, W.T., Lomonte, J.M., Hatchett, D. and
Garriott, J.C.  Identification of Two Novel Cocaine
Metabolites in Bile by Gas Chromatography/Mass
Spectrometry in a Case of Acute Intravenous Overdose,
J. Anal. Tox, 3(3):91-95, 1979.

Anderson, R.J., Garza, H.R., Garriott, J.C. and
DiMaio, V.J.M.  Intravenous Propylhexedrine
(Benzedrex[R]) Abuse and Sudden Death, Amer. J. Med.,
67:15-20, 1979.

1980    Garriott, J.C. and Petty, C.S.  Death from Inhalant
Abuse:  Toxicological and Pathological Evaluation of 34
Cases, Clin. Tox., 16(3):305-315, 1980.

Yadlowski, J., Tu, A.T., Garriott, J.C. and Norton,
L.E. Investigation of a Case of Suicide by Snake Venom

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 21 of 80

Injection, J. of Forensic Sci., 25(4), October 1980.

Latman, N.S. and Garriott, J.C.  An Analysis of
Biorhythms and their Influence on Motor Vehicle
Fatalities. Acid. Anal. & Prev., 12:383-386, 1980.

Ellman BA, Green CE, Eigenbrodt,E, Garriott,
JC,Curry,TS.Renal infarction with absolute ethanol.
Invest Radiol, 1980, 15:318-322.

1981    Horadam, V.W., Sharp, J.G., Smilack, J.D., McAnalley,
B.H., Garriott, J.C., Stephens, M.K., Prati, R.C.,
Brater, D.C.  Pharmacokinetics of Amantadine
Hydrochloride in Subjects With Normal and Impaired
Renal Function, Ann. Int. Med., 94 (Part I):454-458,
1981.

Daniel, D.R., McAnalley, B.H. and Garriott, J.C.
Isopropyl Alcohol Metabolism after Acute Intoxication        in
Humans, Anal. Tox., 5(3):110-112, 1981.

Finkle, B.S., Ph.D., Caplan, Y.H., Ph.D., Garriott,
J.C., Ph.D., Monforte, J.R., Ph.D., Shaw, R.F., B.S.
and Sonsalla, P.K., M.S.  Propoxyphene in Postmortem
Toxicology 1976-1978, Journal of Forensic Sciences,
26(4):739-757, 1981.

Garriott, J.C., Foerster, E., Juarez, L., DeLaGarza,
F., Mendiola, I., Korman, M. and Curoe, J.  Measurement
of Toluene in Blood and Breath in Case of Solvent
Abuse, Clin. Tox., 18(4):471-9, 1981.

Foerster, E.H. and Garriott, J.C.  Analysis for
Volatile Compounds in Biological Samples, Journal of
Analytical Toxicology, 5:241-244, 1981.

1982    Norton, L.E., Garriott, J.C. and DiMaio, V.J.M.  Drug
Detection at Autopsy:  A Prospective Study of 247 Cases, Journal
of Forensic Sciences, 27(1):66-71, 1982.

Garriott, J.C., DiMaio, V.J.M., Petty, C.S.  Death by
Poisoning: A Ten-Year Survey of Dallas County, Journal
of Forensic Sciences, 27(4), Oct. 1982.

Kurt, T.L., McAnalley, B.H., and Garriott, J.C.  Lead
Encephalopathy from Gasoline Sniffing:  Successful
Treatment with Chelation, Texas Medicine, 78:52-54,
1982.

Anderson, R.J., Reed, W.G., Hillis, L.D., Morgan, C.D.
and Garriott, J.C.  History, Epidemiology, and Medical
Complications of Nasal Inhaler Abuse, Journal of
Toxicology-Clinical Toxicology, 19(1):95-108, 1982.

1983    Garriott, J.C. and DiMaio, V.J.M.  Death in the Dental
Chair:  Three Drug Fatalities in Dental Patients,

Journal of Toxicology-Clinical Toxicology, 9(9):987-995, 1983.

Norton, L.E. and Garriott, J.C.  Detection of Marihuana Use by GC/MS Analysis of Mouth Swabs, The American Journal of Forensic Medicine and Pathology, 4(2), June 1983.

DiMaio, V.J.M., DiMaio, S.M., Garriott, J.C., Simpson, P.  A Fatal Case of Lead Poisoning due to a Retained Bullet, The Amer. J. of For. Med. and Path., 4(2):165, 1983.

Nielsen, H.C., Wiriyathian, S., Rosenfeld, R., Leveno, K., Garriott, J.C.  Chlorpromazine Excretion by the Neonate Following Chronic In Utero Exposure, Pediatric Pharmacol, 3(1):1-5, 1983.

1984    Lewis, Gail D., Alan K. Laufman, J.D., M.D., McAnalley, Bill H., Ph.D., and Garriott, James C., Ph.D. Metabolism of Acetone to Isopropyl Alcohol in Rats and Humans, J. of For. Sci., 29(2):541-549, April 1984.

Garriott, James C., Rodriguez, Robert and DiMaio, Vincent J.M. A Death from Fentanyl Overdose, J. of Anal. Tox., Vol. 8, Nov/Dec 1984.

Garriott, James C. Ph.D., Rodriguez, Robert, B.S., Norton, Linda, M.D.  Two Cases of Death Involving Dicyclomine in Infants - Measurement of Therapeutic and Toxic Concentrations in Blood, Clin. Tox., 22(5):455-462, 1984.

1985    Garriott, James C., and Simmons, Lisa M., B.S.  Five Cases of Fatal Overdose from Caffeine-Containing "Look-Alike" Drugs, J. of Anal. Toxicol. Vol. 9, May/June 1985.

Watson, William A., Garrelts, J.C., Zinn, Philip D., Garriott, J.C., McLemore, T.L., and Clementi, W. A. Chronic Acetazolamide Intoxication, J. Toxicol. Clin. Tox., 22(6):549-563 1985.

1986    Watson, William A., Godley, Paul J., Garriott, James C., Bradberry, J. Chris and Puckett, Jan D.  Blood Phenobarbital Concentrations during Thiopental Therapy, Drug Intelligence and Clin. Pharmacy, 20:283-286, 1986.

Garriott, James C., Ph.D., DiMaio, Vincent J.M., M.D. and Rodriguez, Robert, B.S.  Detection of Cannabinoids     in Homicide Victims and Motor Vehicle Fatalities, J. of For. Sci, 31(4):1274-1282, Oct. 1986.

1987    Castorena, J.L., Garriott, J.C., Barnhardt, F.E. and Shaw, R.F.  A Fatal Poisoning from Nicotiana Glauca,

J. Toxicol. Clin. Toxicol., 25:429-435, 198..

1988    Meatherall, R.C. and Garriott, J.C.  A Sensitive Thin-Layer
        Chromatographic Procedure for the Detection of
        Urinary 11-nor-delta-9-tetrahydrocannabinol-9-carboxylic acid, J.
        Anal. Tox., 12:136-140, 1988.

1989    Watson, William A., Leighton, Johnathon, Guy, Jill,
        Bergman, Randy and Garriott, James.  Recovery of Cyclic
        Anti-Depressants with Gastric Lavage, The J. of Emerg.
        Med., 7:373-377, 1989.

        Klein-Schwartz, W., Gorman, R.L., Oderda, G.M.,
        Massaro, B.D., Kurt, T.L. and Garriott, J.C.  Three
        Fatal Sodium Azide Poisonings, Med. Toxicol. Adverse
        Drug Exp., 4:219-227, 1989.

1990    Chen, N.W., Cody, J.T., Foltz, R., Garriott, J.C., and
        Peat, M.A.  Report of 1988 Ad Hoc Committee on Forensic
        GC/MS:  Recommended Guidelines, J. Forensic Sci.,
        35(2):236-242, 1990.

1991    Garriott, James C.  Skeletal Muscle as an Alternative
        Specimen for Alcohol and Drug Analysis, Symposium
        Honoring Charles S. Petty.  J. Forens. Sci., 6(1):60-
        69, 1991.

        Schwartz, J.G., Somerset, J.S., Harrison, J.M.,
        Garriott, and Castorena, J.L. Eye Injuries With Metal
        Missiles Presenting to an Emergency Center: A Three          Year
Study. American Journal of Emergency Medicine,
        9(4):313-317, 1991.

        Joe, George W., Garriott, James C., and Simpson, D.
        Dwayne. Physical Symptoms and Psychological Distress
        Among Inhalant Users. Hispanic Journal of Behavioral
        Sciences, 13(3):297-314, 1991.

1992    Watson, W.A. and Garriott, J.C. Alcohol and Motorcycle
        Riders: A comparison of Motorcycle and Car/Truck
        DWI's. Vet. Hum. Toxicol. 34(3): 213-215 (1992).

1993    Zivot, U., Castorena, J.L., and Garriott, J.C. A Case of Fatal
        Ingestion of Malathion. Am. J. Forens. Med.
        Pathol. 14(1):51-53 (1993)

        Garriott, J.C. Drug Use Among Homicide Victims.
        Changing Patterns.  Am. J. Forens. Med. Pathol. 14
        (3):234-237 (1993)

1994    Schwartz, J.G., Garriott, J.C., Somerset, J.S., Igler, E.J.,
        Rodriguez, R.R., and Orr, M.D.  Measurements of Fentanyl and
        Sufentanil in Blood and Urine after Surgical Application;
        Implication in Detection of Abuse, Am. J. Forens., Med. Pathol.
        15(3):236-241 (1994)

CVAPDF - www.texlu.com

1998        Hagan, L.L., Goetz, D.W., Revercomb, C.H., and Garriott, J.C.
            Sudden Infant Death Syndrome: a search for allergen
            hypersensitivity. Ann. Allergy, Asthma, & Immunology 80:227-231
            (1998)


## ABSTRACTS

1965        Garriott, J.C., Forney, R.B., Hughes, F.W. and
            Richards, A.B.  Acute Ethanol Toxicity in Dogs,    Toxicol.and
Applied Pharmacol., 7(3) (Abstract).

            Garriott, J.C., Forney, R.B., Hughes, F.W. and
            Richards, Effects of Acute Ethanol Intoxication in the
            Dog, Proceedings of the Fourth International Conference
            on Alcohol and Road Traffic at Bloomington, Dec. 1965.

1968        Garriott, J.C. and Lane, C.E.  Some Effects of <u>Physalia</u>
            Toxin on the Cardiovascular System of the Rat.
            Federation Proceedings, 27(2), March-April 1968.

1974        Petty, C.S., Stone, I.C., Hutson, T.A., Garriott, J.C.
            FLAME:  Computer Communications Among Procedures of
            Forensic Sciences, Dallas, TX, Feb. 1974.

1975        Sturner, W.Q., Garriott, J.C. and Bushee, R.  The
            Comparison of Antemortem and Postmortem Specimens in
            Road Accident Fatalities.  Presented at the Vth
            International Conference of the International
            Association for Accident and Traffic Medicine, and the
            3rd International Conference on Drug Abuse of the
            International Conference on Alcohol and Addictions,
            London, Sept. 4, 1975.

            Garriott, James C.  Driving Under the Influence of
            Drugs - Toxicologic and Case Findings in an 18-month
            Study.  Presented at the Vth International Conference
            of the International Association for Accident and
            Traffic Medicine and the 3rd International Conference
            on Drug Abuse of the International Council on Alcohol
            and Addition, London, England, September 4, 1975.

            Garriott, J.C. and Sturner, W.Q.  Comparative
            Toxicology in Vitreous Humor and Blood.  Presented at
            the Seventh International Meeting of Forensic Sciences,
            Zurich, Switzerland, Sept. 10, 1975.

1979        Gardiner, T.J., McAnalley, B.H., Garriott, J.C. and
            Lowry, W.T.  Analysis of Blood Cyanide Levels after
            Amygdalin Administration in Rats, Fed. Proc., #2381,
            Vol. 38, 1979.

1981        Lewis, G.D., Laufman, A.K., Garriott, J.C. and

CMsPDF - www.fesira.com

McAnalley, B.H. (Abstr)  Metabolism of Acetone to
Isopropyl Alcohol in Rats and Humans.  Fed. Proc.,
March 1981.

Garriott, J.C.  Biological Monitoring of Volatile
Substances.  Presented at the American Industrial
Hygiene Conference, May 24-29, 1981, Portland, OR

1982    Rodriguez, R., Simmons, L., Castorena, J. and
        Garriott, J.C.  A Comprehensive Procedure for Narcotics
        in Blood and Tissue, presented at Southwestern Assoc.    of
Toxicologists meeting, Nov. 13, 1982, Austin, TX.

1984    Watson, W.A., Garrelts, J.C., Zinn, P., Garriott, J.C.,
        Clementi, W.A.  Chronic Acetazolamide Intoxication.
        (Abstr)  American College of Clinical Pharmacy,
        5th Annual Meeting, San Diego, CA, June 26-29, 1984.

        Garriott, J.C., Simmons, L and Poklis, A.  Three Cases
        of Death from "Look-Alike" Stimulant Medications,
        presented at Southwestern Association of Toxicologists,
        Inc. and Society of Forensic Toxicologist, Inc. Joint
        Meeting, St. Louis, MO, Oct. 9-12, 1984.

1985    Watson, W.A., Garriott, J.C. and Godley, P.  Two Cases
        of Elevated Pentobarbital Concentration during Thiopental
        Infusion.  Southwestern Association of Toxicologists, Inc.,
        Shreveport, LA, May 10, 1975.

        Castorena, Joe L., Garriott, J.C. and Shaw, R.  A Fatal
        Poisoning by Nicotiana Glauca, Southwestern Association    of
Toxicologists, Inc., Shreveport, LA, May 11, 1985.

        Watson, W.A., Leighton, G.J., Garriott, J.C. and
        Bergman, R.N.  Lavage Fluid Volume and Drug Recovery in    Anti-
depressant Overdoses, 1985/AACT/AAPCC/ABMT/CAPCC
        Annual Scientific Meeting, Kansas City, MO, Aug. 4-9,
        1985.

1986    DiMaio, V.J.M. and Garriott, J.C.  "Experiences with
        Detection of Cannabinoids in Motor Vehicle Accident and
        Homicide Victims", American Academy of Forensic Sciences, New
        Orleans, LA, Feb. 15, 1986.

1987    Watson, W.A., Barlow, J., Johnson, G., Hibit, J. and
        Garriott, J.C.  Pentobarbital Blood Concentrations          after
Induction of Anesthesia with Thiopental,            presented at the
Spring Meeting of the American Society        for Clinical Pharmacology and
Therapeutics, Orlando,        FL, 1987.

1988    Garriott, J.C., Rodriguez, R.G. and Castorena, J.L.
        "Cocaine Metabolites in Urine and Blood after Ingestion
        of Herb Inca Tea", Spring Meeting of the Southwestern
        Association of Toxicologists, Baton Rouge, LA,
        April 29, 1988.

1989        Garriott, J.C.   Choice of Specimens in Evaluation of
            Postmortem Alcohol, presented at the 41st Annual        Meeting of
the American Academy of Forensic Sciences,        Las Vegas, NV, Feb. 17,
1989.

            Garriott, J.C.  Detection of Heroin Metabolites, Cocaine and Two
            Metabolites in Blood and Vitreous Humor
            at Autopsy, Presented at the 41st Annual Meeting of the
            American Academy of Forensic Sciences, Las Vegas, NV,
            Feb. 17, 1989.

1992        Garriott, J.C.  Forensic Toxicology Aspects of Inhalant Abuse,
            Presented at the fall meeting of the Southwestern Association of
            Toxicologists, San Angelo, TX, Nov. 14, 1992.

1993        "Traffic Safety by Drug Recognition Evaluation?", Symposium
            Drogenkontrolle in der heutigen Gesellschaft, Forensische Chemie,
            Deustsche Gesellschaft für Toxicologie, Neckarelz-Mosbach,
            Germany, 17 April, 1993.

