79

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS COLUMBIA VALLEY HEALTH CARE
SYSTEM, L.P/ D/B/A VALLEY REGIONAL MEDICAL CENTER AND HCA-THE
HEALTHCARE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,

BRANTON & HALL, P.C.
One Riverwalk Place, Suite 1700
700 North St. Mary's Street
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)

By: _____
CAROL P. LOMAX
State Bar No. 12509100
Federal I.D. No. 13464

ATTORNEYS FOR PLAINTIFF

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQEUSTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

**TABLE OF CONTENTS**

**PLAINTIFF'S RESPONSE TO DEFENDANTS COLUMBIA VALLEY HEALTH CARE
SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER AND HCA-THE
HEALTHCARE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**TAB NO.**                    **DESCRIPTION**

1.        Plaintiff's Response to Defendants Columbia Valley Health Care System,
          L.P. d/b/a Valley Regional Medical Center and HCA- The Healthcare
          Company's Motion for Summary Judgment

2.        Plaintiff's Notice of Intent to Use Deposition Excerpts and Exhibits In
          Support of His Response to Defendant's Motion for Summary Judgment

3.        Appendix to Deposition Excerpts and Exhibits In Support of Plaintiff's
          Response to Defendant's Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON                    §
                                      §
                                      §
VS.                                   §        CIVIL ACTION NO. B-00-192
                                      §        JURY REQUESTED
CITY OF BROWNSVILLE,                  §
TEXAS, ET AL                          §

**PLAINTIFF'S RESPONSE TO DEFENDANTS COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P/ D/B/A VALLEY REGIONAL MEDICAL CENTER AND HCA-THE
HEALTHCARE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE HILDA TAGLE,
UNITED STATES DISTRICT COURT:

Comes now the Plaintiff, CANDELARIO DE LEON, and files this his Response to

COLUMBIA VALLEY HEALTH CARE SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL

CENTER AND HCA-THE HEALTHCARE COMPANY's Motion for Summary Judgment and

would show unto the Court as follows:

1.
**SUMMARY OF ISSUES**

The Defendants in this case are incorrect with respect to Plaintiff's evidence. Plaintiff has

produced evidence, designated experts, and provided  expert opinions that place liability on these

Defendants. Plaintiff's Third Amended Complaint makes allegations against these Defendants.

The exhibits attached to the response to Defendants' motion clearly refute these matters at

issue before the court and meet the standards necessary to support a medical negligence claim.

2.
## PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE

Plaintiff would rely upon and incorporate herein by reference the following evidence with respect to his Response to Defendants' Motion for Summary Judgment.  These are in the Appendix attached to this response.

A.    Plaintiff's Third Amended Complaint.

B.    The affidavit of Nick Peters, M.D., and his curriculum vitae.

C.    The affidavit of Zeff Ross, FACHE, and his curriculum vitae.

D.    The records from COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER.

E.    The report of Nick Peters, M.D.

F.    The report of Zeff Ross, FACHE.

G.    Portions of the deposition testimony of the Plaintiff, CANDELARIO DE LEON.

3.
## STATEMENT OF FACTS

The automobile accident made the basis of this lawsuit occurred on December 24, 1998.  At the time of the accident, Plaintiff continually complained to those at the accident site and at the Defendants' hospital that he could not move.  Please see Plaintiff's testimony in Exhibit "G" attached hereto and incorporated herein by reference.

After a cursory examination, Plaintiff was released into the custody of the City of Brownsville Police Department even though he was unable to sign the discharge because of his complaints that he could not move.  Please see Exhibit "D" attached hereto and incorporated herein by reference.  Following an overnight stay at the jail in the City of Brownsville, the Plaintiff who continued to complain that he could not move was taken to Brownsville Medical Center where he

2

was diagnosed with severe spinal cord injuries. He is now a quadriplegic and has been at Valley Grand Manor Nursing Facility since his release from his second hospitalization.

4.
### ARGUMENT AND AUTHORITY

The burden of demonstrating the lack of a genuine issue of material fact is upon the movant and all doubts are resolved against the movant. *University Health Science Center at Houston v. Big Train Carpet of El Paso*, 739 S.W. 2d 792 (Tex. 1997); *City of Houston v. Clear Lake Basin and Authority*, 589 S.W. 2d 671, 678-79 (Tex. 1979). The Defendant who moves for summary judgment has the burden of showing that as a matter of law no material issue of fact exists as to the Plaintiff's cause of action. *MMP, LTD v. Jones*, 710 S.W. 2d 59, 60 (Tex. 1986).

*Celotex Corp. v. Catrett*, 477 U.S. 317,322; 106 S.CT. 2548, 2552 (1986) requires the non-moving party to designate facts which show there is a genuine issue for trial. *Adickes v. S. H. Kress and Company*, 398 U.S. 144,157; 90 S.Ct. 1598,1608 (1970) requires that the moving party show that there is an absence of a genuine issue of material fact.

The Defendants in this case have not met their burden. Plaintiff has shown that to a reasonable degree of medical certainty, the complications of his treatment at Defendants' hospital was a cause of his injuries. Dr. Peters in his affidavit attached hereto as Exhibit "B" and incorporated herein by reference and Mr. Ross in his affidavit attached hereto as Exhibit "C" and incorporated herein by reference speak to the standard of care both medically and within the hospital administration as to the treatment, care and oversight that should have been given to CANDELARIO DE LEON by the staff at the Defendant hospital. The Defendants breached this standard of care.

Further, the deposition testimony of CANDELARIO DE LEON shows that he had no choice in the hospital to which he was taken. His deposition testimony which is attached as Exhibit "G" identifies his inability to move, his great concern, his confusion, and his desire to remain at the hospital with pleas to the hospital staff to grant his wishes.

The depositions of several key fact witnesses in this case have not been taken. For reasons beyond the control of all counsel, these depositions have had to be rescheduled. Counsel for all parties are in the process of seeking again to complete these depositions.

5.
### SUMMARY OF THE ARGUMENT

Plaintiff has provided both to the Defendants and to this Court legally sufficient, competent, direct liability evidence against the hospital Defendants supporting the acts and/or omissions which breached the standard of care with respect to these defendants. Because of this breach of the standard of care, Plaintiff suffered the injuries from which he complains today. Those injuries were caused by both of these Defendants and DR. DOVALE, the emergency room physician who briefly saw CANDELARIO DE LEON.

6.
### CONCLUSION

WHEREFORE, Plaintiff respectfully requests the Court deny Defendants' Motion for Summary Judgment and for such other and further relief as the court deems proper.

4

Respectfully submitted,

BRANTON & HALL, P.C.
One Riverwalk Place, Suite 1700
700 North St. Mary's Street
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)

By: _____
    CAROL P. LOMAX
    State Bar No. 12509100
    Federal I.D. No. 13464

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via Certified Mail Return Receipt Requested this _11th_ day of _January_____, 2002, to the following:

> Tyler Scheuerman
> UZICK & ONCKEN, P.C.
> Fountainhead One Building
> 8200 IH-10 West, Suite 208
> San Antonio, Texas 78230
>
> ATTORNEYS FOR DEFENDANTS,
> STAT PHYSICIANS, P.A. and
> JOAO DOVALE, M.D.
>
> William Gault
> BRIN & BRIN, P.C.
> 1325 Palm Boulevard, Suite A
> Brownsville, Texas 78520
>
> ATTORNEYS FOR DEFENDANTS,
> COLUMBIA VALLEY HEALTHCARE
> SYSTEM, L.P. D/B/A VALLEY REGIONAL
> MEDICAL CENTER AND HCA-THE
> HEALTHCARE COMPANY

CAROL P. LOMAX

G:\WPFILES\FILES CLT\D\DEL9827\PLEAD\SUM-JUD MOT

6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

**PLAINTIFF'S NOTICE OF INTENT TO
USE DEPOSITIONS AND EXHIBITS IN SUPPORT OF
HIS RESPONSE TO DEFENDANTS
MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE HILDA TAGLE:

Pursuant to the Federal Rules of Civil Procedure, Plaintiff, CANDELARIO DE LEON, hereby

files the attached depositions and exhibits in support of his response to Defendants COLUMBIA

VALLEY HEALTHCARE SYSTEM, L.P. d/b/a/ VALLEY REGIONAL MEDICAL CENTER AND

HCA-THE HEALTHCARE COMPANY'S Motion for Summary Judgment and hereby gives notice to

Defendants that Plaintiff intends to use such depositions and exhibits in support of his response to

Defendants Motion for Summary Judgment.

Respectfully submitted,

BRANTON & HALL, P.C.
One Riverwalk Place, Suite 1700
700 North St. Mary's Street
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)

By: _____
CAROL P. LOMAX
State Bar No. 12509100
Federal I.D. No. 13464

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via Certified Mail Return Receipt Requested this _11_ day of _January_, 2002, to the following:

Tyler Scheuerman
UZICK & ONCKEN, P.C.
Fountainhead One Building
8200 IH-10 West, Suite 208
San Antonio, Texas 78230

ATTORNEYS FOR DEFENDANTS,
STAT PHYSICIANS, P.A. and
JOAO DOVALE, M.D.

William Gault
BRIN & BRIN, P.C.
1325 Palm Boulevard, Suite A
Brownsville, Texas 78520

ATTORNEYS FOR DEFENDANTS,
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY REGIONAL
MEDICAL CENTER AND HCA-THE
HEALTHCARE COMPANY

CAROL P. LOMAX

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

**APPENDIX  TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

DOCUMENTS:

A.    Plaintiff's Third Amended Complaint

B.    The Affidavit of Nick Peters, M.D., and his curriculum vitae.

C.    The Affidavit of Zeff Ross, FACHE, and his curriculum vitae.

D.    The records from COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. d/b/a
      VALLEY REGIONAL MEDICAL CENTER.

E.    The report of Nick Peters, M.D.

F.    The report of Zeff Ross, FACHE.

G.    Portions of the deposition testimony of the Plaintiff, CANDELARIO DE LEON.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

State of Texas    §
County of Bexar   §

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of Plaintiff's Third Amended Complaint, and is attached hereto as exhibit "A".

SIGNED this the 11th day of January, 2002.

_____
CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this 11th day of January, 2002.

_____
NOTARY PUBLIC, State of Texas
My Commission Expires: 09-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO De LEON, | § | COMPLAINT FOR DAMAGES FOR VIOLATIONS |
| | § | OF CIVIL RIGHTS UNDER COLOR OF STATE |
| Plaintiff, | § | LAW (42 U.S.C. §§ 1983, 1985, 1988) |
| | § | |
| VS. | § | CIVIL ACTION NO. CV-B-00-192 |
| | § | |
| CITY OF BROWNSVILLE, TEXAS, ET AL., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW comes CANDELARIO De LEON, hereinafter referred to as Plaintiff, and files his Third Amended Complaint, and brings this action for compensatory and punitive damages against CITY OF BROWNSVILLE, TEXAS, BENIGNO REYNA IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE FOR THE CITY OF BROWNSVILLE, HCA– THE HEALTHCARE COMPANY, COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER, JOAO DOVALE, M.D. and STAT PHYSICIANS, P.A. for causes of action, and would respectfully show the Court the following:

1.      This action is brought pursuant to 42 U.S.C. §§1983 and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. Plaintiff also brings claims under state law and invoke the doctrine of pendent jurisdiction.

2.      Plaintiff has complied with all notice requirements, including the requirements of TEX. REV. CIV. STAT. ANN. art. 4590i, § 4.01 (Vernon Supp. 2000), commonly known as the Texas Medical Liability and Insurance Improvement Act.    Defendants   HCA– THE HEALTHCARE

COMPANY, COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. D/B/A VALLEY REGIONAL

MEDICAL CENTER, JOAO DOVALE, M.D., and STAT PHYSICIANS, P.A. were served with

notice by certified mail return receipt requested, as required by article 4590i, Section 4.01(a) of the

Texas Medical Liability and Insurance Improvement Act.

3.      Venue is proper in the United States District Court for the Southern District of Texas,

Brownsville Division, the district in which the claim arose, pursuant to 28 U.S.C. § 1391(b)and (e).

All causes of action asserted herein arose in whole or in part in Brownsville, Cameron County,

Texas.

4.      Plaintiff CANDELARIO DE LEON is a citizen of the United States and a resident

of the State of Texas.

5.      Defendant CITY OF BROWNSVILLE, TEXAS (the "CITY"), a municipal

corporation situated in Cameron County, Texas, a home rule city under the provisions of Article XI,

Section 5 of the Constitution of the State of Texas operating pursuant to the Constitution and the

laws of the State of Texas, has been served with process and has answered herein, such that no

further service is necessary at this time.

6.      BENIGNO REYNA IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE FOR THE CITY

OF BROWNSVILLE ("CHIEF REYNA"), Chief of Police for the City of Brownsville at the time of the

occurrence complained of, has been served with process and has answered herein, such that no

further service is necessary at this time.

7.      Defendant HCA–THE HEALTHCARE COMPANY, a foreign corporation, has been

served with process and has answered herein, such that no further service is necessary at this time.

8.      Defendant COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER, a foreign corporation, has been served with process and has answered herein, such that no further service is necessary at this time.

9.      Defendant JOAO DOVALE, M.D., a resident of Hidalgo County, Texas, has been served with process and has answered herein, such that no further service is necessary at this time.

10.     Defendant STAT PHYSICIANS, P.A., a partnership maintaining an office in Austin, Texas, has been served with process and has answered herein, such that no further service is necessary at this time.

11.     On or about December 24, 1998, Plaintiff CANDELARIO DE LEON sustained serious spinal cord injuries in an automobile accident. After he was transported by EMS to the emergency room of VALLEY REGIONAL MEDICAL CENTER of Brownsville, Texas, where he was met by two police officers with the CITY OF BROWNSVILLE, TEXAS. Despite Plaintiff's repeated statements to the officers that he could not stand, the officers insisted that Plaintiff had sustained only minor injuries and was refusing to stand and cooperate because he was intoxicated.

12.     While in the emergency room of the Defendant Hospital, COLUMBIA VALLEY REGIONAL MEDICAL CENTER, Plaintiff was examined with normal findings documented for the heart, lungs and abdomen. There were no findings recorded for a neurological examination or an examination of his extremities despite adamant complaints of "numbness from the neck down" by Plaintiff. There were no cervical spine films ordered. He received treatment for a minor forehead laceration and was discharged into the custody of the police officers. (See expert's report attached hereto as Exhibit "A.")

13.     Despite his pleas for further medical assistance, Plaintiff was handcuffed with his hands behind his back, forced into a wheelchair and thrown onto the back seat of a police vehicle

for transport to the CITY OF BROWNSVILLE, TEXAS jail. Upon his arrival at the jail, CANDELARIO DE LEON continued to tell officers he could not stand and that he was seriously injured. These officers not only ignored his pleas for medical assistance, but pulled him up by his arms from the wheelchair, threw him on the floor of the jail cell and covered him with a blanket for the night.

14.    Plaintiff was a victim of CITY OF BROWNSVILLE's police procedure, custom and policy that included an unauthorized series of events that violated the laws of the United States of America, the laws of the State of Texas and common law, and caused Plaintiff to sustain permanent, debilitating and disabling injuries and damages.

15.    It was only on December 25, 1998, after checking Plaintiff as he continued to plead with the officers for medical assistance, that the officers transported CANDELARIO DE LEON to the Brownsville Medical Center emergency room where his serious spinal cord injuries were diagnosed.

<u>COUNT I: CLAIMS PURSUANT TO 42 U.S.C. SECTION 1983</u>

Paragraphs 1 through 15 are incorporated herein by reference for all purposes.

16.    Defendants CITY OF BROWNSVILLE, TEXAS and CHIEF REYNA, acting under color of state law, deprived Plaintiff of his rights, privileges and immunities secured by the United States Constitution, specifically those rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

17.    The conduct of THE CITY and CHIEF REYNA's officers in handcuffing Plaintiff's hands behind his back, shoving him into a wheelchair, lifting him by his arms from the wheelchair onto the seat of the police vehicle, and then lifting him by his arms back into the wheelchair, lifting him by his arms from that wheelchair once again and then throwing him on the floor of the jail cell

constituted wanton, reckless, willful and malicious disregard for Plaintiff's safety and subjected Plaintiff to unreasonable excessive force and great bodily injury. Plaintiff suffers from irreparable spinal cord injuries as a proximate result of these unlawful and malicious acts, all committed under color of their authority as agents, servants and employees of THE CITY under the supervision of CHIEF REYNA. The actions of the officers were a grossly disproportionate use of force under the circumstances and clearly unreasonable. Their acts violated Plaintiff's civil rights, including the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

18.    Defendants THE CITY and CHIEF REYNA failed to provide adequate training and supervision regarding the use of excessive force for the circumstances. This deliberate indifference was a proximate cause of the injuries and damages sustained by plaintiff. The use and methods of arrest and restraint for persons in the custody of THE CITY's Police Department is a policy, regulation, and/or decision officially adopted or promulgated by THE CITY. The failure to provide proper training and supervision regarding use of force with persons requiring medical attention, assistance or aid which are in their custody amounts to a deliberate indifference and deprivation of the safety and care of the citizens of THE CITY and Plaintiff. These Defendants were acting under color of state law.

## COUNT II: MEDICAL NEGLIGENCE CLAIMS

Paragraphs 1 through 18 are incorporated by reference for all purposes.

19.    At all times material hereto, Defendants HCA-THE HEALTHCARE COMPANY and COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. d/b/a VALLEY REGIONAL MEDICAL CENTER held themselves out to the community in general, and to Plaintiff as being health care providers having adequate facilities and employing careful, competent staff. The Defendant Hospital represented that its employees were its agents and thereby caused Plaintiff to justifiably rely upon

their care and skills. The Defendant Hospital is subject to liability to Plaintiff for the harm caused by the lack of care or skill of the employees appearing to be its servants or agents. Plaintiff submitted himself to the care and/or protection of the Defendant Hospital in response to an invitation from it to enter into such relationship. The Defendant Hospital created the appearance, if not true in effect, that the employees were agents of the hospital, would provide medical care and that its medical care providers would exercise ordinary care in the treatment of Plaintiff and were skilled, competent and duly licensed to provide same, thus creating agency by estoppel.

20.    The Defendant Hospital is vicariously liable for the negligent acts of its employees who were at all pertinent times acting within the course and scope of their employment. The Defendant Hospital exerted actual control and authority, as well as the right to control the activities of its employees at all pertinent times.

21.    The Defendant Hospital, by and through its actual and ostensible agents, employees, vice principals, and borrowed servants, failed to use ordinary care in providing treatment for Plaintiff CANDELARIO DE LEON that a reasonable and prudent hospital of the same or similar level of certification would have employed under the same or similar circumstances, as follows:

> A.    Failure to complete a neurologic examination at the time of initial presentation;
>
> B.    Failure to follow appropriate policies and procedures with regard to the assessment and treatment of emergency room patients presenting with circumstances and complaints strongly suggestive of the necessity to assess a possible cervical cord injury;
>
> C.    Failure to provide the appropriate personnel to carry out the policies and procedures of the emergency room; and
>
> D.    Failure to properly provide adequate care and treatment for Plaintiff.

Each of the foregoing acts or omissions constitutes a proximate cause of the injuries and damages set forth below.

22.     At the time of the incident in question, Plaintiff CANDELARIO DE LEON was taken to COLUMBIA VALLEY REGIONAL MEDICAL CENTER emergency room by the City of Brownsville EMS.  Plaintiff was seen by Defendant JOAO DOVALE, M.D., who failed to complete any a neurologic examination of him or provide adequate care and treatment to him, and simply discharged him to the custody of the police, whereupon spent the night in jail.  (Please see Exhibit "A".)

23.     At the time of the incident in question, Defendant JOAO DOVALE, M.D. was employed by Defendant STAT PHYSICIANS, P.A. as a contract employee for Columbia Valley Regional Medical Center, now known as VALLEY REGIONAL MEDICAL CENTER..

