United States District Court
Southern District of Texas
FILED

MAY 2 5 2004

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DELEON | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. CV-B-00-192 |
| VS. | § | |
| | § | |
| COLUMBIA VALLEY HEALTHCARE | § | |
| SYSTEM, L.P., JOAO DOVALE, M.D., et al. | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT
COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P.'S
MOTION TO DISMISS**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Plaintiff Candelario DeLeon and files this response to Defendant Columbia Valley Healthcare System L.P.'s motion to dismiss pursuant to TEX. REV. CIV. STAT. ART. 4590i and, in support thereof, respectfully shows as follows:

### INTRODUCTION

1. Defendant Columbia Valley Healthcare System L.P. has filed three motions under a single caption. These motions are: (1) a motion for sanctions, (2) a motion to dismiss under TEX. REV. CIV. STAT. Art. 4590i, § 13.01, and (3) a motion for summary judgment. Since these are three separate motions, Plaintiff files separate responses to each. The following response is directed to Defendant's motion to dismiss under TEX. REV. CIV. STAT. Art. 4590i, § 13.01.

### SUMMARY

2. There are several reasons why Defendant's Motion to Dismiss should be denied. *First*, Defendant's motion relies entirely on state procedural rules governing medical expert reports

that do not apply in federal court. **Second**, Defendant has waived any complaint about the sufficiency of Plaintiff's expert reports by waiting over two years and conducting full discovery before lodging any type of objection to the reports. **Third**, even if the Texas rules provided by Article 4590i, § 13.01 apply to this case, the reports of Plaintiff's experts filed in this case constitutes at least a "good faith effort" to comply with § 13.01(r)(6), and the motion should be denied. **Fourth**, if the court concludes that Art. 4590i, § 13.01's procedural rules do apply to this case and that the reports are insufficient, Plaintiffs' request a thirty day grace period in which to amend the reports pursuant to § 13.01(g) of the Act.

## TEXAS ARTICLE 4590i § 13.01 DOES NOT APPLY IN FEDERAL COURT

3.  The court in *Poindexter v. Bonsukan*, 145 F.Supp.2d 800 (E.D. Tex. 2001) was faced with the same issue currently before this court. The *Poindexter* court framed the issue as follows: "If the Act's expert disclosure requirements do not apply in federal court, the Defendants' motions to strike and to dismiss must be denied." *Poindexter*, 145 F.Supp.2d at 803. In denying Defendants' motion to dismiss, the Eastern District Court concluded in *Poindexter* that the Act's expert disclosure requirements were procedural and as such did not apply in federal court. *See id.* For the same reasons, Plaintiff respectfully urges this court to deny Defendant's motion to dismiss.

4.  It is well-settled that in this action, the Court applies state substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136 (1965); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817 (1938). The procedural requirements of TEX. REV. CIV. STAT. art. 4590i § 13.01 are not binding on plaintiffs in federal courts. Rather, the sufficiency of a complaint and the sufficiency and timing of expert disclosures are judged solely by the standards set out in Federal Rules of Civil Procedure. Similarly, whether parties are to be sanctioned for bringing frivolous claims in federal courts is judged under the Federal Rules.

5.  The Constitution, Article I, § 8, cl. 9, authorizes Congress to establish the lower federal courts. "From almost the founding days of this country, it has been firmly established that Congress, acting pursuant to its authority to make all laws 'necessary and proper' to their establishment, also may enact laws regulating the conduct of those courts and the means by which their judgments are enforced." *Willy v. Coastal Corp.,* 503 U.S. 131, 112 S.Ct. 1076 (1992). The Rules Enabling Act, 28 U.S.C. § 2072, specifically authorizes the creation of rules of procedure for the federal courts.

6.  The Supreme Court has emphasized that Congressional power to make rules governing the practice and pleading in federal courts "includes a power to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either." *Hanna,* 380 U.S. at 472, 85 S.Ct. at 1144; *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.,* 848 F.2d 613, 623 (5th Cir. 1988). Furthermore, Congress has "the power to prescribe procedural rules that differ from state-law rules even at the expense of altering the outcome of litigation." *Ferens v. John Deere Co.,* 494 U.S. 516, 525, 110 S.Ct. 1274 (1990) (emphasis supplied), citing *Hanna,* 380 U.S. at 473, 85 S.Ct. at 1145.[1] "The *Hanna* decision makes clear that *Erie* does not require the federal courts to depart from the Federal Rules in cases where those rules conflict with state law, even if the state law is in some sense "substantive." *Boone v. Knight,* 131 F.R.D. 609 (S.D. Ga. 1990).

