United States District Court
Southern District of Texas
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MAY 2 6 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | CIVIL ACTION NO. CV-B-00-192 |
| VS. | § | |
| | § | (JURY REQUESTED) |
| COLUMBIA VALLEY HEALTHCARE | § | |
| SYSTEM, L.P. D/B/A VALLEY REGIONAL | § | |
| MEDICAL CENTER, JOAO DOVALE, M.D. | § | |
| AND STAT PHYSICIANS, P.A. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P.'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Plaintiff Candelario De Leon and files this his Response to Columbia Valley

Healthcare System, L.P.'s Motion for Summary Judgment and, in support thereof, respectfully shows

as follows:

**INTRODUCTION**

1.      This is a medical malpractice case against Defendant Columbia Valley Regional

Healthcare System, L.P. d/b/a Valley Regional Medical Center (hereinafter referred to as

"Hospital"), and Defendant Joao Dovale, M.D. and Stat Physicians, P.A.  Dr. Dovale was the

Emergency Room physician who treated Plaintiff and Stat Physicians, P.A. is the entity that

contracted with the hospital to staff the Emergency Room with capable physicians.

**SUMMARY JUDGMENT EVIDENCE**

2.      Plaintiff relies upon the following exhibits as summary judgment evidence, and

incorporates same herein.

Exhibit A – Affidavit of Plaintiff Candelario DeLeon and excerpts from the
deposition of Plaintiff Candelario DeLeon, taken December 10, 2001;

<u>Exhibit B</u> – Plaintiff's medical records of 12/24/98 from Brownsville EMS;

<u>Exhibit C</u> – Plaintiff's emergency room medical records of 12/24/98 from Valley Regional Medical Center ("the Defendant Hospital ER records");

<u>Exhibit D</u> – Excerpts from the deposition of Defendant Joao Dovale, M.D., taken on May 19, 2004;

<u>Exhibit E</u> -- the affidavit of Nick Peters, M.D.;

### FACTUAL BACKGROUND AND ARGUMENT

3.     Plaintiff is a quadriplegic.  He was injured in a car wreck on December 24, 1998. After the wreck, while still in his vehicle, Plaintiff began experiencing numbness from the neck down.  Exh. A -- Pl. Depo.at 32-35.   He was unable to move his legs; he had limited movement of his arms; and his extremities were numb.  *Id.*   Because of his inability to move, the paramedics placed a cervical collar on him, removed him from his vehicle, and placed him onto a  backboard for transport to Defendant Hospital.  Exh. A -- Pl. Depo. at 34-36; *see also* Exh. B -- EMS record. In addition to being unable to move, Plaintiff had a laceration to his forehead.  Id.

4.     While en route to the hospital, the EMS personnel charted in their records that Plaintiff "complained of numbness from the neck down."  *See* Exh. B -- EMS Records.

5.     Plaintiff was suspected of driving while intoxicated, so Brownsville Police Department officers accompanied the Plaintiff and paramedics to the Defendant Hospital emergency room so that Plaintiff could be treated and cleared before being taken to jail.

6.     Upon arrival to the hospital's ER, Plaintiff was assessed by a nurse, Harold D. Wright.  See Exh. C -- Hosp. Records, at p. 4.  Plaintiff told everyone who treated him, including nurse Wright, he was paralyzed and could not move -- that he was "numb" and could not feel his arms or legs.  *See* Exh. A -- Pl. Depo. at 50-51.  According to Plaintiff's testimony, the nurse and

doctor that examined him did not examine whether Plaintiff could move his arms or legs. Id. at 51. No one asked Plaintiff's about his numbness or tingling in his extremities. Id.

7.    Nurse Wright charted "+" for movement of all four extremities, but there are no nurse's notes describing how this was accomplished. Nor are there any nurse notes indicating that the complained of numbness was evaluated by nurse Wright or any other hospital staff, or communicated to Dr. Dovale, the ER doctor. *See* Exhibit "C" - Hospital Records, page 4.

8.    Plaintiff testified in his deposition that he told everyone involved in his care that he was numb below the neck and that he could not move. If this is true, which under the summary judgment standard of review it must be taken as true, then the standard of care required the hospital staff, including Nurse Wright, to  communicate this to Dr. Dovale and taken appropriate steps to insure that the spine injury protocol was followed for Plaintiff. See Exh. E – Aff. of Dr. Peters.

9.    Dr. Dovale testified at his deposition that no one told him that Plaintiff was complaining of numbness below the neck or the inability to move his extremities. *See* Exh. D - Dovale depo. at 79-81. Dr. Dovale stated that if he had been told of this complaint of numbness, he would have ordered an x-ray and CT scan of Plaintiff's spine and evaluated him further for a possible spinal cord injury. *Id.* at 80-81.

> Q. If instead you had been told that he was unable to get out of the car because he said he couldn't feel anything below his neck, would you have treated him differently?
>
> A. Yes.
>
> Q. And that would have been [to obtain] an x-ray and CT scan?
>
> *A. Yes. If I was given the privilege of that information, yes.*

Exh. D – Dovale depo. at 80-81.

3

10.     If x-ray and CT scans had been obtained, then it is likely that Plaintiff's spinal cord injury would have been diagnosed in a timely manner and steroids given to minimize any post-traumatic swelling that causes further spinal cord injury. See Exh. E -- Aff. of Dr. Peters. If this had been done, then the injury and swelling to Plaintiff's spinal canal that resulted in his quadriplegia injury could have, in reasonable medical probability, been eliminated such that Plaintiff's injury and paralysis would likely have been much less. Id. For these reasons, the hospital violated the standard of care by failing to communicate the patient's complaint of numbness from the neck down to the ER doctor. This violation of the standard of care was a proximate cause of Plaintiff's injuries and damages.

11.     Further, the hospital's protocol requires that the EMS records be attached to the ER record and provided to the ER doctor at the time of treatment. *See* Exh. D -- Dovale depo. at 38-41. This was not done. Had this been done, Dr. Dovale would have seen that the patient had complained of numbness from the neck down while en route to the hospital. Again, Dr. Dovale testified that had he known of this complaint of numbness, he would have treated the patient differently and would have further evaluated the existence of a spinal cord injury by performing x-rays and a CT scan. This failure by the hospital to follow its protocol by delivering a copy of the EMS record to the ER doctor while the patient was being treated is a further violation of the standard of care of the hospital in the treatment of Plaintiff. See Exh. E - Aff. of Dr. Peters. This violation was a proximate cause of Plaintiff's injuries and damages, in that had Dr. Dovale been made aware of the complaint of numbness, then he would have, by his own admission, performed x-rays, and a CT scan which would have led to the diagnosis of possible spinal cord injury. At the very least, the

4

patient would have been expected to remain on spinal precautions, which would have minimized the extent of his injury and Plaintiff would not have suffered as severe an injury. Id.

12.    For all these reasons, a genuine issue of material fact exists which precludes summary judgment against the Plaintiff on his claims against the hospital.

## MOTION TO SUPPLEMENT

13.    Plaintiff further requests the opportunity to supplement this summary judgment response with the deposition testimony of Plaintiff's experts, Nick Peters, M.D., FACEP an ER physician, and Jeremy D. Slater, M.D., a neurologist. Their depositions are being taken on May 26, 2004, in Houston, Texas. Plaintiff requests the opportunity to supplement this Summary Judgment Response with excerpts from the testimony of Dr. Peters and Dr. Slater within ten days of the completion of their depositions. That is, Plaintiff is requesting until June 7, 2004, in which to supplement this Summary Judgment Response with additional evidence and argument.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendant, Columbia Valley Healthcare System, L.P.'s Motion for Summary Judgment be in all things denied. In the alternative, Plaintiff requests that he be allowed to supplement this Summary Judgment Response on or before June 7, 2004. Plaintiff further requests other relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

**BRANTON & HALL, P.C.**
One Riverwalk Place, Suite 1700
700 N. St. Mary's St.
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)
THOMAS A. CROSLEY
State Bar No. 00783902
S. Dist. Texas No. 15434
JAMES L. BRANTON
State Bar No. 00000069
S. Dist. Texas No.20163

And

Law Offices of Cowen & Bodden
520 E. Levee
Brownsville, Texas 78520
(956) 541-4981
(956) 504-3674 (Fax)

By:_____
        MICHAEL R. COWEN
        State Bar No. 00795306
        S. Dist. Texas No. 19967

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served, via certified mail, return receipt requested, on this 26th day of May, 2004, to:

Steven Matthew Gonzalez                    **CMRRR#7002-0860-0001-1956-7365**
Mr. Gerald E. Castillo
GONZALEZ, GAYTAN, GARZA & CASTILLO, L.L.P.
1317 E. Quebec Avenue
McAllen, TX 78503

ATTORNEYS FOR DEFENDANTS,
STAT PHYSICIANS, P.A. and
JOAO DOVALE, M.D.

William Gault                              **CMRRR#7002-0860-0001-1956-7334**
Paul Fourt
BRIN & BRIN, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520

ATTORNEYS FOR DEFENDANTS
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER

_____
Michael R. Cowen

7

# Exhibit A

## AFFIDAVIT OF CANDELARIO DE LEON

COUNTY OF *CAMERON*    §

STATE OF TEXAS         §

BEFORE ME, the undersigned authority, on this date personally appeared Candelario De Leon, who, being by me duly sworn, deposed and said as follows:

"My name is Candelario De Leon. I am over the age of eighteen (18) years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein, and I have knowledge of each of the matters stated herein. The facts stated in this Affidavit are within my personal knowledge, and are true and correct.

1.      I am a quadriplegic. I was injured in a car wreck on December 24, 1998. After the wreck, while still in my vehicle, I began experiencing numbness from the neck down. I was unable to move my legs, I had limited movement of my arms and my extremities were numb. Because of my inability to move, the paramedics placed a cervical collar on me, removed me from my vehicle and placed me on a backboard for transport to the Defendant Hospital. In addition to my being unable to move, I had a laceration to my forehead.

2.      Upon arrival to the hospital's ER, I was assessed by a nurse. I told everyone who treated me that I was paralyzed and could not move– that I was "numb" and could not feel my arms or legs. The nurse and the doctor that examined me did not examine whether or not I could move my arms or legs. No one asked me about my numbness or tingling in my extremities."

Further affiant sayeth naught.

