IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 0 4 2004

Michael N. Milby
Clerk of Court

| | |
|---|---|
| CANDELARIO DE LEON | § |
| | § |
| VS. | § |
| | § |
| | § |
| | § |
| CITY OF BROWNSVILLE, | § |
| TEXAS, ET AL | § |
| | § |

CIVIL ACTION NO. CV-B-00-192
JURY DEMANDED

## DEFENDANT COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ITS MOTION TO STRIKE EXHIBIT E TO PLAINTIFF'S RESPONSE

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Columbia Valley Healthcare System, L.P. d/b/a Valley Regional Medical Center and files this Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment and Its Motion to Strike Exhibit E to Plaintiff's Response and respectfully moves this Court to grant them a Summary Judgment pursuant to Federal Rules of Civil Procedure 56 and would respectfully show the Court as follows:

## I. EVIDENCE

This Defendant would rely upon and incorporate herein the following evidence:

1.      Deposition of Plaintiff's expert, Nick Peters, M.D., page 7; page 37, line 24 – page 38, line 1; page 38, line 2- page 40, line 12; page 46, lines 3-12; page 71, line 2- page 73, line 11; page 82, lines 2-23; page 82, line 24 - page 83, line 4; page 83, line 13-page 84, line 4; page 93, line 13 – page 94, line 21; page 100, lines 15-20; page 102, line 12-page 105, line 5; page 109, lines 16-21; page 109, line 22-page 110, line 15; page 113, lines 13 – 22; page 128, lines 1-8; page 129,

line 2-page 130, line 15; page 130, lines 16-21; page 131, line 8 - page 133, line 16; page 190, line 23 - page 191, line 5; page 195, line 1- page 197, line 9; page 201, line 22-page 202, line 1; page 202, line 25-page 205, line 15; page 206, line 2 - page 207, line 19; page 210, line 19-page 212, line 14; page 217, line 13-22; page 217, line 23 - page 218, line 1; page 218, lines 2-6, attached hereto and incorporated herein as Exhibit A.

  2.  Exhibits 6, 7 and 8 attached to deposition of Dr. Nick Peters and attached hereto and incorporated herein as Exhibit B.

  3.  American Medical Association Policy H-265.994 Expert Witness Testimony Section 3(a), attached hereto and incorporated herein as Exhibit C.

  4.  Deposition of Dr. Dovale, page 4, page 138, lines 14-25 and page 147, line 25 – page 148, line 14, attached hereto and incorporated herein as Exhibit D.

  5.  Deposition of Plaintiff's expert, Dr. Jeremy Slater, pages 6, and page 44, line 5 - page 46, line 14, attached hereto and incorporated herein as Exhibit E.

## II. DR. PETERS HAD NOT EXPRESSED CRITICISM OF THE HOSPITAL DEFENDANT IN ANY WRITTEN REPORT AND EXPRESSED IT FOR THE FIRST TIME IN HIS DEPOSITION

  Federal Rule of Civil Procedure 26(E)(2)(B) requires an expert to provide a report that contains a complete statement of all of his opinions to be expressed and the basis and reasons therefore. Two reports and one affidavit of Dr. Peters, the Plaintiff's Emergency Medicine expert, were provided to this Defendant through discovery from the Plaintiff's attorneys. See Exhibit A, page 113, lines 13 – 22 and Exhibit B. Dr. Peters stated that in his two reports and one affidavit that he expressed no criticisms of the Defendant hospital. See Exhibit A, page 82, line 24 - page 83, line 4. Dr. Peters acknowledged that he had never expressed any criticisms of the hospital in his reports or in any other way before the day of his deposition. See Exhibit A, page 206, line 2 -

page 207, line 19. Dr. Peters went further to testify that he had never commented as to the standard of care for the hospital in any of his reports. See Exhibit A, page 217, lines 13-22. At no time before his deposition had Dr. Peters ever said how the nurses had failed to meet the standard of care. See Exhibit A, page 217, line 23 - page 218, line 1. Dr. Peters also never testified that nurses' failure to meet the standard of care caused any injury to the Plaintiff. See Exhibit A, page 218, lines 2-6. Clearly, the Plaintiff had never disclosed any expert criticisms from Dr. Peters that were critical of the hospital before his deposition 9 days ago.

III.    DR. PETERS IS DISQUALIFIED FROM TESTIFYING AS TO THE NURSING STANDARD OF CARE AND AS TO CAUSATION AND DAMAGE ISSUES

Dr. Peters stated that he did not know what governed the practice of nursing and he has not reviewed any documents that governed the practice of nursing, including the Texas Nursing Practice Act. See Exhibit A, page 131, line 8 - page 133, line 16. The practice of Registered Nurses (like the one that saw the Plaintiff at Valley Regional Medical Center) is governed by Section 301.001 et. seq. of the Texas Occupations Code. Registered Nurses (sometimes called Professional Nurses in the Code) are governed by the Nursing Practice Act found at that section. Section 301.002(2) sets forth what is covered in professional nursing and what is not covered, including medical diagnosis and prescribing therapeutic or corrective measures. Section 301.151 gives the Board of Nurse Examiners the authority to adopt rules to regulate the practice of nursing and to establish standards of professional conduct for nurses. Section 301.251 requires a person to be a licensed nurse before practicing or offering to practice professional nursing. Clearly, Dr. Peters is not qualified to testify as to the nursing standard of care. He has not read the Nursing Practice Act and was totally unfamiliar with it.

Dr. Peters only practices as an emergency medicine doctor. See Exhibit A, page 37, line 24 – page 38, line 1. He only sees patients in the emergency room and does not handle their care after that. He is not a neurologist or neurosurgeon. Dr. Peters acknowledged that he would not testify as to the long-term sequelae as that requires a different specialty. He acknowledges that ER doctors stabilize a patient, admit or discharge them and get the appropriate consultants. See Exhibit A, page 38, line 2- page 40, line 12. Dr. Peters will defer to an appropriate specialist concerning whether the treatment of the Plaintiff at Valley Regional caused any injuries. See Exhibit A, page 71, line 2- page 73, line 11. Dr. Peters did not review any medical studies other than one page from the year 2000, which was after the date of this incident. See Exhibit A, page 93, line 13 – page 94, line 21.

Dr. Peters agreed that he treated his testimony in a medical malpractice case is the same as if he were practicing medicine. See Exhibit A, page 190, line 23 - page 191, line 5. Dr. Peters agreed with the American Medical Association statement (attached as Exhibit C) that the minimum qualifications of an expert witness should be that the expert would have comparable education, training and occupational experience in the same field as the Defendant and Dr. Peters acknowledged that he did not have those qualifications as to the hospital nurse in this case. See Exhibit A, page 195, line 1- page 197, line 9.

IV.  PLAINTIFF COMPLAINS THAT INFORMATION WAS WITHHELD FROM DR. DOVALE

The Plaintiff attaches Dr. Dovale's testimony which states that the Plaintiff did not complain of numbness to him and that he did not receive the EMS report. Plaintiff alludes to, but produces no evidence that, it was even available and that it would have caused a different outcome.

, See Exhibit D to Plaintiff's response, page 79, lines 2-5. In Plaintiff's response to Defendant's Motion for Summary Judgment, Plaintiff carefully sets out evidence in his affidavit and deposition that Plaintiff claims he gave information of his numbness to the Co-Defendant, Dr. Dovale. See Exhibit A to Plaintiff's response, paragraph 2 of the Affidavit of Candelario DeLeon and Plaintiff's deposition, page 50, lines 10-24. Plaintiff himself produces evidence that if Dr. Dovale had been told of the EMS report, stating that while the patient was being transported to the hospital he complained of numbness from the neck down, then Dr. Dovale would not have done anything differently because he bases his treatment on what he sees during the examination of the patient and that examination did not reveal any numbness. See Exhibit D to Plaintiff's response, page 40, lines 16-25. Dr. Dovale also stated that he knew that the paramedics had removed the patient from his car. See Exhibit D to Plaintiff's response, page 80, lines 2-7. Dr. Dovale even went further to say that he will not proceed with any further workup unless the patient can demonstrate his numbness to the doctor. See Exhibit D to Plaintiff's response, page 41, lines 3-9. Dr. Dovale went further to say that he did not order further tests because the patient did not demonstrate any indication to the doctor that the patient was numb. See Exhibit D to Plaintiff's response, page 41, lines 20-23. Dr. Dovale's testimony further indicates that he is not relying on the nurse because he is doing his own examination of the patient. See Exhibit D, page 138, lines 14-25, and page 147, lines 25 – page 148, line 14.

In Plaintiff's response, it not only sets out Plaintiff's claim that he told Dr. Dovale of his complaints, it also sets out Dr. Dovale's testimony contradicting his own client's statements. Plaintiff's own expert, Dr. Peters, acknowledges that the Plaintiff's complaints of numbness were told to Dr. Dovale. See Exhibit A, page 46, lines 3-12. While Plaintiff has set forth a series of evidence against the Co-Defendant, that is not relevant to the Hospital Defendant which has filed a

Motion for Summary Judgment. The Plaintiff has not set forth any evidence that the hospital nurse knew any information different from Dr. Dovale or that any information was withheld from Dr. Dovale. Neither the Plaintiff's affidavit nor the EMS report states that the nurse was ever told that the paramedics removed the Plaintiff from his car because of his inability to move his body. It was Dr. Dovale that determined what tests to order on the patient and determined to dismiss the patient. The Plaintiff's own expert testified that whether or not Dr. Dovale was told of numbness from the neck down, he would have to independently investigate it. See Exhibit A, page 100, lines 15-20.

Plaintiff sets forth much emphasis on Exhibit B to Plaintiff's response, the EMS report. As can be seen on page 2 of that report, it states that the patient was complaining of numbness from the neck down and he was reassessed in route. It should be pointed out to the Court that even though the EMS reassessed the patient, they never changed their injury information concerning the patient. Dr. Peters even acknowledges that the EMS were not able to substantiate Plaintiff's complaint. See Exhibit A, page 102, line 12 – page 105, line 5. Dr. Peters did not see any objective evidence of numbness in the hospital chart either. See Exhibit A, page 109, lines 16-21. On page 1 of the EMS report it notes that the type of injury is "03," which is a laceration. The severity of the injury is noted by the EMS as a "1," which means a possible injury, and the location of the injury is noted as "16," which is an area on the left forehead. Also on the first page of the EMS report, it asks a statement as to whether or not the patient was "bed confined" before the accident and after the accident, and both times the EMS noted that the patient was not confined to a bed. On the second page of Exhibit B to Plaintiff's response, in the first paragraph under the term "subjective," the EMS notes on the next-to-last sentence that there is no chief complaint which means that the patient is not complaining of anything. Under the area marked as "objective," on the fourth line it states that the head to toe evaluation was done on the patient and all the EMS

found was a small laceration to the patient's forehead. On the fourth line, it states that there is normal range of motion to all four of the patient's extremities (arms and legs). The Plaintiff's medical experts who have been asked about this state that if the EMS had found anything to contradict its normal evaluation of the patient, their standard of care would require that they note it in their chart, and they have admitted that there is nothing noted in their evaluation of the Plaintiff that substantiates his claim of numbness. Furthermore, in Exhibit C of Plaintiff's response, neither the patient's complaints of any kind other than a cut to his forehead nor any objective finding of that is found throughout the medical records. In Plaintiff's own evidence that was produced with its response, Dr. Dovale was specifically asked if he evaluated the patient's numbness, and he stated that he did by pinching the Plaintiff's legs which he withdrew to pain. See Exhibit D to Plaintiff's Response, page 39, lines 13-17.

## V.  X-RAYS

Dr. Peters states that X-rays of the Plaintiff's neck done the next day were normal. See Exhibit A, page 128, lines 1-8. Dr. Peters goes on to state that the clinical examination by Dr. Dovale was normal. He further states that had X-rays been done on December 24, 1998, they would have also been normal. Therefore, he believes that even had X-rays been done, Dr. Dovale would have removed the patient from the spinal precautions. Dr. Peters acknowledges that it is the medical doctor's decision as to whether or not to remove the patient from spinal precautions. See Exhibit A, page 129, line 2 - page 130, line 15.

