

United States District Court
Southern District of Texas
FILED

JUN 0 7 2004

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | CIVIL ACTION NO. CV-B-00-192 |
| VS. | § | |
| | § | (JURY REQUESTED) |
| COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER, JOAO DOVALE, M.D. AND STAT PHYSICIANS, P.A. | § § § § | |

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P.'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Plaintiff Candelario DeLeon and files his Supplemental Response to Columbia Valley Healthcare System, L.P.'s Motion for Summary Judgment and, in support thereof, respectfully shows as follows:

**INTRODUCTION**

1. On May 26, 2004, Plaintiff filed his response to Defendant Columbia Valley Healthcare System, L.P.'s Motion for Summary Judgment. In that response, Plaintiff included a Motion to Supplement his response with additional evidence on or before June 7, 2004. This is Plaintiff's supplement to that response.

**SUPPLEMENTAL SUMMARY JUDGMENT EVIDENCE**

2. Plaintiff relies upon the following exhibits as supplemental summary judgment evidence, and incorporates same herein.

Exhibits A-E -- attached to Plaintiff's Response to Motion for Summary Judgment filed May 26, 2004;

Exhibit F – Excerpts from the deposition of Plaintiff's expert,, Nick Peters, M.D., an emergency room physician;

        Exhibit G -- Excerpts from the deposition of Plaintiff's expert Jeremy Slater, M.D., a neurologist.

**ARGUMENT**

3. The essence of Defendant Hospital's Motion for Summary Judgment, as set forth on p. 14 of its motion is that Plaintiff lacks evidence to support his claim that Defendant Hospital violated the standard of care, and that this violation was a proximate cause of Plaintiff's injuries. This statement is simply not true based upon the summary judgment evidence referenced above.

4. From the Plaintiff's own testimony set forth in Exhibit A, there is clear, uncontroverted evidence that the Plaintiff's complaints of numbness were communicated to the staff of the Defendant Hospital. This is important because if the hospital staff knew of this complaint of numbness, they had a duty to communicate that complaint to the attending ER physician. See Exh. F, Depo of Dr. Peters, at 16.

5. In addition to the affidavit of Nick Peters, M.D., filed previously, Plaintiff supplements the record with the following deposition testimony of Dr. Peters, taken May 26. Specifically, Dr. Peters, an ER physician, testifies that employees of the Defendant Hospital – specifically nurse Wright -- were required by the standard of care to inform the ER physician of the patient's verbal complaints of numbness from the neck down. Exh. F, Depo. of Dr. Peters, at 16. The Defendant Hospital fell below the standard of care when its staff failed to relay this critical information to the ER physician treating Plaintiff. Id. at 17. This violation of the standard of care by the Defendant Hospital was a contributing cause of Plaintiff's injuries and damages. Id. at 18. For these reasons, fact issues exist which preclude the entry of the summary judgment.

6. Quoting from testimony at pp. 16-18 of Dr. Peters' deposition:

Q. I'd like to turn your attention now to the conduct of the hospital and its employees. Do you have an opinion as to whether the hospital employees, and specifically Nurse Wright, fell below the standard of care in his treatment of Mr. DeLeon?
A. Yes.

Q. And assuming that Mr. DeLeon communicated to Nurse Wright that he felt numb below the neck or that he felt paralyzed or that he felt that he could not move his extremities, what did the standard of care require of Nurse Wright?
A. The patient's deposition, he stated he did tell the nurse and the hospital staff that he was numb from the neck down. So it's the nurse's responsibility to place that in the chart and inform the physician.

Q. And do you recall from Dr. Dovale's deposition that he says nobody told him the patient had complained of numbness below the neck?
A. Yes.

Q. And had the doctor been told by the nurse that the patient was complaining of numbness below the neck, what would you then expect, in reasonable medical probability, to occur?
A. With that, I would expect the patient to be kept in the spinal precautions and a complete neurological evaluation, spinal evaluation done, exam and evaluation done, and also supporting x-ray studies and repeat examinations to see how things are changing or not changing, and if the patient persists with those complaints, a neurological or neurosurgical consultation.

Q. So you would expect the standard of care for Nurse Wright to include clearly communicating the patient's complaints of numbness or feelings of paralysis to the treating ER physician?
A. Yes.

Q. And is there any evidence that that was done in this case?
A. None that I found in -- by looking at the chart.

Q. Would it be fair to say that that violation of the standard of care was a cause in contributing to Mr. DeLeon's injuries and damages?
A. Yes.

See Exh. F, Depo. of Dr. Peters, at pp. 16-18.

7. Therefore, according to the uncontroverted summary judgment evidence, the hospital staff knew of the Plaintiff's complaints of numbness from the neck down and, according to Dr.

