*129*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

JUN 2 4 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. CV-B-00-192 |
| | § | JURY DEMANDED |
| | § | |
| CITY OF BROWNSVILLE, | § | |
| TEXAS, ET AL | § | |
| | § | |

**DEFENDANT COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P.'S RESPONSE**
**TO PLAINTIFF'S SUR-REPLY TO THE REPLY OF DEFENDANT'S**
**MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Columbia Valley Healthcare System, L.P. d/b/a Valley Regional Medical Center and files this Response to Plaintiff's Sur-Reply to the Reply of Defendant Columbia Valley Healthcare System, L.P. in its Motion to Dismiss and Motion for Summary Judgment and would respectfully show the Court as follows:

I.

This Defendant asks that Plaintiff's Sur-Reply be stricken because it does not comply with this Court's Local Rules 5.D. which requires the Plaintiff to file a Motion for Leave to file the Sur-Reply.

II.

Additionally, this Defendant requests to respond to Plaintiff's Sur-Reply because of the misleading nature of it. In Plaintiff's Sur-Reply, the heading of paragraph A states that "The Testimony of Dr. Slater Constitutes Clear, Uncontroverted Evidence That Employees And/Or Agents of Valley Regional Medical Center Were Negligent." In the third sentence of that

paragraph, the Plaintiff states "Further, Defendant's representation that Dr. Slater "has never expressed opinions critical of [Valley Regional Medical Center] is categorically false." Plaintiff then goes on to cite the deposition of Dr. Slater at p.16 L.9 through p.17 L.13. The Plaintiff is conspicuously misleading the Court. The portion of the deposition that the Plaintiff cites specifically addresses the care by Dr. Dovale, not this Defendant. See p.16, L.21 through p.17 L.13. Throughout his examination, Plaintiff's attorney asks specific questions only as to Dr. Dovale's conduct. See p.7 L.20 through p.20 L.15 attached hereto as Exhibit A. The Plaintiff's attorney has misled the Court in his Sur-Reply. He never asked any questions, nor did any other attorney ask questions about the negligence of an employee or agent of Valley Regional Medical Center. This Defendant would ask the Court to request that the Plaintiff's attorney show the Court any portion of Dr. Slater's deposition or his reports where he states that an employee or agent of Valley Regional Medical Center was negligent as Plaintiff states is uncontroverted. What this Defendant has represented to the Court expressly complies with the deposition testimony of Dr. Slater and is not "categorically false" as described by Plaintiff. Furthermore, this Defendant has proven beyond a doubt that Dr. Dovale is not its agent. That has not even been challenged by Plaintiff.

This Defendant has also produced as exhibits, Dr. Slater's reports that have been produced by Plaintiff's attorney in discovery. See Exhibit 2 to Plaintiff's Response to Defendant's Motion to Dismiss and Exhibit B attached hereto. In each of those reports, Dr. Slater only stated opinions critical of Dr. Dovale. In his deposition, Dr. Slater agreed that his reports were accurate and fully set forth his opinions. See p.21 L.17 through p.23 L.3 and p.34 L.2-18 attached hereto as Exhibit C.

III.

In paragraph C of Plaintiff's Reply, the Plaintiff states that Mr. Ross has given his opinion that the hospital failed to implement policies that would have prevented the injuries. The problem is that Mr. Ross testified specifically that he had never reviewed any of the Valley Regional Medical Center's policies and procedures. Therefore, he does not have any basis for his opinions and cannot testify to this subject whatsoever. See p.60 L.6-16 attached hereto as Exhibit D.

One of the complaints that Mr. Ross did make in his report concerned the calling of a Trauma code. However, when he was asked about this in the deposition, he was looking at the records from Brownsville Medical Center (which is not a Defendant in this case) and concerned a different date and time that is the basis of this suit. In his deposition, he specifically retracted his opinions concerning the Trauma alert. See p. 65 L.18 through p. 67 L.12 attached hereto as Exhibit E.

WHEREFORE, PREMISES CONSIDERED, Defendant requests that the Court strike Plaintiff's Sur-Reply and grant Defendant's Motion for Summary Judgment, dismiss all of Plaintiff's claims against this Defendant and to sever Plaintiff's claims against this Defendant into its own cause number and to assess costs of court against Plaintiff and for such other and further relief, at law or in equity, to which Defendant may show itself justly entitled to receive.

