United States District Court
Southern Dis'
F
AUG 2 6 2004
Michael N. ....by
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CANDELARIO DE LEON | § | |
| | § | CIVIL ACTION NO. CV-B-00-192 |
| VS. | § | |
| | § | (JURY REQUESTED) |
| COLUMBIA VALLEY HEALTHCARE | § | |
| SYSTEM, L.P. D/B/A VALLEY REGIONAL | § | |
| MEDICAL CENTER, JOAO DOVALE, M.D. | § | |
| AND STAT PHYSICIANS, P.A. | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERTS DR. SLATER, DR. PETERS AND ZEFF ROSS

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Plaintiff Candelario De Leon and files his Response to the Motion to Exclude

Testimony of Plaintiff's Experts Dr. Slater, Dr. Peters and Zeff Ross filed by Defendant

COLUMBIA VALLEY HEALTHCARE SYSTEM, L.P., D/B/A/ VALLEY REGIONAL MEDICAL

CENTER (hereinafter "VALLEY REGIONAL"), and in support thereof, respectfully shows as

follows:

### I. BACKGROUND

1.     This is a medical negligence case against VALLEY REGIONAL which is scheduled

for trial in less than two months (October 4, 2004). Plaintiff's claims stem from actions which

occurred on Christmas Eve in 1998. On that date, Plaintiff sustained a serious spinal cord injury in

an automobile accident. He admitted to EMS workers that he had been drinking and also

complained of "numbness from the neck down." He was transported by EMS to the emergency

room of VALLEY REGIONAL in a cervical collar. At VALLEY REGIONAL, he was met by two

police officers there to arrest him. The health care providers at VALLEY REGIONAL noted that

Plaintiff was "unable to sign" his admission forms "due to medical condition." Despite Plaintiff's repeated statements that he could not stand, and his complaints of numbness, the health care providers at VALLEY REGIONAL did not perform a neurological exam. No one performed a spinal exam and no one ordered cervical spine films. Further, there is no documentation regarding if or when the cervical collar was removed. After he received medical treatment for a laceration to the forehead, Plaintiff was released by health care providers to the custody of police. On the hospital's discharge paperwork instead of Plaintiff's signature was printed "pt. can't sign." The next day, when police noted that Plaintiff was still unable to move, he was taken to the Brownsville Medical Center where he was finally diagnosed with an acute spinal cord injury and eventually discharged to a nursing home. He remains a quadraparetic.

2.    Experts contend that Plaintiff was prematurely discharged from VALLEY REGIONAL and that if he had been treated with intravenous steroids for his spinal cord injury at the time of his admission there, Plaintiff would not have the neurologic deficits he has today. *See* Exhibits B, E, H, I.

3.    Now, less than two months before trial, Defendant VALLEY REGIONAL moves to exclude Plaintiff's experts on the bases that (1) they are not qualified to offer opinions in this case; and (2) their proposed testimony is not reliable. *See* Def't Mtn., 2. To the extent that Defendant relies upon the reasoning and analyses of the Texas Supreme Court in *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713 (Tex. 1998), *Merrell Dow Pharmaceuticals, Inc., v. Havner*, 953 S.W.2d 706 (Tex. 1996) and *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558, (Tex. 1995) and/or state appellate courts in setting the standard for the Court's inquiry, Plaintiff objects and urges that Defendant's motion be denied. Indeed, as articulated below, the proper

analysis for the Court is set out in Federal Rule of Evidence 702 and in *Daubert v. v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579(1993).

## II. PLAINTIFF'S EXPERTS MEET THE REQUIREMENTS OF FRE 702 AND OF *DAUBERT*

4.    Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. This rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

Effective December 1, 2000, Rule 702 was amended to incorporate the principles first articulated by the Supreme Court in *Daubert v. v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579(1993). *See* Fed. R. Civ. P. 702, Adv. Comm. Notes (2000). Under *Daubert,* expert testimony is admissible only if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Watkins v. Telsmith, Inc.,* 121 F.3d 984, 988-89 (5th Cir.1997).

5.    As a preliminary matter, the trial court is required to determine whether a proposed expert is qualified to give expert testimony. *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672, 676 (W.D.Tex. 2002)(citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156 (1999). A party seeking to exclude expert testimony because the expert is not qualified must show that the expert does not possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person. *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2nd Cir.1995). If the trial court determines that the expert is qualified in the relevant field, then the court must exercise its gate-keeper function as provided in *Daubert. See Newton,* 243 F.Supp. 2d at 676.

6.    Notwithstanding the dictates of *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule." FED. R. CIV. P. 702, Adv. Comm. Notes (2000). *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id., quoting United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir.1996). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; *see also In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 744 (3rd Cir.1994), *cert. denied,* 513 U.S. 1190 (1995) ("The grounds for an expert's opinion merely have to be good, they do not have to be perfect."). Thus, while exercising its role as a gate-keeper, "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir. 2002). In support of his contention that Plaintiff's experts are qualified to testify in this case and that said experts' opinions are reliable, Plaintiff appends hereto and fully incorporates herein the following:

| | |
|---|---|
| Exhibit A | *Curriculum Vitae* of Dr. Slater |
| Exhibit B | Expert Report of Dr. Slater |
| Exhibit C | Deposition of Dr. Slater |
| Exhibit D | *Curriculum Vitae* of Dr. Peters |
| Exhibit E | Expert Report of Dr. Peters |
| Exhibit F | Deposition of Dr. Peters |
| Exhibit G | *Curriculum Vitae* of Zeff Ross |
| Exhibit H | Expert Report of Zeff Ross |

Exhibit I        Affidavit of Zeff Ross

Exhibit J        Deposition of Zeff Ross

Exhibit K        Medical literature, authority relied upon by Dr. Slater in formulating his opinions

Exhibit L        Medical literature, authority relied upon by Dr. Peters in formulating his opinions

### A.   PLAINTIFF'S EXPERTS ARE QUALIFIED TO TESTIFY IN THIS CASE

7.      An expert witness "qualified ... by knowledge, skill, experience, training or education," may testify when specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. FED.R.EVID. 702; *see also Daubert,* 509 U.S. at 587. In the present case, Plaintiff has designated an emergency room physician, a neurologist and a hospital administrator as witnesses to establish that Defendants VALLEY REGIONAL and JOAO DOVALE, M.D. were negligent on December 24, 1998. "At this stage, the only question for the trial court is whether the expert is generally qualified to render an opinion on the question in issue." *Christophersen v. Allied- Signal Corp.* ., 939 F.2d 1106, 1110 (5th Cir.1991) (en banc), *cert. denied,* 503 U.S. 912 (1992). The court has wide discretion in determining whether an expert is qualified. *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 274 ((5th Cir.1998) (en banc), *cert. denied,* 526 U.S. 1064 (1999).As articulated below, these witnesses are experts, qualified by knowledge, skill, experience, training and education. Plaintiff urges that their testimony will assist the trier of fact to understand the evidence or to determine the facts at issue in this case: the standard of care applicable to hospital patients such as Plaintiff; whether Defendants breached the standard of care; and whether this breach was a proximate cause of Plaintiff's neurological deficits.

### i.   AS A BOARD CERTIFIED NEUROLOGIST, DR. SLATER IS QUALIFIED TO TESTIFY IN THIS CASE.

8.      Dr. Slater's curriculum vitae, which is attached hereto as Exhibit A and incorporated herein by reference, reflects that he is board certified in neurology.  He has twenty seven (27) years of education and practice in the field of neurology.  Additionally, according to his deposition, he has been consulted in countless emergency room cases and is familiar with the standards of care for emergency room medicine.  *See* Slater Deposition, 11 (Exhibit C).  Dr. Slater also testified that he is familiar with journals, treatises and papers regarding spinal cord injuries, and specifically, nonoperative managment of acute spinal cord injuries.  *See* Slater Deposition, 30, 36 (Exhibit C).  Given his knowledge, skill, experience, training, and education, Dr. Slater is qualified to testify in this case.

### ii.   AS A PHYSICIAN BOARD CERTIFIED IN EMERGENCY MEDICINE, DR. PETERS IS QUALIFIED TO TESTIFY IN THIS CASE.

9.      Dr. Peters' curriculum vitae, which is attached hereto as Exhibit D and incorporated herein by reference, reflects that the is board certified in emergency medicine.  He has over thirteen (13) years education and practice in the area of emergency medicine.  Through his professional studies and personal experience in the emergency room, he is familiar with the standard of care for emergency room physicians.  *See* Peters Deposition, 8 (Exhibit F).  Given his knowledge, skill, experience, training, and education, Dr. Slater is qualified to testify in this case.

### iii.   AS AN ADMINISTRATOR WITH EXPERIENCE IN DEVELOPING MEDICAL STAFF RULES AND REGULATIONS, MR. ROSS IS QUALIFIED TO TESTIFY IN THIS CASE.

10.     According to the curriculum vitae of Mr. Zeff Ross, which is attached hereto as Exhibit G, he is a hospital administrator who has experience in developing rules and regulations for medical staff, including doctors.  Mr. Ross is board certified in health care management, *See* Ross

Deposition, 21 (Exhibit J), and has familiarity with the standards, rules and regulations of the Joint

Commission on Accreditation of Healthcare Organizations (JCAHO). *See* Ross Deposition, 22

(Exhibit J). According to the standards set out by the JCAHO, the goal of the patient assessment

function of hospitals is to determine what kind of care is required to meet a patient's needs. *Id.* at

22-23. Mr. Ross is qualified to explain "what the hospital did or did no do, or the nurses did or did

not do, or the physician did or did not do, in accordance with the standard of care." *Id.* at 44. He

concedes that he is not a physician and will not offer an opinion regarding causation. Id. at 43.

However, with respect to the standards applicable to healthcare providers and the reasons for those

standards, Mr. Ross is indeed qualified by education, training, practical experience, and specialized

knowledge. *See* Exhibits G-J.

**B.    THE OPINIONS OF DR. SLATER, DR. PETERS & MR. ROSS ARE RELIABLE**

11.    *Daubert* lists five non-exclusive factors to consider when assessing the scientific

validity or reliability of expert testimony. These factors are:

1.    Whether the theory or technique has been tested;
2.    Whether the theory or technique has been subjected to peer review and publication;
3.    The known or potential rate of error of the method used;
4.    The existence and maintenance of standards and controls in the methodology; and
5.    Whether the theory or method has been generally accepted by the scientific community. *Daubert,* 113 S.Ct. at 2796-97.

However, as the Supreme Court has recognized, "the factors identified in *Daubert* may or may not

be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular

expertise, and the subject of his testimony." *Kumho Tire,* 119 S .Ct. at 1175; *see also Watkins,* 121

F.3d at 988-89 ("Not every guidepost outlined in *Daubert* will necessarily apply to expert testimony

..."). A trial court has wide latitude in deciding how to determine reliability, just as it has

considerable discretion with respect to the ultimate reliability determination. *Kumho Tire,* 119 S.Ct. at 1176. In most cases, the court must first decide whether the factors mentioned in *Daubert* are appropriate. *Pipitone,* 288 F.3d at 247.

12.     Defendant challenges Plaintiff's expert's opinions on the basis that they do not meet the five *Daubert* factors. Often, however, the *Daubert* factors may not be relevant to the case at hand. *Pipitone,* 288 F.3d at 247. For example, publication in a peer reviewed journal does not necessarily correlate with reliability and is "not [a] dispositive consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Daubert,* 113 S.Ct. at 2797; *see also Kumho Tire,* 119 S.Ct. at 1175. In a case such as this one, where the expert's testimony is based mainly on his personal observations, professional experience, education and training, it is appropriate for the trial court to consider factors *other* than those listed in *Daubert* to evaluate the reliability of the expert's testimony. *Id.* The Advisory Committee notes to Rule 702 specifically contemplate this approach: Nothing in this amendment is intended to suggest that experience alone--or experience in conjunction with other knowledge, skill, training or education- may not provide sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. FED. R. EVID. 702 (Advisory Committee Note).

13.     Likewise, in *Kumho Tire,* the Court explained that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." 526 U.S. at 156. Accordingly, the Fifth Circuit has upheld the admission of expert testimony where it was based on the expert's specialized knowledge, training, experience, and first-hand observation while supported by solid evidence in the scientific community. *Pipitone,* 288 F.3d at 247. Indeed,

Plaintiff argues that the elements enumerated in *Daubert* are not relevant in the present case, a medical malpractice case where experts base their opinions on knowledge, skill, experience, training and education, and not on scientific theories or data. Instead, Plaintiff can show that his experts are reliable based upon their specialized knowledge, training, experience, and first-hand observation while supported by solid evidence in the scientific community.

### i.    DR. SLATER'S OPINIONS ARE RELIABLE.

14.    As a board certified neurologist, Dr. Slater has specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue, i.e., standard of care, breach and causation. His testimony is relevant and reliable in accordance with Rule 702. FED.R.EVID. 702. His opinion is that the neurological examination of Plaintiff on December 24, 1998 was inadequate. *See* Slater Deposition, 87 (Exhibit C). Dr. Slater believes that had Plaintiff been provided with a treatment of steroids for his spinal cord injury on December 24, 1998, Plaintiff would not have the neurologic deficits he has today. *See* Exhibit B. He states unequivocally that in 1998, it was especially standard practice to give steroids early in the course of a spinal injury. *See* Slater Deposition, 25 (Exhibit C). As articulated above, his opinions are based upon his specialized knowledge, training, experience, and first-hand observation of emergency room care. *See* Slater Deposition, 51-52 (Exhibit C). Additionally, his opinions are supported by solid evidence in the medical community which hold that "the earlier you give steroids, the more likely you are to see [neurological] benefit." *Id.* at 43. Although there is debate in the medical literature regarding exactly *how much* improvement a patient gains, the medical literature is clear that steroids are the standard of practice. *Id.* Indeed, different studies reveal different levels of improvement from steroids. *Id.* at 45. However, this debate is fodder for cross-examination not exclusion of evidence altogether.

Dr. Slater's opinion is that if Plaintiff had been provided with a treatment of steroids for his spinal cord injury on December 24, 1998, Plaintiff would not have the neurologic deficits he has today, *See* Exhibit B - C. In addition to being based upon his specialized knowledge, his opinions and testimony is based upon solid evidence in the scientific community. *See* Slater Deposition, 30, 43 (Exhibit C). Dr. Slater relies upon "multiple studies" and a journal article regarding the nonoperative management of acute spinal cord injuries. *See* Exhibit K.

15.    The Fifth Circuit has upheld the admission of expert testimony where it was based on the expert's specialized knowledge, training, experience, and first-hand observation while supported by evidence in the medical community. *See Pipitone,* 288 F.3d at 247. Under this analysis, the testimony of Dr. Slater is reliable and certainly relevant in this case and should not be excluded.

### ii.    DR. PETERS'S OPINIONS ARE RELIABLE.

16.    Dr. Peters is board certified in emergency medicine. See Exhibits D-F. Through his professional studies and personal experience in the emergency room, he is familiar with the standard of care for emergency room physicians. *See* Peters Deposition, 8 (Exhibit F). Dr. Slater has specialized knowledge that will assist the trier of fact to understand the evidence and to determine a fact in issue, i.e., standard of care, breach and causation. His testimony is relevant and reliable in accordance with Rule 702. FED. R. EVID. 702. The *Daubert* analysis focuses on the reasoning or methodology employed by the expert, not the ultimate conclusion. *Watkins,* 121 F.3d at 989. The purpose of such an inquiry is "to make certain that an expert, whether basing testimony upon professional studies or **personal experience**, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Skidmore v. Precision Printing*

*and Packaging, Inc.,* 188 F.3d 606, 618 (5th Cir.1999), *quoting Kumho Tire,* 119 S.Ct. at 1176. (Emphasis added). Thus, the court "must review only the reasonableness of the expert's use of such an approach, together with his particular method of analyzing data so obtained, to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant." *American Tourmaline Fields v. International Paper Co.,* 1999 WL 242690 at *2 (N.D.Tex. Apr.19, 1999), *citing Kumho Tire,* 119 S.Ct. at 1177. Dr. Peter's opinions are that Dr. Dovale and nurses at VALLEY REGIONAL provided Plaintiff with medical care which fell below the minimum standards and that this was a cause in contributing to Plaintiff's injuries and damages. *See* Exhibit E; Peters Deposition, 9-10, 16-18 (Exhibit F). His opinions are based upon his review of medical records, medical literature (See Exhibit L) and his specialized knowledge, training, experience, and first-hand observation.

17.     The Fifth Circuit has upheld the admission of expert testimony where it was based on the expert's specialized knowledge, training, experience, and first-hand observation while supported by solid evidence in the medical community. *See Pipitone,* 288 F.3d at 247. Because the testimony of Dr. Peters meets these requirements, his testimony should not be excluded and Defendant's motion should be denied in all respects.

### iii.   MR. ROSS'S OPINIONS ARE RELIABLE.

18.     Mr. Ross is a hospital administrator who has experience in developing rules and regulations for medical staff, including doctors. See Exhibit G. He has familiarity with the standards, rules and regulations of the Joint Commission on Accreditation of Healthcare Organizations (JCAHO), *See* Ross Deposition, 22 (Exhibit J), and has reviewed and relied upon these criteria in formulating his opinions. *Id.* at 22-23. According to the standards set out by the

Plaintiff's Response to Defendant's Motion to Exclude Experts - Page 11

JCAHO, the goal of the patient assessment function of hospitals is to determine what kind of care is required to meet a patient's needs. *Id.* It is his opinion that the hospital personnel violated the standards established by JCAHO in providing medical care to Plaintiff. See Exhibits H-J. Mr. Ross has specialized knowledge that will assist the trier of fact to understand the evidence and to determine a fact in issue, i.e., standard of care. His testimony is relevant and reliable, in accordance with Rule 702. FED. R. EVID. 702. The purpose of the *Daubert* inquiry is "to make certain that an expert, whether basing testimony upon professional studies or **personal experience**, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Skidmore,* 188 F.3d at 618 (Emphasis added). In this case, Mr. Ross's opinions are based upon his review of JCAHO rules and regulations, his review of medical records and his specialized knowledge, training, experience, and first-hand observation.

19.    The Fifth Circuit has upheld the admission of expert testimony where it was based on the expert's specialized knowledge, training, experience, and first-hand observation and supported by solid evidence in the medical community. *See Pipitone,* 288 F.3d at 247. Mr. Ross's opinions are based upon specialized knowledge, training, experience, and first-hand observation and are supported by JCAHO standards applicable to the medical community. *See Pipitone,* 288 F.3d at 247. Therefore, his proffered testimony meets these requirements of Rule 702 and Defendant's motion to exclude Dr. Ross from testifying in this case should be denied in all respects.

### III.    ALTERNATIVE MOTION TO DESIGNATE EXPERTS OUT OF TIME

20.    This is a medical negligence case. Plaintiff necessarily relies on the testimony of his experts to prove that Defendants breached the standard of care applicable to the respective healthcare providers and that such breach caused Plaintiff's injuries. The exclusion of Plaintiff's expert

witnesses at this juncture would amount to a "death penalty" sanction. See e.g., *Lindley v. Johnson*, 936 S.W.2d 53, 54 n. 1 (Tex. App. – Tyler, 1996); *Smith v. Nguyen*, 855 S.W.2d 263, 266 (Tex.App.--Houston [14th Dist.] 1993, writ denied). Accordingly, should the Court conclude that Plaintiff's experts fail to meet the requirements of Rule 702, Plaintiff respectfully requests leave to designate new experts out of time.

### C.    CONCLUSION

21.    An expert witness qualified by knowledge, skill, experience, training or education may testify when specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. Because Doctors Slater and Peters and Mr. Ross are indeed qualified by knowledge, skill, experience, training and education to serve as experts in this case, and because their specialized knowledge will assist the trier of fact to understand the evidence and to determine a fact in issue, their proffered testimony satisfies the requirements of Fed. R. Evid. 702. Accordingly, Defendants motion to exclude their testimony should be denied in all respects.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendant's Motion to Exclude Testimony of Plaintiff's Experts Dr. Slater, Dr. Peters and Zeff Ross be denied in all respects. Alternatively, should the Court conclude that the motion should be granted, Plaintiff prays that the Court will grant Plaintiff leave to designate new experts out of time. Plaintiff further requests all other relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

**BRANTON & HALL, P.C.**
One Riverwalk Place, Suite 1700
700 N. St. Mary's St.
San Antonio, Texas 78205
(210) 224-4474
(210) 224-1928 (Fax)

By: _____
    THOMAS A. CROSLEY
    State Bar No. 00783902
    S. Dist. Texas No. 15434
    JAMES L. BRANTON
    State Bar No. 00000069
    S. Dist. Texas No.20163

And

MICHAEL COWEN
State Bar No. 00795306
S. Dist. Texas No. 19967
Law Offices of Cowen & Bodden
520 E. Levee
Brownsville, Texas 78520
(956) 541-4981

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served, via certified mail, return receipt requested, on this 25th day of August, 2004, to:

Steven Matthew Gonzalez
Mr. Gerald E. Castillo
GONZALEZ, GAYTAN, GARZA & CASTILLO, L.L.P.
1317 E. Quebec Avenue
McAllen, TX 78503

ATTORNEYS FOR DEFENDANTS,
STAT PHYSICIANS, P.A. and
JOAO DOVALE, M.D.

William Gault
Paul Fourt
BRIN & BRIN, P.C.
1325 Palm Blvd., Suite A
Brownsville, Texas 78520

ATTORNEYS FOR DEFENDANTS
COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. D/B/A VALLEY
REGIONAL MEDICAL CENTER

_____
Thomas A. Crosley
Michael Cowen

# CURRICULUM VITAE

Jeremy D. Slater, MD

**PRESENT TITLE:**    Associate Professor of Neurology

**ADDRESS:**
Business:    University of Texas Health Science Center at Houston
Department of Neurology
6431 Fannin, Suite 7044
Houston, TX 77030
Phone: 713-500-7106
Fax: 713-500-7019

**BIRTHDATE:**    April 29, 1960

**CITIZENSHIP:**    USA

**UNDERGRADUATE EDUCATION:**

1982    Bachelor of Science in Molecular Biophysics and Biochemistry
Yale University, New Have, Connecticut

**POSTGRADUATE EDUCATION:**

1986    Doctorate of Medicine
University of Pittsburgh School of Medicine, Pittsburgh, Pennsylvania

**ACADEMIC APPOINTMENTS:**

1986-1987    Internship, Medical College of Pennsylvania
Philadelphia, Pennsylvania

1987-1990    Neurology Resident, Department of Neurology, University of Miami
School of Medicine Miami, Florida

1989-1990    Chief Resident, Department of Neurology, University of Miami School of
Medicine; Miami, Florida

1990-1991    Fellow in Electrophysiology and Epilepsy, Department of Neurology,
University of Miami School of Medicine, Miami, Florida

1991-1994    Assistant Professor, Department of Neurology, University of Miami
School of Medicine, Miami, Florida

EXHIBIT
tabbies
A

1994-1997    Clinical Assistant Professor, Department of Neuroscience, University of North Dakota School of Medicine, Bismarck, North Dakota

2004-Present    Associate Professor, Department of Neurology, University of Texas-Houston Medical School, Houston, Texas

HOSPITAL APPOINTMENTS:

1994-1997    Staff Neurologist, Medical Director of Clinical Neurodiagnostics Laboratory, Medcenter One, Bismarck, North Dakota

1998-2003    Staff Neurologist, Medical Director of EEG and Evoked Potential Laboratory, St. John's Physicians & Clinics, Springfield, Missouri

2004-Present    Staff Neurologist, Epilepsy Monitoring Unit, Texas Comprehensive Epilepsy Program, Memorial Hermann Hospital

LICENSURE:

State of Missouri        114159
State of California       G86630
State of Texas           (Number not yet available)
DEA                      (Available upon request)
Texas DPS

BOARD CERTIFICATION:

1993        American Board of Psychiatry and Neurology
1997        American Board of Clinical Neurophysiology
2000        American Board of Sleep Medicine

PROFESSIONAL ORGANIZATIONS:

Member, American Academy of Neurology
Member, American Epilepsy Society
Member, American Medical Association
Member, American Academy of Sleep Medicine

PAST GRANT SUPPORT:

1. Abbott Laboratories. Safety and Efficacy of Gabitril in the Treatment of Restless Leg Syndrome – A Pilot Study. March 2000-September 2000. ($5,200)
2. Ivax. Efficacy and Safety of Talampanel as Adjunctive Therapy in Patients with Partial Seizures: A Phase II Clinical Trial. March 2002-December 2003. ($80,000)

PUBLICATIONS:

### BOOKS AND MONOGRAPHS PUBLISHED;

Ramsay RE and Slater JD:  Bromides in The Treatment of Epilepsy:  Principles and Practice.  Edited by Elaine Wyllie, Lea & Febiger, 955-958, 1993.

Wu FY, Slater JD, Ramsay RE and Honig LS:  Neural Networks for EEG Diagnosis in Intelligent Engineering Through Artificial Neural Networks.  Edited by C. H. Dahli, L.I. Burke and Y.C. Shin, ASME Press, Volume 2:559-564, 1992.

Ramsay RE, Slater JD.  Antiepileptic Drugs in Clinical Development in: New Antiepileptic Drug Development:  Preclinical and Clinical Aspects. Edited by J.A. French, M.A. Dichter and I.E. Leppik, Elsevier Science Publishers B.V. Elsevier, New York, 1993.

### JURIED OR REFEREED JOURNAL ARTICLES AND EXHIBITIONS:

Ramsay RE and JD Slater.  Effects of Antiepileptic Drugs on Hormones. Epilepsia, 32 (Suppl 6):  S60-S67, 1991.

Ramsay RE, Wilder BJ, Murphy JV, Holmes GL, Uthman B, Slater JD, Morris DD, Shu VS and Pierce MW.  Efficacy and Safety of Valproic Acid Versus Phenytoin as Sole Therapy for Newly Diagnosed Primary Generalized Tonic-Clonic Seizures.  J Epilepsy, 5:55-60, 1993.

Landy HJ, RG Curless, RE Ramsay, J Slater, C Ajmone-Marsan, & RM Quencer. Corpus Callosotomy For Seizures Associated with Band Heterotopia.  Epilepsia, 34:70-83, 1993.

Landy HJ, RE Ramsay, JD Slater, RR Casiano, & R Morgan.  Vagus Nerve Stimulation for Complex Partial Seizures:  Surgical, Technique, Safety, and Efficacy.  J of Neurosurgery, 78:26-31, 1993.

Wu FY, Slater JD, Honig LS, Ramsay RE.  A Neural Network Design for Event-Related Potential Diagnosis.  Comput Biol Med, 23:251-264, 1993

Landy HJ, RE Ramsay, C Ajmone-Marsan, & JD Slater.  Incomplete Interhemispheric Fissure and Joint Cingulate Gyrus Interfering with Corpus Callosotomy.  J of Neurosurgery.  (In press).

Ramsay RE, Uthman B, Augustinsson L., Upton ARM, Naritoku DK, Willis JK, Treig T, Barolat G, Wernicke JF, and the First International Vagus Nerve Stimulation Study Group:  JD Slater et al.

Vagus Nerve Stimulation (VNS) for Treatment of Partial Seizures:  2.  Safety, Side Effects and Tolerability.  Epilepsia.  (In press).

Slater JD; Morgan R; Ramsay RE; Honig LS; Wu FY.  Neural Network Analysis of the P300 Event-Related Potential in Multiple Sclerosis.  Electroencephalogr Clin Neurophysiol 1994 Feb; 90 (2):114-22.

Ben-Menachem E, Hufnagel A, Wilder BJ, Stefan H, Mirza WU, and the First International Vagal Stimulation Study Group:  JD Slater et al.  Vagal Stimulation as Treatment for Partial Epilepsy:  Effect on Seizures in a Controlled Study.  (Submitted to Epilepsia).

George RE, Sonnen AEH, Ristanovic RK, Barolat G and the First International Vagal Stimulation Study Group:  JD Slater et al.  Vagal Stimulation as Treatment for Partial Epilepsy:  Safety and Tolerability.  (Submitted to Epilepsia.)

Salinsky M, Manon-Espaillat R, Kuzniecky R, Rosenfeld WE and the First International Vagal Stimulation Study Group:  JD Slater et al.  Vagal Stimulation as Treatment for Partial Epilepsy:  Long-Term Effects and Quality of Life.  (Submitted to Epilepsia.)

Slater JD; Ramsay RE; Jacobs W; Brown MC.  Induction of Pseudoseizures With Intravenous Saline Placebo.  Epilepsia 1995 June; 36 (6):  580-5.

Ben-Menachem E; et al; Wernicke JF; Ramsay RE; Stefan H; Treig T; Slater J; Uthman BM; Hammond EJ; Hedner T; Hamberger A.  Epilepsy Res 1995 Mar; 20 (3):  221-7.

Gallo BV; Ramsay RE; DeToledo J; Toledo C; Slater JD.  Pharmacokinetics and Muscle Histopathology Of Intramuscular Valproate.  Epilepsy Res 1997 July; 28 (1):  11-5.

## ABSTRACTS AND OTHER PUBLICATIONS

Slater JD, Singer C, Ramsay RE.  Parkinson's Disease and Epilepsy:  An Epidemiological Survey.  Epilepsia 31 (5):604, 1990.

Ramsay RE, Avery A, Gallo B, Slater JD, and McManus D.  Safety and Kinetics of Intramuscular Valproate.  Epilepsia 31 (5): 654, 1990.

Ben-Menachem E, Hamberger A, Hedner T, Hammond EJ, Uthman RM, Slater JD, Ramsay RE, Wilder BJ.  The Effects of Vagus Nerve Stimulation on Concentrations in the CSF of  5-Hydroxy Indoleacetic Acid, Homovanillic Acid, GABA, and Other Amino Acids in Patients with Partial Epilepsy.  Epilepsia, 32 (Suppl 3) : 90,  1991.

Uthman B, Slater J, Hammond E, Gallo BV, McJilton JS, Wilder BJ, Ramsay RE.  Safety and Tolerability of Vagal Stimulation.  Epilepsia, 32 (Supple 3) : 90, 1991.

Ramsay RE, Uthman B, Ben-Menachem E, Slater J, Erik Augustinssen L, Landy H, Reid S, Hammond E, Andersen O, Gallo BV, McJilton JS, Wilder BJ. Efficacy of Vagal Nerve Stimulation in Partial Seizures: Double-Blind Comparison of Two Stimulus Paradigms. Epilepsia, 32 (Suppl 3) : 90, 1991.

Shor-Posner G, Ramsay RE, Morgan R, Slater J, Beach RS. Association of Electrophysiologic Brain Function and Nutritional Status in Human Immunodeficiency Virus (HIV-1) Infection. Accepted for presentation at the Society for Neuroscience annual meeting, New Orleans, November, 1991.

Slater JD, Lundy DS, Casiano RR, Landy H, Gallo BV, LoPresti J, Ramsay, RE. Vagus Nerve Stimulation Effects on Laryngeal Function. Epilepsia, 33 (Suppl 3) : 101, 1992.

Landy HJ, Slater J, Uthman B, Reid S, Casiano R, Wilder BJ, Ramsay RE. Vagus Nerve Stimulation For Complex Partial Seizures. Accepted for presentation at the American Association of Neurological Surgeons annual meeting, San Fancisco, April 1992.

Slater JD, Wu FY, Ramsay RE. Neural Network Analysis of the P300 Cognitive Evoked Potential in Epilepsy, Multiple Sclerosis and Parkinson's Disease. Epilepsia, 33 (Suppl 3) : 60, 1992.

Aranguiz, C, Nemire R, Slater JD, Jallad NS, LoPresti J, Ramsay RE. Idiokinetic Propanolol-Valproate Drug Interaction. Epilepsia, 33 (Suppl 3) : 102, 1992.

Landy HJ, Ramsay RE, Slater J, Casiano RR, Morgan R. Vagus Nerve Stimulation for Complex Partial Seizures: Surgical Technique, Safety, and Efficacy. Accepted for presentation at the Congress of Neurological Surgeons annual meeting, Washington, D.C., October 31-November 5, 1992.

Wilder BJ, Slater J, Malon J, Campbell K, Gilmore R, Uthman BM, Perchalski RJ, Ramsay RE. Parenteral Loading and Maintenance of Phenytoin with Fosphenytoin, a Phenytoin Prodrug. Epilepsia, 34 (Suppl 2) : 27, 1993.

Ramsay RE, Slater JD, Cox M. Neurocardiogenic Syncope Successfully Treated with Valproate. Epilepsia, 34 (Suppl 2) : 86, 1993.

Slater JD, Brown MC, Ramsay RE, Jacobs W. Intravenous Normal Saline Placebo Induction in Patients with Epilepsy and Pseudoseizures. Epilepsia, 34 (Suppl 2) : 114-115, 1993.

Slater JD, Wu FY, Ramsay RE. Neural Network Analysis of the P300 Cognitive Evoked Response In Temporal Lobe Epilepsy. Epilepsia, 34 (Suppl 2) : 130, 1993.

Jacobs W, Ramsay RE, Slater JD, Brown MC, Nemire RE, Ortiz WR, Ayala R, LoPresti J. Contribution of Family Patterns of Unsuccessful Medical Treatment of Epilepsy. Epilepsia, 34 (Suppl 6) : 10, 1993.

Nemire RE, Ortiz WR, Ayala R, Slater JD, Ramsay RE.  The Effectiveness of Clobazam in Refractory Seizures.  Epilepsia, 34 (Suppl 6) :40, 1993.

Brown MC, Slater JD, Ramsay RE, Landy HJ.  Does Discontinuation of Anticonvulsant Medication Obscure Neuropsychological Data in Focal Epilepsy?  Epilepsia, 34 (Suppl 6): 86, 1993.

Ramsay RE, Slater JD, Aranguiz C, Vega M, Ortiz WR,  Ayala R, Lalama H, Rask C. Open Treatment With Tiagabine and Conversion to Monotherapy of Patients with Uncontrolled Partial and Generalized Seizures.  Epilepsia, 34 (Suppl 6) : 103, 1993.

Slater JD, Wu FY, Meador KJ, Ramsay RE.  Neural Network Analysis of the P300 Event-related Potential in Healthy Subjects in the Drug versus Non-drug State.  Epilepsia, 34 (Suppl 6) : 136,1993.

Ramsay RE, Slater JD, Aranguiz C, Vega M, Ortiz WR, Ayala R, Lalama H, Rask C. Open  Treatment With Tiagabine and Conversion to Monotherapy of Patients with Uncontrolled Partial and Generalized Seizures.  Epilepsia, 34 (Suppl 6) : 103, 1993.

Slater J, Ramsay E, Barolat G, Rosenfeld W, Willis J.  One Year Results of Vagus Nerve Stimulation (VNS) in 82 Refractory Epilepsy Patients.  Presented at the XVth World Congress of Neurology,Vancouver, Canada, September 1993.

Rosenfeld W, Slater J. Characterization of Topiramate-Associated Weight Changes in Adults with Epilepsy. Epilepsia, 43 (Suppl 7): 220, 2002.

**Page 13**

1 accident and then going over their -- their review of
2 systems. You're going to ask them -- if you think
3 there's been a head injury, you're going to ask them
4 about changes of consciousness, headache, dizziness,
5 blurred, double vision. You're going to ask them about
6 do they have any weakness or numbness in their
7 extremities, either all over or affecting one side or
8 the other. If they have been ambulating since the
9 accident occurred, you ask them if they have any
10 problems with ambulation. Have they had any problems
11 with incontinence, fecal incontinence, for example. And
12 probably ask more questions as details of the history
13 come out. You definitely ask them if they have any
14 localized or generalized numbness.
15 And so one thing you would expect a physician
16 to do in this setting is to gather information from the
17 EMS personnel who bring in the patient?
18 Either directly through reading their reports,
19 if nursing staff discussed the, you know, the intake.
20 I -- there are going to be situations where the EMS
21 physician goes in and evaluates when they come and they
22 drop the patient off and leave. But if they do that,
23 generally going to be a record. The EMS
24 personnel are going to leave a record regarding what

**Page 14**

1 they did with the patient, or they will have discussed
2 it with the nurse, ideally both. And somebody's going
3 to have the information. I mean, the pa- -- the patient
4 doesn't come in a vacuum.
5 In this case there's some evidence that the EMS
6 did not return to service until approximately five to
7 ten minutes after Mr. De Leon was discharged from the
8 hospital.
9 A. Okay.
10 Q. And that the EMS personnel were there at the
11 hospital when Mr. De Leon was being treated. In that
12 scenario would you expect the physician to gather
13 information from the EMS about what they observed and
14 what they noted in the patient, either directly or
15 indirectly through the nurses?
16 MS. SAGE: Objection. Calls for
17 speculation. And -- yeah, calls for speculation.
18 Q. (By Mr. Crosley) And you may answer.
19 A. Well, it -- it's not speculation. In my
20 opinion, yeah, of course. I mean, that's -- you're
21 going to -- history is 90 percent of making the
22 diagnosis. You're going to try to get as much
23 information as you can.
24 Q. Is there any evidence, based on what you

**Page 15**

1 reviewed in the medical record and based on your review
2 of Dr. Dovale's testimony, that Dr. Dovale either
3 personally discussed with EMS what they documented and
4 found and observed with respect to Mr. De Leon?
5 A. My impression after reading his depositions is
6 that he didn't speak to them, and he didn't review their
7 notes.
8 Q. Okay. We had talked about what the standard of
9 care requires the ER physician to do when presented with
10 the patient in the same condition as Mr. De Leon, and
11 one thing you had said was get -- get a history,
12 including from the EMS personnel that brought him, and
13 get a history from the patient.
14 A. Right.
15 Q. And then you said something else that -- in
16 response to a question that was the second thing that
17 was supposed to be done which was -- refresh my memory
18 on this.
19 A. Well, you can -- there are a variety of things
20 that are going to take place. Not all of them are going
21 to apply to every patient. There are the standard
22 ABC's, airway, breathing, circulation. You are going to
23 make sure all of these things -- those are the most
24 critical things with any patient that comes into the
25 emergency room. So, you're going to make sure of all

**Page 16**

1 those things are up and running and taken care of,
2 getting IV's in place, making sure that the spine has
3 been stabilized, you've done your neurologic assessment.
4 If there is a suspicion of a spinal cord injury on the
5 basis of your exam, you're going to introduce
6 intravenous steroids, get an immediate neurosurgical
7 consultation, try to arrange for more detailed spine
8 imaging.
9 Q. Okay. Mr. De Leon did have a spinal cord
10 injury when he was evaluated at the Brownsville Medical
11 Center the following day.
12 A. Right.
13 Q. Do you have an opinion as to whether or not he
14 had spinal cord injury when he was being seen and
15 treated in the emergency room on December 24th?
16 A. Certainly seems likely.
17 Q. And based -- is that your opinion based on
18 reasonable medical probability?
19 MR. GAULT: Objection, misstates
20 testimony.
21 Q. (By Mr. Crosley) Do you have an opinion based
22 on reasonable medical probability as to whether or not
23 Mr. De Leon had a spinal cord injury when he was being
24 treated at Valley Regional Hospital by Dr. Dovale?
25 MR. GAULT: Same objection.

**5**

```
 1   IT IS STIPULATED and agreed by and between
 2   counsel for the respective parties hereto that the
 3   deposition of the witness named in the caption hereto
 4   may be taken at this time and place before the officer
 5   named in the caption hereto; that said deposition, or
 6   any part thereof, when so taken, may be used on the
 7   trial of this case with the same force and effect as if
 8   the witness were present in court and testifying in
 9   person.
10       THAT the necessity for preserving objections at
11   the time of taking is waived and that any and all legal
12   objections to this deposition, or any part thereof, may
13   be urged at the time same is sought to be offered in
14   evidence on the trial of this cause; except, however,
15   that objections to the form of the question and/or
16   responsiveness of the answer must be made at the time of
17   taking, or else such objections are waived.
18       THAT the original of this deposition shall be
19   presented to the witness for his examination and
20   signing, and thereafter, the witness shall return same
21   to the officer taking this deposition.
22       THAT if the signed original is not presented to
23   Mr. Thomas A. Crosley to the time of trial or any
24   hearing in this mater, a copy may be used in lieu
25   thereof.
```

**6**

```
 1       (Slater Exhibit No. 1 was marked.)
 2       THE VIDEOGRAPHER: Today is Wednesday, May
 3   26th, 2004. The time is 3:20 p.m. We're now on the
 4   record.
 5              EXAMINATION
 6   BY MR. CROSLEY:
 7       Q.  Please state your name.
 8       A.  Jeremy Daniel Slater.
 9       Q.  And what is your profession?
10       A.  I'm a physician.
11       Q.  I'm handing you what we've marked as Exhibit
12   No. 1 to your deposition. Is that a true and correct
13   copy of your curriculum vitae?
14       A.  Yes.
15       Q.  Does it outline your educational background,
16   your work experience, and your articles that you've
17   authored?
18       A.  Yes, sir.
19       Q.  Tell the jury, do you have a medical specialty?
20       A.  Yes, I do. I specialize in neurology as well
21   as sleep medicine.
22       Q.  What is neurology?
23       A.  Neurology is the study of the central and
24   peripheral nervous system and the diseases that affect
25   those areas.
```

**7**

```
 1       Q.  What year did you obtain your medical doctorate
 2   degree?
 3       A.  1986.
 4       Q.  How long have you been practicing in the field
 5   of neurology?
 6       A.  Well, I -- after finishing the medical
 7   internship in '87, three years of neurology --
 8   depends on how you define "practicing," -- I was doing a
 9   epilepsy fellowship and a clinical neurophysiology
10   Fellowship for a year and a half. And then from that
11   point on, which I believe was 1991, I've been practicing
12   neurology.
13       Q.  Are you currently on staff with any hospitals?
14       A.  Yes.
15       Q.  What hospitals?
16   Memorial Hermann here in Houston.
17       Q.  And are you licensed to practice medicine in
18   the state of Texas?
19       A.  Yes, sir.
20       Q.  Have you reviewed medical records and other
21   materials pertaining to the care given to Candelario
22   De Leon on December 24, 1998 --
23       A.  Yes, sir.
24       Q.  -- by Dr. Dovale?
25       A.  Yes, sir. I'm sorry.
```

**8**

```
 1       Q.  And by the EMS and nurses at Valley Regional
 2   Medical Center?
 3       A.  Yes, sir.
 4       Q.  Do you have any opinions concerning the care
 5   and treatment received by Mr. De Leon?
 6       A.  Yes, I do.
 7       Q.  Okay. And specifically with respect to the
 8   care that he received from Dr. Dovale, who was in the ER
 9   that night, what are your opinions concerning the care
10   received by Mr. De Leon in this case?
11       A.  I have -- basically there are a number of things
12   from the time that one is a, probably a second or third
13   year medical student, that you would -- you are -- that
14   you would expect to see happen in an emergency room when
15   someone presents with a suspected spinal cord injury.
16   This is hammered into you as an intern. It's hammered
17   into you as a resident. It's something that in dealing
18   with emergency room physicians that we -- as a
19   neurologist, I would automatically expect to see take
20   place. And in reviewing these records, it appears that
21   Dr. Dovale failed to perform the appropriate evaluations
22   and didn't do his job.
23       Q.  Okay. Based on your review of this case -- and
24   let me ask, does that include a review of the deposition
25   testimony given last week by Dr. Dovale?
```

17

1    A.  Yes -- yes, I do.
2    Q.  (By Mr. Crosley)  And what is your opinion?
3    A.  I believe that he did.
4    Q.  Do you have an opinion that if Mr. De Leon had
5  received appropriate care on December 24 when he first
6  presented to Valley Regional Hospital as to -- do you
7  have an opinion based on reasonable medical probability
8  as to whether or not his ultimate injuries and damages
9  would have been less than they currently are?
10    A.  Yes, I do.
11    Q.  What is your opinion?
12    A.  I believe that they would have been less than
13  they currently are.
14    Q.  And you mentioned prescription or application
15  of steroids for the possible cervical cord injury.  Can
16  you tell us more about why that is done?
17    A.  Well, the theory is that you are going to
18  reduce tissue swelling in the area of the injury; and
19  there is going to be a lot of inflammation and secondary
20  swelling in the area of a -- an acute cord contusion.
21  The steroids will reduce this, and the literature which
22  has been published indicates the earlier you apply the
23  steroids the better your chances of reducing long-term
24  neurologic sequeli.  It is -- it's the standard of care.
25  You can find it in every textbook of internal medicine,

18

1  textbook of emergency medicine, textbook of neurology,
2  textbook of neurosurgery.  Like I said, this is
3  something that gets hammered into you from the point
4  that you're a third-year medical student.
5    Q.  And if the standard of care had been followed
6  by Dr. Dovale on December 24, then would Mr. De Leon
7  have been given steroid therapy?
8    A.  In all likelihood.  The -- it's -- and it's not
9  simply just a matter of -- of giving or not giving
10  steroids.  In addition, as soon as you become suspicious
11  of the fact that there's a spinal cord injury, you're
12  going to go out of your way to make sure that no
13  additional injury takes place.  And as -- in reviewing
14  the records and then subsequently being able to review
15  his deposition, it seems pretty clear that the -- the
16  collar was taken off by Dr. Dovale without cervical
17  spinal films being obtained and this allows for neck
18  flexion and extension, and everything that occurred
19  after that, he's basically responsible for.  If there's
20  a -- I mean, it opens the neck for additional injury at
21  that point.
22    MS. SAGE:  Objection to the portion that's
23  nonresponsive.
24    Q.  (By Mr. Crosley)  Now, Dr. Dovale noted that in
25  his opinion the patient was obviously drunk.  Do you

19

1  recall that?
2    A.  Yes, sir.
3    Q.  How does the -- the question of whether or not
4  Mr. De Leon was under the influence of alcoholic
5  beverages affect how he should have been treated in the
6  ER?
7    A.  Well, it -- it --
8    MR. GAULT:  Objection, no foundation.
9    Q.  (By Mr. Crosley)  I -- and I -- I could
10  rephrase the question.  Does it make a difference
11  whether or not he's been drinking as to how he should be
12  treated in the ER?
13    A.  The standard --
14    MR. GAULT:  Same objection.
15    A.  The standard of care remains the same.  If you
16  are asking specifically will a patient being inebriated
17  affect your ability to perform an assessment, it depends
18  on the level of inebriation; and in some instances it
19  will.  If you're aware that this is the case -- and it's
20  kind of hard not to be -- you have to exercise extra
21  diligence because you -- you're aware of the ways that
22  your exam is being limited by the fact that the patient
23  may not be providing the most appropriate responses to
24  your exam.  There are parts of your exam that may become
25  unreliable.

20

1    Q.  Is there any indication that Dr. Dovale
2  exercised any of this diligence in his examination of
3  Mr. De Leon?
4    A.  No, sir.
5    Q.  And based on everything you have reviewed, can
6  you state based upon a reasonable degree of medical
7  certainty whether Dr. Dovale failed to use such care as
8  reasonably prudent healthcare providers practicing in
9  the same field and in the same or similar locality would
10  have provided under similar circumstances?
11    A.  Absolutely.
12    Q.  And your opinion on that is?
13    A.  Is that's -- he did not use that kind of
14  care -- that level of care.
15    Q.  Okay.
16    MR. CROSLEY:  I'll pass the witness.
17    EXAMINATION
18  QUESTIONS BY MR. GAULT:
19    Q.  Doctor, my name is Bill Gault, and I represent
20  the hospital.  Do you understand?
21    A.  Yes, sir.
22    Q.  Let me just talk to you a little bit about
23  what's in your file.  Okay?
24    MR. GAULT:  Oh, I'm sorry.  I need a
25  microphone.

25

1   A. Yes, it was.
2   Q. Okay. And when did you receive that?
3   A. A few days ago. I forget the exact date.
4   Q. Okay. Do you -- do you -- I'm going to go
5   ahead and mark this report from Dr. Peters as Exhibit
6   No. 3. That's -- that's something that's been placed in
7   your file; is that correct?
8   A. Yes, sir.
9   Q. Okay.
10      (Slater Exhibit No. 3 was marked.)
11   Q. (By Mr. Gault) All right. Do you know
12   Dr. Peters?
13   A. No, sir.
14   Q. Okay. He -- does he -- you say you work at
15   Memorial Hermann?
16   A. Yes, sir.
17   Q. Do you know if he works there or not?
18   A. Not a clue.
19   Q. Not a clue. Okay. And don't -- you wouldn't
20   have known when he moved here to Houston either?
21   A. No, sir.
22   Q. Okay. Did -- do you have any correspondence on
23   this case?
24   A. Actually, at this point none whatsoever because
25   I suffered -- in the process of moving, I suffered a

26

1   hard drive crash, and I lost all my documentation on a
2   whole bunch of stuff. So everything that I have related
3   to this case is sitting on this table.
4   Q. Okay. And a hard drive crash meant you'd have
5   lost all your e-mail or what?
6   A. I lost all my e-mail. I lost billing sta- --
7   well, not that I keep a whole lot of them anyway because
8   I don't generally keep stuff like that. But I lost
9   about a year and a half's worth of work, unfortunately.
10   Q. Not just this case, but other stuff?
11   A. No, other stuff.
12   Q. Okay. Okay.
13   A. Completely unrelated to medical-legal issues.
14   Q. You don't have any bills or any record of how
15   much time you spent?
16   A. No. That presumably could be obtained through
17   these guys.
18   Q. Okay. Through the lawyers?
19   A. Through the lawyers, yeah.
20   Q. Okay. All right. I guess kind of what I was
21   asking you is: Other than computer-generated stuff, do
22   you have any, like, correspondence from Branton & Hall?
23   A. No.
24   Q. I marked the cover letter where they sent you
25   your report today, but did they --

27

1   A. I've -- I've got -- anything else that -- may
2   have been sent to me in terms of routine correspondence
3   I've discarded at this point.
4   Q. Okay. Let me go through a -- a few other
5   things to see if you have any of this stuff. Do you
6   have a list of the litigation-related matters where
7   you've been engaged as an expert?
8   A. Unfortunately that's one of those things that's
9   gone. I mean, I can give you a rough summary of -- of,
10   you know, prior litigation I've been involved in.
11   Q. Okay. How many times have you been hired as an
12   expert witness?
13   A. Well, there are simply the review of cases.
14   There are actually being called to take depositions, and
15   then there's testifying in court. In the last seven
16   years, I've probably averaged reviewing two or three
17   cases a year. And being called for a deposition
18   probably from -- roughly four or five times, and I've
19   testified in court four times.
20   Q. And what counties or states have you testified
21   in in court?
22   A. Let's see. At least once in Greene County,
23   Missouri.
24   Q. Okay.
25   A. At least once in -- and you will forgive me

28

1   because I forget what county Bismarck, North Dakota, is
2   in.
3   Q. Wherever Bismarck's located.
4   A. Wherever Bismarck's located.
5      And there's a city near -- it's west coast
6   of Florida. And I apologize. It's near Tampa, and I'm
7   blocking -- St. Pete- -- I think it was St. Petersburg.
8   Whatever county St. Petersburg is in.
9   Q. Somewhere in Florida?
10   A. Somewhere in Florida.
11   Q. Okay. And what other place?
12   A. One, two, three -- and Oklahoma City.
13   Q. Oklahoma City Oklahoma, right?
14   A. Yeah.
15   Q. Okay. Now, when did you start this expert
16   witness work?
17   A. That would have been about -- let's see -- six,
18   seven, eight -- eight or nine years ago.
19   Q. Okay. And how long -- you're -- you're with
20   this company AMFS?
21   A. AMFS, yes.
22   Q. Okay. How long have you been with them?
23   A. Probably about six years.
24   Q. Okay. And how much are you receiving for your
25   testimony today?

33

1 then I get a W-2 -- or not a W-2.
2    Q.   One of those tax forms.
3    A.   One of those tax forms from the company at the
4 end of the year, and that just -- that's the amount for
5 the year.
6    Q.   Okay.
7    A.   So, I don't -- I don't spend a lot of time.
8 It's not -- I mean, it's -- it's a source of income, or
9 it has been until now.  It's not a terribly important
10 one.
11    Q.   Okay.  You said "until now."  I mean, is it --
12 is it an important source -- source of your income now
13 or --
14    A.   No.  Actually as of March 1st, any new cases
15 that I become involved in, all of that money will go
16 directly to the university; and I won't receive
17 anything.
18    Q.   Okay.
19    A.   So, it's no longer a source of income --
20    Q.   Have you taken on any new cases since March
21 1st?
22    A.   No, sir.
23    Q.   Okay.  Now, you -- you've authored another
24 report in this case; is that right?  Do you remember
25 that or not?

34

1    A.   No, I don't remember that.
2    Q.   Okay.  You don't remember?  Let me show you --
3 let me just go ahead and show it to you, then.  We'll
4 mark it as Slater Exhibit No. 5.
5       (Slater Exhibit No. 5 was marked.)
6    Q.   (By Mr. Gault)  Do you remember having given a
7 report in January of 2001?
8    A.   I don't remember it, but I -- I believe it.
9    Q.   Okay.
10    A.   Okay.
11    Q.   And take your time if you need to, but that --
12 that report does not look much different than your 2003
13 report.  Is that a fair statement?
14    A.   That's a fair statement.
15    Q.   Okay.  And just in looking at the 2001 report
16 and the 2003 report, pretty much your opinions in this
17 case are -- are fairly consistent?
18    A.   I think so.
19    Q.   Okay.  And you've -- in giving your opinions in
20 your report, you've tried to give the defendants in this
21 case a very fair view of what you're going to be
22 testifying to; is that correct?
23    A.   I believe so.
24    Q.   Okay.  Now, you have not looked at any
25 photographs -- is that correct -- in this case?

35

1    A.   Not that I recall.
2    Q.   Okay.  You don't have any -- do you have any
3 notes in this case?
4    A.   Everything I've got is -- is here.
5    Q.   Okay.  And your only notes are what I call
6 stickies, but they -- I guess they should be called
7 Post-it notes with -- with a little brief statement as
8 to what these documents are.
9    A.   I can -- I'm sure that at the time that I was,
10 for example, drafting these reports, I made notes at the
11 time and then threw those away a long time ago.
12    Q.   Okay.  All right.  I was just trying to find
13 out.  As we sit here today, you don't have any -- any
14 other notes, other than these Post-it notes?
15    A.   No, sir.
16    Q.   Okay.  And pretty much in looking at these
17 Post-it notes, really these are just reminders to help
18 you remember what these documents actually are?
19    A.   Exactly.
20    Q.   Okay.  I don't see where you've -- it doesn't
21 look like you've written really anything of much
22 importance on the Post-it notes.  Is that a fair
23 statement?
24    A.   There might be one or two --
25    Q.   Okay.

36

1    A.   -- brief informa- -- but generally that's
2 correct.
3    Q.   Okay.  Have you referred to any treatises or
4 scholarly journals or any types of studies in rendering
5 your opinions in this case?
6    A.   I am sure at the time that I initially drafted
7 these opinions I went back to the standard textbooks on
8 neurology, neurosurgery, Harris' Internal Medicine and
9 looked through those just to make sure that nothing had
10 substantially changed in terms of the way I understood
11 the pra- -- the standard of care.  I couldn't tell you
12 specifically what those were because this is now three
13 years ago.
14    Q.   Okay.  You may have reviewed those things, but
15 you -- you just can't -- as we sit here today, you
16 couldn't tell us what --
17    A.   I can't tell you which ones.
18    Q.   Okay.  That's fine.  You don't advertise your
19 consulting services, right?
20    A.   No, sir.
21    Q.   Okay.  AMFS does some advertising?
22    A.   I believe so.
23    Q.   Okay.
24    A.   I'm not privy to what they do.
25    Q.   Do you have a copy of your contract, either

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

9 (Pages 33 to 36)

41

1    A.  Yes, sir.
2    Q.  Okay.  Let's see.  It's talking about your list
3  of publications.  Those are reflected in your resume,
4  right?
5    A.  Yes, sir.
6    Q.  Your strength is pretty much in -- in epilepsy;
7  is that correct?
8    A.  Epilepsy and sleep medicine.  If you're looking
9  in my publications, epilepsy specifically.
10    Q.  Okay.  That's -- that's your -- you tell me how
11  y'all say that in medicine.  That's your forte or is
12  that your chosen path of study or how do y'all say that?
13    A.  Focus, specialization at this point,
14  particularly now.  Prior to this when I was in North
15  Dakota and when I was in Springfield, Missouri, I was a
16  general neurologist and saw everything.  I had a special
17  interest in epilepsy, but I was a general neurologist
18  with two other general neurologists.  In a three-person
19  practice you see absolutely everything that comes
20  through.
21        But since I was hired at the University of
22  Texas, beginning in March, I'm running the adult
23  epilepsy unit, and I'm specializing in epilepsy.  That's
24  what I do exclusively.
25    Q.  And most of your publications have been in

42

1  epilepsy?
2    A.  That's correct.
3    Q.  Okay.  Your professional licenses, do you have
4  a Texas license yet?
5    A.  Yes, sir.
6    Q.  Okay.  When did you -- when did that -- you get
7  that?
8    A.  That would have been just prior to March 1st.
9    Q.  Okay.  They issued you probably, what, a
10  temporary license?
11    A.  Yeah.  Well, I don't have a number yet.  I just
12  have a little --
13    Q.  You don't -- you don't have the permanent
14  license?
15    A.  I have a piece of paper that says I have a -- a
16  temporary license until they issue the permanent one.
17    Q.  Okay.  And you're board certified?
18    A.  Yes, sir.
19    Q.  Okay.  I think we've gone through that list.
20  Let's see.  Dr. Slater, let me ask you.  You were
21  talking about giving Mr. De Leon steroids.
22    A.  Yes, sir.
23    Q.  Have there been some studies on administration
24  of steroids for spinal cord injury cases?
25    A.  I can't cite you chapter and verse, but I'm

43

1  aware that there have been several -- multiple studies
2  that looked at intervention with steroids.
3    Q.  Okay.  Have there been some national studies on
4  that?
5    A.  Yes, sir.
6    Q.  Okay.  How many of those --
7    A.  That -- I can't cite that.  I don't recall.
8    Q.  Okay.  How much benefit have those studies
9  found on -- in giving steroids?
10    A.  It's questionable.  Right now as of today,
11  there is a question on exactly how much benefit you gain
12  by giving steroids.  There is still a consensus --
13  there's two -- the two consenses -- if that's the
14  plural -- still exist, one, that the earlier you give
15  steroids the more likely you are to see benefit; and,
16  two, that steroids are still the standard of practice.
17  There is controversy regarding exactly how much
18  improvement you gain, but there has not been a
19  definitive study that shows that they're not of any
20  benefit and that we shouldn't be giving them.
21        So even as of today, the standard of
22  practice remains the same thing.  And -- and the only
23  thing that was true in 1998 is that some of those
24  studies weren't available, and it was even more chapter
25  and verse that you gave steroids early on in spinal cord

44

1  injury.
2        MS. SAGE:  Objection to the nonresponsive
3  portion of that answer.
4        MR. GAULT:  Join.
5    Q.  (By Mr. Gault)  And I apologize, Doctor.  I
6  really wasn't asking about the standard of care
7  question.  I was talking about how much benefit do you
8  get from the steroids, according to these studies.
9    A.  I -- I can't quantify it for you.
10    Q.  Okay.  I mean, at most do you get one level?
11    A.  I -- like I said, I can't quantify it for you.
12    Q.  Okay.  What -- is that something, though, that
13  is addressed by these studies?
14    A.  If I had reviewed those studies collectively
15  recently, I could answer the question; but I haven't
16  done that.
17    Q.  I'm not trying to put words in your mouth or
18  anything.
19    A.  I'm sorry.
20    Q.  I'm just asking you --
21    A.  I can't -- I can't --
22    Q.  -- a few questions on that.
23    A.  I can't answer that.
24    Q.  That's fine.  And I wasn't -- I don't mean to
25  keep pressing you on it.  I was just trying to learn

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

11 (Pages 41 to 44)

49

1    Q.  Okay.  Now -- oh, I was interested in your
2  resume.  You said you were board certified by the
3  American Board of Psychiatry and Neurology?
4    A.  Yes, sir.
5    Q.  And is there a separate American board for
6  clinical neurophysiology?
7    A.  Yes, sir.
8    Q.  Okay.  And then a separate one for sleep
9  medicine?
10    A.  Yes, sir.
11    Q.  Okay.  You know, Dr. Slater, I think that's all
12  the questions I have for you at this time.  I sure
13  appreciate it.  Thank you for helping us out here today.
14        MR. GAULT:  You -- you want to take a
15  break?  You've been looking at your watch for a while.
16        MR. CROSLEY:  I'm fine.  Do you want to
17  take a break or keep going?
18        THE WITNESS:  No.  I'll be here all day.
19  Hopefully not.
20        MS. SAGE:  Hold on here.  We have a
21  wardrobe malfunction.  Not quite like Janet Jackson's.
22        EXAMINATION
23  QUESTIONS BY MS. SAGE:
24    Q.  Doctor, my name is Melissa Sage.  I represent
25  Dr. Dovale and STAT Physicians in this matter.  Do you

50

1  know who I am and who I represent?
2    A.  Now that you've told me.
3    Q.  Okay.  You are not an emergency room physician?
4    A.  That's correct.
5    Q.  You are not trained as an emergency room
6  physician?
7    A.  That's correct.
8    Q.  You have never practiced as an emergency room
9  physician?
10    A.  That's correct.
11    Q.  You base your ability to testify as to the
12  standard of care of an emergency physician based on
13  working beside emergency room physicians.  Is that
14  accurate?
15    A.  That is accurate.
16    Q.  Do you base your ability to testify as to the
17  standard of care with respect to emergency room medicine
18  on anything but working beside emergency room
19  physicians?
20    A.  The treatment of acute spinal cord injury, what
21  you're supposed to do when they come to the emergency
22  room, how the EMS is supposed to handle it, how the
23  emergency room physicians are supposed to handle it, is
24  pretty standard part of medical school teaching fare.
25  It is also something that's hammered into you as a

51

1  neurology resident as you go through your residency.  So
2  it goes way beyond simply working next to these guys.
3    Q.  So, in addition to working next to emergency
4  room physicians to be familiar with the standard of care
5  for an emergency room physician, you state that you also
6  learned as -- of the standard of care for an emergency
7  room physician back in medical school and as a resident?
8    A.  Yes -- yes, ma'am.
9    Q.  Other than that, anything else that you can
10  base your ability to speak to the standard of care for
11  an emergency room physician?
12    A.  Innumerable discussions with emergency room
13  physicians when spinal cord injuries would come in.
14  Innumerable discussions with neurosurgeons when spinal
15  cord injuries would come in, questions about, "Okay.
16  What do we do now?  How -- how are we going to proceed
17  from here?"  These are back and forth discussions, and
18  you get a pretty strong indication after you talk to
19  dozens and dozens and dozens of physicians over hundreds
20  of cases about what the standard of care is when you're
21  talking about this particular.
22        I don't claim to know the standard of care
23  for emergency medicine.  I do know how I expect an
24  emergency room physician to handle an acute spinal cord
25  injury that comes into his ER.  I know what I expect him

52

1  to do as a minimum.
2        MS. SAGE:  And I'm going to object to the
3  portion of that that was nonresponsive.
4    Q.  (By Ms. Sage)  Doctor, so, in addition to these
5  numerous conversations with emergency room physicians,
6  interacting with emergency room physicians -- which I
7  would, I guess, consider the same thing -- residency and
8  medical school, is there anything else that would give
9  you a basis to form your opinion with respect to the
10  standard of care for an emergency room physician?
11    A.  Well, there's all of the reading, CME that you
12  do in the interim, the discussion with the
13  neurosurgeons, which you left out.
14    Q.  Doctor, in your practice -- or actually let's
15  talk about -- let's go back to medical school.  Doctor,
16  you learned a lot of things in medical school that you
17  don't deal with on a day-to-bay -- day-to-bay-- excuse
18  me -- day-to-day basis today, right?  For instance, you
19  learned about the heart and cardiology back in medical
20  school, right?
21    A.  That's correct.
22    Q.  And I would probably guess that you talked to
23  cardiologists a great deal.  Would that be an accurate
24  statement?
25    A.  Fair amount.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

13 (Pages 49 to 52)

**57**

1  A. Yes, I did.
2  Q. Did that case go to trial?
3  A. Yes, it did.
4  Q. Did you have to testify in that case?
5  A. Yes, I did.
6  Q. Do you know if your testimony with respect to
7  the standard of care of an emergency room physician was
8  disqualified or limited in any aspect?
9  A. No, it was not.
10  Q. What specific criticisms did you have of the
11  emergency room --
12  A. I don't --
13  Q. -- physician -- let me finish.
14      What specific criticisms of the emergency
15  room physician did you have in that particular case?
16  A. I don't remember the details at this point.
17  Q. Do you remember what year that was -- that case
18  was?
19  A. No.
20  Q. Do you remember the plaintiff's name in that
21  case?
22  A. No, ma'am.
23  Q. Do you remember the attorney that you worked
24  for in that particular case?
25  A. Definitely not.

**58**

1  Q. And you said you actually gave trial testimony
2  in that?
3  A. Yes, ma'am.
4  Q. Was that in Federal court or state court?
5  A. I -- I'd be lying if I told you I had any idea.
6  Q. Have you ever been disqualified or limited in
7  any way with respect to your expert testimony?
8  A. Not that I was aware of.
9  Q. Now, Doctor, we've marked both of your
10  exhibits -- or both of your reports as exhibits.
11      MR. GAULT: Yeah. I think one is No. 2,
12  and the other is number -- your cover page, Doctor --
13      THE WITNESS: This one's marked as No. 3.
14      MR. GAULT: That's Dr. Peters'.
15      THE WITNESS: Oh, that's Dr. Peters'. I
16  just have the March 10th sitting here.
17      MR. GAULT: Here's the cover page of
18  exhibit -- this is No. 2 and then --
19      THE WITNESS: That's No. 2, or the other
20  way anyway.
21      MR. GAULT: -- I think Mr. Tom has the
22  other one.
23      Tom, it's right there, isn't it?
24      MR. CROSLEY: Yes.
25      THE WITNESS: That's number --

**59**

1  Q. (By Ms. Sage) Can you -- can you give me the
2  date so I know -- so I'm referring to the right one?
3  But Exhibit No. 2 is which report?
4  A. Exhibit No. 2 is March 10th, 2003.
5  Q. And what's -- what is the other exhibit number?
6  A. January -- oh, it's Exhibit No. 5, January 4th,
7  2001.
8  Q. No. 5. All righty. With respect to Exhibit
9  No. 5, which is the January of 2001 report, you have
10  some criticisms that are pretty much summarized at the
11  end of the report under the "Conclusions" and the
12  "Deviations." Is that a fair statement?
13  A. Let me take a look at them because I don't
14  remember. Under "Deviations"?
15  Q. And then -- let's see. I think you've got some
16  under -- I think you've got some criticisms under
17  "Conclusions" and some under "Deviations." Is that
18  fair?
19  A. Right. That's -- that's fair.
20  Q. And in this particular report, which is dated
21  January 4th of 2001, you have a criticism with respect
22  to failing to complete a neurological exam on
23  Mr. De Leon at the time of his initial presentation.
24  A. I'm sorry. Which one are we looking at?
25  Q. We're looking at the 2001, which is, I think,

**60**

1  Exhibit No. 5.
2  A. Okay.
3  Q. It's the very -- under "Conclusions," it's the
4  very first sentence.
5  A. Yes, that's correct.
6  Q. In addition to that -- well, actually, Doctor,
7  I think that's your only criticism of Dr. Dovale in that
8  particular report. Would that be an accurate statement?
9  A. In that particular report, yeah, that's
10  correct.
11  Q. Now, Doctor, you've had an opportunity to
12  review Dr. Dovale's deposition. Is that accurate?
13  A. Yes, ma'am.
14  Q. Are you -- and are you aware that Dr. Dovale
15  has testified he actually did perform a neurological
16  examination as well as a spine examination?
17  A. Yes, I am.
18  Q. Do you have reason to doubt that particular
19  testimony?
20  A. I can disagree with what he termed a neurologic
21  exam, and I do have reason -- I have -- there is a
22  question in my mind about whether he's being totally
23  honest about it, because of his documentation.
24  Q. And what is your problem with respect to his
25  documentation?

65

1    A. The prime --
2        MR. CROSLEY: Objection.
3    Q. (By Ms. Sage) Pardon. Let me finish.
4        -- would -- if it's a good criticism of
5    Dr. Dovale to say that -- for Mr. De Leon to say there
6    was no exam done given the recollection that he had in
7    his deposition? Wouldn't you want to know that
8    information?
9        MR. CROSLEY: I object to the question,
10   before you answer, on the grounds that it misstates the
11   facts as to when the deposition was given; and that it's
12   compound and confusing, misleading question. Go ahead
13   and --
14   Q. (By Ms. Sage) Go ahead and answer.
15   A. Okay. That would only be true if I was basing
16   my opinion on whether or not a neurologic exam had been
17   completed on Mr. De Leon's deposition, as I said before.
18   90 percent of my impression -- and, in fact, prior to
19   reading the deposition, 100 percent of my impression was
20   based on the documentation. As we are taught, we are
21   taught from the point that we are in medical school on,
22   documentation is everything. If you didn't -- don't
23   write it down, you didn't do it.
24       MS. SAGE: I'm going to object to the
25   nonresponsive portion of that answer.

66

1    Q. (By Ms. Sage) So, I'm confused here, Doctor.
2    You said at one point that you're not basing whether or
3    not the neurological exam was done on the deposition,
4    and then you told me at another point that you are in
5    part basing your opinion on your review of the
6    deposition.
7    A. You're taking --
8    Q. Can you clear that up for me, please?
9    A. You're taking some very --
10       MR. CROSLEY: Objection, misstates
11   testimony.
12   A. You're taking some very, very clear and simple
13   ideas and attempting to confuse them. I'll try to
14   explain it for you. On the basis of the documentation
15   that I had available, it was clear, from the
16   documentation, that a neurologic examination has not --
17   had not been performed. Reading Dr. Dovale's testimony,
18   there was some indication that a very limited and
19   insufficient neurologic exam was performed, at least as
20   stated by the physician. I had problems with it either
21   way. If he performed that exam, it wasn't sufficient;
22   and if he performed that exam, then his documentation
23   was completely incorrect and I -- and that didn't make
24   any sense.
25       The -- I can't tell you whether he did

67

1    that or not. I don't know. I wasn't there. The
2    perception of doubt was only reenforced by reading
3    statements by the patient at the time. And, yes, it is
4    tempered by the fact that he was presumably inebriated
5    at the time and may have impaired recall. So, I can't
6    say with certainty that the patient was right and the
7    physician was wrong. I can't tell you that Dr. Dovale
8    didn't do the exam that he claimed. All I can tell you
9    is quite honestly I have doubts. That's -- that's it
10   pure and simple.
11       MS. SAGE: I'm going to object to the
12   nonresponsive portion of that answer.
13   Q. (By Ms. Sage) Doctor, are you -- simply, are
14   you basing in part whether or not the neurological exam
15   that Dr. Dovale represented as doing was, in fact, done
16   by the review -- the ten-minute review of Mr. De Leon's
17   deposition?
18   A. I already answered your question. I'm not
19   going to repeat it again.
20   Q. Doctor, answer the question.
21   A. I just -- I already did.
22   Q. So, you're refusing to answer the question?
23   A. I believe that I already have.
24   Q. So you're refusing to answer the question?
25   A. I believe that I already have. You're not

68

1    going to get a different response no matter how many
2    times you ask.
3    Q. "Yes" or "no." Doctor, are you refusing --
4    A. It's not --
5    Q. -- to answer the question that I've just asked
6    you?
7    A. I already have. So, I'm not refusing to answer
8    the question.
9        MR. CROSLEY: Objection, argumentative.
10   Q. (By Ms. Sage) Doctor, you said that when you
11   wrote this report that you were confused by the
12   documentation.
13   A. Yes, ma'am.
14   Q. Since Dr. Dovale's deposition has been taken,
15   you've had the opportunity to review it?
16   A. Uh-huh.
17   Q. You've been presented with no evidence other
18   than the medical record which has a symbol on it
19   underneath the back and spine portion of the exam to
20   indicate anything other than the fact that Mr. --
21   Dr. Dovale performed the exam. Is that an accurate
22   statement?
23   A. You want to repeat that?
24   Q. Other than the medical record -- you know, I'm
25   not -- that's a bad question. I'll rephrase.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

73

1    A. -- you have my deposition here. You're hearing
2  it from me right now. The only modifications I'm going
3  to make are the ones that you're hearing right this
4  instant.
5    Q. Well --
6    A. These reports at the time that they were
7  written accurately reflected the medical record; and, in
8  fact, still accurately reflect the med- -- reflect the
9  medical record.
10    Q. But not all of the evidence in this particular
11 case at this point, since you have the deposition now.
12    A. And it's my opinion to the extent that it's
13 modifiable it is modified in a way that I've now stated
14 for you three times.
15    Q. Okay. So, to be fair to the jury, you'd want
16 to include that possibility that there was a
17 neurological exam, albeit in your opinion an inadequate
18 one, but there was a neurological exam performed, or at
19 least there is a possibility, according to Dr. Dovale's
20 testimony. You'd like to include that in your report to
21 be fair to the jury?
22    A. I --
23       MR. CROSLEY: I'll object to the extent
24 that --
25    A. Well --

74

1       MR. CROSLEY: Let me finish the objection,
2  and then you can state your answer.
3       I object to the question to the extent
4  that it presupposes a requirement on the part of the
5  doctor to write a new report after having read
6  Dr. Dovale's deposition within the past week.
7       MS. SAGE: Okay.
8       MR. CROSLEY: And so --
9       MS. SAGE: It's an improper objection.
10       MR. CROSLEY: -- on that basis it's an
11 improper question.
12    Q. (By Ms. Sage) Doctor, can you go ahead and
13 answer the question, please?
14    A. Do you want to repeat the question?
15    Q. Sure.
16    A. They're starting to run together.
17    Q. Doctor, to be fair to Dr. Dovale and to be fair
18 to the jury, now that you've -- now that you've had a
19 chance to review Dr. Dovale's testimony that he did
20 perform a neurological exam, wouldn't you want to
21 include at least that possibility in your report for it
22 to be a complete report?
23       MR. CROSLEY: Same objection.
24    A. No. Because I'm not -- as part of testifying
25 to the jury, I'm not required to alter a prior report.

75

1   You are perfectly free and are asking me those questions
2  and you can ask me those questions in front of the jury
3  and elucidate those points and I will give you exactly
4  the same responses and that is being absolutely fair to
5  both the doctor and the jury.
6    Q. (By Ms. Sage) So given the opportunity, you
7  would not include that possibility in your report or
8  even address that possibility?
9    A. Now you're asking me to speculate, because
10 nobody is asking me to rewrite the report. I'm not
11 going to speculate here.
12    Q. You're not aware of any requirement to have a
13 complete report in Federal court?
14    A. The only -- I -- nobody has talked to me about
15 any requirement to alter my prior reports prior to going
16 into court, no.
17    Q. Let's talk about this issue of an incomplete
18 examination. Let's assume that Dr. Dovale performed the
19 neurological exam that he has represented in his
20 deposition.
21    A. Okay.
22    Q. You've stated that that --
23    A. Mind if I refer to the deposition?
24    Q. Sure.
25       THE WITNESS: Thank you.

76

1       MR. CROSLEY: I have another copy that
2  might be easier, either one.
3       THE WITNESS: Six of one. Yeah, this
4  one's easier.
5    Q. (By Ms. Sage) Are you ready, Doctor?
6    A. I'm just trying to find the place where he
7  actually talked about the exam.
8       MR. CROSLEY: Is there a question pending?
9  Was there --
10       MS. SAGE: No. I'm -- yes. Well, I
11 think there -- I was going to get to the point where he
12 thought whether or not the -- what was wrong with the
13 neurocheck.
14    A. All right. Go ahead. I'm sorry. What's the
15 question?
16    Q. (By Ms. Sage) I just wanted to get to that
17 point. You had mentioned several times that if the
18 neurological exam was performed as Dr. Dovale stated he
19 performed it, you said it was inadequate?
20    A. Correct.
21    Q. Dr. Dovale's exam included a no- -- an
22 observation and notation -- or sorry. An observation
23 that Mr. De Leon was moving all four extremities?
24    A. I believe that's correct.
25    Q. And Dr. Dovale's neurological examination of

81

1  middle of your answer?
2    A.  Yes, he did.
3    Q.  All right.  Maybe you ought to look at that.
4  It must be important.
5       MR. CROSLEY:  Objection, argumentative,
6  sidebar.
7    A.  In any case --
8       MR. CROSLEY:  I was laboring under the
9  assumption that you were asking him about what
10  Dr. Dovale did and charted, and I thought it might be
11  appropriate for him to have Dr. Dovale's record if
12  you're going to question him on that record.
13       MS. SAGE:  I was asking about the
14  deposition testimony, but thank you.
15    A.  The dep- -- in the deposition, one of the --
16  the things that was emphasized repeatedly by Dr. Dovale
17  is that he knew this guy was drunk.  He emphasized that
18  he -- repeatedly that if somebody has a spinal cord
19  injury, they couldn't just be weak.  If they were able
20  to move their extremities, they couldn't have a spinal
21  cord injury.  That was his statement, and that's just
22  flat out wrong.  That in order to do a complete
23  neurologic assessment, you have to assess for
24  generalized or lateralized weakness, because actually
25  most of the spinal cord injuries or spinal cord

82

1  pathology that I've ever seen have not presented with
2  absolute total paralysis.  They have been able to move,
3  and there's actually a -- a grading scale you learn as a
4  medical student that even my surgery pals and internists
5  still -- even the psychiatrists know how to do this.  So
6  it's not something that you learn, and it's knowledge
7  that you forget.  But he didn't do that.  He just looked
8  and saw if he could move his arms and legs, and on that
9  basis assumed that there was no spi- -- there could not
10  be -- he stated there could not be a spinal cord injury
11  on that basis, and that's flat out wrong.
12       MS. SAGE:  I'm going to object to that as
13  nonresponsive.
14    Q.  (By Ms. Sage)  Doctor, I -- I guess I'm just
15  asking you:  Is there evidence in that deposition -- if
16  you assume that Dr. Dovale is telling the truth -- that
17  he asked what -- what Mr. De Leon's symptoms were?  I
18  didn't ask if he was asking specifically about numbness.
19  Is there evidence that he asked Mr. De Leon what his
20  symptoms were?
21    A.  Actually looking at this, it's very difficult
22  for me to tell exactly what he asked him as far as
23  specifics as far as symptoms reading through it.  I --
24  it's very difficult for me to look at this and say
25  Dr. Dovale asked him a specific question, and the

83

1  patient gave a specific answer.
2    Q.  I'm not -- I guess I'm not even asking about --
3    A.  So, if I --
4    Q.  -- specifics.
5    A.  Well, no.  But the problem is if I can't
6  think -- looking through here I can't find an instance
7  where he said, "I asked him this and got this response,"
8  then as far as I can tell, he didn't take any history at
9  all.
10    Q.  Okay.  So in -- in that record it's your
11  testimony that there is no portion where Dr. Dovale
12  states that he asked what Mr. De Leon's symptoms were?
13    A.  It's possible I missed it.
14    Q.  I tell you what, we've got -- I don't want to
15  keep you here all day going through that deposition.  So
16  let me -- let me ask this question.
17       MR. CROSLEY:  Is there any particular page
18  you'd like to refer him to for the purpose of your
19  questions?
20       MS. SAGE:  Just asked if he recalls
21  whether or not there's any indication that Dr. Dovale
22  asked Mr. De Leon about what his symptoms were, in that
23  deposition.
24    A.  Not that I can see.
25    Q.  (By Ms. Sage)  Okay.  You -- you will recall

84

1  that it's Dr. Dovale's testimony that Mr. De Leon was
2  able to converse freely with him and talk to him about
3  what was going on, despite the fact that Mr. De Leon was
4  being belligerent with the police?
5    A.  I believe there was a section of his testimony
6  where they were asking him about whether or not
7  Dr. -- Mr. De Leon's behavior in any way prevented him
8  from performing the exam, and maybe that's what you're
9  referring to.
10    Q.  And do you recall what the response was with
11  respect to whether his actions prevented him from doing
12  the exam?
13    A.  My understanding of his answer was that, no,
14  his -- Mr. De Leon's actions did not prevent him from
15  doing the exam.  He indicated that he followed commands,
16  and he mentioned repeatedly the things that Mr. De Leon
17  did not complain of but did not -- but actually
18  testified to the fact that he didn't ask him the
19  questions in the first place.  And if there's somewhere
20  in here where he specifically asked him some questions,
21  I haven't been able to find it.  And maybe you can point
22  it out to me.
23       MS. SAGE:  And I'm going to object to the
24  nonresponsive portion of that.
25    Q.  (By Ms. Sage)  Doctor, have you seen the

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

89

1 the top of the foot feel the same as the bottom of the
2 foot?" And, actually, in the case of a possible spinal
3 cord injury, which you suspect because the guy's got a
4 collar on, it takes you an additional 30 seconds to run
5 down the dermatomes along his back. And you do a
6 dermatomal exam to see if he's got evidence of a -- a
7 spinal cord sensory level. And it may not be a loss.
8 It may simply be a reduction in response to pinprick
9 rather than the elimination. He may not have paralysis.
10 He may simply have weakness.
11         But all of these things are going to lead
12 you to -- lead you to suspect that there's a problem.
13 On a routine basis you would do an anal sphincter tone
14 check to see if there's a loss of anal sphincter tone
15 that would lead you to suspect -- lead you to believe
16 that there's a cord problem. Part of that -- that would
17 be part of the standard neurologic exam in a -- in a
18 patient in this instance. You would do and document
19 reflex testing, and you would do and document plantar
20 responses and see if his reflexes are increased,
21 decreased, if his plant- -- if his plantar -- if his big
22 toe goes up or down when you stroke the bottom of his
23 foot.
24         It sounds like a lot, but all of that can
25 be accomplished within about three minutes, and would

90

1 not have added -- and all the emergency room docs that I
2 know would do that as a matter of course and probably
3 more than that. Once you cleared his -- actually even
4 beforehand. Once you cleared his spinal -- his spine by
5 getting x-rays so that you were certain that you weren't
6 going to -- to jeopardize him by standing him up, you'd
7 stand him up and walk him and see if he could ambulate,
8 because there can be a subtle degree of weakness or
9 spasticity that's reflected from a spinal cord injury
10 that you're not going to see when you do confrontational
11 strength testing.
12         And, again, seeing if he can stand up and
13 seeing if he can walk, after you've done the appropriate
14 things, to make sure that his spine is stable, again,
15 what, another 15, 20 seconds. So, we're not talking
16 about anything that's terribly laborious or requires
17 some fancy neurologic knowledge. This is stuff that the
18 ER docs do all the time.
19         MS. SAGE: I'm going to object to the
20 nonresponsive portion of that answer.
21 Q. (By Ms. Sage) So, it's your testimony that at
22 minimum you would have expected, in addition to what
23 Dr. Dovale testified to doing, confrontational testing?
24 A. Confrontational strength testing, detailed
25 sensory testing, dermatomal exam, reflex testing, anal

91

1 sphincter tone testing, Babinski. And once you've
2 cleared his cervical spine, tried to stand him up and
3 walk him a little bit, yeah, that would be a minimum.
4 Q. So, you would consider this a bare minimum
5 standard with respect to an individual coming in with a
6 half-centimeter laceration to his forehead after being
7 involved in a minor car accident?
8 A. No. I would consider this the bare minimum in
9 a patient who is a potential spinal cord injury, as
10 demonstrated by the EMS concerns because they put a
11 collar on -- a collar on him in the first place. That
12 cervical collar says that he has a spinal cord injury
13 until proven otherwise. So, yes, that's the standard of
14 care. You can't rephrase it the way that you did and
15 still accurately reflect the situation. So, the
16 question is incorrect.
17 Q. So, it's that collar that tells you, "Hey, this
18 guy is special. He might have a spinal cord injury,"
19 right?
20 A. That's at a minimum. I mean, that's auto- --
21 the reason that they put the collar in place is because
22 they want to stabilize the cord. And this just goes
23 back to obtaining the appropriate history. You want to
24 find out why they put the collar on.
25 Q. Do you know what standard operating procedure

92

1 is for Brownsville EMS as far as whether or not to put
2 an individual in cervical collar or a spinal --
3 spinal -- spinal board?
4 A. Well, the standard across the Country, so far
5 as I know, doesn't change. If you have -- if you have
6 any reason to suspect that there is a possible spinal
7 cord trauma, you stabilize the spine, and part of that
8 involves putting a collar in place. If there is some
9 particular change of the rules in Brownsville, I'm not
10 aware of it; but I didn't think that changed from one
11 locale to the other. That's pretty standard care.
12         MS. SAGE: That's fine. Let's go ahead.
13 That's fine. Yeah. Go ahead. That's fine. Right now
14 is fine.
15         THE VIDEOGRAPHER: So we're off the
16 record?
17         MS. SAGE: Yeah.
18         THE VIDEOGRAPHER: Off the record at 4:55
19 p.m.
20         (Recess taken from 4:55 p.m. to 5:05 p.m.)
21         THE VIDEOGRAPHER: Back on the record at
22 5:05 p.m.
23 Q. (By Ms. Sage) Doctor, when we left, I think we
24 were talking about minimum testing with respect to a
25 neurological exam --

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

23 (Pages 89 to 92)

97

1  patient who's in the emergency room who's got a cervical
2  collar in place. And that's my experience with every
3  EMS service I've ever worked with and every emergency
4  room I've ever worked in.
5      Q. But you've never worked with Brownsville EMS;
6  is that right?
7      A. That's correct.
8      Q. Moving on, you said -- you agreed with me that
9  your only criticism in the Exhibit No. 5, which is the
10  January 4th, 2001, report, your only criticism contained
11  in that report is that -- where did it go? -- is that
12  there was a failure to complete a neurological exam on
13  Mr. De Leon.
14      A. Well, everything else follows the failure to
15  complete the neurologic exam. I mean, there are other
16  failures in terms of care. He didn't obtain x-rays to
17  clear the cervical spine before removing the collar, but
18  his index of suspicion that -- I mean, he didn't do the
19  exam to establish whether or not there were signs and
20  symptoms of a spinal cord injury in the first place.
21  So, the primary problem is not doing the exam. There
22  are secondary things that follow, for example, not doing
23  the x-rays to clear the cervical spine to take the
24  collar off.
25      Q. Okay. But that mention of not doing the x-rays

98

1  is not contained in that report of 2001; is that
2  correct?
3      A. That's correct.
4      Q. Moving on to your -- oh, other than the
5  secondary thing with respect to the x-rays, is there
6  anything else that -- you know what, strike that. Let's
7  move on to your next report.
8          And this one is dated March 10th of 2003,
9  and I think it was Deposition Exhibit No. 2.
10      A. Right.
11      Q. And in this report you also mention the failure
12  to complete a neurological examination on Mr. De Leon.
13  That's the same criticism back in your other report of
14  2001?
15      A. Right.
16      Q. And you've also indicated that you believe that
17  possibly an x-ray, CT, or MRI should have been done.
18  Would that be fair to say that's another criticism of
19  Dr. Dovale contained in that report?
20      A. Well, I'd break it into pieces. The x-rays
21  would be mandatory for removal of the collar, and if the
22  clinical examination revealed evidence of focal
23  neurological deficits or deficits make you -- suspect
24  that there's a spinal cord injury, you'd proceed with an
25  emergent MRI. But if you had x-ray evidence that there

99

1  was instability of the cervical spine, you'd probably
2  also proceed with a -- so either one could lead you to
3  the conclusion that you needed to get an emergent MRI.
4      Q. So, whatever order you take those in, there's a
5  separate set of criticisms regarding radiographical
6  evidence. Would that be fair to say?
7      A. Correct.
8      Q. Other than that criticism with respect to the
9  radiographic failure to take radiographic films in
10  whatever order and your criticism with respect to the
11  neurological examination of Mr. De Leon, are there any
12  other criticisms contained within this report?
13      A. Not contained with that report, no.
14      Q. You mentioned earlier that you would also
15  criticize the history that Dr. Dovale took of the
16  patient.
17      A. That's correct.
18      Q. That's not contained in the report?
19      A. No. No, it's not.
20      Q. You had in your possession prior to writing
21  your report the medical records from Valley Regional
22  Medical Center?
23      A. That's correct.
24      Q. Are there any other criticisms you have that
25  are not contained within your report?

100

1      A. Besides the criticism regarding the history
2  taking?
3      Q. Yes. Besides that one.
4      A. Not that I can recall at the moment.
5      Q. You mentioned earlier that alcohol can be an
6  issue with respect to evaluating a patient with a spinal
7  cord injury. Is that fair to say?
8      A. That's correct.
9      Q. But you said something that was interesting,
10  and -- and let me know if this is not correct. You said
11  the alcohol -- it's not so much being intoxicated with
12  the alcohol but how it affects the examination, the
13  ability to take a history, as far as evaluating a spinal
14  cord injury.
15      A. It's -- it's a complicated question and a
16  complicated answer. Dependent on the level of
17  intoxication, alcohol can affect the central nervous
18  system in a variety of ways, and the ways that it
19  affects the central nervous will differ depending on the
20  level of intoxication. At lower levels of intoxicat- --
21  lowest levels of intoxication there may be absolutely no
22  interference whatsoever. You can't even tell that
23  they're intoxicated. At higher levels of intoxication,
24  it may impair the ability to get an accurate history.
25  In other words, you'll ask questions and not get

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

25 (Pages 97 to 100)

105

1  actually given plaintiff's counsel any visual or
2  demonstrative aids or materials of any kind for use in
3  testifying in this case or for your deposition?
4      A.  No.
5      Q.  Have you been asked to come live to trial?
6      A.  Not yet.
7      Q.  Are you basing your opinion on any other expert
8  reports?
9      A.  You mean -- I don't understand the question.
10     Q.  Are you for -- in -- in coming to your opinions
11  in -- actually your opinions in -- in both of your
12  reports, are you relying on any other expert reports to
13  come to those conclusions?
14     A.  Oh, you mean like other expert testimony?
15     Q.  Right.
16     A.  No, no.  Absolutely not.
17     Q.  You've never examined Mr. De Leon, right?
18     A.  No, I have not.
19     Q.  Have you written any articles or any other
20  publications that -- that would relate to any issue in
21  dispute in this particular case?
22     A.  No.
23     Q.  And you said you were unaware as to whether
24  AMFS does any advertising with respect to expert
25  locating?

106

1      A.  I -- I don't -- I haven't seen any advertising,
2  but as a company, I'm sure they probably do.
3      Q.  Did you bring -- other than that document, did
4  you bring any medical texts, articles, publications
5  which support your opinions relating to this particular
6  case which have been subjected to peer review and
7  publication?
8      A.  No, I haven't.
9      Q.  When did you get ready for this deposition?
10     A.  This particular deposition?
11     Q.  Yes, sir.
12     A.  On and off over the last several weeks.
13     Q.  In going through your documents, I noted
14  that -- I didn't see any notices of deposition.  Do you
15  know if your ex- -- your wit- -- sorry.  Your -- your
16  deposition has been set before?  That was a terrible
17  question and I'm very tired, but I'm going to say it
18  again.
19          Do you know whether or not your deposition
20  has been agreed to and set before today?
21     A.  In other words, was there a prior date that I
22  was --
23     Q.  That would be a better question, and, yeah.
24     A.  I think there was.  I don't remember the
25  specifics of it, but I remember being contacted.  I

107

1  leave all of that scheduling up to my secretary, and she
2  says, "You're doing such and such on such and such a
3  date.  No, it's been rescheduled," that sort of thing.
4      Q.  Do you recall getting a deposition notice in
5  this case for earlier this month?
6      A.  I don't recall it, but that -- it's entirely
7  possible.
8      Q.  Wouldn't it have made it to the file if you
9  would have received the deposition notice?
10     A.  If that was something that I was supposed to
11  keep and bring with me, I apologize.  I don't
12  normally -- once I've got the date in my calendar,
13  I don't normally han- -- hang on to stuff like that.
14     Q.  So, in your other cases where you've testified,
15  you didn't hang on to the deposition notices and the
16  accompanying subpoenas?
17     A.  Not usually.
18     Q.  The case in Oklahoma City that you testified
19  in, who retained you?
20     A.  Well, I worked for -- I was working for AMFS,
21  but if you're talking about which law firm, I -- I can't
22  remember.  But AF- -- AMFS will have that on record.
23     Q.  Wasn't that just last year?
24     A.  Yes.
25     Q.  And you testified in trial?

108

1      A.  Yes, I did.
2      Q.  You were testifying for the plaintiffs at that
3  point, right?
4      A.  Yes, I believe I was.
5      Q.  If you had to do a breakdown of percentage as
6  far as how many cases you do for the plaintiff and how
7  many cases you do for the defense, what kind of
8  breakdown would you do -- would you give me?
9      A.  It comes out to about 50/50, actually.  We
10  don't know when they send us the case which side
11  we're -- we're going to take.  They just call us up and
12  say, "Okay.  What's your -- here -- here are the medical
13  records.  This is the situation.  What do you think?"
14  And the question is did so-and-so something wrong.
15  That's usually the question.  Did a particular
16  physician, hospital, whatever, do something wrong.  And
17  you say, "Yeah, I think they did something wrong," or,
18  "No, I didn't think they did something wrong."  And then
19  you have a discussion with -- you get contacted -- you
20  contact the law firm.  You have a discussion with them.
21  And at that point you find out which side they're on.
22          And there have been lots of times when
23  I've called them up and told them what they didn't want
24  to hear.  In other words, I didn't think that -- either
25  as a defense they didn't have a defense or as the

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

27 (Pages 105 to 108)

113

1
2  THE STATE OF TEXAS
3
4
5
6      I, Mary Abbott Burkes, Certified Shorthand
7  Reporter in and for the State of Texas, hereby certify
8  that at the time and place stated the witness, JEREMY
9  DANIEL SLATER, M.D., personally appeared before me, and
10  after being by me first duly sworn to tell the truth,
11  was examined by counsel for the respective parties
12  hereto; that the testimony of said witness was taken in
13  shorthand by me, later reduced to typewriting under my
14  direction, and the foregoing 113 pages are a true and
15  correct transcript of said testimony.
16      GIVEN under my hand and seal of office on this
17  day of        , 2004.
18
19
20
21
           Mary Abbott Burkes
22         Certified Shorthand Reporter
           in and for the State of Texas
23         Reporter Certification No. 5199
           Expires December 31, 2005
24
25

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

Curriculum Vitae

# Nick Paul Peters, MD, FACEP

Diplomate, American Board of Emergency Medicine

1919 Post Oak Park Ln 1113
Houston, Texas 77027
Tel: (713) 776-5552
Fax: (713) 776-5989

## HOSPITAL ADDRESS

Memorial Hermann Southwest Hospital
Emergency Department
7600 Beechnut
Houston, TX  77074

## EDUCATIONAL HISTORY

| | |
|---|---|
| Creighton University School of Medicine, Omaha, Nebraska | 1987-1991 |
| University of San Francisco, San Francisco, California | 1983-1987 |
| Sacramento City College, Sacramento, California | 1984 |
| Consumnes River College, Sacramento, California | 1982-1983 |

## DEGREES EARNED

| | | |
|---|---|---|
| Doctor of Medicine | Creighton University | 1991 |
| Bachelor of Science-Biology | University of San Francisco | 1987 |

## POSTGRADUATE TRAINING

| | |
|---|---|
| Emergency Medicine Residency<br>University of Arizona, Tucson, Arizona | 1993-1994 |
| Emergency Medicine Internship/Residency<br>UCLA King/Drew Medical Center, Los Angeles, California | 1991-1993 |

## CERTIFICATION AND LICENSING

Diplomate of the American Board of Emergency Medicine
Licensed by the Texas Board of Medical Examiners
Advanced Trauma Life Support
Advanced Cardiac Life Support - provider and instructor



Peters
EXHIBIT NO. 1

EXHIBIT

D

Nick Peters, MD
C.V. page 2 of 3

## CURRENT HOSPITAL AFFILIATIONS

Memorial Hermann Southwest Hospital
   Houston, Texas

2004 to present
Medical Director
volume 70,000

Baylor Medical Center at Garland
   Garland, Texas

1994 to 2004
Associate Medical Director

Texoma Medical Center
   Denison, Texas

1994 to present
Emergency Medicine Staff

Baylor Medical Center at Grapevine
   Grapevine, Texas

1996 to present
Emergency Medicine Staff

## CAREER AFFILIATIONS

| | |
|---|---|
| 2004 to present- | Medical Director at MH Southwest Hospital |
| 2004 to present- | MH Southwest Hospital medical staff |
| 2004 to present- | Teaching in Family Practice Residency Program, MH Southwest Hospital |
| 2002 to 2004 | Associate Medical Director at Baylor Medical Center at Garland |
| 1993 to present- | Emergency Medicine Practice |
| 1997 to 2004 | Teaching in Family Practice Residency Program, Baylor Medical Center at Garland |
| 1996 to present- | Baylor Medical Center at Grapevine part-time medical staff |
| 1995 to present- | Texoma Medical Center part-time medical staff |
| 1994 to present- | Baylor Garland Medical Center medical staff |
| 1994 to present- | Instructor for Health Science Technology Clinical Rotations, Garland High School |
| 1994 | Raymond Bliss Army C Hospital, Fort Huachuca, Arizona. Emergency medicine staff |
| 1994 | Sierra Vista Community Hospital, Sierra Vista, Arizona Emergency medicine staff |
| 1993 | Orthopaedic Hospital, Los Angles, California Emergency medicine staff |
| 1984 - 1987 | Animal Laboratory Manager, Institute of Chemical Biology, San Francisco, California |
| 1986 - 1987 | Orientation Chairman, University of San Francisco, San Francisco, California |

Nick Peters, MD
C.V. page 3 of 3

## PROFESSIONAL ORGANIZATIONS

American College of Emergency Physicians
Texas College of Emergency Physicians
Texas Medical Association
Collin-Fannin County Medical Society

## HONORS

Fellow, American College of Emergency Physicians
Instructor of the Year - Health Science Technology Clinical Rotations year 2001 & 2003
Instructor Award from Garland high School Clinical Rotations 2000, 01, 02 and 2003
Frank G. Brooks National Award, for excellence in Research
Alpha Sigma Nu National Honor Society
Deans Medal Finalist, University of San Francisco
Presidential Achievement Award, University of San Francisco

## COMMUNITY AND UNIVERSITY SERVICE

Instructor in Garland High School Clinical Rotation Program, 1994-2003
Resident Physician Admission Committee, University of Arizona. 1993-1994
Medical College Recruitment Program, Creighton University, 1998-1991
Committee for Orientation, Advising and Registration, University of
    San Francisco, 1986-1987

## RESEARCH AND PUBLICATIONS

Article

Chang, Enders, Sprengel, Peters, Varmus, Ganum: Expression of the precore
region of an avian hepatitis B virus is not required for viral replication.
Journal of Virology Oct 1987

Abstracts

Prediction of the severity of acute pancreatitis. Annals of Emergency Medicine
Feb 1994.

Medical control of mass gatherings: can paramedics perform without physicians
on site? Annals of Emergency Medicine May 1994.

# Nick Peters, MD FACEP
## 7600 Beechnut
## Houston, Texas 77074

February 8, 2004

Tom Crosley
Branton & Hall
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, Texas 78205

Dear Mr. Crosley,

Upon your request I Nick Peters, MD a licensed practicing physician board certified in Emergency Medicine have reviewed the medical records of Mr. DeLeon. Specifically, I have reviewed the records of two different emergency department visits, for December 24, 1998 and December 25, 1998, as well as hospital records. My opinions herein are based upon my education, training, experience, and knowledge of the care and diagnosis of spinal cord injuries and Emergency Medicine.

I received my Doctor of Medicine degree from Creighton University School of Medicine in Omaha, Nebraska, in 1991. I did an internship and began a residency in Emergency Medicine at UCLA King/Drew Medical Center, Los Angeles, California from 1991 to 1993. I finished my residency in Emergency Medicine at the University of Arizona, in Tucson Arizona from 1993-1994. I practiced Emergency Medicine at Baylor Medical Center at Garland since successfully completing my Residency until December 2003. In January 2004 I began my practice at Memorial Herman Southwest Hospital as the Medical Director of Emergency Medicine. As part of my daily practice I evaluate patients with suspected spinal cord injures.

Mr. DeLeon was a 57 year old male involved in a motor vehicle collision the evening of December 24, 1998. Paramedics found him unable to get out of the car. The paramedics placed him in spinal precautions including a cervical spine collar, head immmobilization and strapped to a back board. On arrival the Emergency Department at Columbia Valley Regional Medical Center it was reported the patient complained of numbness from the neck down. On the Conditions of Admission form from the hospital was printed "Pt. unable to sign due to medical condition", instead of Mr. DeLeon's signature. Dr. Joao Dovale examined the patient and stapled a facial laceration. The patient was taken off spinal precautions and Dr. Dovale noted the patient was "obviously drunk". The patient was discharged from the emergency department to police custody to go to jail after approximately 30 minutes. On the discharge paperwork instead of Mr. DeLeon's signature was printed, "pt. can't sign".

On December 25, 1998 Mr. DeLeon was brought to Brownsville Medical Center Emergency Department with "back pain", "numbness in body" and "can't move legs". Paramedics brought him from the jail. After multiple x-rays were performed including cervical, dorsal and lumbar spine CT and MRI a diagnosis of "acute spinal cord injury", "cervical cord compression" was made. The patient was admitted for further care and



page 2 of 2

evaluation of his quadriplegia.

After my review of the records available, I believe the medical care rendered to Mr. DeLeon fell below minimal standards. The incidences and reasons form my opinion are as follows:

On the first Emergency Department encounter the patient was removed from spinal precautions prematurely. The standard of care to remove a patient from spinal precautions require a patient to be awake, alert with no distracting injuries and no mind altering substances in the patients system. With these conditions met the physician can assess spinal stability after a careful normal neurological and spinal exam, often including x-rays and occasionally special studies or consulting opinions. In my opinion Dr. Dovale did not follow standard of care by not performing a neurological examination or spinal exam. Also the patient had a mind altering substance in his system as noted by Dr. Dovale as being "obviously drunk". No x-rays were done to even attempt to find the cause of the patient's compliant of numbness. The patient was prematurely discharged from the Emergency Department. With spinal cord injuries the early use of steroids is needed for treatment. By the time the patient's condition was diagnosed a day later steroid treatment would have limited benefit. In my opinion these deviations from the standards of care and failure to treat are the major contributing causes of Mr. DeLeon's spinal cord Injury.

In summary, it is my professional opinion the care for Mr. DeLeon fell substantially below the standards of care at the Emergency Department at Columbia Valley Regional Medical Center. Reasonable care would have protected the spinal cord from further injury. As a result of these breaches in the standard of medical care Mr. DeLeon did not have the opportunity to minimize or even possibly eliminate any long term paralysis, and other sequela.

Please do not hesitate to contact me if there are additional records for review or if there are additional questions which need to be addressed.

Sincerely,


Nick Peters, MD

**Page 1**

1     FOR THE SOUTHERN DISTRICT OF TEXAS
           BROWNSVILLE DIVISION

2
   CANDELARIO DE LEON   )
3                 )
   VS.          ) CIVIL ACTION NO. CV-B-00-192
4                 )
   COLUMBIA VALLEY HEALTHCARE) (JURY REQUESTED)
5  SYSTEM, L.P. D/B/A VALLEY  )
   REGIONAL MEDICAL CENTER, )
6  JOAO DOVALE. MD. AND STAT )
   PHYSICIANS. P.A.     )
7
8
   •••••••••••••••••••••••••••••••••••••••••••••••••
9     VIDEOTAPED ORAL DEPOSITION OF
10    NICK PAUL PETERS. M.D.. FACEP
11         MAY 26, 2004
12  •••••••••••••••••••••••••••••••••••••••••••••••••
13
14    VIDEOTAPED ORAL DEPOSITION OF NICK PAUL PETERS.
15  M.D., FACEP, produced as a witness at the instance of the
16  Plaintiff, and duly sworn, was taken in the above-style
17  and numbered cause on the 26th day of May. 2004. from
18  8:49 a.m to 2:22 p.m.. before Mary Abbott Burkes. CSR, in
19  and for the State of Texas. recorded by machine
20  shorthand. at the law offices of Worldwide Court
21  Reporters, Inc.. 3000 Weslayan. Suite 235, Houston. Texas
22  77027, pursuant to the Federal Rules of Civil Procedure
23  and the provisions stated on the record or attached
24  hereto; that the deposition shall be read and signed
25  before any notary public.

**Page 2**

1
2     A P P E A R A N C E S
3
4  FOR THE PLAINTIFF·
5    Mr. Thomas A. Crosley
     BRANTON & HALL, P.C.
6    One Riverwalk Place, Suite 1700
     San Antonio. Texas 78205
7
8  FOR THE DEFENDANTS STAT PHYSICIANS. P.A. AND JOAO DOVALE.
   M.D.:
9
    Ms. Melissa Sage
10  GONZALEZ, GAYTAN. GARZA & CASTILLO, L.L.P
    1317 E. Quebec Avenue
11  McAllen. Texas 78503
12
   FOR THE DEFENDANTS COLUMBIA VALLEY HEALTHCARE SYSTEM.
13  L.P. D/B/A VALLEY REGIONAL MEDICAL CENTER AND HCA-THE
   HEALTHCARE COMPANY:
14
    Mr. William Gault
15  BRIN & BRIN, P.C.
    1325 Palm Blvd.. Suite A
16  Brownsville, Texas 78520
17
18  VIDEOGRAPHER:
19    Mr. Scott Campbell
20
21
22
23
24
25

**Page 3**

1              INDEX
2  ORAL DEPOSITION OF NICK PAUL PETERS, M.D., FACEP
3            MAY 26, 2004
4
5
6  Appearances....................................... 3
7  Stipulations...................................... 6
8  Examination - Mr. Crosley....... ............ 7
   Examination - Mr. Gault.................... 18
9  Examination - Ms. Sage..................... 134
   Further Examination - Mr Crosley.............. 172
10  Further Examination - Mr. Gault............... 189
   Further Examination - Ms. Sage............... 242
11
   Witness' signature page... ................ ..254
12
   Reporter's Certificate................. ......255
13
14        EXHIBIT INDEX·
15  Exhibit No.   Description     Marked
16  Peters 1             7
        Curriculum vitae of Nick Paul Peters.
17        M.D., FACEP
18  Peters 2          20
        10-20-00 letter from Beth Barker to
19        Nick Peters. M.D., RE: Candelario
        De Leon
20
21  Peters 3         21
        12-29-03 letter from Vivian Martinez
22        to Nick Peters, M.D., and attached ,
        deposition notice with subpoena
23        duces tecum
24
25

**Page 4**

1           EXHIBIT INDEX
2  Exhibit No    Description    Marked
3  Peters 4         21
        2-10-04 invoice and 3-4-03 invoices
4        from Nick Peters. M D., RE:
        Candelario De Leon.
5
6  Peters 5         21
        List of Litigation-related matters
7        as expert for Nick Peters. M D..
        and 9-8-03 invoice
8  Peters 6         22
        2-8-04 letter from Nick Peters, M D.,
9        to Tom Crosley outlining expert opinions
10  Peters 7         25
        1-11-02 affidavit of Carol P. Lomax and
11        attached 11-10-00 letter from Nick Peters.
        M.D.. to Carol Lomax outlining expert
12        opinions
13  Peters 8         33
        10-17-00 Expert Services Agreement between AMFS
14        and Branton & Hall
15  Peters 9         125
        1-11-02 letter affidavit of Carol P. Lomax
16        and attached Affidavit of Nick Peters. M.D.
        and curriculum vitae
17
18  Peters 10       172
        Cross-Notice of Intention to Take Oral
19        Deposition and Subpoena Duces Tecum of
        Nick Peters. M.D.
20  Peters 11       172
        Document entitled "Criteria used in the Nexus
21        trial, reprinted courtesy of Dr. Jerome
        Hoffman"
22
   Peters 12       175
23        Pages 471. 472. and 473 on Head Injury and
        Spinal Cord Compression from the Washington
24        Manual
25



EXHIBIT

F

9

1    A.  Yes.
2    Q.  Have you reviewed information and material
3  pertaining to the case of Candelario De Leon?
4    A.  Yes.
5    Q.  And can you tell us what information and
6  material you have reviewed?
7    A.  I've had the opportunity to look at the chart
8  and the paramedic's sheet, the nursing sheet, and the
9  physician's sheet from his first visit to the emergency
10  department the night of the motor vehicle collision.
11    Q.  December 24, 1998?
12    A.  Correct.  I had the chance to look at the same
13  information for his visit to the hosp- -- emergency
14  department admission to the hospital the following day.
15  I've had a chance to look at the deposition by the
16  physician and also the deposition by Mr. De Leon.
17    Q.  Okay.  Is this the type of information that is
18  customarily reviewed by physicians such as yourself when
19  they are reviewing the care provided to another patient
20  for purposes of litigation?
21    A.  Yes.
22    Q.  And as a result of your review of this
23  information, have you come to any opinions concerning the
24  care provided by Dr. Dovale or the employees of Valley
25  Regional Hospital?

10

1    A.  Yes, I have.
2    Q.  With respect to the care of Dr. Dovale, do you
3  have an opinion as, then, to whether or not his care was
4  below the minimum accepted standard of care required of
5  him?
6    A.  Yes.  I think it was below the minimum standards
7  expected of him.
8    Q.  And explain to us why you believe Dr. Dovale
9  practiced below the standard of care on December 24,
10  1998, with respect to Mr. De Leon.
11    A.  Mr. De Leon was brought to his emergency
12  department after a motor vehicle collision.  The
13  paramedics had placed him in spinal immobilization,
14  including neck collar and back board.  He did have some
15  head injury, and it was well documented that Mr. De Leon
16  also had some intoxicating substances onboard, alcohol.
17  Under those situations, you -- the emergency physician
18  has to assume that a patient has a spinal injury,
19  including a cervical spine injury, until proven
20  otherwise.  And to completely rule out a spinal injury,
21  there's a certain process you have to follow and --
22    Q.  What is that process?
23    A.  The process is you have to do a complete and
24  thorough examination on the patient, both on his spine
25  and -- and on him neurologically.  And that's something

11

1  that is limited any time someone has an intoxicating
2  substance onboard; in other words, in their system.  So
3  to do that adequately, you basically have to wait till
4  the patient is sober.  So until then, you maintain his
5  spinal precautions.
6          Second of all, you can -- you do the
7  initial examination to see what you're starting with.  If
8  it's normal, you're in good shape.  But if it's --
9  there's any question at all, then, you know, you have to
10  assume there's something going on there.  In this case,
11  I -- I think there was a problem, in that it does not
12  appear that an examination was done on the spine or
13  neurologically.  The collar was removed and the back
14  board was removed before you could justify removing it
15  under any circumstances in this type of a case.
16          And then I think there's also a factor that
17  the patient had neurological complaints that were not
18  addressed, which would have been another indication in
19  and of -- by itself that should have been addressed
20  further to rule out spinal cord injury.
21    Q.  Okay.
22    A.  And that was when he was complaining of
23  numbness.
24    Q.  You're aware that the patient was complaining of
25  numbness from the neck down?

12

1    A.  That was in the paramedic report, yes.
2    Q.  Okay.  And you have reviewed Dr. Dovale's
3  deposition?
4    A.  Yes, I have.
5    Q.  So, you're familiar, at least to some extent,
6  with his testimony he's previously given in this case?
7    A.  Yes.
8    Q.  And based on your review of his medical records,
9  did you come to a conclusion as to whether or not
10  Dr. Dovale performed a neurological exam on the patient?
11    A.  By the medical records, it does not appear he
12  did.
13    Q.  He used a null sign to chart on his record under
14  the section applying to a neurological exam, correct?
15    A.  Yes.
16    Q.  And what does that customarily mean in your
17  profession?
18    A.  It depends where it's used.  But if it's used in
19  the physical exam, to me it means that it wasn't
20  addressed.
21    Q.  Okay.  And --
22          MR. GAULT:  Objection, nonresponsive.
23    Q.  (By Mr. Crosley)  The -- the testimony of
24  Dr. Dovale is that he did perform a neurological exam and
25  it was normal, and that's why he wrote a null sign.

17

1    Q.  (By Mr. Crosley) Okay.  And do you recall from
2  Dr. Dovale's deposition that he says nobody told him the
3  patient had complained of numbness below the neck?
4    A.  Yes.
5    Q.  And had the doctor been told by the nurse that
6  the patient was complaining of numbness below the neck,
7  what would you then expect, in reasonable medical
8  probability, to occur?
9    A.  With that, I would expect the patient to be kept
10  in the spinal precautions and a complete neurological
11  evaluation, spinal evaluation done, exam and evaluation
12  done, and also supporting x-ray studies and repeat
13  examinations to see how things are changing or not
14  changing, and if the patient persists with those
15  complaints, a neurological or neurosurgical consultation.
16    Q.  So you would expect the standard of care for
17  Nurse Wright to include clearly communicating the
18  patient's complaints of numbness or feelings of paralysis
19  to the treating ER physician?
20    A.  Yes.
21    Q.  And is there any evidence that that was done in
22  this case?
23    A.  None that I found in -- by looking at the chart.
24    Q.  Would it be fair to say that that violation of
25  the standard of care was a cause in contributing to

18

1  Mr. De Leon's injuries and damages?
2    A.  Yes.
3        MR. CROSLEY:  I'll pass the witness.
4        EXAMINATION
5  QUESTIONS BY MR. GAULT:
6    Q.  Doctor, let's just mark what's in your file
7  here -- or talk about it.  When you -- you were sent this
8  case the first time on October 20th of 2000; is that
9  correct?
10    A.  Yeah, I think that's when I first received it.
11    Q.  Okay.  And along with the -- sending you --
12  let's just mark that as Peters Exhibit No. 2.  That's the
13  letter sending you the case, right?
14    A.  Yes.
15    Q.  Okay.  Along with what was sent to you at that
16  time, you got the December 24th, 1998 medical records
17  from Valley Regional; is that correct?
18    A.  Correct.
19    Q.  Let's see.  If I can just ... all right.  You --
20  you would have gotten the December 25th, 1998 medical
21  records from Brownsville Medical Center; is that right?
22    A.  Correct.
23    Q.  All right.  Appears to be another copy of
24  those -- or you got the December 25th, 1998 admission
25  from Brownsville Medical Center; is that right?

19

1    A.  Yes.
2    Q.  All right.  You got an EMS report for...
3    A.  One of those EMS reports is a transfer after he
4  was placed in a home and he was brought back for another
5  medical condition.
6    Q.  Okay.
7    A.  That was indirectly related to --
8    Q.  All right.  All right.  And you got the December
9  24th, 1998 EMS report; is that right?
10    A.  Yes.
11    Q.  And from looking at it, that looks like all the
12  documents you were sent on October 20th of 2000.  Is --
13  is that a fair statement?
14    A.  That sounds appropriate.
15    Q.  Okay.  Be -- feel free to check that and see if
16  that's -- that's all you were sent.
17    A.  I -- I believe that was all he sent me.  There's
18  a lot of papers here, but I believe this is everything I
19  was sent --
20    Q.  Uh-huh.
21    A.  -- at that time.
22    Q.  And then in your file, you have a second copy of
23  the December 24th, 1998 medical records from Valley
24  Regional, right?
25    A.  Yes.

20

1    Q.  If you can just hand me that.  Now, I've marked
2  as -- and I'm just going to mark this one sheet as
3  Exhibit No. 2.  That's the cover sheet.  She can make a
4  copy and give you back the original.  Okay?
5    A.  Okay.
6        (Peters Exhibit No. 2 was marked.)
7    Q.  (By Mr. Gault) Now, I also have some
8  correspondence here to you December 29th, 2003.  That's a
9  letter to you talking to you about your deposition on
10  January 27th --
11    A.  Yes.
12    Q.  -- of 2004; is that correct?
13    A.  That's correct.
14    Q.  And then attached to that letter is a copy of
15  the deposition notice and subpoena duces tecum; is that
16  right?
17    A.  Correct.
18    Q.  All right.  And then we also have in your file
19  -- let's see -- just another copy of that deposition
20  notice; is that correct?
21    A.  Yeah, I -- that looks correct.  I'm not sure if
22  -- I think -- I don't know if that's just a copy, or if I
23  got that sent at a different time.  That looks like the
24  same thing.
25    Q.  Okay.  It was -- it's stamped here December

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

25

1   stated those were customarily reviewed when you're
2   treating patients in the emergency room. Do you remember
3   having said that?
4           MR. CROSLEY: Objection,
5   mischaracterization of the testimony.
6       A.  I remember the question being reviewing cases as
7   pertaining to medical legal situations. Because for
8   medical care, we -- the depositions wouldn't be
9   available.
10      Q.  (By Mr. Gault) Okay. You've only done that,
11  what -- you -- this is only the third case you've given
12  testimony in --
13      A.  That's correct.
14      Q.  Okay. You're not holding yourself out as an
15  expert on what to review in medical legal cases, are you?
16      A.  If I understand the question correctly --
17      Q.  Yes, sir.
18      A.  -- if what you're saying is I'm an expert in the
19  medical legal aspect of it, no.
20      Q.  Okay.
21      A.  As expert in my field, yes.
22      Q.  All right. Now, when you -- when you did --
23  let's just show -- I've got a report here for you. It's
24  dated November 10th of 2000.
25          (Peters Exhibit No. 7 was marked.)

26

1       Q.  (By Mr. Gault) We'll mark that as Peters
2   Exhibit No. 7. Is that your first report in this case?
3       A.  You said November, 2000?
4       Q.  November 10th, I believe.
5       A.  Yeah, this should be my first -- yeah, this --
6   this would be my first.
7       Q.  And the first page of that has an affidavit from
8   Carol Lomax. She's the lawyer who hired you; is that
9   correct?
10      A.  Yes.
11      Q.  The first page is what I'm talking about here.
12      A.  Yes.
13      Q.  Okay. Now, on that November 10th of 2000
14  report, what did you have available to review in this
15  case?
16      A.  With this report, I had the medical records from
17  the 24th and the 25th.
18      Q.  Okay. So you had --
19      A.  I think it -- I think it's stated in here in the
20  beginning, "reviewed the records of two different
21  emergency department visits, with paramedic
22  transportation records for December 24th, 1998 and
23  December 25th, 1998." And it says, "I was also provided
24  with the inpatient hospital records for his admission
25  from December 25th, 1998."

27

1       Q.  Okay. So you had the EMS report, right?
2       A.  Uh-huh.
3       Q.  Is that right?
4       A.  Yes.
5       Q.  You had the records from Valley Regional for
6   December 24th, 1998, right?
7       A.  Yes.
8       Q.  And the records from Brownsville Medical Center
9   for December 25th, 1998 and his inpatient stay?
10      A.  Yes.
11      Q.  Nothing else?
12      A.  Nothing else.
13      Q.  Okay. Now, you did not have Dr. Dovale's
14  deposition at that time; is that right?
15      A.  That is correct.
16      Q.  You did not have Mr. De Leon's deposition at
17  that time; is that correct?
18      A.  That's correct.
19      Q.  Okay. Now, you had -- in that initial report
20  you had in the case, you had criticism of other
21  healthcare providers, didn't you?
22      A.  I believe I did.
23      Q.  Okay. And have you stated any of those earlier
24  today?
25      A.  No. I didn't.

28

1       Q.  Okay. Matter of fact, in that -- back on
2   November 10th of 2000, you had criticisms of the -- you
3   had criticisms of the EMS transfer of Mr. De Leon from
4   the jail to the -- to BMC on December 25th, 1998; is that
5   correct?
6       A.  Yes.
7       Q.  Okay. And you thought that those criticisms
8   contributed to the cause of Mr. De Leon's quadriplegia;
9   is that correct?
10      A.  I believe -- and I haven't seen this for a long
11  time. Let's see exactly what I wrote.
12      Q.  Paragraph 2.
13      A.  I wrote that it was a contributing cause.
14  So --
15      Q.  Of Mr. De Leon's --
16      A.  Yeah.
17      Q.  -- quadriplegia?
18      A.  So it could possibly have been a contributing
19  cause, yes.
20      Q.  Well, do you remember what my question was?
21      A.  Repeat --
22          MR. CROSLEY: Objection to the extent this
23  is harassing the witness.
24      Q.  (By Mr. Gault) Do you remember?
25      A.  Not specifically.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

7 (Pages 25 to 28)

33

1    A. I believe it was a complete report based on the
2  information I had at the time and my opinions at that
3  time.
4    Q. Okay. Now, you also have given us a -- you've
5  also signed an affidavit; is that correct?
6    A. I believe that's correct.
7    Q. All right. And do you know what that affidavit
8  was being used for?
9    A. My understanding was it was just being used for
10  -- for this case. I -- as far as specifically beyond
11  that, I'm not sure.
12       (Peters Exhibit No. 8 was marked.)
13    Q. (By Mr. Gault) Let's mark Peters Exhibit No. 8.
14  And that's an affidavit of Ms. Lomax swearing to your
15  affidavit; is that correct?
16    A. Yes.
17    Q. Now, your affidavit is dated January 9th of the
18  year 2002.
19    A. Okay.
20    Q. Okay. Now, you -- you didn't have a copy of
21  that here in your file today, did you?
22    A. No.
23    Q. And you also didn't have a copy of your November
24  10th, 2000 report in your file today; is that correct?
25    A. That's correct.

34

1    Q. Those are things that I've produced for you; is
2  that right?
3    A. Yes.
4    Q. Okay. Now, in looking at your affidavit, is
5  your affidavit of January 9th, 2002 a complete statement
6  of your opinions in the case?
7    A. They would have been my opinions of -- of
8  January, 2002.
9    Q. Okay. What about your report of February 8th of
10  2004. Are those a complete statement of your opinions in
11  this case?
12    A. The statements of February, 2004 are more
13  specific. They're not as inclusive as the previous.
14    Q. They leave out some of your opinions, right?
15    A. Well, the -- yeah, they leave out some things
16  that were addressed in the previous ones.
17    Q. Right. They leave out your reports about
18  Brownsville Medical Center and the EMS; is that correct?
19    A. Yes.
20    Q. And why did you find it never necessary to have
21  opinions about the -- the Brownsville Police Department?
22    A. I'm sorry. Can you repeat that, please?
23    Q. Why have you never included any opinions
24  about the treatment by the Brownsville Police Department?
25    A. Oh. The police, from what -- from what I saw in

35.

1  the information provided to me, were acting on what
2  information they were given by the physician. Was that
3  they were told that the patient didn't have an injury.
4  So at that point, they were just trying to get the
5  patient into the -- into their custody and deal with him
6  in that way. So I thought it was just an extension
7  of -- of what the doctor had told them that they -- they
8  could do with the patient.
9    Q. Well, from what you understand of the way the
10  police treated Mr. De Leon, you wouldn't expect them to
11  treat someone in their custody that way, would you?
12       MR. CROSLEY: I object to the -- the
13  question. It's vague, ambiguous, mischaracterizes the
14  previous evidence.
15    Q. (By Mr. Gault) Go ahead.
16    A. I would ex- -- if the physician told the police
17  that the patient didn't have any physical problems, I can
18  understand the police physically picking up a patient and
19  moving him, thinking the patient is being noncooperative.
20       As far as any excessive force, which, you
21  know, that, I -- I'm not -- I don't really have an
22  opinion of right now in this case. Then, you know.
23  that's -- that's a separate and completely different
24  issue.
25    Q. Well, I guess what I was addressing to you --

36

1  you're a medical doctor, right?
2    A. Yes.
3    Q. You -- you can't testify as to the police
4  standard of care, right?
5    A. Right.
6    Q. But even if they're taking a person in perfect
7  health to the jail, you wouldn't expect them to treat a
8  person in perfect health way they treated Mr. De Leon,
9  would you?
10       MR. CROSLEY: Objection, assumes facts not
11  in evidence.
12    A. The police, if they -- if they think the patient
13  is malingering, they're going to pick him up and carry
14  him. And that's -- that's what I'm -- that's -- that's
15  what I had thought that they were doing.
16    Q. (By Mr. Gault) What about dropping him to the
17  floor in the jail cell?
18    A. I mean, dropping someone to the floor, I don't
19  think that's a good thing to do in any situation.
20    Q. What about throw them head-first into the back
21  seat of the police car, with their neck hanging off the
22  seat?
23       MR. CROSLEY: I object to this line of
24  inquiry -- let me finish the objection -- from this
25  witness. He's a medical doctor. He's not been asked to,

**41**

1    A.  Yesterday.
2    Q.  Yesterday.  Was he here yesterday meeting with
3  you?
4    A.  He came into town yesterday and provided me with
5  the deposition so I could read it --
6    Q.  Of Mr. De Leon?
7    A.  Yeah, of Mr. De Leon.
8    Q.  Okay.  And about what time was that?
9    A.  The afternoon.  About 7:00 o'clock.
10    Q.  Okay.  And then you -- you read it?
11    A.  Yeah.  I -- I -- I read it at that time, and
12  then I gave it back to him.
13    Q.  At what time?
14    A.  Probably took me about an hour to read it.
15    Q.  Okay.  So you -- you read it at -- started
16  reading at 7:00 p.m. and gave it back to him at  8:00
17  p.m.?
18    A.  Approximately.
19    Q.  He's -- he's shaking his head and things, but
20  you can't --
21    A.  Uh-huh.
22    Q.  -- cue your answers off him.  I -- I just need
23  your -- your sworn testimony.
24      MR. CROSLEY:  Well, okay.  Let me object,
25  misleading question.

**42**

1    A.  Okay.
2    Q.  (By Mr. Gault)  Is what I said correct?
3    A.  Okay.  Can you repeat it, please?
4    Q.  He gave it to you at 7:00 p.m. last night.
5    A.  Uh-huh.
6    Q.  And then you read it and gave it back to him at
7  8:00 p.m.?
8      MR. CROSLEY:  Objection, mischaracterizes
9  his testimony.  The question is:  When did you give it
10  back to me?
11      THE WITNESS:  When did I give it back to
12  you?
13    A.  Actually, I -- I gave it back to him this
14  morning.
15    Q.  (By Mr. Gault)  Oh, this morning.
16    A.  I think I gave it --
17    Q.  Okay.
18    A.  -- back to him this morning.
19    Q.  But you read it from 7:00 to 8:00 last night?
20    A.  Yeah, I read it when I got it.
21    Q.  All right.  You had never read Mr. De Leon's
22  testimony before last night at 7:00 p.m.?
23    A.  That's correct.
24    Q.  Okay.  You would not have been able to testify
25  today as to any complaints against Valley Regional

**43**

1  Medical Center had you not read Mr. De Leon's testimony;
2  is that correct?
3    A.  Um ...
4      MR. CROSLEY:  Let's see.  I'll object to
5  the question.  It mischaracterizes the -- well, improper
6  hypothetical.  I could ask him hypothetical questions
7  without him having read Mr. De Leon's testimony and
8  still --
9      MR. GAULT:  Please stop testifying,
10  Counsel.
11    Q.  (By Mr. Gault)  Would you answer the question,
12  Doctor?
13    A.  Okay.  Repeat it one more time, please.
14    Q.  Did the objection interfere with you
15  understanding?
16      MR. CROSLEY:  Objection, sidebar.
17    Q.  (By Mr. Gault)  Doctor, what I'm asking you
18  is --
19    A.  Uh-huh.
20    Q.  -- you did not have any opinions about Valley
21  Regional Medical Center before 7:00 p.m. last night when
22  you read doc- -- Mr. De Leon's testimony; is that
23  correct?
24    A.  I -- I -- I did have opinions -- after reading
25  his testimony, I had opinions that -- that I thought that

**44**

1  there was more involved here than -- based on the
2  initi- -- information I had previously.
3    Q.  What were your opinions about Valley Regional
4  Medical Center before 7:00 p.m. last night and your
5  meeting with Mr. Crosley?
6    A.  There's a question of whether the information
7  from the paramedics had gotten to the physician with the
8  EMS report that had stated the patient had numbness from
9  the neck down.  And the question is whether that
10  information was provided to the doctor.  When I read
11  Dr. Dovale's deposition, he says he did not have that
12  information; if he did, he would have acted differently.
13  And so that's information getting it to the doctor.
14    Q.  Where did Dr. Dovale say that in his deposition?
15    A.  I couldn't tell you what page, but I remember
16  reading that in his deposition.
17    Q.  Well, do you also remember Dr. Dovale saying he
18  still would have done his examination of this patient;
19  and from what he found, that there was no reason to do
20  anything differently?
21    A.  Uh-huh, I remember him stating that, also.
22    Q.  Okay.
23    A.  I think he worded it something to the effect of
24  "I would have done other studies like x-rays if I would
25  have had that information" about --

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

11 (Pages 41 to 44)

49

1   to you about this report, November 10th of 2000. You
2   said -- you said a term that I found was interesting.
3   November 10th of 2000. You got that there?
4       A. Okay.
5       Q. Okay. If you'll turn to No. 1 there on the page
6   you're on.
7       A. Okay.
8       Q. I believe it's the last sentence. You're
9   talking about "gross negligence." What is that,
10  Dr. Peters?
11      A. Well, I would say that's a -- a legal term that
12  I probably can't define very well at this time. At the
13  time I wrote this, I probably had a definition in mind.
14  As of right now, I could probably only give you a
15  layperson's opinion of what that would mean.
16      Q. Go ahead.
17      A. Just looking at the context of -- of it. Yeah,
18  in this statement I -- I think what I was trying to say
19  is that I thought the physician was negli-- negligent
20  and it was a significant negligence in deviation of care.
21      Q. That's your understanding of what "gross
22  negligence" is?
23      A. Yes.
24      Q. Has anyone told you that in the tort reform of
25  1995, "gross negligence" was taken out as a cause of

50

1   action in this type of case?
2       A. No.
3       Q. They didn't tell you that?
4       A. No.
5       Q. Okay. You've dropped that term, "gross
6   negligence," from your subsequent reports; is that
7   correct?
8       A. Yes, I believe that's correct.
9       Q. Why is that?
10      A. I -- I can't tell you specifically why, other
11  than that when I used it here, I -- at the time, I
12  probably thought I was saying it in the terminology that
13  was proper. And then subsequently, in the other times I
14  wrote it, it wasn't a phrase that -- that I would use
15  anymore.
16      Q. You don't intend to testify in front of the jury
17  as to anyone's gross negligence. Is that a fair
18  statement?
19      A. I would say that I guess it's a term that
20  I don't have a good enough legal understanding to -- to
21  be able to -- to say what I would ...
22      Q. Let me ask you: Is operating a car while you're
23  drunk, is -- in your opinion, is that negligence?
24      A. From -- I would say "yes."
25      Q. In your opinion, would that be gross negligence?

51

1       A. Well, as a person who is not an expert in the
2   law, I would think -- I would think -- to me, the word
3   "gross" is "large." So it's a large negligence. So I
4   would say "yes."
5       Q. Okay. And operating a car without a seat belt,
6   in your opinion, is that negligence?
7       A. I would say that's more irresponsibility. I
8   would use that term more.
9       Q. Not acting reasonably, right?
10      A. Not acting reasonably.
11      Q. And -- and that, of course, would be negligence,
12  right?
13      A. Because that's -- you're more endangering
14  yourself more than you're endangering other people.
15      Q. Right.
16      A. I guess when I say "negligence," I'm thinking
17  about endangering other people.
18      Q. Oh, you don't know that you can be negligent and
19  endanger yourself?
20      A. Well, there again, like I say, I don't have a --
21          MR. CROSLEY: Objection, argumentative.
22      A. I don't have a lawyer's knowledge of the law.
23      Q. (By Mr. Gault) Okay. In this case, if the jury
24  is asked whether or not, if Mr. De Leon was not wearing
25  his seat belt, if that was negligence, would you agree

52

1   that it was?
2           MR. CROSLEY: Objection, irrelevant.
3       A. From the definition you have just given me, I'd
4   say "yes."
5       Q. (By Mr. Gault) Okay. Now, then also you -- you
6   know how this accident came about, right, this auto
7   accident?
8       A. That part of the deposition, I -- I did not read
9   real carefully. I remember him talking about a car
10  coming in and -- and stuff, but I don't -- I didn't read
11  that real carefully.
12      Q. Oh, are there parts of Mr. De Leon's deposition
13  that you read carefully and parts you did not?
14      A. The -- some of the introductory parts about, you
15  know, his family and things like that. I was looking
16  more at the medical, the stuff about the hospital
17  specifically.
18      Q. Of his entire deposition, how many pages of it
19  do you think you read carefully?
20      A. That, I can't tell you.
21      Q. And is there -- did Mr. Crosley take back the
22  deposition of Mr. De Leon from your file?
23      A. It was -- it was his copy, and I just -- I gave
24  it back to him, thinking it was his copy.
25      Q. This morning?

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

13 (Pages 49 to 52)

57

Q. How do you know that EMS report was given to the hospital?

A. The only way I, at that time, knew of anything as far as that was because it was included in the chart, that -- that it was part of the patient's presentation --

Q. Okay.

A. -- at the hospital.

Q. Is it in this copy of the chart that I have right here?

A. I'm not sure. I'll have to look. No, it's not in this one. It's --

Q. All right. Let me -- show me the copy of the EMS report that was included in the Valley Regional chart.

A. Papers got shuffled a little bit. I believe this was the page you're looking for.

Q. Let me look at the page before that. What does it say here on the page before that as to when the ambulance was returned to service?

A. "20" -- and I think it says "33."

Q. When was Mr. De Leon dismissed from Valley Regional?

A. 2030.

Q. So the ambulance wrote on their own report -- the EMS wrote on their own report that they returned

58

their vehicle back to service at 8:35 p.m.; is that correct?

A. 8:35, 8:33, yeah.

Q. 8:33. Okay.

A. Yeah.

Q. 8:33 p.m. And that's -- that's after Mr. De Leon was discharged from Valley Regional; is that correct?

A. Yes.

Q. So that copy that you showed me could not have been in the hospital chart; is that correct?

MR. CROSLEY: Objection. That assumes facts not in evidence.

A. I -- I wouldn't say absolutely because, you know, if he used a different watch or something. We're talking two or three minutes, you know, three minutes here. So --

Q. (By Mr. Gault) What -- what evidence do you have that --

A. -- I'd say I can't say one way or the other for sure.

Q. What evidence do you have that on arrival to the emergency room, Mr. De Leon was complaining of numbness from the neck down?

A. The evidence I have would be the paramedic note

59

that they had -- that they had written, and then what Mr. De Leon said in his deposition.

Q. That he told everybody about his numbness?

A. That he told everybody, yes.

Q. Right. Okay. All right. Let -- let's talk about the paramedic, though. The paramedic report talks about being en route; is that correct?

A. Yes.

Q. Okay. "En route" means while he's still in the ambulance on the way to the hospital, right?

A. Correct.

Q. Okay. Now, say -- by the way, the paramedics reassessed Mr. De Leon; is that correct?

A. I believe -- yeah. I mean, yeah, they did.

Q. Could they find anything wrong with him other than the small cut to his forehead?

A. From looking at their chart, I think it was just the complaint of being numb from the neck down, his confusion, smell of alcohol on onboard. I think I covered -- I think that covers it.

Q. Let -- let me -- okay. A complaint of numbness is a subjective complaint?

A. Yes.

Q. Okay. I guess what I'm talking about, could the paramedics find any objective evidence that Mr. De Leon

60

had any numbness or anything wrong with him neurologically?

A. Yes. He had an altered mental status.

Q. Well, he was confused, right?

A. Right.

Q. And he had just been in an automobile accident, right?

A. Yes.

Q. Nothing is abnormal about that, is it?

A. Altered mental status is abnormal.

Q. All right. He was drunk, too, wasn't he?

A. Yes.

Q. A lot of times, drunks are confused, aren't they?

A. That -- that is true. Many drunks can be -- people who are intoxicated can be confused.

Q. He had just rear-ended another vehicle, hadn't he?

A. Yes.

Q. Okay. Other than his confusion and his subjective complaint of numbness, do you see anywhere where the EMS noted that they could verify any of his numbness?

A. No.

Q. Okay. As we sit here today, it was -- at least

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

15 (Pages 57 to 60)

65

1  again you state that the "paramedics found him unable to
2  get out of the car " Do you see that on the third
3  paragraph of the first page?
4     A.  Uh-huh.
5     Q.  Do you see that, sir?
6     A.  Yes.
7     Q.  Okay. And now in -- in looking back at the
8  chart, you don't see where that's actually indicated
9  anywhere; is that correct?
10    A.  I'm just looking over the paramedic sheet --
11    Q.  Sure.
12    A.  -- right now. Yes, that's correct.
13    Q.  Okay. Now, and then you also state in your
14  affidavit, "On arrival to the emergency department at
15  Columbia Valley Regional Medical Center, it was reported
16  the patient complained of numbness from the neck down."
17  As we sit here today, you do not have any evidence that
18  that occurred. Is that a fair statement?
19    A.  I would say I got -- I got that statement from
20  the paramedic chart, and I was making the assumption that
21  that chart was provided and available to the hospital and
22  to the doctor.
23    Q.  Okay.
24    A.  That's where that came from.
25    Q.  Okay. That's -- that was just -- that was an

66

1  assumption you made in this sworn affidavit, though?
2     A.  Yes.
3     Q.  Okay. Now, you talk about -- once again, you
4  have the same three complaints that you have in your
5  first report, and then you have a fourth category of
6  complaints; is that correct?
7     A.  Yes.
8     Q.  Okay. In your -- your first paragraph in your
9  affidavit is similar to your first paragraph in your
10  previous report; is that correct?
11    A.  You're talking about No. 1?
12    Q.  Yes, sir.
13    A.  I believe so.
14    Q.  Okay. And in No. 1 there, who are you
15  complaining -- whose actions are you complaining about?
16    A.  Again, it's Dr. Dovale's.
17    Q.  Okay. In paragraph 2, whose actions are you
18  complaining about?
19    A.  There again, it would be mainly Dr. Dovale.
20    Q.  Okay. In paragraph 3 you're complaining about
21  the EMS transfer of Mr. De Leon to the -- I'm sorry --
22  from the jail to BMC; is that correct?
23    A.  Yes.
24    Q.  Okay. And then on paragraph 4 you're
25  complaining about Mr. De Leon's treatment there at

67

1  Brownsville Medical Center; is that correct?
2     A.  Yes.
3     Q.  All right. Now, once again, in your sworn
4  testimony in this affidavit, you -- when you're talking
5  about the EMS transfer of Mr. De Leon to Brownsville
6  Medical Center, you state, "This deviation from the
7  standard of care was a contributing cause of
8  Mr. De Leon's quadriplegia"; is that correct?
9     A.  I'm sorry. Where -- where are we at, again?
10    Q.  Yes, sir. No. 3.
11    A.  Okay.
12    Q.  The last sentence on No. 3 --
13    A.  Okay.
14    Q.  -- where you're talking about the paramedics on
15  December 25th, 1999.
16    A.  Yes. That is a possible contributing cause.
17  Any movement will -- can contribute to it.
18    Q.  Okay. Dr. Peters, I'm sorry. My question was
19  probably unclear. My question to you was: On paragraph
20  3 of your sworn affidavit, you state that "on December
21  25th" -- that's Christmas day, when the paramedics are
22  transferring Mr. De Leon from the jail to Brownsville
23  Medical Center, you state -- you're complaining about
24  their transfer. And you state, "This deviation from the
25  standard of care was a contributing cause of

68

1  Mr. De Leon's quadriplegia."
2     A.  Yes.
3     Q.  Did I state that correctly?
4     A.  Yes.
5     Q.  Okay. Certainly, you had enough information to
6  make that opinion back on January 9th, 2002; is that
7  correct?
8     A.  Yes.
9     Q.  Okay. You have not received any medical records
10  of Mr. De Leon after January 9th, 2002; is that true?
11    A.  I -- whatever I have here in front of me. So
12  whatever the last date of this is.
13    Q.  Well, you received all those in the year --
14    A.  Yeah.
15    Q.  -- 2000; is that correct?
16    A.  And -- and that's the last records I have.
17    Q.  Okay. And you re- -- you received Mr. De Leon's
18  medical records in the year 2000; is that right?
19    A.  Yes.
20    Q.  Okay. And what I'm talking about is a sworn
21  affidavit you gave in the year 2002.
22    A.  Okay.
23    Q.  You understand that?
24    A.  Yeah. Okay.
25    Q.  Okay. And so what I'm saying is from the

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

73

1  Q.  Okay.  Now, Doctor, I guess what I'm talking
2  about is:  Pretty much after they leave your emergency
3  room, you've turned them over to a specialist.
4  A.  That is --
5  Q.  Is that correct?
6  A.  Yeah, that's correct.
7  Q.  And those are the best people to testify as to
8  the extent of someone's injuries; is that correct?
9  A.  For long-term, yes.
10  Q.  Sure.
11  A.  I agree.
12  MR. CROSLEY:  Are you at a good stopping
13  point?
14  MR. GAULT:  Yeah.  Oh, any time, Tom.  I'm
15  easy on breaks.  Whatever you want to do.
16  THE VIDEOGRAPHER:  Off the record at 10:04
17  a.m.
18  (Brief recess taken.)
19  THE VIDEOGRAPHER:  Back on the record at
20  ten minutes after 10:00 a.m.
21  Q.  (By Mr. Gault)  Dr. Peters, let me ask you:
22  There were neurological checks done on Mr. De Leon; is
23  that correct?
24  A.  Yes.
25  Q.  Okay.  They were both done by the nurse and

74

1  Dr. Dovale; is that correct?
2  A.  Dr. Dovale's chart doesn't -- it doesn't really
3  indicate a neurological examination.  I believe he just
4  put a null sign next to that.
5  Q.  Well, as you -- when you testify in front of
6  this jury, are you going to testify that Dr. Dovale did
7  do neurological checks or did not?
8  A.  Based on the null sign, I'm going to say he did
9  not.
10  Q.  Okay.  Well, I thought, for example, checking
11  his eyes was a neurological check.
12  A.  It depends on what you do with the eyes.
13  There's parts of the ophthalmic exam, part of the head
14  exam, and then there's parts that can be part of the
15  neuro exam.
16  Q.  Did Dr. Dovale check the patient's eyes?
17  A.  I'd have to look at the chart and see
18  specifically.  He -- he does -- he does have a notation
19  about the eyes, yes.
20  Q.  That they're normal; is that correct?
21  A.  What little he has written down here, it looks
22  like it's normal, yes.
23  Q.  Do you remember my question, Doctor?
24  MR. CROSLEY:  Objection, argumentative.
25  A.  Why don't you go ahead and repeat your question.

75

1  Q.  (By Mr. Gault)  Sure.  All I stated was:  He --
2  he said the eyes were normal; is that correct?
3  A.  Yes.
4  MR. CROSLEY:  Objection, asked and
5  answered.
6  Q.  (By Mr. Gault)  Okay.  And, Doctor, in order to
7  be a fair witness, certainly you want to give a
8  responsive answer to my question, right?
9  A.  Yes.
10  Q.  Okay.  And saying things like -- like "what
11  little he has written down here," I mean, that's -- that
12  was not part of my question, right?
13  MR. CROSLEY:  Objection, argumentative.
14  The witness is entitled to answer the question if it's
15  necessary to fully explain his answer.
16  A.  This is not a complete eye exam.  So that was my
17  statement of "what little is written down."
18  Q.  (By Mr. Gault)  Okay.  Did he write down one way
19  or the other what he checked on his eyes?
20  A.  I don't see, really, any significant details.
21  He says -- well, what I'm reading here, this says
22  "normal."
23  Q.  Okay.  Would it be speculation, then, to say
24  what Dr. Dovale checked on the patient's eyes?
25  A.  Yeah.  And that's -- that's why that a detail in

76

1  the history is usually very helpful.
2  Q.  I was just asking you:  Is it speculation to --
3  to try to --
4  A.  Yes, it is speculation.
5  Q.  Okay.  And then he also checked his ear, nose,
6  and throat, right?
7  A.  Well, he has "ENT," and he has another null
8  sign.
9  Q.  You don't know whether he did or not?
10  A.  I couldn't say.
11  Q.  But you've seen his deposition; is that correct?
12  A.  Yes.
13  Q.  And at that time, he said he did, right?
14  A.  Yes, in his deposition he said he did.
15  Q.  Has Mr. De Leon denied that?
16  A.  I don't remember Mr. De Leon specifically
17  addressing the ear, nose and throat exam.
18  Q.  It -- it sounds like you're complaining about
19  Dr. Dovale's charting technique; is that right?
20  A.  I do think his technique is -- is sparse, yes.
21  Q.  Is there any written standard of care as to how
22  ER doctors are supposed to chart negative findings?
23  A.  As far as any written standard of care, as of
24  the time when this happened, I can't say I know of any
25  general ones that are national standards or state

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

19 (Pages 73 to 76)

81

1   Mr. De Leon's deposition by the time of your February
2   8th, 2004 report; is that correct?
3      A.   I had not seen his deposition.
4      Q.   All right.
5      A.   At that point.
6      Q.   Okay. Now, you -- once again, in your February
7   8th, 2004 report, you state, "Paramedics found him unable
8   to get out of the car." We've already addressed that,
9   right?
10     A.   Yeah. I -- I had that impression, and I can't
11  tell you where I got that from because --
12     Q.   Okay.
13     A.   -- I don't see it in the chart today.
14     Q.   All right. Is there anything in this third
15  report that is a criticism of Valley Regional Medical
16  Center?
17     A.   I do not believe I have any direct criticisms of
18  Valley Regional in this.
19     Q.   Okay. So as we sit here today, you've given
20  three reports in this case, right?
21     A.   Correct.
22     Q.   Have you signed any affidavits for Mr. Crosley
23  or any other statements for Mr. Crosley?
24     A.   I believe this is all I've done.
25     Q.   Okay.

82

1      A.   Yeah, I've not signed anything for him.
2      Q.   Okay. Has he talked to you about giving another
3   affidavit in this case or another statement in this case?
4      A.   Yes, he has.
5      Q.   What has he talked to you about that?
6      A.   He said after I get a chance to review the
7   depositions, that he may ask me to come up with another
8   affidavit.
9      Q.   Concerning what?
10     A.   Concerning the issues of -- the issues of the --
11  of what Mr. De Leon had stated and involving the
12  interactions with the nurse, the hospital and the
13  paramedics.
14     Q.   When did y'all have this discussion?
15     A.   I think, if I remember correctly, we had a brief
16  phone discussion a few days ago that he was going to get
17  me some more information and would want me to look at it.
18  And then yesterday when we talked, he says after I -- I
19  look at the information, that he wanted to talk to me
20  again to see what my opinions would be.
21     Q.   When are y'all going to have this next
22  conversation?
23     A.   We don't have anything planned.
24     Q.   Okay. I guess what I'm getting at is: You've
25  already given two reports and one sworn affidavit, right?

83

1      A.   Yes.
2      Q.   In none of those you have criticisms of Valley
3   Regional Medical Center; is that correct?
4      A.   Yes.
5      Q.   Okay. From reading Dr. Dovale's deposition, you
6   did not know whether or not he knew of numbness from the
7   neck down as a complaint from Mr. De Leon, right?
8      A.   Well, from reading his definition, he says he
9   does -- he did not know about it.
10     Q.   Okay. And -- but then from reading Mr.
11  De Leon's deposition, he said he told everyone about it?
12     A.   He made the statement, "I told everybody."
13     Q.   Okay. And, of course -- and so now, in
14  everything you've reviewed in the case, you have evidence
15  that -- that that information was transmitted to the
16  doctor?
17     A.   I -- at this point -- at this time I -- I --
18  I don't know if I can say I have evidence that the
19  information was transmitted to a doctor.
20     Q.   Well, you have a sworn deposition, right?
21     A.   From?
22     Q.   Mr. De Leon.
23     A.   The -- and there again, I want to go back and
24  before I do an affidavit, make sure I get the details
25  right. But my impression from what I -- when I read

84

1   the -- his affidavit, is I don't remember him stating
2   specifically that he told a physician.
3      Q.   But he told everybody?
4      A.   He says, "I told everybody."
5      Q.   Okay. All right. And you haven't -- you
6   haven't ever wanted to clarify that statement, right?
7      A.   I haven't had the opportunity to clarify it.
8      Q.   Well, you've never asked to get Mr. De Leon on
9   the phone and talk to him about it, right?
10     A.   No.
11     Q.   You've never asked to -- you know, to talk to
12  anyone else about that, right?
13     A.   No. Just the information that's been provided
14  for me and --
15     Q.   Okay.
16     A.   -- I've shared with you.
17     Q.   So you have some evidence that Mr. De Leon had
18  told the doctor about his numbness from the neck down?
19     A.   Possible evidence. I didn't say it's evidence,
20  but it's a possibility.
21     Q.   Well, when Mr. De Leon said he told everyone,
22  you would assume that includes Dr. Dovale, right?
23     A.   It could include Dr. Dovale. There again, the
24  patient states that he wasn't sure who the doctor was.
25  And so whether Dr. Dovale was in the room or not when he

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

21 (Pages 81 to 84)

89

1   A.  Well, Dr. Dovale testified he did do an exam.
2   Q.  So it's up -- going to be up to the jury to
3  decide, right?
4   A.  Most likely, yes.
5   Q.  Sure.
6   A.  Uh-huh.
7   Q.  In other words, you would not want the jury to
8  come away from this deposition thinking that -- that
9  you're disregarding Dr. Dovale's testimony, right?
10   A.  I am not disregarding his testimony.
11   Q.  Okay.  Because you rely on it for some things --
12   A.  Uh-huh.
13   Q.  -- and then you -- you seem to discount it for
14  others?
15   A.  Yes.  There's some -- there is some
16  inconsistencies in his deposition.
17   Q.  But that's not for you to determine what's --
18  what's true or what's not, right?
19   A.  That is -- it's only my opinion of the care of
20  the case and using that information to try to determine
21  that.
22   Q.  Right.  I mean, what you have to do is take
23  everything Dr. Dovale said at face value, right?
24        MR. CROSLEY:  Objection.  It
25  mischaracterizes what the witness must or must not do.

90

1   A.  I don't -- I don't think I can take everything
2  at face value.  Sometimes you have to look at it to get
3  more detail out of it --
4   Q.  (By Mr. Gault)  In- --
5   A.  -- and incorporate that with the other
6  testimony, too.
7   Q.  Okay.  Including Dr. Dovale's statement that he
8  didn't -- did not know that the plaintiff was complaining
9  of a neurological -- or numbness.  You don't take that at
10  face value either, do you?
11   A.  Um, I -- I really don't know what he knew or
12  didn't know as far as that statement.
13   Q.  Right.  You don't know what he did or did not do
14  in doing neurological checks for Mr. De Leon, right?
15   A.  I wasn't there to actually witness it, so I
16  can't see it.  Like I said before, it is possible.  But
17  his charting does not reflect a neurological exam.
18   Q.  Yeah.  But certainly the best witness we have is
19  to what was done is Dr. Dovale, right?
20        MR. CROSLEY:  Objection, argumentative.
21   A.  I don't know if I can classify him as a "best
22  witness."  I'd classify him as a witness.
23   Q.  (By Mr. Gault)  There was another witness in the
24  room, but he was drunk, right?
25   A.  Well, there's the -- the patient was -- the

91

1  nurse was there, and there's a possibility that other
2  people -- other hospital staff may have been in and out
3  at different times.
4   Q.  Do you remember my question?
5   A.  Your initial -- or last question I remember is
6  who was -- that the doctor was the best witness.
7   Q.  No, sir.  My question was:  There was another
8  witness in the room, but he was drunk?
9   A.  Oh, the patient --
10   Q.  Is that correct?
11   A.  That is correct.
12   Q.  All right.  So he would not be the best witness,
13  right?
14   A.  I don't -- I don't know if I can classify people
15  as the best or worst witness.
16   Q.  Okay.  Now, the injuries in this case, you've
17  been very careful saying that people contributed to them;
18  is that correct?
19   A.  Yes.
20   Q.  The cause of the injuries was what?
21   A.  I think the actual cause was the initial motor
22  vehicle accident.
23   Q.  Mr. De Leon caused that, right?
24   A.  I -- I never saw the police report saying who
25  actually caused the police -- the car accident.

92

1   Q.  In his deposition he testified --
2   A.  Okay.
3   Q.  -- he rear-ended the vehicle in front of him,
4  right?
5   A.  I believe that's correct.
6   Q.  Okay.  And it's your understanding that that is
7  the cause -- him running into the car in front of him is
8  the cause of his injuries, right?
9   A.  Based on the information, yes --
10   Q.  Sure.
11   A.  -- that you just said.
12   Q.  Mr. De Leon being drunk certainly caused the
13  accident, also, right?
14   A.  Intoxication while operating a motor vehicle
15  does contribute to car accidents, so I would say that was
16  a contributing factor to the car accident.
17   Q.  Mr. De Leon's failure to wear a seat belt is a
18  cause of his injuries; is that correct?
19        MR. CROSLEY:  Objection, misstates the
20  evidence.
21   A.  Not wearing a seat belt puts you at higher risk
22  for many types of injuries and probably was involved in
23  his --
24   Q.  (By Mr. Gault)  Okay.
25   A.  -- injury.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

23 (Pages 89 to 92)

97

1  number. So I don't know if I saw it --
2      Q.  Do you remember having -- them having asked
3  Mr. De Leon about that?
4      A.  Maybe that's where I thought I saw it. Like I
5  say, I don't know, so I -- I'd have to go back and look
6  to know for sure.
7      Q.  And -- and you've not reviewed anything else
8  other than what I've covered with you here today, right?
9      A.  That's correct.
10     Q.  Okay. Now, let me talk to you about this --
11  this next affidavit you're planning on giving in this
12  case. What do you plan on putting in the affidavit,
13  based on what you know about this case?
14     A.  I -- at this point I -- I'm going to look at the
15  material a little more before I actually do the
16  affidavit; so I can't tell you exactly what it's going to
17  be. But I think, based on the information that I've, you
18  know, received recently, I'll state that the
19  information -- because as you pointed out, the
20  paramedics' sheet may not have gotten to the doctor and
21  the patient talked about telling the -- the hospital
22  staff that he was feeling the symptoms of numbness from
23  the neck down and that doc- -- that Dr. Dovale says that
24  he didn't know about that complaint, that that
25  information should have been passed on to the doctor.

99

1  question.
2      A.  Okay. Can you repeat the question now, again?
3      Q.  Sure. To be fair with this jury, you would also
4  want to let them know, and this judge -- you'd want to
5  let them know that it would be up to Dr. Dovale to
6  determine whether or not the patient was making
7  complaints of numbness from the neck down, right?
8      A.  I don't -- well, to determine if the patient is
9  making complaints, I mean, the patient said he made the
10  complaints. It's up to Dr. Dovale to determine what the
11  next course of action is to do about the complaints.
12     Q.  And I guess what I'm saying is whether or not --
13  you know, whether or not that was communicated to
14  Dr. Dovale, it's up to him to find out if the patient has
15  that complaint of numbness from the neck down, right?
16     A.  It's -- it's up to him to pursue it.
17     Q.  Okay. So whether or not the patient just told
18  the nurse, it's still up to Dr. Dovale to find out about
19  that complaint, right?
20     A.  Well, if the patient tells the nurse something
21  like that, the nurse is expected to chart it and
22  communicate that with the physician.
23     Q.  And --
24     A.  That's part of the communication and the --
25  working together, the doctor and nurse relationship.

98

1      Q.  You're also going to put in there that if
2  Mr. De Leon said he told everybody about his numbness,
3  then, you know, obviously he told the doctor, too, right?
4          MR. CROSLEY: Objection, form.
5      A.  I would have to read his statement and get the
6  context of that before I know for sure what I would put
7  with that.
8      Q.  (By Mr. Gault) You'll also put in there that
9  regardless of -- of who was told, it would be up to the
10  doctor to determine whether or not the patient was
11  complaining of numbness from the neck down, right?
12     A.  I'm sorry. Could you repeat that?
13     Q.  Yes. You would also put in there that it would
14  be up to Dr. Dovale to determine whether or not the
15  patient was making that complaint, right?
16     A.  To determine if he was making that complaint?
17     Q.  Yes, sir.
18         MR. CROSLEY: I'm going to object to this
19  series of questions about what the doctor is going to put
20  in his affidavit, on the grounds that the determination
21  of what an affidavit is used for is made by the lawyer,
22  for court purposes, and so the doctor may not be privy to
23  what information is requested of him for the affidavit.
24         MR. GAULT: That's not a legal objection.
25     Q.  (By Mr. Gault) Go ahead, Doctor. Answer my

100

1      Q.  Sure. And from what you saw from the chart, at
2  least from what you can tell from the chart, that was
3  never communicated to the nurse, was it?
4      A.  The nurse did not put that in the note at all.
5      Q.  And from what you can tell and the way you know
6  about charting, had that kind of complaint been told to a
7  medical person, either a nurse or doctor, that's
8  something that they would have charted, right?
9      A.  Something they should have charted, yes.
10     Q.  Sure. And they would have charted, right?
11  That's a significant statement, right?
12     A.  Well, when you say "would have," I mean, they
13  should have. Whether they would have, sometimes things
14  are left out that should be put in there.
15     Q.  And from your review of this case, to be fair to
16  the judge and the jury, you would certainly state that
17  regardless of whether or not Dr. Dovale was told of
18  numbness from the neck down, he would independently
19  investigate that aspect of this case, wouldn't he?
20     A.  Yes.
21     Q.  Okay. And from your review of this case,
22  Dr. Dovale did investigate whether or not the patient had
23  numbness; is that correct?
24     A.  His chart does not address that.
25     Q.  What about his deposition?

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

105

1    Q.  A 12 out of 12, right?
2    A.  Yeah.
3    Q.  Which means that he did not suffer any trauma
4  that they could determine?
5    A.  No major trauma.
6    Q.  No major trauma, right.  Would you even
7  consider, from what you see here, as his injury severity
8  being a possible injury and a laceration to the
9  forehead -- would you even consider this a trauma case?
10   A.  Yes.
11   Q.  Okay.  So any -- any type of automobile
12  accident, you consider it a trauma case?
13   A.  Yes.
14   Q.  Okay.  Now, back on the Glasgow coma scale, the
15  one point he had deducted from his perfect score was
16  because he was disoriented and converses; is that
17  correct?
18   A.  Correct.
19   Q.  Do you know the cause of that?
20   A.  No.
21   Q.  Okay.  You had --
22   A.  I have speculation, but I don't know the actual
23  cause.
24   Q.  Well, I'm not going to ask you to speculate.  Do
25  you have any evidence that it's related to a neurological

106

1  injury or alcohol ingestion or anything else?
2    A.  I do have some evidence that it's related to
3  alcohol.
4    Q.  Okay.  And what is your understanding of what
5  Mr. De Leon's blood alcohol content would have been on
6  Christmas Eve night when he had this automobile accident?
7    A.  I can't give you a number.  But based on the
8  descriptions, it sounds like he would be above the
9  legally drunk level.
10   Q.  Well, way beyond legally drunk, right?
11   A.  Probably significantly above it.
12   Q.  Have you seen any testing of Mr. De Leon's blood
13  alcohol content anywhere in this case?
14   A.  No.
15   Q.  Okay.  And you -- of course, you were not given
16  the reports from the Brownsville Police Department as to
17  whether or not he took the Breathalyzer test, right?
18   A.  I have no information from the police.
19   Q.  Okay.  Is there anything about the injuries that
20  he would have -- that we know he has now, that would have
21  kept him from blowing in the Breathalyzer test?
22   A.  If he was speaking as much as they're saying he
23  was, he would physically be able to do it.  If he was a
24  little confused, as far as getting him to cooperate to do
25  it well would have been the only question.

107

1    Q.  Okay.  But from what you could see from -- at
2  Valley Regional, the patient was no longer confused,
3  right?
4    A.  Yeah.  From what they said, he was no longer
5  confused.
6    Q.  Okay.  And by the way, in his state of
7  intoxication, nothing would have kept him from answering
8  the questions that go along with the Breathalyzer test,
9  would it?
10   A.  I would assume not.  I don't know what the
11  questions are that go along with it.
12   Q.  "When's the last time you ate?  What did you
13  eat?  How much did you eat?  How much have you drank?
14  When's the last time you drank?" things like that.
15   A.  Okay.  Yeah, he should have been able -- if he
16  was oriented and cooperative, he should have been able to
17  answer those questions.
18   Q.  Okay.
19       MR. GAULT:  I think they need to change the
20  tape.
21       THE WITNESS:  Okay.
22       THE VIDEOGRAPHER:  The time is 10:50 a.m.
23  We're off the record.
24       (Brief recess taken.)
25       THE VIDEOGRAPHER:  Beginning Tape 2 of the

108

1  deposition.  We're back on the record at 10:55 a.m.
2    Q.  (By Mr. Gault)  Dr. Peters, let me read to you
3  from Mr. -- Dr. Dovale's deposition.  Here, I have it
4  right here.  You can look at your copy.  If you'd turn to
5  page 40.
6    A.  Okay.
7    Q.  You've read this entire thing, right?
8    A.  Yes.
9    Q.  Okay.  And it says on there -- I'm reading from
10  line 16, the question -- this is from Mr. Crosley.  It
11  says: "If you had known that Mr. De Leon was complaining
12  of numbness from the neck down while he was being
13  transported by EMS to your hospital, would you have done
14  anything differently?"
15       And his answer there on line 22 is: "No,
16  because I base my -- my treatment and my handling of the
17  case by what I see and what I find when I examine the
18  patient, and I didn't have any indication that he was
19  numb, that he had any numbness."
20       Did I read that correctly?
21   Q.  Yes.  Is that how you do it, also, Doctor?
22   A.  No, it's not.
23   Q.  Do you go in and do your own independent
24  examination of the patient?
25   A.  Yes.

113

1  that you've received as an expert witness over the last
2  ten years?
3      A.  I don't have that with me.  It's -- there again,
4  I have that, my financial records, in my storage.  It's
5  not a significant amount compared to my income.  But if
6  that was very important to you, I could get it for you.
7      Q.  And that's something -- you have a C.P.A. do
8  your taxes, I assume, right?
9      A.  Yeah.
10     Q.  And that's something that's available to the
11 C.P.A.?
12     A.  I could get it through him.
13     Q.  Let's see.  We've gone through three -- I guess
14 two reports and one affidavit that you've given, and
15 there are no other reports or affidavits that you've done
16 up to this point; is that right?
17     A.  Um --
18     Q.  In this case.  I'm sorry.  In this case.  I
19 apologize.
20     A.  In this case, yeah.  What we've gone through
21 today is, from the best of my memory, is everything I've
22 done.
23     Q.  You've not seen any photographs?
24     A.  No, I've not seen any photographs.
25     Q.  You don't have any -- do you have any notes on

114

1  this case?
2      A.  The notes -- after I -- after I write the thing,
3  I usually shred the notes.
4      Q.  Okay.
5      A.  My notes are usually highly illegible.  So I
6  usually don't keep them.
7      Q.  Okay.  You've not reviewed any treatises or
8  scholarly journals other than what we've marked as --
9  well, we haven't even marked it, but this one page.
10 You've not reviewed anything else for this case?
11     A.  Well, I mean, my usual reading of things, which
12 is, you know, from multiple medical and emergency
13 medicine texts and review courses, and things like that.
14     Q.  You haven't brought any of those here with you
15 today?
16     A.  No.
17     Q.  And don't advertise, do you?
18     A.  No.
19     Q.  Do you have a contract for your work on this
20 case?
21     A.  The -- I have an agreement relationship with
22 a -- a company, and the contract is with them.
23     Q.  AMFS?
24     A.  AMFS, yes.
25     Q.  Okay.  Did you bring that with you today?

115

1      A.  Actually, I didn't.  I had lost a copy of that
2  years ago; and because I don't do it very frequently,
3  it's not something I've really kept up with.
4      Q.  How were you contacted in this case?
5      A.  On this one?  AMFS will contact me.  They'll
6  call me.  They'll say, "We have a case we'd like you to
7  review."  They'll give me some basic information about,
8  you know, "Here's the patient.  This is" -- blah, blah,
9  blah, just some factual information.  And then they ask
10 me if I'm interested in reviewing it further.  If I say
11 yes and then they send me the -- the chart, the
12 information I actually review; and then I review it, give
13 them the information, and then, you know, go from there.
14     Q.  Did you get a summary of the case?
15     A.  No, I don't think I -- they gave me -- on the
16 phone they give you a -- a brief summary to see if you're
17 interested in receiving the rest of the chart.
18     Q.  Who is Zeff Ross?
19     A.  Zeff Ross?  I don't know Zeff Ross, offhand.
20     Q.  Okay.  He's involved in AMFS, isn't he?
21     A.  I don't know.
22     Q.  You don't know?
23     A.  I -- I deal with basically -- like, I guess it's
24 a case manager, somebody that calls me.
25     Q.  Uh-huh.  Okay.

116

1      A.  And I don't know Zeff Ross.
2      Q.  AMFS would have sent you some correspondence in
3  this case?
4      A.  They -- usually the information they send me is
5  like, you know, "Here's the chart," or, "You'll be
6  contacted by the law firm," that kind of stuff.
7      Q.  Do you have some of that for this case?
8      A.  I don't believe I have any of that left.  It's
9  usually really nothing in it, other than saying, "Here's
10 the chart."
11     Q.  Did you throw that away, or what?
12     A.  I must have thrown that away, because this is --
13 this is what I have here.
14     Q.  Okay.  Now, AMFS is an expert witness service?
15     A.  Yes.
16     Q.  And what they do is lawyers call them and -- and
17 ask them to find an expert witness in the fields that
18 they want them to find one?
19     A.  That's my understanding how they work.  From my
20 perspective, is they -- they'll call me and say, "We have
21 a case we want you to review."  And then they usually put
22 me in touch with the lawyer, and then I work with the
23 attorney from there.
24     Q.  Okay.  How much are you getting paid in this
25 case?

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

121

1    Q. Okay.
2    A. That's why I have it written down as I was doing
3 it.
4    Q. Did you bring that with you today?
5    A. No.
6    Q. Okay. Well, we -- you spent how long last
7 night?
8    A. Probably -- probably about an hour, a little
9 over an hour last night.
10   Q. Okay. And that was reading Mr. De Leon's
11 deposition?
12   A. Yes.
13   Q. Mr. Crosley was there?
14   A. Actually I -- I read that later on my own. I
15 looked at it while he was there, and then I read it on my
16 own.
17   Q. Okay. So you met with him about an hour last
18 night?
19   A. We met and talked about the case for a few
20 minutes, and then talked about some other things not
21 related to case for a while.
22   Q. Other cases or some --
23   A. Just social things.
24   Q. Okay. And so I guess what I'm trying to get at
25 is: How much time did you spend yesterday?

122

1    A. I probably spent another hour yesterday and
2 early in the afternoon, oh, probably about 45 minutes or
3 so. And then the other time I spent the day before that.
4    Q. Okay. Doing what?
5    A. Just looking at the materials in the case,
6 looking through the chart again, looking at the reports I
7 had.
8    Q. Okay.
9    A. That's the time I'll bill. There's probably
10 more time that I spent that I'm not going to bill for.
11   Q. Okay. Now, do you have any e-mail or any other
12 type of correspondence on this case?
13   A. The only e-mail I have is a -- well, they
14 initially tried to send me -- his office tried to send me
15 Dr. Dovale's deposition through the e-mail, and I didn't
16 receive all of it. So they had to overnight the rest of
17 it to me. And then they said about e-mailing me some
18 other information, and -- and it didn't come through the
19 e-mail well. So that I did not receive. It was not
20 factual material. I don't remember what it was.
21       THE WITNESS: Do you remember? It was your
22 secretary.
23       MR. CROSLEY: No, I don't.
24   A. Something else.
25   Q. (By Mr. Gault) When was that, though?

123

1    A. Over the last two or three days.
2    Q. Okay. But what was it about, though?
3    A. I think it had something to do with the -- the
4 subpoena information or something -- something like this
5 or something. They said there was a new one.
6    Q. Okay. Have you brought any of those e-mails
7 here today?
8    A. No, I didn't.
9    Q. Okay. Let me tell you -- the -- how did you
10 know -- let me get your affidavit that you did.
11   A. Which one? This -- is this it?
12   Q. Let's look. No, the affidavit that you did.
13   A. Okay.
14   Q. Oh, okay. How did you know how to format this
15 on top? Is that something -- I mean, where did you get
16 that from?
17   A. I have had to do a couple of affidavits before;
18 so, I know in general how to do it. And then I just
19 asked what the wording is on the -- on the beginning
20 part.
21   Q. Okay. Over the phone, I take it?
22   A. I think it was probably over the phone.
23   Q. Okay. And then all pleadings, depositions, or
24 discovery material that you've reviewed, you've -- we've
25 talked about that, right?

124

1    A. Yes.
2    Q. We've talked about your invoices?
3    A. Uh-huh.
4    Q. The record of your time, you don't have it here
5 with you today. I guess you can provide that, right?
6    A. Yeah. If you need more details, I can dig up
7 everything I can.
8    Q. Well, you understand we've been asking for that
9 in your -- in your deposition notices?
10   A. Uh-huh.
11   Q. Right?
12   A. Yes.
13   Q. Okay. Now, we've gone through all the documents
14 you've read, reviewed, or -- or used to refresh your
15 recollection prior to the deposition, right?
16   A. Yes.
17   Q. Okay. Your publications are in your resume,
18 right?
19   A. Yes.
20   Q. Did you bring any of your board certifications
21 with you here today?
22   A. I didn't bring the actual certificate. The
23 board certification information is in my C.V., though --
24   Q. Okay.
25   A. -- as well as my license.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

129

1 A. No, they do not.
2 Q. With the x-ray being normal at Brownsville
3 Medical Center, had those same x-rays been done at Valley
4 Regional Medical Center, they would have served further
5 to have taken Mr. De Leon off his spinal precautions; is
6 that correct?
7 A. They -- to remove someone -- they would not show
8 injury, most likely. That's why I said I think they'd be
9 the same.
10 THE WITNESS: Excuse me.
11 A. The -- if you have normal x-rays, that tells you
12 that it's -- it lessens the chance of a serious spinal
13 cord injury, but does not eliminate it. And it takes
14 more than that to make the decision that say, "Yes, this
15 patient doesn't have a spinal cord injury. Take the
16 collar off and let him -- let him get up and walk out of
17 here." So it gives you more information, but it still
18 does not give you enough by itself.
19 Q. Okay. And you've seen Dr. Dovale's testimony
20 that he did a neurological examination of the patient,
21 right?
22 A. He -- in his deposition he stated he did an exam.
23 Q. That's the clinical evidence you need to take
24 off his spinal precautions; is that correct?
25 A. That's part of it.

130

1 Q. Okay. And he took a history from Mr. De Leon;
2 is that correct?
3 MR. CROSLEY: Objection, misstates the
4 evidence.
5 A. His history in his chart, basically, doesn't say
6 anything. In his deposition, he says he did take a
7 history.
8 Q. (By Mr. Gault) Okay. Dr. Dovale was the one
9 who made the call to take the patient off the spinal
10 precautions; is that correct?
11 A. That's correct.
12 Q. Okay. Dr. Dovale felt that he had the
13 information that he needed in order to make that call; is
14 that correct?
15 A. Yes.
16 Q. Okay. Now, you know, of course, Dr. Dovale is
17 an independent contractor; is that correct?
18 A. That's my understanding.
19 Q. Okay. So you've worked at hospitals who've had
20 that same type of relationship with you; is that correct?
21 A. Yes.
22 Q. Okay. You have not reviewed any policies or
23 procedures there from Valley Regional Medical Center; is
24 that correct?
25 A. That's correct.

131

1 Q. What is your definition of "negligence"?
2 A. I would say my definition would be not doing
3 something that is needed to be done.
4 Q. Okay. And that's -- you -- you use that
5 definition when you've used that term in your reports or
6 in this case; is that correct?
7 A. Yes.
8 Q. Now, what governs the practice of nurses?
9 A. What governs the practice of nurses?
10 Q. Yes, sir.
11 A. Kind of a broad question. I would say the
12 standards of the nursing industry and -- that they're
13 teaching, and things like that.
14 Q. Can you tell me the name of those?
15 A. Of their -- I don't know the nursing
16 organizations.
17 Q. Okay. Have you reviewed any of those?
18 A. Not -- not the organizational level, no.
19 Q. Okay. Have you reviewed any standards for
20 nurses?
21 A. I have within hospital facilities, in particular
22 hospitals.
23 Q. You're talking about policies and procedures?
24 A. Policy, procedures, guidelines, things of that
25 nature.

132

1 Q. Right. Which you've not done in this case?
2 A. Not for this case.
3 Q. Are there any other standards that govern
4 nurses' practice?
5 A. I mean, it's standards you get with health
6 professionals, you know, the standards of what's in their
7 community, the state, in the nation; and based on the
8 education, the -- and whatever happen -- specialties they
9 happen to be working in.
10 Q. What are the state standards for the practice of
11 nursing?
12 A. I mean, you're talking very broad here. We're
13 talking answers that come in big, thick binder books. So
14 it's difficult for me to answer your question.
15 Q. Do you know the names of any of those?
16 A. No, I can't name them.
17 Q. And you have not reviewed any of those; is that
18 correct?
19 A. Not at that level, no.
20 Q. Well, at what -- other than your hospitals, you
21 have not reviewed any nursing standards; is that correct?
22 A. Not beyond the hospitals I've worked at.
23 Q. Okay. And you -- you have not cited any of the
24 hospitals' standards where you've worked at in -- in this
25 case; is that correct?

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

33 (Pages 129 to 132)

137

1  Brownsville Medical Center?
2      A.  Well, I don't remember the details of the
3  conversation; but I remember general -- he never told me,
4  "This is what you need to put into it."  I just remember
5  him saying, "This is -- I want you to give me your
6  opinion based on the events of the first day."  So that's
7  what I did, or the first visit.
8      Q.  But as we've spoken earlier -- as you've spoken
9  earlier with Mr. Gault, you said that you would still
10  have the same criticisms against Brownsville Medical
11  Center and against EMS.  Is that accurate?  You would
12  still have those criticisms?
13      A.  Yeah.  My opinions are -- on the other things
14  are -- I still have those.
15      Q.  So they haven't changed at all?
16      A.  They haven't changed.
17      Q.  And in addition, when you were speaking with
18  Mr. Gault, you mentioned that if the Brownsville Police
19  Department threw Mr. De Leon into the jail cell and
20  mishandled him in the police car such as that statement
21  that Mr. Gault said, that that would also be a
22  contributing factor to Mr. De Leon's injury?
23      A.  Any movement is a contributing factor, and
24  movements as you're describing right now would
25  contribute.

138

1      Q.  So if that were true, that would have
2  contributed to his injures?
3      A.  With movement like that, any movement like that,
4  could contribute.
5      Q.  Other than the criticisms that are contained in
6  your November, 2000 report, and then that additional one
7  based on Brownsville Police Department's treatment of
8  Mr. De Leon, do you have any other criticisms of any of
9  the healthcare providers with respect to causing
10  Mr. De Leon's injuries?
11      A.  I'm sorry.
12      Q.  I'm trying --
13      A.  Who are we including in this?
14      Q.  I'm -- I'm including -- other than -- we've got
15  your 2000 report which has the criticisms against EMS --
16      A.  Right.
17      Q.  -- against Dr. Dovale, and against Brownsville
18  Medical Center; and then we had your criticism with
19  respect to if -- if Mr. De Leon was handled the way that
20  he claims to have been handled by the Brownsville Police
21  Department, that also would have contributed to his
22  factors -- or contributed to his injuries.  Other than
23  those, are you criticizing anyone else for contributing
24  to Mr. De Leon's injuries?
25      A.  To go through the process is the issue:  If the

139

1  nurse knew about it, didn't relate it to the doctor as
2  significant.
3      Q.  Okay.  Other than the nurse issue, anybody else?
4      A.  Okay.  Again, getting the inf- -- paramedic
5  information to the hospital, also, would be the other
6  factor.
7      Q.  What -- what criticism would you have with
8  respect to getting the paramedic information to the
9  hospital?
10      A.  The hospital is supposed to get that information
11  and get it to the doctor.
12      Q.  Is that anywhere in your -- either of your two
13  reports or your affidavit?
14      A.  No, it's not.
15      Q.  Looking at your February report and based on
16  your testimony today, I want to go over what specific
17  criticisms you have against Dr. Dovale.
18      A.  Okay.
19      Q.  And I want to be fair to you.  So if I misstate
20  it, let me know.  My understanding of your criticisms of
21  Dr. Dovale at this point are your alleged statement -- or
22  you're alleging that he failed to do a spinal exam?
23      A.  Uh-huh.
24      Q.  That he failed to do a neurological exam?
25      A.  Uh-huh.

140

1      Q.  And that he -- and what other criticisms, other
2  than those two -- two items, are you -- are you focusing
3  on?
4      A.  Well, the biggest thing is I -- he -- he didn't
5  protect this patient's spinal cord.  And everything else
6  stems around that.
7      Q.  And I failed -- I mentioned that -- I forgot to
8  mention that.  He -- you also in your report mention that
9  he took off the cervical collar, and you said it was
10  untimely at that point?
11      A.  He took the cervical collar off and allowed the
12  patient to be moved.  The patient -- you know, he had a
13  suspected C spine fracture or C spine injury.  With that
14  kind of suspicion, whether it's proven or not, you assume
15  it -- it's there until you completely prove it otherwise.
16  And in -- I did not see where he can -- he proved it
17  otherwise.  And then if you do have a suspicion like
18  that, then you need to involve a neurosurgical and
19  neurology consult to be working with you.  And that's
20  when they started doing further things.  The spinal
21  immobilization helps stabilize it and that's a form of
22  treatment; but then you start getting to the next step
23  into actually treating it more aggressively, such as
24  steroids and things of that nature.
25      Q.  How would you clear a patient who comes in with

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

35 (Pages 137 to 140)

145

1  exam and he did do a spinal exam?
2      A.  He states he did one.  It sounds like he did a
3  very superficial neurological exam.  Because in
4  neurological exams, there's different levels of doing it.
5          MS. SAGE:  I'm going to object to the
6  extent that is nonresponsive.
7      Q.  (By Ms. Sage)  It is Dr. Dovale's testimony that
8  he performed a neurological exam and a spinal exam on
9  this patient.
10     A.  He -- he talked about doing a neurological
11 spinal exam in his testimony.
12     Q.  And did he in his deposition display -- did he
13 state in the deposition that he didn't remember treating
14 this gentleman?
15     A.  No.  He states that he remembered treating the
16 patient.
17     Q.  And he specifically remembered doing a
18 neurological exam on this -- on doctor -- on Mr. De Leon?
19     A.  He did talk about doing one.
20     Q.  And he stated that he specifically recalled
21 doing a spinal exam on Mr. De Leon?
22     A.  I -- yeah, I think I remember him talking about
23 doing a spinal exam in his deposition.
24     Q.  And do you recall Mr. -- or Dr. Dovale recalling
25 the conversations Mr. De Leon had with the police

146

1  officers?  Do you remember that testimony about what
2  Mr. De Leon was saying to the police officers?
3      A.  You mean from Mr. De Leon's testimony?
4      Q.  From -- I'm sorry.  Let me -- let me restate the
5  question.
6          When you read Dr. Dovale's deposition, you
7  saw the portion where he remembered Mr. De Leon swearing
8  at the police officers?
9      A.  Yeah.
10     Q.  You've mentioned several times that you disagree
11 with the type of charting that Mr. -- or that Dr. Dovale
12 did in this particular case.
13     A.  Yes.
14     Q.  And you said that it's your experience that a
15 null sign would indicate that an exam was not performed?
16     A.  Yeah.  The -- the null sign can be used in
17 different ways in the chart.  It's not something that's
18 really used in physical exams.  It just doesn't tell you
19 anything.
20     Q.  So that's not something you would use in your
21 charting to indicate that there were no positive
22 findings?
23     A.  I would use it to indicate that I didn't do it.
24     Q.  Are you aware that it is Dr. Dovale's position
25 that he uses that in the event that there are no positive

147

1  findings but despite doing an exam?
2      A.  I -- I did see it in the deposition.  He
3  mentioned that.
4      Q.  And despite reviewing that testimony, it is
5  still your opinion that he did not perform the
6  neurological and spinal exam?
7      A.  Well, he also mentioned that he didn't -- did
8  not do a rectal or a genital exam; and he used the same
9  symbol for that.  So it leaves a lot of confusion, if
10 that's true.
11     Q.  And I'm going to object to the responsiveness of
12 that.  Doctor, my question is:  Dr. Dovale remembers
13 doing a spinal exam and doing a neurological exam and
14 finding no positive findings, yet your criticism is that
15 he didn't perform those two exams.  Where are you getting
16 that information?
17     A.  His chart does not document findings of an exam.
18     Q.  So, you as an objective expert are saying, "Hey,
19 I don't believe Dr. Dovale's testimony.  I'm going to
20 say, 'Look, the chart doesn't have it in there.  So his
21 testimony means nothing to me'"?
22     A.  I'm saying his chart is not supporting what he
23 said in his deposition.
24     Q.  But he said it in his deposition.  So you're
25 disregarding that information --

148

1      A.  Um --
2      Q.  -- to come to your conclusions?
3          MR. CROSLEY:  Objection, argumentative.
4      A.  I'm stating that I -- I think his chart is not
5  consistent with what he said in his deposition.
6      Q.  (By Ms. Sage)  So you are completely
7  disregarding his testimony in his deposition that he
8  performed a neurological exam and a spinal exam when
9  coming to your conclusion that those two exams were not
10 performed?
11     A.  I'm saying if he -- I'm not sure to what extent
12 he examined the patient.  And if he did do any part or
13 portion of the exam, he didn't document it.  Whatever his
14 findings were, he didn't document it.  So, based on the
15 information, I think -- and his charting techniques, I
16 think it's reasonable to conclude that it wasn't done.
17     Q.  Doctor, have you ever been sued before?
18     A.  Yes.
19     Q.  Was there an expert witness on the plaintiff's
20 side in that case?
21     A.  Yes.
22     Q.  And would you want that expert witness on the
23 other side to take into account both the chart and your
24 testimony as a doctor?  Wouldn't you think that would be
25 more fair?

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

153

1  he did it and it was normal. So that leads to a lot
2  of -- you know, it leads me to believe that it's -- he's
3  not record -- he's not documenting things in a consistent
4  fashion.
5      Q. It would lead -- lead you to believe -- Doctor,
6  wouldn't you want to look at his testimony, read his
7  testimony, and determine what he means by using that --
8  that symbol? Wouldn't you want to do that?
9      A. I'd want to know what he means by that symbol,
10 but I question why he uses it so universally.
11     Q. But the doctor specifically recalls doing a back
12 and neuro check. So you know what he meant by that
13 circle with a slash through it?
14         MR. CROSLEY: Objection. It -- your
15 question misstates the evidence, and I suppose you're
16 requiring this witness to take at a hundred percent face
17 value as true all of your client's testimony. Is that
18 what you're saying?
19         MS. SAGE: That would be an improper
20 objection.
21     Q. (By Ms. Sage) Doctor, let me -- let me -- let
22 me ask you again without your attorney's testimony.
23         MR. CROSLEY: Object to the sidebar.
24     Q. (By Ms. Sage) Doctor, wouldn't it be important
25 to you to know exactly what Dr. Dovale meant when he used

154

1  that symbol underneath the "back" and "neurological" part
2  of the chart? Wouldn't that be important to you?
3      A. Yeah. I would -- I would -- it would be very
4  helpful if he had given us adequate documentation in the
5  chart.
6      Q. But now you've had the opportunity to review his
7  deposition, to hear that he, in fact, did a back and a
8  neurological exam. Doesn't that clear up for you what he
9  meant by that circle?
10     A. I think it still is not clear.
11     Q. Why is it not clear? He told you in his
12 deposition, "I did a back exam. I did a neuro exam. And
13 this is what this symbol means, is that there are no
14 positive findings." Does he have any question as to
15 whether he did those two exams on Mr. De Leon?
16         MR. CROSLEY: Object to the sidebar.
17     A. He -- he states his opinion firmly.
18     Q. (By Ms. Sage) So Dr. -- Dr. Dovale, in his
19 deposition, you didn't see any question as to whether he
20 did the back and neurological exam as far as his memory?
21     A. He states he remembers doing it.
22     Q. And he says specifically in his deposition that
23 that symbol means he performed the back and neurological
24 exam and there were no positive findings?
25     A. That's what he stated in his deposition.

155

1      Q. Doctor, as one of your criticisms, you said that
2  it was important for the patient to be alert and
3  oriented, to have no distracting injuries. Are those
4  both true of Mr. Dovale -- or Mr. De Leon when he was in
5  the emergency room, according to the records?
6      A. Yeah. According to the records, he was oriented
7  in the emergency department; and the injury to his head,
8  his forehead, from what they described, appears to be not
9  a distracting injury.
10     Q. So the other criteria you were mentioning was no
11 intoxicating substances?
12     A. That's correct.
13     Q. Was that the only other criteria with respect to
14 whether or not you would go forward with additional
15 exams, other than the other two we just mentioned?
16     A. The -- the history and physical exam.
17     Q. What history would be important in this
18 particular case? Would it be the event that brought him
19 to the hospital? Would that be the important
20 information?
21     A. Mechanism of injury is important, and also
22 his saying that he was experiencing the numb feeling.
23     Q. Doctor, I'm going to ask you since -- I'm going
24 to ask you to assume something. Assume with me that
25 Dr. Dovale did not -- was not aware that Mr. De Leon was

156

1  complaining of numbness while he was with the paramedics.
2  Assume with me that Dr. Dovale did not know that. Would
3  it have been proper for him to discharge Mr. De Leon
4  after -- assuming he did a neurological exam, assuming he
5  did a spinal exam, would it be improper at that point for
6  him to discharge him --
7      A. Um --
8      Q. -- and there were no positive findings on those
9  exams?
10     A. No positive findings on exams, the patient is
11 not intoxicated.
12     Q. I didn't -- I left that out, to be fair with
13 you.
14     A. Okay. So the patient is not intoxicated, the
15 physical exam is normal, both neurological and spinal
16 exam, no distracting injuries, patient is completely
17 awake and alert and not complaining of any numbness
18 anywhere. Going through -- meeting all that, it sounds
19 like we're getting close to meeting the criteria we
20 discussed earlier.
21     Q. So at that point it would be okay. It would be
22 within the standard of care to discharge Mr. De Leon --
23     A. If it --
24     Q. -- assuming that those were all true?
25     A. Meeting all that criteria and doing the full

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

161

1 exam, x-rays that are essentially normal, that you should
2 leave the cervical collar on until the patient is no
3 longer intoxicated?
4    A.  Correct.
5    Q.  Can you point me to any literature that says
6 that?
7    A.  You can look at the emergency medicine
8 literature.  There's several references like Tinelli
9 should have something like that.  Harrison's should have
10 something like that.  ACLS manual should have something
11 like that.  The NEXUS criteria, which is from that New
12 England Journal of Medicine article, talks about that.
13    Q.  Does it say specifically in those sources that
14 given a normal exam and normal x-rays and, in fact, a
15 normal CT, that you should leave a patient in a cervical
16 collar until they are no longer intoxicated?
17    A.  I can't quote those texts, but I do know that --
18 this is something you're taught in -- when you're -- very
19 early parts of training in trauma and emergency medicine
20 is that you don't take the collar off until they're
21 sober.
22    Q.  So every drunk that comes into your hospital,
23 Doctor, if they're in spinal precautions and a cervical
24 collar, if you evaluate them, find nothing to be wrong
25 with them but being intoxicated, despite a neurological

162

1 exam, despite a spinal exam, despite x-rays that show
2 normal, despite a CT scan that show as normal, you would
3 still leave them in the cervical collar and the backboard
4 until they sober up?
5    A.  In some instances you can take them off of the
6 backboard if you have them on affirmative gurney.  But
7 the C spine precautions -- because you -- sometimes you
8 can still maintain them in precautions if the patient is
9 cooperative enough.  But the precautions, I would
10 maintain them, yes.  I'd keep the collar on and I'd keep
11 the precautions.
12    Q.  On every drunk that comes in, given a normal
13 finding in every exam that you perform on them, but for
14 that they are intoxicated?
15    A.  Yes.
16    Q.  How long does it take for a person who is over
17 the legal limit to become sober?
18    A.  It depends on several factors: how high their
19 alcohol level is, how much the person drinks on an
20 regular basis.  People who drink more metabolize alcohol
21 faster.  It depends on factors like that.
22    Q.  Well, let's say you've got this particular
23 gentleman who is a chronic drunk and drinks quite often,
24 according to his own admission in his deposition.  You
25 read that, right?

163

1    A.  Yes.
2    Q.  How would he deal with alcohol, as opposed to a
3 normal individual, in your -- in your experience?
4    A.  His -- his liver would -- would be expected to
5 metabolize it at a faster rate, assuming his liver was
6 still healthy.
7    Q.  So Mr. De Leon had a long history with alcohol
8 before he came into the emergency room at Valley
9 Regional?
10    A.  It appears that way.
11    Q.  So your criticism of Dr. Dovale, other than your
12 call that he did not perform a neurological exam and did
13 not perform a spinal exam, would come down to the fact
14 that Mr. Dovale -- or Mr. De Leon was in the hospital and
15 he was intoxicated with a cervical collar on, and the
16 cervical collar and spinal board should have stayed on?
17    A.  Yes.  And the complaint of numbness, that's
18 something that I think needed to be pursued further.
19    Q.  Assuming that Dr. Dovale doesn't know about the
20 complaint of numbness --
21    A.  Okay.
22    Q.  -- performs a neurological exam such that he
23 described in his deposition -- let's assume everything
24 else is true but for Mr. De Leon is not intoxicated --
25 would it have been appropriate for Dr. Dovale to dismiss

164

1 Mr. De Leon and remove the cervical collar?
2        MR. CROSLEY:  Objection, vague, ambiguous
3 hypothetical.
4    A.  Not intoxicated, basically a complete normal
5 exam and history, from what you're telling me; yeah, you
6 can get him removed off the backboard spinal cord.
7        MS. SAGE:  Really briefly, I've sent out a
8 cross-notice yesterday, and I think we've gone over
9 everything.  Where did that go?  Hold on.
10        Tom, did you get that?
11        MR. CROSLEY:  I've not seen a cross-notice.
12        MS. SAGE:  It's got pretty much everything
13 that he's --
14        MR. CROSLEY:  Do you have a copy of it with
15 you?
16        MS. SAGE:  Yeah, I'm looking for that.  I
17 just had it out.  I was just thumbing through it.  I
18 wonder -- he's got a copy, I think.  Let's go off the
19 record really quick.
20        THE VIDEOGRAPHER:  Off the record at 12:08
21 p.m.
22        (Brief recess taken.)
23        THE VIDEOGRAPHER:  We're back on the record
24 at 12:12 p.m.
25    Q.  (By Ms. Sage)  Doctor, I sent out a cross-notice

169

1 extent of our conversation that had to do with this case.
2 Anything else we talked about had nothing to do with this
3 case.
4    Q.  And that was your first in-person meeting with
5 Mr. Crosley?
6    A.  Yes, it is.
7    Q.  And before that, you had spoken on the phone?
8    A.  I think two times before that on the phone.
9 I'm -- is that -- as I remember correctly.
10    Q.  Now, you said you got the deposition transcript
11 of Dr. Dovale -- when -- do you know when you got that?
12    A.  The -- his office tried to e-mail it to me over
13 the weekend.  I got it -- the first 60 pages of it
14 through the e-mail.  For some reason I didn't get the
15 rest of it.  So they overnighted it to me.  So I read
16 part of it on my computer off the e-mail and I read part
17 of it off of the -- the copy I brought with me here today
18 and that I received Wednesday -- no, no.  Today is
19 Wednesday.  I received that Tuesday.  Because Tuesday
20 afternoon is when I looked at it.
21    Q.  Are you aware that that deposition was just
22 taken last week?
23    A.  I knew it was recent.  I -- the date's on here.
24 I didn't look at the --
25    Q.  Yeah.  It was a week ago on Wednesday.

170

1    A.  Yeah.
2    Q.  Did you know before yesterday that Mr. De Leon's
3 deposition had been taken?
4    A.  I think I was aware they were going to do it,
5 but I don't -- I didn't know any of the details.  I don't
6 think I knew it actually had been done.
7    Q.  Wouldn't that have been important to you to
8 review it prior to rendering any opinions in this case,
9 if it -- if it was in existence before you -- before you
10 did your report?
11    A.  Well, all information is always helpful.
12    Q.  Would you have liked to have had that when you
13 wrote your report back in February?
14    A.  I mean, in -- back in February, if I had
15 information, I don't know what I would have done with it
16 at the time.  At the time in February, I was just
17 summarizing in a -- in a more narrow manner what I had
18 already stated.
19    Q.  Okay.
20    A.  So it wasn't like I was reviewing something new
21 or different.
22       MS. SAGE:  And I'm going to --
23    A.  So I think the -- I think the issue wasn't new
24 material, just summarizing.
25       MS. SAGE:  And I'm going to object to that

171

1 as nonresponsive.
2    Q.  (By Ms. Sage)  Wouldn't it have been important
3 to you, as somebody rendering opinions in this case, to
4 have reviewed the plaintiff's testimony, if it was
5 available, prior to rendering a report?
6    A.  It would have been good information to have.
7 It's based on the information I clued -- included in that
8 report, I don't think it would have changed the reports
9 in any significant fashion.
10    Q.  But you were never provided that deposition
11 prior to rendering your report in February of 2004?
12    A.  I did not have it at that time.
13    Q.  Before you rendered your opinions in either one
14 of these reports, did -- were you interested in seeing
15 what Dr. De Lee -- or Dr. Dovale's deposition would say?
16    A.  I was interested in seeing what it would say,
17 yes.
18    Q.  Would you have been more comfortable rendering
19 your report if you would have been able to review what
20 Dr. Dovale had to say about his charting before rendering
21 your opinions?
22    A.  I don't think it's a matter of comfort.  You get
23 more information, you incorporate that into your opinion.
24    Q.  Except for in this particular instance you
25 didn't really incorporate that into your opinion, because

172

1 you disregarded what Mr. -- what Dr. Dovale said with
2 respect to his exam?
3       MR. CROSLEY:  Objection, argumentative.
4 Mischaracterizes his testimony, and asked and answered.
5    Q.  (By Ms. Sage)  Go ahead and answer, Doctor.
6    A.  Okay.  I -- I looked at the deposition; I looked
7 at the chart, made my decisions based on that.
8    Q.  So the additional information of Dr. Dovale's
9 deposition didn't change your opinion one iota from what
10 it was back in February?
11    A.  I -- I don't think there was any significant
12 changes in my opinion.
13       MS. SAGE:  Pass the witness.
14       MR. CROSLEY:  Bill, are you going to have
15 anything further?
16       MR. GAULT:  Nothing unless you do.
17       MR. CROSLEY:  Let's take a short break.
18       THE VIDEOGRAPHER:  Off the record at 12:23
19 p.m.
20       (Peters Exhibit No. 10 was marked.)
21       THE VIDEOGRAPHER:  Back on the record at
22 12:34 p.m.
23       (Peters Exhibit No. 11 was marked.)
24          FURTHER EXAMINATION
25 QUESTIONS BY MR. CROSLEY:

177

1    A.  Yes.
2    Q.  What -- what is ataxia?
3    A.  Ataxia is when you have difficulties with your
4  coordination.  Like you can't walk straight, or you can't
5  pick things up easily; coordination, essentially.
6    Q.  So if you have a patient that has ataxia and
7  they were involved in a motor vehicle collision that
8  could have caused -- may have caused some type of injury,
9  would you want to evaluate that patient to rule out a
10  spinal cord injury as being a cause of the ataxia?
11        MS. SAGE: Objection, leading.
12    A.  Yes.
13    Q.  (By Mr. Crosley) Is there any evidence that
14  that was done by either Dr. Dovale or the hospital nurses
15  in this case?
16    A.  I'm sorry.  Any evidence --
17    Q.  Any evidence you're aware of that Dr. Dovale
18  determined whether or not Mr. De Leon had ataxia?
19    A.  No, I didn't see any evidence that they
20  didn't -- did an exam for ataxia.
21    Q.  Any evidence that the nurses at the hospital did
22  any exam for ataxia?
23    A.  Ataxia, no.
24    Q.  All right.
25        (Peters Exhibit No. 13 was marked.).

178

1    Q.  (By Mr. Crosley) Next I want to show you
2  Exhibit No. 13, which is a protocol that was received
3  from Columbia Valley Medical Center.
4        MR. GAULT: What number is that?
5        MR. CROSLEY: It is the -- the January,
6  1993 protocol for care of the patient received from EMS,
7  applies to the emergency department.
8        MR. GAULT: Can you just give me the number
9  in the upper right-hand --
10        MR. CROSLEY: E.D. 2490.
11        MR. GAULT: Thank you.
12    Q.  (By Mr. Crosley) Do you see Exhibit 13?
13    A.  Okay.
14    Q.  Will you review Exhibit 13 for me?
15    A.  All right.  Verbally, or just look at it?
16    Q.  Just look at it.
17    A.  Okay.
18    Q.  Is that a customary protocol that in your
19  experience emergency rooms adopt?
20    A.  It would be a common type of protocol.
21    Q.  And does that protocol say what is supposed to
22  happen to the EMS record when the patient is brought by
23  EMS to the hospital?
24    A.  It states that it's -- the EMS makes the copy
25  readily available, and the copy is to be attached to the

179

1  emergency department record.
2    Q.  And you recall that Dr. Dovale testified that he
3  did not have the EMS record attached to the emergency
4  department record when he saw the patient?
5        MR. GAULT: Objection, misstates the
6  evidence.
7    A.  Yes.
8    Q.  (By Mr. Crosley) All right.  And if that is
9  true, then that would be a breach of the hospital's
10  protocol, correct?
11    A.  Yes.
12    Q.  And whose responsibility is it -- strike that.
13        The -- is it the hospital's responsibility
14  to take reasonable efforts to ensure that its protocols
15  are followed?
16        MR. GAULT: Objection, leading.
17    A.  Yes.
18    Q.  (By Mr. Crosley) Are you aware of any evidence
19  in this case that would excuse the hospital's failure to
20  follow the protocol listed on Exhibit 13?
21        MR. GAULT: Objection, leading.
22    A.  Repeat that.
23    Q.  (By Mr. Crosley) Are you aware of any evidence
24  in this case that excuses the hospital's failure to
25  follow the protocol listed in Exhibit 13?

180

1    A.  No.
2    Q.  If the protocol in Exhibit 13 had been followed,
3  then the EMS record that has the language on it:
4  "Patient complained of numbness from the neck down,"
5  would have been part of the ER record at the time the
6  patient was being treated in the ER?
7        MS. SAGE: Objection, leading.
8    A.  I would assume so.
9        (Peters Exhibit No. 14 was marked.).
10    Q.  (By Mr. Crosley) I'm going to hand you the
11  protocol for the hospital, E.D. 1770.  Effective date,
12  September, 1992. "Guidelines for Neuromuscular Disorder
13  Assessment."  Do you see that document?
14    A.  Yes.
15    Q.  Without regard to whether or not -- for this
16  question I'm not asking did Mr. -- Dr. Dovale do a
17  neurological exam or what did it cover.  Rather, I'm
18  asking was there any type of neuromuscular assessment
19  that should have been performed on Mr. De Leon?  Do you
20  understand my question?
21    A.  Yes.
22    Q.  Let me --
23    A.  I'm looking at this -- this -- this one seems to
24  reach and include the scope of some medical conditions,
25  too.  That's why I spent a little time looking at it.

185

1    MS. SAGE: Objection, leading.
2    A.   This is common.
3    Q.   (By Mr. Crosley)  And so Exhibit No. 16, does it
4  tell us what the -- what the nurse is supposed to do in
5  terms of the physical assessment of the patient?
6    MS. SAGE: Objection, leading.  Calls for
7  speculation.
8    A.   There's a section for physical assessment.
9    Q.   (By Mr. Crosley)  And would you read what Item
10  No. 2 is, under "Physical Assessment"?
11    A.   Assess motor and sensory function.
12    Q.   So there we have those two words, "motor" and
13  "sensory."  And you've described previously that those
14  are different?
15    A.   Yes.
16    Q.   And we know from the nursing record that there
17  was some kind of documentation of motor function.
18    A.   That's correct.
19    Q.   But did you see any documentation by the nurse
20  of sensory function?
21    A.   No, I did not.
22    Q.   And according to the hospital's protocol,
23  Exhibit No. 16, sensory function is supposed to be
24  assessed by the nurse at -- in the ER?
25    MS. SAGE: Objection, leading.

186

1    Q.   (By Mr. Crosley)  Is that a true statement?
2    A.   Yes.
3    Q.   And based on all the evidence available to you,
4  does it appear that sensory function on Mr. De Leon was
5  assessed by Nurse Wright, or any other employee, at the
6  hospital?
7    A.   I did not see any -- anything to indicate that
8  was done.
9    Q.   And is a violation of -- or is the failure to
10  follow that -- strike that.
11    Are you aware of any excuse for the
12  hospital's failure to follow its protocol, which we
13  marked as Exhibit No. --
14    MR. GAULT: Objection, misstates --
15    Q.   (By Mr. Crosley)  -- 16?
16    A.   I'm not aware of anything.
17    Q.   And, in your opinion, is the failure to follow a
18  protocol by a hospital below the standard of care --
19    MS. SAGE: Objection, calls for
20  speculation.
21    Q.   (By Mr. Crosley)  -- unless there is some good
22  reason for the failure to follow that protocol?
23    MS. SAGE: Objection, calls for
24  speculation.  Improper hypothetical.
25    A.   The -- the guidelines of protocol are set up

187

1  as -- to aid and assist in the treatment of patients and
2  help with getting consistent care to all patients.
3  When -- when you deviate from protocols like this, it's
4  usually important to give an explanation of why you
5  deviate.
6    Q.   And no such explanation was given in this
7  case --
8    A.   No.
9    Q.   -- was there?
10    A.   No.
11    Q.   Neither by the hospital nor the doctor?
12    MR. GAULT: Objection, leading.
13    A.   That's correct.
14    (Peters Exhibit No. 17 was marked.)
15    Q.   (By Mr. Crosley)  Next, I'd like to show you --
16    MR. CROSLEY: Do you have a paper clip?
17  That's all right.  We'll do it later.
18    MS. SAGE: I've got a whole box.
19    Q.   (By Mr. Crosley)  Next, I'd like to show you,
20  Dr. Peters, Exhibit No. 17, which is "Trauma Alert
21  Criteria" for the emergency room.
22    MR. GAULT: What number is it?
23    MR. CROSLEY: It's No. 14.
24    Q.   (By Mr. Crosley)  Do you see Exhibit No. 17?
25    A.   Okay.

188

1    Q.   Is Exhibit 17 a customary protocol that
2  emergency rooms at hospitals will adopt, in your
3  experience?  That or something similar to it?
4    A.   Something in variations of this, depending on
5  the resources of the hospital.
6    Q.   With respect to the treatment of Mr. De Leon
7  after the treatment was concluded by Dr. Dovale, did you
8  see in either the records or the review of the
9  depositions how it was that Mr. De Leon was removed from
10  the examination table?
11    A.   I know that he was carried, placed in -- picked
12  up and placed in a wheelchair.
13    Q.   Assuming that Mr. De Leon -- well, strike that.
14    Let's assume for the moment that we take
15  Dr. Dovale's testimony as 100 percent true, that he did
16  perform neurological exam and that it was normal.  Upon
17  conclusion of the examination and learning that the
18  patient was unable to walk under his own power from the
19  examination room, does that affect your opinions as to
20  what should have been done at the time?
21    A.   If, under the scenario that the patient's exam
22  was normal when he was in C spine precautions, and then
23  when he got up to ambulate he was unable to ambulate, in
24  that case, scenario, let me know that something happened
25  between the time of the exam and when they tried to get

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

47 (Pages 185 to 188)

193

1    Q.  (By Mr. Gault) Did anyone ask you what you were
2  active in?
3         MR. CROSLEY:  I'm going to object.
4  Harassing the witness.
5    A.  No.  I was not asked what I was --
6    Q.  (By Mr. Gault)  I was asking were you a member
7  in the American Medical Association.  You understand
8  that?
9         MR. CROSLEY:  Objection, sidebar.
10    A.  I understand that.
11    Q.  (By Mr. Gault)  Can you tell me how many years
12  you were in the American Medical Association?
13    A.  As I previously answered the question, I'm not
14  sure.  Having been a member for a while, and I was not a
15  member very long when I was.
16    Q.  Okay.  So when we look at Exhibit -- Peters
17  Exhibit No. 8, it has an affidavit of Carol Lomax, who
18  was an attorney representing Mr. De Leon, correct?
19    A.  Yes.
20    Q.  Right?  And on there she -- and this is dated
21  January 11th, 2002.  And she states that attached hereto
22  as Exhibit B a true and correct copy of your curriculum
23  vitae.  Now, feel free to look at that and see if I
24  stated that correctly.
25    A.  It appears you stated that correctly.

194

1    Q.  Okay.  Is that -- let's just see.  Is that
2  located on there?  American Medical Association, is that
3  in your resume attached to that?
4    A.  Yes, it is.
5    Q.  Okay.  But in 2002, then, that would not have
6  been a true and correct copy of your resume; is that
7  correct?
8    A.  I'd have to go back and look at my records.  If
9  I listed it here, I would think I would have been,
10  because I know I was the Texas College -- I mean, the
11  Texas Medical Association, which is the Texas chapter.
12  I'd have to go back and look at my records because I --
13  at least I don't know the last time I was a member.
14    Q.  Okay.  So now your testimony is you may have
15  been a member of the AMA in the year 2002?
16    A.  My testimony has been that I'm not sure the last
17  time I was a member.  I know it's been a while.
18    Q.  Five or six years ago?
19    A.  I don't know -- remember exactly.
20    Q.  Okay.  And 2002 was only two years ago, though,
21  right?
22    A.  Yes, that is two years ago.
23    Q.  So, as far as you know, you could have been a
24  member of the AMA just two years ago?
25    A.  It's possible.

195

1    Q.  All right.  Now, would you agree, Doctor, that
2  the minimum statutory requirements for qualifications as
3  an expert witness should reflect that the witness is
4  required to have comparable education, training, and
5  occupational experience in the same field as the
6  defendant?
7    A.  Yes.
8    Q.  Okay.  Now, do you have education in the same
9  field as Nurse Wright?
10    A.  I have not been trained as a nurse; so, no.
11    Q.  Do you have training in the same field as Nurse
12  Wright?
13    A.  No, I'm not trained as a nurse.
14    Q.  Okay.  Do you have occupational experience in
15  the same field as Nurse Wright?
16    A.  Not as a nurse.
17    Q.  Okay.
18    A.  As a -- in emergency medicine, I have, yes.
19    Q.  As a doctor?
20    A.  As a doctor.
21    Q.  You have much more extensive training than Nurse
22  Wright would have; is that correct?
23    A.  I more more extensive and different training.
24    Q.  And different.  That's correct.  Now, so, based
25  upon what we talked about earlier as the minimum

196

1  statutory requirements for qualification as an expert
2  witness as far as Nurse Wright is concerned, you would
3  not meet that criteria, would you?
4         MR. CROSLEY:  Objection.  That -- improper
5  question of this witness.
6    A.  Well, also, as part of my practice, I have been
7  practicing as an administrator in emergency medicine; and
8  in that capacity I do -- I am involved with the nursing
9  staff in that sense.
10    Q.  (By Mr. Gault)  Well, you told us earlier you
11  didn't have comparable education, training, or
12  occupational experience as Nurse Wright; is that correct?
13    A.  That's correct.
14    Q.  And I said based upon what you agreed to
15  earlier, then, you would not qualify for the minimum
16  statutory requirements for qualification as an expert
17  against him.  Is that a fair statement?
18         MR. CROSLEY:  I'm going to object to the
19  question, in that it's not up to this witness to
20  determine whether or not he's qualified as an expert.
21  It's up to the court.
22    A.  With my experience and training and position,
23  I -- I believe I have a knowledge to understand what the
24  training and expectations are of nursing staff for
25  emergency departments.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

201

1  arrived, that's what they should be presenting when they
2  came in. So that's what that represents.
3    Q. Should have?
4    A. Well, that's -- that's the -- that's where I got
5  that from, was from the paramedic record.
6    Q. Okay. Well, earlier you were shown a hospital
7  policy; and you were criticizing whether or not the EMS
8  report was in the chart. Was it in the chart or not?
9    A. It was in the chart when I reviewed it.
10  Dr. Dovale says it was not in the chart when he had
11  access to it.
12    Q. Okay. Well, he was -- he was in there before
13  the EMS ever even left the hospital, wasn't he?
14    A. Yes.
15    Q. Okay. Now, the -- the guideline, the hospital
16  guideline you were talking about earlier, do you think
17  you misled the jury on what that states?
18    A. What -- what particular are you talking about?
19    Q. Yeah. Let's look at your exhibit here that you
20  were referring to when you were talking to Crosley.
21    A. And what is your question with this?
22    Q. The first sentence says: "EMS makes readily
23  available to the emergency department a copy of the
24  ambulance record." Do you have any evidence that that
25  was not done?

202

1    A. No, I don't have evidence that was not done.
2    Q. Okay. And Mr. De Leon was in the hospital and
3  out within 25 minutes; is that correct?
4    A. I don't know the exact time, but it was
5  something close to that amount.
6    Q. Right. And the EMS didn't even finish filling
7  out their paperwork until after that time; is that
8  correct?
9    A. The time the patient left and the time the
10  paperwork was done appeared to be pretty close to about
11  the same amount of time. EMS record was about three
12  minutes later.
13    Q. Three minutes later. That's a fair statement to
14  the jury, right?
15    A. Well, the times in the charts, three minutes
16  difference.
17    Q. Right. And so what I said to the jury was
18  absolutely correct, right?
19        MR. CROSLEY: Objection, argumentative.
20    A. What statement was it that you said to the jury?
21    Q. (By Mr. Gault) By the time Dr. Dov- -- I'm
22  sorry -- Mr. De Leon left, the EMS had not even completed
23  their paperwork, had they?
24    A. According to the times in the chart, no.
25    Q. Okay. Now, this -- it says: "This copy (pink)

203

1  is to be attached to the Emergency Department Medical
2  Record." You have no evidence to say that it was not, do
3  you?
4    A. No, I don't.
5    Q. Okay. Is there anything else in this -- what
6  exhibit number is this, sir?
7    A. 13.
8    Q. Okay. Is there anything else in this Exhibit
9  No. 13 that in some way you find critical of the
10  hospital?
11    A. Beyond what we discussed, no.
12    Q. No. I'm talking about -- we -- you and I have
13  not discussed anything where you found it was critical of
14  the hospital. Is there something in here that some way
15  forms a criticism of the hospital?
16    A. Right now I don't see anything else that I can
17  say is critical to the hospital.
18    Q. Okay. So -- well, you said "anything else." Is
19  there anything in there that you see that can some way
20  form a criticism of the hospital in this case?
21    A. And so your question is anything I can find
22  critical of the hospital?
23    Q. Out of this exhibit.
24    A. Oh, out of this exhibit?
25    Q. Yes, sir.

204

1    A. Nothing else right now.
2    Q. Well, you said "nothing else." I'm saying is
3  there anything, period. What about this policy in any
4  way forms a criticism of what the hospital did?
5    A. The -- the ambulance record was placed on the
6  chart. So this -- looks like this was met.
7    Q. Okay. So was talking about policy E.D. 2490
8  earlier, was that just a complete waste of the jury's
9  time in this case?
10        MR. CROSLEY: Objection, argumentative.
11    Q. (By Mr. Gault) Was it?
12    A. I -- it was -- I don't know if it was a waste of
13  time or not. It was a discussion to check the EMS record
14  procedure, getting it to the chart.
15    Q. It was not meant -- the discussion of E.D. 2490
16  was not meant as a criticism of the hospital. Is that a
17  fair statement?
18    A. I don't know what it was meant for. I was just
19  reviewing to see if this was a -- the policy, which was
20  handed to me, so I read it while we were there; and that
21  the record needs to be put in the chart.
22    Q. As far as you can tell, it was?
23    A. Yes.
24    Q. Okay. So -- by the way, Dr. Peters, you had
25  never been shown that document?

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

51 (Pages 201 to 204)

209

1  ambulance records; is that right?
2     A.  Not that I remember, looking at them today.
3     Q.  All right.  Now, you also state that your
4  statement about on arrival to the emergency department
5  Mr. De Leon complaining of numbness from the neck down,
6  that -- that is just something that you've assumed; is
7  that correct?
8     A.  That's something that I got from the paramedic
9  run sheet.
10    Q.  Well, but it doesn't say on arrival he
11 complained of that, right?  There's no mention of him
12 complaining of that at the hospital, is there?
13    A.  No.  That's stating that he was complaining of
14 it; and when the paramedics arrived there, they give
15 their reports, and that would be an expected part of the
16 verbal report.
17    Q.  That's something you've assumed or would expect?
18    A.  Yes.
19    Q.  Okay.  Now -- and I guess we could go through
20 the rest of your reports, but there's -- as far as, you
21 know, you making a statement that no neurological exam
22 was done on Mr. De Leon, that's not correct, is it?
23    A.  Well, that's a point of argument between what
24 the -- looking at the chart and what the -- Dr. Dovale
25 had said.

210

1     Q.  The nurse did a neurological exam, didn't she --
2  didn't he?
3     A.  Did a partial one.
4     Q.  That's part of the neurological exam, right?
5     A.  It's part of one, yes.
6     Q.  And Dr. Dovale, you saw where he documented part
7  of a neurological exam.  Specifically documented that.
8     A.  Are you referring to -- what part?
9     Q.  Well, we went over it earlier.  Remember talking
10 about his head, eyes, ears, throat, things like that?
11    A.  That would be a very incomplete part of the
12 exam.
13    Q.  There's a difference between partial and none,
14 right?
15    A.  Yes.
16    Q.  "None" means none whatsoever, and "partial"
17 means it's some, right?
18    A.  Yes.
19    Q.  You've practiced at Mt. Graham Community
20 Hospital?
21    A.  Yes.
22    Q.  Okay.  And as practicing at Mt. Graham Community
23 Hospital, certainly you're familiar with the paperwork
24 that they do there at Mt. Graham Community Hospital,
25 right?

211

1     A.  It's been years since I practiced there.
2     Q.  When is the last time you practiced there?
3     A.  Probably around 1994.
4     Q.  Uh-huh.  And at least back at that time you were
5  familiar with the paperwork that they did at Mt. Graham
6  Community Hospital, right?
7     A.  In 1994 I was.
8        (Peters Exhibit No. 19 was marked.)
9     Q.  (By Mr. Gault)  Sure.  And what I'm showing you
10 as Exhibit 19, that's a condition of admission from
11 Mt. Graham Community Hospital, isn't it?
12    A.  It does look like that, yes.
13    Q.  Uh-huh.  On No. 1 there on the first page, I'm
14 reading the second -- third sentence that says:  "The
15 undersigned recognizes that all physician -- physicians
16 furnishing services to the patient, including the
17 radiologist, pathologist, anesthesiologist, consultant
18 and the like may be independent contractors and neither
19 employees nor agents of the hospital."  That's -- that
20 was the way Mt. Graham did its conditions of admissions
21 back in -- when you practiced there; is that correct?
22    A.  I -- probably.  I -- I don't remember reviewing
23 the consent forms back then, but --
24    Q.  Your hospital --
25    A.  I was an independent contractor, yes, if that's

212

1  what you're asking.
2     Q.  Okay.  And Mt. Graham was also -- it was also
3  their position that the patient's care is under the
4  control of his attending physicians.  Did I read that
5  right?
6     A.  Yes.
7     Q.  That's certainly the way it was while you were
8  there; is that correct?
9     A.  Yes.
10    Q.  Okay.  And as an emergency room doctor, you were
11 the attending physician; is that correct?
12    A.  Yes.
13    Q.  You took control of your patients, didn't you?
14    A.  Yes.
15    Q.  All right.  Now, what level of blood alcohol
16 content in a person causes numbness?
17    A.  It depends on the person and how much --
18 probably how much drinking experience they have, and on
19 the person in particular.  So --
20    Q.  For example, with Mr. De Leon, what would you
21 expect his blood alcohol level to be before he would have
22 numbness?
23    A.  Probably something over 150, but that's a guess.
24    Q.  Over -- in other words 0.15?
25    A.  Yeah.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

53 (Pages 209 to 212)

217

1    Q.  Okay.  All right.  Now, let me talk to you about
2  another -- what's required in a report.  If a -- if a --
3  a particular report requires at that you put in an
4  applicable standard of care in the manner in which the
5  provider failed to meet the standard of care, and the
6  causal relationship between that failure and the injury,
7  is it a fair statement that you have not included any of
8  that in your two reports or your affidavit as far as
9  Valley Regional is concerned?
10        MR. CROSLEY:  Object to the predicate being
11  improper.
12    A.  I'm sorry.  What was your premise with this?
13    Q.  (By Mr. Gault)  Yes, sir.  In none of your three
14  reports that you've done in this case did you include an
15  applicable standard of care for Valley Regional.  Is that
16  a correct statement?
17    A.  An applicable standard of care, I assume that
18  means what I'm -- you're saying the comments on their
19  standard of care?
20    Q.  Yes, sir.
21    A.  Okay.  I did not make comments on their standard
22  of care.
23    Q.  Okay.  You also did not include in any of your
24  three reports how the nurse failed to meet that standard
25  of care; is that correct?

218

1    A.  That is correct.
2    Q.  And you also did not include in any of your
3  three reports the cause -- causation analysis as to the
4  nurse's failure to meet the standard of care, how that
5  caused an injury.  Is that a fair statement?
6    A.  That's true.
7    Q.  All right.  Now, some of the other things you
8  covered at the break, you were shown some -- some
9  hospital guidelines; is that correct?
10    A.  Yes.
11    Q.  Were you shown all of the hospital guidelines
12  that Valley Regional has produced in this case?
13    A.  No.  There was -- I think there were more than
14  the few pages that I saw.
15    Q.  Were you only shown the ones that you talked
16  about with Mr. Crosley, or were you shown some other
17  ones?
18    A.  I think I was shown less than what we talked
19  about when we came back in the room.
20    Q.  Okay.  So some of them in your testimony here,
21  you saw them for first time as you were testifying?
22    A.  Yes.
23    Q.  Okay.  So, in other words, if we produced, gosh,
24  15, 20, or so, policies and procedures, you haven't seen
25  all them, have you?

219

1    A.  No, I have not.
2    Q.  Let me read to you -- you know -- you know in
3  dealing with policies and procedures, usually there is an
4  initial policy or procedure that every hospital have
5  that sets out that these documents in this book do not
6  set out the standard of care; isn't that right?
7    A.  They usually put a statement in there like that.
8    Q.  That's right.  So earlier in -- and we don't
9  want to mislead the jury, but earlier when -- when you
10  were being asked questions about hospital guidelines or
11  hospital policies or procedures, that is not necessarily
12  the standard of care; is that right?
13    A.  It's not always the standard of care.  It's a
14  guideline, usually set up as a guideline to help make
15  care more consistent between different patients.
16    Q.  Right.  But also, really, a guideline is
17  something that you can go look to if you have no idea
18  what you're doing; is that correct?
19    A.  Well, that kind of situation hopefully doesn't
20  happen.  I mean, you say you don't know what you're
21  doing.  Hopefully that doesn't happen in a practicing
22  hospital like you're talking about.
23    Q.  I guess what I'm getting at, in reality, every
24  time a patient walks in the emergency department, the
25  nurses aren't going over there and looking at the

220

1  guideline book, right?
2    A.  No.  Usually it's referred to from time to time
3  and not regularly.
4    Q.  Right.  As a matter of fact, in reality the
5  nurses rarely go over and look at the guideline book that
6  the hospital provides; is that correct?
7    A.  That's really up to the nurse and the nursing
8  director and how they interact.  But it's -- they
9  don't -- they often don't carry it with them when they're
10  seeing patients.
11    Q.  Sure.
12    A.  It's kept somewhere where it's available to
13  them.
14    Q.  As a matter of fact, they almost never carry it
15  with them when they're seeing patients?
16    A.  They don't carry it with them.  It's just
17  available in the emergency department or some other place
18  for them in most places.
19    Q.  Right.  And so, for example, if you have someone
20  coming in and you're trying to figure out if a minor
21  consent -- can consent to surgery or a minor can deliver
22  a baby or something, and you're trying to figure out, you
23  know, what do we do in this situation, that's a good
24  place to go look at the hospital guideline book; is that
25  right?

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

225

1    Q.  And that -- is that an appropriate thing to put
2  in a hospital guideline book?
3    A.  Yeah.  That's something that you commonly see in
4  hospital guideline books.
5    Q.  Because as healthcare providers, you're treating
6  the person in front of you.  You're not treating it based
7  on a cookbook; is that correct?
8    A.  Yes.
9    Q.  Okay.  And then a physician's decisions for care
10  may vary from the guidelines, based upon the physician's
11  medical judgment.  Is that a true statement?
12    A.  Yes.
13    Q.  Okay.  Now, earlier you were talking about
14  guideline E.D. 1770.  Would you pull that out, please,
15  sir.  What exhibit is that, please, sir?
16    A.  1770?
17    Q.  Yes, sir.  What exhibit?
18    A.  Oh, I'm sorry.  14.
19    Q.  It says:  "Guidelines for Neuromuscular Disorder
20  Assessment Form."  Did I read that correctly?
21    A.  Yes.
22    Q.  Dr. Peters, from what's in the Valley Regional
23  Medical Center records, this guideline does not apply.
24  Is that a fair statement?
25    A.  This guideline covers more medical causes of

226

1  neuromuscular problems, and we were dealing with trauma.
2    Q.  Okay.  This guideline does not apply.  Is that a
3  fair statement?
4    A.  This -- I'd say this guideline was not written
5  for this kind of a patient, although many of the things
6  in here could be crossed -- could be used into it.  But,
7  yeah, this -- reading this in more detail, it looks like
8  it's for medical patients more than trauma patients.
9    Q.  To answer my question, this guideline does not
10  apply, is that a fair statement?
11    A.  Yes.
12    Q.  Okay.  So our discussions, or your discussions
13  earlier about E.D. 1770, that doesn't apply to this case,
14  does it?
15    A.  Although there's points of this that would be
16  good for this case in the sense of care that could be
17  given, this is not -- looking at this in more detail,
18  this does not look like it applies directly.
19    Q.  And certainly we do not want to mislead the jury
20  by trying to make them think that this E.D. 1770 applies;
21  is that right?
22    A.  We never want to mislead the jury.
23    Q.  Right.  And if we tried to allege that E.D. 1770
24  applies in this case, that would be misleading the jury,
25  wouldn't it?

227

1    A.  If it -- this -- this taking -- it could be --
2  could be used to mislead the jury if it was -- --
3    Q.  Another --
4            MR. CROSLEY:  Did you finish your answer,
5  Doctor?
6            THE WITNESS:  Yeah.
7    Q.  (By Mr. Gault)  Another guideline that you
8  talked about earlier -- and I want to address with you --
9  is Trauma 9, or T9, I believe.  Let's just look at that,
10  please, sir.  That's Exhibit No. 16 to your deposition.
11  The title of Exhibit No. 16, or T -- Trauma No. 9 says:
12  "Protocol:  Nursing Care of the Patient with Spinal Cord
13  and Vertebral Column Trauma."  Did I read that correctly?
14    A.  Yes.
15    Q.  Dr. Peters, based upon the medical records in
16  Valley Regional -- Valley Regional Medical Center
17  records, this guideline would not apply to this case.  Is
18  that a fair statement?
19    A.  I disagree with that.
20    Q.  Okay.
21    A.  I think this is very applicable.
22    Q.  Okay.  Well, let me ask you:  Did Dr. Dovale
23  find any indication that Mr. De Leon sustained spinal
24  cord or vertebral column trauma?
25    A.  The -- I would say the answer to that is yes,

228

1  and I think the reason is -- is that with the patient's
2  mechanism of injury and the fact that the paramedics
3  brought him in on the backboard and C collar, you have to
4  assume that he has trauma until ruled otherwise.  So in
5  that setting, you follow this protocol until you rule it
6  out.  So as long as he's on that backboard in that
7  situation, you have to approach it with this kind of a
8  protocol.  That's what this protocol is set up for, an
9  emergency department.  And if later on you determine that
10  there is no injury, then you can -- you can stop
11  following the protocol, or one similar to it.
12    Q.  I'm sorry.  Did Dr. Dovale ever diagnose spinal
13  cord or vertebral column trauma for Mr. De Leon?
14    A.  He -- he did not diagnose it, but he was
15  evaluating a patient with the potential of it.  It would
16  be in the differential diagnosis, not in the final
17  diagnosis.
18    Q.  And in his final diagnosis, he ruled out trauma
19  to the spinal column, didn't he?
20    A.  In his opinion he did.
21    Q.  Okay.  So getting back to my first statement,
22  based upon Dr. Dovale's evaluation of Mr. De Leon, this
23  would not apply, would it?
24    A.  I think this is very applicable.  The
25  differential diagnosis when the patient comes in -- which

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

233

1    Q. And let's just go on. No. 10 says pain.
2 There's no documentation he's complaining of pain, right?
3    A. Uh-huh.
4    Q. Is that right?
5    A. Yes.
6    Q. No. 12 says weakness. There's no documentation
7 he's complaining of that?
8    A. It's not documented.
9    Q. Sure. 13 is decreased sensation, and 14 is
10 absent sensation, right?
11    A. It's less than 13, yes.
12    Q. That's his sensory, isn't it?
13    A. Those would be sensory.
14    Q. And then 18 is paralysis, right?
15    A. That would be motor.
16    Q. Right. Motor. And then 19 and 20 are blanks
17 where you can add something that's not included in the
18 first 18; is that correct?
19    A. Yes.
20    Q. Nurse Wright -- when Nurse Wright was evaluating
21 Mr. De Leon, Nurse Wright had the opportunity to assess
22 which of these 18, or any other things, applied to
23 Mr. De Leon, right?
24    A. He had the opportunity to do that, yes.
25    Q. Right. Including whether or not Mr. De Leon had

234

1 weakness, decreased sensation, absent sensation, or
2 paralysis; is that correct?
3    A. Those are available to circle here, yes.
4    Q. Sure. And the way this is set up, you don't go
5 right beside each one, "no," or, "does not apply," or
6 something like that, right?
7    A. That's not the way -- doesn't look like that was
8 the way he was using it.
9    Q. What you do is you look at this patient --
10 this -- this man's figure there, and then what you do is
11 you document what the patient does have, right?
12    A. Yes.
13    Q. So, at least from looking at this, Nurse Wright
14 had a conscious effort at trying to figure out which of
15 these 18 or more problems this patient had; is that
16 correct?
17    A. I don't know. I can't -- I don't know what he
18 was thinking at the time when he was filling this out.
19    Q. Well, then, as you sit here today, it's just
20 total speculation as to whether or not Nurse Wright
21 addressed whether or not Mr. De Leon had any sensory
22 deficits. Is that a fair statement?
23    A. Yes.
24    Q. Okay. So earlier, if there was some statement
25 to the jury that T9 -- T9 was not met because there was

235

1 no assessment of the patient's sensory function, that
2 would just be speculation. Is that a fair statement?
3    A. I'd say there's speculation with that.
4    Q. Okay. And certainly, Dr. Peters, as you can see
5 here, Nurse Wright had the opportunity to address all
6 this, and at least consciously did not note any of these
7 loss of sensation things on this figure; is that right?
8    A. I don't know what -- what they -- if he did it
9 consciously or unconsciously.
10    Q. Well, Nurse Wright --
11    A. That, I can't answer.
12    Q. -- was looking at this part of the chart, wasn't
13 he?
14    A. I can make the assumption of that, but you're
15 making me -- you want me to assume again. I don't -- I
16 don't know what Nurse Wright was thinking.
17    Q. Well, Nurse Wright specifically wrote what he
18 found of these 18 things, right?
19    A. He wrote of the abrasion; and anything further
20 you probably would have to ask Nurse Wright what he was
21 thinking.
22    Q. Well, he wrote of laceration, No. 2 --
23    A. Uh-huh.
24    Q. -- right?
25    A. That is written down here, yes.

236

1    Q. Abrasion is No. 1. He wrote No. 2, right?
2    A. That's correct.
3    Q. Okay. No. 2 to the forehead, right?
4    A. Yes.
5    Q. Okay. He's addressing this part of what's shown
6 in the medical records, right?
7    A. He has with the laceration.
8    Q. By the way, the EMS never noted that they found
9 any sensory loss to Mr. De Leon, did they?
10    A. I didn't see any reference to sensory in their
11 evaluation.
12    Q. As a matter of fact, Dr. Dovale said that he
13 specifically tested that, didn't he?
14    A. He did say that in his deposition.
15    Q. All right. So if we're looking at Trauma No. 9,
16 policy and procedure, is it a fair statement to this jury
17 that you do not think that that was violated?
18    A. I would say that at this point, with what we
19 just discussed, I -- I can't say for sure if it was
20 violated or not.
21    Q. Okay. It would be mere speculation to say that
22 it was?
23    A. Yes.
24    Q. Okay. Now, let's look at -- you talked about
25 another policy and procedure, Trauma No. 14. Let's just

241

1  it. I just haven't needed it recently; and there's other
2  books I would tend to go to first.
3      Q. Say, have you read any materials from AMFS?
4      A. I have read just some materials several years
5  ago when I first got in conjunction with them. I haven't
6  read anything in the last few years.
7      Q. Okay. Have you -- they have materials on how
8  to -- how to prepare or be cross-examined; is that
9  correct?
10     A. They do have some materials like that, yes.
11     Q. Have you read those?
12     A. It's been -- like I said, it's probably been
13  years since I've seen any of them.
14     Q. Okay. But you have read those at some point?
15     A. Yeah. I -- when I first started, they had a
16  little booklet with some information; and I read through
17  that.
18     Q. Okay. And so in addition to them finding expert
19  witnesses for lawyers, they -- they assist the expert in
20  how -- how to handle a deposition; is that right?
21     A. It's general things. Just stating things like
22  review the records, give honest answers, things like
23  that, that I remember.
24     Q. They also talk about how to best connect with
25  and persuade a jury, don't they?

242

1      A. I don't remember reading anything about talking
2  to juries.
3      Q. Okay. The AMFS articles also talk about how to
4  bulletproof your C.V. and written reports. Have you seen
5  that?
6      A. No.
7          MR. CROSLEY: Objection --
8      Q. (By Mr. Gault) Did you know they were
9  available?
10         MR. CROSLEY: -- mischaracterizes exhibits.
11     Q. (By Mr. Gault) Did you know they were
12  available?
13     A. I didn't know they were specifically available.
14  I knew there was some material, but I don't know from
15  details what material it is that's available.
16     Q. Okay. Do you get a discount on their materials?
17     A. I have no idea. I have never -- I assume you're
18  saying they're for sale. I didn't know they had material
19  for sale.
20         MR. GAULT: Okay. I think that's all I
21  have at this point.
22     MS. SAGE: I don't have much.
23         FURTHER EXAMINATION
24  QUESTIONS BY MS. SAGE:
25     Q. Doctor, did EMS document any loss of

243

1  consciousness on the way -- or on the -- on the initial
2  EMS transport?
3      A. I did not see any documentation about loss of
4  consciousness.
5      Q. And, in fact, did they not -- did they mention
6  specifically that there was no loss of consciousness in
7  their report?
8      A. I don't remember if they said no. I'd have to
9  look at that. I'm not sure what happened to my sheet.
10     Q. I managed to lose one sheet of mine. If it's in
11  there...
12     A. Yeah, I was under the impression there was no
13  loss of consciousness; but I don't remember seeing it
14  specifically written down in the EMS sheet.
15         MR. CROSLEY: Here's a copy of it.
16     A. Yeah, they state here no loss of consciousness.
17     Q. (By Ms. Sage) And didn't the nurse at Valley
18  Regional document that there was no loss of
19  consciousness?
20     A. Yes.
21     Q. And didn't Dr. Dovale mention that there was no
22  loss of consciousness?
23     A. I think he did in his deposition. I don't know
24  if he did in his chart.
25     Q. Do you remember what Mr. De Leon said with

244

1  respect to his ability to -- or -- I always -- I switch
2  the names, all the time.
3          Do you remember what Mr. De Leon said at
4  Valley -- what was going on with him at Valley Regional
5  with respect to moving his extremities in his deposition?
6  Do you recall that?
7      A. I don't remember the detail right now.
8      Q. Isn't it true that in his deposition he said
9  while at Valley Regional he was unable to move his feet,
10  and one of his arms was not moving as well as it should?
11     A. That sounds familiar, but I -- I don't remember
12  offhand exactly.
13     Q. Wouldn't his complaints, though -- I know you
14  had a chance to review the deposition yesterday.
15  Wouldn't it have been important for you to focus on what
16  type of ability he -- to move his extremities, what he
17  had when he came into the hospital?
18     A. It's important to know what his abilities are,
19  and it's -- from a practical side from an emergency
20  physician, it's really important to know if he has any
21  kind of deficit whatsoever. It doesn't really matter
22  what it is, because then you know you need to do
23  something else to protect the C spine. As far as the
24  details of it, that's -- that information will help the
25  specialist more than it's going to help the emergency

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

249

1     MR. CROSLEY: Objection, argumentative.
2     MS. SAGE: Fine. Let me finish the
3   question.
4     Q. (By Ms. Sage) So now you're telling me that
5   there is room for skepticism; but if the record states
6   that you said there's no reason to doubt him, which one
7   are you going to go with, that there's no reason to doubt
8   with -- doubt him or that there's room for skepticism?
9   Which one would you pick, then --
10     MR. CROSLEY: Objection, argumentative.
11     Q. (By Ms. Sage) -- if the record supports that
12   you made that statement?
13     A. Well, the motor exams that are documented here
14   are just general motor exams. A detailed motor exam
15   probably would have answered that question for all of us
16   and that's not documented and I don't know if that was
17   done. So, yes, there's some vagueness. Yes, there's
18   some questioning. But I don't see a detailed motor exam
19   documented anywhere.
20     MS. SAGE: And I'm going to object to that
21   as nonresponsive.
22     Q. (By Ms. Sage) Doctor, I'm asking you, if the
23   record supports that you earlier told me that there was
24   no reason to doubt Mr. De Leon's testimony and that you
25   are now telling me that there's room for skepticism with

250

1   respect to that testimony, what is your position, that
2   there's room for skepticism; or that there's no reason to
3   doubt him?
4     A. I think there is room to question whether he
5   could move his legs or not, and I don't remember making
6   the first statement saying I -- be the absolute statement
7   that you said initially, how you worded it.
8     Q. Doctor, you said you were involved in a prior
9   lawsuit that involved spinal precautions that allegedly
10   there were some issues as to whether they should have
11   been put on, and there was a result of paralysis. Is
12   that accurate?
13     A. There -- the patient that -- had spinal injury
14   that did not want to be placed in spinal precautions.
15     Q. But it was a spinal injury case?
16     A. Yes.
17     Q. Where was that filed in? Where --
18     A. It was in Dallas.
19     Q. Who represented you in that?
20     A. I think it was Fulbright & Jaworski.
21     Q. Do you remember who the plaintiff's counsel was
22   in that particular case?
23     A. No, I don't.
24     Q. Did you have your deposition taken in that case?
25     A. Yes, I did.

251

1     Q. Did that case go to trial?
2     A. No.
3     Q. Was it settled?
4     A. Yes.
5     Q. In that lawsuit -- do you remember the
6   plaintiff's name in that particular lawsuit?
7     A. I don't remember offhand, no.
8     Q. What year was that, about? If you can't
9   remember exactly.
10     A. Late Nineties. I don't -- '96, '97, I'm
11   guessing.
12     Q. Were there any issues with respect to your
13   charting in that case?
14     A. There was an issue with the charting, because
15   the dictation system that we used in the hospital was not
16   very reliable; and the first time I dictated it, the
17   dictation wasn't available. So I dictated it a second
18   time, and then both copies came back at the same time.
19   They basically said the same thing, but that was the
20   charting issue.
21     Q. So the charting issue was that your notes
22   weren't in the chart when they were needed, right? That
23   was the alleged allegation against you?
24     A. Well, they were -- both copies were available, I
25   think, when they were needed; but there were two copies

252

1   and that was what the question was, why there were two
2   copies.
3     Q. So in that lawsuit there were no allegations
4   that you had inadequate charting?
5     A. I don't remember any allegations about my having
6   inadequate charting.
7     Q. You don't remember being questioned about that
8   during your deposition?
9     A. I remember lots of questions about lots of
10   things and some about charting, but I can't remember
11   anything specific about that.
12     Q. Doctor, what's your understanding of where
13   Mr. De Leon was going after he was discharged from the
14   hospital, from Valley Regional?
15     A. Where I thought he was going?
16     Q. No. Where did he go --
17     A. Oh --
18     Q. -- after Valley Regional?
19     A. My understanding is he was taken to jail by the
20   police.
21     Q. What's your understanding as to whether
22   Mr. De Leon knew he was going to jail while he was in the
23   emergency room?
24     A. I believe he understood that he was under arrest
25   when he was there.

**Worldwide Court Reporters, Inc.**
**1-800-745-1101**

# Zeff Ross, FACHE

10213 Capri Street
Cooper City, Florida  33026-4637
zross@mhs.net

Residence: 954-433-2525
Work:  954-433-1799
Cellular:  954-483-8642

## CAREER SUMMARY

An extraordinary background with experience in non-profit and investor-owned hospitals in urban settings as Chief Executive Officer or Chief Operating Officer.  Capabilities in hospital development (construction and program growth and development), cost management and operations.  Particular strengths in physician development and recruitment, establishing a milieu for safe, quality and customer-focused care, while ensuring net revenue exceeds expenses.

## PROFESSIONAL EXPERIENCE

**Memorial Hospital West,** (236 Beds), Pembroke Pines, Florida                          **April 1991 – Present**
*Administrator*

Memorial Hospital West is a 236-bed acute care medical facility which opened in 1992.  Major accomplishments in the development and operation of this facility included:

- Planned for, operating and managing the hospital since its inception.  (Opened with 100 beds.)
- Coordinated recruitment activities for management staff and over 300 employees in preparation of opening.  Implemented orientation and guest relations programs for all staff.  Expanded staff to over 2,000 FTE's.
- Operated the hospital from opening day without using any agency nurses.
- Implemented patient-focused care by incorporating Patient Assistant Liaisons (PALS) to help provide increased continuity of care to patients with cross-training of many employees; implemented open visitation hours for patients.
- Successfully implemented and continually support the Memorial 21st Century Excellence Program for total quality management.
- Completed the 2002 Joint Commission on Accreditation of Healthcare Organizations Survey receiving a grid score of 97 and a full three-year accreditation.
- Implemented the following new services/programs: diagnostic cardiac catheterization; diabetes center; Neonatal ICU Level II; child care program through an affiliation with the City of Pembroke Pines; ambulatory surgical facility; fitness & rehab center; comprehensive cancer center; a parking garage and a women's center.
- Purchased the medical office building located on the hospital's campus.  Successfully increased the occupancy rate from 83% to 100%.  Built an additional medical office building, and pre-leased it 100%.
- Implemented activities to secure additional medical office space offsite from the campus of Memorial Hospital West in an effort to integrate primary care offices with the hospital.
- Participated in the development, implementation and operation of the Memorial Integrated Healthcare System (IPA's), Medical Management Services Organization (MSO), and Physician Hospital Organization (PHO).  Also participated in closing the MSO!
- Completed the first Employee Opinion Survey of Memorial Hospital West after two years of operation with Administration receiving high accolades from the employees for our commitment to quality patient care, to the employees, to the volunteers, and to the community.  Continue performing these biannually.
- Established a community network providing educational seminars, health screenings, and community health fairs; Partner in Education with local schools, member of civic and community organizations.
- Exceeded the operating budget each year with regard to number of admissions, births, surgeries, patient revenues, payor mix, outpatient procedures, emergency department visits, and excess of revenues over expenses.  Exceeded established fiscal objectives each year by greater than 20%/yr. for initial four years of operation, and by 15%/yr. for next seven years.



EXHIBIT NO. 5
E. LAWRENCE



EXHIBIT
G

Accomplishments related to the organization of the Medical Staff included:
- Development of the medical staff organization, committee structure and credentialing activities.
- Developed, with medical staff input, the initial medical staff bylaws, rules and regulations, individual department rules and regulations, as well as the specified health professional rules and regulations.
- Implemented critical pathways developed by the medical staff and created new clinical resource management program for the medical staff to help reduce resource consumption.
- Recruitment of primary and specialty medical staff to the hospital. Increased medical staff membership from the initial 461 physicians to over 700 physicians in the third year, and greater than 950 currently on staff. Developed a physician orientation book for new physician members of the Medical Staff.

Accomplishments related to the construction of Memorial Hospital West included:
- Participated in the coordination efforts to ensure construction of the 100-bed facility was completed on time and within budget.
- Completed five year master site facility plan and began implementation of Phase I building activities (totaling $20 million dollars) which includes: the expansion of the outpatient, emergency, maternity, laboratory and pharmacy departments and the construction of a Same Day Surgery Center, helistop, fitness & rehabilitation center, a 16-bed observation unit, a radiation therapy center, and a women's center. Implemented new 10 year master site facility plan and completed Phase I building activities (totaling $35 million dollars) which includes: the building of a Comprehensive Cancer Center, a parking garage (1,412 spots), and three additional patient floors. Began implementation of next phase (totaling $30 million) including expansion of the emergency department, surgical services, imaging services and relocating the helistop.
- Utilizing experience in building Memorial Hospital West, currently responsible for the construction of a new 128-Bed hospital ($146 Million) in Miramar, Florida.

**Humana, Inc.,** Louisville, Kentucky                                **July 1985 – April 1991**
Various positions with this multi-hospital system, including:

**Humana Hospital – Palm Beaches,** (250 Beds), West Palm Beach, Florida    **July 1990 – April 1991**
*Executive Director*

Accomplishments at this 250 bed short-term acute care hospital with 88 psychiatric beds, included:
- Recruited both solo and specialty group practitioners to the hospital's market area.
- Reduced annual operating expenses by $250K and payroll expenses by $400K without adverse impact on operations.
- Coordinated $3.5M renovation project. Initiated building of a medical office building on the hospital campus.
- Significantly increased patient satisfaction response through the initiation of product line management and patient relations program.

**Humana Hospital – South Broward,** (256 Beds), Hollywood, Florida    **October 1987 – July 1990**
*Executive Director*

Accomplishments included:
- Formulated and implemented short and long range strategic plans and objectives which resulted in increased market share and maximized margin; implemented board of trustees self-evaluation measurement survey.
- Obtained $1.5M additional revenue as a result of innovative changes to reimbursement systems.
- Increased gross revenue by $700K through business cooperation with private practitioners.
- Exceeded established fiscal objectives by more than 35%.
- Increased patient census by 20% with a decrease of 12% in the length of stay.

Zeff Ross, FACHE                                                                    Page 3

**Humana Hospital – Biscayne**, (458), Miami, Florida            **August 1986 – October 1987**
*Associate Executive Director*

**Humana Hospital – South Broward**, (256) Hollywood, Florida   **January 1986 – August 1986**
*Associate Executive Director*

**Humana Hospital – Biscayne**, (458), Miami, Florida            **April 1985 – January 1986**
*Assistant Executive Director*

**Humana Hospital – Cypress**, (273 Beds), Pompano Beach, Florida   **July 1984 – March 1985**
*Assistant Executive Director*

**The Jamaica Hospital**, (286), Jamaica, New York               **May 1980 – April 1984**
*Administrator*

Responsibilities included Outpatient, Emergency, and Paramedic Ambulance Department, Family Practice Center (including a resident training program for ten (10) family practitioners) and Walk-In Clinic. These areas handled 70K patient visits and 7,500 ambulance calls per year. Accomplishments included grants administration, labor relations and union negotiations, design and administrative coordination of expansion program, and various certificate of need applications.

**Greater New York Hospital Association**, New York, New York     **December 1978 – May 1980**
*Coordinator, Ambulatory Care*

## EDUCATION

Master of Business Administration (MBA) specializing in Health Care Administration, City University of New York, Bernard M. Baruch College/The Mount Sinai School of Medicine, New York, New York. (June 1979)

Bachelor of Science – Psychology, Magna Cum Laude, City University of New York, Brooklyn College, Brooklyn, New York. (June 1977)

## CONSULTING ACTIVITIES

Technical Advisory Service for Attorneys, Blue Bell, PA           October 1993 - Present
*Consultant*

American Medical Forensic Specialists, Berkley, CA               April 1993 – January 2004
*Consultant*

The John Hopkins University, Bloomberg School of Public Health    June 2001 – June 2002
Master of Health Science in Health Finance & Management Program.
*Associate*

Florida International University, School of Healthcare Administration    June 1999 – December 1999
*Preceptor, Graduate Program*

Tufts University School of Medicine MD/MBA in Health Management Program.    June 1998
*Practicum Preceptor*

Zeff Ross, FACHE                                                                                    Page 4

St. Thomas University, Miami, FL                                    September 1987 – August 1989
*Adjunct Professor, Graduate Program in Health Management*
Instructed classes in medical care organization hospital and hospital administration.

Florida International University, Miami, FL                         August 1985 – December 1985
*Adjunct Professor*
Conducted administrative intern preceptorships for graduate students and instructed classes in facility organizational management.

## PROFESSIONAL MEMBERSHIPS

- American College of Healthcare Executives, Member 1985 – 1997; FACHE 1997; Regent for Southern Florida 2003.
- American Hospital Association. Member 1979 - Present.
- Broward Hospital Association. Member since October, 1987. Offices held: Secretary/Treasurer, Chairperson.
- South Florida Healthcare Administrative Forum. Member 1986 - Present. Offices held: Chairman, Nominating Committee, Board of Directors.
- College of Osteopathic Healthcare Executives. Member April, 1989 - July, 1990; Chairperson - Membership Committee; Member - Awards Committee.
- American Osteopathic Hospital Association. Board of Trustees, Representative for Division IV, October 1988 - July 1990.
- Temple Beth Ahm, Board Member, 1999 – 2001.
- American Red Magen David For Israel (ARMDI), Board Member, November 2002 – Present.

## COMMUNITY ACTIVITIES & MEMBERSHIPS

- Miramar/Pembroke Chamber of Commerce. Board of Directors from October 1987 - June 1989; July 1992 - July 1993. Secretary, July 1993 - July 1994; Vice Chairman, July 1994 - July 1995; Chairman-Elect, July 1995 - July 1996; Chairman, July, 1996 - July, 1997; Immediate Past Chairman, July 1997 - July 1998.
- City of Pembroke Pines Police Athletic League (P.A.L.) Board of Directors. April, 1996 - Present.
- Republic Bank aka Family Bank Western Advisory Board. September 1995 - Present
- American Heart Association/Southwest Broward Division. Vice President, September 1991 -January 1993; Board of Directors, January 1993 - Present.
- Speakers Bureau Memorial Hospital/Memorial Hospital West April, 1991 - Present.
- Embassy Creek Elementary School, School Improvement Team (S.I.T.), Member October, 1992 to June, 2000.
- Junior Achievement Program, Walter C. Young Middle School, Instructor. 1994, 1995, 1996, 1997. Pioneer Middle School – 1999, 2003.
- American Cancer Society. Board of Directors, August 1992 - August 1996; Grassroots Program, August 1992 - Present.
- Broward Economic Development Council, Inc. Board of Directors, October 1, 1992 - September 30, 1993.

## AWARDS AND HONORS

- "InPhyNet STAR Award" for "Excellent Innovation and Positive Change", Emergency Department, 2003
- "Best Place to Give Birth", Broward County, Kids' Crown Award, South Florida Parenting Magazine, 2003
- Honorable Mention Award "Best Hospital for Pediatric Emergency Care", Broward County, Kids' Crown Awards, South Florida Parenting Magazine, 2003
- Honorable Mention Award, "Best Hospital for Pediatrics", Broward County Kids' Crown Awards, South Florida Parenting Magazine, 2003

- "Best Hospital for Pediatric Emergency Care", Broward County, Kids' Crown Awards, South Florida Parenting Magazine, 2002
- "Best Place to Give Birth", Broward County, Kids' Crown Awards,South Florida Parenting Magazine, 2002
- "Best Hospital Administrator Award", Florida Medical Business, 2001
- "Excellence in Healthcare Awards", The South Florida Business Journal, 2001
- "Best Hospital/Maternity", South Florida Parenting Magazine, 2001
- "Best Rehabilitative Services Award", Florida Medical Business, 2000
- "Best Hospital/Maternity", South Florida Parenting Magazine, 2000
- "Best Hospital Quick ER", South Florida Parenting Magazine, 2000
- "Best Run Hospital Award", Annual Florida Medical Business Healthcare Awards, 1999
- "100 Top Hospitals: Regional Benchmarks for Success", HCIA/The Health Network, December 1999
- "Corporate Elite", Healthcare Administration, South Florida Business Journal, 1999
- "Family Friendly Employer", South Florida Parenting Magazine, 1999
- "Family Friendly Employer", South Florida Parenting Magazine, 1998
- "Best Maternity Hospital, Best Hospital Women's Center, Best Hospital Maternity Classes and Best Labor & Delivery Nursing", Florida Baby Magazine, 1998
- "Best Hospital in Broward for Maternity", South Florida Parenting Magazine, 1998
- "South Florida's Top Hospitals and Best Gym-Fitness & Rehabilitation Center", Miami Metro Magazine, 1998
- Pinnacle Award", Miramar-Pembroke Chamber of Commerce, March, 1998
- JCAHO Accreditation with Commendation", January, 1997
- "Up & Comers Award" Winner, Price Waterhouse/South Florida Business Journal – September, 1995.  Finalist – 1994, 1993 & 1990.
- "Business Leaders' Award", Industry Appreciation Week, Miramar-Pembroke Chamber of Commerce, 1995
- "Rookie of the Year", American Cancer Society, 1992-1993.
- First Annual Award for Outstanding Administrative Support in Recognition of the Hospital
- Healthcare Human Resources Field given by the South Florida Hospital Personnel Directors Association – April, 1993
- "Best Outpatient Services", South Florida Medical Business for the tri-county area, 1993.

<u>**LICENSES**</u>

Board of Nursing Home Administrators, State of Florida #2850.

<u>**REFERENCES**</u>

References furnished upon request.

Zeff Ross, FACHE
10213 Capri St.
Cooper City, FL   33026-4637

June 28, 2001

Ms. Carol P. Lomax
Branton & Hall
One Riverwalk Place
700 N. St. Mary's St., Ste. #1700
San Antonio, TX    78205

RE:  Candelario De Leon

Dear Ms. Lomax:

I, Zeff Ross, am a Certified Healthcare Executive and Fellow in the American College of
Healthcare Executives and I am currently the Administrator of Memorial Hospital West in
Florida.  With regard to the above referenced matter, I have reviewed the following information:

- Texas Peace Officer's Report of the accident - December 24, 1998
- The Medical Records of Columbia Valley Regional Medical Center
- The Medical Records of Brownsville Medical Center
- The City of Brownsville EMS Reports
- The Report of Nick Peters, M.D.
- The Report of Jeremy Slater, M.D.

Mr. Candelario De Leon is a 57 year old male who was brought to the Columbia Valley Regional
Medical Center emergency department on December 24, 1998 by the City of Brownsville EMS
ambulance after a motor vehicle accident.   According to the ambulance report, the patient was
found sitting on the driver's seat of a small red car which had sustained moderate damage to the
front end.  The EMS notes states, "Per patient, he was the driver, unrestrained with no loss of
consciousness."  The narrative notes from EMS indicate "Patient smelled highly of alcohol and
stated he had been drinking but unknown what or how much".  The patient was alert and oriented
x 1, possibly due to alcohol.  The patient received neck spine immobilization, was extricated and
placed on a backboard and while on route to the hospital, the patient complained of numbness
from the neck down.  The emergency department record indicates that the ER physician
documented that the patient was "obviously drunk - awake and alert".  The examination findings
documented for the eyes, heart, lung and abdomen were normal with no findings recorded for the

EXHIBIT NO. 12

E. LAWRENCE

EXHIBIT
H

Ms. Carol P. Lomax
June 28, 2001

-2-

neurological examination or extremities. The patient received one staple to a forehead laceration and was then discharged to the custody of the police. No further testing, including cervical spine x-rays, CT or MRI were performed. The patient then spent the night in the city jail. The following morning, the patient was brought to Brownsville Medical Center complaining of the inability to move. According to the Ambulance Activity Report dated December 25, 1998 back pain was suspected with the patient complaining of the pain to arms and numbness throughout the body. Patient stated he was unable to walk due to the numbness in his body. He was transported to Brownsville Medical Center for further evaluation and under the History and Physical examination, it was noted that the patient was apparently in a motor vehicle accident last night at 9:00 p.m. The patient was brought in this morning from jail as he was complaining of the inability to move. He spent all night on the cold, concrete floor complaining of pain to his back. Patient states he was unable to get out of his car and felt numb since last night, that he "can't move legs". Patient had a c-collar applied, put onto the backboard, x-rays were performed, and when the patient returned from x-ray, it was noted that the c-collar was off per the x-ray technician and then reapplied. Later that day an MRI was also performed.

According to the consultant's notes, it was noted that immediately after the accident, the patient complained of having numbness in both extremities. He was seen at Valley Regional Medical Center and was incarcerated afterwards for drunk driving. During the whole night, the patient complained of decreased movements of his lower extremities and on waking up this morning, felt more weakness, including the upper extremities. The patient was sent to Brownsville Medical Center from jail to be evaluated. Spinal x-rays were performed including cervical, thoracic, lumbar and all reported normal by the radiologist. The neurologist requested a neurosurgical consult and an MRI was also performed.

It is my opinion, as an expert in hospital administration and after reviewing the information previously noted, and based on a reasonable degree of hospital administrative certainty, that Columbia Valley Regional Medical Center deviated from the standard of care by failing to provide for a complete neurological examination on Mr. De Leon at the time of his initial presentation to their facility. The mechanism of injury indicated a high index of suspicion for the type of injury he received. In addition, the EMS personnel noting the patient's complaints of numbness from the neck down were relatively clear indications to not only fully assess the patient for possible cervical cord injury, but as well to consider activating a trauma alert, which according to the hospital's definition, is a "potentially life threatening injury with vital signs presently stable." However, this was not done and as such, the possibility of early treatment of his injuries, which could have decreased any long term neurological deficit, was lost.

Ms. Carol P. Lomax
June 28, 2001

-3-

Based on a reasonable degree of hospital administrative certainty, it is my opinion that the hospital did not implement such policy and procedures as any reasonably prudent facility would have done under similar circumstances.

I reserve the right to review additional emergency department/trauma policies and procedures, as well as medical staff bylaws and rules and regulations to help further formulate my opinion in the future.

Should you require additional information or have questions regarding any of the above, please feel free to contact me.

Sincerely,

Zeff Ross, FACHE

ZR/laf

As discussed with Mr. Ross, please find a copy of a report prepared for Branton & Hall with regard to the Candelario De Leon case, as well as the billing for services rendered.

Also attached is a bill with regard to the Tomanetz case.

Thanks!

**THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE.** This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, disclosure, dissemination, distribution or copying of this message or the taking of an action in reliance on its contents, is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

From the desk of...

Lisa Felice
Administrative Secretary
Memorial Hospital West
703 N. Flamingo Road
Pembroke Pines, FL 33028

954-433-7199
Fax 954-433-7155

*(facsimile transmission report, printed inverted)*

| | |
|---|---|
| RESULT | OK |
| PGS. SENT | 9 |
| USAGE T | 02.25 |
| ST. TIME | 07/19 07:30 |
| CONNECTION ID | |
| CONNECTION TEL | 8151048861255 |
| TX/RX NO | 0138 |

TRANSMISSION OK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*   TX REPORT   \*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

07/19/2001 THU 07:33 FAX 954 433 7155   MHW ADMINISTRATION   ☑ 001

RE: Candelario De Leon

<u>THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE</u>. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, disclosure, dissemination, distribution or copying of this message or the taking of an action in reliance on its contents, is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

From the desk of...

Lisa Felice
Administrative Secretary
Memorial Hospital West
703 N. Flamingo Road
Pembroke Pines, FL 33028

954-433-7199
Fax: 954-433-7155

06/28/2001 THU 04:40 FAX 954 433 7155 MHW ADMINISTRATION 001

*********************
*** TX REPORT ***
*********************

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 0099 |
| CONNECTION TEL | 812102241928 |
| CONNECTION ID | |
| ST. TIME | 06/28 04:39 |
| USAGE T | 01'19 |
| PGS. SENT | 4 |
| RESULT | OK |

Lomax

## AFFIDAVIT OF ZEFF ROSS, FACHE

STATE OF FLORIDA
COUNTY OF BROWARD

    BEFORE ME, the undersigned authority, on this date, personally appeared ZEFF ROSS,

FACHE, who is personally known to me, and first being by me duly sworn, according to the law

upon his oath, deposed and said:

    "My name is ZEFF ROSS, FACHE,. I am over eighteen (18) years of age and I have
never been convicted of a crime. I am of sound mind and fully competent to testify in the
matter set forth herein. I have personal knowledge of each of the facts and opinions
stated herein, based on my review of the Texas Peace Officer's Report of Accident dated
December 24, 1998; the medical records of Columbia Valley Regional Medical Center;
the medical records of Brownsville Medical Center; the City of Brownsville EMS Report;
the report of Nick Peters, M.D.; and the report of Jeremy Slater, M.D. My opinions are
also based upon my education, training, experience and knowledge of hospital
administration and departmental policies and procedures. Unless stated otherwise, all the
opinions expressed below are based on a reasonable, hospital administrative probability.

I am the administrator at Memorial Hospital West in Pembroke Pines, Florida, a general
acute care hospital. I am licensed in the State of Florida with the Board of Nursing Home
Administrators. I received my Masters in Business Administration specializing in
Healthcare Administration from the City University of New York, Bernard M. Baruch
College/The Mount Sinai School of Medicine, New York, New York in June 1979. I
received a Bachelor of Science - Psychology, Magna Cum Laude at the City University of
New York, Brooklyn College, Brooklyn, New York. I am currently employed as the
Administrator at Memorial Hospital West in Pembroke Pines, Florida and have been in
administration since December, 1978 and an administrator since 1987. I have been a
member of the American College of Healthcare Executives since 1985 and a Fellow since
1997. Additionally, I was a member of the Broward Hospital Association from October
1987 to July 1990 and currently a member of the American Hospital Association since
1979.

I had an opportunity to review the information listed above. The EMS records indicate
that the patient received neck/spine immobilization, was extricated and placed on a
backboard and while on route to the hospital, the patient complained of numbness from
the neck down. After reviewing the emergency department records, there were no
findings recorded for a neurological examination. This examination should have been
conducted during the nursing assessment by the nurses and by the emergency department
physician. Additionally, it is especially important to note that the mechanism of injury
indicated a high index of suspicion to the type of injury he received, and with a



EXHIBIT

*I*

AFFIDAVIT OF ZEFF ROSS, FACHE
Page 2 of 2

good nursing assessment, including a neurological exam, that the healthcare provider should have been able to identify his life/limb threatening injury and thereby reduce the possibility of any long term neurological deficit. However, this was not done by the nurses or the physician and consequently, breached the standard of care, and was a direct and proximate cause of the patient's current condition. Emergency department nurses have responsibility to the patient, different from the physician, to ensure that they properly assess a patient and provide the same level of high quality of care to each patient.

Additionally, the hospital personnel were negligent in not activating a trauma alert which according to the hospital's own definition, is "a potentially life threatening injury with vital signs presently stable". The patient presented with and met the definition for Trauma Alert, yet an alert was not called.

Furthermore, it should be noted that according to the emergency department medical record, upon discharge, although the patient verbalized understanding of the discharge instructions, the patient had to be escorted by a wheelchair and was unable to sign due to the patient's medical condition. The medical condition according to the Valley Regional Medical Center is listed as skin suturing and repair of superficial wound. Consequently, if the patient was unable to sign and required wheelchair assistance upon discharge, the nurse discharging the patient upon the direction of the ER physician, should have as the patient's advocate, questioned such discharge, since there were indications that there was more to the patient's condition than the patient was ultimately treated for. However, this was not done and the hospital did not meet the required standard of care.

It is my opinion that Columbia Valley Regional Medical Center breached the standard of care by not having the emergency department nurse appropriately assess the patient which would have included a neurological check/assessment, and discharged the patient to police custody without questioning the order for discharge when the patient was obviously unable to sign his name due to his medical condition, and as well, required escort by wheelchair. These inactions by the hospital's personnel were a direct and proximate cause of the injuries caused to Candelario De Leon at Columbia Valley Regional Medical Center."

ZEFF ROSS, FACHE

SUBSCRIBED AND SWORN TO before me on this, the 10th day of January, 2002.

Notary Public, State of Florida

OFFICIAL NOTARY SEAL
LISA A FELICE
COMMISSION NUMBER
DD071188
MY COMMISSION EXPIRES
NOV. 12,2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
CIVIL ACTION NO. CV-B-00-192

CANDELARIO DE LEON                    )
                                      )
            Plaintiff,                )
                                      )
        vs.                           )
                                      )
HCA - THE HEALTHCARE COMPANY,         )
COLUMBIA VALLEY HEALTHCARE            )
SYSTEM, L.P. d/b/a VALLEY             )
REGIONAL MEDICAL CENTER,              )
JOAO DOVALE, M.D. and                 )
STAT PHYSICIANS, P.A.                 )
                                      )
            Defendants.               )
------------------------------X

                        Fort Lauderdale, Florida
                        January 13, 2004
                        2:30-5:30 o'clock P.M.


                    - - - - - -

                EXPERT DEPOSITION
                      OF
                  ZEFF ROSS


F 596598/SA 153992

RECEIVED

EXHIBIT
J

Page 6

1    Exhibit Number 2 is the
2    correspondence that you've been sent in this case,
3    is that correct?
4        A    Correct.
5        Q    All right. And what we have in
6    Exhibit Number 2 is a letter dated February 20th
7    of 2002 from Ms. Lomax to yourself, right?
8        A    Correct.
9        Q    A letter dated December 29th, 2003
10   from Vivian Martinez to yourself, is that correct?
11       A    Yes.
12       Q    Okay. A letter dated June 7, 2001
13   from Ms. Lomax to you, is that right?
14       A    Yes.
15       Q    And a letter dated January 25th,
16   2001 from Ms. Lomax to you, is that correct?
17       A    Yes.
18       Q    What we have also as Exhibit Number
19   3 is another letter to you dated February 21st,
20   2003 from Mr. Hoelscher to you, is that correct?
21       A    Correct.
22       Q    And then attached to that is your
23   June 28th, 2001 report, is that correct?
24       A    That is correct. And my handwriting
25   on it.

Page 7

1        Q    And your resume is attached to that?
2        A    Yes.
3        Q    Whose handwriting is on your report
4    here?
5        A    Mine.
6        Q    And that's just in a blue pen I
7    think, is that right?
8        A    That's correct.
9        Q    What we have as Exhibit Number 4 is
10   what, sir?
11       A    A letter dated February 28th, 2003
12   from myself to Ms. Lomax. This is the revised
13   letter after receiving the information regarding
14   formatting in Texas.
15       Q    Okay. And then attached to that is
16   an updated resume that you have, is that right?
17       A    I don't know if it's updated.
18       Q    Well, it's your resume.
19       A    Yes. My resume.
20       Q    All right. And then let's see. We
21   have Exhibit Number 5 is your updated resume, is
22   that correct?
23       A    That is correct.
24       Q    Exhibit Number 6, is this your
25   billing record?

Page 8

1        A    Correct.
2        Q    Is this a complete billing record?
3        A    Excluding today and preparation for
4    today.
5        Q    How much time before today did you
6    spend preparing?
7        A    About two hours.
8        Q    And how much today have you spent?
9        A    An hour coming here; met with the
10   attorney for I don't know how long, I would say 40
11   minutes.
12       Q    You can't ask him.
13       A    Oh, sorry. That's why he
14   wouldn't —
15       Q    He won't let me swear him in.
16       A    I would say 40 minutes.
17       Q    I've got a few questions for you.
18       Exhibit Number 7 is what, please,
19   sir?
20       A    This is a listing of the materials
21   that I reviewed in the case.
22       Q    All right. And that's also
23   reflected in this letter that is contained in
24   Exhibit Number 2, which is the June 7th, 2001
25   letter?

Page 9

1        A    However, added to that was the
2    JCAHO, Joint Commission book.
3        Q    Which is the very last entry on
4    Exhibit Number 7?
5        A    That's correct.
6        Q    And is there anything else that you
7    reviewed other than as reflected in the June 7th,
8    2001 letter from Ms. Lomax to you and Exhibit
9    Number 7?
10       A    No. Not to date, no.
11       Q    And where did you get the JCAHO
12   provision of care materials from?
13       A    I have that. Every hospital has.
14       Q    You got it from your hospital, your
15   office?
16       A    Yes.
17       Q    Now, Exhibit Number 8, can you tell
18   me what that is?
19       A    These are notes. As I go through
20   and read any of the materials that you have so
21   noted, I make some notes.
22       Q    Okay. It's just your summary, I
23   guess, of what you are reviewing?
24       A    As I'm reading, if I like the
25   information, it comes to me, I put it in.

(210) 377-3027                    ESQUIRE DEPOSITION SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100         SAN ANTONIO, TEXAS 78230                   (800) 969-3027
                                                                 272c8d4d-3642-4f92-8492-66e22f0c1 · ·c

ZEFF ROSS

January 13, 2004

Page 14

1    Q    I'm sorry. Get that to where you
2  can see.
3    A    Those are the reports.
4    Q    Okay. When we take a break, I want
5  to look at this February 28th. I haven't seen
6  that one yet.
7         Okay. On your subpoena duces tecum
8  we are on Number 6. You haven't seen any photos,
9  is that right?
10    A    Correct.
11    Q    Number 7, do you have any notes or
12  calculations other than the typewritten document
13  that we've marked as an exhibit?
14    A    No.
15    Q    Number 8 on the subpoena duces tecum
16  asks for documents that you've consulted or relied
17  upon in expressing your opinions in this matter.
18  Do you have any of those other than the JCAHO
19  documents that we've marked as an exhibit?
20    A    No.
21    Q    Number 9 asks for any promotional
22  advertising literature. Do you do any of that?
23    A    No.
24    Q    Do you have any of those?
25    A    No.

Page 15

1    Q    Number 10 asks for any contract or
2  agreement between you and any other party or
3  organization concerning your ability to review
4  claims or litigation as an expert witness. Do you
5  have that?
6    A    I don't have a contract or
7  agreement, no.
8    Q    Do you have a contract for your work
9  in this case?
10    A    I can't say it's a contract. The
11  organization calls and says we have a case, do you
12  want to do it? We say yes. That's it.
13    Q    Oh, you were contacted through an
14  expert witness organization?
15    A    Yes.
16    Q    Which one?
17    A    AMFS.
18    Q    And they are the ones who first
19  contacted you on this case?
20    A    Yes.
21    Q    Do you have any indication as to
22  when you were first contacted by AMFS?
23    A    Probably -- I would be guessing.
24  No.
25    Q    Okay. It was before June 28th,

Page 16

1  2001?
2    A    Yes.
3    Q    Correspondence and telephone message
4  slips, e-mail, any other records reflecting
5  communications between yourself and the plaintiffs
6  and their counsel. You have two message slips, is
7  that correct?
8    A    Correct.
9    Q    And they are right there. And one
10  is dated December 31st, is that right?
11    A    Yes.
12    Q    And that's from Michelle Gordon.
13  Who is that?
14    A    Someone who works --
15    Q    For the plaintiff's lawyers?
16    A    Yes.
17    Q    And it's referring to - Go ahead.
18    A    No. Go ahead.
19    Q    What is that referring to?
20    A    The DeLeon matter.
21    Q    Okay.
22    A    It says specifically the deposit was
23  paid for the depo in 2002, and what the hours of
24  time needed are.
25    Q    Okay. So apparently at that time we

Page 17

1  were getting ready to take your deposition or
2  something?
3    A    Correct.
4    Q    And then you have another phone
5  message slip on January 12th, it doesn't have a
6  year, but it's Branton and Hall. And what is
7  this, confirming your deposition on January 13th,
8  at 2:30 p.m.?
9    A    Yes. It's this year.
10    Q    And then your note from
11  Mr. Hoelscher, but -- So this is in reference to
12  today's deposition.
13    A    Correct. At Esquire offices on
14  US1 - or near US1, and Jason Hoelscher is the
15  contacting attorney.
16    Q    Apparently the two message slips are
17  years apart, I take it.
18    A    Yes.
19    Q    Other than the two telephone message
20  slips, do you have any other message slips
21  concerning this case?
22    A    Nothing.
23    Q    Do you have any e-mail?
24    A    No.
25    Q    Do you communicate by e-mail?

5 (Pages 14 to 17)

ZEFF ROSS

January 13, 2004

Page 22

1    A    That's correct.
2    Q    Let me ask you, Mr. Ross, what are
3  the differences in your two reports here, the June
4  28, 2001 report and the February 28, 2003 report?
5  Do you have a copy of each one?
6    A    I have the original. This is the
7  second.
8    Q    What are the differences in those?
9    A    Just going through this, primarily
10  in the last paragraph on Page 2.
11    Q    Okay.
12    A    I was more specific with regards to
13  what the standard of care was for Columbia Valley
14  Regional Medical Center.
15    Q    And what do you put in your update
16  report what that is?
17    A    The standard of care for Columbia
18  Valley Regional Medical Center would have been to
19  perform a complete neuro exam on Mr. DeLeon at the
20  time of his initial presentation to their
21  facility. It should be noted that the Joint
22  Commission on Accreditation of Healthcare
23  Organizations, JCAHO, Assessments of Patients,
24  August 1997, page PE-1 quote, the goal of the
25  patient assessment function is to determine what

Page 23

1  kind of care is required to meet a patient's
2  initial needs. Unquote. The intent of the
3  standards regarding the assessment is on Page
4  PE-6, is such that when a patient enters the
5  hospital service, staff members first need to find
6  out the reason why the patient was admitted. The
7  initial assessment takes into account the
8  patient's immediate and - and if I may diverge for
9  a moment, I wrote emergent, and I can show you on
10  the Joint Commission standards underneath there,
11  it is emerging. That's a typo. Emerging needs
12  and considers those needs broadly. This initial
13  assessment helps the staff determine what care the
14  patient needs as well as any further assessments.
15  The information gathered at the first patient
16  contact may indicate that the patient needs a
17  broader or more detailed assessment.
18    Q    And then one of the other things --
19  And then other than that paragraph, what else?
20    A    Well, on the first paragraph on page
21  3 I added in the Joint Commission book was
22  utilized.
23    Q    Okay. And one other thing it looks
24  like we didn't mark, you have done an affidavit in
25  this case, is that correct?

Page 24

1    A    That's correct.
2    Q    And that's Exhibit Number 11?
3    A    Correct.
4    Q    It's my understanding from what you
5  are telling me is the purpose of doing a more
6  complete report, your report in 2003, was because
7  you were told that Texas law requires additional
8  information, is that correct?
9    A    Correct.
10    Q    Regardless of Texas law, is your
11  report dated June 28th, 2001 which we've marked as
12  Exhibit Number -- Do you have an exhibit on there?
13    A    No.
14    Q    We don't have an exhibit on there?
15    A    No, sir.
16    Q    Let me mark that as Exhibit Number
17  12.
18      Do you want a copy?
19    Q    Yes, sir. Do you have a copy?
20  Okay. Thank you.
21      June 28th, 2001 report we've marked
22  as Exhibit Number 12, is that correct?
23    A    Correct.
24    Q    And we had previously marked as
25  attached to Exhibit Number 3, right?

Page 25

1    A    Yes.
2    Q    That was the same report, it just
3  has your writing on it?
4    A    Correct.
5    Q    Regardless of whatever the Texas law
6  held, did you feel that your June 28, 2001 report
7  was a fair statement of your opinions in this
8  case?
9      MR. HOELSCHER: Objection to form.
10    A    Can I answer?
11    Q    Yes.
12    A    Yeah. It was a fair statement. The
13  updated report gave the thought process behind the
14  statements.
15    Q    And it was pursuant to the
16  attorney's request, is that right?
17    A    It was pursuant to the attorney's
18  request in formatting for Texas law.
19    Q    Okay. Fine.
20      I guess what I'm getting at, you
21  feel that your June 28, 2001 and your February 28,
22  2003 reports are fair statements of your opinions,
23  is that correct? I'm sorry. Did I misstate? I'm
24  looking for February 28th, 2003.
25    A    I'm listening. Yes.

7 (Pages 22 to 25)

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX:(210) 344-6016
(800) 969-3027
272c8d4d-3642-4f92-8492-66e22f0c15••

ZEFF ROSS                                                                                                    January 13, 200?

Page 30

1    Q    Okay.  I was just asking.
2         Never had a speeding ticket or
3    anything?
4    A    No.
5    Q    Okay.  That's good.
6         Did you report any of your opinions
7    from this suit to any board, agency or other
8    entity?
9    A    No.
10   Q    Your report solely went to the
11   plaintiff's law firm in this case?
12   A    Correct.
13   Q    You didn't feel the need to report
14   anything you saw on this case to any board, or
15   agency, or commission or anything like that?
16   A    It would have been inappropriate for
17   me to do that.
18   Q    Let me -- Maybe my question was
19   probably unclear.
20        You didn't see the need to report
21   any of your opinions in this case to any board,
22   agency, or commission, or anything of that nature,
23   is that correct?
24   A    Correct.
25   Q    Now, let me ask you, Mr. Ross, what

Page 31

1    is the standard of care for an expert testifying
2    in your field in a case like this?
3         MR. HOELSCHER:  Objection to form.
4    A    Normally speaking, one should be at
5    least a CHE, which is a certified healthcare
6    executive, in American College of Healthcare
7    Executives, or higher, such as fellow.  And have
8    experience in operating hospitals with emergency
9    departments.
10   Q    You know, that probably was an
11   unclear question.
12   A    Sorry.
13   Q    No.  The question was unclear.
14        I was just asking what is the
15   standard of care for an expert testifying in your
16   field in a case like this?
17   A    I'm not following the question.  I
18   apologize.
19   Q    You were given the qualification --
20   A    Yes.
21   Q    -- for an expert?  And
22   qualifications means what you have in your
23   background.
24   A    Right.
25   Q    I was asking you what kind of

Page 32

1    standard of care do you hold in an expert
2    testifying in your field in a case like this to -
3    what is the standard of care you are held do?
4         MR. HOELSCHER:  Objection to form.
5    A    I would think that the standard of
6    care would be to review the material and give a
7    straight up opinion of what was done, or occurred,
8    and do so ethically with no prejudices one way or
9    the other.
10   Q    Okay.  Of course, you would expect
11   an expert in your field testifying in a case like
12   this to testify truthfully and honestly, right?
13   A    Yes.
14   Q    For their reports to be truthful and
15   honest, right?
16   A    Yes.
17   Q    If there is information that is
18   helpful to the defendant, you are going to point
19   that out, correct?
20   A    Yes.
21   Q    And if there is information helpful
22   to the plaintiff who you were hired by in this
23   case, certainly you would point that out?
24   A    Yes.
25   Q    You are not going to -- Standards of

Page 33

1    care for an expert testifying in a case like this
2    would not stretch his opinions in any manner, is
3    that correct?
4         MR. HOELSCHER:  Objection to form.
5    A    That's correct.
6    Q    Is it fair to say that a standard of
7    care for an expert like yourself would not testify
8    in medical causation?
9         MR. HOELSCHER:  Objection to form.
10   A    Correct.
11   Q    And you do not testify on medical
12   causation, is that correct?
13   A    Correct.
14   Q    Okay.  Is it also fair to say that
15   you do not testify on something that may cause a
16   medical condition, is that correct?
17   A    If it has to do with a policy or
18   procedure not being followed, then, yes, I can.
19   If it has to do with a medical issue per se, where
20   you need a medical education, then I would not be
21   capable of doing such.
22   Q    Well, let me ask you.  Has a policy
23   or procedure not being followed ever caused a
24   medical condition?
25   A    Certainly.

9 (Pages 30 to 33)

ZEFF ROSS

January 13, 200?

**Page 38**

1  Q   Back to my question, then.  Is it
2  fair to say that the plaintiff was the one that
3  caused the automobile accident?
4        MR. HOELSCHER:  Objection to form.
5  A   I think so.
6  Q   Did the plaintiff by causing the
7  auto accident also cause his injuries?
8        MR. HOELSCHER:  Objection to form.
9  A   I can't determine that.
10  Q   Okay.  Now, what was the ultimate
11  diagnosis, medical diagnosis, of the plaintiff's
12  medical condition?
13  A   Ultimate being when?
14  Q   Well, from anything you've seen.
15  A   Quadriplegic.
16  Q   That was the medical diagnosis?
17  A   The medical diagnosis was that he
18  had cord compression, cervical cord compression.
19  Q   Cervical cord compression is your
20  understanding of the medical diagnosis?
21  A   Acute cervical cord injury with
22  resulting tetraparesis.
23  Q   Now, did the plaintiff, to your
24  knowledge, have any underlying conditions,
25  congenital conditions?

**Page 39**

1  A   Not to my knowledge.
2  Q   Now, wouldn't you agree that the
3  sole cause of the plaintiff's injuries was the
4  automobile accident?
5        MR. HOELSCHER:  Objection to form.
6  A   I can't say that, no.
7  Q   You have a college degree, is that
8  correct?
9  A   Correct.
10  Q   Okay.  And that's a bachelor of
11  science, I believe?
12  A   Correct.
13  Q   And then you have a master of
14  business administration?
15  A   Correct.
16  Q   Do you have any medical schooling?
17  A   EMT.
18  Q   Excuse me.
19  A   EMT.
20  Q   EMT.
21  A   Yes.
22  Q   Okay.  I was talking about medical
23  doctor schools.
24  A   No.
25  Q   EMT is - how long a course is that?

**Page 40**

1  A   It was one year.
2  Q   One year.  And were you actually in
3  the EMT at some point?
4  A   A life ago, when I was 22,
5  thereabouts.  Volunteer.
6  Q   Did you actually practice as an EMT,
7  or were you a coordinator, or what were you doing?
8  A   I was an EMT, but I was the
9  coordinator for ambulatory services at Jamaica
10  Hospital.
11  Q   Were you actually riding on the
12  ambulance or were you coordinating?
13  A   Volunteering in my neighborhood in
14  Long Island.
15  Q   Volunteering what?
16  A   Oh, I'm sorry.  Volunteering as an
17  EMT with the fire department.
18  Q   How many days a week are you talking
19  about you did that?
20  A   Volunteer meant that if you were
21  there in Long Island, because I worked in Queens,
22  and the bells went off throughout the township,
23  that you would respond.
24  Q   How many days in your life have you
25  actually worked as an EMT?

**Page 41**

1  A   I probably did it for a year.
2  Q   I'm not talking -- You didn't do it
3  365 days.
4  A   No.  You were always on call.  When
5  you went home, for example, if something happened,
6  you went.
7  Q   Let me put it to you an easier way.
8  A   Go ahead.
9  Q   How many days in your life did you
10  actually ride on the ambulance or treat folks as
11  an EMT?
12  A   25.
13  Q   25 days out of your entire life?
14  A   25 times I would go somewhere to
15  treat someone.
16  Q   Okay.  Out of your entire life?
17  A   Correct.
18  Q   Okay.  So I guess what I'm
19  getting -- And your license has long since
20  expired?
21  A   Oh, yes.
22  Q   More than 25 years ago?
23  A   Yes.
24  Q   Almost 30 years ago.
25  A   Let's stick with 25.

11 (Pages 38 to 41)

ZEFF ROSS

January 13, 200[4]

Page 46

1   when you are not qualified to testify, is that
2   correct?
3       A   Agreed.
4       Q   Now, can you testify -- Are you
5   qualified to testify as to whether or not the
6   plaintiff's actions caused any of his own
7   injuries?
8       A   No.
9       Q   Once again, that would take a
10  medical doctor to testify, is that a fair
11  statement?
12      A   Yes.
13      Q   Now, as to what happened in the
14  automobile accident and whether or not the
15  plaintiff's injuries from the minute of the
16  automobile accident until the present were caused
17  or contributed to by the healthcare providers, you
18  are going to defer to a medical doctor, is that
19  correct?
20      A   As long as we're not talking about
21  what they did or didn't do I guess in accordance
22  with the standard of care, which would talk about
23  the provision of care and the ultimate outcome of
24  that care, yes.
25      Q   I'm sure my question was unclear.

Page 47

1           And what I'm asking you is from the
2   point of the automobile accident until the
3   patient's present condition as to whether or not
4   the doctors, the nurses or anyone else caused or
5   contributed to his injuries, you are not going to
6   be giving that testimony, is that a fair
7   statement?
8       MR. HOELSCHER:  Objection to form.
9       A   If a nurse didn't do something and
10  that ultimately helped cause the outcome or the
11  patient's condition, then I can so state that.
12  But if you are talking about the medical issue,
13  then you are correct, I can't.
14      Q   Can you testify that - whether the
15  nurses did or failed to do anything in this case
16  caused any injury to the plaintiff?
17      A   I can testify whether they met the
18  standard of care in assessing the patient and
19  things to that effect.  Not to the medical
20  condition of the patient.
21      Q   Your answer to my question would be
22  no, is that correct?
23      A   Correct.
24      Q   Okay.  Now, you understand in order
25  to be an expert witness, you want to give truthful

Page 48

1   answers, right?
2       A   Correct.
3       Q   You want to be responsive to the
4   questions, right?
5       A   And I'm trying.
6       Q   And you understand when I say
7   standard of care, I'm talking about standard of
8   care, right?
9       A   Right.
10      Q   And when I talk about causation, I'm
11  talking about a different issue than the standard
12  of care, right?
13      A   And that becomes somewhat nebulous
14  for me, so that may be some of the difficulty.
15      Q   You don't understand causation?
16      A   Oh, I understand causation.  But not
17  everything is black and white.  So that if a nurse
18  did or did not do something and then it caused
19  causation, the patient to be injured or have a
20  negative outcome, then that's something that I can
21  state.  I can't state the medical condition per
22  se.  Physicians can do that.
23      Q   Can you testify as to any of the
24  healthcare providers' actions or inactions in this
25  case caused the patient to have an adverse

Page 49

1   outcome?
2       A   As a contributing factor to what
3   occurred following policy and procedures, yes.  As
4   a contributing factor to what you are saying, a
5   medical condition, then a physician can do that.
6       Q   What did the healthcare providers do
7   or fail to do that contributed to the plaintiff's
8   injuries?  I'm sorry.  Tell me how they
9   contributed.
10      MR. HOELSCHER:  Objection to form.
11      A   In my opinion, the hospital has
12  what's known as a trauma alert available to them.
13  That was not called.  By calling that, the patient
14  may very well have been sent to another facility
15  that would have been more capable of caring for a
16  motor vehicle accident victim and/or brought in
17  additional resources to their facility.
18          Additionally, the assessment -- The
19  complete physical assessment of the patient was
20  not complete.  The neurological assessment was not
21  performed by the medical staff or the nursing
22  staff.  And without that, you don't have the
23  complete assessment of a patient to see what the
24  emerging needs are of the patient.
25      MR. GAULT:  Objection.

13 (Pages 46 to 49)

ZEFF ROSS

January 13, 2004

Page 54

1  policies and procedures.
2      A    Yes.
3      Q    You have never supervised a nurse's
4  technical work, is that correct?
5      A    Correct.
6      Q    In other words, the nursing work.
7      A    Correct.
8      Q    You all set up policies and
9  procedures, right, your hospital does?
10      A    Yes.
11      Q    You have all kinds of guidelines to
12  do those, right?
13      A    Yes.
14      Q    You talked to JCAHO.  That's J C H O
15  Mr. Lawrence.  You've talked about there are all
16  other types of organizations that provide you all
17  with formatting of policies and procedures, is
18  that correct?
19      A    Correct.
20      Q    As to what a nurse should or should
21  not do in actual hands-on patient care, is it fair
22  to say that you are not qualified to address that?
23      A    Yeah.
24      Q    As to what a doctor should or should
25  not do in hands-on patients care, is it fair to

Page 55

1  say that you will not address that?
2      A    Correct.
3      Q    Okay.  What you are looking at this
4  at is from the administrative standpoint?
5      A    Correct.
6      Q    Mr. Ross, to be an administrator,
7  does Florida have any educational requirements?
8      A    Florida does not have the
9  educational requirements above a Bachelor's
10  degree.  However, the American College of
11  Healthcare Executives does.
12      Q    Okay.  I'm sorry.  My question was
13  unclear.
14          To be a hospital administrator, does
15  the State of Florida have an educational
16  requirement?
17      A    They have the requirements -- The
18  State of Florida usually will accept anyone to
19  become a hospital administrator.  Normally they
20  wish to see someone with a Bachelor's degree in
21  that position.
22      Q    Is there a state law in Florida --
23      A    No.  Not in accordance with the
24  hospital administrator.  Nursing home, yes.
25      Q    I'm sorry.  I'm being unclear.

Page 56

1          Let's talk in hospitals, not nursing
2  homes, okay?
3      A    No problem.
4      Q    You are not going to give any
5  opinions as to the nursing home care of
6  Mr. DeLeon, are you?
7      A    No.
8      Q    So let's talk about hospitals.  Do
9  you understand what I'm talking about?
10      A    Yes.
11      Q    Acute care hospitals.
12      A    Correct.
13      Q    Is that the appropriate terminology?
14      A    Yes.
15      Q    And you are a hospital administrator
16  for an acute care hospital, is that right?
17      A    Right.
18      A    110 beds I believe, is that right?
19      A    It's 236 licensed.  It used to be
20  110 years ago.
21      Q    When did you all change?
22      A    Through the years.  We opened in
23  1992 with 100 beds.  Then we added ten.  Then we
24  added 26 general medical, surgical and kept adding
25  general medical, surgical.  So we're up to 236

Page 57

1  license.
2      Q    Is this resume that's attached to
3  this - attached to your June 28, 2001 report, is
4  that out of date?
5      A    Yes.
6      Q    In 2001 were you all 110 beds?
7      A    No.  We were more.
8      Q    How many beds?
9      A    That's incorrect.  We were 172, I
10  believe.  172?  Yeah.  I think it was 172.  I
11  would have to check.
12      Q    If a lawyer gave an affidavit that
13  the resume -- If a lawyer gave an affidavit in
14  January of 2002 that this resume showing you all
15  were a 110-bed hospital was a true and correct
16  copy of your curriculum vitae, would that be
17  false?
18          MR. HOELSCHER:  Objection to form.
19      A    It would be a - I don't want to use
20  the word typo, because we were at one time 110
21  beds.  But it was something that was put
22  inadvertently.  We put in additional beds.  We can
23  show that through the licensing in the state.
24      Q    When was the last time that this
25  licensing of 110 beds was in your resume?

15 (Pages 54 to 57)



Page 62

1    Q    Do you buy the forms for your ER
2  department in the hospital where you work?
3    A    We've made up our own.
4    Q    You made up your own.
5        Have you ever worked in a hospital
6  where they buy the form of them from a printer?
7  In other words, there is a book of exemplars and
8  you pick out which exemplar you want.
9    A    If we have, we've also quote
10  polished them or made them more into following
11  what we needed, what the needs were of the
12  hospital.
13    Q    Okay.  I guess what I'm getting at
14  is in looking at the ER records from Valley
15  Regional Medical Center, you see where a trauma
16  alert can be called?
17    A    Right.
18    Q    And that's your only evidence that
19  they have that policy available?
20    A    Correct.
21    Q    As to whether or not that policy is
22  adequate, that would just be total speculation on
23  your part?
24    A    Correct.
25    Q    Do you know when at Valley Regional

Page 63

1  Medical Center a trauma alert should be called?
2    A    According -- I had things so neatly
3  done.
4    Q    Sorry about that.
5    A    I'm just looking for my notes now.
6    Q    What do you need?
7    A    My notes.
8        MR. HOELSCHER:  Deposition Number 8.
9        MR. GAULT:  Thank you.
10    A    (Continuing) Thank you.  Here we go.
11        Okay.  I apologize.  Your question?
12        (The record was read by the court
13  reporter, as requested)
14    A    (Continuing) From memory, a trauma
15  alert should be called when there is a high index
16  of suspicion for trauma, and when the patient
17  vitals - or when the patient is stable.
18    Q    That's the requirements of Valley
19  Regional Medical Center?
20    A    I am trying to locate the specific
21  site, and it's going to take me longer than I
22  think you want.
23    Q    No.  I'm not in any hurry.
24        Let me just write down your last
25  answer.  A high index of suspicion for trauma was

Page 64

1  the first thing you said, right?
2    A    Right.
3    Q    And then what did you say about what
4  was the next thing you said?
5        THE WITNESS:  Would you mind?
6        (The record was read by the court
7  reporter, as requested)
8    A    I can't locate it at this time.
9    Q    Well, what are you looking for?  Why
10  don't you tell us that?  I'm just asking what
11  documents are you looking for?
12    A    I'm looking specifically for the
13  check-off box, and I am missing it.  And I had it.
14        Can we take a five-minute and I'll
15  go through this?
16    Q    Absolutely.  Take whatever time you
17  need.
18        (Whereupon, a recess was taken.)
19        THE WITNESS:  It's going to take me
20        more than five minutes.  I got to go page
21        by page.
22    Q    Can you just tell me what you are
23  looking for, though, is it in the Valley Regional
24  record?
25    A    I thought that it was.  And I

Page 65

1  remember seeing it, which was the check-off box
2  you referred to.
3    Q    I didn't refer to it, Mr. Ross.  I
4  think it was something you referred to.
5    A    Well, it was there.  I would have to
6  go through this.
7    Q    Would you like to go off the record
8  while you're looking?
9    A    Sure.  That's fine.
10    Q    Any time you need to take a break in
11  this case, you let me know and I'll be glad to let
12  you use the restroom, or get something to drink.
13  Okay?
14    A    Yes.
15        MR. GAULT:  Okay.  Let's take a
16  break.
17        (Whereupon, a recess was taken.)
18    Q    We are back on the record, Mr. Ross.
19  And did you find the trauma alert?
20    A    In the Brownsville Medical Center
21  Emergency Room assessment form.
22    Q    You understand, that's a different
23  hospital than Valley Regional, right?
24    A    Correct.
25    Q    So you understand that the patient

17 (Pages 62 to 65)

Q You understand there is in this case the doctor is one defendant, right? And you understand he is represented by this other attorney over here?
A Correct.
Q And you understand that Valley Regional is a separate defendant --
A Correct.
Q -- represented by myself.
A Correct.
Q So one of your criticisms is that the doctor did not note any neurological assessment of Mr. DeLeon?
A Correct.
Q From everything you could see at Valley Regional, Doctor Dovale never noted any neurological assessment that he did of Mr. DeLeon, is that a fair statement?
A That's a fair statement.
Q That's your opinion in this case?
A That's correct. His eyes -- He mentioned something about his eyes, which I admit I cannot read. I think it shows eyes normal.
Q That's by the doctor?
A Yeah.

Q Is that a neurological assessment?
A Part of.
Q Well, so Doctor Dovale noted a partial neurological assessment?
MR. HOELSCHER: Objection to form.
A Very partial, yes.
Q Well, I'm just trying to get --
A Yes.
Q What is a fair statement about the Valley Regional Medical Center records, about Doctor Dovale?
A Oh, you are asking me?
Q Yes.
A A fair statement is that under the neuro area on the record, the doctor wrote nothing. He wrote a zero.
Q So are you saying that nowhere in the Valley Regional records did Doctor Dovale note any neurological assessment of Mr. DeLeon?
A Correct. If I may, as indicated previously under the heart, eyes, ears, nose and throat. He simply wrote eyes normal --
Q I'm not asking you where. You could find it nowhere else in the records?
A Other than that one cite.

Q Well, checking eyes is a neurological assessment.
A It's a part of.
Q So you are critical of Doctor Dovale in only checking the patient's eyes in his neurological assessment?
A Correct.
Q He should have checked the entire patient?
A Neurologically.
Q Neurologically. I'm sorry.
A Correct.
Q And then in the -- As far as your criticisms of the nurses, you state that they did a partial neurological assessment, is that correct?
A That's correct.
Q What part of the neurological assessment did they do?
A As previously stated on the emotional state of the patient, the orientation of the patient and the eyes being equal and reactive.
Q So the nurses' only neurological assessment of DeLeon was his emotional state, his orientation times four, is that right?

A Correct.
Q And his eyes were equal and reactive?
A Correct.
Q The nurses did not note anything else as far as Mr. DeLeon's neurological state other than those three areas, is that correct?
A Nothing with regard to motor skills, et cetera. There are X's there.
Q Well, let me reask the question, because it was probably unclear.
The nurses at Valley Regional did not note any other part of the neurological assessment of Mr. DeLeon other than those three areas we discussed?
A Correct.
Q What is a complete neurological assessment?
A As indicated on the form, on the emergency department assessments, nursing assessments form, it would include the size of the pupils, and the motor capabilities of his extremities.
Q Anything else?
A Nothing else on the form.

ZEFF ROSS

January 13, 200(

Page 78

1 millimeters, if that said that, then you would
2 delete your criticisms of the nurses' neurological
3 assessment of patient's pupils, correct?
4      A    Yes.
5      Q    Let's talk about the second opinion
6 you had concerning Mr. DeLeon's motor capabilities
7 in his neurological assessment of that by the
8 nurses. Are you with me?
9      A    Yes.
10     Q    Now, by the way, back on pupils,
11 they do note that the pupils are equal and
12 reactive, right?
13     A    Yes.
14     Q    That's part of that PEARL finding in
15 that nurses' note, right?
16     A    Yes.
17     Q    Now, back on motor capabilities, if
18 the nurses note that the patient can positively
19 himself move his left arm and his right arm, that
20 would be an appropriate assessment of his motor
21 skills, is that correct, for his arms?
22     A    Yes.
23     Q    If the nurses note that the patient
24 can positively move his left leg and his right
25 leg, would that be an appropriate neurological

Page 79

1 assessment of the patient's leg?
2      A    Yes.
3      Q    What else would be required other
4 than pupil size and positively noting that the
5 patient can move his arms and his legs, what else
6 would be required to do an appropriate
7 neurological assessment of the patient?
8      A    A neurologist would be able to -
9 would be better qualified to answer that question.
10 But listening to the directions of move your right
11 arm up; move your left leg down. That type of
12 situation would be part of that. Because you can
13 see someone move their leg, but it may be
14 involuntary.
15     Q    Now, what is -- What would an
16 indication of no cerebral spinal fluid or had
17 blood in the ear canals mean to you?
18     A    It would mean to me as an
19 administrator?
20     Q    In any way.
21     A    It would mean that they did not
22 visibly see something coming out of the ears that
23 was clear or blood of - of red color.
24     Q    Is that a neurological examination?
25     A    It's part of the heart, eyes, ears,

Page 80

1 nose and throat. So it's part of the physical
2 assessments.
3      Q    And if it says ear canals or nares,
4 do you know what N A R E S is?
5      A    No.
6      Q    You don't know?
7      A    No.
8      Q    If the patient had CSF, or blood in
9 his ear canals or his nares, would that indicate a
10 neurological problem of the patient?
11     A    Would it indicate a neurological
12 problem?
13     Q    Yes, sir.
14     A    It can indicate a neurological
15 problem. And that may be nose, too. Some nurses
16 write noses for nostrils.
17     Q    I thank you. But could you answer
18 my question?
19     A    I'm sorry.
20     Q    That's right. I was asking about N
21 A R E S.
22     A    Sorry.
23     Q    Do you know what that word means?
24     A    No.
25     Q    The indication that there is the

Page 81

1 absence of cerebral spinal fluid or blood in the
2 ear canal or nares would be a good indication for
3 patient outcome, is that correct?
4      A    Not necessarily. That's up -- It's
5 better answered by a physician. But, no, not
6 necessarily.
7      Q    Do you know what an indication of no
8 Battle's sign is?
9      A    It's a neurological sign that they
10 look for. I cannot explain it for you. It's
11 better explained by a physician.
12     Q    When it's noted that there is no
13 Battle's signs, is that a good thing for the
14 patient or a bad thing?
15     A    Ask a doctor.
16          MR. HOELSCHER: Objection to form.
17     Q    I guess what I'm getting at is do
18 you expect a patient to have Battle's signs or
19 not?
20          MR. HOELSCHER: Object to form.
21     A    No.
22     Q    You do not expect them. In other
23 words, you don't have Battle's signs, do you?
24     A    No.
25     Q    And you are neurologically normal,

21 (Pages 78 to 81)

Page 86

1    A    Part of, yes.
2    Q    You also saw back when you did your
3  affidavit in this case that the patient's eyes
4  were noted to be equal and reactive, is that
5  correct?
6    A    Correct.
7    Q    That's part of a neurological
8  assessment, is that correct?
9    A    Correct.
10    Q    Is it fair to say, then, that this
11  sentence out of your affidavit is incorrect?
12    A    Correct.
13    Q    Any similar sentences in your report
14  just like in one that there was no findings
15  recorded for neurological examination, those also
16  are incorrect, is that right?
17    A    For the nurses.  For the physician
18  again, it was written as a zero under the neuro,
19  and for the nurses it would be fair to say it was
20  not done.
21    Q    My question was unclear.  Any
22  statements in any document that you authored,
23  after reviewing the medical department records,
24  there were no findings recorded for neurological
25  examination, any statement similar to that in

Page 87

1  either of your reports or your affidavits, would
2  be false.
3    A    Correct.
4    Q    Now, you also say that -- You also
5  indicated on Page 2 in the top portion of your
6  affidavit, it appears that you are saying that the
7  nurses did not do a neurological examination.
8    A    Yes.  I stated with a good nursing
9  assessment, including the neurological exam.
10    Q    You stated, however, this was not
11  done by the nurses or the physician.
12    A    Right.
13    Q    But the nurses did do a neurological
14  exam, didn't they?
15    MR. HOELSCHER:  Object to form.
16    A    Again, they did part of.  So the
17  statement is actually - I mean in essence correct
18  in the sense that it starts additionally it is
19  especially important to note that the mechanism of
20  injury indicated a high index of suspicion to the
21  type of injury he received, and with a good
22  nursing assessment, which this did not include,
23  including a neurological exam, that the healthcare
24  provider should have been able to identify his
25  life and limb threatening injury, and thereby

Page 88

1  reduce the possibility of any long term
2  neurological deficit.
3    Q    However this was not done?  You are
4  saying the nurses did not do a neurological
5  examination?
6    A    They did not do a full.
7    Q    Well, look under the pupils once
8  again in the chart.  You can't see that they noted
9  that the left and right pupil was four
10  millimeters, in the medical chart?
11    A    No.  Again, when I looked at it, I
12  saw X's throughout the entire --
13    Q    I'm just talking about the pupils.
14    A    No.
15    Q    Now looking at it, can you see that
16  it is four millimeters?
17    A    I can see that somebody can look at
18  it and say that's what it says.
19    Q    Well, that's definitely closer to an
20  X than a 4, isn't it?
21    MR. HOELSCHER:  Object to form.
22    A    Not when you look at the whole
23  thing.
24    Q    If you had a question about this,
25  wouldn't you want to ask the nurse about it?

Page 89

1    A    Yes.
2    Q    But you didn't ask any questions?
3    A    I saw the X's.
4    Q    Look at the motors on the left and
5  right arms.  Don't those look more like a plus
6  than an X?
7    MR. HOELSCHER:  Object to form.
8    A    No.  You have literally four that
9  are X's and one that's a T.
10    Q    What we're going to do, Mr. Ross,
11  for the benefit of the judge and the jury in this
12  case, at the top of Exhibit Number 13, would you
13  write a 4?
14    Okay.  In the middle of the page, go
15  on down, would you write a plus?
16    And at the bottom of the page, would
17  you write an X?
18    Okay.  Now, Exhibit Number 13, the
19  writing on there is yours, correct?
20    A    Correct.
21    Q    On the top of the page is a 4?
22    A    Correct.
23    Q    Middle of the page is a plus?
24    A    Correct.
25    Q    And the bottom of the page is an X,

272c8d4d-3642-4f92-8492-66e22f0c15e0

ZEFF ROSS                                                                January 13, 200

Page 94

```
1      Q    Is the fact that Doctor Dovale
2  indicated that Mr. DeLeon's uro systems were
3  normal an indication that he did a urological
4  examination of Mr. DeLeon?
5      MR. HOELSCHER: Objection to form.
6      A    It can be considered an indication.
7      Q    And certainly if you saw evidence
8  that you thought was conflicting in another area,
9  you would want to find out what Doctor Dovale had
10 to say about that, wouldn't you?
11     A    Yes.
12     Q    Because as an administrator of a
13 hospital, you do a peer review, don't you?
14     A    A peer review is performed, yes.
15     Q    Sure. And administration is allowed
16 to participate in a peer review, isn't that
17 correct?
18     A    Yes.
19     Q    Usually a representative from a peer
20 administration is present, right?
21     A    Yes.
22     Q    And part of a peer review is you
23 always give the affected nurse, physician or other
24 person an opportunity to explain what they did,
25 right?
```

Page 95

```
1      A    Yes.
2      Q    That's a fair way to do it, right?
3      A    Yes.
4      Q    That's the way your hospital
5  conducts its business, is that correct?
6      A    Yes.
7      Q    You being the head person in charge
8  of your hospital, that's the way you conduct the
9  business of your hospital?
10     A    Correct.
11     Q    That's the fair way of doing it,
12 right?
13     A    Yes.
14     Q    Now, if you needed an explanation as
15 to something you thought was contradictory,
16 certainly you would want to hear Doctor Dovale's
17 recitation of how he does his charting, right?
18     A    Yes.
19     Q    You have never been an administrator
20 in a Texas hospital, have you?
21     A    No.
22     Q    The only times you have been to
23 Texas was relating to litigation, is that correct?
24     A    Correct.
25     Q    Where you were an expert witness for
```

Page 96

```
1  plaintiffs, is that correct?  You need to look at
2  your testimony?
3      A    Yes.  The list.  I don't have it.  I
4  know that.  I have an extra.  Laredo is part of
5  Texas?
6      Q    Yes.
7      A    I was an expert for the defense in
8  that case.
9      Q    You have been to Texas one time, is
10 that correct?
11     A    Yes, sir.
12     Q    And that was when you were an expert
13 for a hospital in Laredo, Texas?
14     A    Yes, sir.
15     Q    That was back in the mid 1990's?
16     A    Yes.  '95.
17     Q    I guess you have never been an
18 administrator over doctors practicing in Texas, is
19 that correct?
20     A    Correct.
21     Q    You don't have any personal
22 knowledge about Doctor Dovale, is that correct?
23     A    Correct.
24     Q    You have never met Mr. DeLeon, is
25 that correct?
```

Page 97

```
1      A    That's correct.
2      Q    Now, as far as his documentation
3  style, if you had a question about it, the best
4  source of that information would be Doctor Dovale,
5  is that correct?
6      A    That's correct.
7      Q    I want to be sure I have this clear,
8  Mr. Ross.  You are not going to testify as to a
9  nurse's practice -- I'm sorry.  Strike that.
10          You are not going to testify as to
11 the standard of care for a nurse's practice, is
12 that correct?
13     A    Correct.
14     Q    You are not going to testify as a
15 standard of care for doctor's practice, is that
16 correct?
17     A    Correct.
18     Q    I did not see any mention in your
19 reports that the hospital's administration fell
20 below the standard of care.  Did you note that in
21 your reports?
22     A    No, I did not.
23     Q    Wouldn't you agree with me that it's
24 unfair to judge a nurse's practice by a hospital
25 administration standard of care?
```

25 (Pages 94 to 97)



**Page 102**

1  himself?
2          MR. HOELSCHER: Objection to form.
3      A   I don't know if every injury was.
4      Q   Well, do you think or is it your
5  opinion that the EMS caused any injury to
6  Mr. DeLeon?
7          MR. HOELSCHER: Objection to form.
8      A   I don't know that.
9      Q   I mean do you have an opinion that
10  they did?
11     A   No.
12     Q   You don't have any opinion?
13     A   I have no opinion.
14     Q   Do you have any opinion that the
15  driver that was making a turn on another road and
16  was hit from behind by Mr. DeLeon, do you have an
17  opinion that he caused any injury to Mr. DeLeon?
18     A   No opinion.
19     Q   So do you have an opinion that the
20  Brownsville Police Department caused any injury to
21  Mr. DeLeon before he arrived at the hospital? I'm
22  talking about Valley Regional hospital.
23     A   No. No opinion.
24     Q   So I guess what I'm asking about is
25  is it fair to say that Mr. DeLeon proximately

**Page 103**

1  caused all of the injuries that he had when he
2  first arrived at Valley Regional Medical Center?
3          MR. HOELSCHER: Objection to form.
4      A   That he proximately caused it, yes.
5      Q   That's a fair statement, right?
6          MR. HOELSCHER: Objection to form.
7      A   Yes.
8      Q   And did Mr. DeLeon have cord
9  compression or symptoms of cord compression when
10  he arrived at Valley Regional hospital?
11     A   Yes.
12     Q   Did Mr. DeLeon proximately cause his
13  central cord compression?
14          MR. HOELSCHER: Objection to form.
15     A   Proximately caused, yes.
16     Q   Now, I think you told me earlier you
17  do not know whether or not Mr. DeLeon had
18  congenital problems.
19     A   Correct.
20     Q   Say, by the way, does whether or not
21  Mr. DeLeon was intoxicated, you have given no
22  opinions about that in this case, right?
23     A   Correct.
24     Q   You have given no opinions as to
25  whether or not Mr. DeLeon's intoxication had

**Page 104**

1  anything to do with any of the issues in this
2  case, is that correct?
3      A   Correct.
4      Q   Certainly as a layman, though, you
5  know that if a person is intoxicated, they are
6  more likely to be involved in an automobile
7  accident than one who is not intoxicated?
8      A   Correct.
9      Q   Sure. And have you ever heard of a
10  James (Garriott), have you ever heard of him?
11     A   No.
12     Q   You haven't read his deposition in
13  this case?
14     A   No.
15     Q   Now, in your reports, you indicated
16  that Mr. DeLeon spent the night in jail, is that
17  correct?
18     A   Correct.
19     Q   And during the whole night
20  Mr. DeLeon complained of decreased movement to his
21  lower extremities, is that correct, while he was
22  in jail?
23     A   You have my report.
24     Q   You need your report? Sure.
25     A   No. That's fine.

**Page 105**

1      Q   Actually I was reading from this
2  one, but you can read from either one you want.
3      A   They are probably the same.
4          Okay. And your question? I'm
5  sorry.
6      Q   Okay. You stated that while
7  Mr. DeLeon was in jail, he was complaining of
8  decreased movement to his lower extremities,
9  correct?
10     A   Correct.
11     Q   Do you think that the Brownsville
12  Police Department should have returned him for
13  additional medical treatment based upon that?
14          MR. HOELSCHER: Objection to form.
15     A   In my layman opinion?
16     Q   Sure.
17     A   Yes.
18     Q   And would it be fair to say that the
19  Brownsville Police Department is proximately the
20  cause of some of Mr. DeLeon's injuries?
21          MR. HOELSCHER: Objection to form.
22     A   Yes.
23     Q   In your work as a hospital
24  administrator, do you use the term proximate
25  cause?

27 (Pages 102 to 105)

ZEFF ROSS

January 13, 2004

Page 110

1  position?
2      A    Since April of '91.
3      Q    Could you, please, explain to us the
4  materials that you have reviewed in coming to your
5  conclusions in this case?
6      A    Sure.  I reviewed the Texas peace
7  officer's report of the accident on December 24th,
8  1998.
9          The medical records of Columbia
10 Valley Regional Medical Center.  The medical
11 records of Brownsville Medical Center.
12         The City of Brownsville EMS reports.
13         The report of Nick Peters, MD.
14         A report of Doctor Jeremy Slater.
15         As well as the Joint Commission on
16 Accreditation of Healthcare Organizations,
17 Provision of Care, Treatment and Services manual.
18 Accreditation manual.
19     Q    Are you familiar with the
20 appropriate standard of care with regard to the
21 treatment of Candelario DeLeon on December 24th,
22 1998, when he presented to Columbia Valley
23 Regional Medical Center?
24     A    Yes.
25     Q    And how are you familiar with that

Page 111

1  standard of care?
2      A    Through the Joint Commission of
3  Healthcare Organizations.
4      Q    Is there any other educational or
5  work experience that would familiarize yourself
6  with the standards of care on that date?
7      A    Admittedly, as well, after reviewing
8  the records and the Accreditation Manual and my
9  experience as a hospital administrator for
10 approximately 25 years, and my education, I have a
11 Master's degree in it.
12     Q    What was the appropriate standard of
13 care with regard to the treatment of Mr. DeLeon on
14 December 24, 1998 when he presented to Columbia
15 Valley Regional Medical Center?
16     A    That they should have provided a
17 complete neurological exam on Mr. DeLeon at the
18 time of presentation at their facility.  In
19 particular, in light of the injury gave a high
20 index of suspicion for that type of injury, cord
21 compression.
22     Q    Did Columbia Valley Regional Medical
23 Center meet the standards of care on Candelario
24 DeLeon on December 24, 1998?
25     A    No, I don't think it did.

Page 112

1      Q    And why not?
2      A    Because it did not do the complete
3  assessments as indicated.  And even recognizing
4  the pertinent findings from EMS personnel of the
5  patient's complaints from the neck down were
6  relatively clear indication to assess the patient
7  for possible cervical cord injury.
8          MR. HOELSCHER:  I'll pass the
9  witness.  We'll reserve the rest of our
10 questions.
11         REDIRECT EXAMINATION
12         BY MR. GAULT
13     Q    Mr. Ross on the JCAHO manual that
14 you provided --
15     A    Yes.
16     Q    -- that is the basis for your
17 opinions on standard of care, is that correct?
18     A    Yes.  And experience in hospitals,
19 yes.
20     Q    Excuse me?
21     A    And my experience in hospitals, yes.
22     Q    But I just see one page of the JCAHO
23 manual that you are referring to, or is there more
24 than that?
25     A    What I did, the manual itself is

Page 113

1  like yea big.  You are familiar with it.  Right.
2          I gave the top page of it and then I
3  gave the assessments of the patient page, the
4  PE-1, and as well, the practical applications, and
5  as well what the scoring guidelines are behind it.
6  So in other words, the intent of what the standard
7  is.
8      Q    Okay.  So in the JCAHO manual which
9  we've marked as Exhibit Number 10 --
10     A    Yes.
11     Q    -- the first page is just the cover
12 page of the manual, is that correct?
13     A    Correct.
14     Q    Okay.  The second page of Exhibit
15 Number 10, show me what portion of that page the
16 hospital did not follow.
17     A    Where it says the goal of the
18 patient assessment function is to determine what
19 kind of care is required to meet the patient's
20 initial needs.
21     Q    Okay.  How was that not followed?
22     A    The assessment, again, was not a
23 complete assessment and needed to transform that
24 data as they say into information by analyzing it.
25     Q    Okay.

29 (Pages 110 to 113)

ZEFF ROSS

January 13, 2004

Page 118

1   Q    So since you are not going to
2   express those criticisms, we don't need to talk
3   about Doctor Dovale, do we?
4   A    No.
5   Q    If the hospital had checked the data
6   that I noted, then you have no further criticisms
7   on collecting data, is that correct?
8   A    Correct.
9   Q    If on analyzing that data, if a
10  nurse determined that the patient was of an
11  appropriate emotional state, they were alert and
12  oriented times four, the pupils were four
13  millimeters on the left and the right, and they
14  were equal and reactive, they could move their
15  arms and their legs, do you have any criticism,
16  assuming that's true, do you have any criticisms
17  on the analyzing data portion?
18  A    No.
19  Q    Okay. If all what I told you is
20  assumed true, do you have any criticisms on making
21  care decisions? The third part of Page 2 of
22  Exhibit 10.
23  A    Third part of Page 2 being this?
24  The third bullet?
25  Q    The third bullet, making care

Page 119

1   decisions.
2   A    No.
3   Q    Now, on the third page of Exhibit
4   Number 10, what portions of this page are you
5   referring to as criticisms against Valley
6   Regional?
7   A    Under the intent of the PE-1, when a
8   patient enters a hospital service --
9   Q    I'm sorry. I'm on the third page,
10  which is the page before that. That's the third
11  page of Exhibit 10. You can count them if you
12  want, to make sure I'm not misleading you. See,
13  it's one, two, three pages of this exhibit. And
14  on that third page, what portions of that are you
15  using to criticize Valley Regional?
16  A    With the information I have at this
17  point, nothing here.
18  Q    Okay. On the last page, the fourth
19  page of Exhibit Number 10 to your deposition, what
20  portions of that page are you using to criticize
21  the Valley Regional?
22  A    Under the intent of PE.1, when a
23  patients enters a hospital service, staff members
24  first need to --
25  Q    Just tell me the first paragraph

Page 120

1   there. Under Intent of PE.1 and PE.1.1?
2   A    Correct.
3   Q    Okay. The first paragraph?
4   A    Correct.
5   Q    Any other portions other than the
6   first paragraph?
7   A    The second paragraph.
8   Q    Any other portions other than the
9   first and second paragraph?
10  A    The third paragraph.
11  Q    Okay. And each one of those bullet
12  points?
13  A    The patient's diagnosis, the care he
14  or she is seeking, the statement of the hospital
15  has a policy that addresses these issues and
16  defines what areas to include in reassessment. I
17  didn't see the policy, so I don't know that.
18  That's it.
19  Q    Okay. Now, let's start with that
20  last sentence there. You have never asked for any
21  hospital policies, is that correct?
22  A    Correct.
23  Q    You have never been provided any
24  policies, correct?
25  A    Right.

Page 121

1   Q    In order to be a fair witness to
2   both the plaintiff and the defendants, you are not
3   going to criticize the hospital's policies, right?
4   A    Without having the policies, no.
5   Q    Okay.
6   A    But I did reserve the right in my
7   report to review additional policy and procedures
8   to help formulate an opinion.
9   Q    I'm sorry. My question was probably
10  unclear.
11       I said, and my question to you is,
12  in being an expert witness, you want to be, of
13  course, fair to both the plaintiff and the
14  defendants, right?
15       MR. HOELSCHER: Objection to form.
16  A    Right.
17  Q    And would you tell us, having asked
18  for any hospital policies or having been - not
19  been provided any by the plaintiff's counsel, you
20  are certainly not going to have any criticisms of
21  them today, are you?
22  A    Correct.
23  Q    It would be total speculation as to
24  any criticisms you may have about hospital
25  policies, is that correct?

31 (Pages 118 to 121)

ZEFF ROSS                                                                                                January 13, 2004

Page 126

1    A    Correct.
2    Q    Now, do you see where it says injury
3    type slash severity, do you see that?
4    A    I apologize.  I wasn't listening.
5    Q    I'm sorry.  It's under injury --
6    A    No.  I was looking back to the bed
7    confined.
8    Q    Yes, sir.
9    A    That question is was the patient
10   confined to a bed prior to whenever this occurred
11   and/or afterwards.
12   Q    And I asked you afterwards.
13   A    Right.
14   Q    And the answer was no.
15   A    No change.
16   Q    No change.  Do you see where it says
17   injury type slash severity, in the middle of the
18   page?
19   A    Yes.
20   Q    Injury type is 03 laceration type
21   penetration, right?
22   A    Correct.
23   Q    Do you see where it says on
24   severity, it's a one, right?
25   A    On severity.

Page 127

1    Q    Do you see where it says one?
2    A    Yes.
3    Q    And one means possible, right?
4    A    Correct.
5    Q    If we look on the second page of the
6    EMS records, you see where they note that there is
7    no chief complaint?
8    A    Second page?
9    Q    Yes, sir.  First paragraph under
10   subjective, towards the very end of that
11   paragraph.
12   A    Yes.
13   Q    It says no chief complaint, right?
14   A    Correct.
15   Q    What does that mean?
16         MR. HOELSCHER:  Objection to form.
17   A    He may not have verbalized a
18   complaint, which may have been part of his
19   disorientation.
20         MR. GAULT:  Objection.
21   Nonresponsive.
22   Q    I'm sorry for being unclear.  All
23   I'm asking is what does no chief complaint mean?
24         MR. HOELSCHER:  Objection to form.
25   A    That the patient didn't verbalize a

Page 128

1    complaint.
2    Q    Any complaint, right?
3    A    Correct.
4    Q    Any time when you are an EMS person,
5    my toe hurts, that's your chief complaint, right?
6         MR. HOELSCHER:  Objection to form.
7    A    Yes, if you can respond to that, if
8    you are not disoriented.
9         MR. GAULT:  Objection.
10   Nonresponsive.
11   Q    Did I ask anything about orientation
12   in my question?
13         MR. HOELSCHER:  Objection to form.
14   A    No.
15   Q    My question is when EMS arrives on
16   the scene and the person says this is my
17   complaint, whatever it is, that's what they note
18   as the chief complaint, right?
19   A    Correct.
20   Q    And they always note the worst of a
21   person's complaints as chief complaint, right?
22         MR. HOELSCHER:  Objection to form.
23   Q    In other words, if you have a cut on
24   your toe and numbness in your back, the numbness
25   in your back is the chief complaint, is that

Page 129

1    right?
2         MR. HOELSCHER:  Objection to form.
3    A    Normally that would be the way they
4    do it.
5    Q    Do you see in the next paragraph
6    under objective that there is no chest trauma?
7    A    Yes.
8    Q    Do you see under that paragraph on
9    objective, objective means they are actually
10   looking at Mr. DeLeon, poking him, prodding him,
11   picking up his arms and legs, right, that's what
12   objective means, right?
13         MR. HOELSCHER:  Object to form.
14   A    Objective means objective findings,
15   yes.
16   Q    They are not just what someone says,
17   but these are what they can actually find on the
18   patient, right?
19   A    Correct.
20   Q    Now, do you see on the objective
21   findings in this case that they did a head to toe
22   evaluation of Mr. DeLeon?
23   A    Correct.
24   Q    Only a small laceration to his
25   forehead they found, is that correct?

33 (Pages 126 to 129)

ZEFF ROSS                                                                                    January 13, 2004

Page 134

1    Q    Say, by the way, what was this
2  patient's - Mr. DeLeon's mechanism of injury?
3        MR. HOELSCHER:  Objection to form.
4    A    Motor vehicle accident.
5    Q    What speed was he going?
6        MR. HOELSCHER:  Objection to form.
7    A    I don't know that I read that.
8    Q    Is that something that the police
9  officer tried to determine?
10        MR. HOELSCHER:  Objection to form.
11    A    He stated that he failed to control
12  his speed.  I don't know that he put down what the
13  speed was.
14    Q    Did the EMS try to determine
15  Mr. DeLeon's speed in the motor vehicle accident?
16        MR. HOELSCHER:  Objection to form.
17    A    Stating that there was moderate
18  damage to the front end.  That would be the
19  indication that they did.
20    Q    Well, that doesn't tell you what the
21  person's speed was, though, does it?
22    A    No.  If there was no damage,
23  obviously in a true bumper to bumper, then that
24  would indicate very little speed, very low speed.
25  Moderate damage indicates a higher speed.

Page 135

1    Q    What speed does it indicate?
2        MR. HOELSCHER:  Objection to form.
3    A    As I say, a higher speed.  The speed
4  is not indicated.
5    Q    What is a low speed for an
6  automobile accident?  What is the range?
7        MR. HOELSCHER:  Objection to form.
8    A    From one mile to probably 15 miles
9  to 20 miles, depending on the vehicles involved
10  also, because of their type of impact.
11    Q    Where is the basis for that opinion?
12        MR. HOELSCHER:  Objection to form.
13    A    Just reading the safety reports from
14  Consumer Reports.
15    Q    Okay.  Consumer Reports talks about
16  low speed, moderate speed and high speed
17  accidents?
18    A    They say how much impact it takes to
19  do certain amounts of damage.
20    Q    Have you read the Consumer Reports
21  for a 1989 Ford Escort?
22    A    Not that I remember.
23    Q    So is there any way to determine
24  Mr. DeLeon's speed in his accident?
25    A    No.

Page 136

1    Q    Back to what I was asking.  Did EMS
2  determine Mr. DeLeon's speed in this accident?
3        MR. HOELSCHER:  Objection to form.
4    A    No.
5    Q    Did EMS fall below the standards of
6  care in determining Mr. DeLeon's speed in this
7  accident?
8        MR. HOELSCHER:  Objection to form.
9    A    No.
10    Q    Is there anything about the
11  mechanism of Mr. DeLeon's injury that is relevant
12  to this case?
13        MR. HOELSCHER:  Objection to form.
14    A    Being unrestrained in a motor
15  vehicle accident.
16    Q    How is that relevant?
17    A    Because if you are unrestrained in a
18  motor vehicle accident, again, depending on the
19  type impact and the speed, the patient in this
20  case may very well hit the front windshield, which
21  in this case obviously he must have, only because
22  of his head laceration, and then that may lead
23  others to look at further the assessment as they
24  wrote about the numbness from the neck down and
25  indicate to the physician the importance of that

Page 137

1  note.
2    Q    Well, the EMS didn't assess numbness
3  from the neck down, did they?
4    A    It doesn't write it.  They didn't
5  write it under assessments, no.
6    Q    They noted a subjective complaint,
7  is that correct?
8    A    Under their plan.
9    Q    Right.
10    A    Not the subjective under their plan.
11    Q    Under their plan.
12    A    Right.
13    Q    But what they noted was a subjective
14  complaint, right?
15    A    Yes.
16    Q    Every indication of what the EMS
17  noted on this patient indicated that it was an
18  extremely minor injury, is that correct?
19    A    I can't say that.  Because when you
20  write that there is numbness from the neck down,
21  that does not indicate minor, it indicates
22  something that needs to be further checked.
23    Q    Well, let's look on the first page
24  where it says severity and it says possible, a
25  possible injury.

35 (Pages 134 to 137)

ZEFF ROSS

January 13, 2004

Page 142

```
 1   STATE OF FLORIDA  )
                       : SS.
 2   COUNTY OF BROWARD  )
 3              CERTIFICATE
 4        I, EDWARD C. LAWRENCE, Registered
 5   Professional Reporter, certify that I was
 6   authorized to and did stenographically report the
 7   foregoing deposition; and that this computer
 8   transcription is a true and complete record of my
 9   stenographic notes.
10        I further certify that I am not a relative,
11   employee, attorney nor counsel of any of the
12   parties, nor am I a relative or employee of any
13   party's attorney or counsel connected with the
14   action, nor am I financially interested in the
15   action.
16        Dated this 20th day of January, 2004.
17
18
19        Edward C. Lawrence
          Registered Professional Reporter
20
21
22
23
24
25
```

Page 144

```
 1              ERRATA SHEET
 2   DE LEON V HCA, etc., et al. - DEPOSITION OF ZEFF ROSS
 3   PAGE NO.  LINE NO.
 4   _____  _____  _____
 5   _____  _____  _____
 6   _____  _____  _____
 7   _____  _____  _____
 8   _____  _____  _____
 9   _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   Under penalties of perjury, I declare that I have
     read the foregoing document, and that the facts
22   stated in it are true.
23   SIGNATURE_____ DATE_____
24
25
```

Page 143

```
 1   DATE:  January 20, 2004
 2   TO:  Zeff Ross, FACHE
         703 N. Flamingo Road
 3       Pembroke Pines FL 33028
 4   IN RE: DeLeon v HCA-The Healthcare Company, et al.
 5   Please take notice that on Tuesday the 13th day
     of January, 2004, you gave your deposition in the
 6   above-referenced matter.  At that time, you did not waive
     signature.  It is now necessary that you sign your
 7   deposition.
 8   Please call our office at the below-listed number to
     schedule an appointment between the hours of 9:00 a.m. and
 9   4:30 p.m., Monday through Friday.
10   If you do not read and sign the deposition within 30 days,
     the original, which has already been forwarded to the
11   ordering attorney, may be filed with the Clerk of the Court.
     If you wish to waive your signature, sign your name in the
12   blank at the bottom of this letter and return it to us.
13        Very truly yours,
14
15        Edward C. Lawrence, RPR
          Esquire Deposition Services
16        600 South Andrews Avenue - Suite 200
          Fort Lauderdale, FL 33301
17        954.331.4400
18
     I do hereby waive my signature.
19
20   _____
21   cc via transcript:  Mr. Gault
                         Mr. Hoelscher
22                       Mr. Morales
23
24
25
```

37 (Pages 142 to 144)

ZEFF ROSS

auto 38:7
automobile 36:1,12,18
  36:24 38:3 39:4
  46:14,16 47:2 104:6
  135:6
available 49:12 62:19
Avenue 4:13 143:16
aware 28:18 58:17 68:2
a.m 143:8

**B**

B 3:8 91:8,9
bachelor 39:10
Bachelor's 55:9,20
back 37:16 38:1 42:20
  58:10 65:18 78:10,17
  85:2,4,13,17,19 86:2
  91:22 92:3 96:15
  126:6 128:24,25
  136:1
background 29:21
  31:23 45:7
bad 81:14
banks 107:25 108:2
based 105:13
basis 112:16 135:11
  138:18,24 139:3,8,9
Battle's 81:8,13,18,23
  82:4
become 55:19
becomes 48:13
bed 52:3 125:21 126:6
  126:10
beds 56:18,23 57:6,8
  57:21,22,25 58:8
beeper 106:2
before 4:10 5:9 8:5
  15:25 26:19 35:5
  58:7 102:21 119:10
  140:16 141:7
behalf 2:2,4,7
behind 25:13 36:8
  102:16 113:5
being 4:20,20 27:21
  33:18,23 34:20 35:15
  35:20,21 38:13 45:15
  55:25 59:4 69:24
  72:22 95:7 118:23
  121:12 127:22
  136:14
believe 39:11 56:18
  57:10
bells 40:22
belong 59:6,14
below 97:20 131:19
  136:5
below-listed 143:8

benefit 89:11 92:7
beside 91:2,8
best 35:19 83:12 97:3
  98:3 124:11
better 28:9 79:9 81:5
  81:11 99:20
betting 34:11
between 15:2 16:5
  98:23 106:23 143:8
big 113:1 123:19,25
billing 3:16 7:25 8:2
  108:8,15
bills 19:5,25
bit 53:5
black 48:17
blank 143:12
blood 35:10 79:17,23
  80:8 81:1
blue 7:6
board 21:1,4,9,11 30:7
  30:14,21 59:5
boards 21:16
body 83:3
Bonded 141:14
bone 130:6
book 9:2 23:21 61:20
  62:7 67:20
both 45:15 51:16
  107:24 109:6 121:2
  121:13
bottom 37:3,17 89:16
  89:25 143:12
box 60:22 61:3 64:13
  65:1
brain 35:16 124:8
Branton 2:1 17:6
break 14:4 65:10,16
  106:4,7
BRIN 2:3,3
broader 23:17
broadly 23:12
brought 49:16
Broward 4:13 140:17
  141:3 142:2
Brownsville 1:2 4:9
  10:2,11 65:20 66:1
  66:13 102:20 105:11
  105:19 110:11,12
bullet 118:24,25
  120:11
bumper 134:23,23
business 39:14 61:14
  95:5,9
buy 62:1,6

**C**

C 4:10 54:14 124:23,23

141:4 142:4,19
143:15
calculations 14:12
call 41:4 66:15 106:3,5
  143:8
called 49:13 61:4 62:16
  63:1,15 66:6
calling 49:13 66:21
calls 15:11 34:16
canal 81:2
canals 79:17 80:3,9
Candelario 1:3 4:5
  110:21 111:23
capabilities 73:22 74:2
  74:12 78:6,17
capability 34:5
capable 33:21 49:15
  77:16 133:9
car 36:17 139:16
card 61:14
care 9:12 21:12 22:13
  22:17 23:1,13 27:17
  31:1,15 32:1,3,6 33:1
  33:7 43:22 44:11,19
  44:23 46:22,23,24
  47:18 48:7,8,12 53:5
  53:12,15 54:21,25
  56:5,11,16 97:11,15
  97:20,25 99:2 110:17
  110:20 111:1,6,13,23
  112:17 113:19 115:8
  117:23 118:21,25
  120:13 131:20
  132:11,16 136:6
caring 49:15
case 6:2 8:21 15:9,11
  15:19 17:21 18:2,7
  18:19 21:23 23:25
  25:8 26:2,6,14,20,24
  27:10,16,17,20 28:23
  29:7,12,18 30:11,14
  30:21 31:2,16 32:2
  32:11,23 33:1 35:23
  35:25 36:15 45:2,6
  45:24 47:15 48:25
  59:17 60:7 65:11
  67:18 68:16 70:1,20
  84:10 85:6,14,20
  86:3 89:12 92:16,18
  96:8 99:13 103:22
  104:2,13 107:6,11
  108:7 110:5 122:4,14
  122:18 129:21
  132:20,24 136:12,20
  136:21
cases 3:19 11:16
  108:22 109:1,2

causation 33:8,12 34:3
  43:10,16 48:10,15,16
  48:19 132:21,25
  133:9
cause 4:4,21 33:15
  34:11,21 35:25 36:24
  38:7 39:3 47:10 99:8
  99:9,17 100:3,4,9,15
  101:5,9,12,17,17,23
  103:12 105:20,25
  106:12,24 131:25
caused 33:23 34:19
  36:12,18 38:3 43:8
  43:19 44:4 45:1,5,24
  46:6,16 47:4,16
  48:18,25 50:17 99:14
  101:25 102:5,17,20
  103:1,4,15 107:7
causes 34:16 35:18
causing 34:24 38:6
cc 143:21
Center 1:8 10:2,11,14
  22:14,18 27:15 59:22
  60:18 62:15 63:1,19
  65:20 66:1,14,21
  71:10 74:17 101:25
  103:2 110:10,11,23
  111:15,23 117:7
Center's 60:13
centimeter 123:16,19
  124:1
central 103:13
CEO's 68:24 69:5
cerebral 79:16 81:1
certain 34:6 45:19
  58:23 108:4 135:19
certainly 32:23 33:25
  34:10,20 45:18,23
  92:6 94:7 95:16
  104:4 121:20 133:2
CERTIFICATE 141:1
  142:3
certification 21:9,11,12
  21:16
certifications 21:2
certified 21:4 31:5 59:5
certify 141:6 142:5,10
cervical 38:18,19,21
  43:9 112:7
cetera 73:9
change 52:3,4 56:21
  126:15,16
charge 95:7
charges 19:19
chart 85:22 88:8,10
charting 90:12 95:17
  131:17

CHE 31:5
check 57:11 60:22
  90:18 91:17 92:2
  93:18
checked 72:8 85:7 90:8
  91:14 118:5 137:22
checking 5:16 72:1,5
checks 108:11
check-off 64:13 65:1
chest 129:6
chief 53:15,15 127:7,13
  127:23 128:5,18,21
  128:25
circle 75:25 76:5
circled 75:5 125:6
circumstances 77:19
  77:22
citations 37:22
cite 67:25 68:5 71:25
cited 37:18
City 110:12 140:17
CIVIL 1:2
claims 15:4
CLE 21:12
clear 13:14 79:23 97:7
  112:6
Clerk 143:11
close 37:17 99:23
closer 88:19
cloud 45:25
code 133:12
codes 133:16
collected 116:14
collecting 116:8 118:7
collection 115:3
collects 115:3
college 21:8,14 31:6
  39:7 55:10 133:13
color 79:23
Columbia 1:7 2:5
  22:13,17 110:9,22
  111:14,22 117:6,12
Coma 124:22 125:3,4
comes 9:25
coming 8:9 79:22 110:4
commencing 4:15
comment 60:14
commission 9:2 11:20
  22:22 23:10,21 30:15
  30:22 67:20,23 68:1
  68:9 110:15 111:2
  140:22 141:14
commissioned 141:5
communicate 17:25
communicated 18:2
communications 16:5
companies 61:7

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

ZEFF ROSS

difficulty 48:14
direct 3:2 4:22 99:8,24
  100:7 117:15
directed 117:19
directions 79:10
directly 99:14
discharge 98:12
discharged 10:7 98:16
  98:19
discovery 4:3 18:24
  60:1,4
discussed 21:20 73:15
disorientation 127:19
disoriented 125:15
  128:8
District 1:1,1 4:7,8
diverge 23:8
Division 1:2 4:9
doctor 11:11,11 27:19
  27:20,21 28:2,5 34:2
  39:23 42:22,22 43:4
  43:11 45:10 46:10,18
  52:8 54:24 70:2,12
  70:16,24 71:3,11,15
  71:18 72:4 81:15
  83:8,24 90:7 91:17
  91:24 92:7,17 93:9
  93:13 94:1,9 95:16
  96:22 97:4 98:9,23
  99:6 110:14 117:6,13
  118:3
doctors 47:4 96:18
  107:7
doctor's 97:15 117:23
document 11:20 14:12
  86:22 92:11 144:21
documentation 26:19
  97:2
documents 13:4 14:16
  14:19 20:3,11 21:19
  21:22 64:11
doing 5:12,14 24:5
  33:21 40:7 50:20
  52:18 76:24 95:11
  108:7
done 23:24 32:7 34:9
  34:11,11 35:21,21
  63:3 69:2,16,22
  83:22 84:2,7,10
  86:20 87:11 88:3
  98:3,12 100:5,6
  116:22 122:18,20
dot 76:21
dots 75:19
doubt 92:7
Dovale 1:8 2:7 27:20
  27:21 28:2,5 70:16

71:3,11,18 72:4 90:8
  91:17,24 92:7,17
  93:9,13 94:1,9 96:22
  97:4 99:6 117:6
  118:3
Dovale's 95:16 117:13
down 36:8 37:3 63:24
  79:11 84:11 89:15
  91:11 112:5 130:16
  131:10,19 132:8
  134:12 136:24 137:3
  137:20
Dr 2:7
drafted 53:22
dressing 52:4
drink 65:12
driver 37:9,13,23
  102:15
drivers 138:14,15
driver's 20:24
duces 12:6,8 14:7,15
  18:6 19:4,23 21:18
due 131:1,4
duly 4:20 141:5,8
during 104:19
d/b/a 1:7

——————— E ———————

E 3:1,8 80:4,21 91:1
  124:23
each 22:5 75:22 116:19
  120:11
ear 79:17 80:3,9 81:2
earlier 11:21 42:4
  53:21 103:16 107:18
  115:14 117:4 130:13
ears 71:21 79:22,25
easier 41:7
ecchymosis 82:8,12,17
  82:22
education 33:20 69:10
  111:10
educational 55:7,9,15
  58:12 111:4
Edward 4:10 141:4
  142:4,19 143:15
effect 34:21 47:19 99:9
either 18:25 20:12
  21:23 29:6,17 42:9
  52:8 87:1 105:2
else's 77:21
emergency 27:21,22
  28:19 31:8 52:2
  65:21 73:20 74:17
  84:5,15
emergent 23:9 27:3
emerging 23:11,11

27:3 49:24 114:12
emotional 69:23 72:21
  72:24 85:6 114:4
  115:18 118:11
employed 109:21
employee 142:11,12
EMS 102:5 110:12
  112:4 122:22,24
  123:8 124:7,10 125:2
  127:6 128:4,15
  130:21 131:3,8,16,24
  132:6 134:14 136:1,5
  137:2,16
EMT 39:17,19,20,25
  40:3,6,8,17,25 41:11
  42:9,13,18 51:10
en 130:19
end 50:22 127:10
  134:18
engagement 20:5
enough 26:22
enters 23:4 119:8,23
  122:15
entire 41:13,16 72:8
  88:12
entity 30:8
entry 9:3
equal 69:24 72:22 73:2
  78:11 86:4 114:5
  115:19 116:20
  118:14
ER 10:15 28:18 43:23
  60:25,25 61:2,7 62:1
  62:14
ERRATA 144:1
error 27:2 68:18
Escort 135:21
especially 87:19
ESQ 2:2,4,7
Esquire 4:12 17:13
  143:15
essence 87:17
et 4:6 73:9 143:4 144:2
etc 2:5 4:6 144:2
ethanol 131:1
ethically 32:8
ethics 133:12,13,16
ETOL 131:5
evaluation 129:22
  130:2
even 112:3 115:2
ever 29:21 33:23 60:8
  62:5 69:2 104:9,10
  130:21
every 9:13 13:6 61:9
  101:23 102:3 115:4
  137:16

everything 18:12,15,20
  20:7 48:17 70:15
Everywhere 51:17,19
evidence 4:4 29:6
  62:18 66:5,7 94:7
  132:5
exam 22:19 69:22 87:9
  87:14,23 91:18 92:25
  111:17
examination 4:22
  79:24 84:16 86:15,25
  87:7 88:5 91:25
  92:21 94:4 109:18
  112:11 117:15
example 35:3,5 41:5
  92:24
except 98:24
Excluding 8:3
Excuse 39:18 99:25
  112:20 114:15
executive 21:13 31:6
  53:16
executives 21:8,15 31:7
  55:11 59:8 133:14
exemplar 62:8
exemplars 62:7
exhibit 5:21 6:1,6,18
  7:9,21,24 8:18,24 9:4
  9:8,17 11:15,19 12:7
  12:11,13,15 14:13,19
  19:7,20 21:24 24:2
  24:12,12,14,16,22,25
  26:4,8 84:10 89:12
  89:18 113:9,14
  114:15,21 118:22
  119:3,11,13,19 122:3
  122:7
exhibits 20:13,14 67:13
  140:9
expect 32:10 81:18,22
experience 31:8 68:25
  111:5,9 112:18,21
  138:19 139:9,10,17
expert 1:17 4:1 5:2
  13:2,7 15:4,14 31:1
  31:15,21 32:1,11
  33:1,7 47:25 51:10
  52:18 53:9 95:25
  96:7,12 107:24 108:2
  108:3,4 121:12
  132:14 133:21
experts 11:12
expired 41:20
expires 140:22 141:14
explain 5:11 34:18
  81:10 94:24 110:3
explained 81:11

explanation 34:22
  95:14
express 28:22 29:1
  117:22 118:2
expressing 14:17
extra 96:4
extremely 137:18
extremities 73:23 74:2
  104:21 105:8 130:4
eye 75:10
eyes 69:24 70:21,22,23
  71:21,22 72:1,5,22
  73:2 79:25 86:3
  114:6
e-mail 16:4 17:23,25
  18:3

——————— F ———————

F 1:24
FACHE 143:2
facility 22:21 49:14,17
  111:18
fact 36:22 94:1
factor 49:2,4
factors 37:4,8
facts 144:21
fail 49:7
failed 36:7 37:5 47:15
  134:11
failing 37:18
Fain 141:14
fair 25:7,12,22 26:5,13
  26:16 29:15 33:6,14
  34:15 38:2 45:8,15
  46:10 47:6 53:8
  54:21,25 70:18,19
  71:9,14 84:4 86:10
  86:19 95:2,11 102:25
  103:5 105:18 107:5
  121:1,13
fall 136:5
false 45:20 57:17 87:2
  133:17
familiar 110:19,25
  113:1
familiarize 111:5
far 43:7,10 45:4 58:15
  66:20,24 72:13 73:6
  97:2
February 6:6,19 7:11
  13:17 14:5 22:4
  25:21,24
feel 25:6,21 28:7,16
  30:13 42:17 43:15
fell 97:19
fellow 21:6,7,10 31:7
fellows 68:24

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

58:12,19,23 59:2
61:10,19 62:2,5,12
65:23 94:13 95:4,8,9
95:20 96:13 97:24
102:21,22 103:10
105:23 106:15,18
109:22 111:9 113:16
114:22 115:3 116:24
116:25 118:5 119:8
119:23 120:14,21
121:18,24 122:16
125:17 138:19
hospitals 4:3 31:8 56:1
56:8,11 61:8 112:18
112:21
hospital's 52:2 97:19
121:3
hour 8:9 108:15,20,21
hours 8:7 16:23 19:21
143:8
hurry 63:23
hurts 128:5

_____ I _____
idea 84:22
IDENTIFICATION
3:10
identify 87:24 115:8
illegal 52:7
immediate 23:8 114:12
impact 135:10,18
136:19
importance 136:25
important 87:19
improper 133:10
inaction 34:21 50:3,10
inactions 48:24 99:13
inadequate 60:14
74:11
inadvertently 57:22
inappropriate 30:16
132:23
Inc 141:14
income 12:25
incorrect 57:9 86:11,16
indeed 35:8
index 63:15,25 87:20
111:20 139:1,6
indicate 23:16 75:14
76:1,6 80:9,11,14

91:24 92:1 93:14
134:24 135:1 136:25
137:21
indicated 19:10 60:21
71:20 73:19 75:6
87:5,20 90:11 92:3
94:2 104:15 112:3
114:2,13 135:4
137:17
indicates 134:25
137:21
indication 15:21 79:16
80:25 81:2,7 83:4,20
84:1 92:20,23 94:3,6
112:6 134:19 137:16
information 7:13 9:25
23:15 24:8 26:23
32:17,21 67:19 92:4
97:4 98:21,22 107:15
113:24 114:9 115:7,9
117:2 119:16
initial 22:20 23:2,7,12
107:10 113:20
114:11
injured 48:19
injuries 38:7 39:3
43:15,19 44:2,25
45:5 46:7,15 47:5
49:8 50:4,7,11,13,17
51:1 52:11,15 101:18
103:1 105:20 131:25
139:15
injury 38:21 43:9 44:6
45:24 47:16 87:20,21
87:25 99:8,11,14,18
101:24 102:3,5,17,20
107:7 111:19,20
112:7 123:9,15 124:8
124:8,9 125:1 126:2
126:5,17,20 132:21
132:25 133:9 134:2
136:11 137:18,25
138:7,15 139:1,5
Insurance 141:14
intended 133:3
intent 23:2 113:6 119:7
119:22 120:1 122:9
intentional 133:24
interaction 98:23
interested 142:14
interrogatories 19:2
intoxicated 103:21
104:5,7
intoxication 103:25
invalid 132:17
invitations 61:13
invoices 19:5

involuntary 79:14
involved 104:6 135:9
involvement 29:17
Island 40:14,21
issue 33:19 47:12 48:11
122:3
issues 104:1 120:15
122:21

_____ J _____
J 54:14
jail 104:16,22 105:7
JAIME 2:7
Jamaica 40:9
James 104:10
January 1:13 4:14 6:15
10:7,23,25 11:6,7
17:5,7 57:14 107:13
107:14 141:10
142:16 143:1,5
Jason 2:2 17:14
JCAHO 3:20 9:2,11
14:18 22:23 54:14
112:13,22 113:8
132:10,15
Jeremy 110:14
JOAO 1:8
job 42:1
Joint 9:2 11:20 22:21
23:10,21 67:20,22
68:1,8 110:15 111:2
judge 89:11 97:24
June 6:12,23 8:24 9:7
13:14 15:25 22:3
24:11,21 25:6,21
57:3 107:11
jury 89:11
just 5:16 7:6 9:22 12:3
13:22 18:22 22:9
25:2 27:12 29:20
30:1 31:14 34:23
35:4 61:25 62:22
63:5,24 64:10,22
66:24 67:4,14 69:10
71:7 76:19 77:4
86:14 88:13 101:9
106:4 109:16 112:22
113:11 114:14 117:9
117:10,18 119:25
123:5 129:16 135:13

_____ K _____
keep 67:13
keeping 85:12
kept 56:24 117:6
kind 23:1 31:25 113:19
kinds 54:11

know 5:14 7:17 8:10
13:25 31:10 58:15
59:24 60:2,17 62:25
65:11 66:17 68:1,18
77:13,18 80:4,6,23
81:7 90:7 96:4 99:1,4
100:13,20 101:9,10
102:3,8 103:17 104:5
106:5 108:24 120:17
123:13 124:5 134:7
134:12
knowledge 29:16 38:24
39:1 96:22
known 49:12

_____ L _____
L 124:22,23
laceration 123:11
126:20 129:24
136:22 138:5
lack 99:19
Laredo 96:4,13
Large 4:12 140:21
141:6,13
last 9:3 11:14 13:1
22:10 57:24 58:6
63:24 84:11 109:4
119:18 120:20 122:2
Lauderdale 1:12 4:13
140:17 143:16
law 24:7,10 25:5,18
30:11 51:14 52:5
55:22 100:21 101:14
lawful 4:2,20
Lawrence 4:10 54:15
141:4 142:4,19
143:15
lawsuit 5:3 13:7 44:3
lawsuits 13:11
lawyer 57:12,13 100:17
117:5
lawyers 16:15 106:20
layman 34:19 104:4
105:15
lead 82:14 136:22
least 31:5 84:6
left 75:10 76:1,6,10,12
77:14,25 78:19,24
79:11 88:9 89:4
118:13
left-hand 90:22
leg 78:24,25 79:1,11,13
124:19
legal 58:11 101:5,8
106:12
legs 79:5 116:22 118:15
129:11

length 123:23 138:11
LEON 1:3 4:5 144:2
less 123:24
let 8:15 10:1 12:3,3
13:13,13 22:2 24:16
27:12 30:18,25 33:22
36:9 41:7 63:24
65:11,11 69:12 73:10
75:8 76:7 83:6 106:5
116:18 125:20
letter 3:13,14 6:6,9,12
6:15,19 7:11,13 8:23
8:25 9:8 143:12
letters 60:6
let's 7:20 10:10 41:25
42:13 56:1,8 65:15
78:5 120:19 137:23
level 21:10 69:23 85:21
114:4 115:18
liability 37:13
license 20:21,23,24
41:19 57:1 58:20
licensed 56:19
licenses 20:20
licensing 57:23,25
life 40:4,24 41:9,13,16
87:25
light 111:19
like 9:24 18:10 23:24
30:15 31:2,16 32:2
32:11 33:1,7 60:7
65:7 86:14 89:5
113:1 124:17,18
likely 104:6 138:15
limb 87:25
LINE 144:3
lines 114:23 115:11,24
115:25
list 3:19 11:15 20:16
96:3
listen 124:15
listening 25:25 79:10
126:4
listing 8:20
literally 89:8
literature 14:22
litigation 15:4 95:23
little 27:13 29:20 53:4
76:21 123:24 134:24
live 45:25
locate 63:20 64:8
Lomax 6:7,13,16 7:12
9:8
long 8:10 39:25 40:14
40:21 41:19 46:20
88:1 109:25 130:6
longer 35:10 63:21

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-601[
(800) 969-3027

**number** 5:21 6:1,6,18
7:9,21,24 8:18,24 9:4
9:9,17 11:15,19 12:7
12:8,13,15,25 13:6
14:8,11,15,21 15:1
18:5,24 19:4,23 20:3
20:11 21:2,18 24:2
24:12,16,22,25 26:4
37:4 58:23 63:8
84:11 89:12,18 109:4
113:9,15 119:4,19
123:11 143:8
**numbness** 122:23
128:24,24 130:16
131:10,19 132:7
136:24 137:2,20
**nurse** 43:4 47:9 48:17
54:20 82:3,7,24
88:25 94:23 98:3,9
98:14,18,23 99:5
100:24 118:10
**nurses** 44:9 47:4,15
72:14,23 73:5,12
74:1,24 78:2,8,15,18
78:23 80:15 86:17,19
87:7,11,13 88:4
107:7 114:3 115:13
**nurse's** 54:3 97:9,11,24
99:1
**nursing** 20:21 43:1,21
49:21 51:3 52:8 53:9
53:11,14 54:6 55:24
56:1,5 69:21 73:20
87:8,22 98:3

---

**O**

**O** 54:14 90:25 91:1,3,5
124:23,23
**oath** 4:21 92:15 141:1
**obey** 124:16
**Obeys** 124:13
**Object** 61:17 81:20
87:15 88:21 89:7
92:22 117:16 129:13
138:9
**Objection** 25:9 29:3,9
31:3 32:4 33:4,9 35:1
35:6 36:2,14,20 37:1
37:10,20,24 38:4,8
39:5 47:8 49:10,25
50:5 53:13 57:18
67:3 69:9 71:5 74:6
81:16 83:11 92:9,12
93:2 94:5 101:19
102:2,7 103:3,6,14
105:14,21 106:25
117:8 121:15 124:3

127:16,20,24 128:6,9
128:13,22 129:2
131:21 132:2 134:3,6
134:10,16 135:2,7,12
136:3,8,13 138:16
**objective** 129:6,9,9,12
129:14,14,20 130:2
130:24 131:1,5 132:6
**obstinate** 50:19
**obviously** 134:23
136:21
**occur** 138:20
**occurred** 32:7 34:12
44:6 49:3 126:10
**off** 40:22 53:18 65:7
91:17 125:12
**office** 9:15 53:17 143:8
**officer** 36:23 53:15,16
134:9
**officer's** 110:7
**offices** 17:13
**official** 141:9
**often** 139:14
**Oh** 8:13 15:13 36:6
40:16 41:21 48:16
71:12
**okay** 5:24 6:12 7:15
9:22 10:1 11:10,14
11:19 12:22 14:4,7
15:25 16:21,25 22:11
23:23 24:20 25:19
29:15,20 30:1,5
32:10 33:14 34:13
38:10 39:10,22 41:16
41:18 44:18,21,24
45:4,13 47:24 50:13
55:3,12 56:2 62:13
63:11 65:13,15 66:9
67:13,16 69:6,12,13
76:18,20 83:24 89:14
89:18 90:6 105:4,6
109:11 113:8,14,21
113:25 114:21
118:19 119:18 120:3
120:11,19 121:5
122:6 135:15 139:24
**once** 46:9 83:5 88:7
117:1
**one** 10:19,22 14:6
15:16 16:9 18:5,17
22:5 23:18,23 27:2
31:4 32:8 35:19
36:17 38:2 40:1,2
44:16 50:23 51:4,7
57:20 61:21,22 67:6
67:8 70:2,11 71:25
75:6 76:24 77:10

86:14 89:9 92:4,19
96:9 98:15 101:9
104:7 105:2,2 106:6
112:22 119:13
120:11 123:15 125:12
126:24 127:1,3
130:25 131:2,17
135:8 138:23 140:5
**ones** 15:18 69:6
**oneself** 35:13
**only** 27:13 62:18 72:5
72:23 74:11 95:22
98:15 129:24 136:21
138:7
**onto** 50:10
**opened** 56:22
**operating** 31:8 53:15
**opinion** 12:17 26:16
32:7 34:10,17 49:11
67:21 70:20 77:17
78:5 102:5,9,12,13
102:14,17,18,19,23
105:15 121:8 135:11
**opinions** 14:17 25:7,22
26:5,24 27:9,14,17
27:19 28:4,13,22
29:2 30:6,21 33:2
56:5 59:16 67:17
68:10,16,19,22 69:1
69:8 98:8 103:22,24
112:17
**opportunity** 82:25
94:24
**order** 47:24 98:15,18
121:1 140:6
**ordering** 140:3 143:11
**orders** 124:15
**organization** 15:3,11
15:14 59:5,7
**organizations** 22:23
54:16 109:7 110:16
111:3
**orientation** 72:21,25
85:21 128:11 131:4
**oriented** 118:12 125:18
130:25
**original** 22:6 143:10
**originals** 19:9
**osteopath** 42:22
**other** 9:7 12:1 13:11,20
14:12,18 15:2 16:4
17:19,20 20:8,23,23
21:16 23:18,19,23
26:22 27:5 30:7 32:9
36:17 37:9,9,13,23
42:8 50:6 54:6,16
59:12 62:7 68:24

70:3 71:25 73:7,13
73:14 74:5,8,20,20
79:3 81:22 94:23
98:14 101:9 108:22
109:1 111:4 113:6
116:22 120:5,5,8,8
128:23 131:17
**others** 28:9 92:10
136:23
**out** 19:19 23:6 32:19
32:23 41:13,16 42:9
45:19 51:9 52:17
53:9 57:4 60:25
61:13 62:8 79:22
86:11 94:9 122:17
123:5 130:15
**outcome** 46:23 47:10
48:20 49:1 81:3
100:6
**over** 13:1 35:11 44:18
45:25 66:10 70:4
96:18 109:4
**Overview** 114:24
115:24
**own** 43:24 46:6 52:1
62:3,4
**o'clock** 1:14 4:15

---

**P**

**P** 2:2
**page** 22:10,24 23:3,20
37:2,16,17 64:20,21
75:20 84:12 87:5
89:14,16,21,23,25
90:15 92:4 112:22
113:2,3,11,12,14,15
114:13,14,15,16,21
118:21,23 119:3,4,9
119:10,11,14,18,19
119:20 122:3,8 123:9
126:18 127:5,8
137:23 144:3
**pages** 119:13
**paid** 16:23 19:10,11,13
19:15
**pan** 52:3
**papers** 12:16,20
**paragraph** 22:10 23:19
23:20 84:11 119:25
120:3,6,7,9,10 122:9
122:12 127:9,11
129:5,8
**paralysis** 83:2
**part** 43:14,18 44:2,6
52:7 62:23 71:2 72:3
72:18 73:13 78:14
79:12,25 80:1 83:17

85:3,9,13 86:1,7
87:16 94:22 96:4
115:10 116:12
118:21,23 122:8,12
122:20 127:18
**partial** 69:22 71:4,6
72:15 84:18 92:23
**participate** 94:16
**particular** 111:19
**parties** 142:12
**parts** 84:6 114:18
116:5
**party** 15:2 28:23
**party's** 142:13
**pass** 112:8
**past** 11:16
**patience** 109:12
**patient** 10:6 22:25 23:4
23:6,14,15,16 47:18
47:20 48:19,25 49:13
49:19,23,24 51:21,24
52:2 54:21 63:16,17
65:25 72:9,21,22
78:18,23 79:5,7 80:8
80:10 81:3,14,18
82:11,18,20 83:8,19
83:24,25 91:19 98:12
98:16,18 99:6 112:6
113:3,18 115:8,21
118:10 119:8 122:15
122:17,22 124:7
125:21 126:9 127:25
129:18 130:15,19,25
132:12,16 136:19
137:17
**patients** 22:23 43:23
54:25 119:23 139:14
139:15
**patient's** 23:1,8 43:9
47:3,11 50:13 72:5
75:10 76:12,16 78:3
79:1 83:2 85:6,20
86:3 90:8 112:5
113:19 114:3,6,12
115:4,17 116:12
120:13 124:11 125:3
130:23 131:4,9,18
132:7 134:2 139:1
**paying** 108:18
**pays** 108:13
**PC** 2:1,3
**peace** 110:6
**PEARL** 78:14
**peer** 68:15 94:13,14,16
94:19,22
**Pembroke** 143:3
**pen** 7:6

**REDIRECT 3:2**
112:11
**reduce** 88:1
**refer** 43:19 65:3 130:21
**reference** 17:11
**referred** 65:2,4
**referring** 11:20 16:17
16:19 112:23 119:5
123:13 130:13 138:5
**reflect** 69:19
**reflected** 8:23 9:7
19:25
**reflecting** 16:4
**refresh** 20:12
**regard** 43:22,24 67:11
69:23 73:8 110:20
111:13
**regarding** 7:13 23:3
**Regardless** 24:10 25:5
**regards** 22:12
**Regional** 1:8 10:14
22:14,18 27:14 59:22
60:12,17 62:15,25
63:19 64:23 65:23
66:6,18,20 69:17
70:7,16 71:10,18
73:12 74:17 90:12
91:23 101:25 102:22
103:2,10 110:10,23
111:15,22 117:7,20
119:6,15,21
**Regional's** 84:5 98:5
**Registered** 141:12
142:4,19
**related** 99:19 100:6
**relates** 122:13
**relating** 95:23
**relative** 142:10,12
**relatively** 112:6
**relevant** 136:11,16
**relied** 14:16
**rely** 27:8
**remember** 65:1 92:14
135:22
**remention** 115:15
**removed** 67:12
**repeat** 61:23 83:5
114:19
**report** 3:13,22 6:23 7:3
10:19 11:11 13:6,14
13:17 22:4,4,16 24:6
24:6,11,21 25:2,6,13
30:6,10,13,20 35:22
36:3 37:11 57:3 67:1
67:4,12,23 68:1,4,5
86:13 104:23,24
107:11 110:7,13,14

121:7 122:24 124:7
124:10,11 142:6
**reporter** 63:13 64:7
140:2,6 141:12 142:5
142:19
**reports** 11:2,7 13:20
14:3 22:3 25:22 26:8
26:19 27:6,8 32:14
66:25 87:1 97:19,21
101:12 104:15
110:12 135:13,14,15
135:20
**representative** 94:19
**represented** 70:3,9
**request** 25:16,18
**requested** 63:13 64:7
**requests** 19:2
**require** 35:14,16 58:22
133:16
**required** 23:1 79:3,6
113:19 115:9
**requirement** 55:16
59:13
**requirements** 55:7,9,17
58:11,12,19 63:18
**requires** 24:7
**reserve** 109:14 112:9
121:6 139:22,25
**resources** 49:17
**respect** 20:5
**respects** 45:11
**respiratory** 92:24
**respond** 40:23 128:7
**response** 124:12
125:13
**responsive** 48:3
**rest** 112:9
**restrained** 138:14
**restraints** 139:16
**restroom** 65:12
**resulting** 38:22
**resume** 3:15 7:1,16,18
7:19,21 12:8 42:2,5
57:2,13,14,25 58:1,2
58:3,5,8
**return** 143:12
**returned** 105:12
**review** 15:3 27:16 32:6
34:7 90:14,16 93:12
93:18,22 94:13,14,16
94:22 108:23 109:2
121:7 139:13
**reviewed** 3:17 8:21 9:7
10:3,12,15 11:25
18:7,12,15,18,19,21
18:25 21:19 67:19
68:8,15 98:4 110:4,6

116:15 138:23
**reviewing** 9:23 84:15
86:23 92:5 111:7
**revised** 7:12
**ride** 41:10
**riding** 40:11
**right** 5:9,22,25 6:5,7,13
7:7,16,20 8:22 10:4
11:24 14:9 16:9,10
24:25 25:16 31:24
32:12,15 37:6 45:11
45:21 48:1,4,8,9,12
50:16 52:21 53:12,24
54:9,12 56:16,17,18
60:9,15 61:8,16,22
62:17 64:1,2 65:23
67:8,13 68:11,14
70:2 72:25 74:9,14
74:19 75:10,23 76:1
76:2,6,15,16 77:8,11
77:14,25 78:12,15,19
78:24 79:10 80:20
82:5 85:15,25 86:16
87:12 88:9 89:5
90:15,23 91:2,15,20
94:20,25 95:2,12,17
98:10,11 100:11,18
100:21,24 101:5
103:5,22 107:25
113:1 114:23 116:1,8
117:9 118:13 120:25
121:3,6,14,16 122:4
122:6 123:2 124:2,18
124:19,19 125:7,8,13
125:14,18,25 126:13
126:21,24 127:3,13
128:2,5,18,21 129:1
129:11,12,18 130:10
130:19 131:6,22
132:18 133:3,7,24
137:9,12,14 138:8
139:19,21
**road** 102:15 143:2
**room** 27:22 52:2 65:21
74:17
**Ross** 1:19 3:3 4:1,18
5:1,2,16 22:2 30:25
55:6 65:3,18 77:4
84:4 89:10 97:8
109:11,16,20 112:13
138:14 141:7 143:2
144:2
**route** 130:19
**RPR** 143:15

_____

**S**

**S** 3:8 80:4,21 124:22,23

**safety** 135:13
**same** 25:2 37:17 61:19
92:4 99:22 105:3
**Sample** 3:23
**saw** 30:14 35:22 85:1,2
86:2 88:12 89:3 94:7
116:16
**saying** 43:7 49:4 69:4
69:15,18 71:17 76:21
82:3 87:6 88:4 92:17
117:6 123:3
**says** 15:11 16:22 76:10
76:14 77:24 80:3
84:14 88:18 90:14,16
90:18,22 91:3,8,12
92:24 93:18 113:17
125:20 126:2,16,23
127:1,13 128:16
129:16 130:15,24
137:24,24
**scale** 124:22,23,24
125:3,4
**scene** 128:16
**schedule** 143:8
**school** 44:13 51:3,6
**schooling** 39:16
**schools** 39:23
**science** 39:11
**Sciences** 107:20
**scientific** 69:7,11
138:21
**scoring** 113:5 125:9
**se** 33:19 48:22 69:10
**seal** 141:9
**second** 22:7 37:2 67:23
68:1 78:5 106:6
113:14 114:21 120:7
120:9 127:5,8
**Sections** 11:22,23
**see** 7:20 10:10 11:5
14:2 27:5 30:20 34:8
34:9 35:13 36:3 37:8
37:22 49:23 55:20
62:15 67:4 68:25
70:15 79:13,22 85:4
85:17,19 88:8,15,17
90:11,14,16,25 97:18
112:22 116:2 119:12
120:17 126:2,3,16,23
127:1,6 129:5,8,20
130:4,7
**seeing** 65:1 85:13
138:19
**seeking** 120:14
**seen** 5:22 10:18,22 11:3
11:10 14:5,8 38:14
60:3

**sell** 61:8
**send** 108:10
**sensation** 83:1,2
**sense** 34:4,5 35:17,18
87:18
**sent** 6:2 49:14 60:8
**sentence** 86:11 120:20
122:2
**sentences** 86:13
**separate** 70:7
**service** 23:5 119:8,23
122:16
**services** 4:12 13:2 19:6
19:15 40:9 110:17
143:15
**set** 54:8
**setting** 27:9
**seven** 75:7
**severity** 126:3,17,24,25
137:24 138:2
**SHEET** 144:1
**shoot** 35:9
**shot** 35:15
**shoulder** 66:10
**show** 23:9 57:23
113:15 132:20,24
133:8
**showed** 84:6
**showing** 57:14 75:22
**shows** 70:23 76:20
82:16 92:25
**side** 90:22
**sign** 81:8,9 143:6,10,11
**signature** 140:15 143:6
143:11,18 144:23
**signs** 53:18 81:13,18,23
82:4
**similar** 68:25 86:13,25
**simply** 71:22
**since** 41:19 109:7 110:2
118:1
**sir** 7:10 8:19 24:15,19
29:24 75:24 80:13
91:2 96:11,14 114:17
126:8 127:9
**sit** 12:3 60:11
**site** 63:21
**situation** 79:12
**six** 37:2 108:25
**size** 73:21 74:1,12,24
75:2,4,5,9,13,23
76:14,19 77:14,18
79:4 114:4 115:19
116:16,19 123:21
**skills** 73:8 78:21 116:17
**slash** 126:3,17
**Slater** 11:11 110:14

together 12:5
told 24:7 51:12 103:16
  107:17 118:19
top 75:20 87:5 89:12
  89:21 113:2
Torres 36:23
total 10:11 62:22
  121:23
towards 127:10
township 40:22
training 42:21,23 43:1
  44:7 50:25
transcript 140:3
  143:21
transcription 142:8
transform 113:23
trauma 43:25 49:12
  60:18 61:4 62:15
  63:1,14,16,25 65:19
  66:6,15,21 67:1,11
  129:6
treat 41:10,15
treated 52:12,13
treating 51:23,23 52:14
  139:11,12
treatment 105:13
  110:17,21 111:13
  132:12,16
trial 11:18 109:15
tried 134:9
Troy 141:14
true 57:15 84:17,20
  118:16,20 134:23
  142:8 144:22
truly 143:13
trust 92:10
truth 13:25
truthful 26:9 32:14
  47:25
truthfully 32:12
try 134:14
trying 13:24 34:18
  44:12 48:5 63:20
  71:7
Tuesday 143:5
turn 45:19 102:15
two 8:7 16:6 17:16,19
  22:3 26:19 27:6,8
  29:7,12 114:23
  115:11 119:13
type 42:23,25 58:20
  79:11 87:21 111:20
  123:8 124:8,9,25
  126:3,17,20,20
  135:10 136:19
types 42:14 54:16
typewritten 14:12

typo 23:11 57:20
typographical 27:2

U

U 91:1
ultimate 38:10,13
  46:23
ultimately 47:10
Um-hum 27:24 100:10
unclear 30:19 31:11,13
  34:14 36:10 44:1
  46:25 55:13,25 73:11
  74:23 75:3 86:21
  121:10 127:22
under 69:20 71:14,21
  76:10 77:19,21 85:2
  85:3 86:18 88:7
  90:18 91:11 92:2,3
  92:24,25 93:12,17,22
  114:23 115:3,24
  116:7 117:3,19 119:7
  119:22 120:1 122:9
  124:8,9 126:5 127:9
  129:6,8 130:9,12,24
  137:5,8,10,11 144:21
underlying 38:24
underneath 23:10
understand 5:6 34:20
  34:22 44:20,23 47:24
  48:6,15,16 53:5 56:9
  65:22,25 70:1,3,6
  93:6,10 101:4
understanding 24:4
  36:16 38:20 61:9
  91:16 101:16,22
unfair 97:24
uninterpreted 114:1
unit 36:6,8
United 1:1 4:7
Unquote 23:2
unrestrained 136:14
  136:17 138:14,17
  139:14,15
until 19:16 46:16 47:2
  67:23,25 107:11
  109:15
untrue 84:23
update 22:15 58:4
updated 3:15 7:16,17
  7:21 25:13 58:2
uro 93:14,17 94:2
urological 94:3
use 4:4 57:19 65:12
  67:18,22 100:2,8,9
  100:14,14 101:11
  105:24 106:14,17,21
  132:19,23 133:10

139:16
used 26:21 56:19 68:4
  124:24 133:8
uses 132:15
using 69:7 100:3
  101:13 119:15,20
  132:17
usually 55:18 82:19
  94:19 98:13

V

v 143:4 144:2
validating 130:22
Valley 1:7,7 2:5 10:14
  22:13,18 27:14 59:21
  60:12,17 62:14,25
  63:18 64:23 65:23
  66:6,18,20 69:16
  70:6,16 71:10,18
  73:12 74:16 84:5
  90:12 91:23 98:4
  101:25 102:22 103:2
  103:10 110:10,22
  111:15,22 117:7,20
  119:5,15,21
vehicle 37:9 49:16
  130:10 134:4,15
  136:15,18 139:11
vehicles 135:9
verbal 124:15 125:13
verbalize 127:25
verbalized 127:17
very 9:3 49:14 68:1
  71:6 127:10 134:24
  134:24 136:20
  143:13
via 143:21
victim 49:16
violated 98:9
violating 52:4
violation 51:13
visibly 79:22
visit 10:15
vitae 57:16
vitals 63:17
Vivian 6:10
voluntary 59:5,10
Volunteer 40:5,20
Volunteering 40:13,15
  40:16
vs 1:5

W

W 124:23
wait 76:4,4

waive 143:6,11,18
walk 5:25
walked 52:1
want 5:16,18 13:25
  14:4 15:12 19:21
  24:18 45:18,23 47:25
  48:3 50:19 57:19
  61:10,21,21 62:8
  63:22 67:6 88:25
  90:5 94:9 95:16 97:7
  105:2 119:12 121:12
  123:2,5,6 140:9,10
wasn't 123:16 126:4
way 27:13 29:20 32:8
  37:3 41:7 45:20 50:3
  50:11 61:6 68:21
  69:5 74:15 76:22,24
  77:5,11 78:10 79:20
  95:2,4,8,11 101:9
  103:20 129:3 131:17
  133:2 134:1 135:23
ways 77:8
weakness 83:1
wedding 61:13
week 40:18
well 7:18 23:14,20
  33:22 35:22 38:14
  49:14 52:14 64:9
  65:5 67:20,22 68:2,2
  68:13 71:3,7 72:1
  73:10 75:8 76:7 85:4
  88:7,19 99:21 102:4
  110:15 111:7 113:4,5
  115:2 117:4 122:24
  123:16 124:10 125:6
  134:20 136:20 137:2
  137:23 140:5
went 11:18 30:10 40:22
  41:5,6 67:20 68:8
were 11:20 15:13,22
  17:1 24:7 27:13
  31:19 32:22 35:8,8
  40:2,7,7,11,12,20
  41:4 42:4 45:1 46:16
  50:7 52:15 57:6,7,9
  57:15,20 58:10 59:4
  62:11 73:2 75:12,17
  84:7,15,18,21 86:4
  86:24 90:9 92:15,16
  94:2 95:25 96:12
  112:5 116:17 117:10
  117:14,19 118:11,12
  118:14 130:13 138:5
weren't 52:14 117:20
West 109:22
we'll 5:24,25 67:13
  112:9 139:22

we're 5:12,14 46:20
  53:4 56:25 89:10
we've 12:1,11,13 14:13
  14:19 18:14 19:6
  20:8 21:19,23 24:11
  24:21 62:3,9 74:5
  113:9
while 65:8 68:11,12
  104:21 105:6
white 48:17
whole 88:22 104:19
WILLIAM 2:4
windshield 136:20
wise 123:20,23
wish 55:20 143:11
witness 3:2 4:2,19 5:2
  13:2 15:4,14 20:4,5
  21:23 47:25 64:5,19
  93:4 95:25 106:2
  107:24 108:2 112:9
  121:1,12 133:21
  140:15 141:7,9
word 57:20 80:23
  101:5 117:6
words 26:22 42:8 50:6
  54:6 59:12 62:7
  81:23 98:14 113:6
  128:23
work 15:8 54:4,6 62:2
  105:23 106:18 111:5
  133:20
worked 40:21,25 62:5
works 16:14
worse 50:7
worst 128:20
wouldn't 5:13 8:14
  39:2 52:5 88:25
  94:10 97:23 98:7
wound 52:4 138:6
write 28:1 63:24 80:16
  89:13,15,17 137:4,5
  137:20
writing 25:3 68:11
  89:19 90:3
written 12:16 37:11
  86:18
wrote 23:9 71:15,16,22
  136:24

X

X 1:10 3:1,8,23 88:20
  89:6,17,25
X'd 116:17
X's 73:9 74:25 75:1,7
  85:1 88:12 89:3,9
  116:16

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027



© 2001 Lippincott Williams & Wilkins, Inc.

| Volume 26(24S) Supplement | 15 December 2001 | pp S31-S37 |

# Nonoperative Management of Acute Spinal Cord Injury
[Nonoperative Management of Acute Spinal Cord Injury]

## Nockels, Russ P. MD

From the Department of Neurological Surgery, Laboratory for Spinal Cord Injury Repair, Loyola University Medical Center, Loyola Stritch School of Medicine, Maywood, Illinois.
Device status category: 1.
Conflict of interest category: 12.
*Address reprint requests to*
*Russ P. Nockels, MD*
*Department of Neurological Surgery*
*Loyola University Medical Center*
*2160 South First Avenue*
*Maywood, IL 60153*
*E-mail: rnockel@lumc.edu*

## Outline

- Abstract
    - Injury Detection
    - Primary and Secondary Tissue Damage
    - Preservation of the Patient's Life
        - Management at the Scene
        - Respiratory Support
        - Hemodynamic Management
        - Spinal Shock
    - Optimizing Return of Neurologic Function
        - Immobilization
        - Neurologic Examination
        - Pharmacologic Treatment
        - Radiographic Evaluation
        - Nonoperative Stabilization
        - Timing
        - Technique of Traction
        - Postacute Support
        - Nutritional and Metabolic Response to Injury
        - Prevention of Secondary Complications
        - Deep Vein Thrombosis/Pulmonary Embolism
        - Integument Breakdown.
- Conclusion
- Key Points
- References



**Graphics**

- Table 1
- Table 2

---

# Abstract⏎

Advances in transport, imaging, and stabilization of the injured patient have made the topic of acute management more important than ever in patients with spinal cord injury. Optimal treatment requires prompt delivery of care for life-threatening respiratory and hemodynamic events in a manner that will not further damage the unstable spinal elements. The application of these treatment principles broadly to injured patients is necessitated by our inability to determine, on an acute basis, those patients who might eventually recover meaningful neurologic function from those who will not. Therefore, nonoperative management of acute spinal cord injury requires consideration of two goals: 1) the preservation of the patient's life and 2) optimizing the potential for recovery of neurologic function. The first consideration requires not only an understanding of the novel systemic consequences of spinal cord injury but also of treatments directed at combating them. The second includes the application of resuscitative measures without further damaging the spinal cord and, in some cases, the use of traction and immobilization. In the past these efforts were aimed primarily at increasing the survival rate of patients with spinal cord injury, whereas current care may also play an important role in the eventual recovery of neurologic function. Despite many advances in our understanding of the basic mechanisms of paralysis, clinical management of spinal cord injury remains a significant challenge and one that requires continuing efforts at improving acute and postacute therapies.

---

Spinal cord injury (SCI) is perhaps the worst of all survivable traumas. The devastating results of SCI in terms of loss of independence, psychologic impact, and socioeconomic costs are staggering. [16,42] Although repair of the injured spinal cord remains a topic confined to the laboratory bench, effective clinical tools are available to assist in the proper understanding of spinal injury syndromes and the application of effective and safe resuscitative measures. It is important to remember that the ultimate outcome of SCI depends on the quantity and quality of axons surviving at the level of injury. [17,33,58]

## Injury Detection⏎

The initial management of the patient with acute SCI is to resuscitate if necessary and to do no further harm. Therefore, all patients with acute SCI first benefit from the health care professional who makes the diagnosis. Few traumatic illnesses are as vulnerable to acute aggravation caused by improper management, or with more tragic results, than SCI. Emergency personnel can often make the diagnosis in the field, but the index of suspicion required to preserve function in incompletely injured patients who are comatose or unresponsive requires a special sensitivity. All patients with head injuries, especially those with frontal or facial trauma, should be suspect for occult SCI. Additionally, patients with multiple long bone and pelvic fractures, or focal neurologic deficit, have an elevated risk of spinal column injury. [4] A penetrating injury in the proximity of the spine may injure the spinal cord by direct force or by percussive effect, which may result in a spinal cord contusion or hematoma. Any fall from a significant height (above 10

ft) or high-speed injury mechanism (faster than 35 mile/h) may be sufficient to cause SCI, especially in the older population in whom degenerative spinal stenosis may be superimposed. 4 Therefore, protection of spinal alignment in patients unable to cooperate with an examination after a trauma is required, followed by a systematic approach to detection.

## Primary and Secondary Tissue Damage

To better understand the anatomic and physiologic aftermath of SCI, investigators have developed the concept that various types of tissue damage result. 19,48 So-called "primary" injury refers specifically to the mechanical disruption of axons as a result of stretch or laceration. Treatment to reverse neurologic deficit resulting from this form of injury does not currently exist. However, spinal cords from injured patients rarely demonstrate complete severance, and experimentally injured spinal cords appeared to have little tissue damage immediately after injury despite severe neurologic deficit. This leads to the concept that a progressive form, or "secondary" injury, was present. Multiple mechanisms have been postulated as responsible for secondary injury including "free radical" formation, 28 uncontrolled calcium influx, 39,64 ischemia, and lipid peroxidation. 10,26,27 More recently, investigators have noted more protracted forms of injury that are controlled on the molecular level. For example, programmed cell death (apoptosis) is widespread and expressed for weeks to months after the injury. 40 Whether these later events are destructive or beneficial remains a matter of intense study. It is however likely that multiple pathologic events are responsible for the progressive form of spinal tissue damage after SCI.

## Preservation of the Patient's Life
## Management at the Scene

Prehospital management should seek primarily to protect the patient from further injury and to provide early resuscitation and transport to an appropriate acute care facility. Regional trauma centers that provide a multidisciplinary team of health care professionals should be the destination of choice. The ABCs, as outlined by the Advanced Trauma Life Support System, should be implemented as a primary resuscitative effort. 1 Acute respiratory and hemodynamic failure causes the most deaths soon after SCI. 32 Optimal management is based on an understanding of the causes of these physiologic changes and timely intervention. Specific measures are outlined below:

## Respiratory Support

Oxygenation is important in attenuating further ischemic injury to the damaged spinal cord. Upper cervical injuries (occurring rostral to C3) are often the cause of acute fatality because of loss of respiratory drive. With some function above C4, individuals can generate tidal volumes of 100 to 150 mL because of excursion of the scalene and sternocleidomastoid muscles. Intubation at the scene is best performed with a blind nasoendotracheal intubation, or with manual inline traction and oral intubation. 1,36 Fiber optic confirmation, if available, is also helpful. Hyperextension of the neck during intubation is to be avoided because it may create further spinal stenosis because of displacement of injured spinal segments and/or infolding of the ligamentum flavum.

Overall, respiratory complications closely correspond to the severity of SCI and systemic shock. Pulmonary toilet and airway management is important in preventing subacute failure of oxygenation because of the buildup of respiratory secretions and frank infection. Therefore, early

and aggressive airway and pulmonary management with proactive treatment of pre-existing pulmonary disease and aggressive pulmonary toilet and early mobilization are commonly used. Despite these measures, however, up to 62% of SCI patients have serious respiratory morbidity. [37]

## Hemodynamic Management⊔

Acute SCI can cause a syndrome analogous to a "functional sympathectomy" in lesions above T6, resulting from the interruption of cardiac accelerator nerves. One should think of the heart after acute SCI as having decreased chronotropic and ionotropic capacity. The normal tachycardia in response to hypotension may be blocked. A "relative" hypovolemia exists because of an increase in venous capacitance. Intravenous replacement therapy should maintain systolic blood pressure between 80 and 100 mm Hg. [60] Treatment of bradycardia (<40 beats/min) should begin with atropine 0.2 to 0.5 mg intravenously. In patients more than 50 years of age, Swan-Ganz catheterization and volume resuscitation to a pulmonary capillary wedge pressure of 18 mm Hg and a target systolic arterial pressure between 80 and 100 mm Hg should be used. [56,60] In younger patients volume expansion is used to increase intravascular supply and stroke volume, but one should be careful not to overcompensate. If hypotension persists, an intravenous [beta]-agonist (dopamine 5–15 $\mu g \cdot kg^{-1} \cdot min^{-1}$ or dobutamine 3–20 $\mu g \cdot kg^{-1} \cdot min^{-1}$) is used. The use of primary [alpha]-agonists (such as levoephedrine) should be avoided because it will increase cardiac afterload and impair cardiac output.

Penetrating SCI presents a far greater challenge with regard to neurologic recovery. When all patients with myelopathy after penetrating injuries are considered, only 22% have incomplete injuries, with a nearly 10-fold male:female ratio. In the series by Zipnick et al, [66] only 26% of patients with cervical penetrating injuries had hypotension, prompting concern in the hypotensive patients that blood loss rather than relative hypovolemia may be responsible. [66]

## Spinal Shock⊔

In common use spinal shock is a misnomer. Among spinal professionals use of the term may well have two meanings. The first describes an acute neurologic syndrome indicating complete paralysis, loss of sensation, absent reflexes, and muscular hypotonia at the time of initial evaluation. This occurs in approximately 50% of patients. The etiologies behind this phenomenon include primary axonal and cellular dysfunction, ionic conduction block caused by sodium/potassium shifts, maintenance of spinal inhibitory pathways, hyperpolarization of caudal motor neurons, and loss of fusimotor drive in caudal spinal segments. [38] These mechanisms evolve for a period of hours to days and may mask the functioning of less injured spinal tissue. According to Stauffer, there is a 99% likelihood of spinal shock, as defined, resolving in 24 hours. [57]

The concept of "spinal shock" has recently been criticized for a number of important reasons. Importantly, there is no universal agreement on the time at which the phase of spinal shock ends. Furthermore, the state of spinal shock has no prognostic significance. Ko et al provided a careful review of reflex recovery after SCI. [34] They reported the emergence of the delayed plantar response as the first recovered reflex, usually within a few days of injury, followed by the bulbocavernosum and cremasteric reflex. [34] Deep tendon reflexes recovered by 1 to 2 weeks. Less than 8% of patients had no reflexes on the day of injury, and reflex recovery did not follow a caudal–rostral pattern. The delayed plantar response has prognostic significance when delayed for >=48 hours, indicating poor potential for ambulation.

The concept of "spinal shock" as it relates to neurologic dysfunction should therefore be reconsidered. The initial neurologic examination in patients with SCI should not be used as a basis to determine the extent of primary spinal cord damage, nor should it overshadow the potential that residual neurologic function may be spontaneously obtained once these local events return toward normal. Unfortunately, the degree of neurologic impairment early after injury is often a major determinant affecting the aggressiveness of treating physicians. Given that no clear-cut data exist to support aggressive surgical care or traction to reduce spinal malalignment, the decision-making process is only further complicated by the notion of spinal shock. The potential exists that these local microenvironmental events can mask residual postinjury neurologic function. Therefore, even patients who appear complete on presentation may obtain some degree of functional recovery once these pathochemical events have subsided. Furthermore, careful examination of the pattern and detail of reflex recovery may prove much more valuable with regard to prognosis for ambulation.

The second entity reflects the loss of vasomotor tone as a consequence of the injury and refers primarily to systemic hypotension, or "shock." As mentioned previously, this may not be caused by volume loss but rather the loss of sympathetic vasomotor tone and should be treated with volume resuscitation and [beta]-agonists. [60]

## Optimizing Return of Neurologic Function

The number and quality of surviving axons traversing the injured site play an essential role in recovery after SCI. Therefore, an important concept in the acute phase of management is the prevention of reinjury to the spinal cord. Nearly all of the pathochemical processes thought to play an important role in secondary injury are made worse by hypoxemia, hypotension, and fever. [28,65] Therefore, those treatments outlined above play no small role in the patient's eventual neurologic outcome. Stabilization of abnormal motion segments itself plays an important role in preventing reinjury. In addition, it is widely held that early realignment of the spine and therefore indirect decompression of the spinal canal may also optimize functional recovery. These issues are discussed below.

### Immobilization

For SCI to have occurred, either deformation of the spinal elements must have compressed the cord or ongoing compression by displaced spinal elements must be present. Because neither scenario can be confirmed before imaging studies, the patient must be treated as if any significant movement of the spine will cause further damage. Physiologic load is avoided by transporting the patient in recumbency with every attempt to immobilize the spine. These measures include the application of a rigid collar and backboard. In patients with pre-existing spinal deformities such as ankylosing spondylitis, *in situ* positioning with sandbags placed around the neck and shoulders and taping of the patient to a backboard are used to prevent movement. Any movement of the patient is performed with strict adherence to spinal alignment. At no time should the association of the head and torso be altered from the straight position. Special considerations are indicated for children less than 7 years of age, when the greater relative volume of the cranium to the torso may cause excessive flexion of the cervical spine unless the above measures are used in conjunction with a behind the shoulder pad. [31]

### Neurologic Examination

A comprehensive neurologic examination is key to the next phase of treatment. First, patients

are examined for signs of obvious head, torso, and abdominal injuries. The back is inspected with the patient turned in a lateral decubitus position, at all times maintaining strict spinal precautions. Facial, scalp, and torso injuries are helpful in determining force vectors applied to the spine during injury.

Voluntary movements of the arms and legs are grossly tested and measured (Table 1). Careful inspection of muscle groups is then carried out to determine graded strength from proximal to distal. During the sensory examination any areas of reported numbness are noted and tested first, and the borders of returning sensation are noted both proximal and distal to the insensate area. A fractured wooden swab stick can identify areas of pin sensation without injuring the skin.

## Table 1.  Spinal Level of Injury and Key Muscle Groups

| Level | Muscle Group(s) |
|-------|-----------------|
| C5 | Elbow flexors (biceps, brachialis) |
| C6 | Wrist extensors (extensors carpi radialis longus and brevis) |
| C7 | Elbow extensors (triceps) |
| C8 | Finger flexors (flexor digitorum profundus) to middle finger |
| T1 | Small finger abductor (abductor digiti minimi) |
| L2 | Hip flexors (iliopsoas) |
| L3 | Knee extensors (quadriceps) |
| L4 | Ankle dorsiflexors (tibialis anterior) |
| L5 | Long toe extensors (extensor hallucis longus) |
| S1 | Ankle plantarflexors (gastrocnemius, soleus) |

Table 1. Spinal Level of Injury and Key Muscle Groups

The American Spinal Injury Association scale (Table 2) is useful in recording myotomal and dermatomal function. 1 It is important to record the time of these findings, along with any retained zones of sensation, such as sacral sparing. The presence of any neurologic function below the level of injury has important prognostic significance and should be noted. The initial examination is compared with subsequent examinations at determined, frequent intervals so that further deterioration can be easily determined. Progressive loss of neurologic function requires explanation because untreated deterioration carries a very poor prognosis. Sacral sparing is commonly the first indication of incompleteness of injury in a patient with a dense deficit; therefore, special attention is paid to the presence or absence of a bulbocavernosus reflex, the quality of sphincter tone, and voluntary anal contractions.

## Table 2. American Spinal Injury Association Impairment Scale

| Grade | Category | Description |
|-------|----------|-------------|
| A | Complete | No sensory or motor function is preserved in the sacral segments S4–S5 |
| B | Incomplete | Sensory but not motor function is preserved below the neurologic level and extends through the sacral segments S4–S5 |
| C | Incomplete | Motor function is preserved below the neurologic level, and the majority of key muscles below the neurologic level have a muscle grade <3 |
| D | Incomplete | Motor function is preserved below the neurologic level, and the majority of key muscles below the neurologic level have a muscle grade ≥3 |
| E | Normal | Sensory and motor function are normal |

Table 2. American Spinal Injury Association Impairment Scale

### Pharmacologic Treatment[±]

Secondary tissue damage after SCI is time dependent and therefore potentially treatable. This has led to the testing of a number of pharmacologic agents in the past 15 years. Glucocorticoids were used with some success in treating experimental SCI, leading to clinical trials of methylprednisolone in 1990 (National Acute Spinal Cord Injury Studies [NASCIS] II) [6] and 1997 NASCIS III). [7,8] These studies have concluded that treatment with methylprednisolone (loading dose 30 mg/kg intravenously) is beneficial when given within 8 hours of injury. When the loading dose is given within 3 hours of injury, 24 hours duration of 5.4 mg/kg intravenous drip is required. Patients treated with the loading dose between 3 and 8 hours are given the identical drip, but for 48 hours duration. Patients do not benefit from methylprednisolone if given >8 hours after the injury. Patients with penetrating SCI do not benefit from treatment with methylprednisolone. [30] Other agents, such as the potent lipid peroxidation inhibitor Lazaroid (Upjohn, Kalamazoo) [8] and ganglioside [22] have also undergone clinical evaluation, but their benefit if any is less clear.

Much debate surrounds the risk/benefit ratio of methylprednisolone use in SCI, prompting some North American centers to re-evaluate its use in acute SCI. [9,47] However, it remains the standard treatment in the United States while the debate continues. Given the modest improvement in functional recovery reported by the NASCIS trials, the optimal pharmacologic treatment of acute SCI clearly remains elusive. In general, however, the decision to treat with methylprednisolone should be made coincident with the diagnosis of SCI, and the treatment

should be initiated as soon as possible.

## Radiographic Evaluation[1]

Emergency radiologic evaluation of the patient's spine requires coordination with other aspects of the patient's condition. [13] Although proper identification of a patient's spinal fractures is a priority, the efficient gathering of this information in the presence of ongoing resuscitative measures should be the goal. The lateral cervical radiograph obtained in the emergency room is still widely used as the minimum requirement in assessing the patient's spine. [21,41,53,54] Complete spine films are performed at the earliest convenient time point, remembering that 10% to 15% of patients with a spinal fracture have a noncontiguous spinal fracture. Visualization of C1 through the top of T1 is necessary to avoid missed injuries. Plain films of the cervical spine demonstrating widening of the interspinous process distance, rotation of the facet joints, or more than 11° of segmental angulation, as compared with other contiguous segments, or 3.5 mm of translation are considered unstable. [55,62,63] Dynamic images, *i.e.*, flexion–extension studies, are reserved for patients who are neurologically intact but have significant axial pain. Spiral computed tomography may enhance views of transitional areas, such as the occipitocervical and cervicothoracic junction. [2,3]

Emergent magnetic resonance imaging (MRI) scanning is indicated in unexplained neurologic deficit, discordant skeletal and neurologic levels of injury, and worsening neurologic status. Spinal cord injury lesions enhanced with gadolinium A T2-weighted sagittal image may demonstrate posterior ligamentous injury. After an extensive review, Fehlings et al determined that in patients with cervical SCI, the midsagittal T1- and T2-weighted images provided the most quantifiable and reliable assessment of spinal cord compression. [20]

Computed tomography myelography is used when MRI is not feasible. Axial computed tomography studies provide a great deal of useful information with regard to the location and degree of bony injury and the percentage of canal compromise. Canal compromise is best determined by two-dimensional reconstructions of the spinal computed tomography and MRI if available. Injury to the vertebral arteries may result from fractures within the foramen transversarium or from sufficient spinal distraction to cause endothelial stretch injury. Patients with altered mental status and cervical spine injury are suspect for vertebral arterial injury and may require vertebral angiography. Recently, MRI has been useful as a noninvasive means of determining vertebral artery patency. [23] Thoracolumbar fractures are typically classified as unstable based on significant vertebral displacement, highly comminuted burst fracture, or significant posterior ligamentous injury. Spinal cord injury without radiographic abnormality is a syndrome caused by ligamentous failure and spinal deformation, which reduces to normal alignment after injury. This phenomenon occurs in children and in some adults at the atlantoaxial junction. [49]

## Nonoperative Stabilization[1]

Stabilization of the injured spinal segment and decompression of the spinal canal, either through axial traction or realignment, are typical goals of nonoperative treatments. Stability requires that the spine tolerate physiologic loads without progressive pain, deformity, or neurologic deficit. Thoracolumbar injuries limited to compression of the anterior column alone or burst fractures with less than 50% canal compromise and stable posterior ligamentous structures can often be treated in a rigid brace. Thoracic and thoracolumbar fracture dislocations are treated with open reduction and instrumentation. Cervical dislocations and severe compression fractures are frequently considered for reduction by means of axial traction. Patients

with pre-existing spinal deformity, such as ankylosing spondylitis, are not candidates for axial traction. The timing and technique of traction are discussed below.

### Timing. ⊥⌐

Traction may be initiated as soon as a malalignment is noted on emergency lateral cervical radiography. Reports of patients improving in neurologic function after the application of cervical traction have been noted. 11,24,31 However, clinical studies do not conclusively indicate that "early" traction and reduction of malalignment improve recovery, partly because of a lack of agreement on what constitutes "early." Preclinical studies of experimental SCI indicate a window of 6 to 8 hours during which decompression can reverse neurologic deficits. 14,15 Whereas few would argue against patients with cervical dislocations undergoing reduction of the deformity, the real controversy exists regarding the significance of traction with regard to neurologic recovery. 24,46 Most experimental and clinical studies of SCI suggest that the primary force of impact is the major determinant of neurologic outcome.

Some controversy exists about whether patients are better served by MRI determination of disc herniation before active reduction of deformity through traction. 50,51 Disc herniation as a result of cervical traction in facet dislocations is either extremely rare or without significant risk of neurologic injury. 18,24,59 Realignment of the spine with carefully applied axial traction remains a core belief of many spinal surgeons. In the absence of strong evidence that pretraction MRI significantly alters treatment, traction and realignment are typically applied at the earliest opportunity.

### Technique of Traction. ⊥⌐

Stabilization of the injured spine requires elimination of pathologic movement at the injury site and may prevent progressive spinal cord damage caused by repeated contusion or compression. In cervical fractures and severe ligamentous injuries, traction is routinely used as an interim measure while the injury is investigated, although rigid collar support might be effective in patients undergoing radiographic evaluation who do not have significant post-traumatic deformities. The application of modern halo rings may be preferable to tongs because they allow conversion to a halo jacket, and most are able to be secured to an operating room table if surgery becomes necessary. However, halo ring application is more complicated than tongs. In children conventional Gardner–Wells tongs are not appropriate and pediatric halos should be used. Muscle relaxation and sedation assist in reduction of deformities, but the patient should be awake sufficiently to report neurologic changes and cooperate with the examination.

The two key components of cervical traction are the amount of weight and the direction of applied force, creating a classic force vector. Facet dislocations often require a slight degree of flexion to help mobilize "locked" facets. After reduction the direction of traction force is opposed to the vector of injury. For example, flexion injuries are placed in slight extension. An improvement of 12% has been observed in cadaveric cervical spinal canals after traction. 12 Overdistraction may occur through the use of inappropriately large weights to reduce unstable spinal elements, especially in distraction-type injuries. This may worsen spinal cord damage and risks injury to the vertebral arteries. An injury that is not reducible by this method usually requires open reduction, although some surgeons use traction up to one half the patient's body weight (approximately 100 lb). Thoracolumbar fractures and dislocations are treated with open reduction and stabilization.

The role of spinal traction and early reduction of displaced spinal elements remains a mainstay of treatment, although scientific support is lacking. In some centers early recognition of the injury and definitive operative stabilization are the preferred course of treatment in patients who are hemodynamically stable. Early reduction of spinal malalignment and mobilization of the patient are the usual goals of early hospital-based management and, in combination with more chronic measures outlined below, usually represent the best treatment for patients who do not require surgery.

## Postacute Support.↵

After stabilization of the patient's hemodynamic and respiratory status, along with proper immobilization of the injured spine, the focus shifts to improving the patient's overall condition and avoiding long-term complications, such as metabolic imbalance, deep vein thrombosis (DVT)/pulmonary embolism, and cutaneous ulcers.

## Nutritional and Metabolic Response to Injury.↵

Most patients lose weight (mean 10%) in the first 4 weeks after SCI. Nitrogen excretion parallels changes in body weight. Calcium excretion is increased for 3 weeks after injury and usually plateaus at 150% above baseline. 29,52 It is important to remember that metabolic losses and nutritional needs are far in excess of immobilized patients, and appropriate caloric and metabolic support should be calculated and met as intravenous feedings or enteral support is feasible. 5,52

## Prevention of Secondary Complications↵
## Deep Vein Thrombosis/Pulmonary Embolism.↵

Deep venous thrombosis and pulmonary emboli are commonly associated with the patient with SCI, in as much as 80% and 10% of patients, respectively. 25 The severity of the motor deficit and a thoracic level of injury increase the risk of thromboembolic complications. 25,35,45 Early application of prophylactic measures, such as sequential compression devices of the lower extremities, increases endothelial production of protocycline-like substances and seems to lower the incidence of DVT from 49% to 72% to 5%. 45 Other measures to prevent DVT are more controversial, although it is the general opinion that early mobilization and heparin therapy (5000 subcutaneously twice a day) may be beneficial. Because the incidence of DVT peaks at 7–8 days, heparin therapy may be delayed a few days after injury. Anticoagulation therapy is continued until the patient is ambulatory or for 3 months postinjury in nonambulatory patients. 25,45 The incidence of pulmonary embolism is difficult to determine because minor emboli may be difficult to detect, as hemoptysis from suctioning and chest wall anesthesia masking pleuritic pain. A sudden deterioration of blood gases (hypoxia and hypocapnia) in a patient with SCI is the most common sign of pulmonary embolism. Fatal pulmonary emboli caused by saddle emboli are far more difficult to prevent than DVT or nonfatal pulmonary embolism.

## Integument Breakdown.↵

Skin breakdown has its roots in the early management of patients and occurs in 28% to 85% of patients. 43,44 For example, patients retained on a rigid backboard for more than 8 hours may suffer cutaneous ill effects. Decubiti are best prevented through a combination of frequent patient turning (every 2 hours initially), padding of pressure points, nutritional support, and identification and treatment of cutaneous erosions in the early stages.

Other systemic effects of SCI include ileus, treated with nasogastric suction and Reglan as needed. Bladder atonia is managed with an indwelling catheter for 1 to 2 weeks, followed by intermittent straight catheterization every 4 to 6 hours. Aggressive management of fevers not only assists in the rapid treatment of common infections, such as pneumonia and urinary tract infections, but may also play a role in preventing further damage to the spinal tissue in the acute stage. Because of the loss of autonomic regulation, it is important to maintain the patient in a temperature-regulated environment. Joint immobility from disuse may be caused by heterotopic bone formation and may respond to early mobilization and range of movement exercises.

## Conclusion

Skilled nonoperative acute management is an important facet of care surrounding any patient with SCI. With proper resuscitative techniques, the special combination of life-saving measures and protection of the spinal cord from further injury can be achieved. Efficient diagnosis, neurologic vigilance, and spinal traction and immobilization, when indicated, are important measures. Prevention of more chronic complications, such as infection, thromboembolism, and decubiti, are initiated in the acute management stage. The combination of these efforts will help patients with SCI reach their highest levels of recovery.

## Key Points
* Proper evaluation and injury detection are key to capturing patients with SCI.
* Preservation of the patient's life requires an understanding of the unique hemodynamic and respiratory features of acute SCI.
* Treatments that promote neurologic recovery continue to evolve but seem to involve rapid steroid treatment and spinal decompression and stabilization.

## References

1. American College of Surgeons. Advanced Trauma Life Support, 5th ed. Chicago: American College of Surgeons, 1995. [Context Link]

2. Berne JD, Velmahos GC, El-Tawil Q, et al. Value of complete cervical helical computed tomographic scanning in identifying cervical spine injury in the unevaluable blunt trauma patient with multiple injuries: A prospective study. J Trauma 1999; 47: 896–902; discussion 902–3. Ovid Full Text Bibliographic Links [Context Link]

3. Bicknell JM, Fielder K. Unrecognized incomplete cervical spinal cord injury: Review of nine new and 28 previously reported cases. Am J Emerg Med 1992; 10: 336–43. Bibliographic Links [Context Link]

4. Blackmore C, Emerson SS, Mann FA, et al. Cervical spine imaging in patients with trauma: Determination of fracture risk to optimize use. Radiology 1999; 211: 759–65. Bibliographic Links [Context Link]

5. Blissitt PA. Nutrition in acute spinal cord injury. Crit Care Nurs Clin North Am 1990; 2: 375–84. Bibliographic Links [Context Link]

6. Bracken MB, Shephard MJ, Collins WF, et al. A randomized, controlled trial of methylprednisolone or naloxone in the treatment of acute spinal-cord injury: Results of the Second National Acute Spinal Injury Study. N Engl J Med 1990; 322: 1405–11. Bibliographic Links [Context Link]

7. Bracken MB, Shephard MJ, Holford TR, et al. Administration of methylprednisolone for 24 or 48 hours or tirilazad mesylate for 48 hours in the treatment of acute spinal cord injury: Results of the Third National Acute Spinal Cord Injury Randomized Controlled Trial. National Acute Spinal Cord Injury Study. JAMA 1997; 277: 1597–604. Ovid Full Text Bibliographic Links [Context Link]

8. Bracken MB, Shephard MJ, Holford TR, et al. Methylprednisolone or tirilazad mesylate administration after acute spinal cord injury: 1-year follow up. Results of the Third National Acute Spinal Cord Injury randomized controlled trial.

J Neurosurg 1998; 89: 699–706. Bibliographic Links [Context Link]

9. Bracken MB, Aldrich EF, Herr DL, et al. Clinical measurement, statistical analysis, and risk-benefit: Controversies from trials of spinal injury. J Trauma 2000; 48: 558–61. Ovid Full Text Bibliographic Links [Context Link]

10. Braughler JM, Hall ED. Involvement of lipid peroxidation in CNS injury. J Neurotrauma 1992; 9 (suppl 1): 1–7. [Context Link]

11. Brunette DD, Rockswold GL. Neurologic recovery following rapid spinal realignment for complete cervical spinal cord injury. J Trauma 1987; 27: 445–7. Bibliographic Links [Context Link]

12. Ching RP, Watson NA, Carter JW, et al. The effect of post-injury spinal position on canal occlusion in a cervical spine burst fracture model. Spine 1997; 22: 1710–5. Ovid Full Text Bibliographic Links [Context Link]

13. Cohn SM, Lyle WG, Linden CH, et al. Exclusion of cervical spine injury: A prospective study. J Trauma 1991; 31: 570–4. Bibliographic Links [Context Link]

14. Delamarter RB, Sherman JE, Carr JB. Volvo Award in experimental studies. Cauda equina syndrome: Neurologic recovery following immediate, early, or late decompression. Spine 1991; 16: 1022–9. Bibliographic Links [Context Link]

15. Delamarter RB, Sherman J, Carr JB. Pathophysiology of spinal cord injury: Recovery after immediate and delayed decompression. J Bone Joint Surg Am 1995; 77: 1042–9. Ovid Full Text Bibliographic Links [Context Link]

16. DeVivo MJ. Causes, costs of spinal cord injury in the United States. Spinal Cord 1997; 35: 809–13. Bibliographic Links [Context Link]

17. Dobkin BH. Functional rewiring of brain and spinal cord after injury: The three Rs of neural repair and neurological rehabilitation. Curr Opin Neurol 2000; 13: 655–9. Ovid Full Text Bibliographic Links [Context Link]

18. Eismont FJ, Arena MJ, Green BA. Extrusion of an intervertebral disc associated with traumatic subluxation or dislocation of cervical facets: Case report. J Bone Joint Surg Am 1991; 73: 1555–60. Bibliographic Links [Context Link]

19. Faden AI. Experimental neurobiology of central nervous system trauma. Crit Rev Neurobiol 1993; 7: 175–86. Bibliographic Links [Context Link]

20. Fehlings MG, Rao SC, Tator CH, et al. The optimal radiologic method for assessing spinal canal compromise, cord compression in patients with cervical spinal cord injury. Spine 1999; 24: 605–13. Ovid Full Text Bibliographic Links [Context Link]

21. Gehweiler JA Jr, Clark WM, Schaaf RE, et al. Cervical spine trauma: The common combined conditions. Radiology 1979; 130: 77–86. Bibliographic Links [Context Link]

22. Geisler FH, Dorsey FC, Coleman WP. Recovery of motor function after spinal-cord injury: A randomized, placebo-controlled trial with GM-1 ganglioside. N Engl J Med 1991; 324: 1829–38. Bibliographic Links [Context Link]

23. Giacobetti FB, Vaccaro AR, Bos-Giacobetti MA, et al. Vertebral artery occlusion associated with cervical spine trauma: A prospective analysis. Spine 1997; 22: 188–92. Ovid Full Text Bibliographic Links [Context Link]

24. Grant GA, Mirza SK, Chapman JR, et al. Risk of early closed reduction in cervical spine subluxation injuries. J Neurosurg 1999; 90 (suppl): 13–8. Bibliographic Links [Context Link]

25. Green D. Prevention of thromboembolism after spinal cord injury. Semin Thromb Hemost 1991; 17: 347–50. Bibliographic Links [Context Link]

26. Hall ED. Effects of the 21-aminosteroid U74006F on posttraumatic spinal cord ischemia in cats. J Neurosurg 1988; 68: 462–5. Bibliographic Links [Context Link]

27. Hall ED. Inhibition of lipid peroxidation in central nervous system trauma and ischemia. J Neurol Sci 1995; 134

(suppl): 79–83. Bibliographic Links [Context Link]

28. Hall ED, Braughler JM. Free radicals in CNS injury. Res Publ Assoc Res Nerv Ment Dis 1993; 71: 81–105. Bibliographic Links [Context Link]

29. Halm MA. Elimination concerns with acute spinal cord trauma: Assessment and nursing interventions. Crit Care Nurs Clin North Am 1990; 2: 385–98. Bibliographic Links [Context Link]

30. Heary RF, Vaccaro AR, Mesa JJ, et al. Steroids and gunshot wounds to the spine. Neurosurgery 1997; 41: 576–83; discussion 583–4. Ovid Full Text Bibliographic Links [Context Link]

31. Herzenberg JE, Hensinger RN, Dedrick DK, et al. Emergency transport and positioning of young children who have an injury of the cervical spine: The standard backboard may be hazardous. J Bone Joint Surg Am 1989; 71: 15–22. [Context Link]

32. Jackson AB, Groomes TE. Incidence of respiratory complications following spinal cord injury. Arch Phys Med Rehabil 1994; 75: 270–5. Bibliographic Links [Context Link]

33. Kakulas BA. A review of the neuropathology of human spinal cord injury with emphasis on special features. J Spinal Cord Med 1999; 22: 119–24. Bibliographic Links [Context Link]

34. Ko HY, Ditunno JF Jr, Graziani V, et al. The pattern of reflex recovery during spinal shock. Spinal Cord 1999; 37: 402–9. Bibliographic Links [Context Link]

35. Kulkarni JR, Burt AA, Tromans AT, et al. Prophylactic low dose heparin anticoagulant therapy in patients with spinal cord injuries: A retrospective study. Paraplegia 1992; 30: 169–72. Bibliographic Links [Context Link]

36. Lam A. Spinal cord injury: Management. Curr Opin Anesth 1992; 5: 632–9. [Context Link]

37. Lam AM. Acute spinal cord injury: Monitoring and anaesthetic implications. Can J Anaesth 1991; 38 (4 Pt 2):60–73. [Context Link]

38. Leis AA, Kronenberg MF, Stetkarova I, et al. Spinal motoneuron excitability after acute spinal cord injury in humans. Neurology 1996; 47: 231–7. Ovid Full Text Bibliographic Links [Context Link]

39. Leybaert L, de Hemptinne A. Changes of intracellular free calcium following mechanical injury in a spinal cord slice preparation. Exp Brain Res 1996; 112: 392–402. Bibliographic Links [Context Link]

40. Lu J, Ashwell KW, Waite P. Advances in secondary spinal cord injury: Role of apoptosis. Spine 2000; 25: 1859–66. Ovid Full Text Bibliographic Links [Context Link]

41. MacDonald RL, Schwartz ML, Mirich D, et al. Diagnosis of cervical spine injury in motor vehicle crash victims: How many X-rays are enough? J Trauma 1990; 30: 392–7. Bibliographic Links [Context Link]

42. Marshall LF. Epidemiology, cost of central nervous system injury. Clin Neurosurg 2000; 46: 105–12. Bibliographic Links [Context Link]

43. Mawson AR, Biundo JJ Jr, Neville P, et al. Risk factors for early occurring pressure ulcers following spinal cord injury. Am J Phys Med Rehabil 1988; 67: 123–7. Bibliographic Links [Context Link]

44. Mawson AR, Siddiqui FH, Biundo JJ. Enhancing host resistance to pressure ulcers: A new approach to prevention. Prev Med 1993; 22: 433–50. Bibliographic Links [Context Link]

45. Merli GJ. Management of deep vein thrombosis in spinal cord injury. Chest 1992; 102 (suppl 6): 652–7. [Context Link]

46. Murphy MJ, Ogden JA, Southwick WO. Spinal stabilization in acute spinal injuries. Surg Clin North Am 1980; 60: 1035–47. Bibliographic Links [Context Link]

47. Nesathurai S. Steroids, spinal cord injury: Revisiting the NASCIS 2 and NASCIS 3 trials. J Trauma 1998; 45: 1088–93. [Context Link]

48. Nockels R, Young W. Pharmacologic strategies in the treatment of experimental spinal cord injury. J Neurotrauma 1992; 9 (suppl 1): 211–7. [Context Link]

49. Pang D, Wilberger JE. Spinal cord injury without radiographic abnormalities in children. J Neurosurg 1982; 57: 114–29. Bibliographic Links [Context Link]

50. Pratt ES, Green DA, Spengler DM. Herniated intervertebral discs associated with unstable spinal injuries. Spine 1990; 15: 662–6. Bibliographic Links [Context Link]

51. Robertson PA, Ryan MD. Neurological deterioration after reduction of cervical subluxation: Mechanical compression by disc tissue. J Bone Joint Surg Br 1992; 74: 224–7. Bibliographic Links [Context Link]

52. Rodriguez DJ, Benzel EC, Clevenger FW. The metabolic response to spinal cord injury. Spinal Cord 1997; 35: 599–604. Bibliographic Links [Context Link]

53. Ross SE, Schwab CW, David ET, et al. Clearing the cervical spine: Initial radiologic evaluation. J Trauma 1987; 27: 1055–60. [Context Link]

54. Scher AT. Cervical spinal cord injury without evidence of fracture or dislocation: An assessment of the radiological features. S Afr Med J 1976; 50: 962–5. Bibliographic Links [Context Link]

55. Scher AT. Unilateral locked facet in cervical spine injuries. AJR Am J Roentgenol 1977; 129: 45–8. Bibliographic Links [Context Link]

56. Schwenker D. Cardiovascular considerations in the critical care phase. Crit Care Nurs Clin North Am 1990; 2: 363–7. Bibliographic Links [Context Link]

57. Stauffer ES. Neurologic recovery following injuries to the cervical spinal cord and nerve roots. Spine 1984; 9: 532–4. Bibliographic Links [Context Link]

58. Tuszynski M, Edgerton R, Dobkin B. Recovery of locomotion after experimental spinal cord injury: Axonal regeneration or modulation of intrinsic spinal cord walking circuitry? J Spinal Cord Med 1999; 22: 143. Bibliographic Links [Context Link]

59. Vaccaro AR, Falatyn SP, Flanders AE, et al. Magnetic resonance evaluation of the intervertebral disc, spinal ligaments, and spinal cord before and after closed traction reduction of cervical spine dislocations. Spine 1999; 24: 1210–7. Ovid Full Text Bibliographic Links [Context Link]

60. Walleck CA. Neurologic considerations in the critical care phase. Crit Care Nurs Clin North Am 1990; 2: 357–61. Bibliographic Links [Context Link]

61. Weingarden SI. Deep venous thrombosis in spinal cord injury: Overview of the problem. Chest 1992; 102 (suppl 6): 636–9.

62. White AA 3rd, Panjabi MM. Update on the evaluation of instability of the lower cervical spine. Instr Course Lect 1987; 36: 513–20. Bibliographic Links [Context Link]

63. Woodring JH, Goldstein SJ. Fractures of the articular processes of the cervical spine. AJR Am J Roentgenol 1982; 139: 341–4. Bibliographic Links [Context Link]

64. Young W. Role of calcium in central nervous system injuries. J Neurotrauma 1992; 9 (suppl 1): 9–25. [Context Link]

65. Young W. Secondary injury mechanisms in acute spinal cord injury. J Emerg Med 1993; 11 (suppl 1): 13–22. Bibliographic Links [Context Link]

*66. Zipnick RI, Scalea TM, Trooskin SZ, et al. Hemodynamic responses to penetrating spinal cord injuries. J Trauma 1993; 35: 578–82; discussion 582–3.* <u>Bibliographic Links</u> [<u>Context Link</u>]

Key Words: spinal cord injury; spine trauma; acute treatment; nonoperative management; traction; resuscitation]**Spine 2001;26:S31–S37**

*Accession Number: 00007632-200112151-00007*

*Copyright (c) 2000-2004 <u>Ovid Technologies, Inc.</u>*
Version: rel9.1.0, SourceID 1.9087.1.155

1. **Diencephalic herniation** is caused by a medial supratentorial lesion that forces the diencephalon through the tentorial notch. This process produces (1) Cheyne-Stokes respirations, (2) small but reactive pupils, (3) paresis of upward gaze, and (4) altered mental status.

2. **Uncal herniation** is caused by a lateral supratentorial lesion that forces the medial portion of the temporal lobe (the uncus) through the tentorial notch. The subsequent pressure on midbrain structures results in (1) alteration of consciousness; (2) a dilated, unreactive pupil ipsilateral to the mass, from third nerve compression; and (3) hemiparesis on either side. Eye movements need not be impaired.

3. **Tonsillar herniation** results from pressure that forces the inferior portion of the cerebellum through the foramen magnum, compressing the medulla. This produces (1) altered consciousness and (2) respiratory irregularity or apnea.

II. **Treatment.** Neurosurgical intervention is the definitive treatment for some focal causes of acutely increased ICP, including epidural, subdural, and cerebellar hematomas. Surgery is not helpful for increased ICP following ischemic, anoxic, or metabolic brain necrosis. When increased ICP occurs in a neurosurgical candidate, forced hyperventilation and osmotic agents should be used to delay advancing herniation.

A. **Hyperventilation** using endotracheal intubation produces a fall in arterial $PCO_2$, thereby reducing cerebral blood flow. Arterial $PCO_2$ should be maintained at approximately 25 mm Hg. Peak effect occurs within 2–30 minutes.

B. **Osmotic agents** including mannitol, glycerol, and urea, rely on an intact blood-brain barrier to draw water from the brain tissue compartment into the systemic vascular compartment. Mannitol should be infused IV as a 20% solution (100 g of mannitol in 500 ml of 5% D/W) over 10–20 minutes with a of 1–2 g/kg and maintenance of 50–300 mg/kg IV q6h. A filter should be used to exclude crystals. Therapeutic effect begins within minutes, reaches a in about 90 minutes, and decreases over hours. These agents are generally only in anticipation of more definitive treatment (e.g., evacuation of coma). Complications of osmotic use include a rebound increase in ICP, intravascular volume expansion with pulmonary edema or congestive failure, and osmotic diuresis with subsequent dehydration and hyperna-

C. **Corticosteroids** are effective in reducing the edema surrounding a tumor and may also be beneficial for trauma and abscess. Dexamethasone, 10 mg IV (or IM), is given initially, followed by 4 mg IV, IM, or PO q6h. Edema due to anoxia and infarction does not respond to steroids. (For a full discussion, see R. A. Fishman, *Cerebrospinal Fluid in Diseases of the Nervous System.* Philadelphia: Saunders, 1981.)

## Head Injury

Treatment and prognosis of head trauma depend on the extent and pathologic type of brain injury. Clinical assessment must define the cause, type, location, and extent of injury.

I. **Assessment**
A. **History** should document the temporal course of all symptoms, particularly loss of consciousness. Amnesia is related to the severity of the blow and should diminish over time as the patient recovers.

B. **General physical examination** must establish whether the vital signs are stable and if other significant trauma is present.

C. **Neurologic examination** should be repeated at frequent intervals to document any progression of neurologic deficits.

D. **Radiography** of the skull (posteroanterior, Towne's, and lateral views) and cervical spine (open-mouth posteroanterior and lateral views, inclusive of C1–C7) should be obtained.

E. **Computed tomography** of the head should be obtained in patients with focal

neurologic deficits, open or penetrating head trauma, depressed or comminuted skull fractures, or mental status abnormalities that are prolonged, progressive, or of delayed onset, or suggestive of focal lesion (e.g., aphasia).

II. **Prognosis and treatment** depends on the type of injury.

A. **Concussion** is a transient abnormality of consciousness (e.g., loss of consciousness, confusion, agitation, amnesia) without focal motor or sensory impairment. Close observation for at least 24 hours, with or without hospitalization, is necessary because onset of intracranial hemorrhage and edema can be delayed.

B. **Contusion** can be diagnosed by inspection (e.g., penetrating injury), CT scan, and clinical inference from focal neurologic signs. Patients with contusion should be observed in the hospital until stable (at least 24 hours). Prophylactic anticonvulsant therapy is suggested to minimize the risk of early (the first week) posttraumatic seizures, but long-term efficacy depends on individual risk factors (*N. Engl. J. Med.* 323:497, 1990).

C. **Skull fractures** require neurosurgical assessment. Basilar skull fractures are diagnosed more reliably by the presence of otorrhea, rhinorrhea, hematotympanum, postauricular hematoma, and periorbital hematoma than by radiographs.

D. **Epidural hematoma** is typically caused by a skull fracture crossing the path of a meningeal artery or vein. Precipitous deterioration often occurs after an initial asymptomatic period. Without immediate surgical evacuation, brain herniation will rapidly ensue.

E. **Subdural hematoma** results from disruption of the dural venous sinuses or the veins passing from the brain to the dural sinuses. Signs may develop acutely or chronically.

1. **Acute subdural hematoma** is a neurosurgical emergency.

2. **Chronic subdural hematoma** is most common in aged, debilitated, and alcoholic patients, and those receiving anticoagulants. Antecedent trauma is often minimal. Symptoms tend to be nonspecific (e.g., headache, confusion, lethargy) and can fluctuate markedly. Small, bilateral subdural hematomas can be difficult to detect with CT scan, unless iodinated contrast material is given IV.

3. **Spinal fracture and dislocation** are commonly seen with head trauma. In every instance of significant head trauma, the neck must be stabilized in a cervical collar until the integrity of the spine is established.

## Spinal Cord Compression

I. **Presentation.** Spinal cord compression often presents with rapid functional deterioration. Difficulty walking, back pain, and incontinence are common presenting symptoms. Signs and symptoms of spinal injury may be secondary to nerve root compression (radicular signs) or spinal cord compression (myelopathic signs).

A. **Radicular signs** follow the dermatomal and myotomal distributions of the nerve root and are helpful in localizing the lesion.

1. **Pain** tends to be lancinating, shooting along the dermatome. Valsalva maneuvers and movement will often induce radicular pain.

2. **Sensory loss** also follows the dermatome but need not be complete. A zone of hypersensitivity and paresthesias may exist between the normal and insensate regions.

3. **Weakness** is restricted to the muscles supplied by the root. Tone is diminished, as radicular lesions affect the lower motor neuron.

4. **Reflexes** are diminished at the level of the involved root but are unaffected elsewhere.

5. **Bowel and bladder function** are impaired only if coccygeal roots are involved.

B. **Myelopathic signs** (from cord compression) are characterized by the presence of a "level" above which function is preserved and below which function is compromised bilaterally ("pars" distribution). The level indicates the spinal cord level of the lesion. Sensory level indicates the spinal cord level of lesion locati...



EXHIBIT

Peters
EXHIBIT NO. 12
5/21/04