Journal of Spinal Disorders
Vol. 13, No. 3, pp. 185–199
© 2000 Lippincott Williams & Wilkins, Inc., Philadelphia

# A Critical Appraisal of the Reporting of the National Acute Spinal Cord Injury Studies (II and III) of Methylprednisolone in Acute Spinal Cord Injury

William P. Coleman, *Edward Benzel, †David W. Cahill, ‡Thomas Ducker, §Fred Geisler, ‖Barth Green, §Mitchell R. Gropper, ¶Jan Goffin, **Parley W. Madsen III, ††Dennis J. Maiman, ‡‡Stephen L. Ondra, §§Michael Rosner, ‖‖Rick C. Sasso, ¶¶Gregory R. Trost, and ***Seth Zeidman

*WPCMath, Annapolis, Maryland; *The Cleveland Clinic, Cleveland, Ohio; †USF Physicians Group, Tampa, Florida; ‡Johns Hopkins University, Baltimore, Maryland; §Chicago Institute for Neurosurgery and Neuroresearch, Chicago, Illinois; ‖University of Miami, Miami, Florida; ¶Universitaire Ziekenhuis Leuven, Leuven, Belgium; **Microsurgery and Brain Research Institute, St. Louis, Missouri; ††Medical College of Wisconsin, Milwaukee, Wisconsin; ‡‡Northwestern University, Chicago, Illinois; §§Hendersonville, North Carolina; ‖‖Indianapolis Neurosurgical Group, Indianapolis, Indiana; ¶¶University of Wisconsin-Madison, Madison, Wisconsin; and ***Strong Memorial Hospital, Rochester, New York, U.S.A.

**Summary:** From the beginning, the reporting of the results of National Acute Spinal Cord Injury Studies (NASCIS) II and III has been incomplete, leaving clinicians in the spinal cord injury (SCI) community to use or avoid using methylprednisolone in acute SCI on the basis of faith rather than a publicly developed scientific consensus. NASCIS II was initially reported by National Institutes of Health announcements, National Institutes of Health facsimiles to emergency room physicians, and the news media. The subsequent report in the *New England Journal of Medicine* implied that there was a positive result in the primary efficacy analysis for the entire 487 patient sample. However, this analysis was in fact negative, and the positive result was found only in a secondary analysis of the subgroup of patients who received treatment within 8 hours. In addition, that subgroup apparently had only 62 patients taking methylprednisolone and 67 receiving placebo. The NASCIS II and III reports embody specific choices of statistical methods that have strongly shaped the reporting of results but have not been adequately challenged or or even explained. These studies show statistical artifacts that call their results into question. In NASCIS II, the placebo group treated before 8 hours did poorly, not only when compared with the methylprednisolone group treated before 8 hours but even when compared with the placebo group treated after 8 hours. Thus, the positive result may have been caused by a weakness in the control group rather than any strength of methylprednisolone. In NASCIS III, a randomization imbalance occurred that allocated a disproportionate number of patients with no motor deficit (and therefore no chance for recovery) to the lower dose control group. When this imbalance is controlled for, much of the superiority of the higher dose group seems to disappear. The NASCIS group's decision to admit persons with minor SCIs with minimal or no motor deficit not only enables statistical artifacts it complicates the interpretation of results from the population actually sampled. Perhaps one half of the NASCIS III sample may have had at most a minor deficit. Thus, we do not know whether the results of these studies reflect the severely injured population to which they have been applied. The numbers, tables, and figures in the published reports are scant and are inconsistently defined, making it impossible even for professional statisticians to duplicate the analyses, to guess the effect of changes in assumptions, or to supply the missing parts of the picture. Nonetheless, even 9 years after NASCIS II, the primary data have not been made public. The reporting of the NASCIS studies has fallen far short of the guidelines of the ICH/FDA and of the

Received October 11, 1999; accepted October 12, 1999.
Address correspondence and reprint requests to Dr. W. P. Coleman, WPCMath, 130 Market St., Annapolis, MD 21401, U.S.A.

Evidence-based Medicine Group. Despite the lucrative "off label" markets for methylprednisolone in SCI, no Food and Drug Association indication has been obtained. There has been no public process of validation. These shortcomings have denied physicians the chance to use confidently a drug that many were enthusiastic about and has left them in an intolerably ambiguous position in their therapeutic choices, in their legal exposure, and in their ability to perform further research to help their patients. **Key Words:** Spinal cord injuries—Methylprednisolone—U.S. Food and Drug Administration—Drug approval.

The reports of the National Acute Spinal Cord Injury Studies (NASCIS) have had an important influence on the pharmacologic treatment of acute spinal cord injury (SCI). Still, 9 years after the first report of a beneficial effect of methylprednisolone after acute SCI in NASCIS II, these reports continue to be controversial, and little independently verifiable information is available.

Our purpose in this article is to examine the NASCIS group's reports and determine what conclusions can be drawn from them.

## HISTORY

### The Release of the NASCIS II Results Before Scientific Publication

The results of NASCIS II were announced by the National Institutes of Health (NIH), before any scientific publication of the study, in public press releases (1,2) and in facsimiles (3) sent to emergency rooms.

The National Institute of Neurological Disorders and Stroke press release (1) of 30 March 1990 claimed, "The study is the first to demonstrate positive results from treatment in acute SCI, and points out the importance of early treatment. The conclusion is based on a randomized trial of 487 patients with acute SCI treated in 10 collaborating centers in the United States."

The NIH press releases about the significant improvement in SCI were widely reported in the news media (4–10). The *New York Times* (4) reported, "For the first time, researchers have shown that drug treatment can reduce paralysis and other disability in people with serious spinal cord injury." Other press releases (11,12) have reaffirmed the NIH's enthusiastic support of the reported positive results.

Clinicians expected that conclusive, scientifically presented results would be released promptly, and that an indication for methylprednisolone in acute SCI would be sought from the Food and Drug Administration (FDA). However, these expectations were not met.

The results contained in the initial scientific publication in the *New England Journal of Medicine* (13) were less conclusive than the publicity has led one to expect, and the reporting of them was vague. In fact, there was a negative result for the primary efficacy analysis of the 487 patients entered in the study.

The article reported a positive result only for a secondary post hoc analysis in a subgroup of patients who received treatment within 8 hours and had, apparently, only 62 patients taking methylprednisolone and 67 receiving placebo. (Data published later [14] show further that most of the combined improvement from all patients in this subgroup was due to differences in the changes in the patients with incomplete lesions. This comparison involved only 22 patients in the methylprednisolone group and 24 patients in the placebo group.) The reported recovery was for a motor scale rather than for a functional scale that might have been more indicative of clinical recovery.

Thus, the result that was publicized and reported as primary was found only in a small subgroup. This fact is still poorly appreciated because of the confusing way in which the results were presented. The article abstract gave sample sizes for the entire patient group but does not mention the negative result of the analysis for this group. It reports the positive result for the subgroup but does not mention its size. The size of this subgroup is nowhere given explicitly but apparently must be inferred by adding the sizes, given in Table 5, of some of its subgroups.

In response to a letter (15) in *The Medical Journal of Australia*, Dr. Michael Bracken (16) gave seven reasons for the decision to release the study findings before their publication. These reasons might be convincing were it not for the disparity between the strength of the conclusions reported in the early publicity and those reported in the *New England Journal of Medicine* article, and were it not for the potentially misleading vagueness of the reporting in the article.

### The Failure To Seek Food and Drug Administration Approval

Such controversies might have been dispelled if methylprednisolone in SCI had gone through the FDA approval process. It has not. We are told that the evidence for methylprednisolone is strong. If it is, then why has it not been presented to FDA? If the evidence is not strong enough to

be presented to FDA, then is it strong enough that methylprednisolone should be the treatment of choice for acute SCI?

The fact that methylprednisolone has generic patent status has been cited as a reason for not seeking an indication. Nonetheless, Upjohn and other companies are profiting from the off-label use of methylprednisolone for SCI in the United States, and there are lucrative markets for methylprednisolone in other countries as a patent medicine.