            "Toxicology of Opiates and Cocaine in Blood, Vitreous Humor,
            Urine and Hair", Presented at the National Association of Medical
            Examiners/AAFS 46th Annual Meeting, San Antonio, TX, Feb. 14-19,
            1994

            "The Pharmacological Basis of DRE", presented at the Southwestern
            Association of Toxicologists Fall Meeting, San Angelo, TX Nov.
            13, 1999.

## WORKSHOPS AND INVITED LECTURES

ASCP Medical Technology Training Institute, University of Texas
Health Science Center at Dallas, Dallas, TX, June 5-7, 1972,
(Faculty).

ASCP Med. Tech. Symposium - Section Director, Toxicology,
April 16-17, 1974.

ASCP: Chicago, September, 1974 - "Interpretative Toxicology",
(Faculty).

Invited to consult and participate in symposium "Drug Involved
Death Conference", NIMH Project, University of California at
Irvine, CA, Nov. 1974.

Invited speaker, California Association of Toxicologists -
November, 1974, San Diego - DUID (Driving under the influence of
drugs).

Invited speaker, Institute of Clinical Toxicologists - December,
1974, "Quality Control in the Toxicology Laboratory".

ASCP: Washington, March, 1975 - "Interpretive Toxicology"
(Faculty).

CAP Forensic Pathology Seminar, Washington, D.C., April 3-5, 1975, Faculty, (Lecturer).

Invited Lecturer: Pittsburgh Spectroscopic Conference, April, 1975, Cleveland, "Interpretive Toxicology".

Invited Seminar Speaker: University of Texas Health Science Center at San Antonio, Pharmacology Dept., June 27, 1975.

ASCP: Medical Technologists Workshop - Baylor Hospital, Dallas, Texas, August, 1975, "Toxicology and Pharmacology of Narcotics and Alcohol".

ASCP: 1976 Spring Meeting, Dallas, Texas, March 22. Workshop, "A Day In The Crime Laboratory", Charles S. Petty, Director, Southwestern Institute of Forensic Sciences. Faculty.

ASCP: Chicago, January 1976 - "Role of Toxicology in Death Investigations", (Faculty).

ASCP: Spring Meeting, Dallas, TX, March 19-25, 1976, Tucson, January, 1977, "Decision-Making in Forensic Toxicology", (Faculty).

American Society of Clinical Pharmacology and Therapeutics, 78th Annual Meeting, "Application of GC/MS to Misadventures", March 24, 1977, Dallas, TX.

Centro Mexicano de Estudios en Farmacodependencia - Annual Meeting in Mexico City, Invited Speaker, August, 1977, "The Hallucinogens; Chemistry; Pharmacology and Analysis".

Drugs and Driving Workshop, Dept. of Transportation - Highway Safety Research Institute, University of Michigan, March 5-7, 1978, Invited Participant.

ASCP: Chicago, April, 1978, Basic Forensic Pathology II; Workshop (Faculty), "Toxicology and Pharmacology of Alcohols".

Traffic Institute, Northwestern University, Homicide and Major Crime Scene Investigation course, August 16, 1978, Dallas, TX, Invited Lecturer.

Alaska Dept. of Public Safety, Anchorage, AK, Death Investigation Seminar, Lecturer, September, 1978.

NIDA, March 22, 1979 (National Institute on Drug Abuse) Symposium on Inhalants Abuse (Invited Participant).

ASCP: Advanced Forensic Pathology Workshop, April 10, 1979, "Advanced Toxicology Techniques and Interpretation", Dallas, TX.

ASMT: Workshop, June 20, 1979, Las Vegas, NV, Invited Lecturer, "Radio-immunoassay in Toxicology".

ASCP: Basic Forensic Pathology, Salt Lake City, September 27, 1979, "Forensic Toxicology" (Faculty).

CNsPDF - www.fesisa.com

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 28 of 80

National Institutes on Drug Abuse (NIDA): Technical Review on Inhalant
Abuse, March 22, 1979, Bethesda, MD. Participant)

Texas Safety Association (American Association of Industrial
Hygienists), March 18, 1979, Dallas, TX, Invited Lecturer,
"Toxic Effects of Heavy Metals".

AOAC: Workshop, St. Louis, April 4, 1980, Invited Lecturer, "Gas
Chromatographic Analysis for Basic Drugs".

American Lung Association: Current Issues in Occupational Health, June 7,
1980, Dallas, TX, Invited Lecturer, "Toxic Effects of Industrial Agent
Combinations".

International Association for Accident and Traffic Medicine,
II International Seminar, March 23-27, Toluca, Mexico, "Drug and Alcohol
Involvement in Traffic Accidents and Fatalities", Invited Lecturer.

Texas Section AACC, Arlington, TX, April 11, 1981, Invited Speaker and
Session Chairperson, "Vapor-Phase Analysis of Toluene in Blood and Breath
Samples".

ASCP: Charleston, SC, April 14, 1981, (Faculty), "Toxicology-Pertaining to
Comprehensive Death Investigation".

ASCP: Key West, FL, May 25, 1982, (Faculty), Advanced Forensic Pathology
Seminar, Interpretative Toxicology.

University of Texas Health Science Center at Dallas, Pathology Dept.,
Automobile Crash Seminar, Oct. 2, 1982, Dallas, TX (Faculty).

New Orleans Chromatography Analytical Discussion Group, 13 Annual
Symposium, May 13-14, 1982, Featured Speaker.

NOSOTROS - Worden School of Social Services, Invited Lecturer on "Medical
Aspects of Inhalants", Feb. 22, 1983, San Antonio, TX.

Seminario Nacional Sobre Identificacion de Drogas de Abuso,
Sponsored by the Attorney Generals of the Mexican Republic and the Federal
District, Mexico City, Mexico, Invited Lecturer on Abuse Drugs
Identification - Hallucinogens and Amphetamines, March 14 and 15, 1983.

Current Concepts in Analytical, Clinical and Forensic Toxicology, Course
sponsored by Dept. of Pathology, University of Texas Health Science Center
at San Antonio, Faculty, Lecturer on "Current Problems in Forensic
Toxicology and Heavy Metals Toxicology", March 17 & 18, 1983.

Worden School of Social Services - NOSOTROS, Invited Lecturer on "Medical
Aspects of Inhalants", Nov. 23, 1983, San Antonio
College, San Antonio, TX.

Governor's Task Force on Inhalant Abuse, Texas Employment
Commission, Rm. 304, 12th and Trinity Sts., Austin, TX, Invited Lecturer on
"Inhalants:  What Are They and What Are The Effects?" March 16, 1984.

Texas Dept. of Community Affairs, Inhalants Abuse Conference, Invited Lecturer on "Chemical, Physiological, Medical Aspects of Inhalant Abuse", April 26, 1984, Houston, TX.

The Bexar County Juvenile Probation Dept. and the Texas Council on Crime and Delinquency, Invited Lecturer on "Substance Abuse" at the Barbara Jordan Community Center, 2803 E. Commerce, San Antonio, TX, May 16, 1984.

Participant in Inservice Seminar on Inhalant Abuse sponsored by the City of San Antonio, May 17, 1984, Lectured on "Toxicology Effects of Inhalants".

Governor's Task Force on Inhalant Abuse, Mexican American Unity Council, 2300 W. Commerce, San Antonio, TX, Invited Lecturer on "Deaths by Location", June 20, 1984.

Association of Official Analytical Chemists (AOAC) 10th Annual Spring Training Workshop, April 8-11, 1985, Lectured on "GC/MS Analysis of Cannabis Metabolites in Autopsy Cases, Meeting held in Dallas, TX.

Pathology Residents and Laboratory Section, Wilford Hall, Lackland AFB, TX, Lectured on "Forensic Toxicology", April 3, 1985.

Forensic Toxicology Drug Testing, Laboratory Manager's Conference, sponsored by Brooks AFB, TX, Sept. 10-12, 1985, Invited lecturer on "Courtroom Implications of GC/MS Testing of Cannabinoids in Biological Specimens", Sept. 11, 1985, at El Tropicano Hotel, San Antonio, TX.

Lecture:  "Medical Aspects of Inhalant Abuse", Nosotros, Inc., Statewide Inhalant Abuse Conference, April 3, 1986, St. Anthony Inter-Continental Hotel, at San Antonio, TX.

Workshop Coordinator:  The Cannabinoids:  Current Methodology and Interpretation, 38th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, Feb. 10-15, 1986.

"Correlation of Drug Levels in Muscle and Blood", Charles S. Petty, M.D. Scientific Symposium.  University of Texas Southwestern Medical Center, Dallas, TX, Nov. 17-18, 1989.

Society of Forensic Toxicologists, Inc., Conference on Analysis of Hair for Drugs of Abuse, May 28-29, 1990, Washington, D.C. (Panelist).

Participant, NIDA Inhalant Abuse Research Symposium, Medical Center Hilton Hotel, Houston, Texas, June 26, 1990.

"The Chemistry of Crime Solving", San Antonio Section, American Chemical Society, San Antonio, Texas, September 18, 1990.

Symposium on Forensic Chemistry, American Chemical Society, 47th Southwest Regional Meeting, San Antonio, TX., October 4, 1991. Symposium organizer, moderator.

Workshop presenter, "Effects of Alcohol", Joint meeting of the Southwestern Association of Toxicologists, Southwestern Association of Forensic Scientists and Southern Association of Forensic Scientists. Shreveport, LA,

CutePDF - www.fasiso.com

April 8-11, 1992.

"Forensic Toxicology", San Antonio Section, American Chemical Society. May 27, 1992.

"The Role of the Laboratory in Forensic Medicine", The San Antonio Society for Medical Technology, UTHSC, October 28, 1992.

"Back to Basics" Workshop Presenter, 45th Annual Meeting of the American Association of Forensic Sciences, Boston, MA, February 16, 1993.

"Forensic Drug Analysis in Hair", Texas Section American Association of Clinical Chemists, Galveston, Texas, March 26, 1993.

"Traffic Safety by drug Recognition Evaluation", presented to the Ministry of the Interior and Chiefs of Police, Saarbrücken, Germany, April 14, 1993; Ministry of the Interior, München, Germany, April 19, 1993.

"Drugs and Human Performance", Workshop Moderator, Annual Meeting of the Society of Forensic Toxicologists, Phoenix, Arizona, October 13, 1993.

"Forensic Toxicology", Representative of The Committee on Liaison with the American Academy of Forensic Sciences, 24th Annual Meeting of The American Association of Psychiatry and the Law, Paso del Rio Hilton Hotel, San Antonio, Texas, October 23, 1993.

"Pharmacology of Ethyl Alcohol; Effects on the Body", Workshop presentation, Current Approaches in Forensic Toxicology, Society of Forensic Toxicologists/International Association of Forensic Toxicologists, Tampa, Florida, Oct. 31, 1994.

"Legal and Medical Alcohol", Plenary Lecture, presented at *Advances in Clinical and Forensic Toxicology II*, CME Program, Medical College of Wisconsin, Milwaukee, Wisconsin, May 11-12, 1995.

"Forensic Toxicology-Science After Death", presented at *Toxicology: Tradition Meets the Future*, The South Texas Poison Center and the University of Texas Health Science Center at San Antonio, Annual Conference, Hyatt Regency, San Antonio, Texas, August 24, 1996.

"La Function del Lab oratorio de Toxicological", presented at the *1a Reunion Centro Americana de Cadencies Foresees*, San Salvador, El Salvador, C.A., November 6-8, 1996.

"Interpretation de loss Resulted de Toxicological Forensic", presented at the *1a Reunion Centro Americana de Cadencies Foresees*, San Salvador, El Salvador, C.A., November 6-8, 1996.

"Drugs Imported from Mexico-Analytical Approach and Case Histories", presented at the Quarterly Meeting of the California Association of Toxicologists, Oakland, CA, February 8, 1997.

"Pharmacology and Toxicology of Alcohol", presented at annual meeting of SOFT in Workshop, *Fundamentals of Alcohol Testing and Interpretation*, October 5, 1997, Snowbird, Utah.

•"Pharmacology of Alcohol", presented at AAFS/CAT seminar *The Effects of Alcohol and Drugs on Human Performance and Behavior*, UCLA Conference Center, Los Angeles, CA, August 20-22, 1998.

"Herbs of the Curanderos", workshop presented at the annual meeting of the Society of Forensic Toxicology, Albuquerque, NM, October 6-10, 1998.

"The role of Alcohol in Accidents", presented at Traffic Accident Reconstruction & Litigation Seminar, Lawyers & Judges Publishing Co., Tucson, AZ, Nov. 6, 1998.

"The Pharmacology Basis of DRE" Presented at the DRE (Drug Recognition Expert) Workshop, Meeting of the Southwestern Association of Toxicologists, San Angelo, Texas Nov. 11, 1999.


### JAMES C. GARRIOTT, PH.D., D-ABFT
### TOXICOLOGIST
*16031 Oak Grove*
*San Antonio, Texas 78255*
*(210) 695 9520; FAX (210) 695 9520*
*e-Mail: JCGARRIOTT@satx.rr.com*

January, 2000
**Toxicology Consulting--James C. Garriott, Ph.D.**
**Statement of current fees:**

Consulting time (office, phone); research; reports, etc.:
$ 200.00/Hr

Deposition testimony; court testimony:
$ 300.00/Hr

Daily rate (out of town testimony, depositions, etc.); expenses not included, basic travel expenses required in advance:
$ 2000.00/Day

Court setting/standby alert for testimony (if canceled):
$ 250.00

Retainer required for case acceptance:
$ 1000.00

James C. Garriott, Ph.D.
Tax id/SS #: 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

**Nick Peters, MD**
**2300 Marie Curie Rd**
**Garland, Texas 75042**
**(972) 562-8541**

November 10, 2000

Carol Lomax
Branton & Hall
737 Travis Park Plaza Building
711 Navarro, Suite 737
San Antonio, Texas 78205

Re: Candelario DeLeon  9827

Dear Ms Lomax,

I, Nick Peters am a licensed physician Board Certified in Emergency Medicine. I have reviewed the medical records sent from your office relating to the care of Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998. Also, I was provided the inpatient hospital  records for his admission from his December 25, 1998 arrival to his discharge on January 6, 1999. Mr. DeLeon was brought back for other medical problems on January 8 and was discharged on January 29, 1999.

As you know, Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998.  Paramedics found him unable to get out of the car.  The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a back board.  On arrival to the emergency department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down.  Dr. Dovale Joao examined the patient and stapled a facial laceration.  The patient was cleared from spinal precautions and Dr. Joao noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes at 2030.

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center emergency department with" back pain",  "numbness in body" and "can't move legs". Paramedics brought him from the jail to the hospital on a backboard without a cervical spine collar.  Dr. Nagarjun Narra  applied a C-collar but when the patient returned from x-ray the collar had been removed.  Later the cervical collar was replaced.  After

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 2

multiple x-rays were performed including cervical, dorsal and lumber spine, CT and MRI a diagnosis of acute spinal cord injury, cervical cord compression was made. The patient was admitted for further care and evaluation of his quadriplegia.

He was discharged from the hospital for supportive care and therapy, to be brought back 2 days later on January 8, 1999 for an infection and was later discharged again on January 29, 1999.

After my review of the records available, I believe several times the medical care rendered to Mr. DeLeon fell below expected standards. The incidences and reasons for my opinion are as follows:

1.  On the first emergency department encounter the patient was removed from spinal precautions prematurely. To safely remove a patient from such precautions, he must be awake, alert with no distracting injuries and no mind altering substances substances in the patient's system. Then the physician can access spinal stability after a careful normal neurological and spinal exam. Often needed are x-rays and occasionally special studies or consulting opinions . Dr. Joao did not document a neurological examination, or a spinal exam. The patient had a mind altering substance in his system as noted by the physician as "obviously drunk". No x-rays where done to even attempt to find the cause of the patient's compliant of numbness. In my opinion this gross negligence was a major contributing cause of Mr. DeLeon's spinal cord injury.

2.  When the paramedics arrived to care for Mr. DeLeon at the jail on December 25, 1999, they put him on a back board, but no cervical collar. With his cervical spine unstabilized he was at high risk of further unnecessary injury while being transported. This deviation from the standards of care was a contributing cause of Mr. DeLeon's quadriplegia.