24.     Plaintiff alleges that Defendant JOAO DOVALE, M.D. was in the course and scope of his employment with Defendant STAT PHYSICIANS, P.A. on the occasion in question, and that STAT PHYSICIANS, P.A. is, therefore, liable for the negligent acts and/or omissions of Defendant JOAO DOVALE, M.D. under the doctrine of *respondeat superior*.

25.     At all times material hereto, Defendant, JOAO DOVALE, M.D. held himself out to the community in general and to Plaintiff as being a medical doctor possessing the ordinary skills of a physician, and owed Plaintiff a duty to exercise ordinary care in the diagnosis and treatment of Plaintiff's condition.

26.     Defendant JOAO DOVALE, M.D. was negligent in the course of his care and treatment of Plaintiff and deviated from the standard of care on the occasion in question, as follows:

A.     Failure to conduct a neurologic examination or at the time of initial presentation;

B.     Failure to conduct an examination of Plaintiff's extremities;

C.     Failure to follow appropriate policies and procedures with regard to the assessment and treatment of emergency room patients presenting with circumstances and complaints strongly suggestive of the necessity to assess

a possible cervical cord injury; and

D.    Failure to provide adequate care and treatment for Plaintiff.

Each of the foregoing acts or omissions constitutes a proximate cause of the injuries and damages set forth below.

## COUNT III: RECOVERY OF DAMAGES

Paragraphs 1 through 26 are incorporated by reference for all purposes.

27.    As a result of the acts and negligence of Defendants as described above, Plaintiff has suffered severe, debilitating injuries, including quadriplegia.  Plaintiff has sustained permanent bodily impairment, disfigurement, a loss of earnings, and a loss of earning capacity, all in the past and, in reasonable probability, he will continue to sustain such damages in the future.  Plaintiff has experienced great physical pain and mental anguish, and will in all reasonable probability, continue to do so in the future by reason of the nature and severity of his injuries.

28.    Plaintiff has incurred reasonable hospital, doctor, medical and nursing expenses for treatment related to injuries sustained in this incident and will, in all reasonable medical probability, continue to incur doctor, medical and nursing expenses in the future for the rest of his life.

29.    The acts and omissions on the part of the Defendants HCA-THE HEALTHCARE COMPANY, COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. d/b/a VALLEY REGIONAL MEDICAL CENTER, JOAO DOVALE, M.D. and STAT PHYSICIANS, P.A., as set forth above, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff, and of which they had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff.  Such malice resulted in Plaintiff's injuries set out herein, and it is on the basis of such malice that Plaintiff hereby seeks an award of exemplary damages in an amount of at least $5,000,000.00.

30.    Attached hereto as Exhibit "A" is the expert report of Jeremy D. Slater, M.D., and as Exhibit "B" that of Nick Peters, M.D., pursuant to TEX. REV. CIV. STAT. art. 4590i, § 13.01(a)(3) (Vernon Supp. 1997).

## COUNT IV: ATTORNEYS' FEES

Paragraphs 1 through 30 are incorporated herein for all purposes.

31.    Pursuant to 42 U.S.C. § 1988, Plaintiff requests this Court award Plaintiff reasonable and necessary attorneys' fees and expenses which Plaintiff has incurred and will continue to incur during all trial and appellate court proceedings.

## JURY TRIAL REQUESTED

32.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury.

WHEREFORE, Plaintiff respectfully prays that upon final trial of this cause, Plaintiff recovers:

a.    Judgment against Defendants, jointly and severally, for general and specific damages in the amount of at least $10,000,000.00;

b.    Exemplary damages in the amount of at least $5,000,000.00 as set forth herein;

c.    Pre-judgment interest;

d.    Post-judgment interest at the highest rates permitted by law;

e.    Reasonable attorneys' fees to the extent recoverable by law;

f.    All costs of court expended herein; and

g.    All other relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

By: _____
CAROL P. LOMAX
State Bar No. 12509100
Federal I.D. No. 13464
BRANTON & HALL, P.C.
One Riverwalk Place, Suite 1700
700 North St. Mary's Street
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)

COUNSEL FOR PLAINTIFF


PLAINTIFF HEREBY DEMANDS TRIAL BY JURY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been forwarded by certified mail return receipt requested, on this ___23___ day of ___May___, 2001, to:

Ryan Henry
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
Brownsville, Texas 78521

ATTORNEYS FOR DEFENDANTS,
CITY OF BROWNSVILLE, TEXAS and
BENIGNO REYNA IN HIS OFFICIAL CAPACITY
AS CHIEF OF POLICE FOR THE CITY OF BROWNSVILLE

Tyler Scheuerman
UZICK & ONCKEN, P.C.
8200 IH 10 West, Suite 208
San Antonio, Texas 78230

ATTORNEYS FOR DEFENDANTS,
STAT PHYSICIANS, P.A. and
JOAO DOVALE, M.D.

William Gault
Paul Fourt
BRIN & BRIN, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520

ATTORNEYS FOR DEFENDANTS
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER AND
HCA-THE HEALTHCARE COMPANY

_____
CAROL P. LOMAX

\\Bh_1\BH_DATA\WPFILES\FILES.CLT\D\DEL9827\PLEAD\DEL9827.OA3

**St.JOHN'S**
PHYSICIANS & CLINICS

## Smith-Glynn-Callaway Medical Building

January 4, 2001

Carol P. Lomax
Branton & Hall
737 Travis Park Building
711 Navarro, Suite 737
San Antonio, Texas 78205-1787

Re:    Patient: Candelario DeLeon
       File Number: 9827

Dear Ms. Lomax:

I, Jeremy D. Slater, M.D., am a licensed physician, Board Certified in Neurology, Clinical Neurophysiology and Sleep Medicine. I have reviewed the records of Candelario DeLeon. These include the following:
1. Emergency room records from Columbia Valley Regional Medical Center, dated 12/24/98.
2. Hospital records from the Brownsville Medical Center, dated 12/25/98 through 1/7/99.
3. EMS ambulance activity records from the City of Brownsville, dated 12/24/98 through 1/29/99.

**Case Summary:**

Candelario DeLeon is a 58 year old male with an essentially negative past medical history, who was brought to the Columbia Valley Regional Medical Center emergency room on 12/24/98 by the City of Brownsville EMS ambulance after a motor vehicle accident. The patient was found, sitting in the driver's seat, unrestrained. According to the EMS notes, "Pt. Smelled highly of ETOH and stated he had been drinking but unknown what or how much". A cervical collar was placed and the patient was extricated through the driver's door onto a backboard (10 PM). On route, the patient complained of "numbness from the neck down".

Upon arrival in the emergency room (10:05 PM), the ER physician notes document that the patient is "obviously drunk – awake". Normal exam findings are documented for the heart, lungs and abdomen, with no findings recorded for the neurological examination or

PLAINTIFF'S
EXHIBIT
A

**ST.JOHN'S**
PHYSICIANS & CLINICS

## Smith-Glynn-Callaway Medical Building

extremities. Nursing notes document the absence of CSF or blood in the ear canals, and the absence of Battle's sign, or periorbital ecchymoses. The presence of the cervical collar is noted. The patient received one staple to a forehead laceration and was then discharged to the custody of the police. No cervical spine films were ordered – there is no documentation regarding if or when the collar was removed.

The patient then spent the night in the city jail. Waking the next morning, he complained of being unable to move. When the EMS service arrived, he complained of pain in his arms and numbness throughout his body. At that time, no cervical collar was in evidence. The patient was placed on a backboard, secured with straps and transported to the Brownsville Medical Center emergency room.

Upon arrival in the emergency room, the patient was assessed and underwent X-rays of the cervical spine. Once these were completed, because of clinical suspicion of a cord compression, he received high-dose Solumedrol intravenously, 30 mg/kg. A Foley catheter was placed, and 400 cc of urine drained. Spine X-rays were completed including cervical, thoracic and lumbar, all of which were read as normal. A neurology consultation was obtained. The neurologist, on the basis of the clinical examination, suspected a low cervical cord compression, and ordered an MRI of the cervical spine. This was completed, and demonstrated no hematoma, moderate changes of cervical spondylosis with spinal canal stenosis in the mid to lower cervical spine. Neurosurgical consultation was ordered. A subsequent MRI of the thoracic spine was unremarkable, as was a CT scan of the brain.

Through the remaining hospitalization the patient received supportive therapies, and at the time of discharge to a nursing home, the patient remained quadraparetic, with a T8 sensory level.

**Conclusions:**

It is my professional opinion that the emergency room physician at Columbia Valley Regional Medical Center deviated from the standard of care by failing to complete a neurologic examination on Mr. DeLeon at the time of his initial presentation. The circumstances of the patient's injury, in addition to his complaints to the EMS personnel of numbness from the neck down, are both strongly compelling reasons to assess for possible cervical cord injury. Had he completed a neurological examination at that time, he might have discovered clinical evidence suggesting the presence of a cord compression. Early treatment with high-dose intravenous steroids could have been initiated, possibly reducing the level of longterm neurologic deficit.

**St.John's**
PHYSICIANS & CLINICS

## Smith-Glynn-Callaway Medical Building

**Deviations:**

Based on a reasonable degree of medical certainty, it is my opinion that the physician did not use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would have provided under similar circumstances. It is my opinion that the breach in care caused a lost opportunity for a medical intervention that may have significantly reduced the patient's longterm deficits.

Signed,

Jeremy D. Slater, M.D.

**Nick Peters, MD**
**2300 Marie Curie Rd**
**Garland, Texas 75042**
**(972) 562-8541**

November 10, 2000

Carol Lomax
Branton & Hall
737 Travis Park Plaza Building
711 Navarro, Suite 737
San Antonio, Texas 78205

Re: Candelario DeLeon  9827

Dear Ms Lomax,

I, Nick Peters am a licensed physician Board Certified in Emergency Medicine. I have reviewed the medical records sent from your office relating to the care of Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998. Also, I was provided the inpatient hospital records for his admission from his December 25, 1998 arrival to his discharge on January 6, 1999. Mr. DeLeon was brought back for other medical problems on January 8 and was discharged on January 29, 1999.

As you know, Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998.  Paramedics found him unable to get out of the car.  The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a back board.  On arrival to the emergency department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down.  Dr. Dovale Joao examined the patient and stapled a facial laceration.  The patient was cleared from spinal precautions and Dr. Joao noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes at 2030.

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center emergency department with" back pain",  "numbness in body" and "can't move legs". Paramedics brought him from the jail to the hospital on a backboard without a cervical spine collar. Dr. Nagarjun Narra  applied a C-collar but when the patient returned from x-ray the collar had been removed.   Later the cervical collar was replaced.  After



PLAINTIFF'S
EXHIBIT
B

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 2

multiple x-rays were performed including cervical, dorsal and lumber spine, CT and
MRI a diagnosis of acute spinal cord injury, cervical cord compression was made.
The patient was admitted for further care and evaluation of his quadriplegia.

He was discharged from the hospital for supportive care and therapy, to be brought
back 2 days later on January 8, 1999 for an infection and was later discharged again
on January 29, 1999.

After my review of the records available, I believe several times the medical care
rendered to Mr. DeLeon fell below expected standards. The incidences and reasons
for my opinion are as follows:

1.    On the first emergency department encounter the patient was removed from
      spinal precautions prematurely. To safely remove a patient from such
      precautions, he must be awake, alert with no distracting injuries and no mind
      altering substances substances in the patient's system. Then the physician can
      access spinal stability after a careful normal neurological and spinal exam.
      Often needed are x-rays and occasionally special studies or consulting
      opinions . Dr. Joao did not document a neurological examination, or a spinal
      exam. The patient had a mind altering substance in his system as noted by the
      physician as "obviously drunk". No x-rays where done to even attempt to find
      the cause of the patient's compliant of numbness. In my opinion this gross
      negligence was a major contributing cause of Mr. DeLeon's spinal cord injury.

2.    When the paramedics arrived to care for Mr. DeLeon at the jail on December
      25, 1999, they put him on a back board, but no cervical collar. With his cervical
      spine unstabilized he was at high risk of further unnecessary injury while being
      transported. This deviation from the standards of care was a contributing
      cause of Mr. DeLeon's quadriplegia.

3.    When the patient arrived to emergency on December 25, 1999 Dr. Narra
      appropriately placed a cervical collar on Mr. DeLeon. Unfortunately when he
      returned from having his x-rays done the collar was off. Later it was put back
      on. Even with normal cervical spine x-rays, the spinal precautions must not be
      removed if their is evidence of a neurological deficit. At this time Mr. DeLeon
      had obvious signs of injury with decreased motor and sensory function. The
      removal of the collar at this point was a departure from acceptable medical
      standards demonstrating negligence and could have contributed to his ultimate
      spinal injury.

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 3

In summery, it is my professional opinion the care for Mr. DeLeon fell substantially below standards of care several times by various caretakers.  Reasonable care would have protected the spine from further injury.  As a result of these breeches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

Please do not hesitate to contact me if there are additional records for review or if there are additional questions which need to be addressed.


Sincerely,

Nick Peters, MD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

| | |
|---|---|
| State of Texas | § |
| County of Bexar | § |

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of Affidavit and Curriculum Vitae of Nick Peters, M.D., and is attached hereto as exhibit "B".

SIGNED this the 11th day of January, 2002.

CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this 11 day of January, 2002.

NOTARY PUBLIC, State of Texas
My Commission Expires: 07-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

## AFFIDAVIT OF NICK PETERS, MD

Before me, the undersigned authority, on this day personally

appeared Nick Peters, MD, who is personally known to me, and first

being by me duly sworn, according to law upon his oath, deposed

and said:

My name is Nick Peters, MD. I am of sound mind and fully competent to testify in the matter set forth herein. I am a licensed physician Board Certified in Emergency Medicine. I have reviewed the medical records relating to Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998. My opinions herein are based upon my education, training, experience, and knowledge of the care and diagnosis of spinal cord injuries.

I received my Doctor of Medicine degree from Creighton University School of Medicine in Omaha, Nebraska, in 1991. I did an internship and began a residency in Emergency Medicine at UCLA King/Drew Medical Center, Los Angeles, California from 1991 to 1993. I finished my residency in Emergency Medicine at the University of Arizona, in Tucson Arizona from 1993-1994. I have been practicing Emergency Medicine at Baylor Medical Center at Garland since successfully completing my Residency. As part of my daily practice I evaluate patients with suspected spinal cord injuries.

Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998. Paramedics found him unable to get out of the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a back board. On arrival to the emergency department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down. On the Conditions of Admission form from the hospital was printed instead of Mr. DeLeon's signature, "Pt. unable to sign due to medical condition". Dr. Dovale Joao examined the patient and stapled a facial laceration. The patient was cleared from spinal precautions and Dr. Joao noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes. On his discharge paperwork instead of Mr. DeLeon's signature was printed, "pt. can't sign".

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center

emergency department with" back pain", "numbness in body" and "can't move legs". Paramedics brought him from the jail to the hospital on a backboard without a cervical spine collar. A C-collar was applied in the hospital, but when the patient returned from x-ray the collar had been removed. Later the cervical collar was replaced. After multiple x-rays were performed including cervical, dorsal and lumber spine, CT and MRI a diagnosis of acute spinal cord injury, cervical cord compression was made. The patient was admitted for further care and evaluation of his quadriplegia.

After my review of the records available, I believe several times the medical care rendered to Mr. DeLeon fell below minimal standards. The incidences and reasons for my opinion are as follows:

1.  On the first emergency department encounter the patient was removed from spinal precautions prematurely. To safely remove a patient from such precautions, he must be awake, alert with no distracting injuries and no mind altering substances in the patient's system. Then the physician can access spinal stability after a careful normal neurological and spinal exam, often including x-rays and occasionally special studies or consulting opinions . Dr. Joao did not document a neurological examination, or a spinal exam. The patient had a mind altering substance in his system as noted by the physician as "obviously drunk". No x-rays where done to even attempt to find the cause of the patient's compliant of numbness. In my opinion this deviation from standards of care is a major contributing cause of Mr. DeLeon's spinal cord injury.

2.  The patient was prematurely discharged from the Emergency department. Mr. De Leon complaining of numbness, and it clearly documented that he could not sign for his care in the hospital should have been reason not to discharge him. Instead he was discharged from the hospital in a wheelchair. There was no documentation from the Emergency Department staff or physician that the patient could walk. It was only documented he could not sign for himself because of his current medical condition.

3.  When the paramedics arrived to care for Mr. DeLeon at the jail on December 25, 1999, they put him on a back board, but no cervical collar. With his cervical spine unstabilized he was at high risk of further unnecessary injury while being transported. This deviation from the standards of care was a contributing cause of Mr. DeLeon's quadriplegia.

4.  When the patient arrived to emergency on December 25, 1999 Dr. Narra appropriately placed a cervical collar on Mr. DeLeon. Unfortunately when he returned from having his x-rays done the collar was off. Later it was put back on. Even with normal cervical spine x-rays, the spinal precautions must not be removed if their is evidence of a neurological deficit. At this time Mr. DeLeon had obvious signs of injury with decreased motor and sensory function. The removal of the collar at this point was a departure from acceptable medical

standards and could have contributed to his ultimate spinal cord injury.

In summery, it is my professional opinion the care for Mr. DeLeon fell substantially below standards of care several times by various caretakers. Most notable the care he received in the Emergency Department at Columbia Valley Regional Medical Center. Reasonable care would have protected the spinal cord from further injury. As a result of these breeches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.


_____
NICK PETERS, MD

Subscribed and sworn to before me o this, the ___9th___ day of January 2002.

_____
Notary Public, State of Texas



Marianne Kerr Estrada
Notary Public, State of Texas
My Commission Expires
Oct. 12, 2002

# Nick Paul Peters, MD
## 30 Secretariat Lane
## McKinney, Texas 75069
## (972) 562-8541

### PERSONAL

| | |
|---|---|
| Born: | Fairfield, California |
| Health: | Excellent |
| DOB: | October 22, 1964 |
| Marital Status: | Single |

### CERTIFICATION AND LICENSING

Diplomate of the American Board of Emergency Medicine
Texas Medical License      J7627

### CURRENT EMERGENCY MEDICINE PRACTICE

Baylor Medical Center at Garland
Garland, Texas

Full time staff Emergency Physician
Over 40,000 visits/ year.  Involves
teaching in residency program.
1994 to present

Texoma Medical Center
Denison, Texas

Part-time Staff Emergency Physician
1995 to present

Baylor Medical Center at Richardson
Richardson, Texas

Part-time Staff Emergency Physician
1995 to present

Baylor Medical Center at Grapevine
Grapevine, Texas

Part-time Staff Emergency Physician
1996 to present

### PAST EMERGENCY MEDICINE PRACTICE EXPERIENCE

Sierra Vista Community Hospital
Sierra Vista, Arizona

Staff Emergency Physician
1994

Raymond Bliss Army C Hospital
Fort Huachuca, Arizona

Staff Emergency Physician
1994

Mt. Graham Community Hospital
Safford, Arizona

Staff Emergency Physician
1994

Orthopaedic Hospital
Los Angeles, California

Staff Emergency Physician
1993

Nick Paul Peters, MD                      page 2

## EDUCATION

| Residency-Emergency Medicine | Location | Degree/Date |
|---|---|---|
| University of Arizona | Tucson, Arizona | 1993-4 |

| Internship/Residency-Emergency Medicine | | |
|---|---|---|
| UCLA King/Drew Medical Center | Los Angeles, California | 1991-3 |

| Medical School | | |
|---|---|---|
| Creighton University School of Medicine | Omaha, Nebraska | MD 1991 |

| Colleges and Universities | | |
|---|---|---|
| University of San Francisco | San Francisco, California | BS 1987 |
| Sacramento City College | Sacramento, California | |
| Consumnes River College | Sacramento, California | |

## ADMINISTRATIVE EXPERIENCE (outside of medicine)

| Animal Laboratory Manager | Institute of Chemical Biology | 1984-7 |
|---|---|---|
| Orientation Chairman | University of San Francisco | 1986-7 |

## UNIVERSITY SERVICE

| Residency Admission's Committee | University of Arizona |
|---|---|
| Medical College Recruitment Program | Creighton University |
| Committee for Orientation, Advising and Registration | University of San Francisco |

## PROFESSIONAL ORGANIZATIONS

American College of Emergency Physicians
Texas College of Emergency Physicians
American Medical Association

## RESEARCH AND PUBLICATIONS

Chang, Enders, Sprengel, Peters, Varmus, Ganum: Expression of the precore region of an avian hepatitis B virus is not required for viral replication. Journal of virology Oct 1987.