7.  Discovery is a procedural matter governed in federal court by the Federal Rules of Civil Procedure and not by state discovery practices. *See* 8 Wright and Miller, Federal Practice and Procedure § 2005 (1970).[2] The state rules at issue in the present case, Article 4590i § 13.01, set

forth that a plaintiff is to produce an expert report after filing a lawsuit asserting a 'health care liability claim' and also provide for sanctions if the plaintiff fails to comply. These are matters of procedure covered by the Federal Rules of Civil Procedure.

8. The rules in question are properly considered procedural because they regulate "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *See Hanna*, 380 U.S. at 464, 85 S.Ct. at 1140, quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14, 61 S.Ct. 422, 426 (1941). In such circumstances, *Hanna* teaches that even the "state's characterization of its own rule as substantive rather than procedural must nevertheless yield to the strong presumptive validity of the properly promulgated federal procedural rule, which will be upheld as controlling the procedure in the federal court." *Rosales v. Honda Motor Co.*, 726 F.2d 259, 262 (5th Cir. 1984).

9. Of course, it should be noted that Texas does not consider § 13.01 to be substantive but instead acknowledges that § 13.01 provides merely procedural rules. As described by one state appellate court in Texas: "Article 4590i, section 13.01 generally establishes *procedural provisions to be applied in a lawsuit* asserting a 'health care liability claim,' such as the medical malpractice claim in this case." *Broom v. MacMaster*, 992 S.W.2d 659, 663 (Tex. App.--Dallas 1999, no pet.) (emphasis supplied). More importantly, even the Texas Legislature chose to place § 13.01 in Article 4590i, Subchapter M, which *the Texas legislature entitled "Procedural Provisions."*[3]

10. Furthermore, state rules or laws that provide sanctions for bad-faith conduct by a litigant are generally deemed procedural and not applied by a federal court applying state law. *See*

---

[3] *See gen. Johnston v. U.S.*, 85 F.3d 217 (5th Cir. 1996) (court considered name of subtitle within 4590i as part of its analysis in concluding that federal limitations and not 4590i § 10.01 applied to medical malpractice claim under Texas law asserted through FTCA).

*Ashland Chemical Inc. v. Barco Inc.*, 123 F.3d 261, 264 (5th Cir. 1997) ("We therefore must determine whether the Local Rule is *procedural, like sanctions for bad-faith conduct*, or substantive." [emphasis supplied]). The relief sought by the Defendant in the present case is the "sanctions" authorized by Article 4590i § 13.01(e).[4] The standard employed under Texas state law in deciding whether to award such sanctions is essentially bad faith.[5]

11.     Although the Fifth Circuit has applied portions of 4590i which govern substantive medical malpractice liability under Texas law (*see Lucas v. United States*, 807 F.2d 414 (5th Cir.1986) (defendant entitled to liability caps set by 4590i), it has never applied the requirements of §13.01 regarding expert reports.[6]

---

[4] Section 13.01 (e) provides:
>   If a plaintiff fails to comply with the requirement of furnishing an expert report to each physician and health care provider she has sued by the 180th day after filing her lawsuit, and has not voluntarily dismissed the suit, the trial court shall, on the motion of the affected physician or health care provider, enter an order awarding **as sanctions** against the claimant or the claimant's attorney:
>   (1) the reasonable attorney's fees and cost of court incurred by that defendant;
>   (2) the forfeiture of any cost bond respecting the claimant's claim against that defendant to the extent necessary to pay the award; and
>   (3) the dismissal of the action of the claimant against that defendant with prejudice to the claim's refiling.

TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(e)(emphasis supplied).

[5] "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a *good faith* effort to comply with the definition of an expert report in Subsection (r)(6) of this section." Article 4590i at Sec. 13.01(l) (emphasis supplied). Furthermore, a court "shall" grant a 30 day extension to allow a plaintiff to comply with the expert report requirements as long as the plaintiff's failure to comply was not "intentional or the result of conscious indifference." *Id.* at Sec. 13.01(g).