_____
CANDELARIO DE LEON

SUBSCRIBED and SWORN to before me on this 26th day of May, 2004

JOSIE O. LUCIO
Notary Public,
State of Texas
My Comm. Exp. 08-22-2004

_____
NOTARY PUBLIC, State of Texas
My Commission Expires: 8-22-04

E:\Clients\De Leon, Candelario\Affidavit-Candelario.wpd

*HB/Rtr2-19827*

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON,          ) (
     Plaintiff           ) (
                    ) (
VS.                          ) ( CIVIL ACTION NO. CV-B-00-192
                    ) ( JURY DEMANDED
CITY OF BROWNSVILLE,         ) (
TEXAS, ET AL.,               ) (
     Defendants          ) (

_____

ORAL DEPOSITION OF
CANDELARIO DE LEON
DECEMBER 10, 2001

_____

ORAL DEPOSITION OF CANDELARIO DE LEON, produced

as a witness at the instance of the DEFENDANTS COLUMBIA

VALLEY HEALTHCARE SYSTEMS, L.P. D/B/A VALLEY REGIONAL

MEDICAL CENTER AND HCA - THE HEALTHCARE COMPANY, taken

in the above styled and numbered cause on DECEMBER 10,

2001, reported by RHONDA A. MARTIN, Certified Court

Reporter No. 4297, in and for the State of Texas, at

the Valley Grande Manor, 901 Wild Rose Lane,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure.

Multi-Page™                                    DECEMBER 10, 2001

**DEPOSITION OF CANDELARIO DE LEON**

| Page 30 |
| --- |

1    Q. When the accident happened, what happened to
2    you?
3    A. I only had a blow here on my head --
4    Q. Okay.
5    A. -- a small blow on my head.
6    Q. Did you hurt yourself anywhere else?
7    A. Not that I know of.
8    Q. Okay. Where did you hit your head? On the
9    steering wheel, dashboard, roof? Where?
10   A. On the roof, in that area where the dashboard
11   is, on top, on the roof of the car.
12   Q. Okay. Was the door on your side able to be
13   opened?
14   A. They opened it.
15   Q. Okay.
16   A. They did.
17   Q. Did they open it simply by pulling on the
18   handle and opening it or did they have to get that
19   machinery that forces the door open?
20   A. I didn't see that they would use anything.
21   Q. Okay. So they just opened the door with their
22   hands?
23   A. That's what I think.
24   Q. Okay. And who opened the door for you?
25   A. The paramedics.

| Page 31 |
| --- |

1    Q. Did the paramedics get there before the police
2    or after the police?
3    A. Before the police.
4    Q. Do you remember whether or not the driver of
5    the other car came over and talked to you?
6    A. No.
7    Q. Did you talk to him?
8    A. I don't remember since I didn't know who he
9    was. I told the paramedics to let me go and to go and
10   check the other people in front since I was only
11   feeling a blow.
12   Q. Did you have your car repaired?
13   A. No.
14   Q. What happened to the car?
15   A. It was picked up by the wrecker, and I never
16   went to pick it up, so they sold it.
17   Q. Okay. Did you send anybody from your family to
18   go and get your personal effects out of the car?
19   A. No.
20   Q. How long after the accident did the paramedics
21   get there?
22   A. I have no idea.
23   Q. Okay. Was it a matter of minutes? Was it an
24   hour?
25   A. Minutes, I guess.

| Page 32 |
| --- |

1    Q. Okay. Did you have any conversations with
2    them?
3    A. Only about what I told you, and they asked me
4    what I had, if something was hurting, and I only told
5    them that I was unable to move. That's when they
6    placed something on my neck. They took me out and they
7    placed me on the stretcher.
8    Q. Okay. How many paramedics were there?
9    A. The ones that I saw, the ones that I dealt with
10   were two.
11   Q. Okay. Could you describe either one of them
12   for us, please?
13   A. I'm not too good to describe them. Sometimes I
14   see my son and I don't -- I cannot identify him. I
15   have a hard time with my eyes.
16   Q. Did they speak to you in English or in Spanish?
17   A. Spanish.
18   Q. Did they both speak Spanish?
19   A. I think so.
20   Q. Okay. What was it specifically that you told
21   them, to the best of your recollection, your exact
22   words?
23   A. They asked me what I had and I told them the
24   only thing is that I cannot move. I don't feel
25   anything else. I don't feel.

| Page 33 |
| --- |

1    Q. You don't feel anything where?
2    A. In all my body.
3    Q. Okay. Could you move your hands?
4    A. One.
5    Q. Okay. Could you move your legs?
6    A. I don't know because I felt as though I was
7    stuck, but I wasn't stuck. I didn't feel them.
8    Q. Okay. You could not feel your legs?
9    A. No.
10   Q. Okay. Could you move your legs?
11   A. No.
12   Q. Okay. And you could not move one arm?
13   A. No.
14   Q. And which arm was that?
15   A. The one that I would move?
16   Q. Yes.
17   A. It was the right one, and it's the one that I
18   cannot move now.
19   Q. Okay. So at the time, you could move your
20   right arm?
21   A. A little bit.
22   Q. Okay. And you could not move your left arm at
23   all?
24   A. Yes. The only thing that I could move were my
25   arms, but a little bit.

DEPOSITION OF CANDELARIO DE LEON

**Page 34**

1  Q. Okay. You told us that you could move one arm.
2  A. Yes.
3  Q. Okay. And that that arm is the right arm.
4  A. Yes.
5  Q. Okay. So if you could only move one arm, then
6  you could not move the other one, the left arm?
7  A. Yes, I could move it a little bit, but I'm
8  talking about movements. With this arm, I could touch
9  my forehead, that -- that -- which was the one that was
10  bleeding.
11  Q. Okay. So when you just now indicated with this
12  arm, you're talking about your right arm?
13  A. Yes.
14  Q. Okay. Could you move your left arm at all?
15  A. I think that at that time I did.
16  Q. All right.
17      MS. LOMAX: Could we see if Willy needs to
18  take a little break right now or if he wants to go on?
19      MR. SULLIVAN: (Moving head up and down.)
20      MS. LOMAX: We've been going about an
21  hour. Do you want a little break or do you want to go
22  on?
23      THE WITNESS: I feel okay.
24      MR. SULLIVAN: Okay. Let's keep going.
25  Q. Did the paramedics take you out of the car?

**Page 35**

1  A. Yes.
2  Q. Were you able to stand up?
3  A. No.
4  Q. Okay. How did they take you out of the car?
5  A. They grabbed me from my shoulders and they
6  brought me out backwards.
7  Q. When you say they took you --
8  A. They placed kind of a board and then they moved
9  me.
10  Q. Okay. Did they reach under your arms and pull
11  you out that way?
12  A. I couldn't see. They worked with me, and since
13  I was not feeling anything, I don't know where they
14  grabbed me from. I don't know.
15  Q. Do you remember anything that they told you?
16  A. Such as what?
17  Q. I don't know. Whatever it was that they told
18  you.
19  A. They were only asking me if I was feeling
20  anything else and they took me to the hospital.
21  Q. Okay. So you don't remember anything that they
22  told you?
23  A. They asked me if I had an allergy to any
24  medication.
25  Q. Okay. Do you know whether or not they took

**Page 36**

1  your blood pressure?
2  A. I think they did.
3  Q. Okay. Anything else? They put you on a
4  backboard. Did they put a collar on you?
5  A. Yes. Before they brought me out, they placed
6  something on my neck.
7  Q. Before they brought you out of the car?
8  A. Uh-huh.
9  Q. Is that a "yes"?
10  A. Yes.
11  Q. Okay. Now, did they do anything else when they
12  put you in the ambulance?
13  A. Yes. They put an IV.
14  Q. Okay. Did they tell you what they were doing
15  with that IV?
16  A. Yes. They were going to put me some serum, I
17  guess. I don't know.
18  Q. Some serum?
19  A. Serum.
20  Q. Okay. Do you remember anything else that they
21  did there at the scene?
22  A. No.
23  Q. Do you know whether or not they asked you about
24  any drinking that you had done?
25  A. I don't remember.

**Page 37**

1  Q. Okay. Where were you when the police came?
2  Were you still in the car or were you already in the
3  ambulance?
4  A. I don't remember.
5  Q. Okay. Do you remember talking to the police
6  officers?
7  A. When I was already in the hospital.
8  Q. Okay. That's the first time you remember
9  talking to them?
10  A. Yes.
11  Q. Okay. You did not talk to the police officers
12  at the scene?
13  A. I don't remember.
14  Q. All right. When you worked regularly before
15  the accident, about how much might you drink in, say,
16  the course of a week?
17      MS. LOMAX: Do you want to define a time
18  frame in that?
19  Q. Say about the last five or six years before the
20  accident.
21  A. More or less about a six-pack every day or
22  more, depending.
23  Q. Okay. Depending on what?
24  A. How much money I had.
25  Q. So would you drink as many as two or three

DEPOSITION OF CANDELARIO DE LEON

Page 50

1 Q. Would you be able to describe the doctor?
2 A. No.
3 Q. Can you remember any conversations between the
4 doctor and the nurse?
5 A. No.
6 Q. Do you remember any conversations between you
7 and the doctor?
8 A. The doctor didn't even speak to me.
9       MR. CASILLAS: Object, nonresponsiveness.
10 Q. Do you remember the doctor?
11 A. No.
12 Q. Okay. You cannot describe him?
13 A. No.
14 Q. Okay. And you wouldn't know whether he was a
15 man or a woman? Excuse me. You wouldn't know whether
16 the doctor was a man or a woman?
17 A. He is the man who placed the stitches, and it
18 was a man doctor.
19 Q. But you don't remember anything at all about
20 your conversation with him?
21 A. He didn't ask me anything.
22 Q. Okay. Did you ask him anything?
23 A. I would be asking. I wanted to know why I was
24 paralyzed, why I couldn't move.
25 Q. And you told him that?

Page 51

1 A. I asked everybody why.
2 Q. Okay. Do you remember whether or not the
3 doctor examined you?
4 A. No.
5 Q. Okay. So the only thing you remember is that
6 he put a staple in your head?
7 A. Yes. One was placed well and the other was
8 hanging there.
9 Q. Okay. Do you remember whether or not the nurse
10 or the doctor examined whether or not you could move
11 your legs or your arms?
12 A. No.
13 Q. Okay. They didn't do it or you don't remember?
14 A. I say that they didn't do it. Maybe they moved
15 me since I didn't feel.
16 Q. But there was no examination of the movement of
17 your arms?
18 A. No.
19 Q. And there was no examination for the movement
20 of your legs?
21 A. No.
22 Q. How long were you at the hospital? Do you
23 remember?
24 A. For about 20 or 25 minutes. That's what I
25 think.