· VI. HOSPITAL POLICY ON EMS REPORT

Dr. Peters' affidavit is misleading. His deposition was taken on May 26, 2004. At that time, he had not given the affidavit that is attached to Plaintiff's response to Defendant's Motion for Summary Judgment. See below Paragraph IX. During his deposition, Dr. Peters, when asked about the policy concerning the EMS report, stated that he had no evidence that the policy had not been followed. See Exhibit A, page 201, line 22 - page 202, line 1. Dr. Peters went on to state that the testimony that he gave earlier in the deposition, when being asked about the EMS policy by Mr. Crosley, was not meant as a criticism of the hospital. The first time that he had even seen the policy was after all three of the attorneys had initially asked him questions and then the attorney for the Plaintiff took a break and showed him the policy. It is not something that Dr. Peters had ever made one of his criticisms, nor was he expressing criticisms of the hospital in that policy at his deposition. See Exhibit A, page 202, line 25 - page 205, line 15.


VII. INDEPENDENT CONTRACTOR

While it has not been disputed by Plaintiff, Dr. Peters further acknowledges that Dr. Dovale was an independent contractor of this Defendant. See Exhibit A, page 130, lines 16 - 21. Dr. Peters acknowledges that the independent contractor emergency physician is in control of the patient. See Exhibit A, page 210, line 19 - page 212, line 14.


VIII. CAUSATION

Plaintiff's other expert, Dr. Slater, acknowledges that even had there been treatment of Mr. DeLeon with steroids, there is not an agreement within the medical community that it would have

changed the outcome of the Plaintiff's injuries in this case.  See Exhibit E, page 44, line 6 - page 46, line 14.

## IX.   MOTION TO STRIKE DR. PETERS' AFFIDAVIT ATTACHED TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dr. Peters gave his deposition on May 26, 2004 between 8:49 a.m. and 2:22 p.m.  See Exhibit A Cover Sheet.  During his deposition, Dr. Peters discussed that he had spoken with the Plaintiff's attorney about giving an additional affidavit.  See Exhibit A, page 82, lines 2–23.  Dr. Peters had testified that he had given two written statements and one affidavit in this case up to that point.  See Exhibit A, page 113, lines 13-22.  Copies of those are attached hereto as they were attached to Dr. Peters' deposition.  See Exhibit B.  Dr. Peters' latest affidavit, which is attached to the Plaintiff's response, was done after his deposition, and it contains new opinions that had never been expressed in any previous report.  His previous reports had never expressed any opinions critical of the hospital.  Dr. Peters had never even seen the hospital policies and procedures before his deposition.  Dr. Peters even gave testimony in his affidavit that contradicted what he had just previously said an hour before in his deposition.  Please see the above paragraph II in this motion as contrasted to what is contained in Dr. Peters' affidavit.

The Plaintiff attached Exhibit E to its Response to this Defendant's Motion for Summary Judgment and it was Dr. Peters' affidavit.  The fax indications on it are that the page labeled Exhibit E was page 33/36 pages and had a fax time of 3:34 p.m. on 5/26/04, the date their response was filed.  The first page of the affidavit of Nick Peters was marked page 2/2 and had a fax time of 3:42 p.m., and the two following pages were marked page 35/36 and 36/36 and were timed 3:36 p.m., all dated 5/26/04.  It appears obvious that Dr. Peters continued to make changes in his

' affidavit even after his deposition had been taken and while the Defendant's attorneys were waiting to take Dr. Slater's deposition.

Dr. Peters also stated in his deposition that he was going to do more investigation before he did an additional affidavit. Dr. Peters had not verified Mr. DeLeon's statement as to who he meant when he said he told "everybody" about his numbness and Dr. Peters stated that he wanted to clarify that. See Exhibit A, page 83, line 13 - page 84, line 4. Obviously, from looking at his latest affidavit that was attached to Plaintiff's response, he had done nothing further to clarify that statement. Dr. Peters stated that his latest affidavit would be done in the next couple of days after his deposition on 5/26/04. See Exhibit A, page 109, line 22 - page 110, line 15. Clearly, those statements were false.

Defendant moves to strike Dr. Peters' affidavit from Plaintiff's response to Defendant's Motion for Summary Judgment. There is no reason why Defendant should not be allowed to rely upon the two previous reports and one previous affidavit of Dr. Peters given in this case and produced to this Defendant in discovery, which make no complaints of the hospital or the nursing care given to the Plaintiff. At his deposition, Dr. Peters even tried to add complaints of the nursing care during his deposition, but eventually acknowledged that those complaints were not valid. Then, about one hour after his deposition had been completed and while the attorneys for the Defendants were waiting in the deposition room to begin the deposition of Dr. Slater, which began at 3:49 p.m., Dr. Peters was meeting with Plaintiff's counsel and preparing new opinions that had contradicted his testimony that he just completed. Defendant moves to strike Exhibit E to Plaintiff's Response.

WHEREFORE, PREMISES CONSIDERED, Defendant requests that the Court grant its Motion for Summary Judgment, dismiss all of Plaintiff's claims against this Defendant and to sever

· Plaintiff's claims into its own cause number and to assess costs of court against Plaintiff and for

such other and further relief, at law or in equity, to which Defendant may show itself justly entitled

to receive.

Respectfully submitted,

By:_____

William Gault
Federal I.D. No. 14685
State Bar No. 07765050
Michael Quintanta
Federal I.D. No. 33291
State Bar No. 24037314
Brin & Brin, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520
(956) 544-7110
(956) 544-0607 Telecopier

Of Counsel:

Brin & Brin, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520
(956) 544-7110
(956) 544-0607 Telecopier

ATTORNEYS FOR DEFENDANT
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER

## CERTIFICATE OF SERVICE

This is to certify that the above and foregoing instrument has been forwarded to counsel as indicated below on this the ___4___ day of June, 2004.

Mr. Thomas Crosley                    **VIA CMRRR 7002 0460 0000 6426 4252**
Branton & Hall, P.C.
One Riverwalk Place, Suite 1700
700 N. St. Mary's St.
San Antonio, Texas 78205

Michael Cowen                         **VIA CMRRR 7002 0460 0000 6426 4269**
Law Offices of Michael R. Cowen
520 E. Levee
Brownsville, TX 78520

Steven M. Gonzalez                    **VIA REGULAR MAIL**
Gerald Castillo
Gonzalez, Gaytan, Garza & Castillo, L.L.P
1317 E. Quebec Avenue
McAllen, Texas 78503

William Gault

1                  FOR THE SOUTHERN DISTRICT OF TEXAS
                            BROWNSVILLE DIVISION
2

CANDELARIO DE LEON          )
3                              )
VS.                         )    CIVIL ACTION NO. CV-B-00-192
4                              )
COLUMBIA VALLEY HEALTHCARE) (JURY REQUESTED)
5  SYSTEM, L.P. D/B/A VALLEY )
   REGIONAL MEDICAL CENTER,  )
6  JOAO DOVALE, MD. AND STAT )
   PHYSICIANS, P.A.          )
7

8

9    ****************************************************
     VIDEOTAPED ORAL DEPOSITION OF

10         NICK PAUL PETERS, M.D., FACEP

11                    MAY 26, 2004

12   ****************************************************

13

14          VIDEOTAPED ORAL DEPOSITION OF NICK PAUL PETERS,

15  M.D., FACEP, produced as a witness at the instance of the

16  Plaintiff, and duly sworn, was taken in the above-style

17  and numbered cause on the 26th day of May, 2004, from

18  8:49 a.m to 2:22 p.m., before Mary Abbott Burkes, CSR, in

19  and for the State of Texas, recorded by machine

20  shorthand, at the law offices of Worldwide Court

21  Reporters, Inc., 3000 Weslayan, Suite 235, Houston, Texas

22  77027, pursuant to the Federal Rules of Civil Procedure

23  and the provisions stated on the record or attached

24  hereto; that the deposition shall be read and signed

25  before any notary public.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**



1       A.    That's correct.

2       Q.    You've never practiced neurosurgery or

3   neurology; is that correct?

4       A.    That is correct.

5       Q.    When you see patients, you see them in the

6   emergency department unless you're called to the floor

7   for a code or something like that; is that correct?

8       A.    That is correct.

9       Q.    Okay.  You're not -- you're not going to testify

10  in this case about what should have been done with the

11  patient after the emergency room treatment; is that

12  correct?

13      A.    I would think that would be better addressed by

14  a neurologist or neurosurgeon.

15      Q.    Right.  You don't intend to testify in that

16  regard; is that correct?

17      A.    I -- you're correct.  I intend to testify from

18  the emergency department perspective.

19      Q.    All right.  You're not going to testify as to

20  the extent of Mr. De Leon's injury; is that correct?

21      A.    To the -- you mean for the long-term sequelae

22  or -- I don't know if I understand your question.

23      Q.    What about -- you're not going to testify to the

24  long-term sequelae of his injury?

25      A.    No.

1      Q.   Okay.

2      A.   I'll stick to the emergency.

3      Q.   And you're not going to testify as to the extent

4  of his injury, though, how injured he is?

5      A.   I'm not sure if I'm answering this correctly,

6  from what you're asking.  I will testify to the extent of

7  the injury that an emergency physician would be able to

8  see and diagnose.  But as far as beyond that, no, I would

9  not testify.

10     Q.   Okay.  And you're not going to testify as to the

11  effect of any possible treatment, what you think should

12  have been done to Mr. De Leon -- what effect that would

13  have on his injury, are you?

14     A.   I can testify what an emergency department

15  treatment would have.

16     Q.   Okay.  I guess what I'm getting at, the

17  treatment you're talking about giving to Mr. De Leon,

18  while that's initiated in the emergency room, it's

19  usually followed up by -- with other doctors other than

20  ER doctors, right?

21     A.   That is correct.

22     Q.   In other words, others doctors would -- while

23  you might initiate treatment, other doctors would follow

24  up with his care?

25     A.   That is correct.

1       Q.   And when I mean -- say "other doctors," I'm
2   talking about other specialties, right?
3       A.   Yes.
4       Q.   Neurology, neurosurgery, something like that?
5       A.   Correct.
6       Q.   Not emergency room doctors?
7       A.   That's right.
8       Q.   What you do in the emergency room is you
9   stabilize the patient, and you either admit them or you
10  discharge them, or you order further tests and get in the
11  appropriate consultants; is that correct?
12      A.   That is a pretty good summary.
13      Q.   All right.  Now, you've never seen Mr. De Leon;
14  is that correct?
15      A.   That is correct.
16      Q.   You've never talked to him?
17      A.   I have never talked to him.
18      Q.   All right.  In -- in looking at your materials
19  here, I did not see Mr. De Leon's deposition.  Where is
20  Mr. De Leon's deposition?
21      A.   It was provided to me by Tom Crosley; and the
22  copy that I had, I gave back to him.
23      Q.   When was that?
24      A.   It was in the last two days.
25      Q.   What day?

1    there with "everybody," don't you?

2        A.    Yes.

3        Q.    Okay.  Now -- so one way or another, it's your

4    understanding as the testimony is, the -- at least from

5    Mr. De Leon, his complaint of numbness got to the doctor,

6    didn't it?

7        A.    I'm sorry.  One more time, please.

8        Q.    Sure.  From Mr. De Leon's testimony, his

9    complaint of numbness got to Dr. Dovale, didn't it?

10       A.    It -- it ap- -- yes, it appears he did get

11   that --

12       Q.    All right.

13       A.    -- information.

14       Q.    So I guess what I'm saying is:  Before 7:00 p.m.

15   last night, what were your criticisms --

16       A.    Uh-huh.

17       Q.    -- of Valley Regional Medical Center?

18       A.    Well, saying he did get the information, the

19   patient says -- from the patient's -- is saying that he

20   could -- he gave him the information.  Dr. Dovale says he

21   did not have the information.  So my criticisms are if

22   Dr. Vale -- Dovale is correct in that he did not get the

23   information, that the information should have been

24   provided to him.

25       Q.    And if -- if Mr. De Leon, who you're here

1    patient.

2        Q.    But, Doctor, on a patient like Mr. De Leon, had

3    he been admitted to the hospital, you would not have

4    followed this patient; is that correct?