Dovale, did not relay those complaints to him. See paragraph 9 of Plaintiff's Response to Defendant Columbia Valley Healthcare System, L.P.'s Motion for Summary Judgment filed May 26, 2004, for the citation to Dr. Dovale's testimony on this issue.

8.  Further, according to the deposition testimony of Jeremy Slater, M.D., a neurologist, Plaintiff's injuries and damages would not have been as severe if he had received appropriate care when he first presented to Valley Regional Hospital on December 24. See Exh. G - depo of Jeremy Slater, M.D. at 16:9 -17:13.

9.  In conclusion, summary judgment is improper because Plaintiff has proffered competent summary judgment evidence that the Defendant Hospital's acts or omissions violated a the requisite standard of care (that the Hospital staff should clearly communicate to the ER physician the patient's complaints of numbness) and that, as a proximate result of that violation, Plaintiff suffered injuries and damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendant, Columbia Valley Healthcare System, L.P.'s Motion for Summary Judgment be denied. Plaintiff further requests all other relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

**BRANTON & HALL, P.C.**
One Riverwalk Place, Suite 1700
700 N. St. Mary's St.
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)

By: ______________________
THOMAS A. CROSLEY
State Bar No. 00783902
S. Dist. Texas No. 15434
JAMES L. BRANTON
State Bar No. 00000069
S. Dist. Texas No.20163

And

Law Offices of Cowen & Bodden
520 E. Levee
Brownsville, Texas 78520
(956) 541-4981
(956) 504-3674 (Fax)

By: ______________________
MICHAEL COWEN
State Bar No. 00795306
S. Dist. Texas No. 19967

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing has been served, via certified mail, return receipt requested, on this 7th day of June, 2004, to:

Steven Matthew Gonzalez
Mr. Gerald E. Castillo
GONZALEZ, GAYTAN, GARZA & CASTILLO, L.L.P.
1317 E. Quebec Avenue
McAllen, TX 78503

**CMRRR#7002-0860-0001-1956-7419**

ATTORNEYS FOR DEFENDANTS,
STAT PHYSICIANS, P.A. and
JOAO DOVALE, M.D.

William Gault
Paul Fourt
BRIN & BRIN, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520

**CMRRR#7002-0860-0001-1956-7426**

ATTORNEYS FOR DEFENDANTS
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER

Michael Cowen

# EXHIBIT "F"

FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON )
)
VS. ) CIVIL ACTION NO. CV-B-00-192
)
COLUMBIA VALLEY HEALTHCARE) (JURY REQUESTED)
SYSTEM, L.P. D/B/A VALLEY )
REGIONAL MEDICAL CENTER, )
JOAO DOVALE, MD. AND STAT )
PHYSICIANS, P.A. )

*************************************************
VIDEOTAPED ORAL DEPOSITION OF
NICK PAUL PETERS, M.D., FACEP
MAY 26, 2004
*************************************************

VIDEOTAPED ORAL DEPOSITION OF NICK PAUL PETERS, M.D., FACEP, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-style and numbered cause on the 26th day of May, 2004, from 8:49 a.m to 2:22 p.m., before Mary Abbott Burkes, CSR, in and for the State of Texas, recorded by machine shorthand, at the law offices of Worldwide Court Reporters, Inc., 3000 Weslayan, Suite 235, Houston, Texas 77027, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

EXHIBIT INDEX

| Exhibit No. | Description | Marked |
|---|---|---|
| Peters 13 | E.D. 2490 entitled "Protocol: Care of the Patient Received from EMS." dated Jan. 1993. | 177 |
| Peters 14 | E.D. 1770 entitled "Guidelines for Neuromuscular Disorder Assessment Form." dated Sept 1992 | 180 |
| Peters 15 | E.D 1651 entitled "Guidelines for Minor Head Injury Assessment Form." dated Sept 1992 | 182 |
| Peters 16 | Protocol entitled "Protocol Nursing Care of the Patient with Spinal Cord and Vertebral Column Trauma." Trauma Number 0009, dated 11-24-98 | 183 |
| Peters 17 | Protocol entitled "Trauma Alert Criteria." dated 2-10-99 | 187 |
| Peters 18 | Page from FRCP 26. General Provisions Governing Discovery: Duty of Disclosure. Disclosure of Expert Testimony | 206 |
| Peters 19 | Two pages of Conditions of Admissions form from Mt. Graham Community Hospital | 211 |

REQUESTS FOR INFORMATION

| NO. | PAGE:LINE |
|---|---|
| 1 | 222:16 |

IT IS STIPULATED and agreed by and between counsel for the respective parties hereto that the deposition of the witness named in the caption hereto may be taken at this time and place before the officer named in the caption hereto; that said deposition, or any part thereof, when so taken, may be used on the trial of this case with the same force and effect as if the witness were present in court and testifying in person;

THAT the necessity for preserving objections at the time of taking is waived and that any and all legal objections to this deposition, or any part thereof, may be urged at the time same is sought to be offered in evidence on the trial of this cause; except, however, that objections to the form of the question and/or responsiveness of the answer must be made at the time of taking, or else such objections are waived;

THAT the original of this deposition shall be presented to the witness for his examination and signing, and thereafter, the witness shall return same to the officer taking this deposition;

THAT if the signed original is not presented to Mr. Thomas A. Crosley to the time of trial or any hearing in this mater, a copy may be used in lieu thereof.