Respectfully submitted,

By: _____

William Gault
Federal I.D. No. 14685
State Bar No. 07765050
Michael Quintanta
Federal I.D. No. 33291
State Bar No. 24037314
Brin & Brin, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520
(956) 544-7110
(956) 544-0607 Telecopier

Of Counsel:

Brin & Brin, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520
(956) 544-7110
(956) 544-0607 Telecopier

ATTORNEYS FOR DEFENDANT
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER

## CERTIFICATE OF SERVICE

This is to certify that the above and foregoing instrument has been forwarded to counsel as indicated below on this the 24th day of June, 2004.

Mr. Thomas Crosley                          **VIA CMRRR 7002 0460 0000 6426 4740**
Branton & Hall, P.C.
One Riverwalk Place, Suite 1700
700 N. St. Mary's St.
San Antonio, Texas 78205

Michael Cowen                               **VIA CMRRR 7002 0460 0000 6426 4757**
Law Offices of Michael R. Cowen
520 E. Levee
Brownsville, TX 78520

DELEON/VRMC: MSJ-RSP03
PAGE 4

Steven M. Gonzalez
Gerald Castillo
Gonzalez, Gaytan, Garza & Castillo, L.L.P
1317 E. Quebec Avenue
McAllen, Texas 78503

**VIA REGULAR MAIL**

_____
William Gault

Page 6

1              (Slater Exhibit No. 1 was marked.)

2              THE VIDEOGRAPHER:  Today is Wednesday, May

3    26th, 2004.  The time is 3:20 p.m.  We're now on the

4    record.

5                         EXAMINATION

6    BY MR. CROSLEY:

7         Q.    Please state your name.

8         A.    Jeremy Daniel Slater.

9         Q.    And what is your profession?

10        A.    I'm a physician.

11        Q.    I'm handing you what we've marked as Exhibit

12   No. 1 to your deposition.  Is that a true and correct

13   copy of your curriculum vitae?

14        A.    Yes, sir.

15        Q.    Does it outline your educational background,

16   your work experience, and your articles that you've

17   authored?

18        A.    Yes, sir.

19        Q.    Tell the jury, do you have a medical specialty?

20        A.    Yes, I do.  I specialize in neurology as well

21   as sleep medicine.

22        Q.    What is neurology?

23        A.    Neurology is the study of the central and

24   peripheral nervous system and the diseases that affect

25   those areas.



Page 7

1    Q.    What year did you obtain your medical doctorate

2    degree?

3    A.    1986.

4    Q.    How long have you been practicing in the field

5    of neurology?

6    A.    Well, I -- after finishing the medical

7    internship in '87, three years of neurology residency --

8    depends on how you define "practicing" -- I was doing a

9    epilepsy fellowship and a clinical neurophysiology

10   fellowship for a year and a half.  And then from that

11   point on, which I believe was 1991, I've been practicing

12   neurology.

13   Q.    Are you currently on staff with any hospitals?

14   A.    Yes.

15   Q.    What hospitals?

16   A.    Memorial Hermann here in Houston.

17   Q.    And are you licensed to practice medicine in

18   the state of Texas?

19   A.    Yes, sir.

20   Q.    Have you reviewed medical records and other

21   materials pertaining to the care given to Candelario

22   De Leon on December 24, 1998 --

23   A.    Yes, sir.

24   Q.    I'm sorry.  -- by Dr. Dovale?

25   A.    Yes, sir.

1    Q.    And by the EMS and nurses at Valley Regional

2   Medical Center?

3    A.    Yes, sir.

4    Q.    Do you have any opinions concerning the care

5   and treatment received by Mr. De Leon?

6    A.    Yes, I do.

7    Q.    Okay.  And specifically with respect to the

8   care that he received from Dr. Dovale, who was in the ER

9   that night, what are your opinions concerning the care

10  received by Mr. De Leon by Mr. Dovale?

11   A.    Well, basically there are a number of things

12  from the time that one is a, probably a second or third

13  year medical student, that you would -- you are -- that

14  you would expect to see happen in an emergency room when

15  someone presents with a suspected spinal cord injury.

16  This is hammered into you as an intern.  It's hammered

17  into you as a resident.  It's something that in dealing

18  with emergency room physicians that we -- as a

19  neurologist, I would automatically expect to see take

20  place.  And in reviewing these records, it appears that

21  Dr. Dovale failed to perform the appropriate evaluations

22  and didn't do his job.

23   Q.    Okay.  Based on your review of this case -- and

24  let me ask, does that include a review of the deposition

25  testimony given last week by Dr. Dovale?

1    A.    Yes, sir.

2    Q.    -- and based on the totality of the information

3    reviewed by you, do you have an opinion as to whether or

4    not Dr. Dovale failed to complete a thorough neurologic

5    evaluation on Mr. De Leon?