It is difficult to ignore the stream of methylprednisolone publications by Bracken and his colleagues, and his repeated appearance, and that of Upjohn representatives, at national and international scientific meetings. At the Fourth International Congress of Neurotrauma, Seoul, Korea, on August 28, 1997, Pharmacia and Upjohn held a special luncheon symposium promoting the use of methylprednisolone in SCI, presenting it as a standard of care widely used in the United States that has been scientifically proved and rigorously examined by journal reviewers. Upjohn and also Pharmacia and Upjohn, after their merger, have been generous sponsors at most national and international neurotrauma conferences and symposia for the last decade.

These publications and appearances may not be advertising, but they have the same effect. The wording of the publications is often close to that of a package insert, usurping the FDA's function of making drug recommendations. The abstract of one such publication (17) states "The authors conclude that treatment with the study dose of methylprednisolone is indicated for acute spinal cord trauma. . ." The endings of the abstract and of the conclusions of the NASCIS III article (18) in the *Journal of the American Medical Association (JAMA)* define regimens on which certain classes of patients should be maintained.

We do not accuse anyone of deliberate bad faith. However, there seems to be a lack of responsibility in advocating and profiting from the use of methylprednisolone for an unapproved indication while refusing to act to legitimize or even clarify the situation.

## INADEQUACIES IN STATISTICS AND REPORTING

The uncertainties arising from the manner in which the results of the NASCIS studies were announced and from the failure to seek FDA approval for this indication leave the clinical community to try to resolve the scientific questions based on the published reports. However, several obstacles make this difficult.

There are four classes of issues. In any study so large, so complex, and so important, (1) questions of interpretation arise. Interpretation is colored by the (2) specific choices of methods that were made. In this case, the published reports neither sufficiently justify these choices nor make the clinical implications clear to readers who are not statisticians. Worse, (3) statistical procedures are so sketchily documented that even the statistically savvy do not have enough details to reconstruct the choices made or to make educated guesses at the probable effects of different choices. Finally, (4) the primary data have apparently never been made available to any independent reviewer or agency.

The net effect of these shortcomings is that the NASCIS group has not left anyone the means to verify the published interpretations or to evaluate alternative interpretations. The SCI community must accept or reject the published conclusions as stated, and they are offered no evidence for making this choice other than faith. Science is not faith. A key component of science is reproducibility: the willingness to have one's conclusions open to question from every angle by all interested parties. Here we will document, in order, each of the four assertions we made in the preceding paragraph.

### Questions of Interpretation Arise

In animal studies, evidence for the effectiveness of methylprednisolone does appear very strong. However, extrapolation of these data to human injury raises questions that have not been answered. In laboratory experiments, the dose is typically administered a few minutes after injury; in humans it is typically administered a few hours after injury. (We are not aware of any laboratory correlate of the 8-hour rule reported in NASCIS II.) The dose may not scale as a simple multiple of body weight, and it may also be influenced by other factors, including injury severity. There are differences between animal and human physiology. Laboratory models do not mimic the complex pattern of multiple injuries and cardiopulmonary dysfunction often present in human trauma (19–22). The dorsal column impact model is not as physiologically consistent with clinical injury as some others are.

For all of these reasons, it is less than certain that the methylprednisolone effects in animals are likely to be observed in humans or, if they have been, that the NASCIS studies have hit on dosing and timing regimens that are optimal or even adequate. The animal studies and the human studies are different, and little work has been done to relate them explicitly. It is simply not true that the NASCIS studies either strongly confirm or are strongly confirmed by the animal studies.

For NASCIS II, both the strengths and the interpretive ambiguities are illustrated by Figure 6 of the 1-year follow-up article (14). It shows that most of the combined improvement from all patients in the subgroup treated before 8 hours is due to differences in the changes in the patients with incomplete lesions. For these patients with incomplete injuries, this figure suggests five conclusions:

1. The methylprednisolone group treated before 8 hours appears to have done significantly better than the corresponding placebo group.
2. The methylprednisolone group treated after 8 hours appears to have done significantly worse than the corresponding placebo group.
3. The placebo group treated before 8 hours progressed so that at the end of the first 6 weeks it appears to have had recovery comparable to the corresponding methylprednisolone group, but to have recovered very little after that.
4. The placebo group treated after 8 hours appears to have done significantly better than the placebo group treated before 8 hours.
5. The placebo group treated after 8 hours appears to have done as well as the methylprednisolone group treated before 8 hours.

The first two of these conclusions were reported as the primary results of NASCIS II. The other three conclusions lead to paradoxes that seem impossible and therefore raise the possibility of a statistical flaw in the NASCIS II data or analysis.

The third conclusion contradicts a common clinical observation that a patient with an incomplete SCI who has recovered significant neurological function by 6 weeks will continue to improve significantly during the ensuing 1-year period.

The fourth conclusion contradicts a common clinical observation that SCI patients who are admitted early often have the best improvement. (Doubtless, none of the clinical centers think that the care delivered in the first 8 hours prevented later neurological recovery of their patients and that the patients would have been better off to wait 8 hours before being treated.)

The fifth conclusion implies that it would be acceptable not to treat with methylprednisolone before 8 hours because treating with placebo after 8 hours would yield the same result. For clinical purposes, this would contradict the result of NASCIS II (that before 8 hours, treatment with methylprednisolone appears better than placebo) unless we are prepared to believe that placebo after 8 hours is better than placebo before 8 hours.

Thus, there is good reason to question the results of NASCIS II. However, as is documented below, we are left without the data that would allow us to confirm or disprove our conjectures.

For NASCIS III also, there is an anomaly that calls into question the validity of the published results. The NASCIS studies used a broad definition of SCI that includes many patients with no motor deficit. We might concede the researchers the right to define their terms, but the choice they have made makes statistical interpretation treacherous. If a patient has no motor deficit to begin with, then by definition he or she cannot improve in motor score. If further, by the luck of the draw, one of the treatment arms is assigned more than its share of such patients, then that arm is unlikely to show as much improvement as the others. In fact, this is what happened in NASCIS III. The 24MP (treated with methylprednisolone for 24 hours) control arm was disadvantaged in comparison to the active arms: 48MP (methylprednisolone for 48 hours) and 48TM (tirilizad for 48 hours).

Let us examine the arithmetic to clarify the issue. (Here, as elsewhere in the NASCIS reports, it is impossible to make the numbers work out exactly. In this section, however, the point being made is so clear that it will be enough to be approximately correct.)

Table 3 of the *JAMA* article (18) shows the main results of NASCIS III, those mentioned most prominently in the abstract. In the combined (<8 hours) group, the average change in motor score at 6 months is shown to be

- 13.4 for 142 patients assigned to 24MP;
- 14.4 for 149 patients assigned to 48TM (the p value was 0.58, compared with 24MP); and
- 16.8 for 149 patients assigned to 48MP (the p value was 0.07, compared with 24MP).

Figure 1 of the same article indicates that 166 patients were randomized to 24MP. Later, Table 2 tells us that on admission 24.7%, or 41 of the 166 patients, had normal motor scores. Therefore they could not contribute any motor improvement to the averages quoted in the preceding paragraph. This 24.7% of patients in 24MP with normal motor scores in is contrast to only 10.8% in the 48TM group and only 13.9% in the 48MP group.

What bias did this randomization imbalance introduce? The average motor score changes were presumably calculated by adding all the motor changes and then dividing the total by $n$. Therefore, we should be able to reverse this process and determine the value of the total motor score change if we multiply the average by $n$. For the 24MP group, we calculate that the total motor change at 6 months, when 142 patients remained, was $13.4 \times 142 = 1902.8$. If we exclude the 41 patients with no motor deficit, this total remains the same (because they could not have improved), but the sample size becomes $142 - 41 = 101$, and the average motor change for this group is there-

fore $1902.8 \div 101 = 18.8$. Similarly, if we exclude the patients with no motor deficit from the other two groups, the average motor change for the 48TM group equals 15.6, and for the 48MP group it equals 20.