3.  When the patient arrived to emergency on December 25, 1999 Dr. Narra appropriately placed a cervical collar on Mr. DeLeon. Unfortunately when he returned from having his x-rays done the collar was off. Later it was put back on. Even with normal cervical spine x-rays, the spinal precautions must not be removed if their is evidence of a neurological deficit. At this time Mr. DeLeon had obvious signs of injury with decreased motor and sensory function. The removal of the collar at this point was a departure from acceptable medical standards demonstrating negligence and could have contributed to his ultimate spinal injury.

CitaPDF - www.fasita.com

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 3

In summery, it is my professional opinion the care for Mr. DeLeon fell substantially below standards of care several times by various caretakers. Reasonable care would have protected the spine from further injury. As a result of these breeches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

Please do not hesitate to contact me if there are additional records for review or if there are additional questions which need to be addressed.


Sincerely,

Nick Peters, MD

# Nick Paul Peters, MD
## 30 Secretariat Lane
## McKinney, Texas 75069
## (972) 562-8541

## PERSONAL

| | |
|---|---|
| Born: | Fairfield, California |
| Health: | Excellent |
| DOB: | October 22, 1964 |
| Marital Status: | Single |

## CERTIFICATION AND LICENSING

Diplomate of the American Board of Emergency Medicine
Texas Medical License       J7627

## CURRENT EMERGENCY MEDICINE PRACTICE

Baylor Medical Center at Garland
    Garland, Texas

Full time staff Emergency Physician
Over 40,000 visits/ year.  Involves
teaching in residency program.
    1994 to present

Texoma Medical Center
    Denison, Texas

Part-time Staff Emergency Physician
    1995 to present

Baylor Medical Center at Richardson
    Richardson, Texas

Part-time Staff Emergency Physician
    1995 to present

Baylor Medical Center at Grapevine
    Grapevine, Texas

Part-time Staff Emergency Physician
    1996 to present

## PAST EMERGENCY MEDICINE PRACTICE EXPERIENCE

Sierra Vista Community Hospital
    Sierra Vista, Arizona

Staff Emergency Physician
    1994

Raymond Bliss Army C Hospital
    Fort Huachuca, Arizona

Staff Emergency Physician
    1994

Mt. Graham Community Hospital
    Safford, Arizona

Staff Emergency Physician
    1994

Orthopaedic Hospital
    Los Angeles, California

Staff Emergency Physician
    1993

Nick Paul Peters, MD                                page 2

EDUCATION

| Residency-Emergency Medicine | Location | Degree/Date |
|---|---|---|
| University of Arizona | Tucson, Arizona | 1993-4 |

| Internship/Residency-Emergency Medicine | | |
|---|---|---|
| UCLA King/Drew Medical Center | Los Angeles, California | 1991-3 |

| Medical School | | |
|---|---|---|
| Creighton University School of Medicine | Omaha, Nebraska | MD 1991 |

| Colleges and Universities | | |
|---|---|---|
| University of San Francisco | San Francisco, California | BS 1987 |
| Sacramento City College | Sacramento, California | |
| Consumnes River College | Sacramento, California | |

ADMINISTRATIVE EXPERIENCE (outside of medicine)

| Animal Laboratory Manager | Institute of Chemical Biology | 1984-7 |
|---|---|---|
| Orientation Chairman | University of San Francisco | 1986-7 |

UNIVERSITY SERVICE

| Residency Admission's Committee | University of Arizona |
|---|---|
| Medical College Recruitment Program | Creighton University |
| Committee for Orientation, Advising and Registration | University of San Francisco |

PROFESSIONAL ORGANIZATIONS

American College of Emergency Physicians
Texas College of Emergency Physicians
American Medical Association

RESEARCH AND PUBLICATIONS

Chang, Enders, Sprengel, Peters, Varmus, Ganum: Expression of the precore region of an avian hepatitis B virus is not required for viral replication. Journal of virology Oct 1987.

Abstracts

Prediction of the severity of acute pancreatitis. Annals of Emergency Medicine Feb 94.

Medical control of mass gatherings: can paramedics perform without physicians on-site? Annals of Emergency Medicine May 94.

HOBBIES AND INTERESTS

Raising horses, running, fishing, and clarinet.



**Smith-Glynn-Callaway Medical Building**

January 4, 2001


Carol P. Lomax
Branton & Hall
737 Travis Park Building
711 Navarro, Suite 737
San Antonio, Texas 78205-1787


     Re:    Patient: Candelario DeLeon
            File Number: 9827

Dear Ms. Lomax:

I, Jeremy D. Slater, M.D., am a licensed physician, Board Certified in Neurology, Clinical Neurophysiology and Sleep Medicine. I have reviewed the records of Candelario DeLeon. These include the following:

1.  Emergency room records from Columbia Valley Regional Medical Center, dated 12/24/98.
2.  Hospital records from the Brownsville Medical Center, dated 12/25/98 through 1/7/99.
3.  EMS ambulance activity records from the City of Brownsville, dated 12/24/98 through 1/29/99.

**Case Summary:**

Candelario DeLeon is a 58 year old male with an essentially negative past medical history, who was brought to the Columbia Valley Regional Medical Center emergency room on 12/24/98 by the City of Brownsville EMS ambulance after a motor vehicle accident. The patient was found, sitting in the driver's seat, unrestrained. According to the EMS notes, "Pt. Smelled highly of ETOH and stated he had been drinking but unknown what or how much". A cervical collar was placed and the patient was extricated through the driver's door onto a backboard (10 PM). On route, the patient complained of "numbness from the neck down".

Upon arrival in the emergency room (10:05 PM), the ER physician notes document that the patient is "obviously drunk – awake". Normal exam findings are documented for the heart, lungs and abdomen, with no findings recorded for the neurological examination or



# Smith-Glynn-Callaway Medical Building

extremities. Nursing notes document the absence of CSF or blood in the ear canals, and the absence of Battle's sign, or periorbital ecchymoses. The presence of the cervical collar is noted. The patient received one staple to a forehead laceration and was then discharged to the custody of the police. No cervical spine films were ordered – there is no documentation regarding if or when the collar was removed.

The patient then spent the night in the city jail. Waking the next morning, he complained of being unable to move. When the EMS service arrived, he complained of pain in his arms and numbness throughout his body. At that time, no cervical collar was in evidence. The patient was placed on a backboard, secured with straps and transported to the Brownsville Medical Center emergency room.

Upon arrival in the emergency room, the patient was assessed and underwent X-rays of the cervical spine. Once these were completed, because of clinical suspicion of a cord compression, he received high-dose Solumedrol intravenously, 30 mg/kg. A Foley catheter was placed, and 400 cc of urine drained. Spine X-rays were completed including cervical, thoracic and lumbar, all of which were read as normal. A neurology consultation was obtained. The neurologist, on the basis of the clinical examination, suspected a low cervical cord compression, and ordered an MRI of the cervical spine. This was completed, and demonstrated no hematoma, moderate changes of cervical spondylosis with spinal canal stenosis in the mid to lower cervical spine. Neurosurgical consultation was ordered. A subsequent MRI of the thoracic spine was unremarkable, as was a CT scan of the brain.

Through the remaining hospitalization the patient received supportive therapies, and at the time of discharge to a nursing home, the patient remained quadraparetic, with a T8 sensory level.

## Conclusions:

It is my professional opinion that the emergency room physician at Columbia Valley Regional Medical Center deviated from the standard of care by failing to complete a neurologic examination on Mr. DeLeon at the time of his initial presentation. The circumstances of the patient's injury, in addition to his complaints to the EMS personnel of numbness from the neck down, are both strongly compelling reasons to assess for possible cervical cord injury. Had he completed a neurological examination at that time, he might have discovered clinical evidence suggesting the presence of a cord compression. Early treatment with high-dose intravenous steroids could have been initiated, possibly reducing the level of longterm neurologic deficit.



# Smith-Glynn-Callaway Medical Building

**Deviations:**

Based on a reasonable degree of medical certainty, it is my opinion that the physician did not use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would have provided under similar circumstances. It is my opinion that the breach in care caused a lost opportunity for a medical intervention that may have significantly reduced the patient's longterm deficits.

Signed,

Jeremy D. Slater, M.D.

3231 South National Avenue • Springfield, Missouri  65807-7396 • 417-885-7422
A member of the Sisters of Mercy Health System–St. Louis

## ST JOHN'S PHYSICIANS AND CLINICS
Curriculum Vitae

1.    Date:  June, 2000

## PERSONAL

2.    Name:  Jeremy D. Slater, M.D.

3.    Home Phone:  (417) 886-5470

4.    Office Phone: (417) 888-5659

3.    Office Address:  Smith-Glynn-Callaway Clinic
                       3231 S. National Avenue
                       Springfield, MO  65807

6.    Citizenship:  USA

## HIGHER EDUCATION

7.    Institutional (institution; degree; date conferred):

      1982   Bachelor of Science in Molecular Biophysics and Biochemistry, Yale University;
             New Haven, Connecticut

      1986   Doctorate of Medicine, University of Pittsburgh School of Medicine;
             Pittsburgh, Pennsylvania

8.    Certification, licensure (description; board of agency; dates):

      Licenses:
                 Missouri
                 Registered with D.E.A. (available upon request)
                 Diplomate, American Board of Psychiatry and Neurology, 1993
                 Diplomate, American Board of Clinical Neurophysiology, 1997
                 Diplomate, American Board of Sleep Medicine, 2000

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 41 of 80

## EXPERIENCE

9.    Academic (institution; rank/status; dates):

86-87    Internship, Medical College of Pennsylvania, Philadelphia, Pennsylvania

87-90    Neurology Resident, University of Miami School of Medicine, Department of Neurology, Miami, Florida

89-90    Chief Resident, University of Miami School of Medicine, Department of Neurology, Miami, Florida

90-91    Fellow in Electrophysiology and Epilepsy, University of Miami School of Medicine, Department of Neurology, Miami, Florida

91-94    Assistant Professor, University of Miami School of Medicine, Department of Neurology, Miami, Florida

94-97    Clinical Assistant Professor, University of North Dakota School of Medicine, Department of Neuroscience, Bismarck, North Dakota

## TEACHING RESPONSIBILITIES:

87-90    Third and fourth year medical student instruction during the Neurology Rotation

89-90    Instruction of first year Neurology residents

89-90    Supervision of Jackson Memorial Hospital Neurology inpatient service

89-90    Supervision of Jackson Memorial Hospital Neuro-Medical Intensive Care Unit

90-94    Interpretation of EEG and evoked potential studies at the Miami Veterans Administration Hospital

90-94    Instruction of first through third year Neurology residents

90-94    Supervision of care for Epilepsy Foundation clinic patients

CSXPDF - www.fesisx.com

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 42 of 80

91-94      Rotations as both the inpatient neurology consult attending, and as the inpatient neurology attending

91-present      Supervision of EEG videotelemetry unit and interpretation of EEG videotelemetry studies.

10.    Non-academic (institution; rank/status; dates):

94-97      Staff neurologist and medical director of the clinical neurodiagnostics laboratory, Bismarck, North Dakota

98-present      Staff neurologist, St. John's Physicians & Clinics, Springfield, Missouri

PUBLICATIONS (author(s) (in actual precedence of authorship); title; publisher or journal name; date; page numbers)

11.    BOOKS AND MONOGRAPHS PUBLISHED:

Ramsay RE and Slater JD: Bromides in The Treatment of Epilepsy: Principles and Practice. Edited by Elaine Wyllie, Lea & Febiger, 955-958, 1993.

Wu FY, Slater JD, Ramsay RE and Honig LS: Neural Networks for EEG Diagnosis in Intelligent Engineering Through Artificial Neural Networks. Edited by C. H. Dahli, L.I. Burke and Y.C. Shin, ASME Press, Volume 2:559-564, 1992.

Ramsay RE, Slater JD. Antiepileptic Drugs in Clinical Development in: New Antiepileptic Drug Development: Preclinical and Clinical Aspects. Edited by J.A. French, M.A. Dichter and I.E. Leppik, Elsevier Science Publishers B.V. (In press).

12.    JURIED OR REFEREED JOURNAL ARTICLES AND EXHIBITIONS:

Ramsay RE and JD Slater. Effects of Antiepileptic Drugs on Hormones. Epilepsia, 32 (Suppl 6): S60-S67, 1991.

Ramsay RE, Wilder BJ, Murphy JV, Holmes GL, Uthman B, Slater JD, Morris DD, Shu VS and Pierce MW. Efficacy and Safety of Valproic Acid Versus Phenytoin as Sole Therapy for Newly Diagnosed Primary Generalized Tonic-Clonic Seizures. J Epilepsy, 5:55-60, 1992.

CQuPDF - www.foxitx.com

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 43 of 80

Landy HJ, RG Curless, RE Ramsay, J Slater, C Ajmone-Marsan, & RM Quencer.  Corpus Callosotomy For Seizures Associated with Band Heterotopia. Epilepsia, 34:70-83, 1993.

Landy HJ, RE Ramsay, JD Slater, RR Casiano, & R Morgan.  Vagus Nerve Stimulation for Complex Partial Seizures:  Surgical, Technique, Safety, and Efficacy. J of Neurosurgery, 78:26-31, 1993.

Wu FY, Slater JD, Honig LS, Ramsay RE.  A Neural Network Design for Event-Related Potential Diagnosis. Comput Biol Med, 23:251-264, 1993

Landy HJ, RE Ramsay, C Ajmone-Marsan, & JD Slater.  Incomplete Interhemispheric Fissure and Joint Cingulate Gyrus Interfering with Corpus Callosotomy. J of Neurosurgery. (In press).

Ramsay RE, Uthman B, Augustinsson L., Upton ARM, Naritoku DK, Willis JK, Treig T, Barolat G, Wernicke JF, and the First International Vagus Nerve Stimulation Study Group:  JD Slater et al. Vagus Nerve Stimulation (VNS) for Treatment of Partial Seizures:  2.  Safety, Side Effects and Tolerability. Epilepsia. (In press).

Slater JD; Morgan R; Ramsay RE; Honig LS; Wu FY.  Neural Network Analysis of the P300 Event-Related Potential in Multiple Sclerosis.  Electroencephalogr Clin Neurophysiol 1994 Feb; 90 (2): 114-22.

Ben-Menachem E, Hufnagel A, Wilder BJ, Stefan H, Mirza WU, and the First International Vagal Stimulation Study Group:  JD Slater et al.  Vagal Stimulation as Treatment for Partial Epilepsy: Effect on Seizures in a Controlled Study.  (Submitted to Epilepsia).

George RE, Sonnen AEH, Ristanovic RK, Barolat G and the First International Vagal Stimulation Study Group:  JD Slater et al.  Vagal Stimulation as Treatment for Partial Epilepsy:  Safety and Tolerability.  (Submitted to Epilepsia.)

Salinsky M, Manon-Espaillat R, Kuzniecky R, Rosenfeld WE and the First International Vagal Stimulation Study Group:  JD Slater et al.  Vagal Stimulation as Treatment for Partial Epilepsy: Long-Term Effects and Quality of Life.  (Submitted to Epilepsia.)

Slater JD; Ramsay RE; Jacobs W; Brown MC.  Induction of Pseudoseizures With Intravenous Saline Placebo. Epilepsia 1995 June; 36 (6):  580-5.

Ben-Menachem E; et al; Wernicke JF; Ramsay RE; Stefan H; Treig T; Slater J; Uthman BM; Hammond EJ; Hedner T; Hamberger A.  Epilepsy Res 1995 Mar; 20 (3):  221-7.

CSstPDF - www.fastio.com

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 44 of 80

Gallo BV; Ramsay RE; DeToledo J; Toledo C; Slater JD. Pharmacokinetics and Muscle Histopathology Of Intramuscular Valproate. Epilepsy Res 1997 July; 28 (1): 11-5.

13.   Other works, publications and abstracts:

Slater JD, Singer C, Ramsay RE. Parkinson's Disease and Epilepsy: An Epidemiological Survey. Epilepsia 31 (5):604, 1990.