Abstracts
Prediction of the severity of acute pancreatitis. Annals of Emergency Medicine Feb 94.

Medical control of mass gatherings: can paramedics perform without physicians on-site? Annals of Emergency Medicine May 94.

## HOBBIES AND INTERESTS

Raising horses, running, fishing, and clarinet.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

| | |
|---|---|
| State of Texas | § |
| County of Bexar | § |

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of Curriculum Vitae of Zeff Ross, FACHE, and is attached hereto as exhibit "C".

SIGNED this the 11th day of January, 2002.

_____
CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this 11th day of January, 2002.

_____
NOTARY PUBLIC, State of Texas
My Commission Expires: 09-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

## AFFIDAVIT OF ZEFF ROSS, FACHE .

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, on this date, personally appeared ZEFF ROSS,

FACHE, who is personally known to me, and first being by me duly sworn, according to the law

upon his oath, deposed and said:

"My name is ZEFF ROSS, FACHE,. I am over eighteen (18) years of age and I have
never been convicted of a crime. I am of sound mind and fully competent to testify in the
matter set forth herein. I have personal knowledge of each of the facts and opinions
stated herein, based on my review of the Texas Peace Officer's Report of Accident dated
December 24, 1998; the medical records of Columbia Valley Regional Medical Center;
the medical records of Brownsville Medical Center; the City of Brownsville EMS Report;
the report of Nick Peters, M.D.; and the report of Jeremy Slater, M.D. My opinions are
also based upon my education, training, experience and knowledge of hospital
administration and departmental policies and procedures. Unless stated otherwise, all the
opinions expressed below are based on a reasonable, hospital administrative probability.

I am the administrator at Memorial Hospital West in Pembroke Pines, Florida, a general
acute care hospital. I am licensed in the State of Florida with the Board of Nursing Home
Administrators. I received my Masters in Business Administration specializing in
Healthcare Administration from the City University of New York, Bernard M. Baruch
College/The Mount Sinai School of Medicine, New York, New York in June 1979. I
received a Bachelor of Science - Psychology, Magna Cum Laude at the City University of
New York, Brooklyn College, Brooklyn, New York. I am currently employed as the
Administrator at Memorial Hospital West in Pembroke Pines, Florida and have been in
administration since December, 1978 and an administrator since 1987. I have been a
member of the American College of Healthcare Executives since 1985 and a Fellow since
1997. Additionally, I was a member of the Broward Hospital Association from October
1987 to July 1990 and currently a member of the American Hospital Association since
1979.

I had an opportunity to review the information listed above. The EMS records indicate
that the patient received neck/spine immobilization, was extricated and placed on a
backboard and while on route to the hospital, the patient complained of numbness from
the neck down. After reviewing the emergency department records, there were no
findings recorded for a neurological examination. This examination should have been
conducted during the nursing assessment by the nurses and by the emergency department
physician. Additionally, it is especially important to note that the mechanism of injury
indicated a high index of suspicion to the type of injury he received, and with a

AFFIDAVIT OF ZEFF ROSS, FACHE
Page 2 of 2

good nursing assessment, including a neurological exam, that the healthcare provider should have been able to identify his life/limb threatening injury and thereby reduce the possibility of any long term neurological deficit. However, this was not done by the nurses or the physician and consequently, breached the standard of care, and was a direct and proximate cause of the patient's current condition. Emergency department nurses have responsibility to the patient, different from the physician, to ensure that they properly assess a patient and provide the same level of high quality of care to each patient.

Additionally, the hospital personnel were negligent in not activating a trauma alert which according to the hospital's own definition, is "a potentially life threatening injury with vital signs presently stable". The patient presented with and met the definition for Trauma Alert, yet an alert was not called.

Furthermore, it should be noted that according to the emergency department medical record, upon discharge, although the patient verbalized understanding of the discharge instructions, the patient had to be escorted by a wheelchair and was unable to sign due to the patient's medical condition. The medical condition according to the Valley Regional Medical Center is listed as skin suturing and repair of superficial wound. Consequently, if the patient was unable to sign and required wheelchair assistance upon discharge, the nurse discharging the patient upon the direction of the ER physician, should have as the patient's advocate, questioned such discharge, since there were indications that there was more to the patient's condition than the patient was ultimately treated for. However, this was not done and the hospital did not meet the required standard of care.

It is my opinion that Columbia Valley Regional Medical Center breached the standard of care by not having the emergency department nurse appropriately assess the patient which would have included a neurological check/assessment, and discharged the patient to police custody without questioning the order for discharge when the patient was obviously unable to sign his name due to his medical condition, and as well, required escort by wheelchair. These inactions by the hospital's personnel were a direct and proximate cause of the injuries caused to Candelario De Leon at Columbia Valley Regional Medical Center."

ZEFF ROSS, FACHE

SUBSCRIBED AND SWORN TO before me on this, the 10th day of January, 2002.

Notary Public, State of Florida

OFFICIAL NOTARY SEAL
LISA A FELICE
COMMISSION NUMBER
DD071188
MY COMMISSION EXPIRES
NOV. 12,2005

## Zeff Ross, FACHE

10213 Capri Street
Cooper City, Florida  33026-4637
(954) 433-2525 (Home)
(954) 433-7199 (Work)

EXPERIENCE:

**April 1991**    **ADMINISTRATOR**
**- Present**     **Memorial Hospital West (110 Beds), Pembroke Pines, Florida**

Major Accomplishments include:

I.   **Development & Operations**:

- Planned for, operating and managing the hospital since its inception.

- Coordinated recruitment activities for management staff and over 300 employees in preparation of opening.  Implemented orientation and guest relations programs for all staff.  Expanded staff to over 700 FTE's.

- Operated the hospital from opening day without using any agency nurses.

- Implemented patient-focused care by incorporating Patient Assistant Liaisons (PALS) to help provide increased continuity of care to patients with crosstraining of many employees; implemented open visitation hours for patients.

- Successfully implemented and continually support the Memorial 21st Century Excellence Program for total quality management.

- Patient satisfaction statistics indicate during the latest year of operations of 99.0% outpatient satisfaction, 98.5% inpatient satisfaction and approximately 95% emergency department satisfaction rate.

- Successfully completed the 1997 Joint Commission on Accreditation of Healthcare Organization survey receiving a grid score of 98 and a full three year accreditation with Commendation, a distinction which places Memorial Hospital West within the top 6% of hospitals.

- Proactively implemented a reengineering program to cost effectively meet the challenges of the future in providing quality care with high patient satisfaction.

- Implemented the following new services/programs: diagnostic cardiac catheterization;  invitro fertilization; diabetes center; Level II Neonatal ICU;  child care program through an affiliation with the City of Pembroke Pines; cable television via satellite dishes; ambulatory surgical facility; radiation therapy center; and a women's center..

- Purchased the medical office building located on the hospital's campus.  Successfully increased the occupancy rate from 83% to 100%.

- Implemented activities to secure additional medical office space offsite from the campus of Memorial Hospital West in an effort to integrate primary care offices with the hospital.

- Participated in the development, implementation and operation of the Memorial Integrated Healthcare System (IPA's), Medical Management Services Organization (MSO), and Physician Hospital Organization (PHO).

- Completed the first Employee Opinion Survey of Memorial Hospital West after two years of operation with Administration receiving high accolades from the employees for our commitment to quality patient care, to the employees, to the volunteers, and to the community.

- Established a community network providing educational seminars, health screenings, and community health fairs; Partner in Education with local schools, member of civic and community organizations.

Exceeded the operating budget each year with regard to number of admissions, births, surgeries, patient revenues, payor mix, outpatient procedures, emergency department visits, and excess of revenues over expenses. Exceeded established fiscal objectives each year by greater than 20%/yr. for initial four years of operation.

## II.  Medical Staff Organization:

. Development of the medical staff organization, committee structure and credentialing activities.

. Developed, with medical staff input, the initial medical staff bylaws, rules and regulations, individual department rules and regulations, as well as the specified health professional rules and regulations.

. Implemented critical pathways developed by the medical staff and created new programs for the medical staff to help reduce resource consumption (ie. dissemination of reimbursement and cost information as compared to other physicians in the same specialty with the same DRG's).

. Recruitment of primary and specialty medical staff to the hospital. Increased medical staff membership from the initial 461 physicians to over 700 physicians in the third year, and greater than 900 in the fifth year. Developed a physician orientation book for new physician members of the Medical Staff.

## III.  Construction:

. Coordinated efforts to ensure construction of the 100-bed facility was completed on time and within budget.

. Completed five year master site facility plan and began implementation of Phase I building activities (totaling $20 million dollars) which includes: the expansion of the outpatient, emergency, maternity, laboratory and pharmacy departments and the construction of a Same Day Surgery Center, helistop, fitness & rehabilitation center, a 16-bed observation unit, a radiation therapy center, and a women's center.

**July 1985**          **Humana, Inc., 500 West Main Street, Louisville**
**- April 1991**         **Kentucky   40201**

**July 1990**          **EXECUTIVE DIRECTOR**
**- April 1991**         **Humana Hospital - Palm Beaches (250 Beds), West Palm Beach, Florida**

Accomplishments at this 250 bed short-term acute care hospital with 88 psychiatric beds, included:
. Recruited both solo and specialty group practitioners to the hospital's market area.
. Reduced annual operating expenses by $250K and payroll expenses by $400K without adverse impact on operations.
. Coordinated $3.5M renovation project. Initiated building of a medical office building on the hospital campus.
. Significantly increased patient satisfaction response through the initiation of product line management and patient relations program.

**October 1987**       **EXECUTIVE DIRECTOR**
**- July 1990**          **Humana Hospital - South Broward (256 Beds), Hollywood, Florida**

Accomplishments included:
. Formulated and implemented short and long range strategic plans and objectives which resulted in increased market share and maximized margin; implemented board of trustees self-evaluation measurement survey.
. Obtained $1.5M additional revenue as a result of innovative changes to reimbursement systems.
. Increased gross revenue by $700K through business cooperation with private practitioners.
. Exceeded established fiscal objectives by more than 35%.
. Increased patient census by 20% with a decrease of 12% in the length of stay.

**August 1986**       **ASSOCIATE EXECUTIVE DIRECTOR**
**- October 1987**     **Humana Hospital - Biscayne (458 Beds), Miami, Florida**

Zeff Ross, FACHE                                                                                    Page 3
Resume

| January 1986 | **ASSOCIATE EXECUTIVE DIRECTOR** |
|---|---|
| - August 1986 | **Humana Hospital - South Broward (256 Beds), Hollywood, Florida** |

**April 1985**   **ASSISTANT EXECUTIVE DIRECTOR**
**- January 1986**   **Humana Hospital - Biscayne (458 Beds), Miami, Florida**

**July 1984**   **ASSISTANT EXECUTIVE DIRECTOR**
**- March 1985**   **Humana Hospital - Cypress (273 Beds), Pompano Beach, Florida**

**May 1980**   **ADMINISTRATOR**
**- April 1984**   **AMBULATORY CARE SERVICES (286 Beds), The Jamaica Hospital, Jamaica, New York**

Responsibilities included Outpatient, Emergency, and Paramedic Ambulance Department, Family Practice Center (including a resident training program for ten (10) family practitioners) and Walk-In Clinic. These areas handled 70K patient visits and 7,500 ambulance calls per year. Accomplishments included grants administration, labor relations and union negotiations, design and administrative coordination of expansion program, and various certificate of need applications.

**December 1978**   **COORDINATOR, AMBULATORY CARE**
**- May 1980**   **Greater New York Hospital Association**
                 **New York, New York**

## EDUCATION:

June 1979   Master of Business Administration (MBA) specializing in Health Care Administration
            City University of New York, Bernard M. Baruch College/The Mount Sinai School of Medicine, New York, New York

June 1977   Bachelor of Science - Psychology
            Magna Cum Laude
            City University of New York, Brooklyn College, Brooklyn, New York

## CONSULTING ACTIVITIES:

**Consultant**
.   October, 1993 - Present                          .   April, 1993 - Present
    Technical Advisory Service for Attorneys             American Medical Forensic Specialists
    1166 DeKalb Pike                                     2928 Derby St.
    Blue Bell, PA  19422                                 Berkeley, CA  94705

**Adjunct Professor**
.   September 1987 - August 1989                      .   August 1985 - December 1985
    St. Thomas University, Miami, FL                      Florida International University, Miami, FL
    Graduate Program in Health Management                 . Conducted administrative intern preceptorships
    . Instructed classes in medical care organization        for graduate students & instructed classes in hospital
      and hospital administration.                           facility organizational management

## PROFESSIONAL MEMBERSHIPS:

.   American College of Healthcare Executives, FACHE (1997);  Member 1985 - 1997.

.   American Hospital Association. Member 1979 - Present.

.   Broward Hospital Association.  Member since October, 1987.  Offices held: Secretary/Treasurer, Chairperson.

Zeff Ross, FACHE                                                                     Page 4
Resume
_____

South Florida Healthcare Administrative Forum. Member 1986 - Present  Offices held: Chairman, Nominating Committee, Board of Directors.

College of Osteopathic Healthcare Executives.  Member
April, 1989 - July, 1990; Chairperson - Membership Committee; Member - Awards Committee.

American Osteopathic Hospital Association.  Board of Trustees, Representative for Division IV, October 1988 - July 1990.

## COMMUNITY ACTIVITIES & MEMBERSHIPS:

Miramar/Pembroke Chamber of Commerce.  Board of Directors from October 1987 - June 1989; July 1992 - July 1993. Secretary, July 1993 - July 1994; Vice Chairman, July 1994 - July 1995; Chairman-Elect, July 1995 - July 1996; Chairman, July, 1996 - Present.

City of Pembroke Pines Police Athletic League (P.A.L.) Board of Directors. April, 1996 - Present.

Family Bank Western Advisory Board.  September 1995 - Present

American Heart Association/Southwest Broward Division. Vice President, September 1991 -January 1993; Board of Directors, January 1993 - Present.

Speakers Bureau Memorial Hospital/Memorial Hospital West April, 1991 - Present.

Embassy Creek Elementary School, School Improvement Team (S.I.T.), Member  October, 1992 to Present.

Junior Achievement Program, Walter C. Young Middle School, Instructor. 1994, 1995, 1996, 1997.

American Cancer Society.  Board of Directors, August 1992 - August 1996; Grassroots Program, August 1992 - Present.

Broward Economic Development Council, Inc.  Board of Directors, October 1, 1992 - September 30, 1993.

## AWARDS AND HONORS:

- **Pinnacle Award - Miramar-Pembroke Chamber of Commerce - March, 1998**

- **JCAHO Accreditation with Commendation - January 1997**

- Up & Comers Award Winner - Price Waterhouse/South Florida Business Journal - September, 1995. Finalist - 1994, 1993 & 1990.

Business Leaders' Award - Industry Appreciation Week: Miramar-Pembroke Chamber of Commerce - September 19, 1995

American Cancer Society's "Rookie of the Year" 1992-1993

First Annual Award for Outstanding Administrative Support in Recognition of the Hospital Healthcare Human Resources Field given by the South Florida Hospital Personnel Directors Association - April 1993

"Best Outpatient Services" Award from South Florida Medical Business for the tri-county area - 1993

**LICENSES:**     Board of Nursing Home Administrators, State of Florida #2859

**REFERENCES:**    References furnished upon request

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

State of Texas       §
County of Bexar      §

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of records from COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER, and is attached hereto as exhibit "D".

SIGNED this the 11th day of January, 2002.

_____
CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this 11th day of January, 2002.

_____
NOTARY PUBLIC, State of Texas
My Commission Expires: 09-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003



CIVIL ACTION NO.

CV-B-00-192


CANDELARIO DELEON VS.

CITY OF BROWNSVILLE, TEXAS, ET AL


WRITTEN DEPOSITION AND RECORDS FROM:

VALLEY REGIONAL MEDICAL CENTER

(MEDICAL)


DELIVER TO:

MS. CAROL LOMAX

BRANTON & HALL, P.C.

700 N. ST. MARY'S, STE. 1700

SAN ANTONIO, TEXAS 78205


**Shelli Finger**

Records Coordinator

4437 FM 1863

Bulverde, TX 78163

(210) 823-1199

```
RUN DATE: 12/28/98                Valley Regional ABS DRIVE          PAGE 1
RUN TIME: 1827                       CODING SUMMARY
```

NAME: DE LEON,CANDELARIO V                    ACCT#:      VR98362080
                                              FORM:

ADM DATE: 12/24/98
ATTEND PHYS: Dovale,Joao MD                   UNIT#:      VR021878
   DIS DATE: 12/24/98                         SEX:        M
   DIS DISP:                                  AGE:        57
       LOS: :            1                    DOB:        06/15/41
   PT CLASS: OUT.OTHER                        FIN CLASS:  99
                                              ABS STATUS: FINAL

---

DIAGNOSES
ADMIT     920         CONTUSION FACE/SCALP/NCK
PRINC     873.42      OPEN WOUND OF FOREHEAD
          E812.0      MV COLLISION NOS-DRIVER
          E849.5      ACCID ON STREET/HIGHWAY

OPERATIONS
DATE        PROC CODE & NAME              SURGEON          ANESTHESIOLOGIST
12/24/98    86.59  SKIN SUTURE NEC        Dovale,Joao MD

CPT CODES
12011      REPAIR SUPERFICIAL WOUND(S)

DRG:

STATUS        $REIMB    MIN-LOS    STD-LOS    COST WT    GRP VERS    GRP FC
                                                         16          99


I have reviewed the narrative descriptions of the diagnosis and procedure codes
listed above and agree they accurately reflect the clinical picture of this episode
of care.