[6] In addition to *Poindexter v. Bonsukan*, 145 F.Supp.2d 800 (E.D. Tex. 2001), which is directly on point, there are many other cases decided within this circuit addressing similar issues that clearly point toward applying the federal rules and not § 13.01. *See Mooney Aircraft, Inc. v. Donnelly*, 402 F.2d 400 (5th Cir. 1968) ("No authority, however, demands that we regulate our court appearances and filings by means of sanctions utilized [under a state's law]. In fact, we must repair to our own federal standards."); *Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208 (5th Cir. 1998) (provisions of Texas Declaratory Judgment Act authorizing recovery of attorney's fees were procedural and did not apply in diversity case); *Exxon Corp. v. Burglin*, 42 F.3d 94 (5th Cir. 1995) (federal rule allowing recovery of attorney fees only in case of frivolous appeal, rather than

12. The procedures and deadlines under § 13.01 for when a plaintiff must produce an expert report in support of his claims are in direct conflict with FED.R.CIV.P 26 which sets its own procedures and deadlines (and allows the federal trial courts considerable discretion to act as it deems appropriate given the circumstances of a case). As stated above, discovery is a procedural matter governed in federal courts by the Federal Rules and not by state discovery practices. *See* note 2, *supra*, and cases cited therein. The procedures under § 13.01 conflict with the federal rules and, in federal court, are displaced by the federal rules.

13. The substantive law of Texas will not be affected by applying the Federal Rules of Civil Procedure to govern pleading and expert disclosures in diversity cases asserting Texas law health care liability claims. A plaintiff (and/or his lawyer) asserting a health care liability claim under Texas law in federal court is subject to sanctions under FED.R.CIV.P. 11 if the lawsuit is frivolous, if the allegations are not warranted by existing law, if the allegations do not have evidentiary support, or if the lawsuit has been presented for any improper purpose. The plaintiff asserting a health care

---

state rule allowing recovery of attorney fees regardless of which party ultimately prevailed on the merits, applied in diversity action); *Carter v. General Motors Corp.*, 983 F.2d 40 (5th 1993) (federal procedural law and not Texas rule governed award of costs in diversity case); *Johansen v. E.I. Du Pont De Nemours & Co.*, 810 F.2d 1377 (5th Cir. 1987) (FRCP 15 not Texas procedural rules governed whether amended pleading would relate back); *Rosales v. Honda Motor Co., Ltd.*, 726 F.2d 259 (5th Cir. 1984) (federal procedural rules regarding bifurcated trials governed in diversity case rather than Texas substantive law entitling plaintiff to one indivisible trial); *Gates v. L.G. DeWitt, Inc.*, 528 F.2d 405, 411 (5th Cir.1976) (state law requiring a plaintiff, in a direct action against an insurance company, to attach a copy of the insurance policy to his complaint is inapplicable since "[plaintiff] sued in federal court where his pleadings were controlled by Fed.R.Civ.P. 8...."); *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 749 (5th Cir.1973) ("A complaint is sufficient if it satisfies the Federal Rules, even though it would be subject to demurrer in a state court...."); *Eyerly Aircraft Co. v. Killian*, 414 F.2d 591, 603 (5th Cir.1969) (Although a federal court is bound by the substantive elements of state law, it is "not bound to follow the state law regarding the way the substantive rights must be pled or shown since such matters are governed by the Federal Rules of Civil Procedure."); *Fradella v. Abbott Laboratories*, 1999 WL 461819 (E.D. La. 1999) (FRCP 41 not state law governed dismissal for want of prosecution); *Sneed Shipbuilding, Inc. v. Spanier Marine Corp.*, 125 F.R.D. 438 (E.D. Tex. 1989) (federal rules of procedure applied rather than Texas rule requiring sworn affidavit denying claim).

liability claim will have to produce "a written report prepared and signed by the witness" from every expert witness. FED.R.CIV.P. 26a(2)(B).[7] Most importantly, the plaintiff in federal court will have to prove the exact same substantive elements to support a health care liability claim under Texas law as a plaintiff in Texas state court. The substantive law and the "outcome" are unchanged; only procedures regarding expert reports are changed.

14. For all the reasons previously stated, the Federal Rules are valid and apply in this case. The procedural requirements of the state rules, Article 4590i § 13.01, do not apply. The Defendant's motion should be denied.