Page 52

1 Q. Okay. Other than the lady that you saw in the
2 beginning, the nurse or nurses, and the doctor, did you
3 talk to anybody else at the hospital who was a hospital
4 employee?
5 A. No, I don't remember.
6 Q. Okay. How was it that you left the hospital?
7 A. They took me out on a stretcher and then they
8 placed me in a wheelchair.
9 Q. Okay. When you say "they," who are you talking
10 about?
11 A. I cannot say that it was the paramedics or
12 hospital personnel because I don't remember.
13 Q. Okay. Do you remember whether you -- that bed
14 is called a gurney. Do you understand that?
15 A. I don't know what that is.
16 Q. Okay. Well, were you on a bed or were you on
17 something with wheels?
18 A. With wheels.
19 Q. Were you still on the backboard?
20 A. I don't remember since I couldn't feel.
21 Q. Well, did they take you off the backboard?
22 A. I don't know.
23 Q. Okay. When you were removed from the hospital,
24 were you still lying down?
25 A. I think I was laying down until I got out of

Page 53

1 the hospital.
2 Q. Okay. You were lying down on that bed with the
3 wheels?
4 A. Yes. To be quite honest, I don't remember
5 well. If you would have asked me that two or three
6 days after, I would.
7 Q. Well, I need to ask you now because I wasn't
8 there two or three days afterwards and this lawsuit
9 wasn't filed two or three days later, so the only thing
10 we have is your memory now.
11 A. I don't remember.
12 Q. Okay. Was -- the hospital bed or the gurney,
13 was it pushed outside when they got you off that and
14 into the car?
15 A. I don't remember what happened, but I do
16 remember this, that when I got to the police car, I was
17 sitting down on the seat.
18 Q. Sitting down on the seat of the car?
19 A. On the wheelchair.
20 Q. Okay. Do you know how it was that you got from
21 the gurney to the wheelchair?
22 A. I don't remember.
23 Q. Okay.
24 A. As I said, I was upset because I wasn't being
25 taken care of.

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE   CHANGE                                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

    I, CANDELARIO DE LEON, have read the foregoing
transcript and hereby affix my signature that same is
true and correct, except as noted above.

                        _____ witness to his mark
                        CANDELARIO DE LEON


THE STATE OF TEXAS

COUNTY OF HIDALGO

          SUBSCRIBED AND SWORN TO BEFORE ME, the

undersigned authority on this the ___10th___ day of

_____, 2002.


                        _____
                        Notary Public in and for
                        The State of Texas

                    BRYANT & STINGLEY, INC.
          McAllen          Harlingen          Brownsville
       (956)618-2366    (956)428-0755      (956)542-1020

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON,     )(
       Plaintiff       )(
                  )(
VS.                )( CIVIL ACTION NO. CV-B-00-192
                  )( JURY DEMANDED
CITY OF BROWNSVILLE,     )(
TEXAS, ET AL.,         )(
       Defendants      )(

REPORTER'S CERTIFICATION

I, RHONDA A. MARTIN, Certified Court Reporter,
certify that the witness, CANDELARIO DE LEON, was duly
sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
DECEMBER 10, 2001; that the deposition was reported by
me in stenograph and was subsequently transcribed by me
or under my supervision.

I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

WITNESS MY HAND on this the _21st_ day of
_December_, 2001.

_Rhonda Martin_
RHONDA A. MARTIN, Texas CSR 4297
Expiration Date: 12-31-01
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550
(956)428-0755

BRYANT & STINGLEY, INC.
McAllen        Harlingen       Brownsville
(956)618-2366    (956)428-0755    (956)542-1020





## CITY OF BROWNSVILLE EMS
## AMBULANCE ACTIVITY REPORT

PLEASE PRESS PEN FIRMLY   N⁰ 124764

TDH Firm # 031010

Date 12/24/98   Incident # 98-P-    → 98469
City Brownsville   Pick Up Location/Hospital Code: FM 802 and Central Ave
Dist./Sta. # 2   City Brownsville   County 01   State TX   Zip Code 78521

Type of run: (1 - Emergency)  2 - Non Emergency  3 - No treatment, No transport  4 - False Alarm  5 - Cancelled  6 - Treatment, No Transport

| Call Received | Amb. Dispatched | Enroute | Arrived Scene | Departed Scene | Arrive Dest. | Return to Svc. |
|---|---|---|---|---|---|---|
| 1929 | 1929 | 1929 | 1933 | 1950 | 2000 | 2037 |

Patient name (print) Candelario V. DeLeon   Age 57   6 mm 6/15 HM

Address 190 E. 10th St
Phone 95 544 00 20   Race 1 - White 2 - Black 3 - Hispanic 4 - Other
City Brownsville   Zip Code 78854   County Cameron   Sex 1 M 2 - F
Responsible Party Self
Private Insurance
Medicaid # 454 66 2544

1 - Self  2 - Insur  3 - Medicare  4 - Medicaid  6 - Other  8 - No pay

**TREATMENT SUMMARY**

| Time | Dose | Drug/treatment | Route |
|---|---|---|---|
| 1938 | 4cpm | O2 | NRB |
| 1945 | 500cc | 0.9 NaCl | IV |
|  | 15g | drip |  |

Patient delivered to VRMC ER
Hospital Code 0315100
0 - Hospital E.D.
1 - Hosp. Critical Care Unit
2 - Outpatient Dept.
3 - Hospital Bed
4 - Hospital Bed
5 - Nursing Home
6 - Residence
7 - Other Med. Fac.
8 - Other

**Best Motor Response** / **Best Verbal Response** / **Eyes Response** / **Glasgow Score**

Bed Confined? Before Yes No  After Yes No
Unconscious/Shock?  Yes No
Emergency Situation?  Yes No
Physical Restraints?  Yes No
Visible Hemorrhage?  Yes No

| Time | Revised Trauma Score | Resp. | Pulse | BP | Bg |
|---|---|---|---|---|---|
| 1933 | 12 | 20 | 85 | 140/90 | 186 |
| 1950 | 12 | 18 | 90 | | |
| 2000 | 12 | 18 | 96 | 142/94 | |

DOS: 1 - Yes  2 - No
Allergies NKA
Local Physician Unknown

---

| INJURY LOCATION | INJURY LOCATION | Probable Cause 1 - 819-0 | Was Injury work related? 1 - Yes  2 - No | Suspected Illness / Symptoms |
|---|---|---|---|---|

**Injury Type**
1 - Burn
2 - Fracture/Dislocation
3 - Laceration/Penetration
4 - Internal
5 - Drowning/Suffocation/Choking
6 - Drug Overdose
7 - Acute Alcohol Intox.
8 - Spine/Brain
9 - Scrape/Bruise/Cut
10 - Sprain/Strain

**Place of Occurrance**
1 - Home
2 - Farm
3 - Mine/Quarry
4 - Industrial Place
5 - Recreational
6 - Street or Highway
7 - Public building
8 - Residential Institution
9 - Other specified place
10 - Unspecified place

1 - Heart Complication
2 - Other Cardiac Distress
3 - Stroke/CVA (cerebrovascular)
4 - Infectious Disease
5 - Convulsions / Seizures
6 - Fainting
7 - Diabetic
8 - High Risk Infant (Neonatal)
9 - Obstetrical / Gynecological
10 - Respiratory Distress
11 - Emotional / Mental Distress
12 - Gastrointestinal
13 - Allergic Reaction
14 - Other

*Injury Type / Severity (1 - Posible ; 2 - Non Incapac ; 3 - Incapac ) / ** Injury Location (See Diagram)

A. 03   1   6   B.    C.

Preventive Aid?  1 - None  2 - Seat Belt/Shoulder Harness  3 - Air Bag and Belt  4 - Air Bag Only  5 - Child Restraint  6 - Protective Helmet  7 - Padding/Protective Clothing  8 - Other

Aid Prior to Arrive?  1 - No  2 - Yes, CPR only  3 - Yes, CPR/AED  4 - Yes, AED only  5 - Yes, other   Vehicle Extrication Required?  1 - Yes  (2 - No)

Wnd. No.: none stated   Meds: none stated

Basic Life Support:  1 - Bandaging  2 - Splinting  3 - Traction  4 - Oxygen  5 - Psych Assistance  9 - C.P.R  10 - Minor Bleeding Controlled  11 - Burn Cooled/Dressed  8 - Thumper  12 - Neck/Spine Immobilized  7 - Restraints  8 - Suction  13 - Emergency Childbirth  14 - Major Bleeding Controlled  15 - Airway Maintenance  16 - Assisted Breathing  17 - Shock Management

Advanced Life Support*:  18 - Intubation  19 - Cardiac Monitoring  20 - Defib-Man  21 - Defib-AED  22 - I.V. Therapy  23 - MEDS  24 - Telemetry  25 - Mast

*(To elaborate on these skills, please use an Advance Life Support Report Form)

| Driver | J. __ | Training Level 4 | 1)ECA | ☑ City | Unit No. M2-190 |
| Attendant | F. D. Rojas | Training Level 4 | 2)EMT ☐ County | Mileage End 0.0-609 |
| Attendant | | Training Level | 3)EMT - I ☐ Port | Start 609 |
| Please code Training Levels for ALL personnel making the run Codes | 4)Para | Zone 2 | Receiving MdRN |

Transport refused  1 - Yes  (2 - No)

FOR OFFICE USE ONLY   002004

Police Crash Report ID #

All patient information will be kept strictly confidential

Use S. O. A. P. Method for Narrative purposes.

**Narrative:**

Dispatched to: Fm 802 and Central Ave.

In reference to: MVA

**Subjective:** Upon arrival, pt. was a 57 yo ♂ involved in a MVA. Pt. was found sitting on driving seat of a small red car. Car c̄ moderate damage to front end. (& per pt. he was the driver) unrestrained, c̄ no LOC. Pt. smelled highly of ETOH and stated he had been drinking but unknown what or how much. No chief complaint. Unknown of any HX or RX.

**Objective:** Pt. CAOX1 poss. due to ETOH, no airway comp., unlabored breathing, clear B/L breath sounds, ⊖ chest trauma, pupils: PERL X2, skins: normal, head to toe — only a small laceration to forehead. Normal ROM to all 4 extremities, no long bone FX suspected. V/S: BP 174/90, P: 68, R: 18-20 c̄ glucose level at 186 mg/dL.