5        A.    That is correct.

6        Q.    All right. You would not have been able to --

7    in -- in general terms, you would not know the extent of

8    his injury a month later; is that correct?

9        A.    Not officially. A lot of times, emergency

10   physicians like to follow up on their patients. But

11   officially, no, you would not know.

12       Q.    You wouldn't be treating him a month later?

13       A.    You -- that's correct.

14       Q.    Right.

15       A.    You would not be treating him.

16       Q.    Okay. As -- as far as who's the best person to

17   testify as to what his injuries may or may not have been,

18   had the medical care been given the way you'd have wanted

19   to -- it to have been given, you would defer to a

20   different type of specialist. Is that a fair statement?

21       A.    That, I agree with, yes.

22       Q.    Okay. And as far as, you know, when we appear

23   in front of this judge and this jury, you certainly want

24   to be fair to the jury, right?

25       A.    Yes.

1    Q.    Okay.  And as far as what the medical care that

2    was given to him or not given to Mr. De Leon, as far as

3    how that caused any injuries, you're going to defer to

4    another specialist on that; is that correct?

5                MR. CROSLEY:  Objection.  That

6    mischaracterizes his testimony.

7    A.    I think the specialist can give good, detailed,

8    and better information, but I don't think that completely

9    eliminates my opinion as an emergency physician, on the

10   long-term outcome.

11   Q.    (By Mr. Gault)  You've never testified as a

12   neurologist before; is that correct?

13   A.    That is correct.

14   Q.    Or a neurosurgeon?

15   A.    That's correct.

16   Q.    Okay.  You've never treated people as a

17   neurologist or a neurosurgeon; is that correct?

18   A.    That's correct.

19   Q.    You've never followed people for neurological

20   injuries; is that correct?

21   A.    Well, in training, you do.  But as private

22   practice, no.

23   Q.    Okay.  You've never, since you've been

24   practicing as a doctor in the real world, right?

25   A.    That's correct.

1          Q.   Okay.   Now, Doctor, I guess what I'm talking

2     about is:   Pretty much after they leave your emergency

3     room, you've turned them over to a specialist.

4          A.   That is --

5          Q.   Is that correct?

6          A.   Yeah, that's correct.

7          Q.   And those are the best people to testify as to

8     the extent of someone's injuries; is that correct?

9          A.   For long-term, yes.

10         Q.   Sure.

11         A.   I agree.

12              MR. CROSLEY:   Are you at a good stopping

13     point?

14              MR. GAULT:   Yeah.   Oh, any time, Tom.   I'm

15     easy on breaks.   Whatever you want to do.

16              THE VIDEOGRAPHER:   Off the record at 10:04

17     a.m.

18              (Brief recess taken.)

19              THE VIDEOGRAPHER:   Back on the record at

20     ten minutes after 10:00 a.m.

21         Q.   (By Mr. Gault)   Dr. Peters, let me ask you:

22     There were neurological checks done on Mr. De Leon; is

23     that correct?

24         A.   Yes.

25         Q.   Okay.   They were both done by the nurse and

1    A.    Yeah, I've not signed anything for him.

2    Q.    Okay.  Has he talked to you about giving another

3    affidavit in this case or another statement in this case?

4    A.    Yes, he has.

5    Q.    What has he talked to you about that?

6    A.    He said after I get a chance to review the

7    depositions, that he may ask me to come up with another

8    affidavit.

9    Q.    Concerning what?

10    A.    Concerning the issues of -- the issues of the --

11    of what Mr. De Leon had stated and involving the

12    interactions with the nurse, the hospital and the

13    paramedics.

14    Q.    When did y'all have this discussion?

15    A.    I think, if I remember correctly, we had a brief

16    phone discussion a few days ago that he was going to get

17    me some more information and would want me to look at it.

18    And then yesterday when we talked, he says after I -- I

19    look at the information, that he wanted to talk to me

20    again to see what my opinions would be.

21    Q.    When are y'all going to have this next

22    conversation?

23    A.    We don't have anything planned.

24    Q.    Okay.  I guess what I'm getting at is:  You've

25    already given two reports and one sworn affidavit, right?

1     A.   Yes.

2     Q.   In none of those you have criticisms of Valley

3 Regional Medical Center; is that correct?

4     A.   Yes.

5     Q.   Okay.  From reading Dr. Dovale's deposition, you

6 did not know whether or not he knew of numbness from the

7 neck down as a complaint from Mr. De Leon, right?

8     A.   Well, from reading his definition, he says he

9 does -- he did not know about it.

10    Q.   Okay.  And -- but then from reading  Mr.

11 De Leon's deposition, he said he told everyone about it?

12    A.   He made the statement, "I told everybody."

13    Q.   Okay.  And, of course -- and so now, in

14 everything you've reviewed in the case, you have evidence

15 that -- that that information was transmitted to the

16 doctor?

17    A.   I -- at this point -- at this time I -- I --

18 I don't know if I can say I have evidence that the

19 information was transmitted to a doctor.

20    Q.   Well, you have a sworn deposition, right?

21    A.   From?

22    Q.   Mr. De Leon.

23    A.   The -- and there again, I want to go back and

24 before I do an affidavit, make sure I get the details

25 right.  But my impression from what I -- when I read

```
 1    the -- his affidavit, is I don't remember him stating
 2    specifically that he told a physician.
 3        Q.   But he told everybody?
 4        A.   He says, "I told everybody."
 5        Q.   Okay.  All right.  And you haven't -- you
 6    haven't ever wanted to clarify that statement, right?
 7        A.   I haven't had the opportunity to clarify it.
 8        Q.   Well, you've never asked to get Mr. De Leon on
 9    the phone and talk to him about it, right?
10        A.   No.
11        Q.   You've never asked to -- you know, to talk to
12    anyone else about that, right?
13        A.   No.  Just the information that's been provided
14    for me and --
15        Q.   Okay.
16        A.   -- I've shared with you.
17        Q.   So you have some evidence that Mr. De Leon had
18    told the doctor about his numbness from the neck down?
19        A.   Possible evidence.  I didn't say it's evidence,
20    but it's a possibility.
21        Q.   Well, when Mr. De Leon said he told everyone,
22    you would assume that includes Dr. Dovale, right?
23        A.   It could include Dr. Dovale.  There again, the
24    patient states that he wasn't sure who the doctor was.
25    And so whether Dr. Dovale was in the room or not when he
```

1     Q.    So I guess what your testimony is in this case

2    is -- is as far as any of the medical folks are

3    concerned, at most, they could have just contributed to

4    his injuries; is that correct?

5     A.    I believe that they -- that there was

6    contributed -- yeah, by the care he got or didn't get.

7    Yes.

8     Q.    Okay.  And my question was:  At most, they just

9    contributed to his injuries?

10     A.    I mean, they didn't cause the car accident.  But

11    once the car accident did happen, then they did

12    contribute to it.

13     Q.    Have you reviewed any medical studies in forming

14    your opinions in this case?

15     A.    I haven't reviewed any particular studies just

16    for this case.  I just have reviewed in my usual review

17    of articles and continuing education and things like

18    that; I've done things.  I did bring something that I had

19    with this paperwork here that you brought up before, "The

20    New England Journal" article.

21     Q.    Well, it's just one page --

22     A.    That's a --

23     Q.    -- is what you brought, right?

24     A.    That's -- that's a summary of -- of -- of that.

25     Q.    Yeah.  Let's find that.  You have some notes on

'1   that.  Oh, here it is.

2       A.   The notes on the back have nothing to do with

3   this case.

4       Q.   That's for another patient or something like

5   that?

6       A.   Yeah.  That's a very old piece of paper.

7       Q.   Okay.

8       A.   That has nothing to do with this case.

9       Q.   Right.  Okay.  So the only thing you've brought

10  here for this case is the year 2000 "New England Journal

11  of Medicine" -- one sheet, right?

12      A.   Yeah.

13      Q.   Why -- why didn't you bring the rest of this

14  article?

15      A.   I don't have the rest of the article.

16      Q.   Okay.  Where did you get this from?

17      A.   I don't remember where I got it from.  I picked

18  it up somewhere in my practice and got it -- it's -- this

19  criteria is in multiple sources in emergency and in

20  trauma literature.  I don't know specifically where I got

21  it.

22      Q.   What was the mechanism of Mr. De Leon's injury?

23      A.   His mechanism was a motor vehicle accident.

24      Q.   I'm sorry.  What did he -- what's your

25  understanding of -- he's sitting in the car, holding the

1    Q.    Sure.   And from what you saw from the chart, at

2    least from what you can tell from the chart, that was

3    never communicated to the nurse, was it?

4    A.    The nurse did not put that in the note at all.

5    Q.    And from what you can tell and the way you know

6    about charting, had that kind of complaint been told to a

7    medical person, either a nurse or doctor, that's

8    something that they would have charted, right?

9    A.    Something they should have charted, yes.

10    Q.    Sure.   And they would have charted, right?

11    That's a significant statement, right?

12    A.    Well, when you say "would have," I mean, they

13    should have.   Whether they would have, sometimes things

14    are left out that should be put in there.

15    Q.    And from your review of this case, to be fair to

16    the judge and the jury, you would certainly state that

17    regardless of whether or not Dr. Dovale was told of

18    numbness from the neck down, he would independently

19    investigate that aspect of this case, wouldn't he?

20    A.    Yes.

21    Q.    Okay.   And from your review of this case,

22    Dr. Dovale did investigate whether or not the patient had

23    numbness; is that correct?

24    A.    His chart does not address that.

25    Q.    What about his deposition?

1     Q.   And had they found it, it was certainly the --

2  it would be a breach of the standard of care for them not

3  to record it?

4     A.   Well, what I was -- what I was saying before

5  with the paramedics is that they often don't do that fine

6  of a neurological exam, so sometimes they don't -- they

7  don't do -- get that -- quite that much detail.

8     Q.   Do you remember my question?

9     A.   You said --

10          MR. CROSLEY:  Objection, argumentative.

11     A.   I remember your question.  I --

12     Q.   (By Mr. Gault)  Doctor, it would have been a

13  breach of the standard of care for these paramedics not

14  to have recorded any objective findings of numbness from

15  the neck down if they could determine it; is that

16  correct?

17     A.   If they -- if they had a significant finding on

18  the physical exam, they should include it in their

19  report.

20     Q.   And you do know that the EMS reassessed the

21  complaint of numbness from the neck down, right?

22     A.   They made a note of it in their -- in their

23  charting.

24     Q.   Okay.  And they did not ever record any

25  objective finding of it?

1    A.    They didn't record any objective finding of it.

2    They also did not record any objective testing of it,

3    either -- or detailed testing of it.

4    Q.    Well, let's talk about that, then.  Do you see

5    that the EMS recorded Mr. De Leon's motor response?

6    A.    Yes.

7    Q.    Okay.  What is "motor response"?

8    A.    They -- on their best motor response, they have

9    6, which "obeys spontaneously."

10    Q.    And what they're doing here is they're seeing

11    whether or not he can move his extremities, right?

12    A.    Yeah, with -- what that infers is that if you

13    ask him to -- to "move your hand," you move your hand.

14    Q.    Okay.  They're doing -- this is a neurological

15    check; is that right?

16    A.    That is a -- that is a type -- that is a part of

17    the neurological check.

18    Q.    That's part of the Glasgow coma scale --

19    A.    Yes.

20    Q.    -- right?  By the way, Mr. De Leon received a

21    normal finding on his Glasgow coma scale, didn't he?

22    A.    No.

23    Q.    Well, he received a 14, which is the highest

24    finding you could have, right?

25    A.    No.

1      Q.   Well, it's 13 out of 15 is the top finding,

2  isn't it?

3      A.   15 is normal.

4      Q.   15 is -- 15 is -- is totally perfect?

5      A.   15 is normal.

6      Q.   13 out of 15 gives you the top score on the

7  Glasgow coma scale?

8      A.   The Glasgow coma scale, 15 is normal.  Anything

9  below 15 is not normal.  The range they're giving as 13

10  to 15 is a tool used to say that although it's not

11  normal, it's not indication of a serious neurological

12  brain injury.