THE VIDEOGRAPHER: Today is Wednesday, May 26th, 2004. The time is 8:49 a.m. We're now on the record.

NICK PAUL PETERS, MD, FACEP, having been duly sworn, was examined and testified as follows:

EXAMINATION

QUESTIONS BY MR. CROSLEY:

Q. Good morning. Please state your name for the record.
A. Nick Paul Peters.
Q. And what is your profession?
A. I'm an emergency medicine physician.
(Peters Exhibit No. 1 was marked.)
Q. I'm handing you what I've marked as Exhibit No. 1 to your deposition this morning. Can you tell us what that document is?
A. It's my curriculum vitae, which is like a resume.
Q. Okay. Is it current?
A. Yes, it is.
Q. Can you describe for us your educational background?
A. I have an undergraduate degree in biology, and I have my medical degree from Creighton University. I did

an emergency medicine internship and residency at a U.C.L.A. Martin Luther King program in Los Angeles, and I finished my emergency medicine training at the University of Arizona in Tucson.
Q. Your area of specialty is in emergency medicine?
A. That's correct.
Q. And how do you -- how are you currently employed?
A. I'm employed as medical director at Memorial Hermann Southwest Hospital as -- in the emergency department.
Q. Okay. And describe for me your work history since becoming an emergency physician?
A. I worked for approximately nine years in the Dallas area at -- in the Baylor system. My main hospital was the Baylor Hospital at Garland. And then just recently I came to Houston to work at the Memorial Hermann Southwest Hospital, within the last five months.
Q. Are you familiar with the standards of care that apply to the practice of emergency medicine in the state of Texas?
A. Yes.
Q. And would that include the standards of care that would apply in this case for practice at Valley Regional Hospital in Brownsville, Texas?

A. Yes.
Q. Have you reviewed information and material pertaining to the case of Candelario De Leon?
A. Yes.
Q. And can you tell us what information and material you have reviewed?
A. I've had the opportunity to look at the chart and the paramedic's sheet, the nursing sheet, and the physician's sheet from his first visit to the emergency department the night of the motor vehicle collision.
Q. December 24, 1998?
A. Correct. I had the chance to look at the same information for his visit to the hosp- -- emergency department admission to the hospital the following day. I've had a chance to look at the deposition by the physician and also the deposition by Mr. De Leon.
Q. Okay. Is this the type of information that is customarily reviewed by physicians such as yourself when they are reviewing the care provided to another patient for purposes of litigation?
A. Yes.
Q. And as a result of your review of this information, have you come to any opinions concerning the care provided by Dr. Dovale or the employees of Valley Regional Hospital?

A. Yes, I have.
Q. With respect to the care of Dr. Dovale, do you have an opinion as, then, to whether or not his care was below the minimum accepted standard of care required of him?
A. Yes. I think it was below the minimum standards expected of him.
Q. And explain to us why you believe Dr. Dovale practiced below the standard of care on December 24, 1998, with respect to Mr. De Leon.
A. Mr. De Leon was brought to his emergency department after a motor vehicle collision. The paramedics had placed him in spinal immobilization, including neck collar and back board. He did have some head injury, and it was well documented that Mr. De Leon also had some intoxicating substances onboard, alcohol. Under those situations, you -- the emergency physician has to assume that a patient has a spinal injury, including a cervical spine injury, until proven otherwise. And to completely rule out a spinal injury, there's a certain process you have to follow and --
Q. What is that process?
A. The process is you have to do a complete and thorough examination on the patient, both on his spine and -- and on him neurologically. And that's something

that is limited any time someone has an intoxicating substance onboard; in other words, in their system. So to do that adequately, you basically have to wait till the patient is sober. So until then, you maintain the spinal precautions.
Second of all, you can -- you do the initial examination to see what you're starting with. If it's normal, you're in good shape. But if it's -- there's any question at all, then, you know, you have to assume there's something going on there. In this case, I -- I think there was a problem, in that it does not appear that an examination was done on the spine or neurologically. The collar was removed and the back board was removed before you could justify removing it under any circumstances in this type of a case.
And then I think there's also a factor that the patient had neurological complaints that were not addressed, which would have been another indication in and of -- by itself that should have been addressed further to rule out spinal cord injury.
Q. Okay.
A. And that was when he was complaining of numbness.
Q. You're aware that the patient was complaining of numbness from the neck down?