6    A.    I -- I have an opinion, and I do believe that

7    he did, indeed, fail to complete a thorough neurological

8    evaluation.

9    Q.    Did the standard of care require Dr. Dovale to

10   complete a thorough neurologic evaluation on

11   Mr. De Leon?

12   A.    Yes, sir.

13   Q.    And why is that?

14   A.    Well, there are very few things in medicine

15   that are as critical to recognize early and intervene

16   early as spinal cord injuries.  They're -- they are very

17   susceptible to further injury.  There are some things

18   that can be done to hopefully make them better, but

19   there are lots of things that you can do, either through

20   inaction or worse, to make them worse.  And early

21   recognition, evaluation, and treatment is the key.  The

22   studies on spinal cord injury indicate that the earlier

23   you intervene, for example, with steroids, the better

24   you do.

25            The -- if you don't keep the spinal cord

1  stabilized and there's movement, traction, torsion, et

2  cetera, you can take an existing injury and make it

3  significantly worse.  And then -- I apologize because

4  the answer's going on so long I forgot the original

5  question.

6      Q.   Okay.  And the question was:  Why do you feel

7  that Dr. Dovale fell below the standard of care in his

8  treatment of Mr. De Leon?

9      A.   Well, I think it was related to why -- why you

10 need to perform a thorough neurologic exam.  If someone

11 comes in with a question of spinal cord compromise, one

12 of the things that you want to establish is, A, is the

13 spinal cord at risk for further distortion.  I mean, is

14 it -- are -- are there breaks in the spine.  Are there

15 dislocations?  Is there soft tissue swelling?  Is there

16 some impingement on the spinal cord?  And you can

17 evaluate that through a variety of imaging types.

18              At the same time, you want to establish

19 whether or not there is already some degree of spinal

20 cord compromise, and the only way that you can do that

21 is by assessing neurologic function.

22     Q.   Okay.  The standard of care required of

23 Dr. Dovale as an emergency room physician, are you

24 familiar with that standard of care?

25     A.   I'm not an emergency room physician, but I -- I

1    think I've got a pretty good familiarity with it from

2    dealing with emergency room physicians and being called

3    to consult on more cases of various types of spinal cord

4    pathology than I can recall.

5         Q.   And you practiced emergency medicine.

6         A.   I didn't practice emergency medicine.  I

7    practiced neurology within the emergency room setting,

8    as a neurology consultant.

9         Q.   And so you practiced in the -- in dealing with

10   patients with the same type of presentation as Mr.

11   De Leon?

12        A.   Yes.

13        Q.   Post motor vehicle accident --

14        A.   Right.

15        Q.   -- with possibility of some cervical or spine

16   injury?

17        A.   Correct.

18        Q.   And the -- what does the standard of care

19   require for a patient like Mr. De Leon who presents to

20   the EM -- ER post MVA on a backboard with a cervical

21   collar?

22        A.   Well, the first thing that you're going to do

23   is make sure that you don't do anything to make the

24   situation worse.  So you're -- you're not going to

25   remove the collar.  You're not going to take the patient

1    off the backboard until you're reasonably certain that

2    they're -- you're not going to endanger them further,

3    you're not going to make the situation worse, because of

4    an unstable spine.

5              So -- but even before you get to the point

6    of doing -- doing imaging, you're going to try to get as

7    much history as possible.  You're going to try -- if

8    somebody showed up in the emergency room, I would

9    minimally expect the emergency room doc to find out why

10   they had a collar on, collar in place.  If they see the

11   collar in place, it obviously indicates that the

12   emerg- -- the EMS personnel felt that there was some

13   risk of a neck injury, a possible spinal cord injury.

14   If they're on a backboard, it raises the possibility of

15   a spine injury.  I'd want to find out why.  What

16   happened.  What were the circumstances that caused them

17   to make that decision.

18   Q.    Should the physician evaluating that patient in

19   the ER inquire as to whether there is any numbness or

20   tingling in any of the patient's extremities?

21   A.    That's the second piece of this.  You get --

22   you get the background history from the people who

23   brought the patient in.  If the patient is capable of

24   providing you with a history, you get as detailed a

25   history from the patient as possible, both about the

1    accident and then going over their -- their review of

2    systems.  You're going to ask them -- if you think

3    there's been a head injury, you're going to ask them

4    about clouding of consciousness, headache, dizziness,

5    blurred, double vision.  You're going to ask them about

6    do they have any weakness or numbness in their

7    extremities, either all over or affecting one side or

8    the other.  If they have been ambulating since the

9    accident occurred, you ask them if they have any

10   problems with ambulation.  Have they had any problems

11   with incontinence, fecal incontinence, for example.  And

12   probably ask more questions as details of the history

13   come out.  You definitely ask them if they have any

14   localized or generalized numbness.