We see that the difference between 24MP and 48MP, the main positive result of NASCIS III, is greatly reduced (the reported value was 13.4 versus 16.8; the adjusted value is 18.8 versus 20.0) when we exclude those patients who could not have improved because they had normal motor scores at baseline and were disproportionately represented in the 24MP control group.

### Specific Choices of Methodology Have Been Made, But Not Clearly Explained or Justified

*The Population Studied Does Not Seem Clinically Relevant*

Table 2 of the *JAMA* article (18) shows that for NASCIS III, the 24MP group had

- 24.7% with normal motor function,
- 10.9% with normal pinprick sensation, and
- 14.6% with normal light touch sensation.

The footnote to this table tells us that no patient had normal function on all three scores, whereas the possibility is left open that patients may have been normal on two of the three tests. How many patients had zero deficit on at least one score? We are astonished to conclude that this number must have been at least 24.7 and may have been as high as $24.7\% + 10.9\% + 14.6\% = 50.2\%$ of the 24MP group. For the 48TM group, this total may approach 35.5%, and for the 48MP group it may approach 39.9%. If we add to these patients the number who may have had only slight deficits on all three scores, it becomes apparent that more than half of the patients in NASCIS III may have been nearly normal on admission.

Even if no randomization imbalance skewed the conclusions, this large, nearly normal subgroup doubtless has recovery characteristics that cannot be extrapolated to the severely injured patients about whom clinicians are most concerned.

It is unclear to which patients the results of the NASCIS studies apply, but it is not predominantly a group of patients with a major SCI. No analysis of the outcome of all such patients has been reported, for NASCIS III or for NASCIS II. Nor, as we see below, do the published results allow such an analysis to be reconstructed.

*Inappropriate Tests May Have Been Used*

The NASCIS studies have often used procedures—such as the *T*-test, analysis of variance, and analysis of covariance—for which the underlying data must fit the bell-shaped normal curve. This assumption seems very unlikely to be met for American Spinal Injury Association (ASIA) score differences, which must fit a range between 70 and 70, and may have many scores at or near 0 or 70 if the ASIA change is used directly, or near 0 or 100 if it is expressed as a percentage. Thus, the change in motor score from baseline to follow-up time for the initially complete patients is highly non-normal. As is well known, most neurological immediate complete patients make little or no recovery. This produces a distribution with a spike at the lowest value. Statistics that depend on a normal distribution assumption are not necessarily applicable to these distributions, so nonparametric statistical methods should be used.

*The Number of Statistical Tests Done Is Excessive*

The p value quantifies the chance of randomly drawing a data set that misleadingly indicates a treatment difference when, in fact, there is none. If multiple statistical tests are performed, the risk of finding a false treatment difference increases.

For this reason, sound scientific practice requires that a clinical trial have only a single primary efficacy analysis and that it be prospectively stated, rather than choosing the best one of many, after the fact. The published NASCIS reports have emphasized (18) that all analyses were preplanned by protocol. However, the reporting is still deficient. Given the many analyses presented, we should be told how many the protocol specified and how broadly they were worded. Most important, a single analysis should be reported as having been prospectively identified as primary.

For one example, the main results of the report (18) on NASCIS III are presented in its Table 3, which alone contains 24 separate probability values. Having $p < 0.05$ means that we can expect false-positive results in 1 of 20 such tests. Thus, the result, namely 1 positive result in 24 tests, is perfectly plausible even if there was no treatment effect.

The footnote to Table 3 indicates that "(t)he p values were calculated from an analysis of covariance." However, no indication is given of whether or how, within the analysis of covariance procedure, any of the common methods were used to adjust the probability values for these simultaneous risks. Furthermore, the footnote appears to conflict with the statements in the text. The reporting is too confusing to form any clear picture of what was done.

This analysis of covariance should disentangle the effects on the motor change of several factors mentioned in the text:

- the baseline motor score,
- whether the lesion was complete or incomplete, and
- interaction between the baseline score and the completeness, and the treatment arm.

Other factors mentioned in Table 3 are

- the time of evaluation (6 weeks or 6 months),
- the time when treatment was initiated (< 8 hours, or < 3 hours, or 3 to 8 hours), and
- status (intent-to-treat, or complier).

It is impossible to determine from the article how many of these factors were included in the analysis of covariance and how many were addressed by doing multiple analyses.

Readers also interested in knowing about the effects of these factors, other than treatment, are given no information. The authors give only confusing indications of how these analyses relate to Table 3. For example, why does Table 3 not break down the difference between complete and incomplete injuries, which is surely an aspect of interest?

Given the ambiguity of the written presentation, these complicated statistical procedures seem to be a barrier, rather than a guide, to understanding.

### Statistical Procedures Are Sketchily Documented

It often happens in the reports of the NASCIS studies that it is impossible, even for professional statisticians, to replicate the statistical analyses or to evaluate the effects of possible changes in analytic strategies. The numbers presented in the reports are incomplete. The changes in underlying assumptions between different tables, or between the tables and the text, often make direct comparison impossible. We will document this in some detail for the example that we have been following.

We tried to determine how the results of NASCIS III would change if the analyses did not include patients who had no motor deficit. We stopped at the point of noting that the average motor changes would be much closer: 18.8 for 24MP versus 20 for 48MP. The next step would be to confirm that this difference is far from statistically significant. It is impossible to do this from the data given in the report.

Not only does the published report make it impossible to derive a probability value but even the steps that we took were approximations. The following are some of the ways that inadequacies in the NASCIS reporting procedures hinder any attempt to answer our questions. It seems to us that there are too many such inadequacies and that they could have been avoided or rectified.

- It is impossible to tell whether the averages reported in Table 3 are the actual averages computed for the groups indicated or are adjusted averages constructed from the analysis of covariance. The latter interpretation is suggested by the wording in the text, "adjusted means resulting from an analysis including the interaction are appropriate for drug protocol comparisons within the complete and incomplete groups." It is not clear to which results this wording applies, but the footnote to Table 3 indicates that the probability values there are taken from analyses of covariance. If the averages in the table are indeed adjusted ones, then there can be no possibility of reconstructing anything.
- It is impossible to compare Figure 1, Table 2, and Table 3 because each deals with several subsets of patients, and the definitions are different in each. We are led to this conclusion in several ways, as follows. For brevity, we adopt the convention that a set of three numbers ($n1$, $n2$, $n3$) refers to quantities in the 24MP, the 48TM, and the 48MP groups, respectively.
  —There are exclusions for intent-to-treat and for compliance that are in no way explained or documented. At 6 weeks, Figure 1 gives the sample sizes as 154, 157, 154, yet Table 3 finds only 151, 156, and 154 in intent-to-treat, and 144, 139, and 145 as compliers. Evidently, 3, 1, and 0 patients were excluded, even from intent-to-treat, and 10, 18, and 9 were excluded from the compliers. No explanation is given. The 6-month data in Table 3 also exclude 3, 1, and 0 from intent-to-treat analyses.
  —Even with these adjustments, the agreement between Figure 1 and Table 2 is not perfect. Figure 1 leads us to expect $166 + 167 + 166 = 499$ patients randomized. If we suppose that we are to subtract the 4 patients excluded from intent-to-treat, there would be 495. However, Table 2 greets us with n = 494 patients on admission. The discrepancy seems to have no explanation. These problems mean that there is no way of knowing, in Table 2, what the base numbers are to which the reported percentages apply.
  —It is impossible to determine how many of the 41 patients with no motor impairment dropped out and were not included in the 6-month analysis.
  —There is no way to know how many of the patients reported in Table 2 as having normal motor scores at baseline pertain specifically to each of the exclusion criteria for the analyses in Table 3.
  —Table 1, using the full complement of 499 patients randomized, and Table 2, with 495 patients, offer markedly divergent estimates of the number of healthy patients. Table 2 finds 24.7%, 10.8%, and 13.9% with normal motor function, 10.9%, 10.8%, and 11.4% with normal response to pinprick, and

14.6%, 13.9%, and 14.6% with normal response to touch, with no patient having all three characteristics. Yet Table 1 finds only 9%, 5.4%, and 8.5% with "normal" listed as the extent of SCI. It is difficult to speculate on the definition of this term and even more difficult to assess the clinical significance of these two tables when their reports are so different and their definitions so unclear. Most of all, it is difficult to imagine how a study of SCI can include 9%, 5.4%, and 8.5% patients whose SCI is "normal."