Ramsay RE, Avery A, Gallo B, Slater JD, and McManus D. Safety and Kinetics of Intramuscular Valproate. Epilepsia 31 (5): 654, 1990.

Ben-Menachem E, Hamberger A, Hedner T, Hammond EJ, Uthman RM, Slater JD, Ramsay RE, Wilder BJ. The Effects of Vagus Nerve Stimulation on Concentrations in the CSF of 5-Hydroxy Indoleacetic Acid, Homovanillic Acid, GABA, and Other Amino Acids in Patients with Partial Epilepsy. Epilepsia, 32 (Suppl 3) : 90, 1991.

Uthman B, Slater J, Hammond E, Gallo BV, McJilton JS, Wilder BJ, Ramsay RE. Safety and Tolerability of Vagal Stimulation. Epilepsia, 32 (Supple 3) : 90, 1991.

Ramsay RE, Uthman B, Ben-Menachem E, Slater J, Erik Augustinssen L, Landy H, Reid S, Hammond E, Andersen O, Gallo BV, McJilton JS, Wilder BJ. Efficacy of Vagal Nerve Stimulation in Partial Seizures: Double-Blind Comparison of Two Stimulus Paradigms. Epilepsia, 32 (Suppl 3) : 90, 1991.

Shor-Posner G, Ramsay RE, Morgan R, Slater J, Beach RS. Association of Electrophysiologic Brain Function and Nutritional Status in Human Immunodeficiency Virus (HIV-1) Infection. Accepted for presentation at the Society for Neuroscience annual meeting, New Orleans, November, 1991.

Slater JD, Lundy DS, Casiano RR, Landy H, Gallo BV, LoPresti J, Ramsay, RE. Vagus Nerve Stimulation Effects on Laryngeal Function. Epilepsia, 33 (Suppl 3) : 101, 1992.

Landy HJ, Slater J, Uthman B, Reid S, Casiano R, Wilder BJ, Ramsay RE. Vagus Nerve Stimulation For Complex Partial Seizures. Accepted for presentation at the American Association of Neurological Surgeons annual meeting, San Fancisco, April 1992.

Case 1:00-cv-00192  Document 66  Filed in TXSD on 09/24/2001  Page 45 of 80

Slater JD, Wu FY, Ramsay RE.  Neural Network Analysis of the P300 Cognitive Evoked Potential in Epilepsy, Multiple Sclerosis and Parkinson's Disease.  Epilepsia, 33 (Suppl 3) : 60, 1992.

Aranguiz, C, Nemire R, Slater JD, Jallad NS, LoPresti J, Ramsay RE.  Idiokinetic Propanolol-Valproate Drug Interaction.  Epilepsia, 33 (Suppl 3) : 102, 1992.

Landy HJ, Ramsay RE, Slater J, Casiano RR, Morgan R.  Vagus Nerve Stimulation for Complex Partial Seizures: Surgical Technique, Safety, and Efficacy.  Accepted for presentation at the Congress of Neurological Surgeons annual meeting, Washington, D.C.,  October 31-November 5, 1992.

Wilder BJ, Slater J, Malon J, Campbell K, Gilmore R, Uthman BM, Perchalski RJ, Ramsay RE.  Parenteral Loading and Maintenance of Phenytoin with Fosphenytoin, a Phenytoin Prodrug.  Epilepsia, 34 (Suppl 2) : 27, 1993.

Ramsay RE, Slater JD, Cox M.  Neurocardiogenic Syncope Successfully Treated with Valproate.  Epilepsia, 34 (Suppl 2) : 86, 1993.

Slater JD, Brown MC, Ramsay RE, Jacobs W.  Intravenous Normal Saline Placebo Induction in Patients with Epilepsy and Pseudoseizures.  Epilepsia, 34 (Suppl 2) :  114-115, 1993.

Slater JD, Wu FY, Ramsay RE.   Neural Network Analysis of the P300 Cognitive Evoked Response In Temporal Lobe Epilepsy.  Epilepsia, 34  (Suppl 2) : 130, 1993.

Jacobs W, Ramsay RE, Slater JD, Brown MC, Nemire RE, Ortiz WR, Ayala R, LoPresti J.  Contribution of Family Patterns of Unsuccessful Medical Treatment of Epilepsy.  Epilepsia, 34 (Suppl 6) : 10, 1993.

Nemire RE, Ortiz WR, Ayala R, Slater JD, Ramsay RE.  The Effectiveness of Clobazam in Refractory Seizures.  Epilepsia, 34 (Suppl 6) :40, 1993.

Brown MC, Slater JD, Ramsay RE, Landy HJ.  Does Discontinuation of Anticonvulsant Medication Obscure Neuropsychological Data in Focal Epilepsy?  Epilepsia, 34 (Suppl 6) : 86, 1993.

Ramsay RE, Slater JD, Aranguiz C, Vega M, Ortiz WR,  Ayala R, Lalama H, Rask C.  Open Treatment With Tiagabine and Conversion to Monotherapy of Patients with Uncontrolled Partial and Generalized Seizures.  Epilepsia, 34 (Suppl 6) : 103, 1993.

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 46 of 80

Slater JD, Wu FY, Meador KJ, Ramsay RE. Neural Network Analysis of the P300 Event-related Potential in Healthy Subjects in the Drug versus Non-drug State. Epilepsia, 34 (Suppl 6) : 136, 1993.

Ramsay RE, Slater JD, Aranguiz C, Vega M, Ortiz WR, Ayala R, Lalama H, Rask C. Open Treatment With Tiagabine and Conversion to Monotherapy of Patients with Uncontrolled Partial and Generalized Seizures. Epilepsia, 34 (Suppl 6) : 103, 1993.

Slater J, Ramsay E, Barolat G, Rosenfeld W, Willis J. One Year Results of Vagus Nerve Stimulation (VNS) in 82 Refractory Epilepsy Patients. Presented at the XVth World Congress of Neurology, Vancouver, Canada, September 1993.

Abstracts Under Review:

14. Other works accepted for publication:

N/A

PROFESSIONAL

15. Funded Research Performed (include all grants received in the last five years, identifying the principal investigator and the amounts and dates of the awards):

Safety and Efficacy of Three Dose Levels of Tiagabine HCl vs. Placebo as Adjunctive Treatment For Complex Partial Seizures.
Abbott Laboratories
Grant Years:     Jan 1992 – Sept 1993
Total Grant:     $72,875

16. Editorial Responsibilities:

17. Professional and Honorary Organizations (member; officer; date):

Member – American Medical Association
Member – American Academy of Neurology

Zeff Ross, FACHE
10213 Capri St.
Cooper City, FL    33026-4637

June 28, 2001

Ms. Carol P. Lomax
Branton & Hall
One Riverwalk Place
700 N. St. Mary's St., Ste. #1700
San Antonio, TX    78205

RE:  Candelario De Leon

Dear Ms. Lomax:

I, Zeff Ross, am a Certified Healthcare Executive and Fellow in the American College of
Healthcare Executives and I am currently the Administrator of Memorial Hospital West in
Florida. With regard to the above referenced matter, I have reviewed the following information:

- Texas Peace Officer's Report of the accident - December 24, 1998
- The Medical Records of Columbia Valley Regional Medical Center
- The Medical Records of Brownsville Medical Center
- The City of Brownsville EMS Reports
- The Report of Nick Peters, M.D.
- The Report of Jeremy Slater, M.D.

Mr. Candelario De Leon is a 57 year old male who was brought to the Columbia Valley Regional
Medical Center emergency department on December 24, 1998 by the City of Brownsville EMS
ambulance after a motor vehicle accident. According to the ambulance report, the patient was
found sitting on the driver's seat of a small red car which had sustained moderate damage to the
front end. The EMS notes states, "Per patient, he was the driver, unrestrained with no loss of
consciousness." The narrative notes from EMS indicate "Patient smelled highly of alcohol and
stated he had been drinking but unknown what or how much". The patient was alert and oriented
x 1, possibly due to alcohol. The patient received neck spine immobilization, was extricated and
placed on a backboard and while on route to the hospital, the patient complained of numbness
from the neck down. The emergency department record indicates that the ER physician
documented that the patient was "obviously drunk - awake and alert". The examination findings
documented for the eyes, heart, lung and abdomen were normal with no findings recorded for the

Ms. Carol P. Lomax
June 28, 2001

-2-

neurological examination or extremities.  The patient received one staple to a forehead laceration and was then discharged to the custody of the police.  No further testing, including cervical spine x-rays, CT or MRI were performed.  The patient then spent the night in the city jail.  The following morning, the patient was brought to Brownsville Medical Center complaining of the inability to move.  According to the Ambulance Activity Report dated December 25, 1998 back pain was suspected with the patient complaining of the pain to arms and numbness throughout the body.  Patient stated he was unable to walk due to the numbness in his body.  He was transported to Brownsville Medical Center for further evaluation and under the History and Physical examination, it was noted that the patient was apparently in a motor vehicle accident last night at 9:00 p.m.  The patient was brought in this morning from jail as he was complaining of the inability to move.  He spent all night on the cold, concrete floor complaining of pain to his back.  Patient states he was unable to get out of his car and felt numb since last night, that he "can't move legs".  Patient had a c-collar applied, put onto the backboard, x-rays were performed, and when the patient returned from x-ray, it was noted that the c-collar was off per the x-ray technician and then reapplied.  Later that day an MRI was also performed.

According to the consultant's notes, it was noted that immediately after the accident, the patient complained of having numbness in both extremities.  He was seen at Valley Regional Medical Center and was incarcerated afterwards for drunk driving.  During the whole night, the patient complained of decreased movements of his lower extremities and on waking up this morning, felt more weakness, including the upper extremities.  The patient was sent to Brownsville Medical Center from jail to be evaluated.  Spinal x-rays were performed including cervical, thoracic, lumbar and all reported normal by the radiologist.  The neurologist requested a neurosurgical consult and an MRI was also performed.

It is my opinion, as an expert in hospital administration and after reviewing the information previously noted, and based on a reasonable degree of hospital administrative certainty, that Columbia Valley Regional Medical Center deviated from the standard of care by failing to provide for a complete neurological examination on Mr. De Leon at the time of his initial presentation to their facility.  The mechanism of injury indicated a high index of suspicion for the type of injury he received.  In addition, the EMS personnel noting the patient's complaints of numbness from the neck down were relatively clear indications to not only fully assess the patient for possible cervical cord injury, but as well to consider activating a trauma alert, which according to the hospital's definition, is a "potentially life threatening injury with vital signs presently stable."  However, this was not done and as such, the possibility of early treatment of his injuries, which could have decreased any long term neurological deficit, was lost.

CVAPDF - www.fastio.com

Ms. Carol P. Lomax
June 28, 2001

-3-

Based on a reasonable degree of hospital administrative certainty, it is my opinion that the hospital did not implement such policy and procedures as any reasonably prudent facility would have done under similar circumstances.

I reserve the right to review additional emergency department/trauma policies and procedures, as well as medical staff bylaws and rules and regulations to help further formulate my opinion in the future.

Should you require additional information or have questions regarding any of the above, please feel free to contact me.

Sincerely,

Zeff Ross, FACHE

ZR/laf

# Zeff Ross, FACHE

10213 Capri Street
Cooper City, Florida  33026-4637
(954) 433-2525 (Home)
(954) 433-7199 (Work)

EXPERIENCE:

**April 1991**          **ADMINISTRATOR**
**- Present**           **Memorial Hospital West (110 Beds), Pembroke Pines, Florida**

Major Accomplishments include:

### I.   Development & Operations:

- Planned for, operating and managing the hospital since its inception.

- Coordinated recruitment activities for management staff and over 300 employees in preparation of opening.  Implemented orientation and guest relations programs for all staff.  Expanded staff to over 700 FTE's.

- Operated the hospital from opening day without using any agency nurses.

- Implemented patient-focused care by incorporating Patient Assistant Liaisons (PALS) to help provide increased continuity of care to patients with crosstraining of many employees; implemented open visitation hours for patients.

- Successfully implemented and continually support the Memorial 21st Century Excellence Program for total quality management.

- Patient satisfaction statistics indicate during the latest year of operations of 99.0% outpatient satisfaction, 98.5% inpatient satisfaction and approximately 95% emergency department satisfaction rate.

- Successfully completed the 1997 Joint Commission on Accreditation of Healthcare Organization survey receiving a grid score of 98 and a full three year accreditation with Commendation, a distinction which places Memorial Hospital West within the top 6% of hospitals.

- Proactively implemented a reengineering program to cost effectively meet the challenges of the future in providing quality care with high patient satisfaction.

- Implemented the following new services/programs: diagnostic cardiac catheterization;  invitro fertilization; diabetes center; Level II Neonatal ICU;  child care program through an affiliation with the City of Pembroke Pines; cable television via satellite dishes; ambulatory surgical facility; radiation therapy center; and a women's center..

- Purchased the medical office building located on the hospital's campus.  Successfully increased the occupancy rate from 83% to 100%.

- Implemented activities to secure additional medical office space offsite from the campus of Memorial Hospital West in an effort to integrate primary care offices with the hospital.

- Participated in the development, implementation and operation of the Memorial Integrated Healthcare System (IPA's), Medical Management Services Organization (MSO), and Physician Hospital Organization (PHO).

- Completed the first Employee Opinion Survey of Memorial Hospital West after two years of operation with Administration receiving high accolades from the employees for our commitment to quality patient care, to the employees, to the volunteers, and to the community.

- Established a community network providing educational seminars, health screenings, and community health fairs; Partner in Education with local schools, member of civic and community organizations.

CAMPDF - www.fenato.com

Zeff Ross, FACHE
Resume

. Exceeded the operating budget each year with regard to number of admissions, births, surgeries, patient revenues, payor mix, outpatient procedures, emergency department visits, and excess of revenues over expenses. Exceeded established fiscal objectives each year by greater than 20%/yr. for initial four years of operation.

## II. Medical Staff Organization:

. Development of the medical staff organization, committee structure and credentialing activities.

. Developed, with medical staff input, the initial medical staff bylaws, rules and regulations, individual department rules and regulations, as well as the specified health professional rules and regulations.

. Implemented critical pathways developed by the medical staff and created new programs for the medical staff to help reduce resource consumption (ie. dissemination of reimbursement and cost information as compared to other physicians in the same specialty with the same DRG's).

. Recruitment of primary and specialty medical staff to the hospital. Increased medical staff membership from the initial 461 physicians to over 700 physicians in the third year, and greater than 900 in the fifth year. Developed a physician orientation book for new physician members of the Medical Staff.

## III. Construction:

. Coordinated efforts to ensure construction of the 100-bed facility was completed on time and within budget.