   _____

   **This form will be maintained as a permanent part of the medical record**

**COLUMBIA Valley**
**Regional Medical Center**

**EMERGENCY DEPARTMENT RECORD**

I hereby authorize treatment and/or consultation of the below stated patient

SIGNED _____ RELATIONSHIP _____

ORDERS □ I □ III □ II □ IV

NAME _Cedric V De Leon_   TODAY'S DATE _12/24/98_   RACE/SEX _H/M_   AGE _59_   DATE OF BIRTH _6/15/41_

TRIAGE TIME _2005_   FAMILY PRESENT □ Yes □ No   MEANS OF ARRIVAL _Medic 2_   FAMILY DOCTOR

TREATMENT AREA _ER 2_   TO AREA FROM TRIAGE   CHECK □ Standing □ Sitting □ Laying   ALLERGIES _NKDA_   WEIGHT _____ kg/lb

TIME TO TREATMENT AREA _2005_   LMP _N/A_   CURRENT MEDS _NONE_   LAST TETANUS _unk_

| | TIME | TEMP | PULSE | RESP | B/P |
|---|---|---|---|---|---|
| 1 | 2605 | 96.2 | 73 | 18 | 167/85 |
| 2 | | | | | |
| 3 | | | | | |

**CHIEF COMPLAINT    HISTORY**

_Unsustained ___ MVC_
_1 cm laceration to forehead_

PAST HISTORY
REVIEWED □ + W/ COMMENTS

FAMILY HISTORY
REVIEWED □ + W/ COMMENTS

SOCIAL HISTORY
REVIEWED □ + W/ COMMENTS

GENERAL/SKIN _Obviously_
_drunk - Awake_
_Alert, Non acute_

EENT _Small (1 cm) laceration_
_on mid forehead closed c_
_one surgical steri_
_Eyes normal  ENT = Ø_

HEART _RRSR_

LUNGS _Clear_
_No chest pain_

ABDOMEN _Obese, soft_
_Non tender_

RECTAL/PELVIC/GENITALIA _Ø_

BACK/NEURO _Ø_

EXTREMITIES _Ø_

| CBC | | UA | |
|---|---|---|---|
| BBC | CC | □ CATH | |
| HGB | SPOC | GEMV | |
| HCT | pH | | |
| WBC | PROTEIN | | |
| SNEUT | WBC | | |
| LYMPHS | RBC | | |
| OTHERS | BACTERIA | | |
| | OTHERS | | |

| SMA6/SMA20 | | UCG | |
|---|---|---|---|
| GLUC | BUNIT | | |
| BUN | CONTROL | PATIENT | |
| Na | PT | | |
| K | PTT | | |
| CL | CULTURES | | |
| CO₂ | | | |

| ENZYMES | | | |
|---|---|---|---|
| SGOT | PULSE OXIM | 9_% | |
| SGPT | ABG | | |
| LDH | pH | | |
| CPK | PCO₂ | | |
| OTHERS | PO₂ | | |
| | ACT HCO₂ | | |
| | O₂ SAT | | |

| EKG | |
|---|---|
| X-RAY | |

**REVIEW OF SYSTEMS**
CHECK APPROPRIATE SQUARES AND DESCRIBE ALL ABNORMAL OR PERTINENT FINDINGS

| SYSTEM | NOR | AB. |
|---|---|---|
| EYES | ✓ | |
| E N T | | |
| CARDIOVASCULAR | ✓ | |
| RESPIRATORY | | |
| GI | | |
| GU | | |
| MUSCULOSKELETAL | | |
| SKIN | | |
| NEURO | | |
| PSYCHIATRIC | | |
| ENDOCRINE | | |
| BLOOD/LYMPH | | |
| ALLERGIC | | |
| IMMUNE | | |

MEDICAL RECORD REQUESTED
MEDICAL RECORD REVIEWED
X-RAY RAD
X-RAY DISCUSSED W/ RAD
X-RAY-ED MD

□ READ BY DOCTOR

**DOCTOR'S ORDERS**

**MEDICATIONS**

**DISCHARGE DIAGNOSIS**
1. _½ cm laceration forehead._
2.
3.

DISPOSITION □ HOME □ PVT DOCTOR □ AMA □ OTHER   DATE _12/24/98_
□ ADMITTED TO   □ TRANS TO   TIME
EXPIRED, SORT TO

DISCHARGE INSTRUCTION: _BPD # 2572 Aster_
_Pt discharged to the car_
_by BPD_

000003  12/24/98

□ NO SCHOOL  □ INSTRUCTION SHEET GIVEN  □ REFERRED TO OR.
□ REFERRED TO DR.

CONDITION DISCHARGE □ IMPROVED □ DETERIORATED □ UNCHANGED □ EXPIRED
DISCHARGE DATE
TIME

NURSE'S SIGNATURE _____  PHYSICIAN'S SIGNATURE _____  PATIENT SIGNATURE _____  WITNESS _____

MEDICAL RECORDS   _Level 3_   _2030_   000003

# COLUMBIA Valley Regional Medical Center

## EMERGENCY DEPARTMENT NURSING RECORD

DDRESSOGRAPH

DE LEON, CANDELARIO V
MR# VR021878   SS# 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
ACCT# VR98362080   12/24/98  M  57
06/15/41· Dovale, Joao MD
VALLEY REGIONAL MEDICAL CTR

**CHIEF COMPLAINT & DURATION**

| TIME | P | CHANGED TO | @ | BY | PATIENT NAME |
|---|---|---|---|---|---|

CHIEF COMPLAINT

---

## ASSESSMENT

**IMMOBILIZATION**
- ❏ Cervical Collar
- ❏ Sandbags
- ❏ Short Spine Board
- ❏ Long Spine Board
- ❏ **SPLINTS**
- ❏ Board
- ❏ Leg Air Short
- ❏ Leg Air Long
- ❏ Ankle Air
- ❏ Arm Air
- ❏ Traction
- ❏ Shock Trousers _____
- ❏ Rotating Tourniquets _____
- ❏ Restraints _____
- ❏ Side Rails Up _____
- ❏ Call Light Within Reach _____

**LEVEN TUBE**
Size _____ Time _____

**CATHETER**
Size _____ Time _____
Straight _____
Foley _____

**ABDOMEN** ☑ Normal
- ❏ Tender
- ❏ URQ   ❏ ULQ
- ❏ LRQ   ❏ LLQ
- ❏ Rigid
- ❏ Distended

### NEURO

PUPILS:  L ___ mm   R ___ mm
MOTOR:  L. Arm ___   R. Arm ___
[2]        L. Leg ___   R. Leg ___
OTHER: _____

1mm 2mm 3mm 4mm 5mm 6mm 7mm

EMOTIONAL STATE.  ☑ Appropriate    ❏ Anxious
❏ Depressed    ❏ Hostile

LEVEL OF CONSCIOUSNESS. (ORIENTATION)
☑ Person                    ☑ Place
☑ Time                      ☑ Situation

PROBLEMS WITH:  ❏ Speech  ❏ Chewing  ❏ Swallowing
EQUAL & REACTIVE.  ☑ Yes  ❏ No
DESCRIBE: _____

INITIALS

### CARDIOVASCULAR

SKIN: ☑ Normal  ❏ Warm  ❏ Cool  ❏ Dry  ❏ Diaphoretic
SKIN COLOR: ☑ Unremarkable  ❏ Cyanosis  ❏ Flushed  ❏ Jaundice  ❏ Palor
☑ No Abnormal Heart Sounds Appreciated  ❏ Abnormal Sound  ❏ Describe: _____

CAPILLARY REFILL:  ☑ < 2 SEC  ❏ > 2 SEC.  Other: _____

INITIALS

### PULMONARY

RESPIRATIONS  LABORED  ❏ Yes ☑ No    ❏ S.O.B.  ❏ Yes ☑ No  ❏ Reg  ❏ Irreg.
COUGH  ❏ Yes ☑ No  Productive  ❏ Yes ☑ No
Retractions  ❏ Yes ☑ No    Describe: _____
Breath Sounds Present All Lung Fields  ☑ Yes  ❏ No
Vesicular Throughout ☑ Abnormal Sounds ❏
Other: _____    Describe: _____

INITIALS

OTHER FINDINGS _____

INITIALS

| TIME | BP | TEMP. | PULSE | RESP. | PUPILS | | GRASP | | DEGREE OF RESPONSE | MOVEMENT OF EXTREMITIES | COMMENTS | NURSES INITIALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | R | L | R | L | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |



1. Abrasion
2. Laceration
3. Puncture
4. Fracture
5. Dislocation
6. Sprain / Strain
7. First Degree Burn
8. Second Degree Burn
9. Third Degree Burn
10. Pain

11. Contusion
12. Weakness
13. Decreased Sensation
14. Absent Sensation
15. Edema
16. Decreased Pulse
17. Absent Pulse
18. Paralysis
19. _____ 0000004
20. _____

MEDICAL RECORDS

000004

# MEDICATIONS AND I.V. FLUIDS

| TIME | MEDICATION | DOSE | ROUTE | SITE A | SITE B | INIT | RESPONSE TO TREATMENT |
|------|-----------|------|-------|--------|--------|------|----------------------|
| 2010 | Diptheria Tetnus ac | 0.5m | FA | RA | | H | no adverse reaction |
| | | | | | | | |
| | | | | | | | |

Method: N - Needle, IC - Intravenous Catheter
CD - Cutdown, SC - Subclavian,
J - Jugular

Site: RA - Right Arm, RH - Right Hand,
RL - Right Leg, LA - Left Arm,
LH - Left Hand, LL - Left Leg

Rate: KVO - "Keep Vein Open"
Number of drops per min. or hour, as
indicated

## INFUSION

| Date | Amount Started | I.V. Solution, Hyperalimentation, Albumin, Blood, Blood Products | I.V. Additives I.V. Piggybacks, I.V. Pushes | Method & Gauge | Site | Rate | Start Time | Start Nurse Initial | Discontinue Time | Discontinue Nurse Initial | Total Amount Infused |
|------|---------------|---|---|---|------|------|------|------|------|------|------|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| TIME | NURSES NOTES | SIGNATURE |
|------|-------------|-----------|
| 2005 | For E.R. Exam was #2 per medic #2 stretcher c c-collar, HI, & full spine board in place, T.V NS infusing well into 18 ga lock Lt Hand | H |
| 208 | Examined by Dr Doble, 1 staple to wound on forehead p local Hygiene, c Pr O2 & med 0.9%, good approximation no further bleeding | H |

## FINAL DISPOSITION

DISMISSED:
Date 12/24/9X   Time: 2030

ACI: ☑ Patient  ☐ Other: ___police officer___       ☑ Verbalized Understanding  ☐ Left Without Instructions
☐ Copy ACI Given  ☑ Escorted Via Wheelchair  ☐ Ambulatory  ☐ To Waiting Room  ☑ Vehicle

INITIALS

ADMITTED:  Room # ____ Via ___    ☐ Wheelchair  ☐ Stretcher   Accompanied By: _____
EQUIPMENT. ☐ Cardiac Monitor  ☐ O2   Report Given To: _____
Family Aware of Admission  ☐ Yes  ☐ No   Present  ☐ Yes  ☐ No
Date _____ Time _____   INITIALS

Acuity    1 2 ③ 4 5
Charge  N/C  1 ② ③ 4 5

TRANSFERRED TO ANOTHER FACILITY: Date _____ Time _____  Via: ☐ POV  ☐ Amb. Co.
Name of Receiving Facility _____   Copies of Records Sent  ☐ Yes  ☐ No
Report Called  ☐ Yes  ☐ No  To Whom _____   M.O.T. Completed  ☐ Yes  ☐ No   INITIALS

SIGNATURE _____   INITIALS
SIGNATURE _____   INITIALS   SIGNATURE _____   INITIALS

# Consent for Medical and/or Surgical Treatment

The patient referred on the registration (the "Patient") personally or through the person legally empowered to do so present and consents Patient as herein contemplated requests and authorizes this Hospital, its employees, agents and otherwise affiliates (jointly and severally termed "Hospital") to ... the hospital care incident to admission therein, including without limitation, routine diagnostic procedure and medical treatment, which is to include whatever procedures that are deemed necessary by the admitting doctor referenced on the registration and such other physicians or assistants as he may designate (jointly and severally termed "Physician").

Patient similarly requests and authorizes Hospital and Physician to administer any treatment, administer anesthetics, and perform such other actions as the Physician may deem necessary or advisable in the diagnosis and treatment of Patient. Patient is aware that the practice of medicine and surgery is not an exact science and acknowledges that no warranty, guarantee or assurance has been made thereto by Hospital and/or Physician as to the results of treatments, examination or otherwise that may be obtained.

## Financial Agreement

For services heretofore performed or to be performed for Patient by Hospital whether one or more, below signed (severally if more than one), whether as Patient, agent or guarantor, agrees and promises to pay the charges for the hospital care so provided Patient in accordance with Hospital's then current regular rates and all costs incurred in collecting same, together with attorney's fees, which Hospital deems necessary and reasonably required to enforce Hospital's rights.

## Assignment of Insurance Benefits to Hospital

As or on behalf of insured under the insurance specified on the registration hereof and otherwise payable thereto (the present and future rights thereto and monies due or to become due therefrom termed "Contract Rights"), below signed irrevocably assigns and transfers to Hospital the Contract Rights, and orders and directs such insurer(s) to pay all monies due or to become due thereunder directly to Hospital or its assigns. To effect such payment Hospital is irrevocably constituted and appointed lawful attorney in fact, with substitution power, to sue or otherwise collect and settle any claim under the Contract Rights as insured without further notice or approval of insured and to endorse in the name of insured any check or other instrument for the payment of monies thereunder. If insured receives monies direct from insurer(s), same shall be held in trust for and immediately transferred to Hospital for amounts due. This assignment is irrevocable with an interest until full and complete payment of all monies due Hospital and its affiliates from this event of admission or otherwise. Money received by Hospital from insurer(s) or other third party sources, less the expense in procuring same, shall be deducted from the principal amount due for services rendered Patient. If charges not covered by insurance can not be paid in full when due, below signed agrees upon request to sign a promissory note bearing interest at the maximum legal rate to pay all debt not paid if credit is approved.

## Professional Services Assignment

To the extent that fees for professional services rendered to the patient are payable, the undersigned hereby assigns to said physicians and authorizes payment directly to said physicians all insurance benefits, including major medical, for professional services rendered to the patient. The undersigned is financially responsible to the physicians for fees not paid pursuant to this agreement.

## Verification of Third Party Benefits

The below signed authorizes the verification of third party benefits, any item referenced herein, statements and other data obtained from Patient and/or below signed and all other persons pertaining to the respective credit and financial responsibilities, understanding that an investigative consumer report may be made whereby information is obtained through personal interviews with third parties. Hospital or its contractor is authorized to investigate all information given by the below signed verbally and other such areas as reasonably connected with the Hospital's efforts in collection, now or in the future. Below signed hereby releases from liability, indemnifies from loss and specifically authorizes any requesting entity to make such disclosure to Hospital or its agents as they deem necessary in considering and verifying any application for credit. Below signed acknowledges that a complete and accurate disclosure of the nature and scope of the investigation will be given upon written request and hereby declares that all information furnished hereon and subsequently is and shall be true.

## Authorization for Release of Information

The Hospital is authorized to furnish from the patient's record requested information or excerpts from the referring physician, if any, and to any insurance company or third party payor for the purpose of obtaining payment of the account of the Hospital or any physician for services provided to the patient. The Hospital is authorized to release information from my medical record to any skilled nursing facility or other health care facility to which I may be transferred.

## Medicare Assignment

Patient's Certification, Authorization to Release Information, and Payment Request. I certify that the information given by me in applying for payment under Title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Social Security Administration or its intermediaries or carriers any information needed for this or a related medicare claim. I request that payment of authorized benefits be made on my behalf.

## Personal Valuables

The below signed understands and acknowledges that Hospital (1) maintains a safe for the safekeeping of property, (2) will not be liable for the loss or damage of any money, jewelry, glasses, prosthetic, document, fur garment or other article, regardless of the article's value or size, unless such article is formally placed within the Hospital's safe, and shall not be liable for loss or damage to any personal property unless deposited in said safe, (3) is NOT responsible for any items until actually placed into said safe, (4) IN NO WAY covenants the condition of article upon Patient's discharge, (5) has the right to retain possession of articles in its possession until its determination who is LEGALLY ENTITLED to possession, which shall be binding, and (6) is entitled to and will retain possession of deposited articles as collateral for and is HEREBY GRANTED A SECURITY INTEREST IN SAME for any outstanding charges due Hospital or its affiliates from the Patient and/or the below signed and IN THE EVENT OF ANY LOSS OR DAMAGE TO THE POSSESSIONS HELD BY HOSPITAL, HOSPITAL WILL ONLY BE LIABLE UPON AFFIRMATIVE PROOF OF ITS GROSS NEGLIGENCE. VALUABLES ARE NOT TO BE KEPT IN PATIENTS ROOMS.

(NOTE, IF PATIENT IS UNABLE TO SIGN, AND IN THE EVENT NO RELATIVE IS PRESENT TO SIGN, THE CUSTODIAN SHALL RETAIN POSSESSION OF VALUABLES AND OBTAIN ACKNOWLEDGEMENT AT THE FIRST AVAILABLE OPPORTUNITY.)

THIS INSTRUMENT IS IMPORTANT. By your signature, you acknowledge understanding of all items set forth herein. READ CAREFULLY BEFORE YOU SIGN. THOUGH A HOSPITAL REPRESENTATIVE WILL BE HAPPY TO EXPLAIN PORTIONS YOU MAY NOT FULLY UNDERSTAND, THE PRINTED FORM STANDS UPON ITS OWN AND IS IN NO WAY AMENDED BY ANY OTHER ORAL OR WRITTEN STATEMENT.

*Pt. unable to sign due to medical condition*

WITNESS _____ 12-24-98 DATE _____ TIME

X PATIENT'S SIGNATURE (If unable to sign, then by Legal Guardian or Next of Kin)

IMPRINT

DE LEON,CANDELARIO V
MR# VR021878   SS# 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
ACCT#VR98362080   12/24/98 M 57
06/15/41 Dovale,Joao MD
VALLEY REGIONAL MEDICAL CTR

RELATIONSHIP _____ 000040006 TIME

X _____
GUARANTOR/POLICY HOLDER   DATE   TIME   RELATIONSHIP

X _____
GUARANTOR/POLICY HOLDER   DATE   TIME   000006

CONDITIONS OF ADMISSION   MEDICAL RECORDS COPY

Columbia Valley Regional Medical Center
100-A ALTON GLOOR, Brownsville, TX  78526  (956)350-7000
Aftercare Instructions

for CANDELARIO DELEON   Thursday, December 24, 1998  8:30 pm

IMPORTANT: We have examined and treated you today on an emergency basis only. This is not a substitute for, or an effort to provide complete medical care. In most cases you must let your doctor check you again. Tell your doctor about any new or lasting problem. It is impossible to recognize and treat all injuries or illnesses in a single Emergency Department visit. If you had special tests such as EKG's and X-rays we will review them again within 24 hours. We will call you if there are any new suggestions. After leaving, you should FOLLOW THE INSTRUCTIONS BELOW.

You were treated today by Dr. JOAO OGVALE.

MOTOR VEHICLE ACCIDENTS.
    Passengers in a car accident get tossed about abruptly. That causes many pulled muscles and sprained ligaments. The pain and stiffness from these injuries is often worst on the day after the accident. After that day, you should feel steadily better. Expect to feel completely better in a week or two.

    People often hurt their neck in an accident. Neck muscle strains can be very painful. They are also likely to get better quickly and completely.

    By far most people recover completely from the strains and sprains of an accident. You should expect that to happen to you! If you are not getting better as discussed above see your doctor. If you get worse at any time, or if you have any new symptoms, CALL YOUR DOCTOR RIGHT AWAY.

FACIAL LACERATION.
    The laceration on your face needed stitches to close the skin. That helps healing. The suture line will be reddened at first. Over time the redness will fade. All lacerations cause scars.

The following affect the size of your scar:
- The size of the laceration.
- Infection.
- Location on your face.
- Exposure to sunlight.
- Your own likelihood to scar.

Do the following:
- Keep your dressing clean and dry for 24 hours.
- After 24 hours, wash your wound gently with soap and water and pat dry.
- Treat the suture line carefully without stretching it.
- Avoid direct sunlight.

IMPORTANTE: El examen y tratamiento medico que usted recibio hoy fue un servicio de emergencia. No debe de considerarse ni oratado ser substituto, de un ex y an adico completo. En la mayoria de los casos, debe de permitir que su doctor lo examine otra vez. Informe a su doctor si tiene problemas nuevos o prolongados. Es imposible el identificar y dar tratamiento a toda enfermedad con solo una visita al Departamento de Emergencia. Si le hicimos analisis especiales como un EKG o rayos-x los evaluaremos a revisar en 24 horas. Lo llamaremos para informarle si hay algun cambio en sus instrucciones. Al irse deber de SEGUIR LAS INSTRUCCIONES QUE SIGUEN.

Usted recibio tratamiento dado por Dr. JOAO OGVALE.
    ACCIDENTES AUTOMOVILISTICOS.
    Los pasajeros de un automovil que choca son aventados abruptamente de un lado a otro. Esto causa una variedad de heridas a musculos y ligamentos. El dolor se siente aun a s el dia despues del accidente. A partir de entonces usted debe sentirse mejor. Anticipe recuperarse por completo en una o dos semanas.

    Estos pacientes tambin tienden a tener heridas leves en el cuello que pueden causar mucho dolor. Estas heridas del cuello, tambin suelen mejorarse r pida y completamente.