## DEFENDANT HAS WAIVED ANY COMPLAINT ABOUT THE INSUFFICIENCY OF PLAINTIFFS' EXPERT REPORTS

15. Defendant's Motion to Dismiss should be further denied for the reason Defendant has waived any right to complain about the sufficiency of Plaintiff's expert reports. "A defendant must timely object to an inadequate expert report." *See Langley v. Jernigan*, 76 S.W.3d 752 (Tex. App. – Waco 2002, pet. denied). Defendants have engaged in written discovery and have taken several depositions. Defendants have been in possession of Plaintiff's expert reports for over three years, yet only now do they complain that the reports are insufficient to give fair notice of the nature of Plaintiff's claims. This complaint, if it exists, is made too late and has been waived. Defendant's motion to dismiss should be denied.

---

[7] FED.R.CIV.P. 26a(2)(B) further provides:
> The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

## PLAINTIFFS' EXPERT REPORTS CONSTITUTE A "GOOD FAITH EFFORT" TO PROVIDE A "FAIR SUMMARY" OF OPINIONS

16. If Article 4590i § 13.01 applies to this case, the reports of Nick Peters, M.D., Jeremy Slater, M.D., and Zeff Ross submitted by Plaintiffs in this case constitute at least a "good faith effort" to comply with § 13.01(r)(6), and the motion should be denied. True and correct copies of these reports are attached hereto as Exhibits 1, 2 and 3 respectively and are incorporated by reference into this response.

17. Article 4590i § 13.01(l) provides that a "court shall grant a motion challenging the adequacy of an expert report *only if* it appears to the court, after hearing that the *report does not represent a good faith effort to comply* with the definition of expert report in Subsection (r)(6) of this section." TEX. REV. CIV. STAT. art. 4590i § 13.01(l) (emphasis supplied). Thus, the issue before this court is not whether the reports of Plaintiffs' experts, taken together, satisfy all of Article 4590i's requirements for "expert reports." The issue is not even whether the reports constitute a "fair summary" as defined by 13.01(r)(6). The question before the Court is whether Plaintiffs' experts' reports, taken together, constitute a "good faith effort" to provide a "fair summary" of Plaintiffs' contentions concerning the standard of care, breach, and causation. *See gen. Palacios v. American Transitional Care Centers of Texas, Inc.*, 4 S.W.3d 857, 861-63 (Tex. App.--Hous. [1st Dist.] 1999, review granted). Because Exhibits 1, 2 and 3 set forth a good faith effort by Plaintiff to provide Defendants with a fair summary of Plaintiff's complaint, Defendant's motion to dismiss should be denied.

### REQUEST FOR GRACE PERIOD

18. In the alternative, in the event this Court concludes that the reports of Plaintiff's experts do not constitute a good faith effort to provide a fair summary and are therefore insufficient

under Art. 4590i, § 13.01, Plaintiff requests that the court identify the specific insufficiency in the reports and provide Plaintiff with a grace period of thirty days in which to submit an amended report. This motion is made pursuant to § 13.01(g) of the Act. Plaintiff would show that he and his counsel have, in good faith, provided a report they believe to be in compliance with § 13.01(r)(6) and the other provisions of the Act. There has been no indication to the Plaintiff of any complaint or deficiency in the expert report provided in this case until the filing of the Defendant's Motion to Dismiss. Thus, any non-compliance, which Plaintiff denies exists, is the result of accident and mistake, not conscious indifference or intentional act. The verification of Plaintiff's counsel is included herein in further support of this motion. For these reasons, Plaintiff request that in the event the court finds merit in the Defendant's motion to dismiss, the court grant a grace period of thirty days to allow cure of any defect in the expert's report.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that this court deny Defendant's Motion to Dismiss. Alternatively, in the event the court finds merit in the Defendant's motion to dismiss, Plaintiff requests that the court identify the specific insufficiencies in the report and grant a grace period of thirty days in which to cure any defect in the expert's report. Plaintiff further requests all other relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

BRANTON & HALL, P.C.
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)

By: _____
THOMAS A. CROSLEY
Texas Bar No. 00783902
S. Dist. Texas No. 15434
JAMES L. BRANTON
Texas Bar No. 00000069
S. Dist. Texas No. 20163

**LEAD COUNSEL FOR PLAINTIFF**

MICHAEL COWEN
Law Offices of Cowen & Bodden
520 E. Levee
Brownsville, Texas 78520
(956) 541-4981
State Bar No. 00795306
S. Dist. Texas No. 19967

**CO-COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Response to Defendant's Motion to Dismiss has been served upon opposing counsel by regular U.S. mail on this **24** day of May, 2004, to:

Steven Matthew Gonzalez
Mr. Gerald E. Castillo
GONZALEZ, GAYTAN, GARZA & CASTILLO, L.L.P.
1317 E. Quebec Avenue
McAllen, TX 78503

ATTORNEYS FOR DEFENDANTS,
STAT PHYSICIANS, P.A. and
JOAO DOVALE, M.D.