**Assessment:** — MVA —

**Plan:** Manual C-Spine movement restriction, C-collar — no neck. Pt. extricated through drivers door onto backboard, head rolls X2. O₂ via NRB @ 10 L/min, In-unit = ECG - NSR @ 69 c̄ no ectopy. IV 18g. on ® dorsal palm c̄ 0.9% NaCl @ 10 AD. Run approx. 60-80 gtts/min. In route, pt. cooperative on stating c/o numbness from neck down. Pt. reassessed in route c̄ no changes. Pt. DNACED @ valemeer 2/...................... P# 38.93

Yo me he negado ha aceptar transportacion en ambulancia hoy
I have refused an offer of ambulance transportation on this date
Patient was advised that the City of Brownsville E. M. S. does not make diagnosis of illnesses or injuries. Moreover, the patient was advised of the possible consequences of his/her refusal of transport and/or treatment to the Emergency Department.

Signature: _____ Time _____ am pm
Patient and/or Responsible Party refused to sign this refusal statement Date 12-2-98
Time: _____ am pm Signature of Attendant making offer: _____ Witness
Statement of **Medical Necessity** for movement of patient by ambulance:

_____

NO 20

Signed: _____   Title _____   000005

(Authorized Personnel at receiving facility)

MEDICAL
DO NOT RE...
COPY TO THIRD PARTY

# Exhibit C

```
RUN DATE: 12/28/98              Valley Regional   ABS   *LIVE*              PAGE 1
RUN TIME: 1827                        CODING SUMMARY
```

```
NAME: DE LEON,CANDELARIO V                    ACCT#:      VR98362080
                                              FORM:
ADM DATE: 12/24/98
ATTEND PHYS: Dovale,Joao MD                    UNIT#:      VR021878
    DIS DATE: 12/24/98                         SEX:        M
    DIS DISP:                                  AGE:        57
        LOS:                                   DOB:        06/15/41
    PT CLASS: ODT OTHER                        FIN CLASS:  99
                                               ABS STATUS: FINAL
```

```
DIAGNOSES
ADMIT    920          CONTUSION FACE/SCALP/NCK
PRINC    873.42       OPEN WOUND OF FOREHEAD
         E812.0       MV COLLISION NOS-DRIVER
         E849.5       ACCID ON STREET/HIGHWAY


OPERATIONS
DATE       PROC CODE & NAME                SURGEON         ANESTHESIOLOGIST
12/24/98   86.59  SKIN SUTURE NEC          Dovale,Joao MD


CPT CODES
12011      REPAIR SUPERFICIAL WOUND(S)


DRG:


STATUS      $REIMB    MIN-LOS   STD-LOS      COST WT    GRP VERS    GRP FC
                                                       16          99
```

I have reviewed the narrative descriptions of the diagnosis and procedure codes
listed above and agree they accurately reflect the clinical picture of this episode
of care.

_____

 **This form will be maintained as a permanent part of the medical record**

## Columbia Valley Regional MC                    ADMITTING FORM

### PATIENT

| PATIENT NO. | F/C | | PATIENT TYPE | | SERVICE DATE | | |
|---|---|---|---|---|---|---|---|
| VR98362080 | 99 | | REG ER | | | | |

| PATIENT NAME | PATIENT PHONE NO | MED. REC NO. | ADMIT DATE | ADMIT TIME |
|---|---|---|---|---|
| DE LEON,CANDELARIO V | 956-504-0020 | VR021878 | 12/24/98 | 2009 |

| PATIENT ADDRESS/CITY/STATE/ZIP CODE | | SSN | DISCH DATE | DISCH TIME |
|---|---|---|---|---|
| 140 E 10TH ST | BROWNSVILLE TX 78521 | 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 | | |

| PATIENT EMPLOYER | OCCUPATION | BIRTH DATE | AGE | SEX | MARITAL | RELIGION | RACE | SERVICE |
|---|---|---|---|---|---|---|---|---|
| GULF PORT SERVICES | | 06/15/41 | 57 | M | D | UN | H | |

| EMPLOYER ADDRESS/CIT | | BUSINESS PHONE NO | ROOM | BED |
|---|---|---|---|---|
| BROWNSVILLE,TX 78521 | | 956-838-0002 | VR ER | |

| ADMIT PHYS/PHONE NO | REFERRING/FAMILY/OTH |
|---|---|
| Doyale,Jose MD / 800-700-1923 | |

ADMITTING DIAGNOSIS
MVA

### GUARANTOR

| GUARANTOR NAME | SSN | GUARANTOR REL | GUARANTOR EMP |
|---|---|---|---|
| DE LEON,CANDELARIO V | 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 | S | GULF PORT SERVICES |

| STREET ADDRESS | PHONE NO | OCCUPATION | BUSINESS PHONE |
|---|---|---|---|
| 140 E 10TH ST | 956-504-0020 | | 956-838-0002 |

| CITY, STATE | ZIP CODE | EMPLOYER ADDRESS |
|---|---|---|
| BROWNSVILLE,TX 78521 | | HC 70 BOX 83,BROWNSVILLE,TX 78521 |

### INSURANCE

| PRIMARY INS COMPANY | SECONDARY INS CO |
|---|---|
| SELF PAY | |

140 E 10TH ST
BROWNSVILLE          TX 78521
956-504-0020

| PRIMARY SUBSCRIBER NAME | PRIMARY POLICY | SECONDARY SUBSCRIBER | SECONDARY POLIC |
|---|---|---|---|
| DE LEON,CANDELARIO V | 454662544 | | |

| PRIM SUBSCRIBER EMP | PRIM GROUP NO | PRIM REL | SEC SUBSCRIBER EMP | SEC GROUP NO | SEC REL |
|---|---|---|---|---|---|
| | | S | | | |

| LOCAL FRIEND/RELATIVE | LOCAL FRIEND/RELATIVE ADDRESS | FRIEND/REL PHONE |
|---|---|---|
| | | |

| EMERGENCY CONTACT | EMERGENCY PHONE | EMERGENCY ADDRESS | REL TO PT |
|---|---|---|---|
| | | | |

| ACCIDENT? | ON JOB INJ? | ACCIDENT COMMENT |
|---|---|---|
| | | |

FINAL DIAGNOSIS (PRIMARY DIAGNOSIS):

SECONDARY DIAGNOSIS OR COMPLICATIONS:

OPERATIVE/NON-OPERATIVE PROCEDURE:

CONSULTANTS:

ACCT#:

VR98362080

UNIT#:
VR021878

ADMIT:

12/24/98

0000002

000002

**COLUMBIA Valley**
**Regional Medical Center**

## EMERGENCY DEPARTMENT RECORD

| | | |
|---|---|---|
| M.R. # | | |
| I hereby authorize treatment and/or consultation of the below stated patient. | | ☐ I  ☒ III |
| SIGNED | RELATIONSHIP | ☐ II  ☐ IV |
| | | ORDERS |

NAME _Cordelia V De Leon_  TODAY'S DATE _12/24/58_  RACE/SEX _W/F_  AGE _59_  DATE OF BIRTH _6/15/41_

TRIAGE TIME _2005_  FAMILY PRESENT ☐ Yes ☐ No  MEANS OF ARRIVAL _Medic 2_  FAMILY DOCTOR

TREATMENT AREA _2_  TO AREA FROM TRIAGE  CHECK ☐ Laying ☐ Standing ☐ Sitting  ALLERGIES _NKDA_  WEIGHT ___ kg/lb

TIME TO TREATMENT AREA _2005_  LMP: _N/A_  LAST TETANUS: _unk_

| VITAL SIGNS | TIME | TEMP | PULSE | RESP | B/P | CURRENT MEDS |
|---|---|---|---|---|---|---|
| 1 | 2005 | 96.2 | 73 | 18 | 167/85 | NONE |
| 2 | | | | | | |
| 3 | | | | | | |

CHIEF COMPLAINT / HISTORY

_Unrestrained driver - MVC_
_1cm laceration to forehead_

PAST HISTORY REVIEWED ☐ + W/ COMMENTS

FAMILY HISTORY REVIEWED ☐ + W/ COMMENTS _?_

SOCIAL HISTORY REVIEWED ☐ + W/ COMMENTS

GENERAL/SKIN _Obviously_
_Chunk- Awake_
_Alert_
_Normal vitals_

HEENT
_Small (thin) laceration_
_on mid forehead closed c_
_On surgical staple_
_Eyes normal ENT = O_

HEART
_LHSR_

LUNGS
_Clear_
_No chest pain_

ABDOMEN
_Obes. soft_
_Non tender_

RECTAL/PELVIC/GENITALIA
_O_

BACK/NEURO
_O_

EXTREMITIES
_O_

| | CBC | | UA | | REVIEW OF SYSTEMS |
|---|---|---|---|---|---|
| | | | | | CHECK APPROPRIATE SQUARES AND DESCRIBE ALL ABNORMAL OR PERTINENT FINDINGS |

| CBC | | UA | | | SYSTEM | NOR. | AB. |
|---|---|---|---|---|---|---|---|
| RBC | | CC | ☐ CATH | | EYES | ✓ | |
| HGB | | SPGC | GEMV | | E.N.T. | ✓ | |
| HCT | | pH | | | CARDIOVASCULAR | ✓ | |
| WBC | | PROTEIN | | | RESPIRATORY | ✓ | |
| SNEUT | | WBC | | | GI | ✓ | |
| LYMPHS | | RBC | | | GU | ✓ | |
| OTHERS | | BACTERIA | | | MUSCULOSKELETAL | ✓ | |
| | | OTHERS | | | SKIN | ✓ | |
| SMA6/SMA20 | | UCG | | | NEURO | ✓ | |
| GLUC | | BUNIT | | | PSYCHIATRIC | ✓ | |
| BUN | | CONTROL | PATIENT | | ENDOCRINE | ✓ | |
| Na | | PT | | | BLOOD/LYMPH | ✓ | |
| K | | PTT | | | ALLERGIC | ✓ | |
| CL | | CULTURES | | | IMMUNE | | |
| CO₂ | | | | | | | |
| ENZYMES | | | | | | | |
| SGOT | | PULSE OXIM | 96% | | | | |
| SGPT | | ABG | | | | | |
| LDH | | pH | | | | | |
| CPK | | PCO₂ | | | | | |
| OTHERS | | PO₂ | | MEDICAL RECORD REQUESTED | | | |
| | | ACT HCO₂ | | MEDICAL RECORD REVIEWED | | | |
| | | O₂ SAT | | X-RAY RAD | | | |
| EKG | | | | X-RAY DISCUSSED W/ RAD | | | |
| | | | | X-RAY-ED MD | | | |
| X-RAY | | | | ☐ READ BY DOCTOR | | | |

DOCTOR'S ORDERS

MEDICATIONS

DISCHARGE DIAGNOSIS
1. _½ cm laceration forehead._
2.
3.