13      Q.   And that was the EMS finding in this case, that

14  there was --

15      A.   Yeah.

16      Q.   -- no serious neurological brain injury?

17      A.   Not a serious one.

18      Q.   Okay.  Now, he also -- Mr. De Leon also received

19  the highest trauma score that he could get, right?

20      A.   Let's see.  Where's the trauma score?  Where is

21  that on here?

22      Q.   "Revised trauma score."

23      A.   Oh.

24      Q.   Right here.

25      A.   Okay.  Yeah, he got a 12 on that.

1    Q.   A 12 out of 12, right?

2    A.   Yeah.

3    Q.   Which means that he did not suffer any trauma

4    that they could determine?

5    A.   No major trauma.

6    Q.   No major trauma, right.  Would you even

7    consider, from what you see here, as his injury severity

8    being a possible injury and a laceration to the

9    forehead -- would you even consider this a trauma case?

10   A.   Yes.

11   Q.   Okay.  So any -- any type of automobile

12   accident, you consider it a trauma case?

13   A.   Yes.

14   Q.   Okay.  Now, back on the Glasgow coma scale, the

15   one point he had deducted from his perfect score was

16   because he was disoriented and converses; is that

17   correct?

18   A.   Correct.

19   Q.   Do you know the cause of that?

20   A.   No.

21   Q.   Okay.  You had --

22   A.   I have speculation, but I don't know the actual

23   cause.

24   Q.   Well, I'm not going to ask you to speculate.  Do

25   you have any evidence that it's related to a neurological

1    injury or alcohol ingestion or anything else?

2        A.    I do have some evidence that it's related to

3    alcohol.

4        Q.    Okay.  And what is your understanding of what

5    Mr. De Leon's blood alcohol content would have been on

6    Christmas Eve night when he had this automobile accident?

7        A.    I can't give you a number.  But based on the

8    descriptions, it sounds like he would be above the

9    legally drunk level.

10       Q.    Well, way beyond legally drunk, right?

11       A.    Probably significantly above it.

12       Q.    Have you seen any testing of Mr. De Leon's blood

13    alcohol content anywhere in this case?

14       A.    No.

15       Q.    Okay.  And you -- of course, you were not given

16    the reports from the Brownsville Police Department as to

17    whether or not he took the Breathalyzer test, right?

18       A.    I have no information from the police.

19       Q.    Okay.  Is there anything about the injuries that

20    he would have -- that we know he has now, that would have

21    kept him from blowing in the Breathalyzer test?

22       A.    If he was speaking as much as they're saying he

23    was, he would physically be able to do it.  If he was a

24    little confused, as far as getting him to cooperate to do

25    it well would have been the only question.

1    Q.    You listen to what other people have to say, but

2  you rely on yourself; is that true?

3    A.    Yes.

4    Q.    Okay.  And while all this other information is

5  helpful, you want to go in and get your own details of

6  this patient; is that correct?

7    A.    Yes.

8    Q.    You ask the patient questions, right?

9    A.    I ask them questions.

10    Q.    Okay.  Similar to what Dr. Dovale did in this

11  case; is that right?

12    A.    Well, similar to what he's saying he did in

13  this -- in his testimony here.

14    Q.    In this answer?

15    A.    In his answer.

16    Q.    Okay.  So let me ask you this, Dr. Peters:  Do

17  you see any evidence in the December 24th, 1998, hospital

18  records that Mr. De Leon had any objective evidence of

19  numbness?

20    A.    No, I did not see any evidence that was the

21  objective evidence of numbness.

22    Q.    Okay.  Now, let me ask you -- you were telling

23  me earlier about some conversations you had with

24  Mr. Crosley.  Had -- have you been asked or been told

25  when you're going to do any further statements or

1   affidavits in this case?

2      A.   I -- I -- we're going to -- I'm going to be

3   doing an affidavit probably in the next couple of days.

4      Q.   Couple of days?

5      A.   Most likely.

6      Q.   Has he given you a deadline for that?

7      A.   No.

8      Q.   Okay.  Are you planning on reviewing any

9   additional material than you've already reviewed in this

10   case?

11      A.   No.  I'm just going to review in a little more

12   detail, but the same material that I already have, that

13   you have, also.

14      Q.   Okay.

15      A.   Nothing new or different.

16      Q.   Okay.  And -- or -- is he going to talk to you

17   about this before you sign your affidavit?

18      A.   I don't -- I don't -- we don't have anything

19   planned to talk.  We may talk, but I don't know if -- we

20   don't have anything planned at this point.

21      Q.   What's your understanding of the parameters of

22   what the affidavit needs to cover?

23      A.   Basically, the things that we've talked about

24   today here, just taking into account my opinion, now

25   including what Dr. Dovale has said in his statements and

1    what Mr. De Leon has said in his statements.

2        Q.    Okay.  You -- you've -- I noticed one of the

3    exhibits to your deposition is a deposition notice.

4        A.    Somewhere in there, yeah.

5        Q.    Okay.  Have you just gotten one notice for your

6    deposition?

7        A.    I've -- I think whatever one I brought here is

8    the one I had.

9        Q.    Have you been sent other deposition notices

10   other than the January 27th, 2004?

11       A.    I don't think I re- -- I did not receive one for

12   this month.  I -- I think this is the -- the only one I

13   have.

14       Q.    You're talking about Exhibit No. 3, I believe?

15   Is it 3, No. 3?  That's the same thing, right?

16       A.    I think it's the same thing.

17       Q.    You can look at it.  Take your time.

18       A.    Yeah, it looks like it's the same thing.

19       Q.    Okay.

20       A.    It's a copy of it.

21       Q.    Has -- as far as you know, has your deposition

22   been scheduled any other time?

23       A.    Yeah.  It was scheduled, oh, two or -- I think

24   two other times.

25       Q.    Have you ever cancelled these because of your

1    that you've received as an expert witness over the last

2    ten years?

3         A.    I don't have that with me.  It's -- there again,

4    I have that, my financial records, in my storage.  It's

5    not a significant amount compared to my income.  But if

6    that was very important to you, I could get it for you.

7         Q.    And that's something -- you have a C.P.A. do

8    your taxes, I assume, right?

9         A.    Yeah.

10        Q.    And that's something that's available to the

11   C.P.A.?

12        A.    I could get it through him.

13        Q.    Let's see.  We've gone through three -- I guess

14   two reports and one affidavit that you've given, and

15   there are no other reports or affidavits that you've done

16   up to this point; is that right?

17        A.    Um --

18        Q.    In this case.  I'm sorry.  In this case.  I

19   apologize.

20        A.    In this case, yeah.  What we've gone through

21   today is, from the best of my memory, is everything I've

22   done.

23        Q.    You've not seen any photographs?

24        A.    No, I've not seen any photographs.

25        Q.    You don't have any -- do you have any notes on

```
1        Q.   Well, do you remember what the x-ray finding was
2    there at BMC?
3        A.   I can't cite it wrote; but what I remember, it
4    did not show much significantly.
5        Q.   As a matter of fact, they read it as normal,
6    didn't they?
7        A.   Yes.  If my memory is correct, yeah, pretty
8    normal.
9        Q.   So when we talked about getting x-rays for
10   Mr. De Leon there at Valley Regional, if they're read as
11   normal, that doesn't do anything for you, does it?
12       A.   It -- it tells you that if the patient has
13   symptoms, it tells you it's probably a type of spinal
14   cord injury that -- well, they actually call it "spinal
15   cord injury without radiological evidence."
16       Q.   X-rays don't tell you about a patient's
17   symptoms?
18       A.   They sometimes can help explain or give you more
19   information about why they have the symptoms, but they
20   don't -- they don't actually let you know what the
21   symptoms are.
22       Q.   Well --
23       A.   They just --
24       Q.   -- in this case, a normal x-ray doesn't tell you
25   the patient's symptoms, do they?
```

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

1    A.    No, they do not.

2    Q.    With the x-ray being normal at Brownsville

3 Medical Center, had those same x-rays been done at Valley

4 Regional Medical Center, they would have served further

5 to have taken Mr. De Leon off his spinal precautions; is

6 that correct?

7    A.    They -- to remove someone -- they would not show

8 injury, most likely.  That's why I said I think they'd be

9 the same.

10           THE WITNESS:  Excuse me.

11    A.    The -- if you have normal x-rays, that tells you

12 that it's -- it lessens the chance of a serious spinal

13 cord injury, but does not eliminate it.  And it takes

14 more than that to make the decision that say, "Yes, this

15 patient doesn't have a spinal cord injury.  Take the

16 collar off and let him -- let him get up and walk out of

17 here."  So it gives you more information, but it still

18 does not give you enough by itself.

19    Q.    Okay.  And you've seen Dr. Dovale's testimony

20 that he did a neurological examination of the patient,

21 right?

22    A.    He -- in his deposition he stated he did an exam.

23    Q.    That's the clinical evidence you need to take

24 off his spinal precautions; is that correct?

25    A.    That's part of it.

1    Q.   Okay.  And he took a history from Mr. De Leon;

2    is that correct?

3              MR. CROSLEY:  Objection, misstates the

4    evidence.

5    A.   His history in his chart, basically, doesn't say

6    anything.   In his deposition, he says he did take a

7    history.

8    Q.   (By Mr. Gault)  Okay.  Dr. Dovale was the one

9    who made the call to take the patient off the spinal

10   precautions; is that correct?

11   A.   That's correct.

12   Q.   Okay.  Dr. Dovale felt that he had the

13   information that he needed in order to make that call; is

14   that correct?

15   A.   Yes.

16   Q.   Okay.  Now, you know, of course, Dr. Dovale is

17   an independent contractor; is that correct?

18   A.   That's my understanding.

19   Q.   Okay.  So you've worked at hospitals who've had

20   that same type of relationship with you; is that correct?

21   A.   Yes.

22   Q.   Okay.  You have not reviewed any policies or

23   procedures there from Valley Regional Medical Center; is

24   that correct?

25   A.   That's correct.

1    Q.    What is your definition of "negligence"?

2    A.    I would say my definition would be not doing

3    something that is needed to be done.

4    Q.    Okay.  And that's -- you -- you use that

5    definition when you've used that term in your reports or

6    in this case; is that correct?

7    A.    Yes.

8    Q.    Now, what governs the practice of nurses?

9    A.    What governs the practice of nurses?

10    Q.    Yes, sir.

11    A.    Kind of a broad question.  I would say the

12    standards of the nursing industry and -- that they're

13    teaching, and things like that.

14    Q.    Can you tell me the name of those?

15    A.    Of their -- I don't know the nursing

16    organizations.

17    Q.    Okay.  Have you reviewed any of those?

18    A.    Not -- not the organizational level, no.

19    Q.    Okay.  Have you reviewed any standards for

20    nurses?

21    A.    I have within hospital facilities, in particular

22    hospitals.

23    Q.    You're talking about policies and procedures?

24    A.    Policy, procedures, guidelines, things of that

25    nature.

1    Q.   Right.  Which you've not done in this case?

2    A.   Not for this case.

3    Q.   Are there any other standards that govern

4    nurses' practice?

5    A.   I mean, it's standards you get with health

6    professionals, you know, the standards of what's in their

7    community, the state, in the nation; and based on the

8    education, the -- and whatever happen -- specialties they

9    happen to be working in.

10   Q.   What are the state standards for the practice of

11   nursing?

12   A.   I mean, you're talking very broad here.  We're

13   talking answers that come in big, thick binder books.  So

14   it's difficult for me to answer your question.

15   Q.   Do you know the names of any of those?

16   A.   No, I can't name them.

17   Q.   And you have not reviewed any of those; is that

18   correct?

19   A.   Not at that level, no.

20   Q.   Well, at what -- other than your hospitals, you

21   have not reviewed any nursing standards; is that correct?

22   A.   Not beyond the hospitals I've worked at.

23   Q.   Okay.  And you -- you have not cited any of the

24   hospitals' standards where you've worked at in -- in this

25   case; is that correct?

1    A.    I've not referred to them.

2    Q.    Okay.  You're not going to testify as to the

3  Nurse Practice Act; is that correct?

4    A.    I'm -- I can't define, or I'm not familiar with

5  the Nurse Practice Act.