A. That was in the paramedic report, yes.
Q. Okay. And you have reviewed Dr. Dovale's deposition?
A. Yes, I have.
Q. So, you're familiar, at least to some extent, with his testimony he's previously given in this case?
A. Yes.
Q. And based on your review of his medical records, did you come to a conclusion as to whether or not Dr. Dovale performed a neurological exam on the patient?
A. By the medical records, it does not appear he did.
Q. He used a null sign to chart on his record under the section applying to a neurological exam, correct?
A. Yes.
Q. And what does that customarily mean in your profession?
A. It depends where it's used. But if it's used in the physical exam, to me it means that it wasn't addressed.
Q. Okay. And --
MR. GAULT: Objection, nonresponsive.
Q. (By Mr. Crosley) The -- the testimony of Dr. Dovale is that he did perform a neurological exam and it was normal, and that's why he wrote a null sign.

Based on your experience and review of medical records from other physicians, is that a plausible explanation?

MR. GAULT: Objection, invades the province of the jury --

MS. SAGE: Objection, calls for speculation.

Q. (By Mr. Crosley) You can answer.

A. I'm sorry. Can you repeat that?

Q. Yes. Is -- is Dr. Dovale's explanation that when he wrote a null sign, it meant that he did a neurological exam and it was normal -- is that a plausible explanation, based on your experience?

MS. SAGE: Objection. It calls for speculation.

MR. GAULT: Invades the province of the jury.

A. It's possible. It's not appropriate. The charts are for communication for -- between other doctors, and that if he was using it in that purpose, it's -- it's not telling any doctors who come back and look at the chart later anything, really. So from that, I think most doctors would assume that that's -- he did not do an exam.

Q. (By Mr. Crosley) Okay. And if he had done an exam, you would expect him to write what those findings

were?

A. Especially in a case where a patient was brought in in spinal precautions. The appropriate and standard would be to address in enough detail to know that he actually did and what he did, including touching the spine for the spinal exam, you know, what kind of a neurological exam was done. So detail like that is expected.

Q. Okay. What, in your opinion, did Dr. Dovale do or fail to do that was a violation of the standard of care?

A. The -- the main thing was taking the patient out of spinal precautions and discharging him. He made the -- it appears that he made the assumption that the patient had no injuries whatsoever. You couldn't make that decision with what he had to work with at the time. So the proper thing to do is to maintain the C spine precautions. If the exam was completely normal, the -- and at that time I would -- in a situation like that, I would do at least plain x-rays to start with, if the exam is completely normal, as Dr. Dovale claims.

Of course, the patient was complaining of numbness. In a situation where I had a complaint like that, I would probably do more than x-rays, just plain x-rays. I'd do something like a CAT scan, also, and

involve a neurology or neurosurgical consultation if I still couldn't prove there's absolutely no injury. And wait for the patient to sober so I can repeat the exam, repeat the history, and see where the patient's at when he has no longer intoxicating substances onboard. And then --

MR. GAULT: Objection, nonresponsive.

A. And then the last thing is the -- we're asking about standard of care, which really hasn't been discussed so far, is I -- in my opinion, it's inappropriate to close a laceration on the face with a staple.

Q. (By Mr. Crosley) Okay.

A. It leaves too big of a scar.

MR. GAULT: Objection, nonresponsive.

Q. (By Mr. Crosley) And as a result of the violations of standard of care by Dr. Dovale, do you have an opinion as to whether or not Mr. De Leon's injuries were made worse than they otherwise would have been?

A. Yes.

Q. And what is your opinion?

A. I think they were made worse. Those precautions I was discussing, they're specifically designed and been developed to protect a patient with this kind of an injury. And that's -- and they've been well proven to

protect a patient with this kind of injury. And I believe this patient had increased injury because of that. And also, the patient should have -- with this kind of injury, there should have been some treatment begun, which he wasn't given any -- didn't get treatment. Instead, he got sent to the jail.

Q. Okay. I'd like to turn your attention now to the conduct of the hospital and its employees. Did -- do you have an opinion as to whether the hospital employees, and specifically Nurse Wright, fell below the standard of care in his treatment of Mr. De Leon?

A. Yes.

Q. And assuming that Mr. De Leon communicated to Nurse Wright that he felt numb --

A. Uh-huh.

Q. -- below the neck or that he felt paralyzed or that he felt that he could not move his extremities, what did the standard of care require of Nurse Wright?

MR. GAULT: Objection, calling for speculation.

A. The -- the patient's deposition, he stated he did tell the nurse and the hospital staff that he was numb from the neck down. So it's the nurse's responsibility to place that in the chart and inform the physician.