15       Q.   And so one thing you would expect a physician

16   to do in this setting is to gather information from the

17   EMS personnel who bring in the patient?

18       A.   Either directly through reading their reports,

19   if nursing staff discussed the, you know, the intake,

20   I -- there are going to be situations where the EMS

21   personnel simply aren't present when the emergency room

22   physician goes in and evaluates when they come and they

23   drop the patient off and leave.  But if they do that,

24   there's generally going to be a record.  The EMS

25   personnel are going to leave a record regarding what

1    they did with the patient, or they will have discussed

2    it with the nurse, ideally both.  And somebody's going

3    to have the information.  I mean, the pa- -- the patient

4    doesn't come in in a vacuum.

5        Q.    In this case there's some evidence that the EMS

6    did not return to service until approximately five to

7    ten minutes after Mr. De Leon was discharged from the

8    hospital.

9        A.    Okay.

10       Q.    And that the EMS personnel were there at the

11   hospital when Mr. De Leon was being treated.  In that

12   scenario would you expect the physician to gather

13   information from the EMS about what they observed and

14   what they noted in the patient, either directly or

15   indirectly through the nurses?

16       A.    Absolutely.

17            MS. SAGE:  Objection.  Calls for

18   speculation.  And -- yeah, calls for speculation.

19       Q.    (By Mr. Crosley)  And you may answer.

20       A.    Well, it -- it's not speculation.  In my

21   opinion, yeah, of course.  I mean, that's  -- you're

22   going to -- history is 90 percent of making the

23   diagnosis.  You're going to try to get as much

24   information as you can.

25       Q.    Is there any evidence, based on what you

1    reviewed in the medical record and based on your review

2    of Dr. Dovale's testimony, that Dr. Dovale either

3    personally discussed with EMS what they documented and

4    found and observed with respect to Mr. De Leon?

5        A.    My impression after reading his deposition is

6    that he didn't speak to them, and he didn't review their

7    notes.

8        Q.    Okay.  We had talked about what the standard of

9    care requires the ER physician to do when presented with

10   the patient in the same condition as Mr. De Leon, and

11   one thing you had said was get -- get a history,

12   including from the EMS personnel that brought him, and

13   get a history from the patient.

14       A.    Right.

15       Q.    And then you said something else that -- in

16   response to a question that was the second thing that

17   was supposed to be done which was -- refresh my memory

18   on this.

19       A.    Well, you can -- there are a variety of things

20   that are going to take place.  Not all of them are going

21   to apply to every patient.  There are the standard

22   ABC's, airway, breathing, circulation.  You are going to

23   make sure all of these things -- those are the most

24   critical things with any patient that comes into the

25   emergency room.  So, you're going to make sure all of

1    those things are up and running and taken care of,

2    getting IV's in place, making sure that the spine has

3    been stabilized, you've done your neurologic assessment.

4    If there is a suspicion of a spinal cord injury on the

5    basis of your exam, you're going to introduce

6    intravenous steroids, get an immediate neurosurgical

7    consultation, try to arrange for more detailed spine

8    imaging.

9         Q.    Okay.  Mr. De Leon did have a spinal cord

10   injury when he was evaluated at the Brownsville Medical

11   Center the following day.

12        A.    Right.

13        Q.    Do you have an opinion as to whether or not he

14   had spinal cord injury when he was being seen and

15   treated in the emergency room on December 24th?

16        A.    Certainly seems likely.

17        Q.    And based -- is that your opinion based on

18   reasonable medical probability?

19             MR. GAULT:  Objection, misstates

20   testimony.

21        Q.    (By Mr. Crosley)  Do you have an opinion based

22   on reasonable medical probability as to whether or not

23   Mr. De Leon had a spinal cord injury when he was being

24   treated at Valley Regional Hospital by Dr. Dovale?

25             MR. GAULT:  Same objection.

Page 17

1    A.    Yes -- yes, I do.

2    Q.    (By Mr. Crosley)  And what is your opinion?

3    A.    I believe that he did.

4    Q.    Do you have an opinion that if Mr. De Leon had

5    received appropriate care on December 24 when he first

6    presented to Valley Regional Hospital as to -- do you

7    have an opinion based on reasonable medical probability

8    as to whether or not his ultimate injuries and damages

9    would have been less than they currently are?

10    A.    Yes, I do.

11    Q.    What is your opinion?

12    A.    I believe that they would have been less than

13    they currently are.

14    Q.    And you mentioned prescription or application

15    of steroids for the possible cervical cord injury.  Can

16    you tell us more about why that is done?