- Even if we could adjust the averages in Table 3 to exclude the patients with normal motor function, it would still be impossible to attach a p value to the results, because the standard deviations, or standard errors, are not given, as is customary in scientific publications.

### Apparently the Data Have Never Been Made Available

These roundabout computations could be avoided if NASCIS would make primary data available to other investigators, who could then check the results directly.

We understand the desire of NASCIS to keep these primary data confidential until they have had a fair chance to analyze them; however, 9 years have now passed since NASCIS II was first published and the data are still not public.

No one has ever reported to us that they have seen the primary data from NASCIS II. To the best of our knowledge, the primary data have never been submitted to the FDA, to the reviewers of the journals in which articles have appeared, or to the investigators at the NASCIS II clinical study centers. Nor, to our knowledge, has any physician ever seen these data.

The NIH policy makes access to primary data the sole prerogative of the principal investigator. However, Dr. Michael Bracken, the principal investigator, should consider that he did not conduct the NASCIS studies by himself. The SCI community, as represented by the long list of NASCIS collaborators and personnel, invested work and talent in these studies. The community as a whole has also shown considerable faith in following the recommendations of NASCIS.

For all the reasons discussed, we regard the NASCIS publications as studies for which reporting is inadequate. The NIH News Release, "Prolonged Treatment with Methylprednisolone Improves Recovery in Spinal Cord Injured Patients," issued 27 May 1997, contains an assertion that would appear to be an overstatement based on a possibly unfounded interpretation: "These investigators have provided us once again with clear, compelling evidence that methylprednisolone makes a difference in the lives of SCI-injured persons, reducing the extent of their disabilities and providing a chance of better recovery."

### WHY DO WE NEED FOOD AND DRUG ADMINISTRATION INVOLVEMENT?

If the FDA had been involved, they doubtless would have cast a more objective eye on the results. It would have been their job to clarify the analyses and to conduct an informed scientific review before an indication would be approved. The FDA, doubtlessly, would have required labeling with detailed support from the evidence available.

The FDA also would have required that safety data be more comprehensive and have a clearer rationale for methylprednisolone use. NASCIS II found that, although there was, as feared, an increase in infections in the methylprednisolone group, this increase was moderate and appeared tolerable given the apparent benefit of the drug. However, for reasons that were good from the perspective of conducting an efficacy study, NASCIS II excluded two groups with a high likelihood of becoming infected: patients with penetrating wounds and patients with multiple trauma. A clinician unsure of the efficacy results might reasonably worry about safety, that these unstudied patients might be at unreasonable risk.

The FDA drug approval process also provides an independent audit of the primary site data (clinical chart) to ensure accuracy of chart data translation into the master computer file. An independent check is considered essential to guard against the many errors that can occur.

Without the comprehensive review that the FDA would have provided, clinicians are left to make do. Many critiques of the limitations of NASCIS data reporting and interpretation have appeared in letters to editors (15,23–28), articles (29–31), and book chapters (32,33). Several retrospective studies after the results of NASCIS II have tried to determine the effects of steroids. The results of these studies have been mixed.

- A Japanese study (34), not yet reported in English, seems to have been modeled on NASCIS II. However, its methods were not clearly reported. Among other difficulties, it appears not to have been a classic prospective, randomized, double-blinded study (35). Therefore, its statistical value seems dubious.
- A study (36) including 145 patients with acute SCIs found that methylprednisolone (n = 80) had a nonsignificant decrease in mortality rate and significantly poorer discharge mobility compared with patients who did not receive methylprednisolone (n = 65). They did not note any difference in the Functional Independence Measure (FIM) rehabilitation score.
- A study (37) including 32 patients with acute SCIs could not make a conclusion about efficacy but found that patients given methylprednisolone had longer hospital stays (44.4 days compared with 27.7 days, p = 0.065) at an estimated cost of $51,504 per patient.

- A study (38) with 93 patients who received methylprednisolone and 47 who did not concluded that methylprednisolone use was associated with early infectious complications but no difference in long-term outcome.
- A study (39) comparing methylprednisolone (54 patients) therapy and no methylprednisolone therapy (29 patients) after penetrating wounds causing acute SCI concluded that methylprednisolone may impair recovery of neurological function.
- A study (40) comparing patients receiving methylprednisolone(n = 55) with those who did not (n = 181) in acute SCI from penetrating injuries found no benefit from methylprednisolone.

Although these studies do not present a uniform opinion, they clearly do not, as a whole, confirm a dramatic benefit of methylprednisolone. It is also of note that these studies have a similar number of patients (or potential statistical power) as the subgroup reported in NASCIS II with beneficial effects of methylprednisolone.

Nesathurai (31) recently published in the *Journal of Trauma* an extensive negative critique of the NASCIS II and III studies. In it he makes several of the same points that we have made here. He concludes that the meaning of the studies "remains unclear," not only statistically but clinically. He states: "To help resolve this dilemma, an impartial, blue-ribbon panel of clinicians and statisticians should be appointed to reanalyze the NASCIS II and III primary data." The only point on which we would disagree with his conclusions is that we believe that a blue-ribbon panel is already in place and prepared to explore such issues in all the necessary depth; namely, the FDA.

The FDA, by its legal mandate, has always held that society has a strong interest in denying a market to any drug indication that is not well established. Surely they are right. The marketing of ineffective drugs not only prompts patients and families to misdirect their money and their hope but it poisons the well and creates a climate that slows the demand and the economic momentum for development of drugs that might work, thus making it more difficult to investigate them.

Researchers in SCI now must design preclinical and clinical experiments that consider possible interactions with a treatment, methylprednisolone, that does not have an FDA-approved indication for treatment of SCI. For animal studies, Nockels and Young (22) write, "NASCIS has complicated acute spinal cord injury studies. To bring a drug to clinical trial, an investigator must now determine the optimal treatment dose, timing and duration over a range of injury severities, in comparison and combination with methylprednisolone. This requirement has so increased the scale of drug testing that multicenter laboratory trials may be necessary." The NIH has cited this fact as a reason for supporting the Multicenter Animal Spinal Cord Injury Study.

The difficulties increase in human trials. For example, Constantini and Young (41) reported an adverse interaction between methylprednisolone and GM-1, based on histologic criteria in an animal experiment. This report influenced design of the multicenter GM-1 study in SCI so that GM-1 was not given until after a 24-hour course of methylprednisolone. However, there is no reason to suppose that this timing is optimal for GM-1.

## COMPARISON OF NASCIS II AND III REPORTING WITH ESTABLISHED STANDARDS

In our interpretation, we have criticized the reporting of the NASCIS studies. The standards we have used are not arbitrary ones; rather, they represent the standards for medical studies generally accepted in the scientific community. In this section, we discuss explicitly how the reporting of NASCIS II and III compares with two well-known sets of guidelines.

### Comparison with the ICH/FDA Guideline

The 17 July 1996 issue of the *Federal Register* published the ICH Guideline on Structure and Content of Clinical Study Reports. It is worthwhile to examine some of the guidance that the FDA provides for study reports and observe how the NASCIS studies measure up against this guidance.

For Selection of Study Population, Inclusion Criteria, the guide states "the suitability of the population for the purposes of the study [should be] discussed. Specific diagnostic criteria used, as well as specific disease requirements (e.g., disease of a particular severity or duration, results of a particular test or rating scales or physical examination...) should be presented." This was not done in the NASCIS studies. The main requirement was merely that the patient had an SCI in the opinion of the investigator. This leaves no means to ensure uniformity or to define the target population to which the results apply. Specifically, this definition does not exclude persons who had normal motor scores and only sensory abnormalities. It is a major limitation that no separate analysis, or descriptive statistics, of the severely injured subgroup has been published.