. Completed five year master site facility plan and began implementation of Phase I building activities (totaling $20 million dollars) which includes: the expansion of the outpatient, emergency, maternity, laboratory and pharmacy departments and the construction of a Same Day Surgery Center, helistop, fitness & rehabilitation center, a 16-bed observation unit, a radiation therapy center, and a women's center.

| | |
|---|---|
| **July 1985**<br>**- April 1991** | **Humana, Inc., 500 West Main Street, Louisville**<br>**Kentucky   40201** |

| | |
|---|---|
| **July 1990**<br>**- April 1991** | **EXECUTIVE DIRECTOR**<br>**Humana Hospital - Palm Beaches (250 Beds), West Palm Beach, Florida** |

Accomplishments at this 250 bed short-term acute care hospital with 88 psychiatric beds, included:
. Recruited both solo and specialty group practitioners to the hospital's market area.
. Reduced annual operating expenses by $250K and payroll expenses by $400K without adverse impact on operations.
. Coordinated $3.5M renovation project. Initiated building of a medical office building on the hospital campus.
. Significantly increased patient satisfaction response through the initiation of product line management and patient relations program.

| | |
|---|---|
| **October 1987**<br>**- July 1990** | **EXECUTIVE DIRECTOR**<br>**Humana Hospital - South Broward (256 Beds), Hollywood, Florida** |

Accomplishments included:
. Formulated and implemented short and long range strategic plans and objectives which resulted in increased market share and maximized margin; implemented board of trustees self-evaluation measurement survey.
. Obtained $1.5M additional revenue as a result of innovative changes to reimbursement systems.
. Increased gross revenue by $700K through business cooperation with private practitioners.
. Exceeded established fiscal objectives by more than 35%.
. Increased patient census by 20% with a decrease of 12% in the length of stay.

| | |
|---|---|
| **August 1986**<br>**- October 1987** | **ASSOCIATE EXECUTIVE DIRECTOR**<br>**Humana Hospital - Biscayne (458 Beds), Miami, Florida** |

Case 1:00-cv-00192  Document 66  Filed in TXSD on 09/24/2001  Page 52 of 80

| January 1986<br>- August 1986 | **ASSOCIATE EXECUTIVE DIRECTOR**<br>**Humana Hospital - South Broward (256 Beds), Hollywood, Florida** |
|---|---|
| **April 1985**<br>- **January 1986** | **ASSISTANT EXECUTIVE DIRECTOR**<br>**Humana Hospital - Biscayne (458 Beds), Miami, Florida** |
| **July 1984**<br>- **March 1985** | **ASSISTANT EXECUTIVE DIRECTOR**<br>**Humana Hospital - Cypress (273 Beds), Pompano Beach, Florida** |
| **May 1980**<br>- **April 1984** | **ADMINISTRATOR**<br>**AMBULATORY CARE SERVICES (286 Beds), The Jamaica Hospital, Jamaica, New York** |

Responsibilities included Outpatient, Emergency, and Paramedic Ambulance Department, Family Practice Center (including a resident training program for ten (10) family practitioners) and Walk-In Clinic. These areas handled 70K patient visits and 7,500 ambulance calls per year. Accomplishments included grants administration, labor relations and union negotiations, design and administrative coordination of expansion program, and various certificate of need applications.

| **December 1978**<br>- **May 1980** | **COORDINATOR, AMBULATORY CARE**<br>**Greater New York Hospital Association**<br>**New York, New York** |
|---|---|

## EDUCATION:

| June 1979 | Master of Business Administration (MBA) specializing in Health Care Administration<br>City University of New York, Bernard M. Baruch College/The Mount Sinai School of Medicine, New York, New York |
|---|---|
| June 1977 | Bachelor of Science - Psychology<br>Magna Cum Laude<br>City University of New York, Brooklyn College, Brooklyn, New York |

## CONSULTING ACTIVITIES:

**Consultant**
- October, 1993 - Present
  Technical Advisory Service for Attorneys
  1166 DeKalb Pike
  Blue Bell, PA  19422
- April, 1993 - Present
  American Medical Forensic Specialists
  2928 Derby St.
  Berkeley, CA  94705

**Adjunct Professor**
- September 1987 - August 1989
  St. Thomas University, Miami, FL
  Graduate Program in Health Management
  . Instructed classes in medical care organization
  and hospital administration.
- August 1985 - December 1985
  Florida International University, Miami, FL
  . Conducted administrative intern preceptorships
  for graduate students & instructed classes in hospital
  facility organizational management.

## PROFESSIONAL MEMBERSHIPS:

- American College of Healthcare Executives, FACHE (1997);  Member 1985 - 1997.
- American Hospital Association. Member 1979 - Present.
- Broward Hospital Association.  Member since October, 1987.  Offices held: Secretary/Treasurer, Chairperson.

CXMPDF - www.tasiu.com

Zeff Ross, FACHE
Resume

- South Florida Healthcare Administrative Forum. Member 1986 - Present. Offices held: Chairman, Nominating Committee, Board of Directors.

- College of Osteopathic Healthcare Executives. Member
April, 1989 - July, 1990; Chairperson - Membership Committee; Member - Awards Committee.

- American Osteopathic Hospital Association. Board of Trustees, Representative for Division IV, October 1988 - July 1990.

## COMMUNITY ACTIVITIES & MEMBERSHIPS:

- Miramar/Pembroke Chamber of Commerce. Board of Directors from October 1987 - June 1989; July 1992 - July 1993. Secretary, July 1993 - July 1994; Vice Chairman, July 1994 - July 1995; Chairman-Elect, July 1995 - July 1996; Chairman, July, 1996 - Present.

- City of Pembroke Pines Police Athletic League (P.A.L.) Board of Directors. April, 1996 - Present.

- Family Bank Western Advisory Board. September 1995 - Present

- American Heart Association/Southwest Broward Division. Vice President, September 1991 - January 1993; Board of Directors, January 1993 - Present.

- Speakers Bureau Memorial Hospital/Memorial Hospital West April, 1991 - Present.

- Embassy Creek Elementary School, School Improvement Team (S.I.T.), Member October, 1992 to Present.

- Junior Achievement Program, Walter C. Young Middle School, Instructor. 1994, 1995, 1996, 1997.

- American Cancer Society. Board of Directors, August 1992 - August 1996; Grassroots Program, August 1992 - Present.

- Broward Economic Development Council, Inc. Board of Directors, October 1, 1992 - September 30, 1993.

## AWARDS AND HONORS:

- Pinnacle Award - Miramar-Pembroke Chamber of Commerce - March, 1998

- JCAHO Accreditation with Commendation - January 1997

- Up & Comers Award Winner - Price Waterhouse/South Florida Business Journal - September, 1995. Finalist - 1994, 1993 & 1990.

- Business Leaders' Award - Industry Appreciation Week: Miramar-Pembroke Chamber of Commerce - September 19, 1995

- American Cancer Society's "Rookie of the Year" 1992-1993

- First Annual Award for Outstanding Administrative Support in Recognition of the Hospital Healthcare Human Resources Field given by the South Florida Hospital Personnel Directors Association - April 1993

"Best Outpatient Services" Award from South Florida Medical Business for the tri-county area - 1993

LICENSES:    Board of Nursing Home Administrators, State of Florida #2856

REFERENCES:    References furnished upon request.

51

# UNITED STATES DISTRICT COURT      SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CANDELARIO DE LEON | § |
| | § |
| VS. | §    CIVIL ACTION NO. B-00-192 |
| | § |
| CITY OF BROWNSVILLE, TEXAS; | §    (JURY REQUESTED) |
| HCA - THE HEALTHCARE COMPANY, | § |
| FORMERLY D/B/A COLUMBIA/HCA | § |
| HEALTHCARE CORPORATION, | § |
| COLUMBIA VALLEY HEALTHCARE | § |
| SYSTEM, L.P., INDIVIDUALLY AND | § |
| D/B/A VALLEY REGIONAL MEDICAL | § |
| CENTER AND FORMERLY D/B/A | § |
| COLUMBIA VALLEY REGIONAL | § |
| MEDICAL CENTER, JOAO DOVALE, M.D., | § |
| AND STAT PHYSICIANS, P.A. | § |

## SCHEDULING ORDER

1.    Trial:  Estimated time to try  10 days.         ☐ Bench    ☒ Jury

2.    New parties must be joined by:                   <u>July 30, 2001</u>

*Furnish a copy of this scheduling order to new parties*

3.    The plaintiff's experts will be named with a report furnished by:    <u>July 2, 2001</u>

4.    The defendant's experts must be named with a report furnished within 30 days of the deposition of the plaintiff's expert.

5.    Discovery must be completed by:           ~~November~~ December 7, 2001
   *Counsel may agree to continue discovery beyond the deadline, but there will be no intervention by the court. No continuance will be granted because of information acquired in post-deadline discovery.*
   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* The court will provide these dates. \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

6.    Dispositive Motions will by filed by:              12/28/01
7.    Joint pretrial order is due:                     2/21/02
8.    Docket Call and final pretrial conference is set for 1:30 p.m. on:    3/7/02
9.    Jury Selection is set for 9:00 a.m. on :            3/11/02

The case will remain on standby until tried.
   Signed on  June 19 , 2001, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge


EXHIBIT
2
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 USDC

By: _____
Ryan Henry
Attorney for City of Brownsville
State Bar # 24007347
Federal Bar # 22965

By: _____
William Gault
Attorney for Defendants Columbia
Valley Healthcare Systems, L.P.
d/b/a Valley Regional Medical
Center; HCA-The Healthcare
Company:

By: _____
Tyler Scheuerman
Attorney for Defendants Stat Physicians
P.A.; Joao Dovale, M.D.

By: _____
Carol Lomax
Attorney for Plaintiff

By:_____

    Ryan Henry
    Attorney for City of Brownsville

By:_____

    William Gault
    Attorney for Defendants Columbia
    Valley Healthcare Systems, L.P.
    d/b/a Valley Regional Medical
    Center; HCA-The Healthcare
    Company:

By:_____

    Tyler Scheuerman
    Attorney for Defendants Stat Physicians
    P.A.; Joao Dovale, M.D.

By:_____

    Carol Lomax
    Attorney for Plaintiff

F.02/02

By: _____
      Ryan Henry
      Attorney for City of Brownsville

By: _____
      William Gault
      Attorney for Defendants Columbia
      Valley Healthcare Systems, L.P.
      d/b/a Valley Regional Medical
      Center; HCA-The Healthcare
      Company:

By: _____
      Tyler Scheuerman
      Attorney for Defendants Star Physicians
      P.A.; Joao Dovale, M.D.

By: _____
      Carol Lomax
      Attorney for Plaintiff

By:_____          By:_____
    Ryan Henry                              William Gault
    **Attorney for City of Brownsville**          **Attorney for Defendants Columbia**
                                            **Valley Healthcare Systems, L.P.**
                                            **d/b/a Valley Regional Medical**
                                            **Center; HCA-The Healthcare**
                                            **Company:**

By:_____          By:_____
    Tyler Scheuerman                        Carol Lomax
    **Attorney for Defendants Stat Physicians**      **Attorney for Plaintiff**
    **P.A.; Joao Dovale, M.D.**

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 59 of 80

# UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF TEXAS

**MICHAEL N. MILBY**
CLERK OF COURT
P.O BOX 61010
HOUSTON, TEXAS 77208

www.txs.uscourts.gov

06/20/01


To:     **William Robert Gault (aty)**

Re:     Notice of Entry of Order or Judgment

_____

Enclosed Order or Judgment entered in:

case number:     1:00-cv-00192

instrument number: 51


If after three attempts this fax fails, then we will print this notice and mail it to you.  For questions, please call (713) 250-5768.

Number of pages including cover sheet:     6

## <u>INDEX OF AUTHORITY</u>

1.    V.A.T.C.S. art. 4590i § 1.02 et. seq.
2.    V.A.T.C.S. art  4590i § 13.01 et. seq.
3.    American Transitional Care Center of Texas, Inc. v. Palacios, 46 S.W. 3d  873 (Tex. 2001)
4.    Wright v. Bowie Memorial Hospital, 48 S.W. 3d 443 (Tex. App.- Forth Worth 2001) no pet. his

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 61 of 80

## Law Review and Journal Commentaries

Durable power of attorney for health care: Texas new legislation. Paul Premack, 53 Tex.B.J. 860 (1990).

## CHAPTER TWENTY-ONE—MEDICAL LIABILITY AND INSURANCE IMPROVEMENT

**Article**

4590i. Medical Liability and Insurance Improvement Act.

## WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Preface.

# Art. 4590i.   Medical Liability and Insurance Improvement Act

*Text of article effective until August 31, 2009*

## SUBCHAPTER A.   GENERAL PROVISIONS

### Short Title

Sec. 1.01.   This part may be cited as the Medical Liability and Insurance Improvement Act of Texas.

### Findings and Purposes

Sec. 1.02.   (a) The Legislature of the State of Texas finds that:

(1) the number of health care liability claims (frequency) has increased since 1972 inordinately;

(2) the filing of legitimate health care liability claims in Texas is a contributing factor affecting medical professional liability rates;

(3) the amounts being paid out by insurers in judgments and settlements (severity) have likewise increased inordinately in the same short period of time;

(4) the effect of the above has caused a serious public problem in availability of and affordability of adequate medical professional liability insurance;

(5) the situation has created a medical malpractice insurance crisis in the State of Texas;

(6) this crisis has had a material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future;

(7) the crisis has had a substantial impact on the physicians and hospitals of Texas and the cost to physicians and hospitals for adequate medical malpractice insurance has dramatically risen in price, with cost impact on patients and the public;

(8) the direct cost of medical care to the patient and public of Texas has materially increased due to rising cost of malpractice insurance protection for physicians and hospitals in Texas;

(9) the crisis has increased the cost of medical care both directly through fees and indirectly through additional services provided for protection against future suits or claims; and defensive medicine has resulted in increasing cost to patients, private insurers, and the state and has contributed to the general inflation that has marked health care in recent years;

(10) satisfactory insurance coverage for adequate amounts of insurance in this area is often not available at any price;

(11) the combined effect of the defects in the medical, insurance, and legal systems has caused a serious public problem both with respect to the availability of coverage and to the

high rates being charged by insurers for medical professional liability insurance to some physicians, health care providers, and hospitals;

(12) the adoption of certain modifications in the medical, insurance, and legal systems, the total effect of which is currently undetermined, may or may not have an effect on the rates charged by insurers for medical professional liability insurance;

(13) these facts have been verified by the Medical Professional Liability Study Commission. which was created by the 64th Legislature.[1]   For further amplification of these facts the legislature adopts the findings of the report of the commission.

(b) Because of the conditions stated in Subsection (a) of this section, it is the purpose of this Act to improve and modify the system by which health care liability claims are determined in order to:

(1) reduce excessive frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical practice systems;

(2) decrease the cost of those claims and assure that awards are rationally related to actual damages;

(3) do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis;

(4) make available to physicians, hospitals, and other health care providers protection against potential liability through the insurance mechanism at reasonably affordable rates;

(5) make affordable medical and health care more accessible and available to the citizens of Texas;

(6) make certain modifications in the medical, insurance, and legal systems in order to determine whether or not there will be an effect on rates charged by insurers for medical professional liability insurance; and

(7) make certain modifications to the liability laws as they relate to health care liability claims only and with an intention of the legislature not to extend or apply such modifications of liability laws to any other area of the Texas legal system or tort law.

### Alternative Partial Limit on Civil Liability

Sec. 11.03. In the event that Section 11.02(a) of this subchapter is stricken from this subchapter or is otherwise invalidated by a method other than through legislative means, the following shall become effective:

In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability of the physician or health care provider for all past and future noneconomic losses recoverable by or on behalf of any injured person and/or the estate of such person, including without limitation as applicable past and future physical pain and suffering, mental anguish and suffering, consortium, disfigurement, and any other nonpecuniary damage, shall be limited to an amount not to exceed $150,000.

### Adjustment of Liability Limits

Sec. 11.04. When there is an increase or decrease in the consumer price index with respect to the amount of that index on the effective date of this subchapter each of the liability limits prescribed in Section 11.02(a) or in Section 11.03 of this subchapter, as applicable, shall be increased or decreased, as applicable, by a sum equal to the amount of such limit multiplied by the percentage increase or decrease in the consumer price index between the effective date of this subchapter and the time at which damages subject to such limits are awarded by final judgment or settlement.

### Subchapter's Application Prevails over Certain Other Laws

Sec. 11.05. The provisions of this subchapter shall apply notwithstanding the provisions contained in Article 4671, Revised Civil Statutes of Texas, 1925, as amended, and the provisions of Article 5525, Revised Civil Statutes of Texas, 1925, as amended.

## SUBCHAPTER L. MISCELLANEOUS PROVISIONS

### Exception From Certain Laws

Sec. 12.01. (a) Notwithstanding any other law, no provisions of Sections 17.41–17.63, Business & Commerce Code, shall apply to physicians or health care providers as defined in Section 1.03(3) of this Act, with respect to claims for damages for personal injury or death resulting, or alleged to have resulted, from negligence on the part of any physician or health care provider.

(b) This section shall not apply to pharmacists.