    Por lo general, toda victima de este tipo de herida se recupera completamente. Usted debe contar con mejorarse tambin! Si esto no sucede vea a su doctor. Si se siente peor o si tiene sintomas nuevos, LLAME A SU DOCTOR DE INMEDIATO.

LACERACION FACIAL.
    La cortada que usted tiene en la cara necesit puntos para cerrarla. Esto ayuda a que sane. La linea suturada tendr una apariencia rojiza al principio. Eso desaparecer con el tiempo. Toda cortada deja una cicatriz.

Lo siguiente afecta el tamaño de la cicatriz:
- El tamaño de la cortada.
- Infecci n.
- En donde se localiza en la cara.
- Si se expone a la luz del sol.
- La forma en que usted cicatriza.

Haga lo siguiente:
- Mantenga el vendaje limpio y seco por 24 horas.
- Despues de 24 horas l vese la herida con cuidado con agua y jab n, y squela sin frotarla..
- Tenga cuidado con la herida, no la estire.
- Evite la luz del sol directa.

000007

Columbi   alley Regional Medical Ce   er
100-A ALTON GLOOR, Brownsville, TX  78526  (956)350-7000
Aftercare Instructions

for CANDELARIO DELEON, . Thursday, December 24, .1998, 8:30 pm

Watch for signs of infection:
- Increasing pain  swelling or redness.
- Pus from the wound.
- Red streaks or fever.

If you  have  and  new or severe symptoms CALL YOUR DOCTOR
RIGHT AWAY.

WOUND CARE (with stitches).
  Keep the dressings clean and dry for 24 hours. After
that, you  may  wash your wound gently. Elevate the wound if
you can. That will feel  better and help your wound heal.

  Even with  great care, any wound can become infected. The
signs of  infection are: increasing redness, swelling, pain,
pus from  the  wound, red streaks, or any unexplained fever.
If you  see  any  signs of infection, CALL YOUR DOCTOR RIGHT
AWAY.

  You have  1  STAPLE.  This (these) should be removed in 5
days.

DIPHTHERIA & TETANUS BOOSTER.
  We gave  you  a  shot to help fight and prevent infection
from a  bacteria  called  Clostridium. This bacteria is a
common cause  of  infections in wounds or cuts. It will also
help to  fight Diphtheria infection. Get this shot every ten
years, even  if  you  don't cut yourself. If you get a dirty
wound, you  will  need a Tetanus booster if you have not had
one within five years.

  Watch for  signs of infection in your wound as discussed.

  This shot  gives  most  people a sore arm for a few days.
(It may  feel  like  someone hit you in the arm.) Other side
effects are  quite  rare. Allergy  would show up as rash or
itching, wheezing or  shortness of breath. If you have any
allergy symptoms,  or  any  new symptoms, CALL YOUR DOCTOR
RIGHT AWAY.

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
  THESE ARE YOUR FOLLOW-UP INSTRUCTIONS!
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
Call as  soon as possible to make an appointment to see your
doctor in  2 days.   You  can reach your doctor by calling
their clinic phone number.
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

  AS ALWAYS,  YOU  ARE THE  MOST  IMPORTANT FACTOR IN YOUR
RECOVERY. Please  follow  the  instructions above carefully.
Take your  medicines  as  prescribed. Most important, see a

Observe si nota los siguientes síntomas:
- Aumento de dolor  inflamaci'n o enrojecimiento.
- Si la sale pus de la herida.
- Si nota líneas rojas o fiebre.

  Si tiene  síntomas nuevos o si empeora, LLAME A SU DOCTOR
DE INMEDIATO.

CUIDADO DE HERIDAS (con puntos).
  Mantenga el  vendaje limpio y seco por 24 horas. Despues
de esto,  puede lavarse la herida levemente. Eleve la parte
afectada si  le  es posible.  Esto har  que sienta alivio.

  A pesar  de  tener mucho cuidado  la heridas se infectan.
Los síntomas  de  infecci'n son enrojecimiento, inflamaci'n
dolor, pus, líneas rojas y fiebre.  Si usted nota cualquiera
de estos síntomas, LLAME A SU DOCTOR DE INMEDIATO

  Le hemos puesto 1 GRAMPA
. Se los tendremos que quitar en 5 días.

REFUERZO DE VACUNA PARA LA DIFTERIA Y EL TETANO.
  Le pusimos  una vacuna para prevenir la infecci'n causada
por la  bacteria Clostridium.   Esta bacteria es la causa
común de  infecciones en heridas o cortadas.  Tambin ayuda a
combatir la  Difteria.  Debe de darse esta vacuna cada diez
años, aun si no se corta.  Si tiene una cortada muy sucia, y
si no  se  ha vacunado  en cinco años, va a necesitar un
refuerzo contra el Ttano.

  Observe si nota síntomas de infecci'n,como se le explic'.

  La vacuna  deja  el brazo adolorido por unos días.  (Va a
sentir como  si  lguien le peg' en el brazo.)  Otros efectos
secundarios son raros.  Síntomas de alergia incluyen,
urticaria, comez'n,  jadeo  y  dificultad al respirar. Si
tiene síntomas  de  alergia o síntomas nuevos, LLAME A SU
DOCTOR DE INMEDIATO.

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
  ESTES SON LAS INSTRUCCIONES QUE DEBE DE SEGUIR!
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
Llame lo  antes  posible  para  hacer cita con su doctor en
2 días.  Usted puede hablar con su doctor si llama el número
de la clínica.
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

  COMO SIEMPRE,  USTED  ES  EL  FACTOR MAS IMPORTANTE EN SU
RECUPERACION. Por favor, siga las instrucciones antes
explicadas.  Tome  las medicinas tal como se las recetaron.

Colum. a Valley Regional Medical nter
100-A ALTON GLOOR, Brownsville, TX  78526  (956)350-7000
Aftercare Instructions

for CANDELARIO DELEON,, Thursday, December 24, 1998, 8:30 pm

doctor again as discussed. If you have problems that we have not discussed, **CALL OR VISIT YOUR DOCTOR RIGHT AWAY.** If you can't reach your doctor, return to the Emergency Department.

"I understand the instructions above, and discussed in the Emergency Department."

_____
Patient or Responsible Person

_____
Physician or Nurse

Lo m s importante es que usted consulte a su doctor como se le ha recomendado.  Si tiene algún problema que no hemos discutido, **LLAME O VEA A SU DOCTOR DE INMEDIATO.** Si no logra hablar con su doctor, vuelva al Departamento de Emergencia.

"Entiendo las instrucciones arriba explicadas, y antes dicutidas en el Departamento de Emergencia."

_____
Peciente o persona responsable

### CIGARETTE SMOKING.

This is surely your greatest health problem! The facts are clear that cigarette smoking will shorten your life. It will cause a great deal of illness along the way. If you need help quitting, talk to your regular doctor.

### SEATBELTS.

There is no doubt that seatbelts save lives. Every day in the Emergency Department we see how people without seatbelts are more severely hurt. We always buckle-up! Please do the same!

### Doctor o Enfermera EL HABITO DE FUMAR.

El h bito que usted tiene de fumar, es sin duda, el mayor problema de salud que tiene. Los hechos demuestran claramente que el fumar acorta la vida. También le causará una gran variedad de problemas de salud. Si necesita ayuda para dejar de fumar, consulte a su doctor.

### CINTURONES DE SEGURIDAD.

Sin duda, los cinturones de seguridad salvan vidas. A diario lo comprobamos en el Departamento de Emergencia, cuando atendemos a personas mal heridas por no haberse puesto el cinturón. Nosotros siempre lo usamos! Por favor, haga lo mismo!

Portions Copyrighted 1986-97, LOGICARE Corporation, Page 3, last page.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

| | |
|---|---|
| State of Texas | § |
| County of Bexar | § |

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of the report of Nick Peters, M.D., and is attached hereto as exhibit "E".

SIGNED this the _11th_ day of January, 2002.

_____
CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this _11th_ day of January, 2002.

_____
NOTARY PUBLIC, State of Texas
My Commission Expires: _09-02-03_

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

**Nick Peters, MD**
**2300 Marie Curie Rd**
**Garland, Texas 75042**
**(972) 562-8541**

November 10, 2000

Carol Lomax
Branton & Hall
737 Travis Park Plaza Building
711 Navarro, Suite 737
San Antonio, Texas 78205

Re: Candelario DeLeon  9827

Dear Ms Lomax,

I, Nick Peters am a licensed physician Board Certified in Emergency Medicine. I have reviewed the medical records sent from your office relating to the care of Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998. Also, I was provided the inpatient hospital records for his admission from his December 25, 1998 arrival to his discharge on January 6, 1999. Mr. DeLeon was brought back for other medical problems on January 8 and was discharged on January 29, 1999.

As you know, Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998. Paramedics found him unable to get out of the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a back board. On arrival to the emergency department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down. Dr. Dovale Joao examined the patient and stapled a facial laceration. The patient was cleared from spinal precautions and Dr. Joao noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes at 2030.

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center emergency department with" back pain", "numbness in body" and "can't move legs". Paramedics brought him from the jail to the hospital on a backboard without a cervical spine collar. Dr. Nagarjun Narra  applied a C-collar but when the patient returned from x-ray the collar had been removed.  Later the cervical collar was replaced. After

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 2

multiple x-rays were performed including cervical, dorsal and lumber spine, CT and MRI a diagnosis of acute spinal cord injury, cervical cord compression was made. The patient was admitted for further care and evaluation of his quadriplegia.

He was discharged from the hospital for supportive care and therapy, to be brought back 2 days later on January 8, 1999 for an infection and was later discharged again on January 29, 1999.

After my review of the records available, I believe several times the medical care rendered to Mr. DeLeon fell below expected standards. The incidences and reasons for my opinion are as follows:

1.  On the first emergency department encounter the patient was removed from spinal precautions prematurely. To safely remove a patient from such precautions, he must be awake, alert with no distracting injuries and no mind altering substances substances in the patient's system. Then the physician can access spinal stability after a careful normal neurological and spinal exam. Often needed are x-rays and occasionally special studies or consulting opinions . Dr. Joao did not document a neurological examination, or a spinal exam. The patient had a mind altering substance in his system as noted by the physician as "obviously drunk". No x-rays where done to even attempt to find the cause of the patient's compliant of numbness. In my opinion this gross negligence was a major contributing cause of Mr. DeLeon's spinal cord injury.

2.  When the paramedics arrived to care for Mr. DeLeon at the jail on December 25, 1999, they put him on a back board, but no cervical collar. With his cervical spine unstabilized he was at high risk of further unnecessary injury while being transported. This deviation from the standards of care was a contributing cause of Mr. DeLeon's quadriplegia.

3.  When the patient arrived to emergency on December 25, 1999 Dr. Narra appropriately placed a cervical collar on Mr. DeLeon. Unfortunately when he returned from having his x-rays done the collar was off. Later it was put back on. Even with normal cervical spine x-rays, the spinal precautions must not be removed if their is evidence of a neurological deficit. At this time Mr. DeLeon had obvious signs of injury with decreased motor and sensory function. The removal of the collar at this point was a departure from acceptable medical standards demonstrating negligence and could have contributed to his ultimate spinal injury.

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 3

In summery, it is my professional opinion the care for Mr. DeLeon fell substantially below standards of care several times by various caretakers. Reasonable care would have protected the spine from further injury. As a result of these breeches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

Please do not hesitate to contact me if there are additional records for review or if there are additional questions which need to be addressed.


Sincerely,

Nick Peters, MD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

State of Texas          §
County of Bexar        §

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of the report of Zeff Ross, FACHE, and is attached hereto as exhibit "F".

SIGNED this the 11th day of January, 2002.

_____
CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this 11th day of January, 2002.

_____
NOTARY PUBLIC, State of Texas
My Commission Expires: 09-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

Zeff Ross, FACHE
10213 Capri St.
Cooper City, FL   33026-4637

June 28, 2001

Ms. Carol P. Lomax
Branton & Hall
One Riverwalk Place
700 N. St. Mary's St., Ste. #1700
San Antonio, TX   78205

RE:  Candelario De Leon

Dear Ms. Lomax:

I, Zeff Ross, am a Certified Healthcare Executive and Fellow in the American College of
Healthcare Executives and I am currently the Administrator of Memorial Hospital West in
Florida.  With regard to the above referenced matter, I have reviewed the following information:

.    Texas Peace Officer's Report of the accident - December 24, 1998
.    The Medical Records of Columbia Valley Regional Medical Center
.    The Medical Records of Brownsville Medical Center
.    The City of Brownsville EMS Reports
.    The Report of Nick Peters, M.D.
.    The Report of Jeremy Slater, M.D.

Mr. Candelario De Leon is a 57 year old male who was brought to the Columbia Valley Regional
Medical Center emergency department on December 24, 1998 by the City of Brownsville EMS
ambulance after a motor vehicle accident.   According to the ambulance report, the patient was
found sitting on the driver's seat of a small red car which had sustained moderate damage to the
front end.  The EMS notes states, "Per patient, he was the driver, unrestrained with no loss of
consciousness." The narrative notes from EMS indicate "Patient smelled highly of alcohol and
stated he had been drinking but unknown what or how much".  The patient was alert and oriented
x 1, possibly due to alcohol.  The patient received neck spine immobilization, was extricated and
placed on a backboard and while on route to the hospital, the patient complained of numbness
from the neck down.  The emergency department record indicates that the ER physician
documented that the patient was "obviously drunk - awake and alert".  The examination findings
documented for the eyes, heart, lung and abdomen were normal with no findings recorded for the

Ms. Carol P. Lomax
June 28, 2001

-2-

neurological examination or extremities.  The patient received one staple to a forehead laceration and was then discharged to the custody of the police.  No further testing, including cervical spine x-rays, CT or MRI were performed.  The patient then spent the night in the city jail.  The following morning, the patient was brought to Brownsville Medical Center complaining of the inability to move.  According to the Ambulance Activity Report dated December 25, 1998 back pain was suspected with the patient complaining of the pain to arms and numbness throughout the body.   Patient stated he was unable to walk due to the numbness in his body.  He was transported to Brownsville Medical Center for further evaluation and under the History and Physical examination, it was noted that the patient was apparently in a motor vehicle accident last night at 9:00 p.m.  The patient was brought in this morning from jail as he was complaining of the inability to move.  He spent all night on the cold, concrete floor complaining of pain to his back.  Patient states he was unable to get out of his car and felt numb since last night, that he "can't move legs".  Patient had a c-collar applied, put onto the backboard, x-rays were performed, and when the patient returned from x-ray, it was noted that the c-collar was off per the x-ray technician and then reapplied.  Later that day an MRI was also performed.

According to the consultant's notes, it was noted that immediately after the accident, the patient complained of having numbness in both extremities.  He was seen at Valley Regional Medical Center and was incarcerated afterwards for drunk driving.  During the whole night, the patient complained of decreased movements of his lower extremities and on waking up this morning, felt more weakness, including the upper extremities.  The patient was sent to Brownsville Medical Center from jail to be evaluated.   Spinal x-rays were performed including cervical, thoracic, lumbar and all reported normal by the radiologist.  The neurologist requested a neurosurgical consult and an MRI was also performed.

It is my opinion, as an expert in hospital administration and after reviewing the information previously noted, and based on a reasonable degree of hospital administrative certainty, that Columbia Valley Regional Medical Center deviated from the standard of care by failing to provide for a complete neurological examination on Mr. De Leon at the time of his initial presentation to their facility.   The mechanism of injury indicated a high index of suspicion for the type of injury he received.  In addition, the EMS personnel noting the patient's complaints of numbness from the neck down were relatively clear indications to not only fully assess the patient for possible cervical cord injury, but as well to consider activating a trauma alert, which according to the hospital's definition, is a "potentially life threatening injury with vital signs presently stable."  However, this was not done and as such, the possibility of early treatment of his injuries, which could have decreased any long term neurological deficit, was lost.

Ms. Carol P. Lomax
June 28, 2001

-3-


Based on a reasonable degree of hospital administrative certainty, it is my opinion that the hospital did not implement such policy and procedures as any reasonably prudent facility would have done under similar circumstances.

I reserve the right to review additional emergency department/trauma policies and procedures, as well as medical staff bylaws and rules and regulations to help further formulate my opinion in the future.

Should you require additional information or have questions regarding any of the above, please feel free to contact me.

Sincerely,

Zeff Ross, FACHE

ZR/laf

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

State of Texas        §
County of Bexar       §

    BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

    "My name is Carol P. Lomax.  I am an attorney licensed to practice law in the State of Texas.  I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein.  The attached is a true and correct copy of excerpts of the deposition testimony of CANDELARIO DE LEON, and is attached hereto as exhibit "G".

    SIGNED this the 11th day of January, 2002.

                                  CAROL P. LOMAX

    SUBSCRIBED and SWORN to before me on this 11 day of January, 2002.

                           NOTARY PUBLIC, State of Texas
                           My Commission Expires: 09-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON,         ) (
        Plaintiff           ) (
                            ) (
VS.                         ) ( CIVIL ACTION NO. CV-B-00-192
                            ) ( JURY DEMANDED
CITY OF BROWNSVILLE,        ) (
TEXAS, ET AL.,              ) (
        Defendants          ) (

_____

ORAL DEPOSITION OF
CANDELARIO DE LEON
DECEMBER 10, 2001

_____

        ORAL DEPOSITION OF CANDELARIO DE LEON, produced

as a witness at the instance of the DEFENDANTS COLUMBIA

VALLEY HEALTHCARE SYSTEMS, L.P. D/B/A VALLEY REGIONAL

MEDICAL CENTER AND HCA - THE HEALTHCARE COMPANY, taken

in the above styled and numbered cause on DECEMBER 10,

2001, reported by RHONDA A. MARTIN, Certified Court

Reporter No. 4297, in and for the State of Texas, at

the Valley Grande Manor, 901 Wild Rose Lane,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure.