William Gault
Paul Fourt
BRIN & BRIN, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520

ATTORNEYS FOR DEFENDANTS
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER

_____
THOMAS A. CROSLEY

## VERIFICATION OF THOMAS A. CROSLEY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, on this day personally appeared THOMAS A. CROSLEY, who, after having been duly sworn, deposed and said as follows:

"My name is THOMAS A. CROSLEY. I am over the age of eighteen (18) years, competent to testify, and have personal knowledge of the facts stated herein. I am the counsel of record for the Plaintiffs in this case.

"I authored the foregoing response and every statement contained therein is within my personal knowledge and is true and correct. Specifically, I believe that the reports of Nick Peters, M.D., Jeremy Slater, M.D., and Zeff Ross attached to the foregoing response to Defendant's Motion to Dismiss as Exhibits 1, 2, and 3 respectively, represent a good faith effort to comply with Art. 4590i, § 13.01. In the event the court does not agree, I affirm that any insufficiency of the report is the result of accident or mistake, not conscious indifference or intentional act.

"Further affiant sayeth naught."

_____
THOMAS A. CROSLEY

SWORN TO AND SUBSCRIBED before me by the said THOMAS A. CROSLEY on this **24** day of May, 2004, to certify which witness my hand and seal of office.

VIVIAN MARTINEZ
MY COMMISSION EXPIRES
July 13, 2005

_____
NOTARY PUBLIC, STATE OF TEXAS

My commission expires:
**7-13-05**

Plaintiffs' Response to Defendant's Motion to Dismiss- Page 11

*Nick Peters, MD FACEP*
*30 Secretariat Ln*
*Fairview, Tx 75069*

February 25, 2003

Jason P. Hoelscher
Branton & Hall
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, Texas 78205

Dear Mr. Hoelscher,

      Upon your request I Nick Peters, MD have reviewed my previous report and will restate my opinions. I am a licensed practicing physician Board Certified in Emergency Medicine. I have reviewed the medical records relating to Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998, as well as hospital records. My opinions herein are based upon my education, training, experience, and knowledge of the care and diagnosis of spinal cord injuries.

I received my Doctor of Medicine degree from Creighton University School of Medicine in Omaha, Nebraska, in 1991. I did an internship and began a residency in Emergency Medicine at UCLA King/Drew Medical Center, Los Angeles, California from 1991 to 1993. I finished my residency in Emergency Medicine at the University of Arizona, in Tucson Arizona from 1993-1994. I have been practicing Emergency Medicine at Baylor Medical Center at Garland since successfully completing my Residency. As part of my daily practice I evaluate patients with suspected spinal cord injuries.

Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998. Paramedics found him unable to get out of the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a back board. On arrival the Emergency Department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down. On the Conditions of Admission form from the hospital was printed "Pt. unable to sign due to medical condition", instead of Mr. DeLeon's signature. Dr. Joao Dovale examined the patient and stapled a facial laceration. The patient was taken off spinal precautions and Dr. Dovale noted the patient was "obviously drunk". The patient was discharged from the emergency department of police custody to go to jail after approximately 30 minutes. On the discharge paperwork instead of Mr. DeLeon's signature was printed, "pt. can't sign".

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center Emergency Department with "back pain", "numbness in body" and "can't move legs". Paramedics brought him from the jail to the hospital on a backboard without a cervical spine collar. A cervical spine collar was applied in the hospital, but when the patient returned from x-ray the collar had been removed. Later the cervical collar was replaced. After multiple x-rays were performed including cervical, dorsal and lumbar spine CT and MRI a diagnosis of "acute spinal cord injury", " cervical cord compression" was made. the patient was admitted

PLAINTIFF'S EXHIBIT

page 2 of 2

for further care and evaluation of his quadriplegia.