DISPOSITION ☒ HOME ☒ PVT DOCTOR ☐ AMA ☐ OTHER  DATE: _12/24/58_
☐ ADMITTED TO ___ ☐ TRANS TO ___  TIME: ___
EXPIRED, SORT TO ___

DISCHARGE INSTRUCTION: _DPD # 2572 ASTER_
_Pt discharged to the care_
_of BPD._
_000003_  12/24/58

☐ NO SCHOOL  ☐ INSTRUCTION SHEET GIVEN  ☐ REFERRED TO DR. ___  CONDITION DISCHARGE ☒ IMPROVED ☐ DETERIORATED ☐ UNCHANGED ☐ EXPIRED  DISCHARGE DATE/TIME

NURSE'S SIGNATURE ___  PHYSICIAN'S SIGNATURE ___  PATIENT SIGNATURE ___  WITNESS ___

MEDICAL RECORDS _L. W..._  _2030_  _000003_

# COLUMBIA Valley
## Regional Medical Center

**EMERGENCY DEPARTMENT**
**NURSING RECORD**

DE LEON, CANDELARIO V
HR# VR021878    SS# 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
ACCT# VR58362080    12/24/98  M  57
06/15/41° Dovale,Joao MD
VALLEY REGIONAL MEDICAL CTR

### CHIEF COMPLAINT & DURATION

| TIME | P | CHANGED TO | @ | BY | PATIENT NAME |
|------|---|-----------|---|----|--------------|
|      |   |           |   |    |              |

CHIEF COMPLAINT

### ASSESSMENT

**IMMOBILIZATION**
❏ Cervical Collar
❏ Sandbags
❏ Short Spine Board
❏ Long Spine Board
❏ SPLINTS
❏ Board
❏ Leg Air Short
❏ Leg Air Long
❏ Ankle Air
❏ Arm Air
❏ Traction
❏ Shock Trousers
❏ Rotating Tourniquets
❏ Restraints
❏ Side Rails Up
❏ Call Light Within Reach

**NEURO**

1mm 2mm 3mm 4mm 5mm 6mm 7mm

PUPILS: L ___ mm    R ___ mm
MOTOR: L. Arm ___    R. Arm ___
[2]    L. Leg ___    R. Leg ___
OTHER: ___

EMOTIONAL STATE: ☑ Appropriate    ❏ Anxious    ❏ Depressed    ❏ Hostile
LEVEL OF CONSCIOUSNESS: (ORIENTATION)    ☑ Person    ☑ Place    ❏ Time    ☑ Situation
PROBLEMS WITH:    ❏ Speech    ❏ Chewing    ❏ Swallowing
EQUAL & REACTIVE: ☑ Yes    ❏ No
DESCRIBE: ___

INITIALS

**CARDIOVASCULAR**
SKIN: ☑ Normal    ❏ Warm    ❏ Cool    ❏ Dry    ❏ Diaphoretic
SKIN COLOR: ☑ Unremarkable    ❏ Cyanosis    ❏ Flushed    ❏ Jaundice    ❏ Pallor
☑ No Abnormal Heart Sounds Appreciated    ❏ Abnormal Sound    ❏ Describe: ___
CAPILLARY REFILL:    ☑ < 2 SEC.    ❏ > 2 SEC. Other: ___

INITIALS

**LEVIN TUBE**
Size ___ Time ___
**CATHETER**
Size ___ Time ___
Straight ___
Foley ___
**ABDOMEN**    ☑ Normal
❏ Tender
❏ URQ    ❏ ULQ
❏ LRQ    ❏ LLQ
❏ Rigid
❏ Distended    ❏ ___

**PULMONARY**
RESPIRATIONS:    LABORED    ❏ Yes ☑ No    ❏ S.O.B. ❏ Yes ☑ No    ❏ Reg. ❏ Irreg.
COUGH    ❏ Yes ☑ No    Productive ❏ Yes ☑ No
Retractions ❏ Yes ☑ No
Describe: ___
Breath Sounds Present All Lung Fields ☑ Yes ❏ No
Vesicular Throughout ☑ Abnormal Sounds ❏
Other: ___
Describe: ___

INITIALS

OTHER FINDINGS

INITIALS

| TIME | BP | TEMP. | PULSE | RESP. | PUPILS | | GRASP | | DEGREE OF RESPONSE | MOVEMENT OF EXTREMITIES | COMMENTS | NURSES INITIALS |
|------|----|----|-------|-------|--------|---|-------|---|---------|----------|----------|----------|
|      |    |    |       |       | R | L | R | L |         |          |          |          |
|      |    |    |       |       |   |   |   |   |         |          |          |          |
|      |    |    |       |       |   |   |   |   |         |          |          |          |
|      |    |    |       |       |   |   |   |   |         |          |          |          |
|      |    |    |       |       |   |   |   |   |         |          |          |          |
|      |    |    |       |       |   |   |   |   |         |          |          |          |
|      |    |    |       |       |   |   |   |   |         |          |          |          |



1. Abrasion
2. Laceration
3. Puncture
4. Fracture
5. Dislocation
6. Sprain / Strain
7. First Degree Burn
8. Second Degree Burn
9. Third Degree Burn
10. Pain

11. Contusion
12. Weakness
13. Decreased Sensation
14. Absent Sensation
15. Edema
16. Decreased Pulse
17. Absent Pulse
18. Paralysis
19. _____ 0000004
20.

MEDICAL RECORDS

000004

## MEDICATIONS AND I.V. FLUIDS

| TIME | MEDICATION | DOSE | ROUTE | SITE A | SITE B | INIT. | RESPONSE TO TREATMENT |
|------|-----------|------|-------|--------|--------|-------|----------------------|
| 2010 | *[illegible]* | 0.5mg | FB | RA | | H | *no adverse reaction* |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Method: N - Needle, IC - Intravenous Catheter
CD - Cutdown, SC - Subclavian,
J - Jugular

Site: RA - Right Arm, RH - Right Hand,
RL - Right Leg, LA - Left Arm,
LH - Left Hand, LL - Left Leg

Rate: KVO - "Keep Vein Open"
Number of drops per min. or hour, as
indicated

### INFUSION

| Date | Amount Started | I.V. Solution, Hyperalimentation, Albumin, Blood, Blood Products | I.V. Additives I.V. Piggybacks, I.V. Pushes | Method & Gauge | Site | Rate | Start Time | Start Nurse Initial | Discontinue Time | Discontinue Nurse Initial | Total Amount Infused |
|------|---------------|------|------|------|------|------|------|------|------|------|------|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

### NURSES NOTES

| TIME | NURSES NOTES | SIGNATURE |
|------|-------------|-----------|
| 2005 | *In E.R. from room #2 per medic + 2 stretcher* *[illegible] HX + fall [illegible] guard in place, I.V.N.S.* *infusing well into 18 gauge L hand* | H |
| 2008 | *Examined by Dr. [illegible], 1 staple to wound on* *forehead [illegible] local hygiene [illegible] good* *approximation and [illegible]* | H |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

### FINAL DISPOSITION

DISMISSED:
Date: _____ Time: _____
ACI: ☑ Patient ☐ Other: _____ ☑ Verbalized Understanding ☐ Left Without Instructions
☐ Copy ACI Given ☑ Escorted Via Wheelchair ☐ Ambulatory ☐ To Waiting Room ☑ Vehicle    INITIALS

ADMITTED: Room # _____ Via _____ ☐ Wheelchair ☐ Stretcher    Accompanied By: _____
EQUIPMENT: ☐ Cardiac Monitor ☐ O2    Report Given To: _____
Family Aware of Admission ☐ Yes ☐ No    Present ☐ Yes ☐ No    INITIALS    Acuity   1 2 ③ 4 5
Date _____ Time _____    Charge N/C   1 2 ③ 4 5

TRANSFERRED TO ANOTHER FACILITY: Date _____ Time _____ Via: ☐ POV ☐ Amb. Co. _____
Name of Receiving Facility _____ 000005    Copies of Records Sent ☐ Yes ☐ No
Report Called ☐ Yes ☐ No To Whom _____    M.O.T. Completed ☐ Yes ☐ No    INITIALS

SIGNATURE _____    INITIALS
SIGNATURE _____    INITIALS

000005

## Consent for Medical and/or Surgical Treatment

The patient referred on the registration (the "Patient") either personally or through the person legally empowered to give this consent and obligate Patient as herein contemplated, requests and authorizes this Hospital, its employees, agents and otherwise affiliates (jointly and severally termed "Hospital") to provide hospital care incident to admission therein, including without limitation, routine diagnostic procedure and medical treatment, which is to include whatever procedures that are deemed necessary by the admitting doctor referenced on the registration and such other physicians or assistants as he may designate (jointly and severally termed "Physician").

Patient similarly requests and authorizes Hospital and Physician to administer any treatment, administer anesthetics, and perform such other actions as the Physician may deem necessary or advisable in the diagnosis and treatment of Patient. Patient is aware that the practice of medicine and surgery is not an exact science and acknowledges that no warranty, guarantee or assurance has been made thereto by Hospital and/or Physician as to the results of treatments, examination or otherwise that may be obtained.

## Financial Agreement

For services heretofore performed or to be performed for Patient by Hospital whether one or more, below signed (severally if more than one), whether as Patient, agent or guarantor, agrees and promises to pay the charges for the hospital care so provided Patient in accordance with Hospital's then current regular rates and all costs incurred in collecting same, together with attorney's fees, which Hospital deems necessary and reasonably required to enforce Hospital's rights.

## Assignment of Insurance Benefits to Hospital

As or on behalf of insured under the insurance specified on the registration hereof and otherwise payable thereto (the present and future rights thereto and monies due or to become due therefrom termed "Contract Rights"), below signed irrevocably assigns and transfers to Hospital the Contract Rights, and orders and directs such insurer(s) to pay all monies due or to become due thereunder directly to Hospital or its assigns. To effect such payment Hospital is irrevocably constituted and appointed lawful attorney in fact, with substitution power, to sue or otherwise collect and settle any claim under the Contract Rights as insured without further notice or approval of insured and to endorse in the name of insured any check or other instrument for the payment of monies thereunder. If insured receives monies direct from insurer(s), same shall be held in trust for and immediately transferred to Hospital for amounts due. This assignment is irrevocable with an interest until full and complete payment of all monies due Hospital and its affiliates from this event of admission or otherwise. Money received by Hospital from insurer(s) or other third party sources, less the expense in procuring same, shall be deducted from the principal amount due for services rendered Patient. If charges not covered by insurance can not be paid in full when due, below signed agrees upon request to sign a promissory note bearing interest at the maximum legal rate to pay all debt not paid if credit is approved.