6    Q.    You're not familiar with it?

7    A.    No.

8    Q.    Okay.  Let me ask -- we had a double negative.

9  Is it true -- is it correct to say that you're not

10  familiar with the Nurse Practice Act?

11    A.    I am not familiar with the Nurse Practice Act.

12    Q.    Okay.  Thank you.  And you don't plan on

13  testifying to the jury concerning the Nurse Practice Act?

14    A.    I have no knowledge of it right now.

15    Q.    Okay.

16    A.    So I can't say any comment on it.

17    Q.    Okay.  This is the second deposition you've

18  given?

19    A.    Yes.

20    Q.    And have you testified at trial?

21    A.    No.

22    Q.    Okay.  Let me read something to you.  If the

23  jury hears this:  "Despite plaintiff's pleas, he was

24  handcuffed, dragged into the police unit, allowing his

25  head to flop onto the floor of the back of -- of the unit

```
1    whatsoever?
2              MR. CROSLEY:  Objection, argumentive.
3         A.   I have done my best to give honest answers, in
4    my opinion.
5         Q.   (By Mr. Gault)  So answer my question.  Have you
6    misled this jury whatsoever?
7              MR. CROSLEY:  Objection, asked and
8    answered?
9         A.   Not to my knowledge.
10        Q.   (By Mr. Gault)  Okay.  Now, let me ask you.
11   You're giving your -- your testimony today is treated by
12   the American Medical Association as the practice of
13   medicine; is that correct?
14        A.   What are you asking?  I'm sorry.
15        Q.   Sure.  The AMA treats what you're doing here
16   today, giving your testimony, as the practice of
17   medicine; is that correct?
18        A.   I'm not sure what the AMA's position is --
19        Q.   Well, you've been --
20        A.   -- on what I'm doing today.
21        Q.   Excuse me?
22        A.   I'm not sure what the official AMA --
23        Q.   You treat this, giving medical legal testimony,
24   as the practice of medicine, don't you?
25        A.   It's, I guess, a type of medicine, reviewing
```

1    cases, yes.

2         Q.   Right.  And you take this with the same

3    seriousness that you do in treating patients; is that

4    correct?

5         A.   Yes.

6         Q.   And you certainly have no objection to your

7    testimony today being peer reviewed; is that correct?

8         A.   That -- I have no objection to that.

9              MR. CROSLEY:  What number are we on?

10             MR. CROSLEY:  18.

11             THE REPORTER:  18.

12        Q.   (By Mr. Gault)  Now, you've been a member of the

13   AMA for a long time; is that correct?

14        A.   I'm not a member of the AMA.

15        Q.   You have been a member of the AMA for a long

16   time; is that correct?

17        A.   No.

18        Q.   Well, how long have you -- were you a member of

19   the AMA?

20        A.   I haven't been a member of the AMA for a number

21   of years.

22        Q.   When is the last time you were a member of the

23   American Medical Association?

24        A.   I don't know the exact date.  Probably five, six

25   years ago.  I'm a member of the Texas chapter, but not of

1    Q.   All right.  Now, would you agree, Doctor, that

2    the minimum statutory requirements for qualifications as

3    an expert witness should reflect that the witness is

4    required to have comparable education, training, and

5    occupational experience in the same field as the

6    defendant?

7    A.   Yes.

8    Q.   Okay.  Now, do you have education in the same

9    field as Nurse Wright?

10    A.   I have not been trained as a nurse; so, no.

11    Q.   Do you have training in the same field as Nurse

12    Wright?

13    A.   No, I'm not trained as a nurse.

14    Q.   Okay.  Do you have occupational experience in

15    the same field as Nurse Wright?

16    A.   Not as a nurse.

17    Q.   Okay.

18    A.   As a -- in emergency medicine, I have, yes.

19    Q.   As a doctor?

20    A.   As a doctor.

21    Q.   You have much more extensive training than Nurse

22    Wright would have; is that correct?

23    A.   I more more extensive and different training.

24    Q.   And different.  That's correct.  Now, so, based

25    upon what we talked about earlier as the minimum

```
 1    statutory requirements for qualification as an expert
 2    witness as far as Nurse Wright is concerned, you would
 3    not meet that criteria, would you?
 4                    MR. CROSLEY:  Objection.  That -- improper
 5    question of this witness.
 6         A.    Well, also, as part of my practice, I have been
 7    practicing as an administrator in emergency medicine; and
 8    in that capacity I do -- I am involved with the nursing
 9    staff in that sense.
10         Q.    (By Mr. Gault)  Well, you told us earlier you
11    didn't have comparable education, training, or
12    occupational experience as Nurse Wright; is that correct?
13         A.    That's correct.
14         Q.    And I said based upon what you agreed to
15    earlier, then, you would not qualify for the minimum
16    statutory requirements for qualification as an expert
17    against him.  Is that a fair statement?
18                    MR. CROSLEY:  I'm going to object to the
19    question, in that it's not up to this witness to
20    determine whether or not he's qualified as an expert.
21    It's up to the court.
22         A.    With my experience and training and position,
23    I -- I believe I have a knowledge to understand what the
24    training and expectations are of nursing staff for
25    emergency departments.
```

Q.    How long have you been an administrator?

A.    I've been doing administration for -- this is the start of my third year.

Q.    So since 2002?

A.    2002.

Q.    So when you gave your report in 2000, you did not have those qualifications.  Is that a fair statement?

A.    I was not actively doing an administrative position at that time.

Q.    Now --

The VIDEOGRAPHER:  Excuse me, Counsel.  I have about ten minutes left on tape.

MR. GAULT:  Go ahead, change it.

THE VIDEOGRAPHER:  We're off the record at 1:11 p.m.

(Brief recess taken.)

THE VIDEOGRAPHER:  Beginning Tape 3 of the deposition.  We're back on the record at 1:12 p.m.

Q.    (By Mr. Gault)  Dr. Peters, will you agree that a physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence or engaging in false -- I'm sorry -- engaging in fraud or deception to the appropriate entities?  Would you agree with that

1    arrived, that's what they should be presenting when they

2    came in.  So that's what that represents.

3         Q.    Should have?

4         A.    Well, that's -- that's the -- that's where I got

5    that from, was from the paramedic record.

6         Q.    Okay.  Well, earlier you were shown a hospital

7    policy; and you were criticizing whether or not the EMS

8    report was in the chart.  Was it in the chart or not?

9         A.    It was in the chart when I reviewed it.

10   Dr. Dovale says it was not in the chart when he had

11   access to it.

12        Q.    Okay.  Well, he was -- he was in there before

13   the EMS ever even left the hospital, wasn't he?

14        A.    Yes.

15        Q.    Okay.  Now, the -- the guideline, the hospital

16   guideline you were talking about earlier, do you think

17   you misled the jury on what that states?

18        A.    What -- what particular are you talking about?

19        Q.    Yeah.  Let's look at your exhibit here that you

20   were referring to when you were talking to Crosley.

21        A.    And what is your question with this?

22        Q.    The first sentence says: "EMS makes readily

23   available to the emergency department a copy of the

24   ambulance record."  Do you have any evidence that that

25   was not done?

1    A.    No, I don't have evidence that was not done.

2    Q.    Okay.  And Mr. De Leon was in the hospital and

3    out within 25 minutes; is that correct?

4    A.    I don't know the exact time, but it was

5    something close to that amount.

6    Q.    Right.  And the EMS didn't even finish filling

7    out their paperwork until after that time; is that

8    correct?

9    A.    The time the patient left and the time the

10   paperwork was done appeared to be pretty close to about

11   the same amount of time.  EMS record was about three

12   minutes later.

13   Q.    Three minutes later.  That's a fair statement to

14   the jury, right?

15   A.    Well, the times in the charts, three minutes

16   difference.

17   Q.    Right.  And so what I said to the jury was

18   absolutely correct, right?

19            MR. CROSLEY:  Objection, argumentative.

20   A.    What statement was it that you said to the jury?

21   Q.    (By Mr. Gault)  By the time Dr. Dov- -- I'm

22   sorry -- Mr. De Leon left, the EMS had not even completed

23   their paperwork, had they?

24   A.    According to the times in the chart, no.

25   Q.    Okay.  Now, this -- it says: "This copy (pink)

1   is to be attached to the Emergency Department Medical

2   Record."  You have no evidence to say that it was not, do

3   you?

4        A.   No, I don't.

5        Q.   Okay.  Is there anything else in this -- what

6   exhibit number is this, sir?

7        A.   13.

8        Q.   Okay.  Is there anything else in this Exhibit

9   No. 13 that in some way you find critical of the

10  hospital?

11       A.   Beyond what we discussed, no.

12       Q.   No.  I'm talking about -- we -- you and I have

13  not discussed anything where you found it was critical of

14  the hospital.  Is there something in here that some way

15  forms a criticism of the hospital?

16       A.   Right now I don't see anything else that I can

17  say is critical to the hospital.

18       Q.   Okay.  So -- well, you said "anything else."  Is

19  there anything in there that you see that can some way

20  form a criticism of the hospital in this case?

21       A.   And so your question is anything I can find

22  critical of the hospital?

23       Q.   Out of this exhibit.

24       A.   Oh, out of this exhibit?

25       Q.   Yes, sir.

1      A.    Nothing else right now.

2      Q.    Well, you said "nothing else."  I'm saying is

3   there anything, period.  What about this policy in any

4   way forms a criticism of what the hospital did?

5      A.    The -- the ambulance record was placed on the

6   chart.  So this -- looks like this was met.

7      Q.    Okay.  So was talking about policy E.D. 2490

8   earlier, was that just a complete waste of the jury's

9   time in this case?

10           MR. CROSLEY:  Objection, argumentative.

11     Q.    (By Mr. Gault)  Was it?

12     A.    I -- it was -- I don't know if it was a waste of

13  time or not.  It was a discussion to check the EMS record

14  procedure, getting it to the chart.

15     Q.    It was not meant -- the discussion of E.D. 2490

16  was not meant as a criticism of the hospital.  Is that a

17  fair statement?

18     A.    I don't know what it was meant for.  I was just

19  reviewing to see if this was a -- the policy, which was

20  handed to me, so I read it while we were there; and that

21  the record needs to be put in the chart.

22     Q.    As far as you can tell, it was?

23     A.    Yes.

24     Q.    Okay.  So -- by the way, Dr. Peters, you had

25  never been shown that document?

1    A.    No, I saw this -- it was -- when we stepped

2    outside during the break is -- it was flashed in front of

3    me, but I didn't really read it.  So the first time I

4    really had a chance to look at it was when I came back

5    in.  So it was today during this deposition --

6    Q.    I see.  So Mr. Crosley asked his questions of

7    you earlier today, and then I believe I did and Ms. Sage

8    did, and then we took a break; and that's the first time

9    you had ever seen this document?

10   A.    Yes.

11   Q.    Okay.  You understand that -- or you have never

12   put criticisms of any of the hospital's policies or

13   procedures in either of your two reports or the affidavit

14   in this case; is that correct?

15   A.    That's correct.

16   Q.    And certainly for you to come up with opinions

17   during the middle of your deposition on things you had

18   never seen would be an unfair way to be an expert

19   witness, at least against my client, wouldn't you agree?

20             MR. CROSLEY:  I'll object.  That's

21   argumentative and -- argumentative.

22   A.    If information is given to me and asks me my

23   opinion, I'll give it.  The fairness, I -- you know,

24   I don't know the -- the rules of your -- of sharing the

25   information well enough to tell if that's a standard or a

1  break from standard in your procedures.

2      Q.   (By Mr. Gault)  That brings up a good point.  If

3  the rule says -- let me show you what one particular rule

4  says.

5              MR. GAULT:  Let's just mark this as Exhibit

6  No. 18.

7              (Peters Exhibit No. 18 was marked.)

8      Q.   (By Mr. Gault)  If a rule says on expert

9  disclosure -- if you could just read the blue part of

10  that rule.

11              Have you read that, Doctor?

12      A.   Yeah, I did just now.

13      Q.   Okay.  If the rule says the report -- it talks

14  about disclosure of expert testimony.  You saw that part

15  of it, right?