Q. (By Mr. Crosley) Okay. And do you recall from Dr Dovale's deposition that he says nobody told him the patient had complained of numbness below the neck?
A. Yes.
Q. And had the doctor been told by the nurse that the patient was complaining of numbness below the neck, what would you then expect, in reasonable medical probability, to occur?
A. With that, I would expect the patient to be kept in the spinal precautions and a complete neurological evaluation, spinal evaluation done, exam and evaluation done, and also supporting x-ray studies and repeat examinations to see how things are changing or not changing, and if the patient persists with those complaints, a neurological or neurosurgical consultation.
Q. So you would expect the standard of care for Nurse Wright to include clearly communicating the patient's complaints of numbness or feelings of paralysis to the treating ER physician?
A. Yes.
Q. And is there any evidence that that was done in this case?
A. None that I found in -- by looking at the chart.
Q. Would it be fair to say that that violation of the standard of care was a cause in contributing to



Mr. De Leon's injuries and damages?
A. Yes.
MR. CROSLEY: I'll pass the witness.

EXAMINATION

QUESTIONS BY MR. GAULT:
Q. Doctor, let's just mark what's in your file here -- or talk about it. When you -- you were sent this case the first time on October 20th of 2000; is that correct?
A. Yeah, I think that's when I first received it.
Q. Okay. And along with the -- sending you -- let's just mark that as Peters Exhibit No. 2. That's the letter sending you the case, right?
A. Yes.
Q. Okay. Along with what was sent to you at that time, you got the December 24th, 1998 medical records from Valley Regional; is that correct?
A. Correct.
Q. Let's see. If I can just ... all right. You -- you would have gotten the December 25th, 1998 medical records from Brownsville Medical Center; is that right?
A. Correct.
Q. All right. Appears to be another copy of those -- or you got the December 25th, 1998 admission from Brownsville Medical Center; is that right?



A. Yes.
Q. All right. You got an EMS report for...
A. One of those EMS reports is a transfer after he was placed in a home and he was brought back for another medical condition.
Q. Okay.
A. That was indirectly related to --
Q. All right. All right. And you got the December 24th, 1998 EMS report; is that right?
A. Yes.
Q. And from looking at it, that looks like all the documents you were sent on October 20th of 2000. Is -- is that a fair statement?
A. That sounds appropriate.
Q. Okay. Be -- feel free to check that and see if that's -- that's all you were sent.
A. I -- I believe that was all he sent me. There's a lot of papers here, but I believe this is everything I was sent --
Q. Uh-huh.
A. -- at that time.
Q. And then in your file, you have a second copy of the December 24th, 1998 medical records from Valley Regional, right?
A. Yes.



Q. If you can just hand me that. Now, I've marked as -- and I'm just going to mark this one sheet as Exhibit No. 2. That's the cover sheet. She can make a copy and give you back the original. Okay?
A. Okay.
(Peters Exhibit No. 2 was marked.)
Q. (By Mr. Gault) Now, I also have some correspondence here to you December 29th, 2003. That's a letter to you talking to you about your deposition on January 27th --
A. Yes.
Q. -- of 2004; is that correct?
A. That's correct.
Q. And then attached to that letter is a copy of the deposition notice and subpoena duces tecum; is that right?
A. Correct.
Q. All right. And then we also have in your file -- let's see -- just another copy of that deposition notice; is that correct?
A. Yeah, I -- that looks correct. I'm not sure if -- I think -- I don't know if that's just a copy, or if I got that sent at a different time. That looks like the same thing.
Q. Okay. It was -- it's stamped here December

# EXHIBIT "G"

FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CANDELARIO DE LEON )
)
VS. ) CIVIL ACTION NO. CV-B-00-192
)
COLUMBIA VALLEY HEALTHCARE) (JURY REQUESTED)
SYSTEM, L.P. D/B/A VALLEY )
REGIONAL MEDICAL CENTER, )
JOAO DOVALE, MD. AND STAT )
PHYSICIANS, P.A. )

*************************************************

VIDEOTAPED ORAL DEPOSITION OF

JEREMY DANIEL SLATER, M.D.