17    A.    Well, the theory is that you are going to

18    reduce tissue swelling in the area of the injury; and

19    there is going to be a lot of inflammation and secondary

20    swelling in the area of a -- an acute cord contusion.

21    The steroids will reduce this, and the literature which

22    has been published indicates the earlier you apply the

23    steroids the better your chances of reducing long-term

24    neurologic sequeli.  It is -- it's the standard of care.

25    You can find it in every textbook of internal medicine,

1    textbook of emergency medicine, textbook of neurology,

2    textbook of neurosurgery.  Like I said, this is

3    something that gets hammered into you from the point

4    that you're a third-year medical student.

5        Q.   And if the standard of care had been followed

6    by Dr. Dovale on December 24, then would Mr. De Leon

7    have been given steroid therapy?

8        A.   In all likelihood.  The -- it's -- and it's not

9    simply just a matter of -- of giving or not giving

10   steroids.  In addition, as soon as you become suspicious

11   of the fact that there's a spinal cord injury, you're

12   going to go out of your way to make sure that no

13   additional injury takes place.  And as -- in reviewing

14   the records and then subsequently being able to review

15   his deposition, it seems pretty clear that the -- the

16   collar was taken off by Dr. Dovale without cervical

17   spinal films being obtained and this allows for neck

18   flexion and extension, and everything that occurred

19   after that, he's basically responsible for.  If there's

20   a -- I mean, it opens the neck for additional injury at

21   that point.

22             MS. SAGE:  Objection to the portion that's

23   nonresponsive.

24       Q.   (By Mr. Crosley)  Now, Dr. Dovale noted that in

25   his opinion the patient was obviously drunk.  Do you

Page 19

1   recall that?

2       A.   Yes, sir.

3       Q.   How does the -- the question of whether or not

4   Mr. De Leon was under the influence of alcoholic

5   beverages affect how he should have been treated in the

6   ER?

7       A.   Well, it -- it --

8            MR. GAULT:   Objection, no foundation.

9       Q.   (By Mr. Crosley)  I -- and I -- I could

10  rephrase the question.  Does it make a difference

11  whether or not he's been drinking as to how he should be

12  treated in the ER?

13      A.   The standard --

14           MR. GAULT:   Same objection.

15      A.   The standard of care remains the same.  If you

16  are asking specifically will a patient being inebriated

17  affect your ability to perform an assessment, it depends

18  on the level of inebriation; and in some instances it

19  will.  If you're aware that this is the case -- and it's

20  kind of hard not to be -- you have to exercise extra

21  diligence because you -- you're aware of the ways that

22  your exam is being limited by the fact that the patient

23  may not be providing the most appropriate responses to

24  your exam.  There are parts of your exam that may become

25  unreliable.

1    Q.    Is there any indication that Dr. Dovale

2  exercised any of this diligence in his examination of

3  Mr. De Leon?

4    A.    No, sir.

5    Q.    And based on everything you have reviewed, can

6  you state based upon a reasonable degree of medical

7  certainty whether Dr. Dovale failed to use such care as

8  reasonably prudent healthcare providers practicing in

9  the same field and in the same or similar locality would

10  have provided under similar circumstances?

11    A.    Absolutely.

12    Q.    And your opinion on that is?

13    A.    Is that's -- he did not use that kind of

14  care -- that level of care.

15    Q.    Okay.

16              MR. CROSLEY:  I'll pass the witness.

17                        EXAMINATION

18  QUESTIONS BY MR. GAULT:

19    Q.    Doctor, my name is Bill Gault, and I represent

20  the hospital.  Do you understand?

21    A.    Yes, sir.

22    Q.    Let me just talk to you a little bit about

23  what's in your file.  Okay?

24              MR. GAULT: Oh, I'm sorry.  I need a

25  microphone.



**Smith-Glynn-Callaway Medical Building**

January 4, 2001

Carol P. Lomax
Branton & Hall
737 Travis Park Building
711 Navarro, Suite 737
San Antonio, Texas 78205-1787

    Re:   Patient: Candelario DeLeon
          File Number: 9827

Dear Ms. Lomax:

I, Jeremy D. Slater, M.D., am a licensed physician, Board Certified in Neurology,
Clinical Neurophysiology and Sleep Medicine. I have reviewed the records of Candelario
DeLeon. These include the following:

1. Emergency room records from Columbia Valley Regional Medical Center, dated
   12/24/98.
2. Hospital records from the Brownsville Medical Center, dated 12/25/98 through
   1/7/99.
3. EMS ambulance activity records from the City of Brownsville, dated 12/24/98
   through 1/29/99.