For Appropriateness of Measurements, the guide states "If any of the efficacy or safety assessments was not standard, i.e., widely used and generally recognized as reliable, accurate, and relevant... its reliability, accuracy, and relevance should be documented.... If a surrogate end point (a laboratory measurement or physical measurement

or sign that is not a direct measure of clinical benefit) was used as a study end point, this should be justified." The NASCIS studies relied on various mathematical transformations (not always clearly documented) of the ASIA motor score and do not adequately emphasize the clinical meaning of these choices as opposed to using a functional score. Furthermore, they used a composite ASIA score based on measuring only one side of the body, although data were available for both sides.

In the section on Primary Efficacy Variable(s), the guideline states "The primary measurements and endpoints used to determine efficacy should be clearly specified. Although the critical efficacy measurements may seem obvious, when there are multiple variables, or when variables are measured repeatedly, the protocol should identify the primary ones with an explanation of why they were chosen, or designate the pattern of significant findings or other method of combining information that would be interpreted as supporting efficacy. If the protocol did not identify the primary variables, the study report should explain how these critical variables were selected (e.g., by reference to publications, guidelines, or previous actions by regulatory authorities) and when they were identified (i.e., before or after the study was completed and unblinded)." The use of the ASIA score may have been decided prospectively.

The guideline specifies that "the statistical analyses planned in the protocol and any changes made before outcome results were available should be described. In this section, emphasis should be on which analyses, comparisons, and statistical tests were planned, not on which ones were actually used... Similarly, if more than one analytical approach is plausible, e.g., changes from baseline response, slope analysis, life table analysis, the planned approach should be identified. Also, whether the primary analysis is to include adjustment for covariates should be specified. If there were any planned reasons for excluding from analysis patients for whom data are available, these should be described. If there were any subgroups whose results were to be examined separately, these should be identified." The population subgroup (< 8 hours) and also the mathematical transformation of the ASIA motor score (change, or percentage change) may not have been identified prospectively. Some of the reports unaccountably omit mention of some population subgroups that were randomized to the study. The methods for covariate adjustment (beyond specifying simply "analysis of covariance") are not indicated, nor is it indicated whether they were defined prospectively.

The guideline discusses sample size determination and states "The planned sample size and the basis for it, such as statistical considerations or practical limitations, should be provided. Methods for sample size calculation should be given together with their derivations or source of reference. Estimates used in the calculations should be provided as to how they were obtained. For a study intended to show a difference between treatments, the difference the study is designed to detect should be specified. For a positive control study intended to show that a new therapy is at least as effective as the standard therapy, the sample size determination should specify the difference between treatments that would be considered unacceptably large, and therefore, the difference the study is designed to be able to exclude." The NASCIS reports do not discuss these issues.

The guideline also discusses changes in study conduct or planned analyses: "Any change in the conduct of the study or planned analyses (e.g., dropping a treatment group, changing the entry criteria or drug dosages, adjusting the sample size) instituted after the start of the study should be described . . . In every section of the report, a clear distinction between conditions (procedures) planned in the protocol and amendments or additions should be made. In general, changes in planned analyses made prior to breaking the blind have limited implications for study interpretation. It is therefore particularly critical that the timing of changes relative to blind breaking and availability of outcome results be well characterized." The NASCIS reports do not discuss these issues.

The guideline is particularly useful in discussing efficacy and safety evaluations. Under efficacy evaluation, the guideline discusses data sets analyzed and states that "exactly which patients were included in each efficacy analysis should be precisely defined, e.g., all patients receiving any test drugs, all patients with any efficacy observations or with a certain minimum number of observations, only patients completing the trial, all patients with an observation during a particular time window, or only patients with a specified degree of compliance. ... Generally, even if the applicant's proposed primary analysis is based on a reduced subset of the patients with data, there should also be, for any trial intended to establish efficacy, an additional analysis using all randomized (or otherwise entered) patients with any on-treatment data." Exclusion of individual patients from intent-to-treat or other analyses are not discussed, nor are issues of imputation of missing data. Some of the data given raise questions about how these issues were handled. Were there no patients with limb fractures that required joint immobilization? If such patients existed, then how were these missing motor scores handled?

Of particular interest in discussing the NASCIS studies is the guidance specifying discussion of demographic and other baseline characteristics: "Group data for the critical demographic and baseline characteristics of the patients, as well as other factors arising during the study that could

affect response, should be presented in this section and comparability of the treatment groups for all relevant characteristics should be displayed by use of tables or graphs. ... In a multicenter study, where appropriate, comparability should be assessed by center, and centers should be compared. ... In addition to tables and graphs giving group data for baseline variables, relevant individual patient demographic and baseline data for all individual patients randomized (broken down by treatment and by center for multicenter studies) should be presented in by-patient tabular listings." Issues of baseline imbalance are not addressed explicitly. To the degree that data are available, very serious questions arise—apparently poor performance of the <8 hour placebo group in NASCIS II, and the apparently disproportionate randomization to the 24MP control group in NASCIS III of patients with no motor deficit and who thus could not improve.

In discussing analysis of efficacy, the guideline states that "Treatment groups should be compared for all critical measures of efficacy (primary and secondary endpoints...), as well as benefit/risk assessment(s) in each patient where these are utilized. In general, the results of all analyses contemplated in the protocol and an analysis including all patients with on-study data should be performed in studies intended to establish efficacy. The analysis should show the size (point estimate) of the difference between the treatments, the associated confidence interval, and, where utilized, the results of hypothesis testing... If any critical measurements or assessments of efficacy or safety outcomes were made by more than one party, overall differences between the ratings should be shown, and each patient having disparate assessments should be identified. The assessments used should be clear in all analyses." The NASCIS reports do not discuss these issues.

The guideline also addresses statistical/analytical issues: "The statistical analysis used should be described for clinical and statistical reviewers in the text of the report, with detailed documentation of statistical methods presented in (the) Appendix. ... Important features of the analysis, including the particular methods used, adjustments made for demographic or baseline measurements or concomitant therapy, handling of dropouts and missing data, adjustments for multiple comparisons ... should be discussed. Any changes in the analysis made after blind-breaking should be identified." The ASIA score for individual muscle groups is sometimes missing because of inability to measure it because of local trauma or limb fracture treatment. How was this handled? More generally, the NASCIS reports do not discuss issues of missing data, individual patient eligibility, or loss to follow-up.

Comparing what we have gleaned from published reports of NASCIS and press releases against what is required of a clinical/statistical study report submitted to FDA, it is apparent that the NASCIS studies might have difficulty meeting the scientific rigor required by FDA in terms of statistical analysis and efficacy. The guideline provides detailed instructions for presenting safety data, including extent of exposure, presentation and discussion of adverse events, and clinical laboratory evaluation. Although no single publication in a journal can be as comprehensive as a final report to the FDA, we note that the NASCIS group has published many reports in the 9 years since NASCIS II and that the sum total of them falls far short on most of the ICH guidelines. How, then, can these reports be construed as providing adequate guidance for the treatment of acute SCI?

### Comparison with the Evidence-Based Medicine Group Guidelines

The Evidence-Based Medicine Group published a well-known series of articles in *JAMA*, "Users Guides to the Medical Literature." The second of these (42) contains an outline called "Readers Guides for an Article About Therapy." Let us check the reporting of NASCIS against this outline, printing the responses in italics.