## SUBCHAPTER M. PROCEDURAL PROVISIONS

### Cost Bond, Deposit, and Expert Report

Sec. 13.01. (a) In a health care liability claim, a claimant shall, not later than the 90th day after the date the claim is filed:

(1) file a separate cost bond in the amount of $5,000 for each physician or health care provider named by the claimant in the action;

(2) place cash in an escrow account in the amount of $5,000 for each physician or health care provider named in the action; or

(3) file an expert report for each physician or health care provider with respect to whom a cost bond has not been filed and cash in lieu of the bond has not been deposited under Subdivision (1) or (2) of this subsection.

(b) If, as to a defendant physician or health care provider, an expert report, cost bond, or cash in lieu of bond has not been filed or deposited within the period specified by Subsection (a) or (h) of this section, the court, on the motion of the affected physician or health care provider, shall enter an order that:

(1) requires the filing of a $7,500 cost bond with respect to the physician or health care provider not later than the 21st day after the date of the order; and

(2) provides that if the claimant fails to comply with the order, the action shall be dismissed for want of prosecution with respect to the physician or health care provider, subject to reinstatement in accordance with the applicable rules of civil procedure and Subsection (c) of this section.

128

Case 1:00-cv-00192  Document 66  Filed in TXSD on 09/24/2001  Page 64 of 80

(c) Before a claim that has been dismissed under Subsection (b)(2) of this section may be reinstated, the claimant must pay the costs of court incurred by the defendant before the dismissal and file a $7,500 cost bond for each defendant physician or health care provider.

(d) Not later than the later of the 180th day after the date on which a health care liability claim is filed or the last day of any extended period established under Subsection (f) or (h) of this section, the claimant shall, for each physician or health care provider against whom a claim is asserted:

(1) furnish to counsel for each physician or health care provider one or more expert reports, with a curriculum vitae of each expert listed in the report; or

(2) voluntarily nonsuit the action against the physician or health care provider.

(e) If a claimant has failed, for any defendant physician or health care provider, to comply with Subsection (d) of this section within the time required, the court shall, on the motion of the affected physician or health care provider, enter an order awarding as sanctions against the claimant or the claimant's attorney:

(1) the reasonable attorney's fees and costs of court incurred by that defendant;

(2) the forfeiture of any cost bond respecting the claimant's claim against that defendant to the extent necessary to pay the award; and

(3) the dismissal of the action of the claimant against that defendant with prejudice to the claim's refiling.

(f) The court may, for good cause shown after motion and hearing, extend any time period specified in Subsection (d) of this section for an additional 30 days. Only one extension may be granted under this subsection.

(g) Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline established by Subsection (d) of this section and after hearing the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

(h) The affected parties may agree to extend any time period specified in Subsection (a) or (d) of this section. An agreement under this subsection is binding and shall be honored by the court if signed by the affected parties or their counsel and filed with the court.

(i) Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for filing an expert report by filing reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

(j) Nothing in this section shall be construed to require the filing of an expert report regarding any issue other than an issue relating to liability or causation.

(k) Notwithstanding any other law, an expert report filed under this section:

(1) is not admissible in evidence by a defendant;

(2) shall not be used in a deposition, trial, or other proceeding; and

(3) shall not be referred to by a defendant during the course of the action for any purpose.

(l) A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of this section.

(m) On the claimant's compliance with the requirements of Subsection (d) of this section:

(1) any cost bond filed or cash deposited in an escrow account by the claimant under this section shall be released;

(2) the claimant, the claimant's counsel, and any surety have no liability on the cost bond or cash deposit; and

(3) an execution shall not be issued on the cost bond or cash deposit.

(n) If a claimant nonsuits a health care liability claim against a physician or health care provider before filing a cost bond and seeks to refile the same or a similar health care liability claim against the physician or health care provider, the claimant shall file a $7,500 cost bond for each previously nonsuited physician or health care provider at the time of the filing of the health care liability claim. If the claimant fails to file the $7,500 cost bond for each physician or health care provider, on motion and hearing the court shall order the filing of the cost bond and the claimant shall pay the movant reasonable attorney's fees incurred in obtaining relief under this subsection.

(o) Notwithstanding any other provision of this section, a claimant who is proceeding without an attorney and who is unable to afford a cost bond or cash deposit may, in lieu of a cost bond or cash deposit, file an affidavit in the same form required for an affidavit in lieu of security for costs under the Texas Rules of Civil Procedure.

(p) In the event of a conflict between this section and another law, including a rule of procedure or court rule, this section controls to the extent of the conflict.

(q) Notwithstanding the provisions of Section 22.004, Government Code, the supreme court may not amend or adopt rules in conflict with this section. The district courts and statutory county courts in a county may not adopt local rules in conflict with this section.

(r) In this section:

(1) "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

(2) "Claim" means a health care liability claim.

(3) "Claimant" means a party who files a pleading asserting a claim. All plaintiffs claiming to have sustained damages as the result of the bodily injury or death of a single person are considered to be a single claimant.

(4) "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

(5) "Expert" means:

(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 14.01(a) of this Act; or

(B) with respect to a person giving opinion testimony about a nonphysician health care provider, an expert who has knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.

(6) "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Palacios

**Discovery Procedures**

Sec. 13.02.  (a) In every health care liability claim the plaintiff shall within 45 days after the date of filing of the original petition serve on the defendant's attorney or, if no attorney has appeared for the defendant, on the defendant full and complete answers to the appropriate standard set of interrogatories and full and complete responses to the appropriate standard set of requests for production of documents and things promulgated in accordance with Subsection (c) of this section.

(b) Every physician or health care provider who is a defendant in a health care liability claim shall within 45 days after the date on which an answer to the petition was due serve on the plaintiff's attorney or, if the plaintiff is not represented by an attorney, on the plaintiff full and complete answers to the appropriate standard set of interrogatories and complete responses to the standard set of requests for production of documents and things promulgated pursuant to Subsection (c) of this section.

(c) The chief justice of the Supreme Court of Texas shall within 30 days after the effective date of this Act appoint as members of the Health Care Liability Discovery Panel three persons from a list of attorneys to be submitted by a statewide association of attorneys whose members include persons who customarily represent patients in health care liability actions and three persons from a list of attorneys to be submitted by a statewide association of attorneys whose members include persons who customarily represent defendants in health care liability actions. Members of the Health Care Liability Discovery Panel serve without compensation. On or before the 1st day of November, 1993, the Health Care Liability Discovery Panel shall promulgate standard sets of interrogatories and requests for production of documents and things appropriate for each of the categories of plaintiffs and defendants usually involved in health care liability claims. In preparing standard sets of interrogatories the Health Care Liability Discovery Panel shall not be restricted in number by any limit imposed under the Texas Rules of Civil Procedure.

(d) The Supreme Court of Texas shall review the standard sets of interrogatories and requests for production of documents and things promulgated by the Health Care Liability Discovery Panel and shall, no later than January 1, 1994, approve them in their entirety, disapprove them in their entirety, or approve them with modifications. If the supreme court disapproves such standard sets of interrogatories and requests for production of documents and things in their entirety, then such standard sets shall be null and void and of no effect, and the Health Care Liability Discovery Panel shall be disbanded. If the supreme court approves such standard sets of interrogatories and requests for production of documents and things with modifications, then the Health Care Liability Discovery Panel shall either approve or disapprove such standard sets of interrogatories and requests for production of documents and things as modified by the supreme court by a vote of at least five of the six members of the panel. If the modifications made by the supreme court fail to obtain the necessary vote for approval by the panel, then such standard sets of interrogatories and requests for production of documents and things shall be null and void and of no effect and the panel shall be disbanded. If the panel approves the modified standard sets of interrogatories and requests for production of documents and things, then the supreme court shall proceed to publish the standard sets in accordance with Subsection (e) of this section.

(e) As soon as practical after the approval of such standard sets of interrogatories and requests for production of documents and things by the Health Care Liability Discovery Panel and the Supreme Court of Texas, and in any event no later than February 1, 1994, the supreme court shall publish such standard sets. Notwithstanding any other law, the supreme court shall not be required to publish such standard sets of interrogatories and requests for production of documents and things for public comment. Beginning on April 1, 1994, all plaintiffs and all physicians or health care providers who are defendants in a health care liability claim in which the plaintiff's original petition is filed on or after that date shall file full and complete answers and responses in accordance with Subsections (a) and (b) of this section.

(f) Nothing in this section shall limit or impede the Supreme Court of Texas in exercising its rulemaking authority pursuant to Sections 22.003 and 22.004, Government Code.

(g) Except on motion and for good cause shown, no objection may be asserted regarding any standard interrogatory or request for production of documents and things, but no response shall be required where a particular interrogatory or request is clearly inapplicable under the circumstances of the case.

(h) Failure to file full and complete answers and responses to standard interrogatories and requests for production of documents and things in accordance with Subsections (a) and (b) of this section or the making of a groundless objection under Subsection (g) of this section shall be grounds for sanctions by the court in accordance with the Texas Rules of Civil Procedure on motion of any party.

(i) The time limits imposed under Subsections (a) and (b) of this section may be extended v the court on the motion of a responding party for good cause shown and shall be extended if agreed in writing between the responding party and all opposing parties. In no event shall an extension be for a period of more than an additional 30 days.

(j) If a party is added by an amended pleading, intervention, or otherwise, the new party shall file full and complete answers to the appropriate standard set of interrogatories and full and complete responses to the standard set of requests for production of documents and

CASPDF - www.fesisc.com

Case 1:00-cv-00192  Document 66  Filed in TXSD on 09/24/2001  Page 67 of 80

things no later than 45 days after the date of filing of the pleading by which the party first appeared in the action.

(k) If information or documents required to provide full and complete answers and responses as required by this section are not in the possession of the responding party or attorney when the answers or responses are filed, the party shall supplement the answers and responses in accordance with the Texas Rules of Civil Procedure.

(l) Nothing in this section shall preclude any party from taking additional non-duplicative discovery of any other party. The standard sets of interrogatories provided for in this section shall not constitute, as to each plaintiff and each physician or health care provider who is a defendant, the first of the two sets of interrogatories permitted under the Texas Rules of Civil Procedure.

(m) Notwithstanding any other provisions of this section, if a court of this state has, prior to the effective date of this section, signed an order in tort litigation in which cases have been consolidated for discovery providing for standard sets of interrogatories and requests for production of documents and things, compliance with such an order shall be deemed to be compliance with the requirements of this section.

## SUBCHAPTER N.  EXPERT WITNESSES

### Qualification of Expert Witness in Suit Against Physician

Sec. 14.01.  (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

(b) For the purpose of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

(d) The court shall apply the criteria specified in Subsections (a), (b), and (c) of this section in determining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care, but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

(e) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This

Supreme Court of Texas.

**AMERICAN TRANSITIONAL CARE CENTERS OF TEXAS, INC. d/b/a American Transitional Hospital, Petitioner,**

v.

**Teofilo PALACIOS and Maria Palacios, individually and a/n/f of Gloria Janeth Palacios and Rocio Daniela Palacios, minors, Maria Angelica Palacios, and Sentry Insurance, a mutual company, Respondents.**

No. 99-1311.

Argued Dec. 6, 2000.
Decided May 10, 2001.
Rehearing Overruled June 28, 2001.

Medical malpractice action was brought against hospital to recover for injuries patient allegedly suffered in fall at hospital. The 280th District Court, Harris County, Tony Lindsay, J., dismissed case for failure to file expert report, as required by Medical Liability and Insurance Improvement Act. Patient appealed. The Houston Court of Appeals, First District, reversed and remanded, 4 S.W.3d 857. On petition for review, the Supreme Court, Hankinson, J., held that: (1) trial court's determination about adequacy of expert report under Act is reviewed under abuse-of-discretion standard, and (2) expert's report did not provide fair summary of standard of care and how it was breached.

Court of Appeals' judgment reversed.

West Headnotes

**[1] Physicians and Surgeons** ⬅➞**18.80(6.1)**
299k18.80(6.1)

Expert testimony is necessary in medical-malpractice cases. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(d).

**[2] Physicians and Surgeons** ⬅➞**18.130**
299k18.130

A trial court's determination about the adequacy of an expert report under the Medical Liability and Insurance Improvement Act is reviewed under an abuse-of-discretion standard. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l), (r)(6).

**[3] Appeal and Error** ⬅➞**984(1)**
30k984(1)

Sanctions are generally reviewed under an abuse-of-discretion standard.

**[4] Physicians and Surgeons** ⬅➞**18.20**
299k18.20

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, the trial court should look no further than the report. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l).

**[5] Physicians and Surgeons** ⬅➞**18.20**
299k18.20

For an expert's report to satisfy the requirements of the Medical Liability and Insurance Improvement Act, the report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l).

**[6] Physicians and Surgeons** ⬅➞**18.20**
299k18.20

For an expert's report to constitute a good-faith effort under the Medical Liability and Insurance Improvement Act, the report must provide enough information to fulfill two purposes: first, the report must inform the defendant of the specific conduct the plaintiff has called into question; second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l), (r)(6).

**[7] Physicians and Surgeons** ⬅➞**18.20**
299k18.20

A report that merely states the expert's conclusions about the standard of care, breach, and causation does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(l), (r)(6).

**[8] Physicians and Surgeons** ⬅➞**18.20**
299k18.20

An expert's report that omits any of the statutory requirements does not constitute a good-faith effort under the Medical Liability and Insurance

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

46 S.W.3d 873
(Cite as: 46 S.W.3d 873, 2001 WL 491205 (Tex.))

Improvement Act. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[9] Physicians and Surgeons ☞18.20**
299k18.20

To avoid dismissal due to inadequacy of an expert's report under the Medical Liability and Insurance Improvement Act, a plaintiff need not present evidence in the report as if it were actually litigating the merits. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[10] Physicians and Surgeons ☞18.20**
299k18.20

The expert's report in a medical malpractice action can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[11] Hospitals ☞8**
204k8

Conclusory statement in expert's report that defendant hospital did not use precautions to prevent patient's fall was not good-faith effort to provide fair summary of standard of care and how it was breached, and thus, dismissal of medical malpractice action was warranted under Medical Liability and Insurance Improvement Act; it could not be determined from that statement if expert believed that standard of care required hospital to have monitored patient more closely, restrained him more securely, or done something else entirely. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

**[12] Physicians and Surgeons ☞18.20**
299k18.20

An expert's report does not constitute a good-faith effort under the Medical Liability and Insurance Improvement Act if it simply states that he or she knows the standard of care and that it was or was not met. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

*875 James C. Marrow, Marshall & McCraken, Wesley Nagorny, Marshall & Gonzalez, Matthew T. McCracken, John C. Marshall, Marshall & McCraken, Hoston, for Petitioner.

D. John Leger, Leger & Coplen, Levon G.

Hovnatanian, Martin Disiere & Jefferson, Houston, Mickey C. Shyrock, Law Office of Mickey C. Shyrock, Athens, for Respondents.

Justice HANKINSON delivered the opinion of the Court.

**1 In this medical-malpractice case we determine the standards for reviewing an expert report under section 13.01 of the Medical Liability and Insurance Improvement Act. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01. The trial court dismissed the Palacioses' medical-malpractice claims against American Transitional Care Centers, Inc., d/b/a American Transitional Hospital, because it determined that the Palacioses' expert report did not show a good-faith effort to provide a fair summary of the expert's opinions about the standard of care, breach, and causation, as required by section 13.01. *See id.* § 13.01(d), (e), (*l*), (r)(6). The court of appeals, after evaluating the trial court's decision as it would a summary-judgment decision, reversed, holding that the report did meet the statutory requirements. 4 S.W.3d 857, 860.

We hold that a trial court's decision to dismiss a case under section 13.01(e) is reviewed for abuse of discretion. We further hold that to constitute a good-faith effort to provide a fair summary of an expert's opinions under section 13.01(*l*), an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. In this case, the trial court did not abuse its discretion in concluding that the challenged report does not meet the statutory requirements and in dismissing with prejudice the claims against American Transitional. Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

Teofilo Palacios suffered brain damage and other severe injuries following a two-story fall at work. After almost a year in an intensive rehabilitation program, he was transferred to American Transitional Hospital for further rehabilitation. Although Palacios at that time was able to *876 communicate with others and respond to simple commands, he required assistance with most daily tasks. In addition, due to the severity of his brain damage, Palacios' physicians prescribed bed restraints for him. Nevertheless, while a patient at American Transitional, Palacios fell from his bed and required additional medical care for his

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

injuries. His family claims that this fall caused him to sustain further brain injury, which impaired his ability to communicate with others and to assist them in his care.