DEPOSITION OF CANDELARIO DE LEON

**Page 2**

APPEARANCES

COUNSEL FOR PLAINTIFF:

CAROL P. LOMAX
BRANTON & HALL, P.C.
One Riverwalk Place, Suite 1700
700 North St. Mary's Street
San Antonio, Texas 78205

COUNSEL FOR DEFENDANTS COLUMBIA VALLEY HEALTHCARE
SYSTEMS, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER
AND HCA - THE HEALTHCARE COMPANY:

THOMAS SULLIVAN
BRIN & BRIN, P.C.
1325 Palm Boulevard, Suite A
Brownsville, Texas 78520

COUNSEL FOR DEFENDANTS JOAO DOVALE, M.D. and STAT
PHYSICIANS, P.A.:

ALFRED M. CASILLAS
UICK & ONCKEN, P.C.
One Fountainhead
8200 I-10 West, Suite 208
San Antonio, Texas 78230

COUNSEL FOR DEFENDANTS CITY OF BROWNSVILLE, BENIGNO
REYNA, ANDRE TORRES, JR., and ALEX ORTIZ:

RYAN S. HENRY
WILLETTE & GUERRA, L.L.P.
International Plaza
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521

ALSO PRESENT:

Cecilia Caso, Interpreter
Mario A. De Leon

**Page 3**

INDEX

           PAGE

Appearances ................................... 2

CANDELARIO DE LEON
Examination by Mr. Sullivan ..................... 4
Examination by Mr. Casillas .................... 106
Examination by Mr. Henry ....................... 133
Examination by Mr. Sullivan .................... 136
Examination by Mr. Casillas .................... 138

Errata Sheet/Signature Page .................... 139

Reporter's Certificate ......................... 140

Attached to the end of the transcript: Stipulations

EXHIBITS
           PAGE
           IDEN.
NUMBER  DESCRIPTION

(No Exhibits Marked)

REQUESTED DOCUMENTS/INFORMATION

NUMBER  DESCRIPTION                          PAGE

1   Request for tax returns ................. 17
2   Request for consent of information
    (Social Security Administration) ........ 17
3   Release of information (unemployment
    commission) ............................. 19
4   Release of information (workers'
    compensation) .......................... 44
5   Blanco's last name and telephone number . 131
6   City where Mary Garza resides .......... 137

**Page 4**

1    MR. SULLIVAN: Do you want to have one
2  objection for all defendants?
3    MS. LOMAX: Yes.
4    CANDELARIO DE LEON,
5  having been duly sworn, testified through the duly
6  sworn interpreter, as follows:
7    EXAMINATION
8  BY MR. SULLIVAN:
9    Q. Okay. Mr. De Leon, my name is Thomas Sullivan,
10  and I represent Valley Regional. Mr. De Leon, I
11  noticed when you came in, from time to time your
12  counsel would speak to you in English, and I understand
13  that perhaps you may understand a little bit of
14  English, but I would ask you, please, to wait until the
15  interpreter has finished so that -- before you answer
16  the question. Okay?
17    A. I agree.
18    Q. And your counsel also told me that you have
19  taken some pain medication this morning; is that
20  correct?
21    A. Yes, it's true.
22    Q. Does that medication prevent you from
23  understanding the questions that we ask?
24    A. I don't think that will interfere.
25    Q. Okay. Will that medication make your questions

**Page 5**

1  any less -- your responses any less accurate?
2    A. I don't know since I'm not a doctor.
3    Q. Okay.
4    MR. SULLIVAN: Ms. Lomax, are you
5  confident that your client will be able to answer our
6  questions without the implication that these questions
7  are -- or his responses are less accurate because of
8  the medication?
9    MS. LOMAX: Yes, I am.
10    MR. SULLIVAN: Okay.
11    MS. LOMAX: Let me add, I have told Mr. De
12  Leon that if it's necessary to take breaks that he
13  should let us know right away. I told him we would
14  take reasonable breaks and I know that no one has any
15  objection to that.
16    MR. SULLIVAN: We do not. I do not.
17    Q. Okay. Mr. De Leon, if at any time I ask you a
18  question you do not understand, please ask the
19  interpreter and I will rephrase my question.
20    A. I agree.
21    Q. And lastly, it is important that you answer
22  with a "Yes" or a "No" rather than a nod of the head or
23  shaking of your head so that -- because the lady to my
24  right is taking down everything that is spoken.
25    A. Okay.

DEPOSITION OF CANDEL...IO DE LEON

Page 6

1    Q. Mr. De Leon, is this the first time your
2  deposition has ever been taken?
3    A. Yes.
4    Q. Okay. Have you had an opportunity to talk with
5  your counsel about the deposition?
6    A. Yes.
7    Q. Okay. And I assume that among the things that
8  she told you was that even though we are not in front
9  of a judge or jury, your testimony here is under oath
10  and would be the same as though it were in front of a
11  judge and jury.
12    A. Okay.
13    Q. Okay. Is that correct? Do you understand
14  that?
15    A. Yes.
16    Q. Okay. Mr. De Leon, will you please give me a
17  little background on your education? How far did you
18  go to school?
19    A. I got up to eighth grade.
20    Q. Okay. And where was that?
21    A. At Villanueva.
22    Q. Villanueva here in the United States?
23    A. Yes.
24    Q. Okay. And that's a little school just north
25  of -- or on 281 just north of Brownsville; is that

Page 7

1  correct?
2    A. Yes.
3    Q. Okay. And do you read and write English?
4    A. A little bit.
5    Q. Okay. Did you go to any kind of training in
6  any kind of a school or courses after eighth grade at
7  Villanueva?
8    A. Well, I attended several courses.
9    Q. Okay. What kind of courses?
10    A. Well, to study documents, what you call
11  documents.
12    Q. What do you mean "study documents"?
13    A. To unload boats, barges, and all type of
14  equipment for railroads.
15    Q. Oh, you studied the documentation then to
16  off-load boats?
17    A. On the dock, I would be in charge. I would
18  work for oil companies and we would receive ships to be
19  able to unload, so there has to be a person all the
20  time on the dock.
21    Q. Okay. Are those documents in English?
22    A. Yes.
23    Q. Okay. Now, did you go to any other courses?
24    A. Also in relation to that, courses when there
25  was an oil spill in the water.

Page 8

1    Q. Were those courses sponsored by the Coast Guard
2  or by the Environmental Protection Agency?
3    A. By both.
4    Q. Okay. Were those courses conducted in English?
5    A. Some of them and some others in Spanish.
6    Q. Okay. Any other courses that you attended?
7    A. No.
8    Q. Okay. When you were working and somebody would
9  ask you for your occupation, what would you say you
10  did?
11    A. Well, my occupation was in the oil terminals.
12    Q. Okay. Were you a longshoreman? Were you a
13  dockhand? Were you a welder? How exactly did you
14  identify your occupation?
15    A. My profession would be to load and unload
16  trucks and also railroad cars, barges, ships, and all
17  type of work that is done in the terminal.
18    Q. Okay. Have you ever been arrested?
19    A. Yes.
20    Q. Let me stop. Other than on Christmas Eve when
21  they arrested you for DWI, had you ever been arrested?
22    A. Yes.
23    Q. Okay. When were you arrested?
24    A. I don't remember. It's been a long time.
25    Q. Okay. How long? Ten years?

Page 9

1    A. More, I think.
2    Q. Okay. 20?
3    A. No.
4    Q. Okay. Was that the first time you were ever
5  arrested?
6    A. Yes.
7    Q. Okay. And what were you arrested for?
8    A. Because I was speeding about ten miles above
9  the speed limit.
10    Q. Okay. The charge was just that, just speeding
11  and nothing else?
12    A. Yes. Also they could smell beer.
13    Q. Okay. Were you arrested for DWI?
14    A. Yes.
15    Q. Okay. And what happened in that case? Did you
16  plead guilty? Did you get probation? What happened?
17    A. I was given probation.
18    Q. Okay. Was that here in Cameron County?
19    A. Yes.
20    Q. Okay. Any other time that you were arrested
21  other than that time you just told us and the time that
22  we're talking about in this case?
23    A. Yes.
24    Q. Okay. And when was that?
25    A. I don't remember.

Page 22

1  A. I think I only remained there for about two
2  years.
3  Q. Okay. And how much were you earning when you
4  were there?
5  A. There, I would make $6 per hour, because at
6  that terminal, we were almost there for free, so to
7  say.
8  Q. Were you working for Gulf Port Services at the
9  time of the accident?
10  A. No.
11  Q. Okay. How long before the accident did you
12  stop working for Gulf Port Services?
13  A. About seven months.
14  Q. Okay. So as I understand it -- and correct me
15  if I'm wrong -- you worked for -- you worked for the
16  company that was bought by Itapco for about 12 years;
17  is that correct?
18  A. Yes.
19  Q. And then eight years after Itapco bought them
20  out?
21  A. Yes.
22  Q. And then you were on unemployment for about a
23  year?
24  A. Yes.
25  Q. And then you worked for Gulf Port Services for

Page 23

1  about two years?
2  A. Yes.
3  Q. And then you were on unemployment for about
4  seven months?
5  A. Six months only.
6  Q. Six months. Okay. And at the time of the
7  accident, you were unemployed?
8  A. Yes.
9  Q. Okay. On Christmas Eve of 1998, what did
10  you -- what had you been doing, say beginning at noon
11  or so on that day, before the accident?
12  A. I was sleeping.
13  Q. Okay. And what time did you wake up?
14  A. About 5:00 in the afternoon.
15  Q. Okay. Did you have -- why were you sleeping
16  that late?
17  A. I had done some work. I had helped a friend
18  and I was tired.
19  Q. Okay. And what kind of work did you do?
20  A. I would help him to clean a septic tank, those
21  bathroom tanks.
22  Q. Okay. And what time did you finish that job
23  with him?
24  A. About 11:00 in the morning, I guess.
25  Q. On the 24th?

Page 24

1  A. Yes.
2  Q. Okay. And did he pay you?
3  A. No. I was doing him a favor.
4  Q. Okay. And what is his name?
5  A. Abel.
6  Q. Abel what?
7  A. I think it was Garcia.
8  Q. Okay. And where does Mr. Garcia live?
9  A. I don't know the name of that place. Where I
10  would be doing the job was at his sister's.
11  Q. What's his sister's name?
12  A. I don't know.
13  Q. Okay. Do you know the address?
14  A. Yes. She lives in Southmost, but I don't know
15  the name of the street.
16  Q. Okay. When you got up at about 5:00 that
17  afternoon, did you have anything to eat?
18  A. No. I just woke up. I took a shower and I
19  watched TV for a while, and then I called a friend to
20  see if I could borrow $40 so I could spend Christmas.
21  MR. SULLIVAN: Excuse me?
22  THE INTERPRETER: "So I could spend
23  Christmas."
24  Q. Okay. What was the name of your friend?
25  A. We call him Blanco. I don't know.

Page 25

1  Q. You don't know his name?
2  A. No.
3  Q. Okay. Did you talk to Blanco?
4  A. Yes.
5  Q. Okay. And did he lend you the $40?
6  A. Yes.
7  Q. Okay. Did you go to his house to get it or did
8  he come to you?
9  A. I went to his place. He owns a bar.
10  Q. Okay. And where is that bar?
11  A. At the Port.
12  Q. Okay. And what's the name of the bar?
13  A. International? No. The name is -- it's been
14  three years now. What's the name of the place? I just
15  know him by Blanco. I think it's International Bar.
16  Q. Okay. And it's out at the Port?
17  A. Yes.
18  Q. Is it across the road from AMFELS?
19  A. No. This is at the beginning of the Port, just
20  getting inside.
21  Q. Okay. Is it on the road to Port Isabel or is
22  it on 511?
23  A. No. It's on the road that goes inside the
24  Port.
25  Q. Okay. How much did you have to drink while you

| Page 26 | Page 28 |
|---|---|
| 1  were at -- excuse me. Did you drink at the bar?<br>2    A. I drank two beers.<br>3    Q. Okay. Did you buy a six-pack or anything?<br>4    A. I had gone to the Tex-Mart. I bought<br>5  cigarettes, I bought a 12-pack, and that's it.<br>6    Q. And where did you go from there?<br>7    A. I was going back to my house.<br>8    Q. Okay.<br>9    A. I was going to pick up a turkey that I had<br>10 there so I could take it to my mother's house.<br>11    Q. And where was the -- when you were coming back<br>12 to your house, which road did you take?<br>13    A. 802.<br>14    Q. And where was the place where you were going to<br>15 pick up the turkey?<br>16    A. At my house, at the trailer that I had.<br>17    Q. Okay. And where was that?<br>18    A. At Old Port Isabel Road.<br>19    Q. Okay. Did you drink any of the beers out of<br>20 the 12-pack?<br>21    A. No.<br>22    Q. Okay. So the only beers you had were the two<br>23 that you drank at your friend's bar?<br>24    A. Yes.<br>25    Q. Okay. You're sure of that? | 1    Q. I did not understand your answer. If the car<br>2  is in front of you, did you try to pass the car on --<br>3  the car on the right or the car on the left?<br>4    A. On the left.<br>5    Q. Okay. Do you remember whether or not the car<br>6  in front of you had its turn signal on?<br>7    A. No.<br>8    Q. Let me double back a little bit. At 5:00 when<br>9  you woke up, did you have anything to eat?<br>10    A. No.<br>11    Q. Okay. When you were working with your friend<br>12 at the septic tank, did you have anything to eat?<br>13    A. No, only my lunch that I had eaten early.<br>14       MR. SULLIVAN: Did he say "lunch" or<br>15 "breakfast"?<br>16       THE INTERPRETER: "Lunch," "almuerzo."<br>17    Q. Okay. What time did you eat?<br>18    A. Well, I woke up at around 5:00 that morning.<br>19 About 6:30 or 7:00 I was eating breakfast.<br>20    Q. Okay. And you hadn't eaten anything until --<br>21 that entire day, from 6:00 in the morning until 7:00<br>22 that night?<br>23    A. No. Probably a snack or something, but that's<br>24 it.<br>25    Q. Okay. And the beers you had at Blanco's bar, |

| Page 27 | Page 29 |
|---|---|
| 1    A. Yes.<br>2    Q. When you were driving down 802, about what time<br>3  was it?<br>4    A. I don't remember. Well, it must have been<br>5  around 7:00 or something.<br>6    Q. Okay. Did the accident occur before the -- you<br>7  got to the place where you were going to find the<br>8  turkey?<br>9    A. Yes.<br>10    Q. Okay. Would you describe the accident for us,<br>11 please?<br>12    A. Well, I was coming and this station wagon -- I<br>13 don't remember very well. It was dark and it was<br>14 raining. I was going to pass the station wagon when<br>15 she cut in, and I wasn't able to brake, so I hit it.<br>16    Q. Okay. Do you remember whether you hit it with<br>17 the front of your car or the front left or the front<br>18 right?<br>19    A. I was never able to get down to see how I hit<br>20 it, but I did hit it -- I rear-ended it with my front.<br>21    Q. Okay. Were you trying to pass him on -- were<br>22 you trying to pass that car on the right or on the<br>23 left?<br>24    A. On the left. He was on his right on the<br>25 outside lane. | 1  International Bar, were they regular 12-ounce cans of<br>2  beer or were they the large ones?<br>3    A. Beer that they sell at the bar, small ones.<br>4    Q. 12-ounce can?<br>5    A. Yes, I do think so. They are small.<br>6    Q. Okay.<br>7    A. I have never paid attention how many ounces<br>8  they have.<br>9    Q. Okay. Well, there are some cans that are about<br>10 this big and there are others that they call tall-boys.<br>11    A. No, small ones.<br>12    Q. Okay. And you had two?<br>13    A. Yes.<br>14    Q. Okay. And about what time was that?<br>15    A. Around 7:00, around there. I only went there<br>16 and that's it.<br>17    Q. Okay. So you had the two beers, then you got<br>18 on the road, and then you had the accident?<br>19    A. Yes.<br>20    Q. Would you agree with me that from the Port to<br>21 802 and Central Avenue it's about five or ten minutes?<br>22    A. More or less. About 15.<br>23    Q. Okay.<br>24       MS. LOMAX: And I think his testimony was<br>25 he stopped and picked up something at the Tex-Mart. |

**Page 30**

1  Q. When the accident happened, what happened to
2  you?
3  A. I only had a blow here on my head --
4  Q. Okay.
5  A. -- a small blow on my head.
6  Q. Did you hurt yourself anywhere else?
7  A. Not that I know of.
8  Q. Okay. Where did you hit your head? On the
9  steering wheel, dashboard, roof? Where?
10  A. On the roof, in that area where the dashboard
11  is, on top, on the roof of the car.
12  Q. Okay. Was the door on your side able to be
13  opened?
14  A. They opened it.
15  Q. Okay.
16  A. They did.
17  Q. Did they open it simply by pulling on the
18  handle and opening it or did they have to get that
19  machinery that forces the door open?
20  A. I didn't see that they would use anything.
21  Q. Okay. So they just opened the door with their
22  hands?
23  A. That's what I think.
24  Q. Okay. And who opened the door for you?
25  A. The paramedics.

**Page 31**

1  Q. Did the paramedics get there before the police
2  or after the police?
3  A. Before the police.
4  Q. Do you remember whether or not the driver of
5  the other car came over and talked to you?
6  A. No.
7  Q. Did you talk to him?
8  A. I don't remember since I didn't know who he
9  was. I told the paramedics to let me go and to go and
10  check the other people in front since I was only
11  feeling a blow.
12  Q. Did you have your car repaired?
13  A. No.
14  Q. What happened to the car?
15  A. It was picked up by the wrecker, and I never
16  went to pick it up, so they sold it.
17  Q. Okay. Did you send anybody from your family to
18  go and get your personal effects out of the car?
19  A. No.
20  Q. How long after the accident did the paramedics
21  get there?
22  A. I have no idea.
23  Q. Okay. Was it a matter of minutes? Was it an
24  hour?
25  A. Minutes, I guess.

**Page 32**

1  Q. Okay. Did you have any conversations with
2  them?
3  A. Only about what I told you, and they asked me
4  what I had, if something was hurting, and I only told
5  them that I was unable to move. That's when they
6  placed something on my neck. They took me out and they
7  placed me on the stretcher.
8  Q. Okay. How many paramedics were there?
9  A. The ones that I saw, the ones that I dealt with
10  were two.
11  Q. Okay. Could you describe either one of them
12  for us, please?
13  A. I'm not too good to describe them. Sometimes I
14  see my son and I don't -- I cannot identify him. I
15  have a hard time with my eyes.
16  Q. Did they speak to you in English or in Spanish?
17  A. Spanish.
18  Q. Did they both speak Spanish?
19  A. I think so.
20  Q. Okay. What was it specifically that you told
21  them, to the best of your recollection, your exact
22  words?
23  A. They asked me what I had and I told them the
24  only thing is that I cannot move. I don't feel
25  anything else. I don't feel.

**Page 33**

1  Q. You don't feel anything where?
2  A. In all my body.
3  Q. Okay. Could you move your hands?
4  A. One.
5  Q. Okay. Could you move your legs?
6  A. I don't know because I felt as though I was
7  stuck, but I wasn't stuck. I didn't feel them.
8  Q. Okay. You could not feel your legs?
9  A. No.
10  Q. Okay. Could you move your legs?
11  A. No.
12  Q. Okay. And you could not move one arm?
13  A. No.
14  Q. And which arm was that?
15  A. The one that I would move?
16  Q. Yes.
17  A. It was the right one, and it's the one that I
18  cannot move now.
19  Q. Okay. So at the time, you could move your
20  right arm?
21  A. A little bit.
22  Q. Okay. And you could not move your left arm at
23  all?
24  A. Yes. The only thing that I could move were my
25  arms, but a little bit.

## Page 34

1  Q. Okay. You told us that you could move one arm.
2  A. Yes.
3  Q. Okay. And that that arm is the right arm.
4  A. Yes.
5  Q. Okay. So if you could only move one arm, then
6  you could not move the other one, the left arm?
7  A. Yes, I could move it a little bit, but I'm
8  talking about movements. With this arm, I could touch
9  my forehead, that -- that -- which was the one that was
10 bleeding.
11 Q. Okay. So when you just now indicated with this
12 arm, you're talking about your right arm?
13 A. Yes.
14 Q. Okay. Could you move your left arm at all?
15 A. I think that at that time I did.
16 Q. All right.
17     MS. LOMAX: Could we see if Willy needs to
18 take a little break right now or if he wants to go on?
19     MR. SULLIVAN: (Moving head up and down.)
20     MS. LOMAX: We've been going about an
21 hour. Do you want a little break or do you want to go
22 on?
23     THE WITNESS: I feel okay.
24     MR. SULLIVAN: Okay. Let's keep going.
25 Q. Did the paramedics take you out of the car?

## Page 35

1  A. Yes.
2  Q. Were you able to stand up?
3  A. No.
4  Q. Okay. How did they take you out of the car?
5  A. They grabbed me from my shoulders and they
6  brought me out backwards.
7  Q. When you say they took you --
8  A. They placed kind of a board and then they moved
9  me.
10 Q. Okay. Did they reach under your arms and pull
11 . you out that way?
12 A. I couldn't see. They worked with me, and since
13 I was not feeling anything, I don't know where they
14 grabbed me from. I don't know.
15 Q. Do you remember anything that they told you?
16 A. Such as what?
17 Q. I don't know. Whatever it was that they told
18 you.
19 A. They were only asking me if I was feeling
20 anything else and they took me to the hospital.
21 Q. Okay. So you don't remember anything that they
22 told you?
23 A. They asked me if I had an allergy to any
24 medication.
25 Q. Okay. Do you know whether or not they took

## Page 36

1  your blood pressure?
2  A. I think they did.
3  Q. Okay. Anything else? They put you on a
4  backboard. Did they put a collar on you?
5  A. Yes. Before they brought me out, they placed
6  something on my neck.
7  Q. Before they brought you out of the car?
8  A. Uh-huh.
9  Q. Is that a "yes"?
10 A. Yes.
11 Q. Okay. Now, did they do anything else when they
12 put you in the ambulance?
13 A. Yes. They put an IV.
14 Q. Okay. Did they tell you what they were doing
15 with that IV?
16 A. Yes. They were going to put me some serum, I
17 guess. I don't know.
18 Q. Some serum?
19 A. Serum.
20 Q. Okay. Do you remember anything else that they
21 did there at the scene?
22 A. No.
23 Q. Do you know whether or not they asked you about
24 any drinking that you had done?
25 A. I don't remember.