After my review of the records available, I believe several times the medical care rendered to Mr. DeLeon fell below minimal standards. The incidences and reasons form my opinion are as follows:

1. On the first Emergency Department encounter the patient was removed from spinal precautions prematurely. The standard of care to remove a patient from spinal precautions require a patient to be awake, alert with no distracting injuries and no mind altering substances in the patients system. With these conditions met the physician can assess spinal stability after a careful normal neurological and spinal exam, often including x-rays and occasionally special studies or consulting opinions. In my opinion Dr. Dovale did not follow standard of care by no documented neurological examination or spinal exam. Also the patient had a mind altering substance in his system as noted by Dr. Dovale as being "obviously drunk". No x-rays were done to even attempt to find the cause of the patient's compliant of numbness. The patient was prematurely discharged from the Emergency Department. In my opinion this deviation from standards of care is a major contributing cause of Mr. DeLeon's spinal cord injury.

2. When the paramedics arrived on December 25,1998 to care for Mr. DeLeon at the jail the standard of care for a recent trauma victim with neurological complaints would have included placing the patient on a backboard and cervical spine collar. The paramedics placed the patient on a backboard without a cervical collar. With the patient's cervical spine not stabilized he was at high risk of further unnecessary injury while being transported. This deviation from the standards of car was a contributing cause of Mr. DeLeon's quadriplegia.

3. When Mr. DeLeon arrived to the Emergency Department on December 25, 1998 he was appropriately placed in a cervical spine collar. Standard of care in Emergency would be to maintain the spinal precautions by keeping the collar in place with evidence of a neurological deficit. This standard of care was not met as when the patient returned from x-ray the collar was removed and Mr. DeLeon had obvious signs of injury with decreased motor and sensory function. It is not documented who removed the collar. The collar was later replaced. The removal of the cervical collar could have contributed to the patients ultimate spinal cord injury.

In summary, it is my professional opinion the care for Mr. DeLeon fell substantially below standards of care several times by various caretakers. Most notable was the care he received in the Emergency Department at Columbia Valley Regional Medical Center. Reasonable care would have protected the spinal cord from further injury. As a result of these breaches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

Please do not hesitate to contact me if there are additional records for review or if there are additional questions which need to be addressed.

Sincerely,

*[signature]*

Nick Peters, MD



**ST. JOHN'S
SMITH-GLYNN-CALLAWAY
MEDICAL BUILDING**

March 10, 2003

Carol P. Lomax
Branton & Hall
737 Travis Park Building
711 Navarro, Suite 737
San Antonio, Texas, 78205-1787

    Re:    Patient: Candelario DeLeon
            File Number: 9827

I, Jeremy D. Slater, M.D., am a licensed physician, Board Certified in Neurology, Clinical Neurophysiology, and Sleep Medicine. I received my M.D. from the University of Pittsburgh in 1986, completed my medical internship at the Medical College of Pennsylvania in Philadelphia in 1987, completed my neurology residency at the University of Miami in 1990, and completed my fellowship in clinical neurophysiology in 1991. As part of my training and in the subsequent years as a general neurologist, I have been involved in the care of numerous patients with spinal cord injuries, both acutely and during rehabilitation. I have interacted with emergency room physicians related to such cases on occasions too numerous to count, and from this can give an opinion of what I, as a treating neurologist, would expect from an emergency room physician as standard of care for a possible spinal cord injury.

Case Summary:

Candelario DeLeon is a 58-year-old male with essentially negative past medical history, who was brought to the Columbia Valley Regional Medical Center emergency room on 12/24/98 by the City of Brownsville EMS ambulance after a motor vehicle accident. The patient was found, sitting in the driver's seat, unrestrained. According to the EMS notes, "Pt. Smelled highly of ETOH and stated he had been drinking but unknown what or how much". A cervical collar was placed and the patient was extricated through the driver's door onto a backboard (10PM). On route, the patient complained of "numbness from the neck down".

Upon arrival in the emergency room (10:05 PM), the ER physician, Joao Dovale, M.D., notes document that the patient is "obviously drunk – awake". Normal exam findings are documented for the heart, lungs and abdomen, with no findings recorded for the neurological examination or extremities. Nursing notes document the absence of CSF or blood in the ear canals, and the absence of Battle's sign, or periobital ecchymoses. The presence of the cervical collar is noted. The patient received one staple to a forehead

3231 SOUTH NATIONAL AVENUE ▪ SPRINGFIELD, MO 65807-7396
417-883-7422 ph.

A member of the Sisters of Mercy Health System




**ST. JOHN'S**
**SMITH-GLYNN-CALLAWAY**
**MEDICAL BUILDING**

laceration and was then discharged to the custody of the police. No cervical spine films were ordered – there is no documentation regarding if or when the collar was removed. The patient then spent the night in the city jail. Waking the next morning, he complained of being unable to move. When the EMS service arrived, he complained of pain in his arms and numbness throughout his body. At that time, no cervical collar was in evidence. The patient was placed on a backboard, secured with straps, and transported to the Brownsville Medical Center emergency room.