## Professional Services Assignment

To the extent that fees for professional services rendered to the patient are payable, the undersigned hereby assigns to said physicians and authorizes payment directly to said physicians all insurance benefits, including major medical, for professional services rendered to the patient. The undersigned is financially responsible to the physicians for fees not paid pursuant to this agreement.

## Verification of Third Party Benefits

The below signed authorizes the verification of third party benefits, any item referenced herein, statements and other data obtained from Patient and/or below signed and all other persons pertaining to the respective credit and financial responsibilities, understanding that an investigative consumer report may be made whereby information is obtained through personal interviews with third parties. Hospital or its contractor is authorized to investigate all information given by the below signed verbally and other such areas as reasonably connected with the Hospital's efforts in collection, now or in the future. Below signed hereby releases from liability, indemnifies from loss and specifically authorizes any requesting entity to make such disclosure to Hospital or its agents as they deem necessary in considering and verifying any application for credit. Below signed acknowledges that a complete and accurate disclosure of the nature and scope of the investigation will be given upon written request and hereby declares that all information furnished hereon and subsequently is and shall be true.

## Authorization for Release of Information

The Hospital is authorized to furnish from the patient's record requested information or excerpts to the referring physician, if any, and to any insurance company or third party payor for the purpose of obtaining payment of the account or by any physician for services provided to the patient. The Hospital is authorized to release information from my medical record to any skilled nursing facility or other health care facility to which I may be transferred.

## Medicare Assignment

Patient's Certification, Authorization to Release Information, and Payment Request. I certify that the information given by me in applying for payment under Title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to the Social Security Administration or its intermediaries or carriers any information needed for this or a related medicare claim. I request that payment of authorized benefits be made on my behalf.

## Personal Valuables

The below signed understands and acknowledges that Hospital (1) maintains a safe for the safekeeping of property, (2) will not be liable for the loss or damage of any money, jewelry, glasses, prosthetic, document, fur garment or other article, regardless of the article's value or size, unless such article is formally placed within the Hospital's safe, and shall not be liable for loss or damage to any personal property unless deposited in said safe, (3) is NOT responsible for any items until actually placed into said safe, (4) IN NO WAY covenants the condition of article upon Patient's discharge, (5) has the right to retain possession of articles in its possession until its determination who is LEGALLY ENTITLED to possession, which shall be binding, and (6) is entitled to and will retain possession of deposited articles as collateral for and is HEREBY GRANTED A SECURITY INTEREST IN SAME for any outstanding charges due Hospital or its affiliates from the Patient and/or the below signed and IN THE EVENT OF ANY LOSS OR DAMAGE TO THE POSSESSIONS HELD BY HOSPITAL, HOSPITAL WILL ONLY BE LIABLE UPON AFFIRMATIVE PROOF OF ITS GROSS NEGLIGENCE. VALUABLES ARE NOT TO BE KEPT IN PATIENTS ROOMS.

(NOTE, IF PATIENT IS UNABLE TO SIGN, AND IN THE EVENT NO RELATIVE IS PRESENT TO SIGN, THE CUSTODIAN SHALL RETAIN POSSESSION OF VALUABLES AND OBTAIN ACKNOWLEDGEMENT AT THE FIRST AVAILABLE OPPORTUNITY.)

THIS INSTRUMENT IS IMPORTANT. By your signature, you acknowledge understanding of all items set forth herein. READ CAREFULLY BEFORE YOU SIGN. THOUGH A HOSPITAL REPRESENTATIVE WILL BE HAPPY TO EXPLAIN PORTIONS YOU MAY NOT FULLY UNDERSTAND, THE PRINTED FORM STANDS UPON ITS OWN AND IS IN NO WAY AMENDED BY ANY OTHER ORAL OR WRITTEN STATEMENT.

Pt. unable to sign due to medical condition

WITNESS  *[signature]*    DATE 12-24-98    TIME

X
PATIENT'S SIGNATURE (if unable to sign, then by Legal Guardian or Next of Kin)

DE LEON, CANDELARIO V
MR# VR021878    SS# 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
ACCT#VR98382080    12/24/98 M 57
06/15/41 Dovale, Joao MD
VALLEY REGIONAL MEDICAL CTR

RELATIONSHIP    000000006    TIME

X
GUARANTOR/POLICY HOLDER    DATE    TIME    RELATIONSHIP

X
GUARANTOR/POLICY HOLDER    DATE    TIME    000000006

CONDITIONS OF ADMISSION    MEDICAL RECORDS COPY

# Columbia Valley Regional Medical Center
### 100-A ALTON GLOOR, Brownsville, TX  78526  (956)350-7000
### Aftercare Instructions

**for CANDELARIO DELEON,  Thursday, December 24, 1998, 8:30 pm**

**IMPORTANT:** We have examined and treated you today on an emergency basis only. This is not a substitute for, or an effort to provide, complete medical care. In most cases, you must let your doctor check you again. Tell your doctor about any new or lasting problems. It is impossible to recognize and treat all injuries or illnesses in a single Emergency Department visit. If you had special tests such as EKG's and X-rays, we will review them again within 24 hours. We will call you if there are any new suggestions. After leaving, you should FOLLOW THE INSTRUCTIONS BELOW.

You were treated today by Dr. JOAO DOVALE.

## MOTOR VEHICLE ACCIDENTS.

Passengers in a car accident get tossed about abruptly. That causes many pulled muscles and sprained ligaments. The pain and stiffness from these injuries is often worst on the day after the accident. After that day, you should feel steadily better. Expect to feel completely better in a week or two.

People often hurt their neck in an accident. Neck muscle strains can be very painful. They are also likely to get better quickly and completely.

By far, most people recover completely from the strains and sprains of an accident. You should expect that to happen to you! If you are not getting better as discussed above, see your doctor. If you get worse at any time, or if you have any new symptoms, CALL YOUR DOCTOR RIGHT AWAY.

## FACIAL LACERATION.

The laceration on your face needed stitches to close the skin. That helps healing. The suture line will be reddened at first. Over time the redness will fade. All lacerations cause scars.

The following affect the size of your scar:
- The size of the laceration.
- Infection.
- Location on your face.
- Exposure to sunlight.
- Your own likelihood to scar.

Do the following:
- Keep your dressing clean and dry for 24 hours.
- After 24 hours, wash your wound gently with soap and water and pat dry.
- Treat the suture line carefully without stretching it.
- Avoid direct sunlight.

**IMPORTANTE:** El examen y tratamiento médico que usted recibió hoy fue un servicio de emergencia. No debe de considerarse, ni pretende ser substituto, de un examen médico completo. En la mayoría de los casos, debe de permitir que su doctor lo examine otra vez. Informe a su doctor si tiene problemas nuevos o prolongados. Es imposible el identificar y dar tratamiento a toda enfermedad, con sólo una visita al Departamento de Emergencia. Si le hicimos análisis especiales como un ECG o rayos-x, los volveremos a revisar en 24 horas. Lo llamaremos para informarle si hay algún cambio en sus instrucciones. Al irse, deber de SEGUIR LAS INSTRUCCIONES QUE SIGUEN.

Usted recibió tratamiento dado por Dr. JOAO DOVALE.

## ACCIDENTES AUTOMOVILISTICOS.

Los pasajeros de un automóvil que choca son aventados abruptamente de un lado a otro. Esto causa una variedad de heridas a músculos y ligamentos. El dolor se siente aún a se el día despus del accidente. A partir de entonces usted deber sentirse mejor. Anticipe recuperarse por completo en una o dos semanas.

Estos pacientes tambin tienden a tener heridas leves en el cuello que pueden causar mucho dolor. Estas heridas del cuello, tambin suelen mejorarse rápida y completamente.

Por lo general, toda víctima de este tipo de herida se recupera completamente. Usted debe contar con mejorarse tambin!. Si esto no sucede vea a su doctor. Si se siente peor o si tiene síntomas nuevos, LLAME A SU DOCTOR DE INMEDIATO.

## LACERACION FACIAL.

La cortada que usted tiene en la cara necesit' puntos para cerrarla. Esto ayuda a que sane. La línea suturada tendr una apariencia rojiza al principio. Eso desaparecer con el tiempo. Toda cortada deja una cicatriz.

Lo siguiente afecta el tamaño de la cicatriz:
- El tamaño de la cortada.
- Infección.
- En donde se localiza en la cara.
- Si se expone a la luz del sol.
- La forma en que usted cicatriza.

Haga lo siguiente:
- Mantenga el vendaje limpio y seco por 24 horas.
- Despus de 24 horas, lave la herida con cuidado con agua y jabón, y squela sin frotarla.
- Tenga cuidado con la herida, no la estire.
- Evite la luz del sol directa.

0000007

## Columbia Valley Regional Medical Center
### 100-A ALTON GLOOR, Brownsville, TX 78526 (956)350-7000
### Aftercare Instructions

for CANDELARIO DELEON,, Thursday, December 24, 1998, 8:30 pm

Watch for signs of infection:
- Increasing pain, swelling or redness.
- Pus from the wound.
- Red streaks or fever.

If you have and new or severe symptoms CALL YOUR DOCTOR RIGHT AWAY.

WOUND CARE (with stitches).

Keep the dressings clean and dry for 24 hours. After that, you may wash your wound gently. Elevate the wound if you can. That will feel better and help your wound heal.

Even with great care, any wound can become infected. The signs of infection are: increasing redness, swelling, pain, pus from the wound, red streaks, or any unexplained fever. If you see any signs of infection, CALL YOUR DOCTOR RIGHT AWAY.

You have 1 STAPLE. This (these) should be removed in 5 days.

DIPHTHERIA & TETANUS BOOSTER.

We gave you a shot to help fight and prevent infection from a bacteria called Clostridium. This bacteria is a common cause of infections in wounds or cuts. It will also help to fight Diphtheria infection. Get this shot every ten years, even if you don't cut yourself. If you get a dirty wound, you will need a Tetanus booster if you have not had one within five years.

Watch for signs of infection in your wound as discussed.

This shot gives most people a sore arm for a few days. (It may feel like someone hit you in the arm.) Other side effects are quite rare. Allergy would show up as rash or itching, wheezing or shortness of breath. If you have any allergy symptoms, or any new symptoms, CALL YOUR DOCTOR RIGHT AWAY.