16      A.   Yes.

17      Q.   "The report shall contain a complete statement

18  of all opinions to be expressed and the basis and reason

19  therefor; the data or other information considered by the

20  witness in forming the opinions," and then it goes on.

21  But did I read that correctly?

22      A.   Yes.

23      Q.   Okay.  You've given two reports and an

24  affidavit; is that correct?

25      A.   Yes.

1    Q.    In none of those three documents did you make

2  any statement that you had ever reviewed any hospital

3  policies or procedures, did you?

4    A.    I do not mention any hospital policies or

5  procedures in those.

6    Q.    Okay.  Your three previous reports -- that's two

7  reports and an affidavit -- were complete and accurate;

8  is that correct?

9    A.    Complete and accurate as I can make it at the

10  time --

11    Q.    Sure.  And in none of them did you have any

12  criticisms of the hospital in regard to their treatment

13  of Mr. De Leon.  Is that a fair statement?

14    A.    Yes, it is.

15    Q.    Okay.  The first time anyone knew of any

16  criticism you might have of the hospital treatment of

17  Mr. De Leon was today during your deposition; is that

18  correct?

19    A.    Yes.

20    Q.    Okay.  Now, do you think that's fair?

21    A.    By the information -- the further information I

22  was getting, I've gotten in the last few days.  So I

23  guess the only other way to have handled it was to delay

24  the deposition again.

25    Q.    Do you have any idea how long Mr. Crosley had

1       Q.    The nurse did a neurological exam, didn't she --

2  didn't he?

3       A.    Did a partial one.

4       Q.    That's part of the neurological exam, right?

5       A.    It's part of one, yes.

6       Q.    And Dr. Dovale, you saw where he documented part

7  of a neurological exam.  Specifically documented that.

8       A.    Are you referring to -- what part?

9       Q.    Well, we went over it earlier.  Remember talking

10  about his head, eyes, ears, throat, things like that?

11       A.    That would be a very incomplete part of the

12  exam.

13       Q.    There's a difference between partial and none,

14  right?

15       A.    Yes.

16       Q.    "None" means none whatsoever, and "partial"

17  means it's some, right?

18       A.    Yes.

19       Q.    You've practiced at Mt. Graham Community

20  Hospital?

21       A.    Yes.

22       Q.    Okay.  And as practicing at Mt. Graham Community

23  Hospital, certainly you're familiar with the paperwork

24  that they do there at Mt. Graham Community Hospital,

25  right?

1     A.    It's been years since I practiced there.

2     Q.    When is the last time you practiced there?

3     A.    Probably around 1994.

4     Q.    Uh-huh.  And at least back at that time you were

5     familiar with the paperwork that they did at Mt. Graham

6     Community Hospital, right?

7     A.    In 1994 I was.

8                (Peters Exhibit No. 19 was marked.)

9     Q.    (By Mr. Gault)  Sure.  And what I'm showing you

10    as Exhibit 19, that's a condition of admission from

11    Mt. Graham Community Hospital, isn't it?

12    A.    It does look like that, yes.

13    Q.    Uh-huh.  On No. 1 there on the first page, I'm

14    reading the second -- third sentence that says:  "The

15    undersigned recognizes that all physician -- physicians

16    furnishing services to the patient, including the

17    radiologist, pathologist, anesthesiologist, consultant

18    and the like may be independent contractors and neither

19    employees nor agents of the hospital."  That's -- that

20    was the way Mt. Graham did its conditions of admissions

21    back in -- when you practiced there; is that correct?

22    A.    I -- probably.  I -- I don't remember reviewing

23    the consent forms back then, but --

24    Q.    Your hospital --

25    A.    I was an independent contractor, yes, if that's

1    what you're asking.

2        Q.    Okay.  And Mt. Graham was also -- it was also

3    their position that the patient's care is under the

4    control of his attending physicians.  Did I read that

5    right?

6        A.    Yes.

7        Q.    That's certainly the way it was while you were

8    there; is that correct?

9        A.    Yes.

10       Q.    Okay.  And as an emergency room doctor, you were

11   the attending physician; is that correct?

12       A.    Yes.

13       Q.    You took control of your patients, didn't you?

14       A.    Yes.

15       Q.    All right.  Now, what level of blood alcohol

16   content in a person causes numbness?

17       A.    It depends on the person and how much --

18   probably how much drinking experience they have, and on

19   the person in particular.  So --

20       Q.    For example, with Mr. De Leon, what would you

21   expect his blood alcohol level to be before he would have

22   numbness?

23       A.    Probably something over 150, but that's a guess.

24       Q.    Over -- in other words 0.15?

25       A.    Yeah.

1      Q.   Okay.  All right.  Now, let me talk to you about

2   another -- what's required in a report.  If a -- if a --

3   a particular report requires at that you put in an

4   applicable standard of care in the manner in which the

5   provider failed to meet the standard of care, and the

6   causal relationship between that failure and the injury,

7   is it a fair statement that you have not included any of

8   that in your two reports or your affidavit as far as

9   Valley Regional is concerned?

10              MR. CROSLEY:  Object to the predicate being

11   improper.

12      A.   I'm sorry.  What was your premise with this?

13      Q.   (By Mr. Gault)  Yes, sir.  In none of your three

14   reports that you've done in this case did you include an

15   applicable standard of care for Valley Regional.  Is that

16   a correct statement?

17      A.   An applicable standard of care, I assume that

18   means what I'm -- you're saying the comments on their

19   standard of care?

20      Q.   Yes, sir.

21      A.   Okay.  I did not make comments on their standard

22   of care.

23      Q.   Okay.  You also did not include in any of your

24   three reports how the nurse failed to meet that standard

25   of care; is that correct?

1      A.    That is correct.

2      Q.    And you also did not include in any of your

3  three reports the cause -- causation analysis as to the

4  nurse's failure to meet the standard of care, how that

5  caused an injury.  Is that a fair statement?

6      A.    That's true.

7      Q.    All right.  Now, some of the other things you

8  covered at the break, you were shown some -- some

9  hospital guidelines; is that correct?

10     A.    Yes.

11     Q.    Were you shown all of the hospital guidelines

12  that Valley Regional has produced in this case?

13     A.    No.  There was -- I think there were more than

14  the few pages that I saw.

15     Q.    Were you only shown the ones that you talked

16  about with Mr. Crosley, or were you shown some other

17  ones?

18     A.    I think I was shown less than what we talked

19  about when we came back in the room.

20     Q.    Okay.  So some of them in your testimony here,

21  you saw them for first time as you were testifying?

22     A.    Yes.

23     Q.    Okay.  So, in other words, if we produced, gosh,

24  15, 20, or so, policies and procedures, you haven't seen

25  all them, have you?

# *Nick Peters, MD FACEP*
## *7600 Beechnut*
## *Houston, Texas 77074*

February 8, 2004

Tom Crosley
Branton & Hall
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, Texas 78205

Dear Mr. Crosley,

Upon your request I Nick Peters, MD a licensed practicing physician board certified in Emergency Medicine have reviewed the medical records of Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits, for December 24, 1998 and December 25, 1998, as well as hospital records. My opinions herein are based upon my education, training, experience, and knowledge of the care and diagnosis of spinal cord injuries and Emergency Medicine.

I received my Doctor of Medicine degree from Creighton University School of Medicine in Omaha, Nebraska, in 1991. I did an internship and began a residency in Emergency Medicine at UCLA King/Drew Medical Center, Los Angeles, California from 1991 to 1993. I finished my residency in Emergency Medicine at the University of Arizona, in Tucson Arizona from 1993-1994. I practiced Emergency Medicine at Baylor Medical Center at Garland since successfully completing my Residency until December 2003. In January 2004 I began my practice at Memorial Herman Southwest Hospital as the Medical Director of Emergency Medicine. As part of my daily practice I evaluate patients with suspected spinal cord injures.

Mr. DeLeon was a 57 year old male involved in a motor vehicle collision the evening of December 24, 1998. Paramedics found him unable to get out of the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immmobilization and strapped to a back board. On arrival the Emergency Department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down. On the Conditions of Admission form from the hospital was printed "Pt. unable to sign due to medical condition", instead of Mr. DeLeon's signature. Dr. Joao Dovale examined the patient and stapled a facial laceration. The patient was taken off spinal precautions and Dr. Dovale noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes. On the discharge paperwork instead of Mr. DeLeon's signature was printed, "pt. can't sign".

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center Emergency Department with "back pain", "numbness in body" and "can't move legs". Paramedics brought him from the jail. After multiple x-rays were performed including cervical, dorsal and lumbar spine CT and MRI a diagnosis of "acute spinal cord injury", "cervical cord compression" was made. The patient was admitted for further care and



evaluation of his quadriplegia.

After my review of the records available, I believe the medical care rendered to Mr. DeLeon fell below minimal standards.  The incidences and reasons form my opinion are as follows:

On the first Emergency Department encounter the patient was removed from spinal precautions prematurely.  The standard of care to remove a patient from spinal precautions require a patient to be awake, alert with no distracting injuries and no mind altering substances in the patients system.  With these conditions met the physician can assess spinal stability after a careful normal neurological and spinal exam, often including x-rays and occasionally special studies or consulting opinions.  In my opinion Dr. Dovale did not follow standard of care by not performing a neurological examination or spinal exam.  Also the patient had a mind altering substance in his system as noted by Dr. Dovale as being "obviously drunk".  No x-rays were done to even attempt to find the cause of the patient's compliant of numbness.  The patient was prematurely discharged from the Emergency Department.  With spinal cord injuries the early use of steroids is needed for treatment.  By the time the patient's condition was diagnosed a day later steroid treatment would have limited benefit.  In my opinion these deviations from the standards of care and failure to treat are the major contributing causes of Mr. DeLeon's spinal cord injury.

In summary, it is my professional opinion the care for Mr. DeLeon fell substantially below the standards of care at the Emergency Department at Columbia Valley Regional Medical Center.  Reasonable care would have protected the spinal cord from further injury.  As a result of these breaches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

Please do not hesitate to contact me if there are additional records for review or if there are additional questions which need to be addressed.

Sincerely,


Nick Peters, MD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

| | |
|---|---|
| State of Texas | § |
| County of Bexar | § |

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of the report of Nick Peters, M.D., and is attached hereto as exhibit "E".

SIGNED this the 11th day of January, 2002.

CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this 11th day of January, 2002.

NOTARY PUBLIC, State of Texas
My Commission Expires: 09-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

Peters

EXHIBIT NO. 2

5/26/04

**Nick Peters, MD**
**2300 Marie Curie Rd**
**Garland, Texas 75042**
**(972) 562-8541**

November 10, 2000

Carol Lomax
Branton & Hall
737 Travis Park Plaza Building
711 Navarro, Suite 737
San Antonio, Texas 78205

Re: Candelario DeLeon  9827

Dear Ms Lomax,

I, Nick Peters am a licensed physician Board Certified in Emergency Medicine. I have reviewed the medical records sent from your office relating to the care of Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998. Also, I was provided the inpatient hospital records for his admission from his December 25, 1998 arrival to his discharge on January 6, 1999. Mr. DeLeon was brought back for other medical problems on January 8 and was discharged on January 29, 1999.

As you know, Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998. Paramedics found him unable to get out of the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a back board. On arrival to the emergency department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down. Dr. Dovale Joao examined the patient and stapled a facial laceration. The patient was cleared from spinal precautions and Dr. Joao noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes at 2030.

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center emergency department with" back pain", "numbness in body" and "can't move legs". Paramedics brought him from the jail to the hospital on a backboard without a cervical spine collar. Dr. Nagarjun Narra applied a C-collar but when the patient returned from x-ray the collar had been removed. Later the cervical collar was replaced. After

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 2

multiple x-rays were performed including cervical, dorsal and lumber spine, CT and MRI a diagnosis of acute spinal cord injury, cervical cord compression was made. The patient was admitted for further care and evaluation of his quadriplegia.

He was discharged from the hospital for supportive care and therapy, to be brought back 2 days later on January 8, 1999 for an infection and was later discharged again on January 29, 1999.