MAY 26, 2004

*************************************************

VIDEOTAPED ORAL DEPOSITION OF JEREMY DANIEL SLATER, M.D., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-style and numbered cause on the 26th day of May, 2004, from 3:49 a.m to 5:27 p.m., before Mary Abbott Burkes, CSR, in and for the State of Texas, recorded by machine shorthand, at the law offices of Worldwide Court Reporters, Inc., 3000 Weslayan, Suite 235, Houston, Texas 77027, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

IT IS STIPULATED and agreed by and between counsel for the respective parties hereto that the deposition of the witness named in the caption hereto may be taken at this time and place before the officer named in the caption hereto; that said deposition, or any part thereof, when so taken, may be used on the trial of this case with the same force and effect as if the witness were present in court and testifying in person;

THAT the necessity for preserving objections at the time of taking is waived and that any and all legal objections to this deposition, or any part thereof, may be urged at the time same is sought to be offered in evidence on the trial of this cause; except, however, that objections to the form of the question and/or responsiveness of the answer must be made at the time of taking, or else such objections are waived;

THAT the original of this deposition shall be presented to the witness for his examination and signing, and thereafter, the witness shall return same to the officer taking this deposition;

THAT if the signed original is not presented to Mr. Thomas A. Crosley to the time of trial or any hearing in this mater, a copy may be used in lieu thereof.

(Slater Exhibit No. 1 was marked.)

THE VIDEOGRAPHER: Today is Wednesday, May 26th, 2004. The time is 3:20 p.m. We're now on the record.

EXAMINATION

BY MR. CROSLEY:

Q. Please state your name.
A. Jeremy Daniel Slater.
Q. And what is your profession?
A. I'm a physician.
Q. I'm handing you what we've marked as Exhibit No. 1 to your deposition. Is that a true and correct copy of your curriculum vitae?
A. Yes, sir.
Q. Does it outline your educational background, your work experience, and your articles that you've authored?
A. Yes, sir.
Q. Tell the jury, do you have a medical specialty?
A. Yes, I do. I specialize in neurology as well as sleep medicine.
Q. What is neurology?
A. Neurology is the study of the central and peripheral nervous system and the diseases that affect those areas.

Q. What year did you obtain your medical doctorate degree?
A. 1986.
Q. How long have you been practicing in the field of neurology?
A. Well, I -- after finishing the medical internship in '87, three years of neurology residency -- depends on how you define "practicing" -- I was doing a epilepsy fellowship and a clinical neurophysiology fellowship for a year and a half. And then from that point on, which I believe was 1991, I've been practicing neurology.
Q. Are you currently on staff with any hospitals?
A. Yes.
Q. What hospitals?
A. Memorial Hermann here in Houston.
Q. And are you licensed to practice medicine in the state of Texas?
A. Yes, sir.
Q. Have you reviewed medical records and other materials pertaining to the care given to Candelario De Leon on December 24, 1998 --
A. Yes, sir.
Q. I'm sorry. -- by Dr. Dovale?
A. Yes, sir.

Q. And by the EMS and nurses at Valley Regional Medical Center?
A. Yes, sir.
Q. Do you have any opinions concerning the care and treatment received by Mr. De Leon?
A. Yes, I do.
Q. Okay. And specifically with respect to the care that he received from Dr. Dovale, who was in the ER that night, what are your opinions concerning the care received by Mr. De Leon by Mr. Dovale?
A. Well, basically there are a number of things from the time that one is a, probably a second or third year medical student, that you would -- you are -- that you would expect to see happen in an emergency room when someone presents with a suspected spinal cord injury. This is hammered into you as an intern. It's hammered into you as a resident. It's something that in dealing with emergency room physicians that we -- as a neurologist, I would automatically expect to see take place. And in reviewing these records, it appears that Dr. Dovale failed to perform the appropriate evaluations and didn't do his job.
Q. Okay. Based on your review of this case -- and let me ask, does that include a review of the deposition testimony given last week by Dr. Dovale?

A. Yes, sir.
Q. -- and based on the totality of the information reviewed by you, do you have an opinion as to whether or not Dr. Dovale failed to complete a thorough neurologic evaluation on Mr. De Leon?
A. I -- I have an opinion, and I do believe that he did, indeed, fail to complete a thorough neurological evaluation.
Q. Did the standard of care require Dr. Dovale to complete a thorough neurologic evaluation on Mr. De Leon?
A. Yes, sir.
Q. And why is that?
A. Well, there are very few things in medicine that are as critical to recognize early and intervene early as spinal cord injuries. They're -- they are very susceptible to further injury. There are some things that can be done to hopefully make them better, but there are lots of things that you can do, either through inaction or worse, to make them worse. And early recognition, evaluation, and treatment is the key. The studies on spinal cord injury indicate that the earlier you intervene, for example, with steroids, the better you do.
The -- if you don't keep the spinal cord

stabilized and there's movement, traction, torsion, et cetera, you can take an existing injury and make it significantly worse. And then -- I apologize because the answer's going on so long I forgot the original question.
Q. Okay. And the question was: Why do you feel that Dr. Dovale fell below the standard of care in his treatment of Mr. De Leon?
A. Well, I think it was related to why -- why you need to perform a thorough neurologic exam. If someone comes in with a question of spinal cord compromise, one of the things that you want to establish is, A, is the spinal cord at risk for further distortion. I mean, is it -- are -- are there breaks in the spine. Are there dislocations? Is there soft tissue swelling? Is there some impingement on the spinal cord? And you can evaluate that through a variety of imaging types.
At the same time, you want to establish whether or not there is already some degree of spinal cord compromise, and the only way that you can do that is by assessing neurologic function.
Q. Okay. The standard of care required of Dr. Dovale as an emergency room physician, are you familiar with that standard of care?
A. I'm not an emergency room physician, but I -- I