**Case Summary:**

Candelario DeLeon is a 58 year old male with an essentially negative past medical
history, who was brought to the Columbia Valley Regional Medical Center emergency
room on 12/24/98 by the City of Brownsville EMS ambulance after a motor vehicle
accident. The patient was found, sitting in the driver's seat, unrestrained. According to
the EMS notes, "Pt. Smelled highly of ETOH and stated he had been drinking but
unknown what or how much". A cervical collar was placed and the patient was extricated
through the driver's door onto a backboard (10 PM). On route, the patient complained of
"numbness from the neck down".

Upon arrival in the emergency room (10:05 PM), the ER physician notes document that
the patient is "obviously drunk – awake". Normal exam findings are documented for the
heart, lungs and abdomen, with no findings recorded for the neurological examination or

231 South National Avenue • Springfield, Missouri  65807-7396 • 417-883-7422
member of the Sisters of Mercy Health System–St. Louis



## Smith-Glynn-Callaway Medical Building

extremities. Nursing notes document the absence of CSF or blood in the ear canals, and the absence of Battle's sign, or periorbital ecchymoses. The presence of the cervical collar is noted. The patient received one staple to a forehead laceration and was then discharged to the custody of the police. No cervical spine films were ordered – there is no documentation regarding if or when the collar was removed.

The patient then spent the night in the city jail. Waking the next morning, he complained of being unable to move. When the EMS service arrived, he complained of pain in his arms and numbness throughout his body. At that time, no cervical collar was in evidence. The patient was placed on a backboard, secured with straps and transported to the Brownsville Medical Center emergency room.

Upon arrival in the emergency room, the patient was assessed and underwent X-rays of the cervical spine. Once these were completed, because of clinical suspicion of a cord compression, he received high-dose Solumedrol intravenously, 30 mg/kg. A Foley catheter was placed, and 400 cc of urine drained. Spine X-rays were completed including cervical, thoracic and lumbar, all of which were read as normal. A neurology consultation was obtained. The neurologist, on the basis of the clinical examination, suspected a low cervical cord compression, and ordered an MRI of the cervical spine. This was completed, and demonstrated no hematoma, moderate changes of cervical spondylosis with spinal canal stenosis in the mid to lower cervical spine. Neurosurgical consultation was ordered. A subsequent MRI of the thoracic spine was unremarkable, as was a CT scan of the brain.

Through the remaining hospitalization the patient received supportive therapies, and at the time of discharge to a nursing home, the patient remained quadraparetic, with a T8 sensory level.

**Conclusions:**

It is my professional opinion that the emergency room physician at Columbia Valley Regional Medical Center deviated from the standard of care by failing to complete a neurologic examination on Mr. DeLeon at the time of his initial presentation. The circumstances of the patient's injury, in addition to his complaints to the EMS personnel of numbness from the neck down, are both strongly compelling reasons to assess for possible cervical cord injury. Had he completed a neurological examination at that time, he might have discovered clinical evidence suggesting the presence of a cord compression. Early treatment with high-dose intravenous steroids could have been initiated, possibly reducing the level of longterm neurologic deficit.



**Smith-Glynn-Callaway Medical Building**

**Deviations:**

Based on a reasonable degree of medical certainty, it is my opinion that the physician did not use such care as reasonably prudent healthcare providers practicing in the same field in the same or similar locality would have provided under similar circumstances. It is my opinion that the breach in care caused a lost opportunity for a medical intervention that may have significantly reduced the patient's longterm deficits.

Signed,

Jeremy D. Slater, M.D.

Page 21

1    Q.    (By Mr. Gault)  Let me just kind of go through

2    some of the things.  What do you have there in front of

3    you?

4    A.    This is a copy of a letter that I sent to

5    Branton & Hall to Carol Lomax, March 10th, 2003.

6    Q.    Let me just see that.  And there was a cover

7    letter that went along with it?

8    A.    Was there?

9    Q.    It was faxed to you, what, today?

10   A.    Yeah.  Yeah.

11   Q.    Okay.  There's a -- there's a cover letter I

12   saw in here earlier.  Do you have it over there?

13   A.    Oh, yeah, it's over --

14   Q.    Yeah, there you go.

15   A.    Yeah, there it is.  Sorry.

16              (Slater Exhibit No. 2 was marked.)

17   Q.    (By Mr. Gault)  Okay.  That's -- this is

18   your -- yeah.  What I've marked is a cover letter --

19   what I've marked as Slater Exhibit No. 2 is a cover

20   letter from Branton & Hall faxing you this report, your

21   three-page report, at about 9:00 this morning; is that

22   correct?