*Are the Results of the Study Valid?*

Primary Guides

- Was the assignment of patients to treatments randomized? *Apparently it was. Even here, the reporting is deficient. In the New England Journal of Medicine report (13) of NASCIS II, it would be mathematically impossible for the block randomization scheme described in the Methods section to have produced the randomization described in Table 2, even allowing for the situation mentioned in its footnote.*
- Were all patients who entered the trial properly accounted for and attributed at its conclusion?
  —Was follow-up complete?
    In NASCIS II, the >8-hour group was not included in the analysis most prominently reported. *In many of the reports there are small, unexplained inconsistencies in the data reporting.*
  —Were patients analyzed in the groups to which they were randomized? *Apparently they were.*

Secondary Guides

- Were patients, health-care workers, and study personnel blinded to treatment? *This is not clear. Although the clinicians involved in patient care would have been unable to tell the difference between placebo and methyl-*

*prednisolone, the situation for naloxone would be quite different, because this dose of naloxone given would have blocked the effects of narcotics for pain relief and anesthesia. No account of how this was managed in the study was presented.*

- Were the groups similar at the start of the trial? *In the case of NASCIS III, they certainly were not. The placebo group was biased by including a much higher proportion of patients with no motor deficit and who therefore could not have improved. It also seems possible that there was some anomaly about the <8-hour placebo group in NASCIS II.*
- Aside form the experimental intervention, were the groups treated equally? *Placebo and methylprednisolone seem to have been treated the same. However, naloxone was perhaps unfairly neglected.*

### What Were the Results?

- How large was the treatment effect? *The reported effect for motor score in NASCIS II was 4.8 ASIA points, in the <8-hour subgroup.*
- How precise was the estimate of the treatment effect? *Because no standard deviations or confidence intervals were given, we do not know the margin of error. Because the p value was 0.03, we infer that the lower end of the confidence interval was near zero: perhaps about 1 ASIA point.*

### Will the Results Help Me in Caring for My Patients?

- Can the results be applied to my patient care? *Because the NASCIS studies included many patients with minimal deficit (perhaps more than 50% in NASCIS III), it is difficult to estimate how the results will apply to the severely injured group of patients that is of greatest interest.*
- Were all clinically important outcomes considered? *The outcome almost exclusively considered was a motor score, so that the improvement could have been due merely to recovery at the level of the injury. The analysis that did consider a functional score (and would have better reflected recovery below the level of the injury) was less strongly positive for methylprednisolone but more so for naloxone.*
- Are the likely treatment benefits worth the potential harms and costs? *It is difficult to judge, because the two groups of patients most likely to suffer infections, the known complication of steroid therapy, were excluded from the study: patients with penetrating wounds and patients with multiple trauma.*

## A SUMMARY EXAMPLE: WHATEVER BECAME OF NALOXONE?

NASCIS II was designed to test naloxone and methylprednisolone. As an example, we would like to pull together the threads of the many criticisms discussed above into a single critique of the reporting for naloxone. It is again important to emphasize that we have no prejudice for or against naloxone and have drawn no conclusions about it. What concerns us is the inability to form rational ideas about naloxone on the basis of the NASCIS reports.

### The Initial Report of NASCIS II

The reports in the *New England Journal of Medicine* article (13) about motor recovery at 6 months with methylprednisolone are confined to motor score changes and fit incompletely into the following schema.

1. The primary analysis, a comparison in the entire study group. For motor function, no numeric or verbal reports are given, although for the changes at 6 weeks we are told that no comparable improvements in motor function were observed.
2. Two secondary subgroup comparisons, divided according to treatment before or after 8 hours. The text tells us that the changes in the >8-hour group were not significantly different. For the <8-hour group we are given averages and probability values but no standard deviations or sample sizes.
3. A secondary analysis with the <8-hour group further broken down into plegic with total sensory loss (n = 123 in the three treatments combined, at 6 months), plegic with partial sensory loss (n = 22), and paretic with variable sensory loss (n = 40). The results are presented in Table 5, which gives averages, p values, and sample sizes but no standard deviations. The p values are obtained, using an unspecified method of testing contrasts, from analysis of variance. In two of the three subgroups, methylprednisolone is significantly better than placebo.

We might expect a similar discussion of naloxone. However, the first two of these analyses are represented only by a sentence: "None of the differences in patients taking naloxone or in patients first treated more than eight hours after injury were statistically significant." We are not told the p values; they might be 0.051 or 0.51. Naloxone plays its part in Table 5, where we see that its motor scores are better than placebo at 6 months in all three subgroups, but not significantly so.

We do, however, see other things in Table 5. The plegic with partial sensory loss subgroup, although numerically much the smallest, experiences much greater motor recov-

ery across treatments than do patients in either of the other two subgroups. Its average improvement was 26.9 ASIA points, compared with 16.8 points in the paretic group and only 7.4 points in the plegic with total sensory loss group. In this subgroup, naloxone is better than placebo (28.9 vs. 26.5), and both are better than methylprednisolone (23). In fact, naloxone enjoys a 5.9 point lead over methylprednisolone in this small group, and this is larger than the 4.8-point lead that methylprednisolone enjoys over placebo in the combined <8-hour group. That is the major positive result of NASCIS II.

Let us summarize the presented results of the *New England Journal of Medicine* article objectively. Neither methylprednisolone nor naloxone was significantly better than placebo in the primary analysis. Many post hoc analyses were performed and sporadically reported. Methylprednisolone is significantly better than placebo in some of these. Naloxone appears better than placebo (and even better than methylprednisolone) in some of these, but not significantly so. In any case, there are too many of these analyses to place confidence in positive results, and their sample sizes are all too small to place confidence in negative results. The published article (13) concludes that "methylprednisolone ... improves neurologic recovery," and that "naloxone ... does not improve recovery." Both of these conclusions overstate the evidence presented.

### The 1-Year Follow-up Report

The article (17) describing the 1-year follow-up contains analyses and results similar to those just described for the initial report. However, it also contains a new analysis of great interest. The patients treated <8 hours after injury were assessed at entry and at 1 year to four functional levels: quadriplegic, paraplegic, quadriparetic, paraparetic. They were given scores depending on whether they improved from their entry level by at least one grade. For methylprednisolone, the ratio of the odds in favor of such an improvement are reported as 1.39 times greater than the odds in favor of improvement for a patient receiving placebo. If this ratio is greater than 1, then methylprednisolone is better than placebo; if less, worse. The 95% confidence interval for this odds ratio is reported to be 0.64 to 3.03. Similarly, for naloxone, the odds ratio is reported to be 1.75, with a CI of 0.79 to 3.86.

Let us make some explicit remarks about the meaning of this result.

- Naloxone did better (odds ratio = 1.75) compared with placebo than did methylprednisolone (odds ratio = 1.39) on this functional scale.
- No statistical test is reported; however, we know from general principles that a treatment would be significantly better than placebo on this scale if the value 1.00 were outside of the confidence interval. But we see that 1.00 is inside the interval for both treatments. We also see that naloxone is close to significantly better than placebo, because 1.00 is so close to the bottom end of its confidence interval, 0.79 to 3.86. We see that methylprednisolone is also close to significance, but not as close as naloxone.
- This analysis for the <8-hour group, although given little attention, is comparable to the one that the article presents as its main result, except that it is expressed in terms of a functional scale rather than a motor scale.

We can summarize the situation as follows.

- On a motor scale, which might indicate only recovery at the level of the injury, naloxone happens to be better, and methylprednisolone significantly better, than placebo in some subgroups.
- On a functional scale, which might indicate recovery that is more useful to the patient, naloxone appears better than methylprednisolone and is nearly significantly better than placebo, in the one subgroup reported.

Despite all this, the article, after summarizing various considerations, concludes sternly that naloxone has no role in the clinical management of the injury. But why?

### Three Interim Reports

Three interim reports (14,44,45) were published in 1992 and 1993 that approximately summarize, in similar ways, the two articles we have just discussed. These articles contain fewer numeric results than the previous ones, and most of these are presented only in graphical figures rather than as numbers.

The primary end point changed from "motor score change" to "percent[age] recovery," which is a different mathematical transformation of the ASIA score. It has a different clinical meaning: A slightly injured patient recovering all of his small motor loss would have only a small "ASIA motor score change," but would have a perfect score of 100% for percentage recovery. Comparing two treatments with respect to one of these transformations is nothing like comparing them with respect to the other transformation, unless the subgroups are carefully defined and controlled. The arcane details of the mathematics can have great clinical significance; thus, it is important to state things carefully and clearly.