Palacios and his family sued American Transitional and the treating doctors, respectively, for negligently failing to prevent the fall and negligently treating him after the fall. After ninety days passed from the date the Palacioses filed suit, American Transitional, along with the other defendants, moved to require the Palacioses to file a $7,500 cost bond, as required by section 13.01(b) of the Medical Liability and Insurance Improvement Act. *See* Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(b) (authorizing a trial court to order a plaintiff to file a $7,500 cost bond for each defendant physician or health-care provider if the plaintiff has not complied with the expert-report or $5,000 cost-bond requirement in section 13.01(a)); *id.* § 13.01(a) (requiring the plaintiff to file either an expert report or a $5,000 cost bond for each defendant physician or health-care provider within ninety days of filing suit). The trial court granted the motion, and the Palacioses filed a cost bond for each defendant.

**2 After 180 days passed from the date the Palacioses filed suit, American Transitional moved to dismiss the case against it because the Palacioses did not file an expert report and curriculum vitae, or nonsuit the claims against American Transitional, as section 13.01(d) of the Act requires. *See id.* § 13.01(d), (e). The Palacioses moved for an extension of time to file the report, which the trial court granted. *See id.* § 13.01(f), (g). The Palacioses then filed a report prepared by Dr. Catherine F. Bontke, who treated Palacios at the first rehabilitation hospital. American Transitional again moved to dismiss under section 13.01(e), claiming that the report did not satisfy the statutory requirements. *See id.* § 13.01(*l*), (r)(6). The trial court granted the motion, dismissed with prejudice the claims against American Transitional, and severed those claims to make the judgment against American Transitional final. *See id.* § 13.01(e).

The Palacioses appealed, and, with one justice dissenting, the court of appeals reversed and remanded after using summary-judgment review standards to evaluate the sufficiency of the expert report. 4 S.W.3d at 860. After indulging every reasonable inference in the Palacioses' favor and eliminating any deference to the trial court's decision, the court of appeals concluded that the trial court erred in dismissing the case because the Palacioses made a good-faith effort to provide a report that met the requirements of section 13.01(r)(6). *Id.* at 862-63. American Transitional petitioned for review challenging both the standard of review applied by the court of appeals and the sufficiency of the Palacioses' report.

[1] Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases. *E.g., Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). "There can be no other guide [than expert testimony], and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury." *Hart,* 399 S.W.2d at 792. Because expert testimony is crucial to a medical-malpractice case, *877 knowing what specific conduct the plaintiff's experts have called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims. This makes eliciting an expert's opinions early in the litigation an obvious place to start in attempting to reduce frivolous lawsuits. *See* HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995).

Accordingly, in section 13.01, the Legislature requires medical-malpractice plaintiffs, within 180 days of filing suit, either to provide each defendant physician and health-care provider with an expert report and the expert's curriculum vitae, or to nonsuit the claims. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(d). If the plaintiff fails within the time allowed either to provide the expert reports and curriculum vitae, or to nonsuit the case, the trial court must sanction the plaintiff by dismissing the case with prejudice, awarding costs and attorney's fees to the defendant, and ordering the forfeiture of any applicable cost bond necessary to pay that award. *Id.* § 13.01(e). If the plaintiff does timely file a report, the defendant may move to challenge the adequacy of the report, and the trial court must grant the motion if "it appears to the court ... that the report does not represent a good faith effort to comply with the definition of an expert report." *Id.* § 13.01(*l*). The statute defines an expert report as "a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). If a trial court determines that an expert report does not meet these statutory requirements and the time for filing a report has passed, it must then dismiss with prejudice the claims against the defendant who has challenged the report. *Id.* § 13.01(e).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 71 of 80

**\*\*3** American Transitional contends that a trial court's determination about the adequacy of an expert report should be reviewed under an abuse-of- discretion standard. The Palacioses respond that whether a report meets the requirements of subsections 13.01(*l*) and (r)(6) is a question of law. They suggest that a trial court's decision on the adequacy of a report should be reviewed as a court would review a summary-judgment decision: that is, by indulging every reasonable inference and resolving any doubts in the nonmovant's favor, and eliminating any deference to the trial court's decision. We agree with American Transitional.

[2][3] The plain language of section 13.01 leads to the conclusion that abuse of discretion is the proper standard. First, the statute directs the trial court to grant a motion challenging the adequacy of an expert report if it "appears to the court" that the plaintiffs did not make a good-faith effort to meet the statutory requirements. *Id.* § 13.01(*l*). This language plainly vests the trial court with discretion. *See* Tex. Gov't Code § 312.002. ("[W]ords shall be given their ordinary meaning."). Second, the statute states that dismissal under section 13.01(e) is a sanction: If the requirements of section 13.01(d) are not met, the court must "enter an order as sanctions" dismissing the case and granting the defendant its costs and attorneys' fees. Tex.Rev.Civ. Stat. Ann . art. 4590i, § 13.01(e). Sanctions are generally reviewed under an abuse-of-discretion standard. *Koslow's v. Mackie*, 796 S.W.2d 700, 704 (Tex.1990). And we presume the Legislature was aware of the standard of review ordinarily applied in sanctions cases when it explicitly identified a court's dismissal under section 13.01(e) as a sanction. **\*878** *See McBride v. Clayton*, 140 Tex. 71, 166 S.W.2d 125, 128 (1943) ("All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it.").

Nevertheless, the court of appeals concluded that the usual standard of review for sanctions should not apply here. The court reasoned that the provisions of article 4590i at issue here were intended to discourage frivolous lawsuits, while sanctions, in contrast, are a response to litigation misconduct. We disagree with this distinction.

Filing a frivolous lawsuit can be litigation misconduct subject to sanction. *See* Tex.R. Civ. P. 13 (imposing sanctions for filing groundless motions, pleadings, or other papers in bad faith or for the purposes of harassment). And one purpose of the expert-report requirement is to deter frivolous claims. House Comm. on Civ. Prac., Bill Analysis, Tex. H.B. 971, 74th Leg.,

R.S. (1995). The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous or at best has been brought prematurely. *See id.* This is exactly the type of conduct for which sanctions are appropriate. *See TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex.1991) (holding that "death-penalty" sanctions are appropriate when a party's discovery abuse justifies a presumption that its claims lack merit). For these reasons, we hold that an abuse-of-discretion standard of review applies to a trial court's decision to dismiss a case under section 13.01(e).

**\*\*4** [4] We next consider whether the trial court abused its discretion in dismissing the Palacioses' claims against American Transitional. The parties disagree about how to determine a report's adequacy under section 13.01(*l* ). American Transitional argues that the trial court must engage in a two-step process: (1) the trial court must determine whether the report constitutes a fair summary of the expert's opinions, Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(r)(6); and (2) if the trial court concludes that the report is not a fair summary, it must then look outside the report at the plaintiff's conduct to determine whether the plaintiff made a good-faith effort to meet the statutory requirements, *id.* § 13.01(*l* ). The Palacioses, on the other hand, argue that the statute requires only one inquiry--whether the report evidences a good-faith effort to provide a fair summary of the expert's opinions. According to the Palacioses, the trial court does not have to make any factual determinations because the only relevant information is in the report itself. We agree with the Palacioses that a trial court should look no further than the report in conducting a section 13.01(*l* ) inquiry.

The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. *Id.* § 13.01(*l* ). That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. *Id.* § 13.01(r)(6). Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

[5][6] Under subsections 13.01(*l* ) and (r)(6), the expert report must represent only a good-faith effort to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00192  Document 66  Filed in TXSD on 09/24/2001  Page 72 of 80

provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See Hart v. Wright,* 16 *879 S.W.3d 872, 877 (Tex.App.--Fort Worth 2000, pet. denied). In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *See* 4 S.W.3d at 865 (Taft, J. dissenting); *Wood v. Tice,* 988 S.W.2d 829, 830 (Tex.App.--San Antonio 1999, pet. denied) (noting that one of the purposes of article 4590i is to deter frivolous claims).

[7][8][9][10] A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. *See, e.g., Hart,* 16 S.W.3d at 877 (holding that a report was inadequate because it stated that the patient had a heart attack and the doctor breached the standard of care, without describing the standard of care); *Wood,* 988 S.W.2d at 831-32 (holding that an expert report did not meet the statutory requirements because it did not name the defendants, state how the defendants breached the standard of care, demonstrate causation and damages, or include a curriculum vitae). However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *See, e.g.,* Tex.R. Civ. P. 166(f) (setting out the requirements for the form and content of affidavits offered as summary-judgment proof); Tex.R. Evid. 802 (stating that most hearsay is inadmissible).

**5 [11] American Transitional contends that Dr. Bontke's report does not meet the statutory requirements because it does not represent a good-faith effort to provide a fair summary of her opinion on the standard of care and how American Transitional breached that standard. The Palacioses respond that the following parts of Dr. Bontke's report establish these elements:

Based on the available documentation I was able to conclude that: Mr. Palacios fell from his bed on 5/14/94 while trying to get out of it on his own. The

nursing notes document that he was observed by nursing on the hour for two hours prior to the fall. In addition, ten minutes before the fall, the nursing notes documents [sic] the his wrist/vest restraints were on. Yet, at the time of his fall he was found on the floor with his vest/wrist restraints on but not tied to the bed. It is unclear how he could untie all four of the restraints from the bedframe in under ten minutes. Obviously, Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized.

....

All in all, Mr. Palacios sustained a second brain injury with a left subdural hematoma while he was an inpatient at [the Hospital].... [I]n my opinion, the medical care rendered to Mr. Palacios at the time of his second brain injury was below the accepted and expected standard of care which he could expect to receive. Moreover, this [sic] below the accepted standard of care extends to both the cause of the second injury as well as the subsequent treatment....

The Palacioses rely mostly on one sentence in the report to establish the standard of care: "Mr. Palacios had a habit of *880 trying to undo his restraints and precautions to prevent his fall were not properly utilized." They argue that the inference can be made from that sentence, along with the statement that "[i]t is unclear how he could untie all four of the restraints from the bed frame in under ten minutes," that Dr. Bontke believes American Transitional's staff should have tied the restraints to the bed more securely.

[12] The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. *See Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 366 (Tex.1987). Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." 4 S.W.3d at 865 (Taft, J. dissenting). The statement the Palacioses rely upon-- that precautions to prevent Palacios' fall were not properly used--is not a statement of a standard of care. Neither the trial court nor American Transitional would be able to determine from this conclusory statement if Dr. Bontke believes that the standard of care required American Transitional to have monitored Palacios more closely, restrained him more securely, or done something else entirely. "It is not sufficient for an

expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *See Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.– El Paso 1995, writ denied). Knowing only that the expert believes that American Transitional did not take precautions to prevent the fall might be useful if American Transitional had an absolute duty to prevent falls from its hospital beds. But as a general rule, res ipsa loquitur does not apply in medical-malpractice cases. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 7.01 (limiting res ipsa loquitur in medical malpractice to the limited classes of cases to which it applied as of August 29, 1977); *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990).

**6 When the expert report's conclusory statements do not put the defendant or the trial court on notice of the conduct complained of, section 13.01(*l* ) affords the trial court no discretion but to conclude, as the trial court did here, that the report does not represent a good-faith effort to provide a fair summary of the standard of care and how it was breached, as section 13.01(r)(6) requires. And because the statutory 180 day time period had passed when the trial court here made that determination, section 13.01(e) required the court to dismiss with prejudice the Palacioses' claims against American Transitional. *See* Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(e). Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**KeyCite**

Date of Printing: SEP 05,2001

## KEYCITE

CITATION:    **American Transitional Care Centers of Texas, Inc. v. Palacios, 46 S.W.3d 873, 44 Tex. Sup. Ct. J. 720 (Tex., May 10, 2001) (NO. 99-1311)**

### Citations
#### Positive Cases
##### **** Examined

1 Hightower v. Saxton, 2001 WL 840615, *1+ (Tex.App.-Waco Jul 25, 2001) (NO. 10-99-364-CV) "" HN: 6,11,12

2 Phillips v. Children's Medical Center Of Dallas, 2001 WL 710440, *1+ (Tex.App.-Dallas Jun 26, 2001) (NO. 05-98-01562-CV) HN: 6,8,11

3 Paslay v. Prigoff, 2001 WL 637819, *1+ (Tex.App.-Dallas Jun 11, 2001) (NO. 05-99-01236-CV) "" HN: 6,11

4 Wright v. Bowie Memorial Hosp., 48 S.W.3d 443, 445+ (Tex.App.-Fort Worth May 31, 2001) (NO. 2-00-072-CV) "" HN: 5,6,11

##### *** Discussed

5 Gonzalez ex rel. Gonzalez v. El Paso Hosp. Dist., 2001 WL 665002, *2+ (Tex.App.-El Paso Jun 14, 2001) (NO. 08-99-00077-CV) HN: 2,7

##### ** Cited

6 Rittmer v. Garza, 2001 WL 893318, *2+ (Tex.App.-Hous. (14 Dist.) Aug 09, 2001) (NO. 14-00-01051-CV) HN: 2

7 Gutierrez v. Walker, 50 S.W.3d 61, 65 (Tex.App.-Corpus Christi Jun 14, 2001) (NO. 13-00-171-CV)

8 Velasquez ex rel. Velasquez v. Tenet Hospitals Ltd., 2001 WL 633770, *3 (Tex.App.-El Paso Jun 07, 2001) (NO. 08-99-00437-CV) HN: 2

9 Richburg v. Wolf, 48 S.W.3d 375, 377+ (Tex.App.-Eastland May 17, 2001) (NO. 11-00-00287-CV) HN: 2

© Copyright West Group 2001

Case 1:00-cv-00192    Document 66    Filed in TXSD on 09/24/2001    Page 75 of 80

Court of Appeals of Texas,
Fort Worth.

Barbara WRIGHT and P.L. Wright, Appellants,
v.
BOWIE MEMORIAL HOSPITAL a/k/a Bowie
Hospital District d/b/a Bowie Memorial
Hospital Authority d/b/a Bowie Memorial Hospital
and Michael T. Layne,
Appellees.

No. 2-00-072-CV.

May 31, 2001.
Rehearing Overruled July 19, 2001.

Patient brought a negligence and medical malpractice action against hospital and physician's assistant due to the treatment she received after she was injured in an automobile collision. The 78th District Court, Wichita County, Keith Nelson, J., dismissed patient's claims. Patient appealed. The Court of Appeals, Livingston, J., held that: (1) trial court did not abuse its discretion when it dismissed patient's claims against physician's assistant based upon patient's expert medical report; (2) a portion of patient's medical expert report that examined hospital's practices and procedures made a good faith effort to comply with the Medical Liability and Insurance Improvement Act (MLIIA); and (3) trial court erred when it awarded physician's assistant and hospital attorney fees and costs.

Affirmed in part and reversed and remanded in part.

Day, J., filed a dissenting opinion.

West Headnotes

[1] Physicians and Surgeons ☜==18.20
299k18.20

A court must dismiss the claim for medical malpractice if the expert medical report is inadequate but only if the report fails to show a good faith effort to comply. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(e)(3).

[2] Physicians and Surgeons ☜==18.130
299k18.130

In reviewing a trial court's order to dismiss medical malpractice action for failure to provide an adequate expert report, the Court of Appeals applies an abuse of discretion standard. Vernon's Ann.Texas Civ.St. art.

4590i, § 13.01(e)(3).

[3] Physicians and Surgeons ☜==18.130
299k18.130

The Court of Appeals has to look only to the report itself in conducting a Medical Liability and Insurance Improvement Act (MLIIA) expert report inquiry; the only relevant information is in the report itself. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

[4] Physicians and Surgeons ☜==18.20
299k18.20

A medical expert's report in medical malpractice action need not marshal all the plaintiff's proof but it must include the expert's opinion on each of the elements identified in the statute. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(r)(6).