## Page 37

1  Q. Okay. Where were you when the police came?
2  Were you still in the car or were you already in the
3  ambulance?
4  A. I don't remember.
5  Q. Okay. Do you remember talking to the police
6  officers?
7  A. When I was already in the hospital.
8  Q. Okay. That's the first time you remember
9  talking to them?
10 A. Yes.
11 Q. Okay. You did not talk to the police officers
12 at the scene?
13 A. I don't remember.
14 Q. All right. When you worked regularly before
15 the accident, about how much might you drink in, say,
16 the course of a week?
17     MS. LOMAX: Do you want to define a time
18 frame in that?
19 Q. Say about the last five or six years before the
20 accident.
21 A. More or less about a six-pack every day or
22 more, depending.
23 Q. Okay. Depending on what?
24 A. How much money I had.
25 Q. So would you drink as many as two or three

| Page 38 | Page 40 |
|---|---|
| 1  six-packs in a day? | 1  hospital. |
| 2  A. Yes. | 2  Q. Okay. |
| 3  Q. Okay. And where would you buy your beer? | 3  A. And since it's new, I don't know which way they |
| 4  A. At the stores. | 4  took. |
| 5  Q. Which stores? Did you go to H.E.B.? Did you | 5  Q. Okay. But you went to the hospital at what is |
| 6  go to Albertson's? Did you go to 7-Eleven? | 6  now on Alton Gloor Boulevard and the expressway? |
| 7  A. There were some Circle Ks close to my house. | 7  A. Yes. |
| 8  Q. Okay. So generally at the convenience stores? | 8  Q. Okay. It used to be called Tejon Road? |
| 9  A. Yes. | 9  A. That's it. |
| 10  Q. I want to make sure that I understand this. | 10  Q. Okay. When you got to the hospital, who was |
| 11  You don't remember talking to the other driver at the | 11  the first person -- other than the paramedics, who was |
| 12  scene of the accident? | 12  the first person you saw? |
| 13  A. No. | 13  A. If only I could remember everything. I think |
| 14  Q. And you don't remember talking to the police | 14  it was a woman. |
| 15  officers at the scene? | 15  Q. Okay. And did she tell you she was a clerk, a |
| 16  A. No. | 16  nurse? |
| 17  Q. Okay. You did tell us everything about your | 17  A. I don't recall. |
| 18  conversations with the paramedics? | 18  Q. Okay. Did you give her -- to whom did you give |
| 19  A. Yes. | 19  the information about your name, address, date of |
| 20  Q. Okay. Do you even remember the police officers | 20  birth, things of that sort? |
| 21  at the scene of the accident? | 21  A. I think it was a woman. |
| 22  A. No. | 22  Q. Okay. And you gave her the information about |
| 23  Q. Okay. So you don't even remember that they | 23  your -- that you had no allergies and that you had |
| 24  were there? | 24  no -- you had -- no, you did not have health insurance? |
| 25  A. No. | 25  A. Yes. |

| Page 39 | Page 41 |
|---|---|
| 1  Q. Did you talk to the paramedics when you were | 1  Q. Okay. And so all of that information about |
| 2  inside the ambulance? | 2  your date of birth, Social Security number, driver's |
| 3  A. Yes, because they wanted to take my jacket away | 3  license, your address, your previous medical history, |
| 4  and they couldn't do it, so I told them to cut it, so | 4  all of that stuff that's on the admission sheet you |
| 5  they would be able to place the IV. | 5  gave to this clerk, to this lady? |
| 6  Q. Okay. Do you remember whether or not they took | 6  MR. SULLIVAN: Excuse me. I didn't say |
| 7  any blood? | 7  "nurse." It was "clerk." |
| 8  A. No. | 8  THE INTERPRETER: The interpreter needs to |
| 9  Q. Do you remember how long the trip was between | 9  make a correction. |
| 10  the point of the accident and the hospital? | 10  A. I couldn't have given them that information |
| 11  A. No. | 11  since I don't know my Social Security number and I |
| 12  Q. Was it very long? Ten minutes, two minutes? | 12  don't remember my driver's license number. |
| 13  A. For me, it was eternity. | 13  Q. Okay. Well, where would she have gotten that |
| 14  Q. Okay. Where was the hospital located? | 14  information? |
| 15  A. By 511. | 15  A. Maybe they got it from my wallet. |
| 16  Q. A hospital on 511? | 16  Q. Did you give them your wallet? |
| 17  A. No. What's the name? Alton Gloor. | 17  A. No. How could I have done so if I couldn't |
| 18  Q. Okay. You went to the new one over by the | 18  move? |
| 19  expressway? | 19  Q. I didn't mean it that way. What I meant was, |
| 20  A. Yes. | 20  did you consent to giving them your wallet? |
| 21  Q. Okay. So it's at the expressway and Alton | 21  A. No. They took it out. The police already had |
| 22  Gloor? | 22  it. The police was there. |
| 23  A. Well, I think that's the one because I, inside | 23  Q. Okay. When did the police take your wallet |
| 24  the ambulance, couldn't see. I was just laying down, | 24  from you? |
| 25  and it was the first time that I would go to that | 25  A. I guess that it was when -- at the site of the |

Page 42

1 accident since I don't recall.
2     Q. Okay. Were the police already at the hospital
3 when you got there?
4     A. I don't know if they came behind the ambulance
5 or if they were already there.
6     Q. Okay. But when they got there, they already
7 had your wallet?
8     A. I guess so.
9     Q. Would your wallet have had the information
10 about your place of employment and your health
11 insurance?
12     A. No.
13     Q. Do you usually carry your Social Security
14 number with you?
15     A. Yes.
16     Q. Okay.
17         MR. CASILLAS: Tom, when you get to a good
18 breaking point, can we take a break?
19         MR. SULLIVAN: Do you want to take a
20 break?
21         MR. CASILLAS: Yeah.
22         MR. SULLIVAN: Okay. Sure.
23         (Brief recess)
24     Q. Do you remember the year and model of your car?
25     A. It was a 1990 Escort.

Page 43

1     Q. Okay. Did it have one of those seat belts that
2 had a lap and then the shoulder belt was all one piece?
3     A. No. You close the door and the seat belt goes
4 across you, and then you have the lower lap, the
5 lower --
6     Q. Okay. Was the shoulder harness working at the
7 time?
8     A. Yes.
9     Q. Okay. Did you disconnect it?
10     A. No.
11     Q. Okay. What about the seat belt, the one that
12 comes across your lap? Was that working?
13     A. Yes.
14     Q. Did you have it on?
15     A. I don't think so.
16     Q. At the time of the accident, did you lose
17 consciousness when you hit your head on the roof?
18     A. I don't remember.
19     Q. Okay. Had a doctor ever told you you had
20 diabetes before the accident?
21     A. No.
22     Q. Okay. Had you ever been hospitalized before
23 the accident?
24     A. I had an accident, but I was not hospitalized.
25 I was only at the emergency room. I was there for

Page 44

1 about eight hours because the doctor would say that
2 instead of being injured, I had a shock. It was a
3 spring from the equipment that they would use to load.
4 It broke and it hit me here. I had kind of like a
5 splinter. When the blow hit, it broke and it left me a
6 hole.
7     Q. About when was that?
8     A. Around 1996 or 1997. I don't recall well.
9     Q. Okay. And it was an accident that happened
10 while you were at work?
11     A. Yes.
12     Q. Okay.
13         MR. SULLIVAN: And then in addition to the
14 tax returns and the Social Security, we would also like
15 a release of information to get those workers'
16 compensation --
17         MS. LOMAX: Oh, the comp claim?
18         MR. SULLIVAN: Yeah, the comp claim, that
19 comp claim, the '96 comp claim.
20         MS. LOMAX: Okay.
21         MR. SULLIVAN: All right? Yes?
22         MS. LOMAX: Uh-huh. Yes.
23     Q. Had you ever been in a hospital before 1996?
24     A. When I was nine years old.
25     Q. What were you in the hospital for when you were

Page 45

1 nine?
2     A. I was operated from a -- it's like a mountain
3 of flesh that forms.
4     Q. Okay. So from about 1951 until 1996, you had
5 not spent anytime in the hospital?
6     A. No.
7     Q. Okay. Do you have a regular doctor?
8     A. I used to have one. He already passed away.
9     Q. Who was that?
10     A. Longoria.
11     Q. What's his first name?
12     A. Vidal.
13     Q. Okay. And what kind of a doctor is Dr.
14 Longoria?
15     A. He was a general doctor. He would operate and
16 he would see you for everything.
17     Q. Okay. And where did he have his offices?
18     A. By Washington Street.
19     Q. Okay. And how many -- when is the last time
20 you saw Dr. Longoria?
21     A. About 12 years ago.
22     Q. Okay. And how long ago did Dr. Longoria die?
23     A. He died when I wasn't here. About ten or 12
24 months ago. About a year ago.
25     Q. Okay. What did you see Dr. Longoria for in

Page 46

1 1989? Was that the correct year?
2   A. I saw him because I couldn't have my bowel
3 movements. I went to see him and he suggested
4 something to help me.
5   Q. Okay. And you didn't see him at all for the
6 next ten or 11 years?
7   A. I would see him often.
8   Q. Often?
9   A. We used to be neighbors over there at the
10 ranch.
11   Q. No. I mean did you see him professionally as a
12 physician.
13   A. No.
14   Q. And before 1989, did you see a doctor? Say at
15 any time during the '80s.
16   A. I have seen several doctors because every year
17 or every two years, you are required to go to a
18 physical.
19   Q. Did you go to the company doctor?
20   A. Yes, the company doctor.
21   Q. Okay. And who was that? Do you remember?
22   A. No.
23   Q. Okay. Let's go back to the time when you were
24 in the hospital on December 24th of 1998.
25     When you were in the hospital -- excuse

Page 47

1 me. Is that the same hospital that you had gone to in
2 1996 when you had the accident at work?
3   A. Yes, I think so. It was the same one, but it
4 was here on 802.
5   Q. Okay. That's the old one, not far from the
6 scene of the accident, right?
7   A. Yes.
8   Q. Okay. You told us about the young lady --
9 excuse me -- about the lady with whom you spoke at the
10 hospital. Have you told us everything about the
11 conversation that you had with her?
12   A. I don't remember very well.
13   Q. Okay. But do you have anything else to add
14 about your conversation with her?
15   A. No.
16   Q. Okay. Now, do you remember being interviewed
17 or having a conversation with any other hospital
18 personnel there?
19   A. No. They would all talk among them, but not
20 with me.
21   Q. Okay. Do you remember talking to a nurse?
22   A. I don't remember, but I think there was a
23 nurse.
24   Q. Okay. Could you describe him for me, please?
25   A. I am very bad with person's features and

Page 48

1 everything.
2   Q. Do you remember talking to the nurse about your
3 previous medical history?
4   A. No.
5   Q. Do you remember talking to the nurse about
6 whether or not you could move your arms and legs?
7   A. No. The only thing that I remember is that I
8 would tell them that I could not move because I could
9 not move.
10   Q. Okay. Do you remember whether or not the nurse
11 took your blood pressure?
12   A. I don't remember, but I -- I guess so.
13   Q. Why do you guess so?
14   A. Because that's almost always what they do as
15 soon as you get in there.
16   Q. Okay. What about your temperature?
17   A. I don't know. I don't recall.
18   Q. Do you recall them taking your -- putting any
19 kind of instruments on you besides the IV that the
20 paramedics put on at the scene?
21   A. No.
22   Q. Okay. Do you know where the nurse might have
23 gotten the information that you had no allergies?
24   A. Because the paramedics asked me if I was
25 allergic to something, if I was allergic to penicillin,

Page 49

1 and I told them that I wasn't.
2   Q. Okay. Do you remember whether or not the nurse
3 at the hospital asked you that same question?
4   A. I don't remember.
5   Q. Are you able to describe any of the nurses
6 physically, how tall they are, how short they are, how
7 fat, how skinny?
8   A. No, because almost all of them, when you are
9 lying down, they seem tall.
10   Q. Okay. You said that they were talking among
11 themselves. Do you remember anything that they said
12 among themselves?
13   A. No, because I don't hear well. Now I hear well
14 because I have this thing, but if I take this thing
15 off, I don't hear well.
16   Q. Okay. Did you have a problem with your hearing
17 before the accident?
18   A. Yes. With one ear, I have never heard well.
19   Q. Okay. Why was it that you never heard well?
20   A. Never, never. I don't know.
21   Q. Have you ever been in the military?
22   A. No. That's why I was not accepted, because of
23 my ear.
24   Q. Okay. Do you remember when the doctor met you?
25   A. No.

**Page 50**

1  Q. Would you be able to describe the doctor?
2  A. No.
3  Q. Can you remember any conversations between the
4  doctor and the nurse?
5  A. No.
6  Q. Do you remember any conversations between you
7  and the doctor?
8  A. The doctor didn't even speak to me.
9       MR. CASILLAS: Object, nonresponsiveness.
10  Q. Do you remember the doctor?
11  A. No.
12  Q. Okay. You cannot describe him?
13  A. No.
14  Q. Okay. And you wouldn't know whether he was a
15  man or a woman? Excuse me. You wouldn't know whether
16  the doctor was a man or a woman?
17  A. He is the man who placed the stitches, and it
18  was a man doctor.
19  Q. But you don't remember anything at all about
20  your conversation with him?
21  A. He didn't ask me anything.
22  Q. Okay. Did you ask him anything?
23  A. I would be asking. I wanted to know why I was
24  paralyzed, why I couldn't move.
25  Q. And you told him that?

**Page 51**

1  A. I asked everybody why.
2  Q. Okay. Do you remember whether or not the
3  doctor examined you?
4  A. No.
5  Q. Okay. So the only thing you remember is that
6  he put a staple in your head?
7  A. Yes. One was placed well and the other was
8  hanging there.
9  Q. Okay. Do you remember whether or not the nurse
10  or the doctor examined whether or not you could move
11  your legs or your arms?
12  A. No.
13  Q. Okay. They didn't do it or you don't remember?
14  A. I say that they didn't do it. Maybe they moved
15  me since I didn't feel.
16  Q. But there was no examination of the movement of
17  your arms?
18  A. No.
19  Q. And there was no examination for the movement
20  of your legs?
21  A. No.
22  Q. How long were you at the hospital? Do you
23  remember?
24  A. For about 20 or 25 minutes. That's what I
25  think.

**Page 52**

1  Q. Okay. Other than the lady that you saw at the
2  beginning, the nurse or nurses, and the doctor, did you
3  talk to anybody else at the hospital who was a hospital
4  employee?
5  A. No, I don't remember.
6  Q. Okay. How was it that you left the hospital?
7  A. They took me out on a stretcher and then they
8  placed me in a wheelchair.
9  Q. Okay. When you say "they," who are you talking
10  about?
11  A. I cannot say that it was the paramedics or
12  hospital personnel because I don't remember.
13  Q. Okay. Do you remember whether you -- that bed
14  is called a gurney. Do you understand that?
15  A. I don't know what that is.
16  Q. Okay. Well, were you on a bed or were you on
17  something with wheels?
18  A. With wheels.
19  Q. Okay. Were still on the backboard?
20  A. I don't remember since I couldn't feel.
21  Q. Well, did they take you off the backboard?
22  A. I don't know.
23  Q. Okay. When you were removed from the hospital,
24  were you still lying down?
25  A. I think I was laying down until I got out of

**Page 53**

1  the hospital.
2  Q. Okay. You were lying down on that bed with the
3  wheels?
4  A. Yes. To be quite honest, I don't remember
5  well. If you would have asked me that two or three
6  days after, I would.
7  Q. Well, I need to ask you now because I wasn't
8  there two or three days afterwards and this lawsuit
9  wasn't filed two or three days later, so the only thing
10  we have is your memory now.
11  A. I don't remember.
12  Q. Okay. Was -- the hospital bed or the gurney,
13  was it pushed outside when they got you off that and
14  into the car?
15  A. I don't remember what happened, but I do
16  remember this, that when I got to the police car, I was
17  sitting down on the seat.
18  Q. Sitting down on the seat of the car?
19  A. On the wheelchair.
20  Q. Okay. Do you know how it was that you got from
21  the gurney to the wheelchair?
22  A. I don't remember.
23  Q. Okay.
24  A. As I said, I was upset because I wasn't being
25  taken care of.

Page 54

1  Q. All right. Did you tell anybody that?
2  A. Yes. I wanted them to look after me.
3  Q. Okay. Who did you tell this to? Who did you
4  tell that you were upset?
5  A. I don't remember.
6  Q. Okay.
7  A. There were too many people. There were several
8  people there. I don't recall.
9  Q. It could have been the paramedics?
10 A. I don't know.
11 Q. Okay. Was it the police?
12 A. I don't know.
13 Q. Okay. If they got you into a wheelchair, was
14 it one like that that you're in now?
15 A. More or less.
16 Q. Okay. So at some point, they had to have taken
17 the backboard off.
18 A. I guess so.
19 Q. Yeah, because you couldn't sit in a wheelchair
20 on the backboard.
21 A. Of course.
22 Q. Okay. Did you still have the collar on?
23 A. No.
24 Q. Okay. When did they take the backboard off and
25 when did they take the collar off?

Page 55

1  A. They took the collar away there at the
2  hospital.
3  Q. Okay. Who took the --
4  A. I think they did it to examine me.
5  Q. Okay. And who would have done that?
6  A. I don't know.
7  Q. When was it that they took you off the
8  backboard?
9  A. I don't remember. I don't know. As I said, I
10 could not feel. I don't know if they took it off when
11 I arrived. I don't know.
12 Q. Okay. Just before you were able to get off the
13 gurney and into the wheelchair, were you able to sit up
14 on the gurney with your legs dangling?
15 A. I don't think so.
16 Q. Okay. How did you get from the gurney to the
17 wheelchair? Did someone pick you up and put you in?
18 Did you walk? What happened?
19 A. I guess somebody picked me up since I couldn't
20 move.
21 Q. Okay. Do you know who it was that picked you
22 up?
23 A. No.
24 Q. Do you know who it was that put you in the
25 wheelchair?

Page 56

1  A. No.
2  Q. Do you know how many people it took to put you
3  in the wheelchair?
4  A. I have no idea.
5  Q. Okay. How much do you weigh?
6  A. Right now?
7  Q. Yes.
8  A. 206.
9  Q. Okay. And how much did you weigh then?
10 A. 270.
11 Q. 270 or 217?
12 A. 270.
13 Q. Okay. Do you still have your driver's license?
14 A. No.
15 Q. Okay. When they put you in the wheelchair, who
16 was it that took you from the wheelchair to the car?
17 A. I guess the police officers.
18 Q. Okay. When you were put in the wheelchair,
19 were you inside the hospital or outside the hospital?
20 A. I don't remember.
21 Q. Okay. But you are sure that -- excuse me. Are
22 you sure that the police put you in -- took you out in
23 the wheelchair?
24 A. Well, I don't know the placement of the
25 wheelchair, but I was on the wheelchair ready to go

Page 57

1  into the car.
2  Q. Okay. And the police officers had you on the
3  wheelchair?
4  A. I guess it was them or the nurse took me out so
5  they could put me in the car. I don't know.
6  Q. Okay. Who put you in the car?
7  A. The police.
8  Q. How did they get you out of the chair?
9  A. They brought the wheelchair by the car. The
10 other one was on the other side and they stretched me
11 inside.
12 Q. Okay. As you were describing that -- and it
13 doesn't show in the translation -- you were leaning
14 forward. Did one stand in front of you and put his
15 arms under your arm?
16 A. They took me in the car. That, I know for
17 sure.
18 Q. Okay. Did they get on either side of you? Did
19 they get one in front, one in back?
20 A. I don't know.
21 Q. But it was the police?
22 A. Yes.
23 Q. Okay. When they got you in the car, where did
24 they put you?
25 A. In the back seat.