Upon arrival in the emergency room, the patient was assessed and underwent X-rays of the cervical spine. Once these were completed, because of clinical suspicion of a cord compression, he received high-dose Solumedrol intravenously, 30 mg/kg. A Foley catheter was placed and 400 cc of urine drained. Spine X-rays were completed including cervical, thoracic and lumbar, all of which were read as normal. A neurology consultation was obtained. The neurologist, on the basis of the clinical examination, suspected a low cervical cord compression, and ordered a MRI of the cervical spine. This was completed, and demonstrated no hematoma, moderate changes of cervical spondylosis with spinal canal stenosis in the mid to lower cervical spine. Neurosurgical consultation was ordered. A subsequent MRI of the thoracic spine was unremarkable, as was a CT scan of the brain.

Through the remaining hospitalization the patient received supportive therapies, and at the time of discharge to a nursing home, the patient remained quadraparetic, with a T8 sensory level.

Conclusions:

The standard of care for a possible cervical spinal cord injury includes the placement of a stabilizing cervical collar, generally by the EMS personnel. The removal of this collar generally takes place only after a set of X-rays are taken of the cervical spine to make sure there is no instability that could result in spinal cord injury. A neurological examination to assess for the presence of dysfunction that might be due to a cord injury is required. If the examination reveals such evidence, an emergent MRI of the cord is completed, unless such a study is simply unavailable, in which case a myelogram and post-myelogram CT could be done. The standard treatment is the use of high-dose intravenous steroids to reduce the occurrence of long term neurologic deficit.

The treating emergency room physician, Joao Dovale, M.D., in this case failed to complete a neurologic examination on Mr. DeLeon at the time of his initial presentation. The circumstances of the patient's injury, in addition to his complaints to the EMS personnel of numbness from the neck down, are both strongly compelling reasons to assess for possible cervical cord injury. Cervical spine X-rays were not ordered, no MRI was done, and no steroids were given. The strongest indication that these measures are

3231 SOUTH NATIONAL AVENUE ■ SPRINGFIELD, MO 65807-7396
417-883-7422 ph.

A member of the Sisters of Mercy Health System



**MERCY**
**ST. JOHN'S**
**SMITH-GLYNN-CALLAWAY**
**MEDICAL BUILDING**

the standard of care for possible cervical cord injury is that when the patient was taken to the Brownsville Medical Center emergency room the following day, these are exactly the steps that were taken. The literature regarding intervention with intravenous steroids indicates the earlier they are given, the more likely they are to be effective. By violating the standard of care, the steroids were delayed many hours. Following the standard of care would likely have resulted in a better outcome, possibly with no residual neurologic deficit.

Deviations:

Based on a reasonable degree of medical certainty, it is my opinion that the physician did not use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would have provided under similar circumstances.
Signed,


Jeremy D. Slater, M.D.

3231 SOUTH NATIONAL AVENUE ■ SPRINGFIELD, MO 65807-7396
417-883-7422 ph.

A member of the Sisters of Mercy Health System

Zeff Ross, FACHE
10213 Capri St.
Cooper City, FL   33026-4637

---

February 28, 2003

Ms. Carol P. Lomax
Branton & Hall
One Riverwalk Place
700 N. St. Mary's St., Ste. #1700
San Antonio, TX   78205

RE:   Candelario De Leon

Dear Ms. Lomax:

I, Zeff Ross, am a Certified Healthcare Executive and Fellow in the American College of Healthcare Executives and I am currently the Administrator of Memorial Hospital West in Florida. My Curriculum Vitae is attached to this report, which further details my qualifications. With regard to the above referenced matter, I have reviewed the following information:

- Texas Peace Officer's Report of the accident - December 24, 1998
- The Medical Records of Columbia Valley Regional Medical Center
- The Medical Records of Brownsville Medical Center
- The City of Brownsville EMS Reports
- The Report of Nick Peters, M.D.
- The Report of Jeremy Slater, M.D.