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
### THESE ARE YOUR FOLLOW-UP INSTRUCTIONS!
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Call as soon as possible to make an appointment to see your doctor in 2 days. You can reach your doctor by calling their clinic phone number.
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

AS ALWAYS, YOU ARE THE MOST IMPORTANT FACTOR IN YOUR RECOVERY. Please follow the instructions above carefully. Take your medicines as prescribed. Most important, see a

Observe si nota los siguientes síntomas:
- Aumento de dolor, inflamación o enrojecimiento.
- Si le sale pus de la herida.
- Si nota líneas rojas o fiebre.

Si tiene síntomas nuevos o si empeora, LLAME A SU DOCTOR DE INMEDIATO.

CUIDADO DE HERIDAS (con puntos).

Mantenga el vendaje limpio y seco por 24 horas. Después de esto, puede lavarse la herida levemente. Eleve la parte afectada si le es posible. Esto har que sienta alivio.

A pesar de tener mucho cuidado, la heridas se infectan. Los síntomas de infección son enrojecimiento, inflamación dolor, pus, líneas rojas y fiebre. Si usted nota cualquiera de estos síntomas, LLAME A SU DOCTOR DE INMEDIATO.

Le hemos puesto 1 GRAMPA
. Se los tendremos que quitar en 5 días.

REFUERZO DE VACUNA PARA LA DIFTERIA Y EL TETANO.

Le pusimos una vacuna para prevenir la infección causada por la bacteria Clostridium. Esta bacteria es la causa común de infecciones en heridas o cortadas. Tambin ayuda a combatir la Difteria. Debe de darse esta vacuna cada diez años, aún si no se corta. Si tiene una cortada muy sucia, y si no se ha vacunado en cinco años, va a necesitar un refuerzo contra el Ttano.

Observe si nota síntomas de infección, como se le explic'.

La vacuna deja el brazo adolorido por unos días. (Va a sentir como si lguien le peg' en el brazo.) Otros efectos secundarios son raros. Síntomas de alergia incluyen, urticaria, comez'n, jadeo y dificultad al respirar. Si tiene síntomas de alergia o síntomas nuevos, LLAME A SU DOCTOR DE INMEDIATO.

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
### ESTES SON LAS INSTRUCCIONES QUE DEBE DE SEGUIR!
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Llame lo antes posible para hacer cite con su doctor en 2 días. Usted puede hablar con su doctor si llama al número de la clínica.
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

COMO SIEMPRE, USTED ES EL FACTOR MAS IMPORTANTE EN SU RECUPERACION. Por favor, siga las instrucciones antes explicadas. Tome las medicinas tal como se las recetaron.

Columbia Valley Regional Medical Center
100-A ALTON GLOOR, Brownsville, TX  78526  (956)350-7000
Aftercare Instructions

for CANDELARIO DELEON,, Thursday, December 24, 1998, 8:30 pm

doctor again as discussed. If you have problems that we have not discussed, CALL OR VISIT YOUR DOCTOR RIGHT AWAY. If you can't reach your doctor, return to the Emergency Department.

"I understand the instructions above, and discussed in the Emergency Department."

_____
Patient or Responsible Person

_____
Physician or Nurse

Lo más importante es que usted consulte a su doctor como se le ha recomendado.  Si tiene algún problema que no hemos discutido, LLAME O VEA A SU DOCTOR DE INMEDIATO. Si no logra hablar con su doctor, Vuelva al Departamento de Emergencia.

"Entiendo las instrucciones arriba explicadas, y antes discutidas en el Departamento de Emergencia."

_____
Peciente o persona responsable

**CIGARETTE SMOKING.**
  This is surely your greatest health problem! The facts are clear that cigarette smoking will shorten your life. It will cause a great deal of illness along the way. If you need help quitting, talk to your regular doctor.

**SEATBELTS.**
  There is no doubt that seatbelts save lives. Every day in the Emergency Department we see how people without seatbelts are more severely hurt. We always buckle-up! Please do the same!

**Doctor o Enfermera EL HABITO DE FUMAR.**
  El hábito que usted tiene de fumar, es sin duda, el mayor problema de salud que tiene. Los hechos demuestran claramente que el fumar acorta la vida. También le causar una gran variedad de problemas de salud. Si necesita ayuda para dejar de fumar, consulte a su doctor.

**CINTURONES DE SEGURIDAD.**
  Sin duda, los cinturones de seguridad salvan vidas. A diario lo comprobamos en el Departamento de Emergencia, cuando atendemos a personas mal heridas por no haberse puesto el cinturón. Nosotros siempre lo usamos! Por favor, haga lo mismo!

Portions Copyrighted 1986-97, LOGICARE Corporation, Page 3, last page.

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON            ) (
                             ) (
        Plaintiff            ) (
                             ) (
VS.                          ) (    CIVIL ACTION NO.
                             ) (    CV-B-00-192
CITY OF BROWNSVILLE, TEXAS,) (
ET AL.                       ) (
                             ) (
        Defendants           ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
JOAO DOVALE, M.D.
MAY 19, 2004

---

ORAL AND VIDEOTAPED DEPOSITION OF JOAO DOVALE,

M.D., produced as a witness at the instance of the

PLAINTIFF, taken in the above styled and numbered cause

on MAY 19, 2004, reported by JODY McWHORTER, RPR,

Certified Court Reporter No. 6095, in and for the State

of Texas, at the offices of Gonzalez, Gaytan, Garza &

Castillo, L.L.P., 1317 East Quebec, McAllen, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached therein.

*ORIGINAL*

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 11:01 | 1  | Q.  What would you typically write down if you had                   |
| 11:01 | 2  | conducted a neurological examination of the patient?                 |
| 11:02 | 3  | A.  Excuse me?                                                        |
| 11:02 | 4  | Q.  What information would you normally chart about                  |
| 11:02 | 5  | a neurological examination of a patient?                             |
| 11:02 | 6  | MS. SAGE:  Objection as vague and                                    |
| 11:02 | 7  | ambiguous.                                                            |
| 11:02 | 8  | A.  If I do an examination on you and I don't find                  |
| 11:02 | 9  | anything abnormal, I will put a zero and a slash on it;             |
| 11:02 | 10 | nothing pertinent to write about.                                   |
| 11:02 | 11 | Q.  Did the -- did you have the -- strike that.                     |
| 11:02 | 12 | When a patient is brought in on an                                  |
| 11:02 | 13 | ambulance, typically the EMS record accompanies the                |
| 11:02 | 14 | patient to the ER, correct?                                         |
| 11:02 | 15 | A.  Not always.  Sometimes I don't see the ambulance              |
| 11:02 | 16 | record ever.                                                         |
| 11:02 | 17 | Q.  The hospital policy is to have the ambulance                   |
| 11:02 | 18 | record accompany the patient to the ER, correct?                   |
| 11:02 | 19 | MR. GAULT:  Objection, form.                                         |
| 11:02 | 20 | A.  Correct, but we don't get the privilege always,              |
| 11:03 | 21 | because sometimes the ambulance personnel is still                  |
| 11:03 | 22 | writing on their records.                                           |
| 11:03 | 23 | Q.  Do you know, did you ever see the EMS records on             |
| 11:03 | 24 | Mr. De Leon?                                                         |
| 11:03 | 25 | MS. SAGE:  Objection as over-broad to time,                         |

| | | |
|---|---|---|
| 11:03 | 1 | when he saw it. |
| 11:03 | 2 | Q.  At any time. |
| 11:03 | 3 | A.  Not when I saw him. |
| 11:03 | 4 | Q.  Excuse me? |
| 11:03 | 5 | A.  Not when I saw Mr. De Leon, I didn't see any EMS |
| 11:03 | 6 | record. |
| 11:03 | 7 | Q.  When did you first see the EMS record on |
| 11:03 | 8 | Mr. De Leon? |
| 11:03 | 9 | A.  When I reviewed the chart. |
| 11:03 | 10 | Q.  When was that? |
| 11:03 | 11 | A.  When I was told that I was being sued for -- |
| 11:03 | 12 | THE WITNESS:  Did I -- |
| 11:03 | 13 | Q.  Did you know -- did you ever ask Mr. De Leon if |
| 11:03 | 14 | he had any numbness in any of his extremities? |
| 11:03 | 15 | A.  I pinched Mr. De Leon's legs and he withdrew the |
| 11:03 | 16 | legs, which means he can feel me pinching him, he can |
| 11:03 | 17 | feel pain. |
| 11:03 | 18 | MR. CROSLEY:  Objection, nonresponsive. |
| 11:03 | 19 | Q.  Did you ever ask him if he felt any numbness in |
| 11:04 | 20 | his extremities? |
| 11:04 | 21 | A.  No. |
| 11:04 | 22 | Q.  You are aware that the EMS technician documented |
| 11:04 | 23 | that while en route to your hospital Mr. De Leon was |
| 11:04 | 24 | complaining of numbness from the neck down? |
| 11:04 | 25 | MS. SAGE:  Objection, over-broad as to |

11:04   1    time.

11:04   2      Q.   You're aware of that now?

11:04   3      A.   Now I am, after the fact.

11:04   4      Q.   What did you do at that time to learn about the

11:04   5    patient's condition while he was being treated by EMS?

11:04   6      A.   The EMS brought the patient. I don't even

11:04   7    remember seeing the EMS people in the room. They

11:04   8    brought the patient, they delivered the patient to the

11:04   9    nurse, and they left.

11:04   10      Q.   So you did not ask the EMS technicians anything

11:04   11    about this patient?

11:04   12      A.   No.

11:04   13      Q.   Did you ever ask to see the EMS record on this

11:05   14    patient before you discharged him?

11:05   15      A.   No.

11:05   16      Q.   If you had known that Mr. De Leon was

11:05   17    complaining of numbness from the neck down while he was

11:05   18    being transported by EMS to your hospital, would you

11:05   19    have done anything differently?

11:05   20      MS. SAGE:   Objection to the extent it

11:05   21    assumes facts not in evidence.

11:05   22      A.   No, because I base my -- my treatment and my --

11:05   23    my handling of the case by what I see and what I find

11:05   24    when I examine the patient, and I didn't have any

11:05   25    indication that he was numb; that he had any numbness.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366     (956)428-0755     (956)542-1020

11:05  1          Q.   If there was an indication or a belief -- let me

11:06  2     strike that.

11:06  3               If there was a suspicion in your mind that

11:06  4     the patient did have numbness below the neck following

11:06  5     an MVA, what is your normal course of treating that

11:06  6     patient?

11:06  7          A.   If the patient demonstrates to me that he is

11:06  8     numb, I will proceed with a much more sophisticated

11:06  9     neurological workup.

11:06  10         Q.   And describe to me what that workup would

11:06  11    include.

11:06  12         A.   It would include x-rays, would include whatever

11:06  13    it takes to find out what the cause of the numbness is,

11:06  14    if he indeed was numb.