After my review of the records available, I believe several times the medical care rendered to Mr. DeLeon fell below expected standards. The incidences and reasons for my opinion are as follows:

1.      On the first emergency department encounter the patient was removed from spinal precautions prematurely. To safely remove a patient from such precautions, he must be awake, alert with no distracting injuries and no mind altering substances substances in the patient's system. Then the physician can access spinal stability after a careful normal neurological and spinal exam. Often needed are x-rays and occasionally special studies or consulting opinions . Dr. Joao did not document a neurological examination, or a spinal exam. The patient had a mind altering substance in his system as noted by the physician as "obviously drunk". No x-rays where done to even attempt to find the cause of the patient's compliant of numbness. In my opinion this gross negligence was a major contributing cause of Mr. DeLeon's spinal cord injury.

2.      When the paramedics arrived to care for Mr. DeLeon at the jail on December 25, 1999, they put him on a back board, but no cervical collar. With his cervical spine unstabilized he was at high risk of further unnecessary injury while being transported. This deviation from the standards of care was a contributing cause of Mr. DeLeon's quadriplegia.

3.      When the patient arrived to emergency on December 25, 1999 Dr. Narra appropriately placed a cervical collar on Mr. DeLeon. Unfortunately when he returned from having his x-rays done the collar was off. Later it was put back on. Even with normal cervical spine x-rays, the spinal precautions must not be removed if their is evidence of a neurological deficit. At this time Mr. DeLeon had obvious signs of injury with decreased motor and sensory function. The removal of the collar at this point was a departure from acceptable medical standards demonstrating negligence and could have contributed to his ultimate spinal injury.

Carol Lomas
Re: DeLeon
Nov. 10, 2000
page 3

In summary, it is my professional opinion the care for Mr. DeLeon fell substantially below standards of care several times by various caretakers. Reasonable care would have protected the spine from further injury. As a result of these breeches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

Please do not hesitate to contact me if there are additional records for review or if there are additional questions which need to be addressed.

Sincerely,

Nick Peters, MD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-192 |
| | § | JURY REQUESTED |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |

## AFFIDAVIT

State of Texas      §
County of Bexar     §

BEFORE ME, the undersigned authority, personally appeared CAROL P. LOMAX who, being duly sworn, deposed and said:

"My name is Carol P. Lomax. I am an attorney licensed to practice law in the State of Texas. I am at least twenty-one years of age, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein and I have personal knowledge of each of the matters stated herein. The attached is a true and correct copy of Affidavit and Curriculum Vitae of Nick Peters, M.D., and is attached hereto as exhibit "B".

SIGNED this the 11th day of January, 2002.

_____
CAROL P. LOMAX

SUBSCRIBED and SWORN to before me on this 11 day of January, 2002.

_____
NOTARY PUBLIC, State of Texas
My Commission Expires: 07-02-03

CATALINA E. BARKER
Notary Public State of Texas
My Commission Expires
SEPTEMBER 02, 2003

Peters
EXHIBIT NO. 8
5/26/04

<u>AFFIDAVIT OF NICK PETERS, MD</u>

Before me, the undersigned authority, on this day personally

appeared Nick Peters, MD, who is personally known to me, and first

being by me duly sworn, according to law upon his oath, deposed

and said:

My name is Nick Peters, MD. I am of sound mind and fully competent to testify in the matter set forth herein. I am a licensed physician Board Certified in Emergency Medicine. I have reviewed the medical records relating to Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits with paramedic transportation records for December 24, 1998 and December 25, 1998. My opinions herein are based upon my education, training, experience, and knowledge of the care and diagnosis of spinal cord injuries.

I received my Doctor of Medicine degree from Creighton University School of Medicine in Omaha, Nebraska, in 1991. I did an internship and began a residency in Emergency Medicine at UCLA King/Drew Medical Center, Los Angeles, California from 1991 to 1993. I finished my residency in Emergency Medicine at the University of Arizona, in Tucson Arizona from 1993-1994. I have been practicing Emergency Medicine at Baylor Medical Center at Garland since successfully completing my Residency. As part of my daily practice I evaluate patients with suspected spinal cord injuries.

Mr. DeLeon was a 57 year old male involved in a motor vehicle collision in the evening of December 24, 1998. Paramedics found him unable to get out of the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immobilization and strapped to a back board. On arrival to the emergency department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down. On the Conditions of Admission form from the hospital was printed instead of Mr. DeLeon's signature, "Pt. unable to sign due to medical condition". Dr. Dovale Joao examined the patient and stapled a facial laceration. The patient was cleared from spinal precautions and Dr. Joao noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes. On his discharge paperwork instead of Mr. DeLeon's signature was printed, "pt. can't sign".

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center

emergency department with" back pain", "numbness in body" and "can't move legs".
Paramedics brought him from the jail to the hospital on a backboard without a cervical
spine collar. A C-collar was applied in the hospital, but when the patient returned from
x-ray the collar had been removed. Later the cervical collar was replaced. After
multiple x-rays were performed including cervical, dorsal and lumber spine, CT and
MRI a diagnosis of acute spinal cord injury, cervical cord compression was made.
The patient was admitted for further care and evaluation of his quadriplegia.

After my review of the records available, I believe several times the medical
care rendered to Mr. DeLeon fell below minimal standards. The incidences and
reasons for my opinion are as follows:

1.    On the first emergency department encounter the patient was removed from
      spinal precautions prematurely. To safely remove a patient from such
      precautions, he must be awake, alert with no distracting injuries and no mind
      altering substances in the patient's system. Then the physician can
      access spinal stability after a careful normal neurological and spinal exam,
      often including x-rays and occasionally special studies or consulting
      opinions . Dr. Joao did not document a neurological examination, or a spinal
      exam. The patient had a mind altering substance in his system as noted by the
      physician as "obviously drunk". No x-rays where done to even attempt to find
      the cause of the patient's compliant of numbness. In my opinion this deviation
      from standards of care is a major contributing cause of Mr. DeLeon's spinal
      cord injury.

2.    The patient was prematurely discharged from the Emergency department. Mr.
      De Leon complaining of numbness, and it clearly documented that he could not
      sign for his care in the hospital should have been reason not to discharge him.
      Instead he was discharged from the hospital in a wheelchair. There was no
      documentation from the Emergency Department staff or physician that the
      patient could walk. It was only documented he could not sign for himself
      because of his current medical condition.

3.    When the paramedics arrived to care for Mr. DeLeon at the jail on December
      25, 1999, they put him on a back board, but no cervical collar. With his cervical
      spine unstabilized he was at high risk of further unnecessary injury while being
      transported. This deviation from the standards of care was a contributing
      cause of Mr. DeLeon's quadriplegia.

4.    When the patient arrived to emergency on December 25, 1999 Dr. Narra
      appropriately placed a cervical collar on Mr. DeLeon. Unfortunately when he
      returned from having his x-rays done the collar was off. Later it was put back
      on. Even with normal cervical spine x-rays, the spinal precautions must not be
      removed if their is evidence of a neurological deficit. At this time Mr. DeLeon
      had obvious signs of injury with decreased motor and sensory function. The
      removal of the collar at this point was a departure from acceptable medical

standards and could have contributed to his ultimate spinal cord injury.

In summary, it is my professional opinion the care for Mr. DeLeon fell substantially below standards of care several times by various caretakers. Most notable the care he received in the Emergency Department at Columbia Valley Regional Medical Center. Reasonable care would have protected the spinal cord from further injury. As a result of these breaches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

_____
NICK PETERS, MD

Subscribed and sworn to before me o this, the ___9th___ day of January 2002.

_____
Notary Public, State of Texas



Marianne Kerr Estrada
Notary Public, State of Texas
My Commission Expires
Oct. 12, 2002

# Nick Paul Peters, MD
## 30 Secretariat Lane
## McKinney, Texas 75069
## (972) 562-8541

## PERSONAL

| | |
|---|---|
| Born: | Fairfield, California |
| Health: | Excellent |
| DOB: | October 22, 1964 |
| Marital Status: | Single |

## CERTIFICATION AND LICENSING

Diplomate of the American Board of Emergency Medicine
Texas Medical License        J7627

## CURRENT EMERGENCY MEDICINE PRACTICE

| | |
|---|---|
| Baylor Medical Center at Garland<br>Garland, Texas | Full time staff Emergency Physician<br>Over 40,000 visits/ year.  Involves<br>teaching in residency program.<br>1994 to present |
| Texoma Medical Center<br>Denison, Texas | Part-time Staff Emergency Physician<br>1995 to present |
| Baylor Medical Center at Richardson<br>Richardson, Texas | Part-time Staff Emergency Physician<br>1995 to present |
| Baylor Medical Center at Grapevine<br>Grapevine, Texas | Part-time Staff Emergency Physician<br>1996 to present |

## PAST EMERGENCY MEDICINE PRACTICE EXPERIENCE

| | |
|---|---|
| Sierra Vista Community Hospital<br>Sierra Vista, Arizona | Staff Emergency Physician<br>1994 |
| Raymond Bliss Army C Hospital<br>Fort Huachuca, Arizona | Staff Emergency Physician<br>1994 |
| Mt. Graham Community Hospital<br>Safford, Arizona | Staff Emergency Physician<br>1994 |
| Orthopaedic Hospital<br>Los Angeles, California | Staff Emergency Physician<br>1993 |

Nick Paul Peters, MD                    page 2

EDUCATION

| Residency-Emergency Medicine | Location | Degree/Date |
|---|---|---|
| University of Arizona | Tucson, Arizona | 1993-4 |

| Internship/Residency-Emergency Medicine | | |
|---|---|---|
| UCLA King/Drew Medical Center | Los Angeles, California | 1991-3 |

| Medical School | | |
|---|---|---|
| Creighton University School of Medicine | Omaha, Nebraska | MD 1991 |

| Colleges and Universities | | |
|---|---|---|
| University of San Francisco | San Francisco, California | BS 1987 |
| Sacramento City College | Sacramento, California | |
| Consumnes River College | Sacramento, California | |

ADMINISTRATIVE EXPERIENCE (outside of medicine)

| Animal Laboratory Manager | Institute of Chemical Biology | 1984-7 |
|---|---|---|
| Orientation Chairman | University of San Francisco | 1986-7 |

UNIVERSITY SERVICE

| Residency Admission's Committee | University of Arizona |
|---|---|
| Medical College Recruitment Program | Creighton University |
| Committee for Orientation, Advising and Registration | University of San Francisco |

PROFESSIONAL ORGANIZATIONS

American College of Emergency Physicians
Texas College of Emergency Physicians
American Medical Association

RESEARCH AND PUBLICATIONS

Chang, Enders, Sprengel, Peters, Varmus, Ganum: Expression of the precore region of an avian hepatitis B virus is not required for viral replication. Journal of virology Oct 1987.

Abstracts
Prediction of the severity of acute pancreatitis. Annals of Emergency Medicine Feb 94.

Medical control of mass gatherings: can paramedics perform without physicians on-site? Annals of Emergency Medicine May 94.

HOBBIES AND INTERESTS

Raising horses, running, fishing, and clarinet.

# American Medical Association
Physicians dedicated to the health of America

| HOME | JOIN / RENEW | CONTACT US | SITEMAP |

privacy statement   web guidelines

Search our site   Find

AMA Home > PolicyFinder

Results List

Search Tips
About AMA Policy
Download Policy Finder
Principles of Medical Ethics
AMA Strategic Plan and Vision
AMA History

## H-265.994 Expert Witness Testimony.

(1) Regarding expert witnesses in clinical matters, as a matter of public interest the AMA encourages its members to serve as impartial expert witnesses.

(2) Our AMA is on record that it will not tolerate false testimony by physicians and will assist state, county and specialty medical societies to discipline physicians who testify falsely by reporting its findings to the appropriate licensing authority. (3) Existing policy regarding the competency of expert witnesses and their fee arrangements (BOT Rep. SS, A-89) is reaffirmed, as follows:

(a) The AMA believes that the minimum statutory requirements for qualification as an expert witness should reflect the following: (i) that the witness be required to have comparable education, training, and occupational experience in the same field as the defendant; (ii) that the occupational experience include active medical practice or teaching experience in the same field as the defendant; and (iii) that the active medical practice or teaching experience must have been within five years of the date of the occurrence giving rise to the claim.