think I've got a pretty good familiarity with it from dealing with emergency room physicians and being called to consult on more causes of various types of spinal cord pathology than I can recall.
Q. And you practiced emergency medicine.
A. I didn't practice emergency medicine. I practiced neurology within the emergency room setting, as a neurology consultant.
Q. And so you practiced in the -- in dealing with patients with the same type of presentation as Mr. De Leon?
A. Yes.
Q. Post motor vehicle accident --
A. Right.
Q. -- with possibility of some cervical or spine injury?
A. Correct.
Q. And the -- what does the standard of care require for a patient like Mr. De Leon who presents to the EM -- ER post MVA on a backboard with a cervical collar?
A. Well, the first thing that you're going to do is make sure that you don't do anything to make the situation worse. So you're -- you're not going to remove the collar. You're not going to take the patient

off the backboard until you're reasonably certain that they're -- you're not going to endanger them further, you're not going to make the situation worse, because of an unstable spine.
So -- but even before you get to the point of doing -- doing imaging, you're going to try to get as much history as possible. You're going to try -- if somebody showed up in the emergency room, I would minimally expect the emergency room doc to find out why they had a collar on, collar in place. If they see the collar in place, it obviously indicates that the emerg- -- the EMS personnel felt that there was some risk of a neck injury, a possible spinal cord injury. If they're on a backboard, it raises the possibility of a spine injury. I'd want to find out why. What happened. What were the circumstances that caused them to make that decision.
Q Should the physician evaluating that patient in the ER inquire as to whether there is any numbness or tingling in any of the patient's extremities?
A. That's the second piece of this. You get -- you get the background history from the people who brought the patient in. If the patient is capable of providing you with a history, you get as detailed a history from the patient as possible, both about the

accident and then going over their -- their review of systems. You're going to ask them -- if you think there's been a head injury, you're going to ask them about clouding of consciousness, headache, dizziness, blurred, double vision. You're going to ask them about do they have any weakness or numbness in their extremities, either all over or affecting one side or the other. If they have been ambulating since the accident occurred, you ask them if they have any problems with ambulation. Have they had any problems with incontinence, fecal incontinence, for example. And probably ask more questions as details of the history come out. You definitely ask them if they have any localized or generalized numbness.

Q. And so one thing you would expect a physician to do in this setting is to gather information from the EMS personnel who bring in the patient?

A. Either directly through reading their reports, if nursing staff discussed the, you know, the intake, I -- there are going to be situations where the EMS personnel simply aren't present when the emergency room physician goes in and evaluates when they come and they drop the patient off and leave. But if they do that, there's generally going to be a record. The EMS personnel are going to leave a record regarding what

they did with the patient, or they will have discussed it with the nurse, ideally both. And somebody's going to have the information. I mean, the pa- -- the patient doesn't come in in a vacuum.

Q. In this case there's some evidence that the EMS did not return to service until approximately five to ten minutes after Mr. De Leon was discharged from the hospital.

A. Okay.

Q. And that the EMS personnel were there at the hospital when Mr. De Leon was being treated. In that scenario would you expect the physician to gather information from the EMS about what they observed and what they noted in the patient, either directly or indirectly through the nurses?

A. Absolutely.

MS. SAGE: Objection. Calls for speculation. And -- yeah, calls for speculation.

Q. (By Mr. Crosley) And you may answer.

A. Well, it -- it's not speculation. In my opinion, yeah, of course. I mean, that's -- you're going to -- history is 90 percent of making the diagnosis. You're going to try to get as much information as you can.

Q. Is there any evidence, based on what you

reviewed in the medical record and based on your review of Dr. Dovale's testimony, that Dr. Dovale either personally discussed with EMS what they documented and found and observed with respect to Mr. De Leon?

A. My impression after reading his deposition is that he didn't speak to them, and he didn't review their notes.

Q. Okay. We had talked about what the standard of care requires the ER physician to do when presented with the patient in the same condition as Mr. De Leon, and one thing you had said was get -- get a history, including from the EMS personnel that brought him, and get a history from the patient.

A. Right.

Q. And then you said something else that -- in response to a question that was the second thing that was supposed to be done which was -- refresh my memory on this.