23   A.    That's correct.

24   Q.    Okay.  And is your report true and accurate and

25   a full statement of your opinions in this case?



1    A.    The modification -- the only modification is

2  that since I wrote this report, I've had the opportunity

3  to review a few additional depositions which weren't

4  available at the time that the report was written.

5    Q.    Okay.  Otherwise you're -- and other than what

6  you've told Mr. Crosley, your opinions are true and

7  complete?

8    A.    Yes, sir.

9    Q.    Okay.  So the only modifications you want to

10  make in your opinions are what you previously testified

11  to with Mr. Crosley?

12    A.    I -- I -- unless -- I can't -- it's hard for me

13  to say exactly how my opinions may have been

14  additionally affected because not every question --

15  conceivable question has been asked ba- -- you know, on

16  the fact that I've reviewed these depositions.  As far

17  as I know, that's correct.

18    Q.    Okay.  I -- I wasn't trying to be tricky.  All

19  I was trying to get at is as we look at your report and

20  as we've already heard your testimony with Mr. Crosley's

21  questions, that's a fair summary of your opinions --

22    A.    Yes, sir.

23    Q.    -- in this case?

24    Q.    Okay.  And I apologize.  I was not trying to be

25  tricky or anything.  I just -- in other words -- and --

1    your opinions are set out in your report and what we --

2    we've previously heard today?

3          A.    That's correct.

4          Q.    Okay.  Let me just go through a couple of the

5    things you've reviewed in this case.  This looks like --

6          A.    They're -- they're labeled.

7          Q.    Okay.  Thank you.  Let's see.  We'll -- let's

8    think of an easy way to go through this.  You have the

9    medical records from Valley Regional Medical Center,

10   right?

11         A.    Correct.

12         Q.    Okay.  And then I'm just going to look through

13   these in a minute.  And then you have the police

14   documents from the Brownsville Police Department?

15         A.    Yes, sir.

16         Q.    Okay.  Very good.  You have the automobile

17   accident report, the DPS report is what I call it?

18         A.    Correct.

19         Q.    Okay.  You have the report from Mr. Ross; is

20   that correct?

21         A.    Yes, sir.

22         Q.    Okay.

23         Q.    And then you have some --

24         A.    That's the report from Dr. Peters.

25         Q.    From Dr. Peters dated February 25th, 2003; is

Page 34

1    A.    No, I don't remember that.

2    Q.    Okay.  You don't remember?  Let me show you --

3    let me just go ahead and show it to you, then.  We'll

4    mark it as Slater Exhibit No. 5.

5              (Slater Exhibit No. 5 was marked.)

6    Q.    (By Mr. Gault)  Do you remember having given a

7    report in January of 2001?

8    A.    I don't remember it, but I -- I believe it.

9    Q.    Okay.

10    A.    Okay.

11    Q.    And take your time if you need to, but that --

12    that report does not look much different than your 2003

13    report.  Is that a fair statement?

14    A.    That's a fair statement.

15    Q.    Okay.  And just in looking at the 2001 report

16    and the 2003 report, pretty much your opinions in this

17    case are -- are fairly consistent?

18    A.    I think so.

19    Q.    Okay.  And you've -- in giving your opinions in

20    your report, you've tried to give the defendants in this

21    case a very fair view of what you're going to be

22    testifying to; is that correct?

23    A.    I believe so.

24    Q.    Okay.  Now, you have not looked at any

25    photographs -- is that correct -- in this case?

Page 4

```
 1                Expert Deposition of ZEFF ROSS, a
 2    witness of lawful age, taken by the Defendant
 3    Hospitals, for the purpose of discovery and for
 4    use as evidence in the above-entitled cause,
 5    wherein CANDELARIO DE LEON is the Plaintiff and
 6    HCA - THE HEALTHCARE COMPANY, etc., et al. are the
 7    Defendants, pending in the United States District
 8    Court for the Southern District of Texas,
 9    Brownsville Division, pursuant to notice
10    heretofore filed, before EDWARD C. LAWRENCE, a
11    Notary Public in and for the State of Florida at
12    Large, at Esquire Deposition Services, Suite 200,
13    600 South Andrews Avenue, Fort Lauderdale, Broward
14    County, Florida, on the 13th day of January, 2004,
15    commencing at 2:30 o'clock P.M.
16                     - - - - - -
17    Thereupon:
18                     ZEFF ROSS
19    A witness named in the notice heretofore filed,
20    being of lawful age, and being first duly sworn in
21    the above cause, testified on his oath as follows:
22                DIRECT EXAMINATION
23                BY MR. GAULT
24         Q     Please tell us your name for the
25    record.
```