These features make it difficult to compare results directly among these three articles (13) and the previous two. Figure 2 of Bracken (45) and Figure 1 of Bracken's other article (44) both seem to correspond to Table 5 of the

*New England Journal of Medicine* article and to Table 5 of the 1-year follow-up article (17). However, based at least on nomenclature, one thing seems clear: The plegic total sensory loss and the paretic variable sensory loss groups are still with us, but the plegic partial sensory loss group seems to have vanished. This is the group in which naloxone appeared to have worked better on motor score change. It is not clear why it has been omitted.

### Summary: NASCIS Reporting on Naloxone

This series of criticisms of the NASCIS reporting on naloxone exemplifies and summarizes the comments we made previously.

- Choices have been made among alternative types of statistical analysis, choices that have important clinical implications but have not been adequately explained and justified. An important example is the choice between a motor score that may express only recovery at the level of the injury and a functional scale that expresses recovery below the injury.
- These choices (for example, between a motor and a functional scale, or among different patient subgroups) can lead to differing conclusions, as they have here. If an analyst simultaneously follows many of these choices, a positive outcome is eventually certain, regardless of whether there is truly a treatment difference. Therefore, a single primary analysis should be unambiguously specified at the beginning of the trial.
- The reporting from NASCIS of numeric results is so spotty, and the scales of measurement (several different versions both of the motor score and of the functional score) and the population subgroups change so frequently that it is impossible for anyone to explore or check the claimed results.
- The primary data are not available to independent observers. The repeated claim that they are available—in the published articles—is simply not true.

### CLINICAL IMPLICATIONS

Methylprednisolone is being used "off label" in SCI; there is no FDA-approved indication for it. This has created an unsatisfactory situation.

Clinically, physicians are left as independent individuals to evaluate the merits of methylprednisolone in patients with different types of SCI. Missing is the public consensus that the FDA approval process normally brings. The state of the scientific evidence is mixed: The statistical presentation has acted as a cloud shielding the primary data from possible alternative interpretations; in any case, the efficacy and safety data are fragmentary when applied to the diversity of SCI patients; and even when there are data, they are far from being as conclusive as NASCIS or the NIH have reported. The FDA would likely have ensured that there were data covering all the main safety and efficacy concerns and would have ensured that the results were codified in a package insert closely reflecting well-established conclusions. Data would have been available in the *Physician's Desk Reference* to guide any physician, whether general practitioner or specialist.

Legally, there is a dilemma for clinicians. The quantity of published information from NASCIS leaves an opening for legal reprisal against physicians who do not use methylprednisolone, even in situations when judgment might suggest they should not. On the other hand, those who do use methylprednisolone are liable for the poorly understood possibilities of adverse events resulting from use of a drug outside of the situations for which there is comprehensive scientific guidance and outside of its FDA-approved indication.

In research, regardless of whether methylprednisolone is as effective as the reports allege it to be, it is not the end of the road. Dr. Bracken (35) himself has written, "There is an urgent need for more randomized trials of pharmacological therapy for acute spinal cord injury . . . Methylprednisolone treatment improves neurological recovery but by no means brings a return to normal function unless there is minimal initial deficit. More research is needed to examine whether different methylprednisolone protocols would achieve even more recovery. Other pharmacologic therapies with different mechanisms of action need to be evaluated."

As professionals, we certainly would like to make further progress in being able to return patients with SCIs to full and useful lives. The ambiguous position of methylprednisolone makes this job more difficult.

### THE ROLE OF THE CLINICAL COMMUNITY

In this review, we have stressed the role of the FDA in ensuring that the development of an approved drug indication reaches a necessary standard of completeness that ties together the community's experience and therefore secures consensus and acceptance. This emphasis should not suggest that we can leave the job solely to the FDA and wait for the results. The clinical community must take responsibility and play an active role in the drug development process, because clinicians have the daily experience that can tie the free-floating abstractions of science to clinical reality.

As we suggested before, it is not enough to assume that results are true because they appear in peer-reviewed journals and are decorated with probability values and statistical jargon. These features are only the clothing of sci-

ence, not its substance. Science is not a matter of acceptable format; it is an attitude of mind, a curiosity, a need to discover the facts of the world as they are.

Clinicians may feel uncomfortable with statistical technicalities. This does not mean that they should abandon their role. On the contrary, they need to demand that statistical reports be explained in clear language that clearly relates scientific results to clinical realities.

Editors often force authors to strip out most of the detailed statistical discussions that would allow the interested reader to explore or replicate the analysis, because they feel that there are few or no readers to read them. We need to realize that, although there may be only a few within the clinical community who can take full advantage of such data to explore the analysis (perhaps working with a statistician to do so), still for any given article, there are some who will be motivated to do so. It is essential to the intellectual health of the community that we make this possible. Editors need to ensure the quality and intelligibility of technical, including statistical, presentations.

Linda R. Cohen and Robert W. Hahn (46) recently published in the Policy Forum section of *Science* a thoughtful call for greater public access to data from studies that have been published in peer-reviewed journals and on which important public policy decisions are to be based.

In answering the question, "Why is availability of the data necessary if we are already protected by peer-review?" Cohen and Hahn cite a study, published in *JAMA* by Godlee, Gale, and Martyn (47), that "gave a paper with eight deliberate errors to 420 people to review. For the 221 reviewers who responded, the maximum number of errors detected was five, the median was two, and 16% of the respondents did not find any."

Although this result might seem surprising at first, further thought suggests that it is doubtless true: A volunteer reviewer for a journal, faced with a paper as complex as the NASCIS reports, without direct contact with reviewers with specific statistical and basic science expertise, and constrained by other time conflicts, would have difficulty being as thorough as an FDA reviewer with a dedicated time commitment working as part of a team.

## CONCLUSIONS

It is imperative that the scientific community have a clearer understanding of the role of methylprednisolone in acute SCI than they have been able to get from the published articles. We are not alone in questioning the unorthodox manner in which methylprednisolone has been gaining a drug indication in SCI (15,24,26–31,48). After 9 years it is difficult to believe that the NASICS group has any intention of clarifying the significant clinical question outlined in this article and elsewhere. Thus, we call on the NASCIS group to post all primary data as public information so that others may finish the data analysis. Furthermore, the procedure for obtaining a drug indication in the United States is very clear—It requires verification and scrutiny by the FDA. There is no excuse for bypassing the FDA. It implies that the FDA would not have granted an indication if an application was submitted. If the NASCIS group continues to refuse to allow independent verification of their reported analysis, then the scientific community should consider the NASCIS conclusions as incomplete and inconclusive.

We are not saying that methylprednisolone is not effective for treatment of SCI; we are saying that we have not been able to determine its efficacy from the published reports. We have been denied the opportunity to use with confidence a drug that many of us were enthusiastic about (49) when reports of the success of NASCIS II first appeared. Since then, excitement has turned to frustration (15,24–31) as the years have gone by; promise has not been followed by public confirmation, and we have been left in an ambiguous clinical, legal, and scientific position.

Collectively, the criticisms of NASCIS have not pointed merely to isolated instances in which one might disagree with particular issues but rather indicate a pervasive failure to meet scientific standards in admitting the possibility of alternatives to the interpretations offered and in providing enough data that independent observers could check them.

### Note

This is an invited review by the listed authors, many of whom serve on the editorial board or do editorial reviews for this journal.

## REFERENCES

1. Cook L, Rowan C, Shaffer S. *National Acute Spinal Cord Injury Study*. Bethesda: National Institute of Neurological Disorders and Stroke (www.ninds.nih.gov), 1990.
2. Cook L, Rowan C. *The Results of a Controlled Multicenter Clinical Trial in the Treatment of Spinal Cord Injury*. Bethesda: National Institute of Neurological Disorders and Stroke (www.ninds.nih.gov), 1990.
3. Walker MD. *New Treatment for Acute Spinal Cord Injury*. Bethesda: National Institute of Neurological Disorders and Stroke (www.ninds.nih.gov), 1990.
4. Leary W. Treatment is said to reduce disability from spinal injury. *The New York Times* 1990;1:26.
5. AP Wire Service. Spine treatment to be publicized. *The New York Times*, A21, 1990.
6. Helms D. New hope for spinal injuries. *Newsweek* 50, 1990.
7. National NYT. Spine treatment to be publicized. *The New York Times National* A21, 1990.
8. Leary W. Delay seen in publicizing spinal drug. *The New York Times* C5, 1990.
9. Weiss R. Drug reduces paralysis after spinal injury. *Science News of the Week* 212, 1990.