[5] Physicians and Surgeons ☜==18.20
299k18.20

The medical expert's report in medical malpractice action must inform the defendant of the specific conduct the plaintiff has called into question; second, the report must provide a basis for the trial court to conclude that the claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, §13.01(r)(6).

[6] Physicians and Surgeons ☜==18.20
299k18.20

Trial court did not abuse its discretion when it dismissed patient's malpractice claims against physician's assistant based upon patient's expert medical report, where expert physician's report failed to provide a summary on the standard of care, breach of that standard, or causal relationship to any damages as to physician's assistant. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

[7] Hospitals ☜==8
204k8

[7] Physicians and Surgeons ☜==18.20
299k18.20

A portion of patient's medical expert report that examined hospital's practices and procedures made a good faith effort to comply with the Medical Liability and Insurance Improvement Act (MLIIA), thus precluding dismissal of negligence and medical

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

CSMPDF www.fasoo.com

Case 1:00-cv-00192  Document 66  Filed in TXSD on 09/24/2001  Page 76 of 80

malpractice action, where report identified the appropriate standard of care for hospital, it identified the manner in which hospital failed to meet the standard, and it provided insight into the casual relationship between the breach and the damages patient suffered. Vernon's Ann.Texas Civ.St. art. 4590i, §13.01(*l*), (r)(6).

**[8] Costs** ☞48
102k48

**[8] Costs** ☞194.48
102k194.48

Physician's assistant was entitled to award of attorney fees and costs, in negligence and medical malpractice action, where malpractice claims against physician's assistant were dismissed. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(e)(1).

**[9] Appeal and Error** ☞1180(1)
30k1180(1)

Hospital was not entitled to award of attorney fees and costs, following dismissal of negligence and medical malpractice action, where dismissal was reversed on appeal. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(e)(1).
*445 Queenan Law Firm, M. Keith Queenan and Britta J. Gordon, DeSoto, for Appellant.

Cowles & Thompson, P.C., Charles T. Frazier, Jr., Gregory J. Lensing, Dallas, for Appellee.

PANEL B: DAY, LIVINGSTON, and GARDNER, JJ.

## OPINION

LIVINGSTON, Justice.

Barbara Wright and P.L. Wright, appellants, appeal the trial court's dismissal of their medical malpractice case against Michael T. Layne, a physician's assistant, and Bowie Memorial Hospital a/k/a Bowie Hospital District d/b/a Bowie Memorial Hospital Authority d/b/ a Bowie Memorial Hospital (collectively "appellees"), due to their failure to comply with the Medical Liability and Insurance Improvement Act (MLIIA) expert report requirement. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(r)(6) (Vernon Supp.2001). They also appeal the trial court's award of attorney's fees against them. We affirm the trial court's judgment as to Layne and reverse and remand as to Bowie Hospital and

reverse and remand on the issue of attorney's fees.

## Facts

Barbara Wright and her husband, P.L. Wright, filed suit against appellees, as well as several other individuals and entities, asserting negligence and medical malpractice claims related to the treatment she received because of her injuries from a motor vehicle accident. The seventy-five-year-old Mrs. Wright was admitted to Bowie Hospital on the day of her accident in December 1996. She was x-rayed and diagnosed with only a patella (knee) fracture despite injuries and x-rays to her right foot while at Bowie Hospital under Layne's and a Dr. Hodde's care. She was then transferred to Bethania Regional Hospital where the diagnosis remained the same. The films of her right foot were either misplaced or unavailable on her admission to Bethania. She had an open reduction and internal fixation of her right patella with no diagnosis of injury to or surgery for her right foot. A month later, in January 1997, one of her doctors noticed a second metatarsal fracture. She participated in physical therapy for her foot pain for two months. However, the pain in her foot continued. Over the next ten months she underwent two more surgeries on her right foot, the last of which was to fuse her foot fracture.

## Adequacy of the Expert Report

[1] In appellants' first issue they complain of the trial court's dismissal of their claims due to the inadequacy of their expert medical report. Under the MLIIA a claimant is required to file an expert medical report that provides a fair summary of the expert's opinion setting forth the standard of care, the manner in which the health care provider failed to meet that standard, and the causal connection between that failure and the injury or harm. *Id.* A court must dismiss the claim if the report is inadequate but *only if* the report fails to show a good faith effort to comply. *Id.* § 13.01(e)(3); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878-79 (Tex.2001) (citing with approval *446 Hart v. Wright,* 16 S.W.3d 872, 877 (Tex.App.--Fort Worth 2000, pet. denied)).

[2] In reviewing a trial court's order to dismiss for failure to provide an adequate expert report, we apply an abuse of discretion standard. *Palacios,* 46 S.W.3d at 877; *Hart,* 16 S.W.3d at 875; *Estrello v. Elboar,* 965 S.W.2d 754, 758 (Tex.App.--Fort Worth 1998, no pet.); *accord Morrill v. Third Coast Emergency Physicians, P.A.,* 32 S.W.3d 324, 327 (Tex.App.--San Antonio 2000, pet. denied); *Tesch v. Stroud,* 28

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00192  Document 66  Filed in TXSD on 09/24/2001  Page 77 of 80

S.W.3d 782, 786 (Tex.App.-- Corpus Christi 2000, pet. denied); *Jackson v. Reardon*, 14 S.W.3d 816, 818 (Tex.App.--Houston [1st Dist.] 2000, no pet.) (applying abuse of discretion standard to review of timeliness of expert report, but not to timeliness question); *Schorp v. Baptist Mem'l Health Sys.*, 5 S.W.3d 727, 733 (Tex.App.--San Antonio 1999, no pet.); *Tibbetts v. Gagliardi*, 2 S.W.3d 659, 663 (Tex.App.--Houston [14th Dist.] 1999, pet. denied) (applying abuse of discretion standard of review to both timeliness and adequacy); *Martinez v. Lakshmikanth*, 1 S.W.3d 144, 146 (Tex.App.--Corpus Christi 1999, pet. denied) (applying abuse of discretion standard to review of timeliness of plaintiff's nonsuit). Appellants urge us to adopt the summary judgment standard of review where the dismissal by the trial court is based on the inadequacy of the report as opposed to its untimeliness. They cite the first court's *Palacios* opinion for this proposition. *See Palacios v. Am. Transitional Care Ctrs. of Tex., Inc.*, 4 S.W.3d 857, 860 (Tex.App.--Houston [1st Dist.] 1999, pet. granted). However, this court has previously decided this issue against appellants as to both an untimely report and as to an inadequate report. *See Elboar*, 965 S.W.2d at 758-59; *Hart*, 16 S.W.3d at 875. And, this issue has recently been decided against them by our supreme court. *See Palacios*, 46 S.W.3d at 877-78.

[3] This dismissal order broadly bases the dismissal on failure to comply with article 4590i, section 13.01 but it fails to identify the particular deficiencies of the report and contains no findings to support it despite two hearings focusing on the report's alleged deficiencies. However, our supreme court has directed us to look only to the report itself in conducting a section 13.01(*l* ) inquiry; "the only relevant information is in the report itself." *Id.* at 878.

[4][5] Thus, we must determine whether the trial court abused its discretion in determining whether the report evidences a good faith effort to provide a fair summary of the expert's opinion. *Id.* at 878-79. A report need not marshal all the plaintiff's proof but it must include the expert's opinion on each of the elements identified in the statute. *Id.; see Hart*, 16 S.W.3d at 877. "[T]he report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit ." *Palacios*, 46 S.W.3d at 879.

[6] Appellants provided a hand-written report from a Dr. Marks for their expert report. The report contained no summary on the standard of care, breach of that

standard, or causal relationship to any damages as to appellee Layne. Appellants conceded at oral argument that the trial court did not abuse its discretion in dismissing appellants' claims against him. Appellants' first issue is, therefore, overruled as to Layne.

As to Bowie Memorial Hospital, Dr. Marks's hand-written report stated, in pertinent part:

> *447 I have reviewed the material you sent me on the above case. I believe that **the hospital fell below the appropriate standard of care in not having a defined mechanism in place whereby x-rays taken in the E.R. are read by a physician specialized in interpreting the films in a timely manner** ( [i.e.] less than 24 hrs). X-rays taken in the [E.R.] need to have re-reads performed within 24 hrs and if there is a discrepancy in the x-ray readings **a system should be in place to inform the patient of this. There did not appear to be any procedure that the hospital has for tracking x-rays. The hospital also doesn't seem to have a system of orienting health care professionals working in the E.R. nor any form of Q/A for P.A.'s staffing the E.R. There didn't appear to be any organized system or protocols for P.A. supervision in the E.R.**
>
> ....
>
> I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then **Ms. Wright would have had the possibility of a better outcome.** [Emphasis added.]

[7] First, the report identifies the appropriate standard of care for the hospital: "[H]aving a defined mechanism in place whereby x-rays taken in the E.R. are read by a physician specialized in interpreting the films in a timely manner ( [i.e.] less than 24 hrs).... [A] system should be in place to inform the patient of this."

Second, it clearly identifies the manner in which the hospital failed to meet that particular standard: "There did not appear to be any procedure that the hospital has for tracking x-rays."

And third, the report provided insight into the causal relationship between any breach and the damages suffered: "[I]f the x-rays [had] been correctly read and ... acted upon ... then Ms. Wright would have had the possibility of a better outcome." While we believe the report adequately provides a fair summary of the standard of care and how the hospital failed to meet that standard, we do not believe it adequately

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

summarizes the causal relationship between the failure and the injury claimed. However, section 13.01(*l*) instructs the trial court to dismiss *only if* the report does not represent a good faith effort to comply with section 13.01(r)(6)'s definition of expert report. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(*l*). According to the supreme court, the focus should be on whether the report provides a basis to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 878-79. While the doctor's report only stated there was a *possibility* that Mrs. Wright might have had a better outcome, we believe this is sufficient to meet the "good faith effort to comply" requirement to provide a fair summary of causation. Cases requiring a showing of "reasonable medical probability" as opposed to a mere "possibility" that the defendant's negligence caused the plaintiff's injury are cases analyzing the threshold a plaintiff must meet to get to a jury or to avoid an instructed verdict. *See, e.g., Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711-12 (Tex.1997), *cert. denied,* 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). In other words, we are not trying to see if the expert report could support a judgment at this point, but trying to determine whether the expert report is a good faith effort at a fair summary of the appellants' claim. Likewise, we do not believe the adequacy of the report should be based solely upon the claimant's failure to use magical words, like "reasonable probability." *See Schaefer *448 v. Tex. Employers' Ins. Ass'n,* 612 S.W.2d 199, 202 (Tex.1980); *Ins. Co. of N. Am. v. Myers,* 411 S.W.2d 710, 713 (Tex.1966). We therefore hold appellants' report was a good faith effort to comply because it provides a basis for the trial court to conclude that the claim has merit.

Because the trial court should have dismissed the claim only if the report failed to show a good faith effort to provide a fair summary of the appellants' claim under section 13.01(r), we believe the trial court abused its discretion in dismissing appellants' claims against Bowie Hospital. To this extent, appellants' first issue is sustained.

[8][9] In appellants' second issue, they challenge the trial court's award of attorney's fees to the appellees, contending there was no evidence to support the award to it. Appellants complain that appellees presented no evidence on attorney's fees at the October 21, 1999 hearing. Further, they complain that the attorney's fee affidavit at pages 50 and 51 of the clerk's record is not part of the clerk's record and they object to its inclusion. Additionally, they complain of appellees'

failure to segregate the attorney's fees incurred for Layne from those incurred for Bowie Hospital.

Because we have determined the trial court abused its discretion in dismissing the suit against Bowie Hospital, it would be error to award attorney's fees. Under section 13.01(e)(1) reasonable attorney's fees and costs may be awarded only to a defendant who is dismissed. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(e)(1); *Elboar,* 965 S.W.2d at 759. Because the dismissal was appropriate as to Layne, he was the only defendant entitled to recover attorney's fees and costs. To the extent appellants' second issue challenges the award of attorney's fees to Bowie Hospital, we sustain issue two. As to appellee Layne, issue two is overruled. Because the fees and costs were not segregated between the two defendants, the attorney's fees issue is reversed and remanded to the trial court for a determination consistent with this opinion.

DAY, J., filed a dissenting opinion.

DAY, Justice, dissenting.

I respectfully dissent from the majority's holding that the trial court abused its discretion in dismissing Appellants' claims against Bowie Memorial Hospital (Bowie) because Appellants' expert report illustrated a good faith effort to comply with section 13.01(r)(6)'s definition of an expert report. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(*l*) (Vernon Supp.2001).

As the majority explains, we review a trial court's order to dismiss a cause of action brought pursuant to article 4590i because of the failure to provide an adequate expert report under an abuse of discretion standard. *Hart v. Wright,* 16 S.W.3d 872, 875 (Tex.App.–Fort Worth 2000, pet. denied); *Estrello v. Elboar,* 965 S.W.2d 754, 757-58 (Tex.App.–Fort Worth 1998, no pet.). The majority concludes the trial court abused its discretion because they feel that Appellants Barbara and P.L. Wright attempted in good faith to satisfy the requirements of section 13.01(r)(6); however, merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Furthermore, section 13.01(*l*) itself provides that:

A court shall grant a motion challenging the adequacy of an expert report *only if *449 it appears to the court, after hearing,* that the report

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00192   Document 66   Filed in TXSD on 09/24/2001   Page 79 of 80

does not represent a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of this section.

Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(*l* ) (emphasis added).

Section 13.01(r)(6) provides that an expert's report is a report written by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding: (1) the applicable standard of care; (2) the manner in which the care rendered by defendant failed to meet the standard of care; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 13.01(r)(6). The majority concludes that Appellants' expert report sufficiently satisfied the first two elements, but that it failed to provide a fair summary of a causal relationship under the third element. However, the majority holds that it was a good faith effort to comply. The majority reasons that the adequacy of the expert's report should not be based solely upon the claimant's failure to use magical words, like "reasonable probability."

The majority, however, does conclude that the use of the word "possibility" does satisfy the good faith effort to comply requirement. The trial court held two hearings to determine whether the expert report was adequate and whether Appellants made a good faith effort to comply. The court heard arguments from both sides and reviewed the expert report. The trial judge indicated that he had to research the issue, and he questioned Appellants' counsel about how the expert report affected Bowie. While I agree that a court

should not find a lack of good faith merely because the expert report failed to include the magical words "reasonable probability," I also believe that we should be restrained in concluding that the report's bare statement that there was a "possibility" that Mrs. Wright might have had a better outcome indicated a good faith effort to comply with section 13.01(r)(6) in contradiction to the trial court's determination.

The record suggests that the trial court could not find a connection between the expert report and Bowie. The trial court specifically stated that "I'm still having a hard time seeing why we have to hold the hospital. I mean ... where is their goof?" Appellants' counsel argued that Bowie's "goof" was in the fact that it saw Barbara Wright with enough of an injury to order an X-ray, it did not adequately look at the X-ray to diagnose her broken foot, and it sent her to another hospital with a report that she had only a broken knee. However, Appellants' counsel conceded that the doctor at the subsequent hospital had an independent duty to verify Michael Layne's report.

Although we may decide that we would have ruled differently than the trial court, we cannot substitute our decision for that of the trial court. *See Downer,* 701 S.W.2d at 241-42. Therefore, after a review of the record, I would hold that the trial court did not abuse its discretion in concluding that Appellants failed to comply with section 13.01(r)(6). Accordingly, I would affirm the trial court's judgment.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Date of Printing: SEP 05, 2001

**KEYCITE**

CITATION:               **Wright v. Bowie Memorial Hosp., 48 S.W.3d 443 (Tex.App.-Fort Worth, May 31, 2001) (NO. 2-00-072-CV)**
                                                    **History**
                                             **Direct History**

=>                1  **Wright v. Bowie Memorial Hosp., 48 S.W.3d 443 (Tex.App.-Fort Worth May 31, 2001)**
                             **(NO. 2-00-072-CV), rehearing overruled (Jul 19, 2001)**

© Copyright West Group 2001