## Page 62

1  tired and I was upset because I wasn't being taken care
2  of, and instead of looking after me, they were taking
3  me to jail.
4      Q. Did they advise you -- did the police officers
5  advise you of your right to remain silent?
6      A. If they told me so, I don't remember.
7      Q. Okay. You've heard of those things we call the
8  Miranda rights, haven't you?
9      A. Yes.
10     Q. Okay. But you don't remember the police
11 officers talking to you about those?
12     A. No.
13     Q. Did you talk to the police officers who were
14 transporting -- excuse me. There was at least one
15 officer transporting you to the jail. Did you talk to
16 him during the trip?
17     A. No. If I said something, I would have said a
18 dirty word because I was quite upset.
19     Q. Okay. What would you have said?
20     A. Because I was not feeling anything. I couldn't
21 feel my body, so I wanted to find out why they weren't
22 looking after me.
23     Q. Okay. Well, what would you have said to the
24 police officers?
25     A. Can you repeat the question, please?

## Page 63

1      Q. Sure. You told us that you would have said a
2  dirty word to them. I just want to know what you would
3  have said.
4      A. I don't remember. There's so many words.
5      Q. Did the police officer respond?
6      A. If he said something, I don't know because I
7  don't hear well and I was tired and upset.
8      Q. So you don't remember anything that the police
9  officer might have told you in the trip to the jail?
10     A. No.
11     Q. When you got to the jail, how was it that you
12 got out of the car?
13     A. They got me out.
14     Q. Okay. I know. How did they get you out?
15     A. I think that by stretching me because they did
16 not place me in a chair.
17     Q. Okay. Did they pull you out?
18     A. I guess so.
19     Q. By your ankles or by your hands?
20     A. I don't know. It must have been from my arms,
21 otherwise I would have had some blows on my head.
22     Q. Okay. Did the police officers at any time
23 strike you?
24     A. No.
25     Q. Did they at any time kick you?

## Page 64

1      A. No.
2      Q. Did they at any time abuse you?
3      A. Not that I know of.
4      Q. Did they put you in a wheelchair?
5      A. No.
6      Q. Well, how was it that you got from the jail --
7  excuse me -- from the car into the area of the jail
8  where they booked you in?
9      A. Dragging me.
10     Q. They dragged you?
11     A. I don't know how it was. They picked up my
12 hands and my legs. I don't know, but they took me.
13     Q. Okay. Were you standing up and they were
14 walking with you around --
15     A. No.
16     Q. Well, then how was it? Did they pick you up
17 fully and --
18     A. Like that. Let me tell you. You grab a person
19 and you drag the person.
20     Q. Excuse me. I didn't understand that.
21         THE INTERPRETER: "You grab a person and
22 you drag him."
23     Q. Okay. So your heels were on the ground?
24     A. Yes.
25     Q. Okay. And they were dragging you backwards?

## Page 65

1      A. Yes.
2      Q. How many?
3      A. I don't remember, but there were two police
4  officers. I guess so since I'm heavy. It must have
5  been two. I don't think one was able to do it. A body
6  just as my body was, I don't think one police officer
7  could have done so.
8      Q. Did you make your body limp?
9      A. I didn't let my body limp. It was already
10 loose.
11     Q. Are you right-handed or left-handed?
12     A. Right-handed.
13     Q. When you got to the area we call the booking
14 area, where they fingerprint you and take your
15 photograph, things of that sort, did they put you in a
16 chair?
17         MS. LOMAX: Objection. That assumes that
18 he was taken to the booking area.
19     A. No.
20     Q. Okay. Were you taken to the booking area?
21     A. No. From there, I was taken to the federal
22 office, or I don't know what kind of office it is, but
23 they didn't take any pictures or anything because I was
24 thrown on the floor, and from there, they dragged me
25 inside to the cell and that's it.

**Page 94**

1 the car would be filled already?
2    A. Yes.
3    Q. Okay. Did the police officers attempt to give
4 you a breath test at any time?
5    A. No.
6    Q. Okay. Do you remember the police officers
7 giving you a warning that in the event you did not take
8 the breath test or if you did not comply with what they
9 call a field sobriety test that your driver's license
10 could be suspended?
11    A. No.
12    Q. Okay. Do you remember the officers telling you
13 that you were drunk and that you were driving?
14    A. No, but I suppose they told me so since they
15 arrested me.
16    Q. Were you drunk?
17    A. No.
18    Q. The only beer that you had had that day were
19 the two beers at the bar?
20    A. That afternoon. In the morning, I had drank
21 about three.
22    Q. Okay. When you got up that morning?
23    A. No, when we were working, picking up the septic
24 tank.
25    Q. Okay. And that would have been, what, about

**Page 95**

1 6:00 in the morning?
2    A. No. No. No.
3    Q. Well, you said that morning.
4    A. Yes, in the morning, but for us, the morning is
5 from noontime back.
6    Q. Okay. Because you were asleep from about 11:00
7 until 5:00?
8    A. Yes. No. From 12:00 to 5:00. I arrived at
9 around 11:00 at my house. I took a shower and
10 everything. I turned the TV on and then I fell asleep.
11    Q. Okay. And so you had had several beers before
12 you got home, correct?
13        MS. LOMAX: I'm going to object to the
14 characterization of "seven."
15        MR. SULLIVAN: I didn't say "seven." I
16 said "several." He said "three."
17    A. Two or three beers. That's what I said.
18    Q. Okay. Two or three beers?
19    A. While we were working, I took a beer to ease
20 the thirst.
21    Q. Okay. So you had two or three beers in the
22 morning and then two beers in the evening between 5:00
23 and 7:00?
24    A. More or less.
25    Q. Okay. Do you smoke?

**Page 96**

1    A. Yes.
2    Q. How long have you smoked?
3    A. For about 20 years, I guess.
4    Q. Okay. About how much do you smoke?
5    A. About a pack of cigarettes every two days.
6    Q. Okay. Do you still smoke that amount now or do
7 you smoke more or less?
8    A. Less because they don't bring me.
9    Q. Who is "they" that do not bring them to you?
10    A. You shouldn't smoke here.
11    Q. Oh, I know you can't smoke inside, but who is
12 it that's not bringing you cigarettes?
13    A. My sons. One of them doesn't like me to smoke.
14 But complaining and everything, they do bring them to
15 me.
16    Q. Okay. When you smoke, you smoke outside?
17    A. Yes.
18    Q. Can you smoke in this courtyard here?
19    A. Yes.
20    Q. And how much do you smoke now?
21    A. About six or seven cigarettes during all day
22 and part of the night.
23        MR. SULLIVAN: Okay. If you would have
24 him sign those release of information from Social
25 Security and the tax returns, I'd be happy.

**Page 97**

1        MS. LOMAX: I need to -- as far as Social
2 Security, it's okay. I can do the tax with him. I
3 think we talked about Social Security --
4        COURT REPORTER: I can't hear you. I'm
5 sorry.
6        MS. LOMAX: I will certainly have him sign
7 the tax request. I need to talk with Bill about the
8 Social Security.
9        MR. SULLIVAN: Okay. Would you have him
10 sign the tax form so I can --
11        MS. LOMAX: Sure. I'd be glad to.
12        MR. SULLIVAN: Okay.
13    Q. Do you still drink?
14    A. No, I can't because I'm taking medicine.
15    Q. Okay. When is the last time you had a beer?
16    A. When I was hurt.
17    Q. Okay. You have not had any alcohol since
18 December of 1998?
19    A. No, unless the medicines have alcohol, but
20 that, I don't know.
21    Q. Okay. Other than beer -- when you were
22 drinking, other than beer, did you drink anything else?
23    A. No.
24    Q. So no rum or whiskey?
25    A. No.

DEPOSITION OF CANDELARIO DE LEON

Page 114

1 earlier testimony, it's my belief, my understanding
2 that you don't recall what that doctor looked like. Is
3 that correct?
4    A. No. He could be here in this same room and I
5 wouldn't know who he is.
6    Q. As we sit here today, can you recall if the
7 doctor spoke to you in Spanish or English?
8    A. No.
9    Q. As we sit here today, can you tell me
10 everything that you saw the doctor do on your behalf?
11    A. No.
12    Q. But you do recall the doctor providing care to
13 you in connection with the cut that you had on your
14 head; is that correct?
15    A. Yes, because when I was going to leave, that's
16 when he put the staples in me, but one staple was
17 hanging and I could see it from here.
18    Q. Do you still have any type of scar in
19 connection with the cut that you sustained on your
20 forehead?
21    A. No.
22    Q. The care that you recall receiving from the
23 doctor at that time, would you agree that the doctor
24 was treating you in a caring and compassionate manner?
25    A. I couldn't tell you.

Page 115

1    Q. You don't recall one way or the other?
2    A. No.
3    Q. And have you already testified earlier today
4 about all the conversations that you recall having with
5 the doctor on that day?
6    A. Yes.
7    Q. Because of the accident and the trauma that you
8 sustained to your head, would you agree that your
9 memory in connection with the events taking place that
10 day is hazy in some respects?
11    A. I couldn't tell you that.
12    Q. Well, you would certainly agree that the
13 healthcare providers are in a better position to
14 testify about the care that they provided to you on
15 December 24th, 1998?
16       MS. LOMAX: Objection, form.
17    A. I do think so because I can't.
18    Q. Do you agree that bad things can happen without
19 somebody being the blame?
20    A. Excuse me. What was your question?
21    Q. Do you agree that bad things can happen to
22 people in everyday situations without somebody else
23 necessarily being the blame for that event?
24    A. Yes. Things happen every day.
25    Q. And you also agree that it's not appropriate to

Page 116

1 blame somebody if it's not their fault?
2    A. If it's not his or her fault, yes.
3    Q. And you certainly would not proceed with a
4 claim against somebody if you believe that it was not
5 their fault?
6    A. Yes.
7    Q. When did you first contact a lawyer about this
8 case?
9       MS. LOMAX: Let me make an objection here.
10 In case there's any question about attorney-client
11 privilege, I'm just simply limiting it to his answer.
12    Q. You can still answer the question.
13    A. I don't know.
14    Q. Do you recall which lawyer you first talked to?
15    A. Yes.
16    Q. Who?
17    A. Henry, and his last name is --
18       THE WITNESS: What's his last name?
19       MS. LOMAX: Only what you remember.
20    A. I've known him for a long time, and all the
21 time he calls himself "Licenciado."
22    Q. Does he have an office in Brownsville?
23    A. Yes.
24    Q. Did you have any discussions with any of your
25 family members about whether or not to file a lawsuit?

Page 117

1    A. No.
2    Q. Have you ever received any type of counseling
3 from any type of psychiatrist or psychologist?
4    A. No.
5    Q. Have you ever been diagnosed with any type of
6 depression, to your knowledge?
7    A. No.
8    Q. Have you ever taken any medication for any
9 depression?
10    A. Here they don't give you any. No. Here they
11 give it to everybody so they don't get depressed.
12       THE INTERPRETER: The interpreter needs to
13 make a correction to the first part of the answer. She
14 thinks it was not correct. Can I check with the
15 witness?
16       MR. CASILLAS: (Moving head up and down.)
17       (Discussion between the interpreter and
18 the witness in Spanish)
19    A. Here they give depression pills to almost
20 everyone for depression since it's quite closed, but if
21 you have relatives, they come and visit you and you
22 don't need it.
23    Q. Are you taking the medication for depression?
24    A. As I said, they give me so many medications
25 that I don't know what they are for.

Page 126

1  working; is that correct?
2      A. No, I wasn't. I wasn't employed.
3      Q. If you had obtained employment soon after or
4  around the time of December 1998 and assuming you did
5  not have any type of injuries, is it safe to say that
6  you would have liked to have retired at the age of 65?
7      A. As I say, it would have depended on where I
8  would be working.
9      Q. Well, you wouldn't want to work until you're
10 age 70, would you?
11         MS. LOMAX: Objection, asked and answered.
12     A. My father worked until he was 74 years old.
13 Why not me?
14     Q. Have you made any attempts to be employed since
15 the incident?
16     A. No. Why am I going to say "Yes" if it's no?
17         MR. CASILLAS: Object to nonresponsiveness
18 of the last part of the answer.
19     Q. It's my understanding that you had been
20 arrested for a DWI prior to 1998; is that correct?
21     A. Yes.
22     Q. Was there any type of automobile accident in
23 connection with that DWI?
24     A. No.
25     Q. At the time you were arrested for that DWI,

Page 127

1  were you drinking beer?
2      A. Yes.
3      Q. How many beers had you had prior to being
4  pulled over for the DWI?
5      A. I have no idea. It's been so long.
6      Q. At the time you were pulled over on that
7  occasion, do you agree that you were intoxicated?
8      A. Yes.
9      Q. You would agree that it's not the right thing
10 to do to drive while you're intoxicated?
11     A. Yes.
12     Q. You agree that it's very dangerous to do so?
13     A. Yes.
14     Q. You also agree that driving intoxicated can
15 cause a lot of harm to you and others?
16     A. Yes.
17     Q. How many beers would you consume before you
18 decided it would not be the right thing to do to drive?
19     A. I have no idea. Depending on the person.
20 There are people that could -- with one beer, they get
21 drunk.
22     Q. Well, my questions are directed to you. I want
23 to know how many beers it would take for you to become
24 intoxicated and unable to drive.
25     A. Six or eight beers.

Page 128

1      Q. Over what time period?
2      A. Two hours, two hours and a half.
3      Q. Have you ever received any type of alcohol
4  counseling?
5      A. No.
6      Q. When you become intoxicated, do you begin to
7  slur your words?
8      A. No.
9      Q. When you become intoxicated, do your eyes get
10 red?
11     A. No.
12     Q. Did the driver that you rear-ended in 1998 ever
13 pursue any claims against you?
14     A. Not that I know of.
15     Q. Do you agree that it's important to be
16 cooperative with police?
17     A. Yes.
18     Q. On the 24th of December 1998, do you believe
19 that the police handled you rougher than you would have
20 liked?
21         MR. HENRY: Objection, specificity. When
22 handling him?
23         MS. LOMAX: Join in that objection.
24     A. No, I don't know. Well, that, I don't know
25 because I don't know how a person should be treated.

Page 129

1      Q. Did you believe that the -- well, first of all,
2  were you upset with the way the police were treating
3  you on December 24th, 1998?
4      A. When an accident happens, you get mad with
5  yourself, and sometimes you don't react well when you
6  are mad, but it was not because I was being mistreated.
7  I was feeling that I was unable to move and I wanted to
8  move.
9      Q. Do you believe that the police weren't as
10 responsive to your complaints on December 24th as you
11 would have liked them to be?
12     A. I couldn't tell you about that because they
13 allowed me to go to the hospital, and then at the
14 hospital, they said that I was well, so they picked me
15 up and they took me to jail.
16     Q. Do you believe that the treatment that you
17 received by the police on December 24th and 25th of
18 1998 caused you harm?
19     A. No. I don't know, but I don't think so. When
20 they touched me, I was already paralyzed.
21         MR. CASILLAS: Let's take a break.
22         (Brief recess)
23     Q. Okay. Mr. De Leon, I'm almost done. Have you
24 been a party to any other lawsuit?
25     A. No.

| Page 134 | Page 136 |
|---|---|
| 1  Q. Okay. Now, you testified earlier that you do<br>2  not remember seeing or speaking to the police at the<br>3  scene of the accident on December 24th, 1998, correct?<br>4  A. Correct.<br>5  Q. Okay. And the first time you remember seeing<br>6  or speaking to the police was at the hospital, correct?<br>7  A. Correct.<br>8  Q. And the police were at the hospital to arrest<br>9  you, correct?<br>10  A. Yes.<br>11  Q. Okay. And it's your understanding that they<br>12  were going to arrest you for driving while intoxicated,<br>13  correct?<br>14  A. Yes.<br>15  Q. Okay. Now, when you were at the hospital, you<br>16  testified earlier that you were on a gurney, correct?<br>17  A. Yes.<br>18  Q. Okay. And you were taken off the gurney and<br>19  placed on a wheelchair, correct?<br>20  A. Correct.<br>21  Q. Okay. Could you not get off the gurney and<br>22  into the wheelchair yourself?<br>23  A. No.<br>24  Q. Okay. And then you were taken from the<br>25  wheelchair and placed into the police car, correct? | 1  upset that you weren't being taken care of, correct? B<br>2  A. Yes.<br>3  Q. Okay. And you wanted to stay at the hospital<br>4  as opposed to go to the jail, correct?<br>5  A. Well, yes, because I was feeling bad. I wasn't<br>6  feeling any blow, but I wasn't feeling anything at all.<br>7  Q. Okay. But you didn't want to go to the jail,<br>8  right?<br>9  A. No.<br>10  Q. Okay. And you would have rather stayed at the<br>11  hospital to be taken care of?<br>12  A. Yes.<br>13  Q. Okay. You testified just recently that you do<br>14  not think it was anything the police officers did that<br>15  harmed you, correct?<br>16       MR. CASILLAS: Objection, form.<br>17  A. Correct.<br>18  Q. And do you think anything that the jailers did<br>19  harmed you?<br>20  A. No.<br>21       MR. HENRY: Okay. I have no further<br>22  questions. I pass the witness.<br>23       EXAMINATION<br>24  BY MR. SULLIVAN:<br>25  Q. What's Mary's last name? |

| Page 135 | Page 137 |
|---|---|
| 1  A. Correct.<br>2  Q. Could you not get out of the wheelchair and<br>3  into the police car yourself?<br>4  A. Yes.<br>5  Q. Okay. Now, you testified earlier that you<br>6  didn't think one police officer could handle lifting<br>7  you up; is that correct?<br>8  A. Correct.<br>9  Q. Okay. And it required more than one, correct?<br>10  A. Yes.<br>11  Q. Okay. Do you think it's possible -- do you<br>12  think it could be difficult for even two police<br>13  officers or two people to lift you up and take you from<br>14  one place and put you in another?<br>15  A. I say yes because I was all limp.<br>16  Q. Okay. And you said you were all limp when they<br>17  picked you up and put you in the police car, correct?<br>18  A. Yes.<br>19  Q. Okay. So you weren't able to help at all the<br>20  officers?<br>21  A. No.<br>22  Q. Okay. Now, you knew you were being arrested at<br>23  that time, correct?<br>24  A. Yes.<br>25  Q. Okay. You testified earlier that you were | 1  A. She remarried. What's her name? Valdez, but<br>2  she remarried, so -- let me ask my son. Okay?<br>3       THE WITNESS: (Speaking in Spanish.)<br>4       MR. MARIO DE LEON: Garza.<br>5  A. Garza.<br>6  Q. Does she work under the name of Garza or under<br>7  the name of Valdez?<br>8  A. I don't know. I never interfere with her<br>9  private life.<br>10  Q. Okay. Is she a registered nurse or a licensed<br>11  vocational nurse?<br>12  A. She's a registered nurse.<br>13  Q. Okay. And the name of the town that she works<br>14  in?<br>15  A. I don't know. She just moved there. She's<br>16  been there for about three or four months.<br>17  Q. Okay. Is it the same town she lives in?<br>18  A. There, but I don't know the name of the town.<br>19  I know it's in Oklahoma, though. I spoke with her<br>20  yesterday. They call me almost every Sunday.<br>21  Q. Okay. Well, then what we'll do is we'll leave<br>22  a blank in the transcript of the deposition, and when<br>23  she calls you next Sunday, you can ask her what town<br>24  and you can fill that in.<br>25  A. Yes. |