Mr. Candelario De Leon is a 57 year old male who was brought to the Columbia Valley Regional Medical Center emergency department on December 24, 1998 by the City of Brownsville EMS ambulance after a motor vehicle accident. According to the ambulance report, the patient was found sitting on the driver's seat of a small red car which had sustained moderate damage to the front end. The EMS notes states, "Per patient, he was the driver, unrestrained with no loss of consciousness." The narrative notes from EMS indicate "Patient smelled highly of alcohol and stated he had been drinking but unknown what or how much". The patient was alert and oriented x 1, possibly due to alcohol. The patient received neck spine immobilization, was extricated and placed on a backboard and while on route to the hospital, the patient complained of numbness from the neck down. The emergency department record indicates that the ER physician documented that the patient was "obviously drunk - awake and alert". The examination findings documented for the eyes, heart, lung and abdomen were normal with no findings recorded for the

PLAINTIFF'S
EXHIBIT

Ms. Carol P. Lomax
February 28, 2003

-2-

neurological examination or extremities. The patient received one staple to a forehead laceration and was then discharged to the custody of the police. No further testing, including cervical spine x-rays, CT or MRI were performed. The patient then spent the night in the city jail. The following morning, the patient was brought to Brownsville Medical Center complaining of the inability to move. According to the Ambulance Activity Report dated December 25, 1998 back pain was suspected with the patient complaining of the pain to arms and numbness throughout the body. Patient stated he was unable to walk due to the numbness in his body. He was transported to Brownsville Medical Center for further evaluation and under the History and Physical examination, it was noted that the patient was apparently in a motor vehicle accident last night at 9:00 p.m. The patient was brought in this morning from jail as he was complaining of the inability to move. He spent all night on the cold, concrete floor complaining of pain to his back. Patient states he was unable to get out of his car and felt numb since last night, that he "can't move legs". Patient had a c-collar applied, put onto the backboard, x-rays were performed, and when the patient returned from x-ray, it was noted that the c-collar was off per the x-ray technician and then reapplied. Later that day an MRI was also performed.

According to the consultant's notes, it was noted that immediately after the accident, the patient complained of having numbness in both extremities. He was seen at Valley Regional Medical Center and was incarcerated afterwards for drunk driving. During the whole night, the patient complained of decreased movements of his lower extremities and on waking up this morning, felt more weakness, including the upper extremities. The patient was sent to Brownsville Medical Center from jail to be evaluated. Spinal x-rays were performed including cervical, thoracic, lumbar and all reported normal by the radiologist. The neurologist requested a neurosurgical consult and an MRI was also performed.

The standard of care for Columbia Valley Regional Medical Center would have been to perform a complete neuro exam on Mr. DeLeon at the time of his initial presentation to their facility. It should be noted that according to the Joint Commission on Accreditation of Healthcare Organizations (JCAHO), Assessment of Patients, August 1997, Page PE-1, "The goal of the patient assessment function is to determine what kind of care is required to meet a patient's initial needs." The intent of Standards regarding assessment (Page PE-6) is such that "When a patient enters the hospital service, staff members first need to find out the reason why the patient was admitted. The initial assessment takes into account the patient's immediate and emergent needs and considers those needs broadly. This initial assessment helps staff determine what care the patient needs as well as any further assessments. The information gathered at the first patient contact may indicate that the patient needs a broader or more detailed assessment."

Ms. Carol P. Lomax
February 28, 2003

-3-

It is my opinion, as an expert in hospital administration and after reviewing the information previously noted, as well the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) Comprehensive Accreditation Manual for Hospitals; The Official Handbook, and, based on a reasonable degree of hospital administrative certainty, that Columbia Valley Regional Medical Center deviated from the standard of care by failing to provide for a complete neurological examination on Mr. De Leon at the time of his initial presentation to their facility. The mechanism of injury indicated a high index of suspicion for the type of injury he received. In addition, the EMS personnel noting the patient's complaints of numbness from the neck down were relatively clear indications to not only fully assess the patient for possible cervical cord injury, but as well to consider activating a trauma alert, which according to the hospital's definition, is a "potentially life threatening injury with vital signs presently stable." However, this was not done and as such, the possibility of early treatment of his injuries, which could have decreased any long term neurological deficit, was lost.

Based on a reasonable degree of hospital administrative certainty, it is my opinion that the hospital did not implement such policy and procedures as any reasonably prudent facility would have done under similar circumstances.

I reserve the right to review additional emergency department/trauma policies and procedures, as well as medical staff bylaws and rules and regulations to help further formulate my opinion in the future.

Should you require additional information or have questions regarding any of the above, please feel free to contact me.

Sincerely,

Zeff Ross, FACHE

ZR/laf