11:06  15         Q.   Okay.  The much more sophisticated neurological

11:06  16    workup would include x-rays?

11:06  17         A.   X-rays, CAT scans, and neurological

11:06  18    consultations, neurosurgical consultation, whatever;

11:07  19    whatever it takes.

11:07  20         Q.   Okay.  In the course of your treatment of

11:07  21    Mr. De Leon, you did not order x-rays?

11:07  22         A.   No, because he never gave me the indication that

11:07  23    he was numb.

11:07  24         Q.   Nor did you order a CT scan?

11:07  25         A.   No, because I don't order a CT scan on

12:07  1    numbness to one or more of the extremities?

12:07  2         A.  Again, the patient did not complain of numbness.

12:07  3    If he complains of numbness, yes, but if you don't

12:08  4    complain of numbness I'm not going to go looking for

12:08  5    ghosts.

12:08  6         Q.  So when you have a patient with a laceration to

12:08  7    the forehead following an MVA, the only time you will do

12:08  8    an x-ray is if the patient has had a loss of

12:08  9    consciousness, is disoriented, has nausea or vomiting,

12:08  10   or numbness or immobility of their extremities?

12:08  11        A.  If he exhibits any neurological deficit, either

12:08  12   on the horizontal or vertical neurological examination,

12:08  13   yes, I will order the x-rays and the CAT scan of the

12:08  14   head.  In the absence of that, no.  Not every -- not

12:09  15   every laceration from a -- on the forehead deserves a

12:09  16   complete radiological evaluation.

12:09  17        Q.  Did you have any information about how severe

12:09  18   the motor vehicle collision was that Mr. De Leon was

12:09  19   involved in?

12:09  20        A.  To my knowledge, it was a minor collision.  He

12:09  21   rear-ended another car, and the occupant of the other

12:09  22   car was never seen medically.

12:09  23        Q.  Do you know -- well, who did you obtain this

12:09  24   information from about the severity of the collision?

12:09  25        A.  The police, because I asked the police how

| | | |
|---|---|---|
| 12:09 | 1 | far -- how bad was the accident.  Minor. |
| 12:09 | 2 | Q.  Did -- was it important for you to know how |
| 12:09 | 3 | Mr. De Leon was removed from his vehicle at the scene of |
| 12:09 | 4 | the wreck? |
| 12:09 | 5 | A.  The paramedics removed him from the car.  That's |
| 12:09 | 6 | how -- that's what I was told; that he was taken from |
| 12:10 | 7 | the car. |
| 12:10 | 8 | Q.  That suggests the possibility of an inability on |
| 12:10 | 9 | his part to move, correct? |
| 12:10 | 10 | MR. GAULT:  Objection, form. |
| 12:10 | 11 | A.  Not necessarily.  If he's drunk, no. |
| 12:10 | 12 | Q.  Well, it's possible that he had an inability to |
| 12:10 | 13 | move? |
| 12:10 | 14 | A.  Anything is possible. |
| 12:10 | 15 | Q.  And you assumed the reason they had to remove |
| 12:10 | 16 | him from the car was because he was drunk, correct? |
| 12:10 | 17 | A.  Probably he didn't want to get out of the car. |
| 12:10 | 18 | Q.  And that was one of the assumptions you made |
| 12:10 | 19 | when you were treating him at that time, correct? |
| 12:10 | 20 | A.  Yes. |
| 12:10 | 21 | Q.  If instead you had been told that he was unable |
| 12:10 | 22 | to get out of the car because he said he couldn't feel |
| 12:10 | 23 | anything below his neck, would you have treated him |
| 12:11 | 24 | differently? |
| 12:11 | 25 | A.  Yes. |

12:11    1        Q.  And that would have been an x-ray and CT scan?

12:11    2        A.  Yes.  If I was given the privilege of that

12:11    3    information, yes.

12:11    4        Q.  Your entire interaction with Mr. De Leon lasted

12:11    5    how many minutes?

12:11    6        A.  No more than half an hour; 28 minutes.

12:11    7        Q.  Okay.  And your neurological assessment of him

12:11    8    was two to three minutes?

12:11    9        A.  In two to three minutes I can do a neurological

12:11   10    assessment of a trauma victim.

12:11   11        Q.  Was Mr. De Leon able to sign any papers at the

12:11   12    hospital?

12:11   13              MS. SAGE:  Objection as it calls for

12:11   14    speculation.

12:11   15        A.  I don't know.  I didn't ask him to sign any

12:12   16    documents.

12:12   17        Q.  If Mr. Wright, the nurse, noted that Mr. De Leon

12:12   18    was unable to sign due to medical condition, would you

12:12   19    have expected him to tell you that fact?

12:12   20        A.  He should have.

12:12   21        Q.  Did Mr. Wright tell you that Mr. De Leon was

12:12   22    unable to sign due to medical condition?

12:12   23        A.  No.

12:12   24        Q.  Would that have been important for you to know?

12:12   25        A.  Maybe, maybe not.  People sign out of the

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON      )(
                       )(
     Plaintiff       )(
                       )(
VS.                 )(   CIVIL ACTION NO.
                       )(   CV-B-00-192
CITY OF BROWNSVILLE, TEXAS,)(
ET AL.             )(
                       )(
     Defendants      )(

REPORTER'S CERTIFICATE

I, JODY McWHORTER, Certified Court Reporter, certify that the witness, JOAO DOVALE, M.D., was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on MAY 19, 2004; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this ___21st___ day of _____, 2004.


JODY McWHORTER, RPR, Texas CSR 6095
Expiration Date: 12-31-04
Bryant & Stingley, Inc.
Firm Registration No. 41
4900 North 10th, Building A, Suite 3
McAllen, Texas 78504
(956) 618-2366

BRYANT & STINGLEY, INC.
McAllen       Harlingen       Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

# Exhibit E

## AFFIDAVIT OF NICK PETERS, M.D., FACEP

COUNTY OF HARRIS      §

STATE OF TEXAS      §

    BEFORE ME, the undersigned authority, on this date personally appeared Nick Peters, M.D., FACEP who, being by me duly sworn, deposed and said as follows:

    "My name is Nick Peters, M.D., FACEP. I am over the age of eighteen (18) years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein, and I have knowledge of each of the matters stated herein. The facts stated in this Affidavit are within my personal knowledge, and are true and correct.

    1.    I am a licensed practicing physician Board Certified in Emergency Medicine. I have reviewed the medical records relating to Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998, as well as hospital records. I have also reviewed the depositions of Dr. Dovale and Mr. DeLeon. My opinions herein are based upon my education, training, experience, and knowledge of the care and diagnosis of spinal cord injuries.

    2.    I received my Doctor of Medicine degree from Creighton University School of Medicine in Omaha, Nebraska in 1991. I did an internship and began a residency in Emergency Medicine at UCLA King/Drew Medical Center, Los Angeles, California from 1991 to 1993. I finished my residency in Emergency Medicine at the University of Arizona in Tucson, Arizona from 1993-1994. I have been practicing Emergency Medicine since successfully completing my Residency, and I currently practice at Memorial Hermann Southwest Hospital. As part of my daily practice I evaluate patients with suspected spinal cord injuries.

    3.    Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998. Paramedics found him in the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a backboard. On arrival at the Emergency Department at Columbia Valley Regional Medical Center, it was reported the patient complained of numbness from the neck down in the EMS records. On the Conditions of Admission form from the hospital was printed "Pt. unable to sign due to medical condition", instead of Mr. DeLeon's signature. Dr. Joao Dovale examined the patient and stapled a facial laceration. The patient was taken off spinal precautions and Dr. Dovale noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes. On the discharge paperwork instead of Mr. DeLeon's signature was printed, "pt. can't sign".

    4.    My understanding is that Mr. DeLeon told the nurse involved in his care that he was numb below the neck and that he could not move. If this is true, then the standard of care required the hospital staff, including Nurse Wright, to communicate this to Dr. Dovale and take appropriate steps to insure that the spine injury precautions were followed for Mr. DeLeon.

5.    Dr. Dovale testified that no one told him that Mr. DeLeon was complaining of numbness below the neck or the inability to move his extremities. Dr. Dovale stated that if he had been told of this complaint of numbness, he would have ordered an x-ray and CT scan of Mr. DeLeon's spine and evaluated him further for a possible spinal cord injury.

6.    If a proper evaluation was performed, including the maintenance of spinal precaution, x-rays, CT scan and a neurological exam, then it is likely that Mr. DeLeon's spinal cord injury would have been diagnosed in a timely manner and steroids given to minimize any post-traumatic swelling that causes further spinal cord injury. If this had been done, then the injury and swelling to Mr. DeLeon's spinal canal that resulted in his quadriplegia injury could have, in reasonable medical probability, been reduced or possibly eliminated such that Mr. DeLeon's injury and paralysis would likely have been much less. For these reasons, the hospital violated the standard of care by failing to communicate the patient's complaint of numbness from the neck down to the ER doctor. This violation of the standard of care was a proximate cause of Mr. DeLeon's injuries and damages.

7.    Further, the hospital's protocol requires that the EMS records be attached to the ER record and provided to the ER doctor at the time of treatment. This was not done. Had this been done, Dr. Dovale would have seen that the patient had complained of numbness from the neck down while en route to the hospital. Again, Dr. Dovale testified that had he known of this complaint of numbness, he would have treated the patient differently and would have further evaluated the existence of a spinal cord injury by performing x-rays and a CT scan. This failure by the hospital to follow its protocol by delivering a copy of the EMS record to the ER doctor while the patient was being treated is a further violation of the standard of care of the hospital in the treatment of Mr. DeLeon. This violation was a proximate cause of Mr. DeLeon's injuries and damages, in that had Dr. Dovale been made aware of the complaint of numbness, then he would have, by his own admission, performed x-rays, and a CT scan which would have led to the diagnosis of possible spinal cord injury. At the very least, the patient would have been expected to remain on spinal precautions, which would have minimized the extent of his injury and Mr. DeLeon would not have suffered as severe an injury. These deviations by the Valley Regional Medical Center Hospital from the standards of care were a contributing cause of Mr. DeLeon's quadriplegia.

Further affiant sayeth naught.

NICK PETERS, M.D., FACEP

2

SUBSCRIBED and SWORN to before me on this ___ day of May, 2004

GLENDA K. JOHNSTON
Notary Public, State of Texas
My Commission Expires
August 30, 2006

NOTARY PUBLIC, State of Texas
My Commission Expires: 08/30/06

G:\WPFILES\FILES\CLVR\Angelina\Report, MR.wpd

3