(b) The AMA believes that model state legislation should be developed making it illegal for medicolegal consulting firms to take a contingent fee in personal injury litigation. Such arrangements threaten the integrity and the compensation goals of the civil justice system. Like the individual expert witness, the role of the medicolegal consulting firm which locates and supplies experts should be one of limited service to the judicial process. Contingent fee arrangements are plainly inconsistent with the scope of this responsibility. Model legislation will be developed which would change state law where necessary to permit cross-examination in accordance with the "Trower" holding and to prohibit payment of contingent fees for all types of medicolegal consultations, including management services provided by firms engaged in locating physician consultants. (Reversing long-standing precedent, the Illinois Supreme Court in the case of Trower v. Jones, 121 Ill. 2nd 211 (1988) upheld a trial court's discretion to allow cross examination on the following issues: (i) the amount of compensation received for the expert's consultation and testimony; (ii) the frequency of the physician's expert witness activities; (iii) the proportion of the physician's professional time devoted to and income derived from such activities; and (iv) the frequency with which he or she testified for either plaintiffs or defendants.) (Sub. Res. 223, A-92; Appended: Sub. Res. 211, I-97; Reaffirmation A-99)



◀ prev / next
**Results** ▶   |   **Back to** results list   |   ◀ prev / next **Policy number** ▶

Search Tips |  New Search |  Refine Search



© Copyright 1995-2003 American Medical Association. All rights reserved.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON          ) (
                            ) (
        Plaintiff           ) (
                            ) (
VS.                         ) (   CIVIL ACTION NO.
                            ) (   CV-B-00-192
CITY OF BROWNSVILLE, TEXAS,) (
ET AL.                      ) (
                            ) (
        Defendants          ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
JOAO DOVALE, M.D.
MAY 19, 2004

---

        ORAL AND VIDEOTAPED DEPOSITION OF JOAO DOVALE,

M.D., produced as a witness at the instance of the

PLAINTIFF, taken in the above styled and numbered cause

on MAY 19, 2004, reported by JODY McWHORTER, RPR,

Certified Court Reporter No. 6095, in and for the State

of Texas, at the offices of Gonzalez, Gaytan, Garza &

Castillo, L.L.P., 1317 East Quebec, McAllen, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached therein.



EXHIBIT
D

Page 4

1           (Dovale Exhibit No. 1 marked)

2                 JOAO DOVALE, M.D.,

3    having been duly sworn, testified as follows:

4                     EXAMINATION

5    BY MR. CROSLEY:

6        Q.  Please state your full name.

7        A.  Joao Dovale, J-O-A-O, Dovale, D-O-V-A-L-E.

8        Q.  Do you have a middle name?

9        A.  M.  Medeiros.

10       Q.  Okay.  Where do you live?

11       A.  I live in McAllen, Texas.

12       Q.  What is your residence address?

13       A.  45 North -- 4500 North 5th Street.

14       Q.  My name is Tom Crosley.  I represent Candelario

15   De Leon in a lawsuit brought against you.  Do you

16   understand that?

17       A.  Yes.

18       Q.  You understand that you have been placed under

19   oath this morning to tell the truth, the whole truth,

20   and nothing but the truth --

21       A.  Yes.

22       Q.  -- as regards this matter?

23       A.  Uh-huh, yes.

24       Q.  Have you had the opportunity to review the

25   medical records regarding your treatment of Mr. De Leon?

Page 138

1    left-hand side of the page, what do you find there,

2    Doctor?

3        A.  Negative, no findings.  No abnormal findings;

4    negative.

5        Q.  Your discharge diagnosis, what's your discharge

6    diagnosis?

7        A.  A 1/2 centimeter laceration on the forehead.

8        Q.  That was what you found on him?

9        A.  That's what I found.

10       Q.  He was -- and then he was -- the discharge

11   instructions were given to the Brownsville Police

12   Department; is that correct?

13       A.  Correct.

14       Q.  Okay.  Dr. Dovale, while you're doing this

15   examination of Mr. De Leon, is the nurse also doing

16   their own examination?

17       A.  Yes.

18       Q.  Okay.  You're not relying on the nurse and the

19   nurse isn't relying on you?

20                MR. CROSLEY:  Objection, leading.

21       Q.  Is that correct?

22       A.  Correct.  That's correct.

23       Q.  Okay.  Are you both professionals who are doing

24   your own work?

25       A.  Yes.

Page 147

1.  see pain marked anywhere on this picture?

2.      A.  No.

3.      Q.  No. 12 says "Weakness."  Do you see weakness

4.  marked anywhere on the picture?

5.      A.  No, sir.

6.      Q.  No. 13 says "Decreased Sensation."  What is

7.  decreased sensation?

8.      A.  Numbness.

9.      Q.  Do you see --

10.      A.  He doesn't feel --

11.      Q.  Do you see that marked anywhere on the picture?

12.      A.  No.

13.      Q.  No. 14 says "Absent Sensation"?

14.      A.  No.

15.      Q.  Do you see that marked anywhere on the picture?

16.      A.  Yes; no.

17.      Q.  No. 18 says "Paralysis."  Do you see that marked

18.  anywhere?

19.      A.  No, sir.

20.      Q.  No. 19 and 20 are left blank where you can add

21.  additional things?

22.      A.  Add additional things.

23.      Q.  You don't see any of those marked?

24.      A.  No.

25.      Q.  Now, Dr. Dovale, I think you said it earlier,

Page 148

1  but even though -- even though you're doing your

2  examination of the patient and the nurse is, are you

3  relying on the nurse to do that?

4       A.  No, sir.

5       Q.  You're doing your own examination?

6       A.  I do my own in depth.

7       Q.  The nurse isn't looking to you for -- to do his

8  examination, right?

9       A.  No.

10      Q.  Okay.  He's doing his own examination?

11      A.  Exactly.

12      Q.  And the EMS did their examination long before

13 they got to the hospital, right?

14           MR. CROSLEY:  Objection, leading.

15      A.  Yes.

16      Q.  Okay.  Now, let me read you from a report of a

17 man named Zeff Ross, dated June 28, 2001.  In his

18 statement here it says, "The examination findings

19 documented for the eyes, heart, lung and abdomen were

20 normal, with no findings recorded for the neurological

21 examination or extremities."  Is that a true statement?

22      A.  Yes.

23      Q.  Well, were there -- are you saying "no findings"

24 means that you've had normal findings?

25      A.  Normal findings; not significant abnormal

Page 1

1 .                FOR THE SOUTHERN DISTRICT OF TEXAS
                        BROWNSVILLE DIVISION
2

     CANDELARIO DE LEON            )
3                                  )
     VS.                           ) CIVIL ACTION NO. CV-B-00-192
4                                  )
     COLUMBIA VALLEY HEALTHCARE)   (JURY REQUESTED)
5    SYSTEM, L.P. D/B/A VALLEY )
     REGIONAL MEDICAL CENTER,  )
6    JOAO DOVALE, MD. AND STAT )
     PHYSICIANS, P.A.             )
7

8

     ****************************************************
9                VIDEOTAPED ORAL DEPOSITION OF
10                JEREMY DANIEL SLATER, M.D.
11                     MAY 26, 2004
12   ****************************************************
13

14          VIDEOTAPED ORAL DEPOSITION OF JEREMY DANIEL
15   SLATER, M.D., produced as a witness at the instance of
16   the Plaintiff, and duly sworn, was taken in the
17   above-style and numbered cause on the 26th day of May,
18   2004, from 3:49 a.m to 5:27 p.m., before Mary Abbott
19   Burkes, CSR, in and for the State of Texas, recorded by
20   machine shorthand, at the law offices of Worldwide Court
21   Reporters, Inc., 3000 Weslayan, Suite 235, Houston,
22   Texas 77027, pursuant to the Federal Rules of Civil
23   Procedure and the provisions stated on the record or
24   attached hereto; that the deposition shall be read and
25   signed before any notary public.

EXHIBIT

Page 6

1          (Slater Exhibit No. 1 was marked.)

2          THE VIDEOGRAPHER:  Today is Wednesday, May

3    26th, 2004.  The time is 3:20 p.m.  We're now on the

4    record.

5                       EXAMINATION

6    BY MR. CROSLEY:

7        Q.    Please state your name.

8        A.    Jeremy Daniel Slater.

9        Q.    And what is your profession?

10       A.    I'm a physician.

11       Q.    I'm handing you what we've marked as Exhibit

12   No. 1 to your deposition.  Is that a true and correct

13   copy of your curriculum vitae?

14       A.    Yes, sir.

15       Q.    Does it outline your educational background,

16   your work experience, and your articles that you've

17   authored?

18       A.    Yes, sir.

19       Q.    Tell the jury, do you have a medical specialty?

20       A.    Yes, I do.  I specialize in neurology as well

21   as sleep medicine.

22       Q.    What is neurology?

23       A.    Neurology is the study of the central and

24   peripheral nervous system and the diseases that affect

25   those areas.

Page 44

1   injury.

2                MS. SAGE:   Objection to the nonresponsive

3   portion of that answer.

4                MR. GAULT:   Join.

5        Q.   (By Mr. Gault)  And I apologize, Doctor.  I

6   really wasn't asking about the standard of care

7   question.  I was talking about how much benefit do you

8   get from the steroids, according to these studies.

9        A.   I -- I can't quantify it for you.

10       Q.   Okay.  I mean, at most do you get one level?

11       A.   I -- like I said, I can't quantify it for you.

12       Q.   Okay.  What -- is that something, though, that

13   is addressed by these studies?

14       A.   If I had reviewed those studies collectively

15   recently, I could answer the question; but I haven't

16   done that.

17       Q.   I'm not trying to put words in your mouth or

18   anything.

19       A.   I'm sorry.

20       Q.   I'm just asking you --

21       A.   I can't -- I can't --

22       Q.   -- a few questions on that.

23       A.   I can't answer that.

24       Q.   That's fine.  And I wasn't -- I don't mean to

25   keep pressing you on it.  I was just trying to learn

1 · about that.  But -- so as we sit here today, you don't

2 know -- you don't know whether or not those national

3 studies on use of steroids quantifies the amount of

4 benefit from giving those?

5      A.   I know what -- what I know is that from reading

6 reviews of the various trials that a controversy exists

7 and that it is not possible today to say if you give

8 steroids you are going to get X degree of improvement.

9 Now, you may look at a particular study and say, "In

10 this study we got this degree of improvement."  I can't

11 tell you what that is.  All I know is that there are --

12 are different studies that are giving different results.

13     Q.   Okay.  Do you know of any studies that would --

14 I'm talking about studies on steroids -- any of those

15 that claim that the early use of steroids would make a

16 person -- you know, put them completely back to normal?

17     A.   I'm not aware of any study that can -- that

18 makes that claim.

19     Q.   Okay.  So, you know, as we sit here today, at

20 best, steroids -- it's -- it's argued in the medical

21 field that they may have some benefit, but we just can't

22 tell how much?

23     A.   That's correct.  It -- and -- but it is also

24 still stated that it's the standard of care.

25     Q.   Yeah.  Oh, I'm sorry.  I'm sorry.  I was just

Page 46

1   talking about the beneficial effect of them versus

2   whether or not to give them.  Do you see what I'm

3   saying?

4       A.   There is -- there is currently debate in the

5   literature about the degree of beneficial effect.

6       Q.   Okay.

7       A.   I'll agree with that.

8       Q.   That debate in the literature about the

9   beneficial effects of administering steroids has been

10  going on for quite some time; is that correct?

11      A.   Yeah.  I can't tell you exactly how long.  I

12  mean, I'm sure there are people who questioned it right

13  from the beginning; but that's not something that I

14  followed super closely.

15      Q.   Part of the problem was the national studies

16  that were initially done were done by the drug companies

17  that were selling the steroids?

18      A.   Well, you're -- you're -- now you're talking in

19  an area that I'm not familiar with.

20      Q.   You're not familiar with that?  Okay.

21              Are there -- are there neurologists who --

22  who treat spinal cord injuries so much a part of their

23  practice that they'd be knowledgeable about the steroid

24  studies?

25      A.   Are there neurologists who would?