A. Well, you can -- there are a variety of things that are going to take place. Not all of them are going to apply to every patient. There are the standard ABC's, airway, breathing, circulation. You are going to make sure all of these things -- those are the most critical things with any patient that comes into the emergency room. So, you're going to make sure all of

those things are up and running and taken care of, getting IV's in place, making sure that the spine has been stabilized, you've done your neurologic assessment. If there is a suspicion of a spinal cord injury on the basis of your exam, you're going to introduce intravenous steroids, get an immediate neurosurgical consultation, try to arrange for more detailed spine imaging.

Q. Okay. Mr. De Leon did have a spinal cord injury when he was evaluated at the Brownsville Medical Center the following day.

A. Right.

Q. Do you have an opinion as to whether or not he had spinal cord injury when he was being seen and treated in the emergency room on December 24th?

A. Certainly seems likely.

Q. And based -- is that your opinion based on reasonable medical probability?

MR. GAULT: Objection, misstates testimony.

Q. (By Mr. Crosley) Do you have an opinion based on reasonable medical probability as to whether or not Mr. De Leon had a spinal cord injury when he was being treated at Valley Regional Hospital by Dr. Dovale?

MR. GAULT: Same objection.

A. Yes -- yes, I do.
Q. (By Mr. Crosley) And what is your opinion?
A. I believe that he did.
Q. Do you have an opinion that if Mr. De Leon had received appropriate care on December 24 when he first presented to Valley Regional Hospital as to -- do you have an opinion based on reasonable medical probability as to whether or not his ultimate injuries and damages would have been less than they currently are?
A. Yes, I do.
Q. What is your opinion?
A. I believe that they would have been less than they currently are.
Q. And you mentioned prescription or application of steroids for the possible cervical cord injury. Can you tell us more about why that is done?
A. Well, the theory is that you are going to reduce tissue swelling in the area of the injury; and there is going to be a lot of inflammation and secondary swelling in the area of a -- an acute cord contusion. The steroids will reduce this, and the literature which has been published indicates the earlier you apply the steroids the better your chances of reducing long-term neurologic sequeli. It is -- it's the standard of care. You can find it in every textbook of internal medicine,

textbook of emergency medicine, textbook of neurology, textbook of neurosurgery. Like I said, this is something that gets hammered into you from the point that you're a third-year medical student.
Q. And if the standard of care had been followed by Dr. Dovale on December 24, then would Mr. De Leon have been given steroid therapy?
A. In all likelihood. The -- it's -- and it's not simply just a matter of -- of giving or not giving steroids. In addition, as soon as you become suspicious of the fact that there's a spinal cord injury, you're going to go out of your way to make sure that no additional injury takes place. And as -- in reviewing the records and then subsequently being able to review his deposition, it seems pretty clear that the -- the collar was taken off by Dr. Dovale without cervical spinal films being obtained and this allows for neck flexion and extension, and everything that occurred after that, he's basically responsible for. If there's a -- I mean, it opens the neck for additional injury at that point.
MS. SAGE: Objection to the portion that's nonresponsive.
Q. (By Mr. Crosley) Now, Dr. Dovale noted that in his opinion the patient was obviously drunk. Do you

recall that?
A. Yes, sir.
Q. How does the -- the question of whether or not Mr. De Leon was under the influence of alcoholic beverages affect how he should have been treated in the ER?
A. Well, it -- it --
MR. GAULT: Objection, no foundation.
Q. (By Mr. Crosley) I -- and I -- I could rephrase the question. Does it make a difference whether or not he's been drinking as to how he should be treated in the ER?
A. The standard --
MR. GAULT: Same objection.
A. The standard of care remains the same. If you are asking specifically will a patient being inebriated affect your ability to perform an assessment, it depends on the level of inebriation; and in some instances it will. If you're aware that this is the case -- and it's kind of hard not to be -- you have to exercise extra diligence because you -- you're aware of the ways that your exam is being limited by the fact that the patient may not be providing the most appropriate responses to your exam. There are parts of your exam that may become unreliable.

Q. Is there any indication that Dr. Dovale exercised any of this diligence in his examination of Mr. De Leon?
A. No, sir.
Q. And based on everything you have reviewed, can you state based upon a reasonable degree of medical certainty whether Dr. Dovale failed to use such care as reasonably prudent healthcare providers practicing in the same field and in the same or similar locality would have provided under similar circumstances?
A. Absolutely.
Q. And your opinion on that is?
A. Is that's -- he did not use that kind of care -- that level of care.
Q. Okay.
MR. CROSLEY: I'll pass the witness.

EXAMINATION

QUESTIONS BY MR. GAULT:
Q. Doctor, my name is Bill Gault, and I represent the hospital. Do you understand?
A. Yes, sir.
Q. Let me just talk to you a little bit about what's in your file. Okay?
MR. GAULT: Oh, I'm sorry. I need a microphone.