Page 5

```
 1         A      Zeff Ross.
 2         Q      Mr. Ross, you are an expert witness
 3   in this DeLeon lawsuit, is that correct?
 4         A      Correct.
 5         Q      And we are here to take your
 6   deposition today.  Do you understand that?
 7         A      Yes.
 8         Q      You have given your deposition
 9   before, right?
10         A      Yes.
11         Q      I don't need to explain to you what
12   we're doing here today?
13         A      I wouldn't think so.
14         Q      I mean you know what we're doing?
15         A      Yes.
16         Q      Just checking.  Mr. Ross, I want to
17   go through a couple of different things with you.
18   What I want to do is go through your file with you
19   today.
20                What we have is I've marked as
21   Exhibit Number 1 your deposition notice.  You've
22   seen that, right?
23         A      Correct.
24         Q      Okay.  And what we'll do in a
25   minute, we'll walk through that stuff.  All right?
```

Page 60

```
 1   discovery?
 2          A       I don't know.
 3          Q       Because you haven't seen any
 4   discovery?
 5          A       Correct.
 6          Q       And in looking at the letters in
 7   this case, it doesn't look like the plaintiff's
 8   attorneys ever sent you those policies or
 9   procedures, right?
10          A       Correct.
11          Q       As we sit here today, you cannot say
12   whether or not the Valley Regional Medical
13   Center's policies and procedures are adequate or
14   inadequate, you can't make any comment about them,
15   right?
16          A       Correct.
17          Q       The reason you know Valley Regional
18   Medical Center has a trauma alert policy and
19   procedure is where?
20          A       On the medical record.
21          Q       Because it's indicated where you can
22   check that box?
23          A       Correct.
24          Q       Now, the medical records you are
25   talking about are the forms out of the ER, ER
```

```
 1   remember seeing it, which was the check-off box
 2   you referred to.
 3         Q    I didn't refer to it, Mr. Ross.  I
 4   think it was something you referred to.
 5         A    Well, it was there.  I would have to
 6   go through this.
 7         Q    Would you like to go off the record
 8   while you're looking?
 9         A    Sure.  That's fine.
10         Q    Any time you need to take a break in
11   this case, you let me know and I'll be glad to let
12   you use the restroom, or get something to drink.
13   Okay?
14         A    Yes.
15              MR. GAULT:  Okay.  Let's take a
16         break.
17              (Whereupon, a recess was taken.)
18         Q    We are back on the record, Mr. Ross.
19   And did you find the trauma alert?
20         A    In the Brownsville Medical Center
21   Emergency Room assessment form.
22         Q    You understand, that's a different
23   hospital than Valley Regional, right?
24         A    Correct.
25         Q    So you understand that the patient
```

EXHIBIT
E

Page 66

```
 1    was not at Brownsville Medical Center on December
 2    24th of 1998.
 3            A     Correct.
 4            Q     Now, I think where we started this
 5    conversation is what evidence did you have that
 6    Valley Regional should have called a trauma alert.
 7    Do you have any evidence of that?
 8            A     No.
 9            Q     Okay.  And if we look at -- Can I
10    look at over your shoulder?
11            A     Please.
12            Q     I don't have a copy of that.
13                  If we look at Brownsville Medical
14    Center, you say they have some qualifications as
15    to when to call a trauma alert?
16            A     Correct.
17            Q     You don't know whether that applies
18    to Valley Regional or not?
19            A     Correct.
20            Q     As far as Valley Regional Medical
21    Center calling a trauma alert, are you going to
22    testify as to that?
23            A     No.
24            Q     Now, can we just -- As far as your
25    reports are concerned, do you agree to strike
```

1    those portions of your report pertaining to trauma

2    alert?

3                    MR. HOELSCHER:  Objection to form.

4         A    Can I just see the report for a

5    minute?

6         Q    Absolutely.  Which one do you want?

7         A    8 I guess.

8         Q    Did I give you the right one?  Is

9    there an affidavit there, too?

10        A    Yes.  And the answer to the question

11   is, yes, with regard to the trauma alert can be

12   removed from the report.

13        Q    Okay.  We'll keep the exhibits right

14   here.  Whenever you need to look at them, just

15   tell me.

16        A    Okay.

17        Q    In forming your opinions in this

18   case, what methodology did you use?

19        A    I reviewed all of the information

20   given; went to the Joint Commission book as well,

21   and formulated the opinion.

22        Q    Well, you didn't use the Joint

23   Commission materials until your second report, is

24   that correct?

25        A    I didn't cite the materials until