10. Kotulak R. Drug reduces paralysis from spinal injuries. *Chicago Tribune* 1, 1990.
11. Larsen N, Clipper S. *Prolonged Treatment with Methylprednisolone Improves Recovery in Spinal Cord Injured Patients*. National Institutes of Health (www.ninds.nih.gov). Bethesda: The National Institutes of Neurological Disorders and Stroke, 1997.
12. Warren M, Oliver N, Thomas A. *Curing Paralysis: A Total NIH Research Effort*. Bethesda: National Institutes of Health (www.ninds.nih.gov), 1996.
13. Bracken MB, Shepard MJ, Collins WF, et al. A randomized, controlled trial of methylprednisolone or naloxone in the treatment of acute spinal-cord injury. Results of the Second National Acute Spinal Cord Injury Study [Comment]. *N Engl J Med* 1990;322:1405–11.
14. Bracken MB, Holford TR. Effects of timing of methylprednisolone or naloxone administration on recovery of segmental and long-tract neurological function in NASCIS 2 [Comments]. *J Neurosurg* 1993;79:500–7.
15. Taylor TK, Ryan MD. Methylprednisolone in the management of acute spinal cord injuries [Letter] [Comments]. *Med J Aust* 1990;153:307–8.
16. Bracken MD. Methylprednisolone in the management of acute spinal cord injuries [Letter] [Comment]. *Med J Aust* 1990;153:368.
17. Bracken MB, Shepard MJ, Collins WF Jr., et al. Methylprednisolone or naloxone treatment after acute spinal cord injury: 1-year follow-up data. Results of the second National Acute Spinal Cord Injury Study [Comments]. *J Neurosurg* 1992;76:23–31.
18. Bracken MB, Shepard MJ, Holford TR, et al. Administration of methylprednisolone for 24 or 48 hours or tirilazad mesylate for 48 hours in the treatment of acute spinal cord injury. Results of the Third National Acute Spinal Cord Injury Randomized Controlled Trial. National Acute Spinal Cord Injury Study. *JAMA* 1997;277;1597–604.
19. Anderson TE, Stokes BT. Experimental models for spinal cord injury research: physical and physiological considerations. *J Neurotrauma* 9 Suppl 1992;1:S135–42.
20. Wrathall JR. Spinal cord injury models. *J Neurotrauma* 1992;9 Suppl 1:S129–34.
21. Tator CH. Hemodynamics issues and vascular factors in acute experimental spinal cord injury. *J Neurotrauma* 1992;9:139–40; discussion 141.
22. Nockels R, Young W. Pharmacologic strategies in the treatment of experimental spinal cord injury. *J Neurotrauma* 1992;9 Suppl 1:S211–7.
23. Shapiro SA. Methylprednisolone for spinal cord injury [Letter] [Comment]. *J Neurosurg* 1992;77:324; discussion 325–7.
24. Ducker TB. Medical treatment in spinal cord injuries [Editorial]. *J Spinal Disord* 1996;9:381.
25. Hardy R. Commentary on Spinal Cord Injury: Role of Steroid Therapy. *Neurosurg Q* 1996;6:71–2.
26. Rosner MJ. National acute spinal cord injury study of methylprednisolone or naloxone [Letter]. *Neurosurg* 1991;28:628–9.
27. Rosner MJ. Methylprednisolone for spinal cord injury [Letter] [Comment]. *J Neurosurg* 1992;77:324–5; discussion 325–7.
28. Rosner MJ. Treatment of spinal cord injury [Letter] [Comment]. *J Neurosurg* 1994;80:954–5.
29. Ducker TB, Zeidman SM. Spinal cord injury. Role of steroid therapy. *Spine* 1994;19:2281–7.
30. Hanigan WC, Anderson RJ. Commentary on NASCIS-2. *J Spinal Disord* 1992;5:125–31; discussion 132–3.
31. Nesathurai S. Steroids and spinal cord injury: revisiting the NASCIS 2 and NASCIS 3 trials. *J Trauma* 1998;45:1088–93.
32. Geisler F. *Past and Current Human Spinal Cord Injury Drug Trials:* In: BC Benzel CT, ed: Rossmont, IL: American Association of Neurological Surgeons Publication Committee: 261–268, 1995.
33. Geisler FH. Clinical trials of pharmacotherapy for spinal cord injury. *Ann NY Acad Sci* 1998;845:374–81.
34. Otani K, AH, Kadoya S, et al. Beneficial effect of methylprednisolone sodium succinate in the treatment of acute spinal cord injury. *Sekitsui Sekizui J* 1994;7:633–47.
35. Bracken M. *Pharmacological interventions for acute spinal cord injury*. The Cochrane Library. Chicago: Cochrane Reviews, 1999.
36. George ER, Scholten DJ, Buechler CM, Jordan-Tibbs J, Mattice C, Albrecht RM. Failure of methylprednisolone to improve the outcome of spinal cord injuries. *Am Surg* 1995;61:659–63; discussion 663–4.
37. Galandiuk S, Raque G, Appel S, Polk HC, Jr. The two-edged sword of large-dose steroids for spinal cord trauma. *Ann Surg* 1993;218:419–25; discussion 425–7.
38. Gerndt SJ, Rodriguez JL, Pawlik JW, et al. Consequences of high-dose steroid therapy for acute spinal cord injury. *J Trauma* 1997;42:279–84.
39. Prendergast MR, Saxe JM, Ledgerwood AM, Lucas CE, Lucas WF. Massive steroids do not reduce the zone of injury after penetrating spinal cord injury. *J Trauma* 1994;37:576–9; discussion 579–80.
40. Levy ML, Gans W, Wijesinghe HS, SooHoo WE, Adkins RH, Stillerman CB. Use of methylprednisolone as an adjunct in the management of patients with penetrating spinal cord injury: outcome analysis. *Neurosurg* 1996;39:1141–8; discussion 1148–9.
41. Constantini S, Young W. The effects of methylprednisolone and the ganglioside GM1 on acute spinal cord injury in rats. *J Neurosurg* 1994;80:97–111.
42. Guyatt GH, Sackett DL, Cook DJ. Users' guides to the medical literature. II. How to use an article about therapy or prevention. B. What were the results and will they help me in caring for my patients? Evidence-Based Medicine Working Group. *JAMA* 1994;271;59–63.
43. Farooque M, Hillered L, Holtz A, Olsson Y. Effects of methylprednisolone on extracellular lactic acidosis and amino acids after severe compression injury of rat spinal cord. *J Neurochem* 1996;66:1125–30.
44. Bracken MB. Pharmacological treatment of acute spinal cord injury: current status and future prospects. *Paraplegia* 1992;30:102–7.
45. Bracken MB. Pharmacological treatment of acute spinal cord injury: current status and future projects. *J Emerg Med* 1993;11 Suppl 1:43–8. 1993.
46. Cohen L, Haha R. A solution to concerns over public access to scientific data. *Science* 1999;285:535–6.
47. Godlee F, Gale CR, Martyn CN. Effect on the quality of peer review of blinding reviewers and asking them to sign their reports: a randomized controlled trial. *JAMA* 1998;280:237–40.
48. Heary RF, Vaccaro AR, Mesa JJ, et al. Steroids and gunshot wounds to the spine [Comments]. *Neurosurg* 1997;41:576–83; discussion 583–4.
49. Ducker TB. Treatment of spinal-cord injury [Editorial] [Comment]. *N Engl J Med* 1990;322:1459–61.